IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PETITION OF FRESCATI SHIPPING COMPANY, LTD., as Owner of the M/T ATHOS I and TSAKOS SHIPPING & TRADING, S.A., as Manager of the ATHOS I for Exoneration from or Limitation of Liability | : : : : : : : | CIVIL ACTION<br><br><br><br><br><br>NO. 05-cv-00305-JF |
| UNITED STATES OF AMERICA<br><br>v.<br><br>CITGO ASPHALT REFINING COMPANY, CITGO PETROLEUM CORPORATION, and CITGO EAST COAST OIL CORPORATION | : : : : : : : | CIVIL ACTION<br><br><br><br><br><br>NO. 08-CV-02898-JF |

**ADJUDICATION**

Fullam, Sr. J.                                              April 12, 2011

On November 26, 2004, the single-hulled tanker *ATHOS I* was traveling up the Delaware River, nearing the end of a 1900-mile journey from Puerto Miranda, Venezuela to Paulsboro, New Jersey. Approximately 900 feet from the dock of the refinery where it was to discharge its cargo, the tanker struck a submerged nine-ton object that ripped two holes in the hull. Some 200,000 barrels of heavy crude oil spilled into the river, with devastating ecological results. The United States government launched a multi-agency response to the disaster, at great cost but with marked success. The issue to be decided by this Court, one explored in exhaustive detail during 41 days of a non-jury trial, is whether the companies associated with the

refinery, CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (collectively, "CARCO") may be held responsible for the clean-up costs and the losses associated with the damage to the ship. For the reasons explained below, I conclude that they may not. I have set forth in narrative fashion my findings of fact (as determined by a preponderance of the credible evidence) and conclusions of law.

## The Litigation

On January 21, 2005, Frescati Shipping Company, Ltd., as owner of the *M/T ATHOS I,* and Tsakos Shipping & Trading, S.A., as manager of the *ATHOS I* (collectively, "Frescati") filed a "Petition for Exoneration from or Limitation of Liability" pursuant to 46 U.S.C. § 183, in connection with claims by the government or others affected by the spill. In the limitation action, filed at Civil Action No. 05-305, CITGO Asphalt Refining Company filed a claim for damages associated with the spill (as did others), and Frescati filed a counterclaim against all three CARCO entities. The United States government later filed a separate action against CARCO at Civil Action No. 08-2898. Frescati and the government resolved their differences, and many claims were settled through administrative proceedings. The trial before the Court comprised all claims by Frescati and the government against CARCO. As the government's claims are based

upon its status as statutory subrogee to the contract-based claims raised by Frescati, they will not be discussed separately.

## The Ship, the Contracts, and the Cargo

The *ATHOS I* was a Panamax-sized tanker[1] with a beam of 105 feet, six inches, and a length of 748 feet. It sailed under the flag of Cyprus and was chartered by Frescati to Star Tankers, Inc., as part of a pooling agreement or time charter. Star Tankers chartered the ship to CARCO with the terms summarized on a "Fixture Recap" dated November 12, 2004. The Fixture Recap incorporated the standard industry form known as "ASBATANKVOY" and included additional terms; it did not specify the port other than as a "safe port" in the United States or the Caribbean. On November 15, 2004, the master of the *ATHOS I*, Captain Iosif Markoutsis, received a "Fixture Note" that confirmed the ship would discharge at a safe port in the United States. The load port was designated as Puerto Miranda, Venezuela.

Star Tankers and CARCO executed a formal "Charter Party," dated November 12, 2004, with an addendum dated December 8, 2004 providing that the laws of the United States govern the contract. The Charter Party (sometimes referred to as a "Voyage Subcharter") was prepared on the standard ASBATANKVOY form and

---

[1] A Panamax-sized ship is one that is the maximum size able to sail through the Panama Canal.

included warranties that the vessel would proceed to the discharging port "or so near thereunto as she may safely get (always afloat) and deliver said cargo," and that the vessel would discharge "at any safe place or wharf" designated by the Charterer, "provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat." Ex. P-357.

Upon arriving at Puerto Miranda, the *ATHOS I* loaded slightly more than 300,000 barrels of heavy crude oil from facilities owned by PDVSA Petroleo, S.A. (the parent company of CARCO). As loading was completed, Captain Markoutsis was presented with the bill of lading for the voyage. The front of the bill of lading form contained spaces for certain information to be filled in for the specific voyage. In the spaces available for the insertion of information concerning the Charter Party, the word "NIL" (meaning "nothing") appeared several times.

The reverse side of the bill of lading included a series of preprinted clauses, one of which specified that English law would govern any disputes. The bill of lading also included language that the cargo was "to be delivered at the Port of Paulsboro, New Jersey, or, so near thereto as the vessel can safely get, always afloat . . . ." Ex. P-375.

Captain Markoutsis signed the bill of lading on November 19, 2004, but also issued two letters of protest dated the same day. One letter noted a discrepancy of 310.53 barrels

between the vessel's records and the bill of lading, Ex. P-381, and the other protested that the bill of lading did not record the date of the Voyage Subcharter of November 12, 2004, which the master requested that PDVSA Petroleo record on the original bills of lading, Ex. P-380.  The *ATHOS I* left Puerto Miranda on November 20, 2004.

## The Site of the Casualty

At approximately 9:02 p.m. on November 26, 2004, the Delaware River docking pilot was on board the *ATHOS I* and tug boats were maneuvering into position when the ship began to list to the port side and oil was observed in the water.  The *ATHOS I,* although damaged, remained afloat; it did not run aground at any point.  The cause of the disaster is uncontested to the extent that all parties agree that the *ATHOS I* struck a submerged object.  Although the object is always referred to as an anchor, the shank had been removed at some point before the object was deposited in the river, so that it could not be used as a ship's anchor (and, because any identifying marks would have been on the shank, its owner could not be traced).  No evidence as to how the anchor came to rest in the river was proffered at trial, but there is supposition that it may have been used as part of dredging operations.  There is no evidence that any party to this litigation – Frescati, CARCO, or the government – knew or had

reason to believe that the anchor was in the river, although it is well-known that all sorts of objects that present a potential danger to navigation lurk beneath the surface of the waters. The parties stipulated that the anchor had been in the river since at least 2001, as close examination of a sonar scan conducted that year by researchers from the University of Delaware reveals the anchor in approximately the same spot where the *ATHOS I* came to grief, in an area of the Delaware River known as Federal Anchorage No. 9 or the Mantua Creek Anchorage ("the Anchorage").[2]

By federal law, the United States Army Corps of Engineers bears the responsibility of keeping the Anchorage dredged to a depth of 40 feet, lest it become too shallow for commercial navigation. The testimony at trial was to the effect that the government does not regularly survey the Anchorage for possible hazards to navigation, but that if a hazard is brought to the government's attention it will be removed if feasible, or mariners will be notified of its location.

At trial, each side blamed the other for the casualty. The plaintiffs contend that CARCO is liable in tort under the theories of wharfinger negligence and misrepresentation, because CARCO failed to survey for obstructions into the Anchorage and because CARCO failed to notify the crew of the *ATHOS I* that CARCO

---

[2] The Anchorage is approximately 2.2 miles long from north to south. N.T. Nov. 10, 2010 at 68 (P. Myhre).

recently had determined that the maximum draft (i.e., the distance from the bottom of the ship to the surface of the water) that would be accepted at its berth had been reduced from 38 feet to 36 feet. The *ATHOS I* had a draft of at least 36 feet, six inches, and thus, according to the plaintiffs, had Captain Markoutsis known of the change, the *ATHOS I* either would not have attempted to reach the berth, would have attempted to decrease the ship's draft before moving upriver, or would have scheduled the passage to arrive at high tide. Frescati also argues that CARCO is liable under the Charter Party and the bill of lading on various contract and warranty theories.

The defendants argue that the blame lies with Frescati (because the *ATHOS I* was in poor condition, its draft was significantly more than 36 feet, six inches, and its crew failed to engage in proper voyage planning that would have brought the ship in at the proper stage of the tide); with the government (because the Anchorage is solely its responsibility); or with the unknown former owner of the anchor (because the hazard to navigation was abandoned without notifying anyone).

After carefully considering all of the evidence, I conclude that CARCO is not liable in either tort or contract.

The Tort Claims

*Negligence*

The government maintains, correctly, that it has no statutory or regulatory duty to scan the Anchorage for hazards to navigation (although it may have assumed a duty through course of conduct, see Japan Line, Ltd. v. United States, 1976 AMC 355 (E.D. Pa. 1975), *aff'd* 1977 AMC 265 (3d Cir. 1976)). The absence of a duty on the part of the government, however, does not mean that a duty then falls upon CARCO.

"It is well settled that a terminal operator such as [CARCO] does not guarantee the safety of vessels coming to its docks." In re Complaint of Nautilus Motor Tanker Co., 862 F. Supp. 1260, 1275 (D.N.J. 1994) (citation omitted), *aff'd,* 85 F.3d 105 (3d Cir. 1996). CARCO does have the duty to furnish a safe berth, including determining whether there are hidden hazards that it could have located with the exercise of reasonable care and inspection. Id. CARCO did inspect its berth; beyond that

> "there is no duty on the part of the wharfinger to provide a berth with safe surroundings (other than an entrance and exit) or to warn that hazards exist in its vicinity . . . ." [Trade Banner Line, Inc. v. Caribbean Steamship Co., 521 F.2d 229, 230 (5th Cir. 1975)]. The duty to provide a safe berth and approach does not create a duty to make safe "adjacent areas." [Sonat Marine, Inc. v. Belcher Oil Co., 629 F. Supp. 1319, 1327 (D.N.J. 1985), *aff'd,* 787 F.2d 583)].

8

Id. Frescati argues that the location of the casualty was within the approach to the berth because ships berthing at the CARCO terminal naturally would traverse the area where the anchor was found. See P. Dougherty Co. v. Bader Coal Co., 244 F. 267, 270 (D. Mass. 1917) (a case in which the ship grounded five or six feet from the dock). But the definition of "approach" that Frescati urges the Court to adopt is unreasonably expansive. Although the docking pilot was aboard the *ATHOS I*, the ship was in an area of the Anchorage open for the passage of all ships, not an area used exclusively, or even primarily, by vessels docking at the Paulsboro refinery. From 2000 to 2004, a total of 673 vessels anchored in the Anchorage (including repeat visits from the same vessel), and in 2004 alone, 121 different cargo vessels anchored in the Anchorage. N.T. Nov. 10, 2010 at 47, 53 (P. Myhre). In 2004, 42 vessels docked at CARCO's terminal (including repeat visits from the same vessel). Ex. D-586. Although not all of these ships would have passed through the area that Frescati contends CARCO should have scanned, the volume of traffic illustrates that CARCO had no control over the use of the Anchorage. To accept Frescati's argument would have the effect of potentially expanding the definition of "approach" to the entire Anchorage or to the entire Delaware River. A more reasonable definition of "approach" is the area "immediately adjacent" to the berth or within "immediate access" to the berth.

9

Western Bulk Carriers, K.S. v. United States, Civ. S-97-2423, 1999 U.S. Dist. LEXIS 22371, at *19-21 (E.D. Cal. Sept. 14, 1999) (citing cases). Under these definitions, the Anchorage was not within the approach to CARCO's berth, and CARCO did not have the legal obligation to survey there.

Frescati also argues that CARCO could have scanned the relevant area of the Anchorage for as little as $10,000, and that such a scan would have detected the presence of the anchor that posed a danger to the *ATHOS I*, a single-hulled tanker that CARCO invited to its berth. Frescati asks the Court to apply the formula first stated by Judge Learned Hand in United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947), by weighing whether the burden of adequate precautions is less than the gravity of the injury discounted by the probability that the injury will occur. See In re City of New York, 522 F.3d 279, 284 (2d Cir. 2008). Judge Hand's formula does not seem to have been accepted in this Circuit, but in any event I do not find it useful here. So far as the evidence at trial shows, neither industry custom nor government regulation would have put CARCO on notice that it should scan into the Anchorage. I am not convinced that had the area been scanned the anchor would perforce have been detected, and although the gravity of the injury is undoubtedly severe, I cannot find that the burden of adequate precautions falls upon CARCO rather than upon the

government or upon whoever abandoned the anchor. I thus conclude as a matter of law that CARCO had no duty to scan for hazards within the Anchorage and is not responsible for the harm caused by the anchor.[3]

*Misrepresentation*

William Rankine, CARCO's Senior Port Captain at Paulsboro in 2004, made the decision to lower the acceptable draft at the berth from 38 feet to 36 feet on November 22, 2004. Frescati argues that the failure to notify the *ATHOS I* of this change constituted a material misrepresentation upon which the ship's captain relied to the plaintiffs' detriment, because the ship, with a draft of more than 36 feet, six inches, would not have attempted to reach the berth or would have traveled at a different stage of the tide.

The evidence shows that the decisions regarding the timing of the Delaware River passage were made by the *ATHOS I*, not CARCO. The decision to change the draft at the berth was not made in anticipation of the arrival of the *ATHOS I* but because the refinery's "season" was ending (the *ATHOS I* was the last ship scheduled to arrive at Paulsboro until the following spring); the

---

[3] In so holding, I find unpersuasive Frescati's citation to New Jersey law governing the liability of business owners. This case is governed by maritime principles, and the cases cited are insufficiently analogous.

change was an internal one made in expectation of the end of the season, to allow the maintenance crew to perform dredging if necessary. N.T. Nov. 22, 2010 at 16-18, 39, 47 (W. Rankine). The change of the controlling draft did not in any way affect the depth of the water at the berth; nor did it affect the berthing window (the stage of the tide at which ships could berth safely). More important, the decision was based on CARCO's concern over increased silting outside of the area where the ship would float when lying at the berth, an area also outside of the Anchorage. N.T. Nov. 22, 2010 at 42 (W. Rankine). In other words, the area of concern was not the area where the casualty occurred and the draft at the berth was factually irrelevant to the casualty.

Accordingly, even if the change in draft and the non-communication of it to Frescati constituted a misrepresentation, which I do not find, it would not have been a material misrepresentation and it did not cause the loss. See Nautilus Motor Tanker Co., 862 F. Supp. at 1270 ("Since there is no nexus between what did or did not happen in the ship berth and the accident, the shoaling [in the berth] and its cause are irrelevant."). The same is true of any other information that Frescati claims should have been provided by CARCO. To the extent that Frescati attempts to recast these claims as a breach of an express or implied warranty, I find that no warranty was breached, and that the berth was safe for the *ATHOS I*.

## The Contract Claims

Frescati (and the government as its subrogee) also claim that CARCO is liable under contract. Both the Charter Party and the bill of lading include what are commonly known as safe port and safe berth warranties, where the designated port or berth is one that the ship can reach, safely afloat. Frescati, which is not a party to the Charter Party, seeks to invoke the safe port and safe berth clauses of that contract as an intended third-party beneficiary. In this case, there was no testimony from representatives of either CARCO or Star Tankers that Frescati was an intended third-party beneficiary of the contract. Star Tankers, not Frescati, assumed the role of owner of the *ATHOS I* for purposes of the voyage. There was also testimony to the effect that Frescati and Star Tankers are engaged in an arbitration in London over Frescati's claims for damage to the *ATHOS I*, persuasive evidence that Frescati has its own contractual remedy, rather than status as a third-party beneficiary. Nor do I find persuasive Frescati's argument that because the Charter Party included a provision that the master would sign bills of lading in the form set forth in the Charter Party (requiring that the shipment would be carried pursuant to the terms of the Charter Party), Frescati became a beneficiary of the Charter Party or can rely upon the bill of lading.

In maritime cases, a bill of lading may function as a contract or simply as a receipt, depending upon the circumstances. When the bill of lading is negotiated to a third party not subject to the terms of a charter party, the bill of lading may become a contract of carriage. See Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 823-24 (2d Cir. 2006). Here, the shipper was PDVSA Petroleo, which arguably negotiated the bill of lading to CARCO, but as CARCO was a party to the Charter Party, the bill of lading did not then become a contract. Frescati also argues, however, that Captain Markoutsis signed the bill of lading and endorsed it with the ship's seal, manifesting an intent to sign on behalf the vessel's owners. I do not find that the evidence, including the testimony of Captain Markoutsis, supports this argument.

Moreover, even if Frescati did have the benefit of the safe port and safe berth warranties, I find that CARCO did not breach any contractual warranties.[4] I do not agree with the cases cited by Frescati that would interpret the warranties as an unconditional guarantee, in effect imposing strict liability upon the wharfinger. Instead, I find more persuasive the view of the Court of Appeals for the Fifth Circuit that "a charter party's

---

[4] The parties dispute whether English or U.S. law applies. I find that the choice of law does not affect the result, but for purposes of this discussion I have accepted Frescati's position that U.S. law applies.

safe berth clause does not make a charterer the warrantor of the safety of a berth. Instead the safe berth clause imposes upon the charterer a duty of due diligence to select a safe berth." Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1156-57 (5th Cir. 1990). CARCO fulfilled its duty of due diligence, and I also find that the port and berth were generally safe. Hundreds of vessels anchored in the Anchorage during the time the anchor is known to have been in the river. Although it is not possible to determine exactly how many ships passed over the anchor's location, nonetheless, the volume of commercial traffic that passed without incident through the Anchorage suggests that the port is safe. With regard to the CARCO berth specifically, during 2004, vessels docked at Paulsboro 42 times. Ex. D-586. On 25 occasions, vessels either arrived or departed from the CARCO berth with a draft of at least 36 feet, six inches, without incident. N.T. Nov. 22, 2010 at 16 (W. Rankine). One vessel, the *NEW RIVER*, arrived on November 16, 2004, just days before the *ATHOS I*, with a draft of 36 feet, 11 inches, and departed with a draft of 37 feet, three inches. The *NEW RIVER* completed loading just before low water and sat at the berth through low water without any problem. N.T. Nov. 22, 2010 at 44-45 (W. Rankine). Based on the evidence, I conclude as a matter of law that the port and the berth were safe for commercial tankers with a draft

of 36 feet, seven inches, which Frescati maintains was the draft of the *ATHOS I.*

I am also persuaded by CARCO's argument that the named-port exception precludes a finding of liability pursuant to the warranties. Under this doctrine, "[w]hen a charter names a port [or berth] and the master proceeds there without protest, the owner accepts the port [or berth] as a safe port, and is bound to the conditions that exist there." Bunge Corp. v. M/V FURNESS BRIDGE, 558 F.2d 790 (5th Cir. 1977). Frescati argues that the existence of the anchor was not "reasonably foreseeable" and thus the named port doctrine does not apply. See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 387 (2d Cir. 2003).

I conclude that Frescati was sufficiently familiar with the port. Between April 1, 1998 and December 9, 2004, 14 vessels operated by Tsakos called at the Paulsboro refinery (including the *ARAMIS*, sister ship to the *ATHOS I*)[5] and a total of 70 Tsakos-operated vessels came into the Delaware River. N.T. Nov. 10, 2010 at 45-46 (P. Myhre). Although the anchor itself was not known to Frescati, the existence in general of lost or abandoned objects in the river was well disseminated through notices to mariners. Accordingly, even if Frescati can claim the benefit of

---

[5] Other Tsakos ships referenced during the trial included the *PORTHOS* and the *D'ARTAGNON*.

the safe port and safe berth warranties, CARCO did not breach the warranties and neither Frescati nor the government can recover in contract.

## Notes on Other Evidence

The parties devoted much time at trial to questions that I have found unnecessary to my decision, including the questions of whether the *ATHOS I* violated various laws and regulations such that it was responsible for the casualty; whether the *ATHOS I* had sufficient under-keel clearance (the distance from the bottom of the ship to the riverbed), as determined in part by whether the anchor was in a "flukes up" or "flukes down" position, etc. Because it may be of some use to the parties, I add the following comments. With regard to the position of the anchor, I found most of the expert testimony, particularly the evidence of computer "modeling", unpersuasive. The most useful evidence regarding the anchor's position came from Peter Traykovski, who analyzed sonar scans and concluded that the anchor was lying with its flukes down both in 2001 and after the casualty, which is persuasive evidence that the anchor tended to remain in that position, rather than at a 65° angle with the flukes up. Although it is safe to say that the crew of the *ATHOS I* did not devote the care and attention to preparation of the voyage planning that might have been advisable, I am not

persuaded that these errors caused the ship to strike the anchor. After hearing all of the evidence, I am of the opinion that the fault for the casualty lies with the anchor's former owner, who abandoned it in the river without notifying anyone.  Finally, although I did not reach the issue of damages, I note that the testimony of the witnesses was compelling with regard to the complexity and difficulty of the oil spill response, and that costs were monitored to the best extent possible under the circumstances.

## Conclusion

I have considered all of the arguments in favor of liability against CARCO raised by Frescati and the government, and to the extent that any are not addressed specifically in this adjudication they have been rejected.

Appropriate orders will be entered.


BY THE COURT:


/s/ John P. Fullam
John P. Fullam,     Sr. J.