# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE PETITION OF FRESCATI SHIPPING COMPANY, LTD., as Owner of the M/T ATHOS I, and TSAKOS SHIPPING & TRADING, S.A., as managers of the ATHOS I, for Exoneration from or Limitation of Liability | ) ) ) ) ) ) ) | Civil Action No. 05-305<br><br><br>(THE HONORABLE JOEL H. SLOMSKY) |
| UNITED STATES OF AMERICA, <br>                    Plaintiff, <br>      v. <br>CITGO ASPHALT REFINING COMPANY, <br>CITGO PETROLEUM CORPORATION, and <br>CITGO EAST COAST OIL CORPORATION, <br>                    Defendants. | ) ) ) ) ) ) ) ) ) | Civil Action No. 08-2898<br><br>(THE HONORABLE JOEL H. SLOMSKY)<br><br>THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED |

## FRESCATI PLAINTIFFS' PRE-HEARING BRIEF ON THE ISSUE OF DAMAGES

3826551v8

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  SUMMARY .......................................................................................................... 1

    A.  Frescati Seeks an Award of $55,497,375.95 in Damages, Plus Pre-Judgment Interest .................................................................................. 1

II.  LEGAL STANDARD .......................................................................................... 3

III.  DAMAGES CATEGORIES ................................................................................ 4

    A.  OPA Removal Costs ................................................................................ 4

        1.  Frescati Seeks $45,317,511 in Damages for OPA Removal Costs ............ 4

        2.  Witnesses and Exhibits Supporting the OPA Removal Costs ................. 5

            a.  Jason Roussel ..................................................................... 5

            b.  Ben Benson ......................................................................... 5

            c.  USCG Capt. Roger Laferriere (Retired) ....................................... 7

            d.  Thomas Morrison ................................................................. 8

            e.  Donna Hellberg .................................................................... 9

            f.  Steve Kegelman (By Deposition Designations) ........................... 10

        3.  CARCO's Challenge to the OPA Removal Costs Claim........................ 11

            a.  CARCO Does Not Dispute $93,753,955.89 in OPA Removal Costs ....................................................................... 11

            b.  Legal Standard Mitigation of Damages .................................... 12

            c.  Frescati Acted Reasonably In Responding to the Spill............... 14

                 (1)  Frescati Cost-Effectively Managed The Spill Response ..................................................... 15

                 (2)  Frescati Also Took Reasonable and Appropriate Steps to Control Spill Response Costs ........................... 16

                 (3)  Frescati's Spill Management Team Adequately Verified the Deployment of Labor, Equipment, and Materials ................................................................ 18

        4.  CARCO's Lone Witness Challenging the Reasonableness of Frescati's Conduct in Managing the Spill Response .............................. 19

            a.  McLellan's Inexperience ....................................................... 20

            b.  McLellan Conducted a "Post-Mortem" Review ........................ 20

            c.  McLellan Failed to Provide Back-Up Data for His "Discrepancies".................................................................... 22

3826551v8

# <u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

|   |   |   |   |   |
|---|---|---|---|---|
| | | d. | On the Stand, McLellan Offered Never-Before-Seen Exhibits | 23 |
| | | e. | McLellan's Credibility is Impeached by His Testimony in K-Sea | 24 |
| | B. | | Frescati Seeks $1,541,597.79 for Non-OPA Response Costs | 25 |
| | | 1. | CARCO Does Not Dispute $501,690.39 in Non-OPA Response Costs | 26 |
| | | 2. | Costs Incurred by Frescati to Manage Third-Party Claims and to Clean and Decontaminate Recreational Boats Soiled by the Spilled Oil | 27 |
| | | 3. | Costs Incurred by Frescati to Remove the Anchor and Pump Casing from the River Bed | 29 |
| | C. | | Frescati Seeks $1,500,000 for the Salem Nuclear Settlement | 29 |
| | D. | | Frescati Seeks $438,542.25 in Damages for Unrepaired Hull Damages | 30 |
| | E. | | Frescati Seeks $50,642.01 in Damages for Vessel/ Miscellaneous Port Expenses | 31 |
| | F. | | Stipulated Damages – $6,649,082.90 | 32 |
| | G. | | CARCO Failed to Offer a Tangible Challenge to Frescati's Extensive Evidence on Damages | 32 |
| IV. | | | PREJUDGMENT INTEREST | 34 |
| | A. | | Prejudgment Interest Is Available to a Successful Admiralty Plaintiff | 34 |
| | B. | | The U.S. Prime Rate of Interest is the Appropriate Interest Rate to Apply to Frescati's Damage Award | 36 |
| | C. | | April 1, 2005 is an Appropriate Commencement Date for the Award of Interest | 38 |

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Aircraft Guar. Corp. v. Strato-Lift, Inc.*,
  991 F. Supp. 735 (E.D. Pa. 1998) ....................................................................14

*The Amiable Nancy*, 16 U.S. 546 (1818) ...................................................................34

*The B. F. Guinan*, 40 F.2d 277, 280, 1930 A.M.C. 219 (E.D.N.Y. 1930).........................30, 31, 32

*Matter of Bankers Trust Co.*,
  658 F.2d 103 (3d Cir. 1981)...........................................................................34

*Beech Aircraft Corp. v. Rainey*,
  488 U.S. 153 (1988)........................................................................................10

*Bosnor, S.A. v. L. A. Barrios*,
  796 F.2d 776 (5th Cir. 1986) ..........................................................................33

*Bostick v. ITT Hartford Grp., Inc.*,
  82 F. Supp. 2d 376 (E.D. Pa. 2000) ..................................................................3

*BP Exploration & Oil, Inc. v. Moran Mid-Atl. Corp.*,
  147 F. Supp. 2d 333 (D.N.J. 2001) ..............................................................13, 36

*Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*,
  950 F. Supp. 904 (E.D. Wis. 1996).................................................................36

*City of Chicago v. M/V Morgan*,
  248 F. Supp. 2d 759 (N.D. Ill. 2003) ...............................................................37

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*,
  515 U.S. 189 (1995).....................................................................................34, 35

*Continental Sweden Corp. v. M.P. Howlett, Inc.*,
  719 F. Supp. 1202 (S.D.N.Y. 1989).................................................................33, 34

*Del. River & Bay Auth. v. Kopacz*,
  584 F.3d 622 (3d Cir. 2009)............................................................................34

*Del. River Tow, LLC v. Nelson*,
  382 F. Supp. 2d 710 (E.D. Pa. 2005) ..............................................................34

*Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister*,
  1994 WL 320328 (S.D.N.Y. June 29, 1994) ......................................................3

## TABLE OF AUTHORITIES

(continued)

**Page**

*Fiat Motors of North America, Inc. v. Mellon Bank, N.A.,*
   827 F.2d 924 (3d Cir. 1987)..........................................................................13, 14

*Gardner v. The Calvert,*
   253 F.2d 395 (3d Cir. 1958)..........................................................................34

*Gatlin Oil Co. v. United States,*
   169 F.3d 207 (4th Cir. 1999) .......................................................................10

*Hewlette v. Barge Bertie,*
   418 F.2d 654 (4th Cir. 1969) .......................................................................30

*Indep. Bulk Transp., Inc. v. Vessel Morania Abaco,*
   676 F.2d 23, 1982 A.M.C. 1535 (2d Cir. 1982) ......................................30, 36, 37

*Koppers v. Aetna Casualty & Surety Co.,*
   98 F.3d 1440 (3d Cir. 1996)..........................................................................12, 13

*M & O Marine, Inc. v. Marquette Co.,*
   730 F.2d 133 (3d Cir. 1984)..........................................................................35

*McElyea v. Navistar Int'l Transp. Corp.,*
   788 F. Supp. 1366 (E.D. Pa.) *aff'd sub nom. McElyea v. Cooper Tire &*
   *Rubber Co.,* 950 F.2d 723 (3d Cir. 1991) ................................................13

*Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.,*
   756 F.3d 825, 833 (5th Cir. 2014) ..............................................................14

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.,*
   924 F. Supp. 1436 (E.D. Va. 1996) ............................................................37

*Matter of Oil Spill by Amoco Cadiz,*
   954 F.2d 1279 (7th Cir. 1992) ....................................................................36, 37

*Orduna S.A. v. Zen-Noh Grain Corp.,*
   913 F.2d 1149 (5th Cir. 1990) ....................................................................34

*Probo II London v. Isla Santay MV,*
   92 F.3d 361 (5th Cir. 1996) ........................................................................35

*Prusky v. RellaStar Life Ins. Co.,*
   532 F.3d 252 (3d Cir. 2008)..........................................................................14

*Reeled Tubing, Inc. v. M/V Chad G,*
   794 F.2d 1026 (5th Cir. 1986) ....................................................................3, 34

-iv-

## TABLE OF AUTHORITIES
(continued)

*S. J. Groves & Sons Co. v. Warner Co.,*
    576 F.2d 524 (3d Cir. 1978) ............................................................................12, 13

*SNCO Barge Lines, Inc. v. Sun Transp. Co., Inc.,*
    775 F.2d 221 (8th Cir. 1985) ..................................................................................35

*Toyota Indus. Trucks U. S. A., Inc. v. Citizens Nat. Bank of Evans City,*
    611 F.2d 465 (3d Cir. 1979)....................................................................................14

*Transorient Navigators Co. v. M/S Southwind,*
    788 F.2d 288 (5th Cir. 1986) ..................................................................................35

*U.S. Fire Ins. Co. v. Allied Towing Corp.,*
    966 F.2d 820 (4th Cir. 1992) ..................................................................................35

*United States v. Shipowners & Merchants Tugboat Co.,*
    205 F.2d 352, 1953 A.M.C. 1259 (9th Cir. 1953) ..................................................30

*Vici Racing, LLC v. T-Mobile USA, Inc.,*
    763 F.3d 273 (3d Cir. 2014)........................................................................3, 13, 32

*Yarmouth Sea Prods. Ltd. v. Scully,*
    131 F.3d 389, 1998 A.M.C. 825 (4th Cir. 1997) ..................................................30

**Statutes**

33 U.S.C. §2702 ............................................................................................................4

33 U.S.C. §2704 ............................................................................................................4

33 U.S.C. §2701 ............................................................................................................4

**Other Authorities**

33 C.F.R. §136.205 ......................................................................................................10

33 C.F.R. §136.203 ...................................................................................................9, 11

Dan B. Dobbs, *Handbook on the Law of Remedies* 187 (1973) .................................13

Dan B. Dobbs, *Handbook on the Law of Remedies* 885 (1993) .................................12

FRE 803(8)....................................................................................................................10

**TABLE OF AUTHORITIES**
(continued)

**Page**

Stanley A. Millan, *Escaping the "Black Hole" in the Gulf*, 24 Tul. Envtl. L.J. 41,
    64-65 (2010)..................................................................................................................10

Steven W. Feldman, *Autonomy and Accountability in the Law of Contracts: A
Response to Professor Shiffrin*, 58 Drake L. Rev. 177, 241 (2009) .......................................13

3826551v8

I.      **SUMMARY**

A.      **Frescati Seeks an Award of $55,497,375.95 in Damages, Plus Pre-Judgment Interest**

Frescati Shipping Company, Ltd. and Tsakos Shipping and Trading, S.A. (collectively "Frescati") seeks a joint and several award of damages against the defendants (collectively "CARCO") for eight categories of costs and expenses:  1) OPA Removal Costs; 2) Non-OPA Response Costs; 3) the Salem Plant Settlement; 4) Unrepaired Hull Damage; 5) Vessel/Misc. Port Expenses; 6) Hull Damage; 7) Loss of Hire; and 8) Natural Resource Damages, for a total of $55,497,375.95.  CARCO has not offered any evidence or witnesses to challenge a number of these damage categories (categories 3, 4, 5, 6, 7 and 8), but through its lone expert, William McLellan, has advanced a mitigation of damages defense for two of the categories (categories 1 and 2).  Without any evidentiary support, CARCO also puts forward legal challenges to another two categories (categories 3 and 4).  The following table provides an overview of the damages Frescati and the United States (by virtue of its subrogation position) seek to recover, along with the amounts contested by CARCO:

| Damages Category | Claim | Uncontested | Evidentiary Issue[1] | Legal Issue[2] |
|---|---|---|---|---|
| 1) OPA Removal Costs *(Exhibit P-1419)* | $133,306,668.31 | $93,753,955.89 | $39,552,712.42 | |
| 2) Non-OPA Response Costs *(Exhibit P-1420)* | $1,541,597.79 | $501,690.39 | $1,039,907.40 | |
| 3) Salem Plant Settlement *(Exhibit P-1422)* | $1,500,000.00 | | | $1,500,000.00 |
| 4) Unrepaired Hull Damage *(Exhibit P-1417a)* | $438,542.25 | | | $438,542.25 |
| 5) Vessel/Misc. Port Expenses *(Exhibit P-1415/1416)* | $50,642.01 | $50,642.01 | | |
| 6) Hull Damage *(Stipulation Dk no. 526/233)* | $3,925,585.11 | $3,925,585.11 | | |
| 7) Loss of Hire *(Stipulation Dk No. 518/234)* | $2,100,00.00 | $2,100,00.00 | | |
| 8) Natural Resource Damages *(Stipulation Dk no. 526/233)* | $623,497.79 | $623,497.79 | | |
| | $141,386,533.26 | $98,685,064.72 | $40,592,619.82 | $1,938,542.25 |

Of the $141,386,533.26 aggregate damages claim, Frescati seeks a net award of only

$55,497,375.95 because it recovered $88,145,646.21 ($87,989,157.31 from the Oil Spill

Liability Trust Fund (the "Fund") and $156,489 through the sale of equipment).

---

[1] As explained in Section III.A.3.a, CARCO's expert produced at trial a summary of "overcharges" which includes costs and expenses never paid by Frescati, and not part of its claim here. Consequently, the "overcharge" figure CARCO's expert offers is artificially high by several million dollars, one of numerous problems with his work product in this litigation.

[2] Although CARCO offered no evidence to contest the Salem Plant Settlement or the Unpaired Hull Damages claim, CARCO asserts legal arguments contesting these damages categories.

Finally, as explained below, Frescati seeks an award of prejudgment interest on seven of the eight damages categories.[3]  Prejudgment interest is "well-nigh automatic" in admiralty cases. *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).  Using the generally accepted prime rate of interest, as of February 1, 2015, pre-judgment interest on the seven categories of damages is now approximately $47 million.  Interest accrues at slightly more than $9,000 per day.  Frescati is therefore seeking a total award of damages of about $102.5 million, a figure that can be finally determined on the date judgment is entered.  Frescati's damage claim is comprised of prototypical damage elements in admiralty cases.

During the Rule 63 Rehearing, the court will hear testimony related to the two damage categories contested on evidentiary grounds (*i.e.* OPA Removal Costs and Non OPA Response Costs) as well as on prejudgment interest.

## II.   <u>LEGAL STANDARD</u>

Frescati's burden is to prove its damages to a reasonable degree of certainty.  *Bostick v. ITT Hartford Grp., Inc*., 82 F. Supp. 2d 376, 378 (E.D. Pa. 2000) ("A plaintiff must show that she is capable of establishing damages to a reasonable certainty."); *Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister*, 1994 WL 320328, at *17 (S.D.N.Y. June 29, 1994) ("Plaintiff must prove the amount to a reasonable certainty.").  As the Third Circuit, in a panel including Judges Ambro and Greenaway, explained, "[o]nce a plaintiff proves its damages, a defendant has the burden to show the damages award should be limited because the plaintiff failed to take reasonable measures to mitigate its loss."  *Vici Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 299 (3d Cir. 2014) (applying Delaware law).  The evidence currently in the record provides documentation for each dollar spent.  The testimony of numerous witnesses establishes both the

---

[3] Frescati is not seeking prejudgment interest on its Unrepaired Hull Damage claim.

reasonableness of Frescati's actions in responding to the casualty event and the relationship between the costs incurred and the casualty.

## III.    DAMAGES CATEGORIES

### A.    OPA Removal Costs

#### 1.    Frescati Seeks $45,317,511 in Damages for OPA Removal Costs

"OPA Removal Costs," as that phrase is defined in the Oil Pollution Act, 33 U.S.C. §2701(31) ("OPA"), refers to $133,306,688.31 in cleanup costs Frescati paid pursuant to its statutory liability for the spill under 33 U.S.C. §2702.  Under OPA, Frescati was able to limit its liability to $45,474,000, pursuant to 33 U.S.C. §2704.  As a consequence, the National Pollution Funds Center (the "Fund") reimbursed Frescati $87,989,157.31 and the United States became subrogated to Frescati's claim against CARCO for the same amount.  Frescati seeks recovery of its unreimbursed OPA Removal Costs, less costs it recovered by selling equipment it purchased for the cleanup.  *Exh. P-1419 (OPA Claim)).*

The following chart summarizes Frescati's OPA Removal Cost claim:

|  | Costs | Credits |  |
|---|---|---|---|
| Frescati's Upfront OPA Removal Costs | $133,306,668.31 |  |  |
| Fund Award Claim No. PO5005-110 |  | ($77,181,859.54) |  |
| Fund Award Claim No. PO5005-110 |  | ($10,807,297.77) |  |
| Sale of Equipment |  | ($156,489.00) |  |
| Total OPA Removal Costs Claim |  |  | $45,317,511.00 |

CARCO does not dispute that Frescati spent a total of $133,306,668.31 on OPA Removal Costs, or that with the above adjustments its ultimate claim against CARCO in this category of damages is $45,317,511.00.

### 2.      Witnesses and Exhibits Supporting the OPA Removal Costs

At the trial before Judge Fullam, five witnesses testified in support of Plaintiffs' OPA

Removal Costs claim:  Jason Roussel, Ben Benson, USCG Capt. Roger Laferriere (Retired),

Thomas Morrison and Donna Hellberg.  In addition, portions of Steve Kegelman's deposition

were designated and admitted into evidence.  The primary exhibit supporting the OPA Removal

Cost claim is Exhibit P-1419 (OPA).  This exhibit provides a detailed breakdown of the OPA

Removal Costs and succinctly and clearly summarizes the invoices received and amounts paid to

each contractor or vendor for what was, by all accounts, a very successful spill response.  The

CD included with this exhibit provides the underlying support and documentation for each dollar

spent through some 61,000 pages of invoices, payment confirmations, and the like.  This exhibit

also includes the Fund's determination of Frescati's claim for reimbursement under OPA.

### a.      Jason Roussel

Jason Roussel of Spill On-Site Services, Inc., or "SOS", is a cost control specialist who

served in the Finance Section of the Incident Command.  *(Trial Tr. Day 19, October 25, 2010,*

*Roussel at 83:22-85:4[1]).*  Exhibit P-1419 was admitted through the testimony of Mr. Roussel.

*(Id. at 105:6-107:5[2]).*  Mr. Roussel testified about the practical side of the spill response effort

and the focus of the Finance Section when reviewing bills, verifying field activities and making

payment recommendations to Mr. Benson and Frescati.  *(Id. at 89:1-90:4[3] 91:11-92:1[4]; 93:19-*

*96:5[5]).*  Mr. Roussel also provided extensive testimony on the cost control measures taken by

Frescati.  *(Id. at 118:14-121:18[6]; Exh. P-1274).*  Mr. Roussel's testimony is not being reheard.

### b.      Ben Benson

Ben Benson of The O'Brien's Group served as the designated Qualified Individual for

the vessel and Tsakos Shipping & Trading as required by OPA and its implementing regulations.

*(Trial Tr. Day 19, October 25, 2010, Benson at 4:3-9[7]; 4:13-16[8]; 5:11-13[9]; 9:1-19[10]; Trial Tr.*

-5-

*Day 15, October 18, 2010, Hajimichael at 78:4-20[11]).*  Mr. Benson is a highly competent spill

response manager, with considerable expertise gained from decades of work on virtually every

major oil spill in this country and many others around the world.  *(Trial Tr. Day 19, October 25,*

*2010, Benson at 7:20-25[12]; 11:9-17[13]).*  It was up to Mr. Benson and Frescati's spill management

team to deploy the spill responders in the field in accordance with the directives of the U.S.

Coast Guard's Federal On Scene Coordinator.  *(Id. at 9:1-8[14]; 10:6-8[15]; 12:16-19[16]; 15:18-*

*16:3[17]; 16:9-17:1[18]; Trial Tr. Day 33, December 1, 2010, Benson at 114:7-115:15[19]; Exh. P-*

*1500 (Vessel Response Plan); Exh. P-1501 (Contract for Oil Spill Response Services for Tank*

*Vessels between Tsakos Shipping & Trading S.A. and O'Brien's Oil Pollution Service, Inc.);*

*Exh. P-1502 (National Response Corporation Agreement for Provision of Response Resources*

*between National Response Corporation and Tsakos Shipping & Trading S.A.)).*

      Mr. Benson will again offer credible testimony regarding the composition and functions

of Frescati's spill management team, including the role of the Finance Section and SOS, in

reviewing and auditing the invoices of the National Response Corporation and its network of

spill response contractors involved in the cleanup.  *(Trial Tr. Day 19, October 25, 2010, Benson*

*at 15:18-16:8[20]; 25:17-26:10[21]; 26:15-18[22]; 37:14-22[23]; 70:1-17[24]).*  Mr. Benson's testimony

will supplement and support the earlier testimony of Mr. Roussel and the deposition testimony of

Steve Kegelman, O'Brien's Manager of Response Services and Mr. Benson's right-hand man.

Mr. Benson will explain Frescati's spill response strategy, the cost-efficiencies obtained by

"hitting the spill hard" early and the considerable effort needed to retain, deploy and coordinate

the actions of the 77 spill response contractors and vendors in difficult field conditions.  *(Trial*

*Tr. Day 19, Benson at 19:21-20:7[25]; Trial Tr. Day 19, October 25, 2010, Roussel at 108:16-*

*110:10[26]; Kegelman Dep., September 11, 2009 at 155:20-156:5[27]).*  The Court will again hear

the accounts of Mr. Benson on the extreme winter weather conditions under which the spill response was performed and the challenges presented by both the weather and the physical properties of the heavy crude oil sinking to the bottom of the river and moving in and out of sensitive marshlands with the ebb and flow of the tide.  *(Trial Tr. Day 19, October 25, 2010, Benson at 29:6-15[28]; 32:21-33:16[29]).*  Mr. Benson will explain in detail how the costs incurred were related to the spill response, the considerable efforts made to manage costs, as well as the process he oversaw for the vetting and payment of the various vendor and spill responder invoices. *(Trial Tr. Day 19, Benson at 25:17-26:10[30]; 50:1-51:7[31]; 37:14-22[32]; 38:6-15[33]).*

### c.      USCG Capt. Roger Laferriere (Retired)

Capt. Laferriere, who served in a variety of positions within the Unified Command, including the role of Federal On-Scene Coordinator, will again testify about the highly organized response effort under the National Contingency Plan using the Incident Command System and the obligations of Frescati as the designated Responsible Party. *(Trial Day 18, October 21, 2010, Laferriere at 8:18-9:12[34]; 11:18-12:15[35]; 11:3-10[36]; 11:11-17[37]; 13:25-14:9[38]; 14:10-23[39]; 16:10-17:6[40]; 18:19-19:4[41]).*  Capt. Laferriere, who was the head of the USCG's Atlantic Strike Team, was at the time one of the most experienced spill responders in USCG, going on to take a senior leadership role in the massive  BP spill response in the Gulf of Mexico among other spill management projects. *(Id. at 4:17-22[42]; 5:6-19[43]).*  As he did when he first testified before Judge Fullam, Capt. Laferriere will describe the careful organization of the spill response effort under the USCG's Unified Command System, along with the preparation and use of Incident Action Plans or "IAPs" and other incident command structure forms to identify tasks to be undertaken in each work zone, which spill response resources would be deployed, including the types of equipment and number of laborers, used in each spill response zone. *(Trial Day 18, October 21, 2010, Laferriere at 16:18-17:2[44]; 19:5-20:3[45]; 37:10-19[46]; 37:20-38:2[47]; Exhs. USA*

-7-

*117-147 (IAP's 1-31)).* The IAPs, along with other plans and documents generated by the Unified Command, were, effectively, a blue print ensuring that the activities being taken in the field were consistent with the cleanup objectives set by the Federal On-Scene Coordinator under the guidance of the National Contingency Plan. *(Exhs. USA 117-147).*

Capt. Laferriere will again explain how the spill response effort was overseen in the field every day by both Mr. Benson's zone supervisors and members of the Coast Guard's Atlantic Strike Team. *Trial Tr. Day 18, October 21, 2010, Laferriere at 4:21-25[48]; 6:6-19[49]; 25:17-32:12[50]; 34:3-17[51]; Exh. USA-127 at 06027-28 (Incident Action Plan #11)).* This testimony will underscore the testimony of Mr. Benson that Frescati's spill management team capably implemented all of the Federal On-Scene Coordinator's directives, resulting in a very efficient and successful spill response. *(Trial Tr. Day 19, October 25, 2010, Benson at 53:12-54:3[52]; Exh. P-1287 (Citation from the USCG to the ATHOS I Unified Command Team)).*

### d.  Thomas Morrison

Thomas Morrison is the Chief of the Claims Adjudication Division of the National Pollution Funds Center. *(Trial Tr. Day 19, October 25, 2010, Morrison at 161:11-163:6[53]).* Mr. Morrison testified about OPA limits to liability, the criteria under OPA for a Responsible Party to be entitled to limit its liability, and his decision to limit Frescati's liability because he found Frescati had met its burden of proof that no gross negligence, willful misconduct or violation of a Federal safety, construction or operating regulation proximately caused the release of the oil. *(Trial Tr. Day 19, October 25, 2010, Morrison at 164:18-166.17[54]; 170:17-171:8[55]; 174:16-175:7[56]; 176:2-16[57]; Exh. USA-367 (Aug. 2006 letter granting limitation)).* Plaintiffs do not anticipate Mr. Morrison testifying at the Rule 63 Rehearing.

-8-

e.      **Donna Hellberg**

Donna Hellberg, who works with Mr. Morrison's claims adjudication section at the

National Pollutions Funds Center, adjudicated Frescati's claim for removal costs.  At the time of

the adjudication, Ms. Hellberg served as the Chief of the Removal Cost Claim Branch Section.

Ms. Hellberg has considerable experience reviewing OPA claims and extensive knowledge of

the spill response process.  *(Trial Tr. Day 20, October 26, 2010, Hellberg at 44:16-21[58]; Trial*

*Tr. Day 19, October 25, 2010, Morrison at 178:13-19[59]).*  Ms. Hellberg will testify that she

evaluated Frescati's claim to determine whether it established by a preponderance of the

evidence that:

> (a)      the actions taken were necessary to prevent, minimize, or mitigate the effects of
> the incident;
>
> (b)      the removal costs were incurred as a result of these actions; and
>
> (c)      the actions taken were determined by the FOSC to be consistent with the National
> Contingency Plan or were directed by the FOSC,

all as required by 33 CFR 136.203.  *(Trial Tr. Day, 20, October 26, 2010, Hellberg at 345:3-*

*16[60]).*

After a detailed and carful audit of Frescati's 61,000 page submission documenting its

OPA Removal Costs, read in conjunction with Coast Guard documentation confirming activities,

labor and equipment deployments, Ms. Hellberg determined that $133,463,157.31 of Frescati's

spill response costs were eligible for reimbursement under the criteria established in the above

quoted Federal Regulation.  *(Trial Tr. Day, 20, October 26, 2010, Hellberg at 32:15-20[61]; 33:1-*

*10[62]; 33:11-35:19[63]; 35:20-37:10[64];38:9-39:4[65]; 39:5-12[66]; 41:7-46:16[67]; 48:21-50:9[68]; 51:2-*

*6[69]; 51:16-52:2[70]; 81:23-82:11[71]; Exh. P-1419 (OPA Claim); Exh. USA-155 (Clams Summary,*

*Claim 1); Exh. USA-157 (Claims Determination Memo); Exh. USA-162 (Detailed Claims*

*Summary, Supplemental Claim); Exh. USA-161 (Claims Determination Supplement)).*

-9-

Ms. Hellberg's testimony will confirm the testimony of Messrs. Benson, Kegelman and Roussel that each dollar set forth in the OPA Removal Cost claim category was appropriately expended on oil spill cleanup activities, carried out consistent with the National Contingency Plan, and as directed by the Federal On-Scene Coordinator. *(Id.; Trial Tr. Day 20, October 26, 2010, Hellberg at 34:3-38:8[72])*; 33 C.F.R. §136.205; *see also Gatlin Oil Co. v. United States,* 169 F.3d 207, 212 (4th Cir. 1999) (holding that the Fund's findings may only be overturned if found to be arbitrary, capricious, or an abuse of discretion) (citing 5 U.S.C. §706(2)(A)); Stanley A. Millan, *Escaping the "Black Hole" in the Gulf*, 24 Tul. Envtl. L.J. 41, 64-65 (2010) ("If a claimant is denied by the Trust Fund, the claimant faces a judicial deference standard in favor of the Fund under the [Administrative Procedure Act].").

Ms. Hellberg will testify that in two adjudications, the Fund reimbursed Frescati $88,145,646.21 (*i.e.* all but $45,474,000 of the $133,463,157.31 Frescati expended in the OPA Response Cost category). *(Trial Tr. Day, 20, October 26, 2010, Hellberg at 50:10-51:1[73]; 52:3-15[74]; Exh. USA-153 (Authorization to pay claim 1); Exh. USA-156 (Claim 1 acceptance letter); Exh. USA-158 (Authorization to pay supplemental claim); Exh. USA-160 (Claim acceptance supplemental) Exh. P-1419, Tabs B and D (OPA Claim and Supplemental Claim Determination Memoranda)).* The Fund's two adjudications were properly admitted into evidence under FRE 803(8), *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 175 (1988), and are entitled to deference. *(Exh. P-1419 Tabs B and D (OPA Claim)).*

### f.    Steve Kegelman (By Deposition Designations)

Steve Kegelman served as a Senior Response Consultant for The O'Brien's Group overseeing the day-to-day operations of the Incident Command. *(Kegelman Dep., September 11, 2009, 12:9-15[75]).* Mr. Kegelman's testimony explained certain aspects of the Incident Command's Finance Section and many of the costs saving measures implemented by the Finance

-10-

Section.  *(Kegelman Dep., September 11, 2009 at 66:14-24[76]; 74:15-75:5[77]; 93:11-24[78])*.  As explained by Mr. Kegelman, the Finance Section, among other things, renegotiated reduced contract rates for personnel and third party markups, implemented direct purchasing to avoid markups, and established a central supply system for consumables and other supplies to reduce costs.  *(Kegelman Dep., September 11, 2009 at 214:9-17[79]; 130:10-131:8[80]; 217:3-24[81])*.  Mr. Kegelman's testimony confirms that Frescati took reasonable steps to mitigate its damages.  Mr. Kegelman will not to testify at the Rule 63 Rehearing.

### 3.   CARCO's Challenge to the OPA Removal Costs Claim

#### a.   CARCO Does Not Dispute $93,753,955.89 in OPA Removal Costs

Of the total amount Frescati spent on OPA Removal Costs, CARCO does not challenge $93,753,955.89.  CARCO uses the testimony of William McLellan to challenge some of the OPA Removal Costs, but the conclusions he reaches are inflated because his calculations:  (1) include a vendor (E.A. Renfroe) that is not even a part of the OPA Removal Cost claim[4]; (2) include invoiced amounts that Frescati never paid in the first place[5]; and (3) fail to adjust for

---

[4] The Fund found $133,463,157.31 of Frescati's costs, paid to 79 contactors, to be reasonably incurred and OPA compensable.  Instead of focusing on the 79 contractors within this category, McLellan ups the total contractors to 80 by adding E A. Renfroe ("Renfroe"), with an alleged overcharge of $233,091.48.  Since these costs are not part of the OPA Removal Cost claim, the Court must deduct the number for Renfroe from McLellan's analysis, or else risk causing Frescati and the government to suffer a "double" deduction.

[5] McLellan's analysis starts with the amounts invoiced to Frescati, which totals  $137,624,936.73 for the 79 contractors in the OPA claim.  However, the amounts invoiced are irrelevant because Frescati is not seeking recovery of the amounts it was invoiced.  Frescati is seeking recovery of $133,463,157.31 in the OPA Removal Cost category, which is the amount Frescati paid, and which the Fund determined met the requirements of 33 CFR 136.203 (explained above).  Thus, McLellan has inflated the alleged "overcharge" by $4,161,779.42 ($137,624,936.73 less $133,463,157.31).  By starting at the wrong place, McLellan's alleged overcharges are themselves unreasonably inflated.

amounts Frescati recouped through the sale of equipment.[6]  To compare McLellan's

"overcharges" to Frescati's actual OPA Removal Costs claim, this Court must make at least three

downward adjustments:

| McLellan's Overcharge Total (D-1987) | 44,104,072.32 | | |
|---|---|---|---|
| Wrongful inclusion of EA Renfroe | | (233,091.48) | |
| Wrongful inclusion of unpaid invoices | | (4,161,779.42) | |
| Failure to account for credits for sold equip. | | (156,489.00) | |
| Necessary downward adjustment adjustments: | | (4,551,359.90) | |
| **McLellan's Discrepancy Amount for OPA Removal Claim After Adjustments** | | | **39,552,712.42** |

After adjusting for these mistakes, McLellan's "overcharges" for the claimed OPA

Removal Cost category total $39,552,712.42.  It therefore appears that CARCO accepts, and

does not challenge $93,753,955.89 of the OPA Removal Cost claim.

### b.    Legal Standard Mitigation of Damages

CARCO's challenge to Frescati's damage claim is that Frescati failed to mitigate its

damages.  (Doc. 697.)  This, of course, is an affirmative defense on which CARCO bears the

burden of proof.  *S. J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 529 (3d Cir. 1978);

*Koppers v. Aetna Casualty & Surety Co.,* 98 F.3d 1440, 1448 (3d Cir. 1996).  Mitigation (also

known as "avoidable consequences") is a limitation on the plaintiff's ability to recover damages

"caused by plaintiff's fault or unreasonableness."  Dan B. Dobbs, *Handbook on the Law of*

---

[6] McLellan includes in his list of "overcharges" the amount Frescati credited back for equipment it purchased during the spill but subsequently sold.  As explained above, after the spill response, Frescati sold some of the spill response equipment it purchased for $156,489.00.  Frescati then adjusted its claim downward by that amount.  McLellan ignores this adjustment and includes it with his other alleged overcharges, inflating his number by $156,489.00.

*Remedies* 885 (1993); *see also, Fiat Motors of North America, Inc. v. Mellon Bank, N.A.*, 827

F.2d 924, 930 (3d Cir. 1987).  To sustain its mitigation defense, CARCO must prove that

Frescati's *conduct* was unreasonable.  *See S. J. Groves*, 576 F.2d at 529; *Koppers*, 98 F.3d at

1448.[7]  *McElyea v. Navistar Int'l Transp. Corp.*, 788 F. Supp. 1366, 1378 (E.D. Pa.) ("It is the

defendant's burden to show that plaintiffs unreasonably failed to minimize their damages") *aff'd*

*sub nom. McElyea v. Cooper Tire & Rubber Co.*, 950 F.2d 723 (3d Cir. 1991).

As the Third Circuit, in a panel including Judges Ambro and Greenaway, emphasized,

"mitigation is a burden of conduct, not a burden of proof."  *Vici Racing, LLC v. T-Mobile USA,*

*Inc.*, 763 F.3d 273, 299 (3d Cir. 2014) (applying Delaware law); *see also* Dan B. Dobbs,

*Handbook on the Law of Remedies* 187 (1973) ("[T]he avoidable consequences defense looks to

[plaintiff's] post-tort conduct.").  "Unreasonable conduct" does not mean plaintiffs—in

hindsight—might have made better business judgments in responding to the casualty or that a

miser would have incurred lower costs.  Rather, "unreasonable conduct" requires the defendant

to show that the plaintiff's decisions were "palpably erroneous."  *BP Exploration & Oil, Inc. v.*

*Moran Mid-Atl. Corp.*, 147 F. Supp. 2d 333, 344 (D.N.J. 2001) (citing *Ellerman Lines, Ltd. v.*

*The President Harding,* 288 F.2d 288, 291 (2d Cir. 1961)).  Or, as explained by the Fifth Circuit,

"'[R]easonableness' here does not require 'infallibility or exactness of mathematical formula.'

We 'will allow the injured party a wide latitude in determining how best to deal with the

situation' because 'the necessity for decision-making was thrust upon him by the defendant, and

---

[7] Steven W. Feldman, *Autonomy and Accountability in the Law of Contracts:  A Response to Professor Shiffrin*, 58 Drake L. Rev. 177, 241 (2009) ("[T]he overwhelming weight of authority states that the breaching promisor must prove that the promise inappropriately failed in avoiding or alleviating his injury."  (internal quotation marks omitted)).

judgments made at times of crisis are subject to human error.'" *Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 833 (5th Cir. 2014) (citations omitted).

Furthermore, for a plaintiff's conduct to be reasonable, the efforts to mitigate damages do not even have to be successful. *Prusky v. RellaStar Life Ins. Co., 53*2 F.3d 252, 263 (3d Cir. 2008) (citing Restatement (Second) of Contracts §350 for the propositions that an "injured party who makes reasonable but unsuccessful efforts to avoid additional loss [is] not precluded from recovery" and "injured party may recover for incidental and consequential costs/damages incurred as a result of reasonable efforts at mitigation even if efforts proved unsuccessful."); *Fiat Motors of North America, Inc. v. Mellon Bank, N.A.*, 827 F.2d 924, 930 (3d Cir. 1987) ("The injured party is not precluded from recovery to the extent that reasonable, but unsuccessful efforts to avoid loss have been made."). "Reasonable conduct 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.'" *Toyota Indus. Trucks U. S. A., Inc. v. Citizens Nat. Bank of Evans City*, 611 F.2d 465, 471 (3d Cir. 1979); *see also Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 739 (E.D. Pa. 1998) ("In determining whether a plaintiff has acted appropriately to mitigate damages, the test to be applied is one of reasonableness. The fact finder must determine whether plaintiff's actions, in the face of the breach, were reasonable considering 'all the facts and circumstances.'") (citations omitted). In the present circumstance, it is uncontroverted that Frescati's response efforts performed under the close supervision of the USCG, were timely and successful.

### c.    Frescati Acted Reasonably In Responding to the Spill

Although CARCO bears the burden to prove its affirmative defense, Frescati has nonetheless put forward substantial evidence showing that its conduct was reasonable. As explained below, the testimony of Messrs. Benson, Roussel, and Kegelman, along with multiple

-14-

exhibits, demonstrate Frescati adequately verified its expenses, took reasonable and appropriate

steps to mitigate its damages, and cost-effectively managed the spill response, in line with the

direction of the Federal On-Scene Coordinator.

(1)     Frescati Cost-Effectively Managed The Spill Response

Mr. Benson's testimony will again establish that in early December, less than a week

after the casualty, the spill management team supplemented its Finance Section by hiring Spill

On Site Management, Inc., a cost control specialist, testimony that echoes the accounts already in

the record from Messrs. Roussel. *(Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10[82];*

*Trial Tr. Day 19, October 25, 2010, Roussel at 83:22-84:12[83]; 85:2-4[84]; Kegelman Dep.,*

*September 11, 2009, 12:9-15[85]).* Messrs. Roussel and Benson explained their invoice review

procedures, auditing each invoice to confirm that:  (i) the invoice reflected labor, equipment or

material charges related to the spill response; (ii) the invoiced charges reflected work actually

performed; and (iii) the rates charged were consistent with the approved contract rates.[8]  *(Trial*

*Tr. Day 19, October 25, 2010, Benson at 26:2-10[86]; 26:15-18[87]; 37:14-22[88]; 38:6-15[89]; Trial Tr.*

---

[8] Mr. Roussel explained the finance section's use of a state-of-the-art software program, known as "CMART," to audit contractor and vendor invoices.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 86:10-20; 87:22-90:4).*  The CMART system created checks and balances to assure contractors billed equipment and personnel at their approved rates.  *(Id.)*  Finance section audits were performed in one of two ways.  Most of the contractor invoicing, as well as significant vendor invoicing, was audited through use of the CMART system.  *(Id.)*  By way of example, Mr. Roussel used an audit form to explain the CMART audit process.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 99:12-104:21).*  Other invoices underwent a "desk audit" wherein Mr. Roussel or someone on his staff manually reviewed the invoice documentation to confirm with the appropriate spill managers, most often zone supervisors, that the charges itemized on an invoice were verified in the field and were being billed at the approved rate.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 92:3-93:7).*  Mr. Roussel also explained the desk audit process using the AMQUIP invoice as an example, pointing out the key elements present on the vendor's invoicing as well as the "sign-offs" provided by two senior spill managers, corroborating that the equipment being invoiced was both billed at the appropriate rate and deployed as claimed on the invoice.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 111:10-114:1).*

Day 19, October 25, 2010, Roussel at 89:1-90:4[90]).  Mr. Benson will again explain why and how

he had confidence that if he received a payment recommendation from the Finance Section, each

of the three review criteria had been met.  *(Trial Tr. Day 19, October 25, 2010, Benson at 41:15-*

*23[91]).*

      Mr. Benson will explain how he would not make a payment recommendation to Frescati

unless the Finance Section approved an invoice for payment using the procedures he,

Mr. Kegelman, and Mr. Roussel described in their earlier testimony, and the Finance Section

would not make a payment recommendation to Mr. Benson until it had audited the contractor

and vendor invoices using the CMART or desk audit procedures.  *(Trial Tr. Day 33, December*

*1, 2010, Benson at 139:20-140:12[92]).*

(2)     Frescati Also Took Reasonable and Appropriate Steps to
Control Spill Response Costs

      At trial, Messrs. Roussel and Benson explained at length the various steps taken

throughout the spill response to control and reduce costs.  Mr. Benson will repeat that testimony

at the rehearing.  One very significant step taken by Mr. Benson on Frescati's behalf was to shift

from the "emergency" phase to the "project management" phase of the spill response on

December 16, 2004.  By doing so, he and members of the Finance Section were able to negotiate

significant rate reductions with the various contractors and vendors.  Mr. Benson will point out at

least one example where the rate was cut in half.  *(Trial Tr. Day 33, December 1, 2010, Benson*

*at 117:12-119:1[93]).*  Already in the record are the following additional steps Messrs. Benson and

Roussel took to control and manage costs:

- Benson's decision to retain Spill On-Site Management, Inc. to supplement the Finance Section.  *(Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10[94]; Trial Tr. Day 19, October 25, 2010, Roussel at 83:22-84:12[95]; 87:10-21[96]).*

- Deploying the CMART System, a state-of-the-art cost control computer program.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 87:22-90:6[97]).*

-16-

- Establishing supervisor-to-worker ratios and equipment-to-operator ratios and adjusting invoices that exceeded those ratios.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 99:6-104:1[98]; Exh. P-1274 (SOS Spill Response Cost Savings Report); Exh. P-1275 (SOS Audit Reports)).*

- Direct purchasing of equipment and materials to avoid vendor markups.  *(Kegelman Dep., September 11, 2009 at 214:9-17[99]; Exh. P-1274 (SOS Spill Response Cost Savings Report)).*

- Renegotiating contractor rates including personnel rates and markups.  *(Trial Tr. Day 19, October 25, 2010, Benson at 24:5-25:16[100]; Trial Tr. Day 19, October 25, 2010, Roussel at 94:18-24;[101] 95:4-96:5[102]; Kegelman Dep., September 11, 2009 at 130:10-131:8[103]; Exh. P-1274 (SOS Spill Response Cost Savings Report)).*

- Establishing a central supply for consumables and other supplies, a measure also designed to reduce contractor markups for such items*.  (Trial Tr. Day 19, October 25, 2010, Benson at 50:1-51:7[104], Exh. P-1419 at ADAM 0000626-7 (OPA Claim); Trial Tr. Day 18, October 21, 2010, Laferriere at 45:19-46:7[105]; Kegelman Dep., September 11, 2009 at 217:3-24[106]; Exh. P-1275 (SOS Audit Reports)).*

- Verifying contractor charges for equipment, materials and personnel with various spill managers (i.e., zone supervisors), either through signed "dailies" or other verification.  *(Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:17[107]).*

- Negotiating a fixed per diem for all oil spill workers that was lower than the published rate for the Philadelphia area, and offering per diems to a wider number of spill response workers as a means of reducing the spill response bureaucracy and increasing the availability of the spill response labor force, to increase spill response efficiency.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 97:9-98:2[108]; Exh. P-1274 (SOS Spill Response Cost Savings Report)).*

- Converting subcontractors to direct contractors to reduce or avoid markups.  *(Trial Tr. Day 19, October 25, 2010, Roussel at 94:25-95:3[109]; Trial Tr. Day 33, December 1, 2010, Benson at 122:24-125:10[110]; Exh. P-1597 (NRC Subcontractor Administration Fee Spreadsheet (Demonstrative)); Exh. P-1274 (SOS Spill Response Cost Savings Report)).*

Mr. Benson will also explain the process of rate roll-backs and contractor markup reductions which his team obtained as soon as reasonably possible.  As the only experienced spill response manager to testify in the case (besides his colleague Mr. Kegelman who shares his views), Mr. Benson's testimony is credible and essentially uncontroverted.

(3)     Frescati's Spill Management Team Adequately Verified the
Deployment of Labor, Equipment, and Materials

Throughout the spill response, Frescati's Spill Management Team verified that invoiced labor, equipment, and material charges reflected the labor, equipment, and materials actually deployed in the field to advance the oil spill cleanup.  The Court will again hear from Capt. Laferriere about how his Atlantic Strike Force personnel inspected every work zone, every day, to confirm that the necessary resources, as prescribed in the Incident Action Plans, were being deployed in the prescribed manner.  Mr. Benson will explain that every work zone also had a division supervisor assigned by the spill management team who oversaw each work zone to verify the labor, equipment and materials present in his work zone each day, testimony that is consistent with existing testimony from Messrs. Roussel and Kegelman.  *(Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:15[111]).*

At the 2010 trial, quite a bit of testimony focused on the use of so-called "dailies" and their significance to the Finance Section's invoice verification process.  Mr. Benson will again explain the use of "dailies," their preparation in the field, and their flow through the Finance Section to support invoice review and approval.  *(Trial Tr. Day 19, October 25, 2010, Benson at 34:3-35:11[112]).*  Mr. Benson will also show how a division supervisor's signature on a "daily" served as contemporaneous verification that the labor, equipment, and materials itemized on the form had in fact been at that zone on that day, in the numbers claimed, advancing the work of the spill response.  *(Trial Tr. Day 19, October 25, 2010, Benson at 35:8-11[113]).*[9]  While CARCO's

---

[9] Mr. Roussel explained that if the finance section did not have a signed Daily, and he acknowledged they did not have them in every instance when the contractor invoices came in, he had to do more work to verify the invoice.  This could be done in a number of ways generally involving direct contact (such as a telephone call) with the zone supervisor or other senior spill manager, to verify the work detailed on an unsigned Daily.  *(Trial Tr. Day 19, October 25, 2010,*

Continued…

expert attempts to make an issue of the fact that not every "daily" was signed, Mr. Benson will

explain, echoing the testimony of Mr. Roussel, that if an invoice was paid without a signed

"daily", it was because other steps were taken by the Finance Section to complete the verification

process. *(Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:17[114]; Trial Tr. Day 22,*

*November 4, 2010, McLellan at 114:24-116:7[115]).*[10]  Mr. Benson will again offer testimony

highlighting examples of adequately supported invoices even where a signed "daily" was not

available.

      The record reflects—and Mr. Benson's recall testimony will amplify—that Frescati took

an organized and reasonable approach to cost management.  On the strength of the processes in

place and the credible testimony offered on the issues, Frescati acted reasonably when it paid

costs based on the recommendation of Mr. Benson.

      **4.**    **CARCO's Lone Witness Challenging the Reasonableness of Frescati's Conduct in Managing the Spill Response**

      To meet its burden of proof that Frescati acted unreasonably in responding to the spill

CARCO offers the testimony of only one witness, William McLellan, a former attorney at its

lead law firm, Chaffe McCall.  *(Trial Tr. Day 21, November 3, 2010, McLellan at 137:10-22[116]).*

As explained below, McLellan's credibility is called into question because he lacks experience,

---

….Continued

*Roussel at 151:7-24).*  Mr. Roussel testified that there were very few invoices that should have
had a signed Daily but did not.  *(cite)*

[10] Mr. Roussel used the AMQUIP and Zep invoices to illustrate the kind of information used by
the finance section to verify charges and their relationship to the spill response.  *(Trial Tr. Day
19, October 25, 2010, Roussel at 111:10-114:19).*  In the case of AMQUIP and Zep, the invoices
themselves bore the signatures or initials of various senior members of the spill management
team, and Mr. Roussel explained that these signatures or initials conveyed to the finance section
that the equipment or materials described on the invoice were used in the response and charged
in accordance with the contract for those services.  (*Id.*)

he conducted only a post-mortem review, he failed to provide backup data for his alleged overcharges, and he failed to comply with the Rule 26 disclosure requirements by unveiling a new exhibit with new totals on the stand.  Furthermore, McLellan's credibility is further impeached by his positional flip-flops between the opinions he gave in this matter challenging the responsible party's expenditures and the opinions he gave in another oil spill matter (the K-Sea)[11] when the responsible party was paying his bills.

### a. McLellan's Inexperience

At the time he offered his expert report in this matter, and later appeared to testify, McLellan had never served in a major spill, such as this one, as an Incident Commander, a Qualified Individual, or most significantly, in the finance section.  *(Trial Tr. Day 21, November 3, 2010, McLellan at 195:6-15[117])*.  McLellan's relative inexperience in these functions, which are at the heart of a major spill response, contrasts starkly with the years of experience brought by Messrs. Benson, Kegelman and Roussel, and the hands-on management and oversight experience of USCG Capt. LaFerriere, who was highly complementary of Frescati's spill response efforts.

### b. McLellan Conducted a "Post-Mortem" Review

McLellan's review is not based on first-hand knowledge.  He was not retained until 2009, and so did not observe the spill response, the Incident Command process or the level of effort undertaken to manage the massive cleanup effort thrust upon Frescati when an anchor punctured the hull of the Athos I.  Rather, McLellan and his equally inexperienced "team" comprised of family and friends, reviewed a "cold record" of over 200,000 documents.  *(Trial Tr. Day 21,*

---

[11] *Targa Midstream Services LP v. K-Sea Transportation Partners, L.P.*, USDC for the Southern District of Texas, Civ. No. G-05-692 ("K-Sea").

*November 3, 2010, McLellan at 141:22-142:9[118]; 197:19-22[119]).* McLellan did not contact any of the people involved in the spill response to determine whether any of the goods or services at issue were provided. McLellan also made no effort to resolve things he or his team identified as "discrepancies" in the documentation. *(Trial Tr. Day 22, November 22, 2010, McLellan at 91:25-92:3[120]; 97:16-22[121]; 118:22-119:10[122]).* Instead of attempting to resolve noted the discrepancies, McLellan simply "disallowed" the cost entirely, and simply pitched it into a pot to be added up under the heading "overcharges". So cursory was his review that it made no difference to him – and thus he made no inquires of the spill responders or the USCG – whether the work had in fact been performed, or equipment or materials had in fact been provided. Instead, McLellan makes the "daily" the most important element of the response, imposing unreasonably high standards for documentation, to reach to his conclusion that the Court should summarily "reject" entire invoices for hundreds of thousands of dollars, for the smallest of perceived irregularities. *(Trial Tr. Day 22, November 4, 2010, McLellan at 86:6-21[123]).* McLellan makes these document-based conclusions <u>without</u> being able to establish in even a single instance that the labor, equipment or materials were not actually provided, or that the vendor in question was not entitled to some payment on its invoices.[12] He also does so by discounting, if not completely disregarding the testimony of four experienced "boots on the

---

[12] It bears repeating that McLellan has disallowed entire labor, materials and equipment invoices for "lack of support" when in his view that invoice lacked, for example, confirmation that a piece of equipment billed was actually delivered. McLellan is not saying that the services, labor or equipment were not provided – and the evidence is that they were – he is alleging that the documents do not, on their face, establish it in fact. Even if the documentation is not adequate, Frescati would have been sued on a theory of unjust enrichment for services performed if they were not paid for at all. McLellan ignores this reality and never even attempts to calculate what value should have been paid for his across-the-board, 100% disallowances. CARCO has thus failed to meet its burden to establish how much of any challenged invoice should NOT have been paid because a service was not provided or a piece of equipment not delivered. Clearly McLellan's across-the-board deductions are arbitrary.

ground" spill responders (Ben Benson, Steve Kegelman, Jason Roussel and USCG Capt. Roger Laferriere) who say that the labor, equipment and materials reflected in these invoices were in fact provided, that the provision of the labor and equipment was verified, and that the overall spill response was successful.

McLellan himself pointed out the shortcoming of this sort of "Post-Mortem" review when he served as an expert in *Targa Midstream Services LP v. K-Sea Transportation Partners, L.P.*, USDC for the Southern District of Texas, Civ. No. G-05-692 ("*K-Sea*"). In *K-Sea*, McLellan was hired to defend the amounts spent to clean up an oil spill, also managed by O'Brien's Group and Spill On Site Management, Inc., the same people that managed the spill for Frescati here. In his *K-Sea* report, McLellan stated:

> A cost review or cost audit … that is done post-event is often called a "Post Mortem" audit/review. This type of audit is limited in that the reviewer does not have the benefit of first hand knowledge and must rely on whatever documentation is available. The reviewer also must be careful not to engage in 20/20 hindsight and remember that the standard of review is not "perfection."

*(McLellan Report, Exhibit P-1580 at 3 (emphasis added)).*

In the *K-Sea* matter, McLellan highlighted the value of first-hand knowledge, stating:

> **The active cost control participants are in the best position to understand the nuances of the response and make appropriate decisions.** In many instances, problems are resolved on site verbally without written documentation. **To this end, what may seem questionable to a person performing an "after-the-fact" review is perfectly logical and reasonable to a person who is acting in time to an event.** Keep in mind that many of the participants in this response know each other from working together on other incidents and have established relationships. These relationships foster trust.

*(McLellan Report, Exh. P-1580 at 2-3 (McLellan Report, 11/2/2007)) (emphasis added).*

### c.    McLellan Failed to Provide Back-Up Data for His "Discrepancies"

McLellan's expert report asserts "discrepancies" he claims existed in the payment documentation.  *(Exh. D-1987 (Vendor Discrepancy List)).*  These "discrepancies" were

-22-

summarized in an exhibit, a version of the Vendor Summary document he eventually produced at trial. *(Id.)* The report simply organized "total claimed discrepancies" by vendor and did not provide <u>any</u> documentation from which Frescati or the United States could determine how or why the calculations were made, or their bases. When months later, in response to renewed discovery requests, McLellan eventually produced a bundle of "data sheets" that were supposed to support the Vendor Summary attached to his report, the amounts reflected therein differed by millions of dollars from the "discrepancies" in his report.[13] At his first deposition in February 2010, McLellan admitted that he had altered the data sheets *after* his report was produced to Frescati and ***he could no longer produce the tabulations that supported the figures contained in his expert report***.[14]

        **d.**        **On the Stand, McLellan Offered Never-Before-Seen Exhibits**

On the eve of trial, over Frescati's objection, CARCO had McLellan produce a new Vendor Summary *(now Exh. D-1987 (Vendor Discrepancy List))* with yet a new set of alleged discrepancies adding nearly $6 million to his tally. As a result, the Court directed CARCO to produce McLellan for a second deposition. At this second deposition, conducted just two days before he testified at the trial, McLellan claimed not to have developed any other documentation that might explain his discrepancy categories – he also still was unable to quantify the amount of discrepancies in his various categories. *(McLellan Dep., November 1, 2010, at 493:1-11[124]))*. Regardless, on the witness stand at trial, McLellan produced a new, never-before-seen

---

[13] McLellan's data sheets were not admitted into evidence at the trial in 2010 and the record CARCO created is without documentary support or other information needed to understand and question McLellan's Overcharge Summary.

[14] *See Frescati's Motion & Memorandum of Law in Support of Motion in Limine to Exclude Expert Report & Testimony of William McLellan*, Doc. Nos. 367 & 103, at 9-10.

comprehensive document, Exhibit D-1988 *(Vendor Excess Payment List)*, turning his alleged

discrepancies into full-blown "overcharges" with very specific figures assigned to each category.

That "Overcharge" Summary is now the centerpiece of CARCO's mitigation of damages

defense.

> **e.      McLellan's Credibility is Impeached by His Testimony in *K-Sea***

McLellan's prior testimony in *K-Sea* undermines the opinions he has proffered here.   In

*K-Sea*, he was defending the amounts spent to clean up an oil spill, also managed by O'Brien's

Group and Spill On Site Management, Inc., the same people that managed the spill for Frescati

here.   His expert report and deposition transcript from *K-Sea* were admitted into evidence during

the trial.   *(Exhs. P-1580 and P-1581)*.   The following table highlights some of the inconsistent

positions McLellan took in the *K-Sea* matter that bear substantially on the credibility of positions

he has taken on this spill response.   McLellan's Summary of Vendor Overcharges By Cost

Category report *(Exh. D-1988)* breaks down the alleged overcharges by category.   In his *K-Sea*

testimony, he takes issue with the validity of many of the exact same categories of overcharges.

| Subject | McLellan's Opinion in *Athos I* | McLellan's Opinion in *K-Sea* |
|---|---|---|
| Who is in the best position to evaluate cost control decisions? | The people on the ground are not in the best position if cost control does not begin until the spill is under control. *(Trial Tr. Day 21, November 3, 2010, McLellan at 197:8-18[125]).* | The active cost control participants are in the best position to understand the nuances of the response and make appropriate decisions. *(Exh. P-1580 (McLellan Report, 11/2/2007 at 2-3.))* |
| Is it unusual not to be able to secure direct billing? | Failure to obtain direct billing is a sufficient reason to reject a charge. *(Exh. D-1988 (McLellan Summary of Vendor Overcharges by Cost Category report); Trial Tr. Day 21, November 3, 2010, McLellan at 164:11-21[126]).* | It is not unusual for the RP not to be successful in securing direct billing arrangement with the subcontractors. *(Exh. P-1580 (McLellan Report at 5 (emphasis added)).* |
| Does the lack of agreed rate reduction for equipment charges equate with poor management? | Failure to reduce rates for equipment charges is a sufficient reason to reject a charge. *(Exh. D-1988 (McLellan Summary of Vendor Overcharges by Cost Category report); Trial Tr. Day 21, November 3, 2010, McLellan at 166:6-25[127]).* | There is no absolute with rate reductions for long term use of equipment.  This item is a proper item for discussion for reduction <u>but the lack of an agreed reduction does not necessarily equate with poor management.</u> *(Exh. P-1580 (McLellan Report at 6 (emphasis added)).* |
| Is it common practice for temp labor to be billed as employees? | Allowing **contractors to bill temp labor out as their own employees is a sufficient reason to reject a charge.** *(Exh. D-1988 (McLellan Summary of Vendor Overcharges by Cost Category report); Trial Tr. Day 21, November 3, 2010, McLellan at 152:18-154:3[128]).* | <u>**A common practice in the industry, regardless if one's contract has a markup clause for subcontractors, is to bring on person(s) from an independent contractor and bill them as your own employees.**</u>  An easy example is [when a contractor] bills independent contractors as their own employees … **Accordingly, <u>to disallow this practice … when it is common in the industry,</u>** and done by them, **<u>is improper.</u>** *(Exh. P-1580 McLellan Report at 7 (emphasis added)).* |
| Should you refuse to pay if you do not have signed "dailies"? | Lack of a signed "daily" is a sufficient reason to reject a particular cost. *(Exh. D-1988 (McLellan Summary of Vendor Overcharges by Cost Category report); Trial Tr. Day 22, November 4, 2010, McLellan at 77:11-14[129]).* | <u>**If I don't have everything [backup for an invoice], I'm not going to say, oh, you don't have to pay him because he doesn't have everything. We know the guy worked, he did the job, so we're going to try to come up with either if it's the full price, its the full price**</u>. *(Exh. P-1581 (McLellan Dep.) at 99:1-19[130].)* |

## B.    Frescati Seeks $1,541,597.79 for Non-OPA Response Costs

"Non-OPA Response Costs" represent expenditures Frescati made in the course of its

response to the spill, but which were not deemed compensable by the Fund under the specific

criteria of OPA for the reimbursement of response costs.  Of Frescati's two submissions to the

Fund (in the aggregate amount of $137,625,081.39), the Fund determined that $1,541,597.79 of

these cost were not "OPA compensable."  Although not reimbursable under OPA because they

are not considered to be directed solely to spill response, they are nevertheless reasonable

expenses that were incurred by Frescati as a direct consequence of the casualty event, and are

therefore recoverable from CARCO as damages under general maritime law.  This cost category

is comprised of the following vendor charges paid by Frescati:

|  | Invoiced Amount | Plaintiff's Claim |
| --- | --- | --- |
| E.A. Renfroe & Co., Inc. | $233,091.48 | $233,091.48 |
| Hudson Marine Management Services | $903,783.08 | $873,783.08 |
| Global Remediation Services, Inc. | $385,621.93 | $384,450.43 |
| Weeks Marine, Inc. | $26,716.20 | $26,716.20 |
| Environmental Protection Engineering S.A. | $23,556.60 | $23,556.60 |
| Total | $1,572,769.29 | $1,541,597.79 |

At trial, Mr. Roussel identified these vendors and the costs paid and the supporting

documentation is set forth in Exhibit P-1420.  *(Trial Tr. Day 19, October 25, 2010, Roussel at*

*115:7[131]; 116:2-18[132]; Exh. P-1420 (Unreimbursed Cleanup Response Costs Claim)).*  The

importance of the work performed by these contractors was clearly necessary and important to

the overall spill response.  *(Trial Tr., Day 19, October 25, 2010, Benson, 45:7-49:16[133]; 49:17-*

*25[134]; Exh. P-1280 (Claims/Decon Scheduling Process Flow Diagram and Decontamination*

*Plan, 12/9/04); Exh. P-1420 (Unreimbursed Cleanup Response Costs Claim)).*

    1.    **CARCO Does Not Dispute $501,690.39 in Non-OPA Response Costs**

CARCO again relies on the testimony of McLellan to challenge these costs.  Of the

$1,541,597.79 Frescati spent on Non-OPA Response Costs, CARCO does not dispute

$501,690.39.  Like his work related to the OPA Removal Costs claim, McLellan overstated his

"discrepancies" by wrongfully including unclaimed amounts.  Here, a downward adjustment of $33,646.50 must be made to McLellan's "overcharges."[15]

### 2. Costs Incurred by Frescati to Manage Third-Party Claims and to Clean and Decontaminate Recreational Boats Soiled by the Spilled Oil

At the Rule 63 Rehearing, Mr. Benson and Capt. Laferriere will again explain that the Unified Command established a section and protocol for receiving and processing third-party claims, which included claims by persons whose boats, wharfs, marinas, and the like, had been damaged by oil spilled from the vessel.  *(Trial Tr., Day 19, October 25, 2010, Benson, 45:7-49:16[135]; Trial Tr. Day 18, October 21, 2010, Laferriere at 9:23-11:10[136])*.  Hudson Marine Management Services ("HMMS") was paid $873,783.08.  *(Exh. P-1420 (Unreimbursed Cleanup Response Costs Claim))*.  HMMS was the initial third-party claims manager for Frescati.  When claims were received by HMMS, the claimant was given the option of accepting money on the claim (which usually meant a long wait) or having its boat or property cleaned.  *(Exh. P-1280)*. If cleaning was selected, the management of the claim fell to Frescati's spill manager (Mr. Benson and The O'Brien's Group) and Global, its subcontractor.  *(Id.)*  Exhibit P-1280 was one of the organizational documents prepared by the Unified Command which acknowledges HMMS's appointment to this position, and depicts the separate role played by HMMS and The O'Brien's Group in the area of third-party claims.  *(Id.)*

Global Remediation Services, Inc. ("Global") was paid $386,925.43 by Frescati to set up and operate recreational boat cleaning and winterizing stations at the sites identified on Exhibit P-1280 *(Decontamination Plan, 12/9/04)*.  *(Trial Tr. Day 19, October 25, 2010, Benson, 48:23-*

---

[15] McLellan offers opinions on only Renfroe, HMMS and Global.  The discrepancies on D-1987 for these OSROs totals $1,073,553.90, but he begins his analysis with a total invoiced amount of $1,524,971.49 when Frescati is only claiming $1,491,324.99.  Thus, McLellan overstated his discrepancies by at least $33,646.50.

*49:16[137]; Exh. P-1420, Tab C (Unreimbursed Cleanup Response Costs Claim)).* Of these costs, $2,475 were deemed OPA compensable and are included in the OPA Removal Costs damages category. *(Exh. P-1419).* The balance of the amount paid to Global is included in the Non-OPA Response Costs category. CARCO did not challenge the necessity or adequacy of the cleaning activities, although McLellan, without explanation, added the entire amount invoiced by Global to his list of "overcharges". Mr. Benson, who oversaw the activities, cogently explained why it was necessary to both clean and winterize the boats being decontaminated, testimony he will repeat when re-called in March. *(Trial Tr. Day 19, October 25, 2010, Benson, 48:23-49:16[138]).*

E.A. Renfroe ("Renfroe") billed and was paid $233,091.48 to support Global's activities, as well as the activities of other spill responders by servicing and repairing boats and equipment such as power washers, air compressors, pumps, and the like. *(Trial Tr. Day 19, October 25, 2010, Benson, 48:15-22[139]; Exh. P-1420, Tab A (Unreimbursed Cleanup Response Costs Claim)).* Clearly, again, these activities were undertaken as a result of the oil spill and served to advance the effectiveness and completeness of the spill response. *(Id.)* CARCO offered no testimony or evidence challenging these services or payments, beyond an unexplained line item in McLellan's report under the heading "overcharges" and a conclusory statement from McLellan that they seemed "redundant." They were not.

As Mr. Benson and Capt. Laferriere will explain, the activities of HMMS, Global, and Renfroe contributed in its own way to the success of the spill response and claims management process. Therefore, the payment of these invoices was a reasonable expense incurred in direct response to the casualty and thus are recoverable from CARCO.

-28-

3.     **Costs Incurred by Frescati to Remove the Anchor and Pump Casing from the River Bed**

Weeks Marine, Inc. billed and was paid $26,716.20 to provide cranes and marine equipment associated with the salvage operations that recovered the anchor and pump casing. These expenses also were reasonably incurred by Frescati in response to the casualty. *(Trial Tr. Day 19, October 25, 2010, Benson at 49:17-25[140]; Exh. P-1420, Tab D (Unreimbursed Cleanup Response Costs Claim)).* Environmental Protection Engineering S.A. ("Protection") billed and was paid $23,556.00 for oversight consulting related to claims management. *(Exh. P-1420, Tab E (Unreimbursed Cleanup Response Costs Claim)).* CARCO did not offer any evidence or testimony to challenge these payments.

C.     **Frescati Seeks $1,500,000 for the Salem Nuclear Settlement**

The "Salem Nuclear Settlement" refers to Frescati's settlement of a multimillion dollar claim made by the owners of the Salem Nuclear Power Plant for damages incurred as a result of the November 26, 2004 spill, which forced an emergency shut-down of the power plant. Defendants contest liability, but not quantum, for the "Salem Nuclear Settlement."

Salem Nuclear submitted claims to the Fund for lost profits and other removal costs. The Fund settled these claims for $33,125,017.17. In November 2008, the owners of the Salem Plant asserted a claim against Frescati for over $4.6 million for interest on the amount recovered from the Fund, which by statute could not be recovered from the Fund. *(Exh. P-1422 (Third party claims)).* CARCO rejected Frescati's tender, leaving Frescati to its own devices to resolve the claim. *(Id. at Athos 78298-78299 and 78415-78418).* In October 2009, Frescati, after careful consideration of the risk and cost of litigation, settled the claim for $1.5 million and in exchange, obtained a complete release for itself and CARCO. *(Id. at Athos 78119.1-78128, 78232, and 78424).* This claim is not expected to be discussed through the re-call witnesses, although both

-29-

Capt. Laferriere and Mr. Benson may discuss the shutdown of the nuclear plant as a consequence of migrating oil from the spill.

**D.**    <u>**Frescati Seeks $438,542.25 in Damages for Unrepaired Hull Damages**</u>[16]

The "Unrepaired Hull Damage" refers to damage the ship sustained as a result of contact with the anchor, but which did not require immediate repairs.  Defendants contest liability, but not the quantum, for the "Unrepaired Hull Damage."

It is well established that a vessel owner is entitled to recover compensation for unrepaired damage to its vessel.  *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 26, 1982 A.M.C. 1535 (2d Cir. 1982) ("If the plaintiff chooses not to or is unable to make repairs […] damages are therefore to be measured by the estimated cost of repairs at a time immediately following the accident."); *see also Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 399, 1998 A.M.C. 825 (4th Cir. 1997); *Hewlette v. Barge Bertie*, 418 F.2d 654, 657 (4th Cir. 1969); *United States v. Shipowners & Merchants Tugboat Co.*, 205 F.2d 352, 1953 A.M.C. 1259 (9th Cir. 1953); *The B. F. Guinan*, 40 F.2d 277, 280, 1930 A.M.C. 219 (E.D.N.Y. 1930).

When the ATHOS I put into dry dock at Mobile, surveyors discovered that the vessel suffered additional damage (though not punctures) to the hull after the ship hit the anchor.  *(Exh. P-1429 (Statement of C. Hajimichael Regarding Damages); Trial Tr. Day 11, October 7, 2010, Bowman at 113:6-115:3[141])*.  The additional hull damage was caused by contact with the riverbed and/or other objects, when the holed ship listed to port and trimmed by the bow.  *(Id.)*  These additional hull damages could not be repaired at Mobile because that port did not have facilities to manage the considerable volume of contaminated liquids then residing in the other

---

[16] Plaintiffs' original claim in this category was over $1 million and included a loss of hire component which was resolved by the loss of hire stipulation discussed above.

affected tanks.  *(Exh. P-1429 (Statement of C. Hajimichael Regarding Damages).*  The vessel

therefore had to leave Mobile with unrepaired damage.  *(Id.)*

Although all of the vessel's contaminated tanks eventually were cleaned (costs covered in

the Hull Damage stipulation, discussed *supra.*), the vessel was placed back into service without

repair to the other damaged hull plates.  *(Id.)*  Mr. Hajimichael testified regarding the hull

damage in question and the process by which estimates were promptly obtained from acceptable

vessel repair facilities capable of making the repairs.  *(Id.)*  The amount presented by

Mr. Hajimichael to repair the hull damage reflects the lowest bid received, in the amount of

$438,542.25.  *(Exh. P-1417a (Hull Damage Claim -- Unrepaired Damages -- Curacao)).*

Business records also admitted through Mr. Hajimichael, include the bid, as well as an

evaluation performed by BMT Salvage, which found the estimate reasonable.  The estimate and

BMT Salvage's evaluation carefully itemize each element of the repair.  *(Exh. P-1417a (Hull

Damage Claim -- Unrepaired Damages -- Curacao)).*  Thus, Frescati has established, to a

reasonable degree of certainty that the fair value of the repair was $438,542.25.  We do not

expect any testimony from the re-call witnesses regarding this element of the damage claim,

although Mr. Hall and/or Mr. Bowman may testify regarding their observation of the hull

damages.

  E. **Frescati Seeks $50,642.01 in Damages for Vessel/ Miscellaneous Port Expenses**

"Vessel/Miscellaneous Costs" refers to assorted expenses Frescati incurred with respect

to the repair of the vessel after the casualty.  These expenditures are not contested by CARCO on

any grounds.

Frescati presented evidence that following the casualty, and as a result thereof, it incurred

costs of $50,642.01 for stern tube oils, vessel stores and the services of BMT Salvage.  *(Exh. P-*

1429 (Statement of C. Hajimichael Regarding Damages); Exh. P-1415 (Hull Damage Claim -- Sterntube Oil and Stores); Exh. P-1416 (Hull Damage Claim -- Underwriter's Survey Costs)). Documentation regarding these costs was presented through the testimony of Mr. Hajimichael and included business records detailing the amounts claimed.  (Id.)  CARCO did not question Mr. Hajimichael regarding this element of the damage claim, or otherwise offer any evidence to establish that the expense was unnecessary or unrelated to the casualty.  Accordingly, Frescati should be awarded the $15,796 paid for stern tube oil and vessel stores and the $34,846.01 paid for the services of BMT Salvage, for a total of $50,642.01.  None of the re-call witnesses are expected to offer further testimony on this element of Frescati's damage claim.

### F.    Stipulated Damages – $6,649,082.90

During the trial, CARCO and Frescati entered stipulations fixing the damage claims in the Hull Damage, Loss of Hire, and Natural Resource Damage categories in the amounts specified above.  (Stipulations of the Parties:  Dkt Nos. 518/234 and 526/233).  The stipulations each provide that the claims are deemed reasonable and proven, so there is no dispute, presuming CARCO is found liable, regarding Frescati's entitlement to a damage award of at least $6,649,082.90.  (Id.)  None of the re-call witnesses are expected to offer further testimony on this element of Frescati's damage claim.

### G.    CARCO Failed to Offer a Tangible Challenge to Frescati's Extensive Evidence on Damages

As explained above, once Frescati established its damages to a reasonable degree of certainty, which it unquestionably did, the burden shifted to CARCO "to show the damages award should be limited because the plaintiff failed to take reasonable measures to mitigate its loss." Vici Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 299 (3d Cir. 2014) (Judges Ambro, Greenaway and Baylson applying Delaware law).  It is not sufficient for CARCO to

-32-

simply disagree with Frescati's proven damages, it is incumbent upon them to establish, as a matter of fact, that Frescati's efforts at salvage, spill response or in mitigation were unreasonable.  *See Bosnor, S.A. v. L. A. Barrios*, 796 F.2d 776, 783 (5th Cir. 1986); *Continental Sweden Corp. v. M.P. Howlett, Inc.*, 719 F. Supp. 1202, 1210 (S.D.N.Y. 1989).  CARCO fatally limited its ability to do so in at least two critical respects.

First, CARCO did not present **any** testimony or evidence with respect to several elements of the damage claim, including the claims for Miscellaneous Port Expenses ($50,642.01), Unrepaired Hull Damage ($438,542.25), the Salem Nuclear Plant Settlement ($1,500,000.00), and within the Claims Management & Marine Services category, more than $451,000 paid to HMMS, $26,716.20 paid to Weeks and $23,556.00 paid to Protection.  Thus, Frescati's evidence of damages in these categories, amounting to nearly $2.45 million, is uncontroverted in the record.  This is **in addition to** CARCO's stipulation to another $6,649,082.90 for damages in the Hull Damage, Loss of Hire and Natural Resource Damage categories.  *(Stipulations of the Parties:  Doc. Nos. 518/234 and 526/233).*

Second, CARCO chose not to challenge the reasonableness of the Federal On-Scene Coordinator's spill response directives or Frescati's compliance with those directives in implementing the work of the spill response.  The evidence is, and will remain following the testimony of the re-call witnesses, uncontroverted that the oil spill response was successful and was, in all respects, carried out consistent with the National Contingency Plan and the orders of Coast Guard's Federal On-Scene Coordinator.  CARCO's only witness on damages, McLellan, who has no experience as a spill manager, limited his work to a post-mortem review of  the appropriateness of the spill response documentation and the management of contractor billing practices. *(Trial Tr. Day 21, November 3, 2010, McLellan at 136:20-137:9[142]; 141:22-*

-33-

143:11[143]; 195:6-11[144]; Trial Tr. Day 22, November 4, 2010, McLellan at 118:22-119:10[145]).  As is clear from his testimony, McLellan was not present during the spill response, did not interview any of the spill responders, and ultimately could not testify that it was more likely than not that the spill response labor, equipment or materials paid for by Frescati were not actually provided in the field.  *(Id.)*

## IV.   PREJUDGMENT INTEREST

### A.   Prejudgment Interest Is Available to a Successful Admiralty Plaintiff

Since before the case of *The Amiable Nancy*, 16 U.S. 546 (1818), courts sitting in admiralty have awarded prejudgment interest to successful plaintiffs.  As the law has developed, prejudgment interest is "well-nigh automatic" in admiralty cases.  *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).  It will be awarded unless exceptional circumstances, not present here, make such an award inequitable or unconscionable.  *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995); *Del. River & Bay Auth. v. Kopacz*, 584 F.3d 622, 634 (3d Cir. 2009); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157-58 (5th Cir. 1990) ("Under the general maritime law, an award of prejudgment interest is the rule rather than the exception."); *Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3d Cir. 1981); *Del. River Tow, LLC v. Nelson*, 382 F. Supp. 2d 710, 712 (E.D. Pa. 2005).  Prejudgment interest is considered a component of the damages award, as opposed to separate from it, though the award of prejudgment interest "must be compensatory, rather than punitive." *Kopacz*, 584 F.3d at 634 (citing *Matter of Bankers Trust Co.*, 658 F.2d at 108); *see also City of Milwaukee*, 515 U.S. at 195-96 ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss.  Full compensation has long been recognized as a basic principle of admiralty law."); *Gardner v. The Calvert*, 253 F.2d 395, 402 (3d Cir. 1958) (noting that "the general rule, which has long been recognized, [is] that interest

-34-

may be allowed to make just compensation for losses in admiralty cases").  "[N]either a good-faith dispute over liability nor the existence of mutual fault justifies the denial of prejudgment interest in an admiralty collision case."  *City of Milwaukee*, 515 U.S. at 199.  A district court's award of prejudgment interest will only be vacated or modified where the district court has abused its discretion.  *See M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133, 136 (3d Cir. 1984).

In addition, Frescati is entitled to recover that portion of the interest that it was statutorily barred from recovering against the United States, when reimbursed $87,989,157.31 by the Fund. *See Transorient Navigators Co. v. M/S Southwind*, 788 F.2d 288, 293-94 (5th Cir. 1986); *see also Probo II London v. Isla Santay MV*, 92 F.3d 361, 364-65 (5th Cir. 1996); *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 829-30 (4th Cir. 1992); *SNCO Barge Lines, Inc. v. Sun Transp. Co., Inc.*, 775 F.2d 221, 227 (8th Cir. 1985).

Prejudgment interest is available not only for amounts expended on OPA-removal and response costs, but as well on all Hull Damage Repair, Loss of Hire, Miscellaneous Port Expenses, Claims Management and Marine Services and Salem Nuclear Settlement elements of Frescati's damage claim.  Frescati is not seeking an award of interest on the Unrepaired Hull Damage element, since that claim does not involve an out-of-pocket expense or loss of income. To date prejudgment interest calculated at the U.S. Prime Rate compounded "daily" totals over $47 million.  Interest accrues at a rate of about $9,000 per day.  Undoubtedly, a lot interest has accumulated in the decade since the casualty. This includes the time value of approximately $55

million for nearly 10 years and the time value of the approximately $88 million reimbursed by the Fund between April 1, 2004 and the reimbursement dates.[17]

At the Rule 63 Rehearing, the court will hear the testimony of Frescati's expert, William Dunkelberg, a retired Professor of Economics at Temple University, whose testimony endorses the generally accepted view the prime interest rate, compounded, is the appropriate and fair interest rate to be referenced when calculating the award of prejudgment interest.  The court will also hear the testimony of Kenneth Boudreaux, CARCO's expert, who, not surprisingly, has advocated a compounded subprime rate, but referenced to the LIBOR.

**B.**      **The U.S. Prime Rate of Interest is the Appropriate Interest Rate to Apply to Frescati's Damage Award**

Use of the prime rate of interest is generally acceptable in maritime and admiralty cases. *Matter of Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir. 1992); *BP Exploration & Oil, Inc. v. Moran Mid-Atl. Corp.*, 147 F. Supp. 2d 333, 347 (D.N.J. 2001); *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 950 F. Supp. 904, 909 (E.D. Wis. 1996) ("[U]nless a court engages in refined rate-setting, tailored specifically to the facts of the case at hand, the prime rate should be used *because it is most nearly reflective of the market rate*."  (emphasis added).  The court in the *Amoco Cadiz* case noted that a district court could look to the rates of the publicly traded notes and debentures obtained by the entity during the prejudgment period, but held that it could also apply the prime rate, "the rate banks charge for short-term unsecured loans to creditworthy customers," in order to avoid engaging in "such refined rate-setting."  *Amoco Cadiz*, 954 F.2d at 1332; *see also Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 27 (2d Cir. 1982) ("Plaintiff's position that prejudgment interest should be determined

---

[17] The Fund reimbursed approximately $77 million in 2006 and approximately $10 million in 2008.

through proof of what the particular plaintiff actually paid to borrow money during the relevant period is in error.  Consideration of the precise credit circumstances of the victim would inject a needless variable into these cases.  Plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations.").

For purposes of this proceeding, Frescati has used the U.S. prime rate of interest.  This is a "tried and true" approach with the fewest variables.  *See Indep. Bulk Transp., Inc.*, 676 F.2d at 27 (counseling against needlessly complicating the interest rate calculation); *City of Chicago v. M/V Morgan*, 248 F. Supp. 2d 759, 779 (N.D. Ill. 2003) (employing the prime rate for calculating prejudgment interest); *Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atl. Corp.*, 924 F. Supp. 1436, 1455 n.13 (E.D. Va. 1996) (setting the rate of prejudgment interest at the prime rate, the prevailing commercial rate on loans to businesses).  As is clear from the testimony of the two economists in this case, Drs. Boudreaux and Dunkelberg, as well as Mr. Hajimichael, a casualty of this size and expense implicates numerous layers of insurance and reinsurance coverage, as well as complicated payment and reimbursement formulas with claim sharing and reinsurance arrangements within the various shipowner mutual societies that insure the world's oil tankers. *(Trial Tr. Day 32, November 30, 2010, Dunkelberg at 27:21-28:12[146]; Trial Tr. Day 22, November 4, 2010, Boudreaux at 130:9-131:3[147]; Trial Tr. Day 15, October 18, 2010, Hajimichael at 146:21-25[148]).*  Unless the court has detailed financial information on all of the parties whose funds are implicated in a major casualty of this type, enabling it to engage in a refined rate-setting process, use of the prime rate is appropriate.  *See Amoco Cadiz*, 954 F.2d at 1332; *Indep. Bulk Transp., Inc.*, 676 F.2d at 27.

-37-

C.     **April 1, 2005 is an Appropriate Commencement Date for the Award of Interest.**

Although Frescati incurred significant costs and losses beginning in November 2004, it has proposed April 1, 2005 as the appropriate start date for the running of prejudgment interest on all but the Salem Plant settlement, where it proposes that interest begin to run from the date the settlement proceeds were paid.

Frescati proposed the April 1, 2005 date convention to simplify the calculation of interest, in part because its payments in the months following the casualty occurred at such a torrid pace that the number of interest commencement dates would make calculation a cumbersome process.  CARCO's expert implicitly, if not explicitly accepted the April 1, 2005 convention when offering his own interest calculations from that start date.  Although Frescati may be leaving money on the table through use of the April 1, 2005 convention, doing so should lessen the purported concern expressed by the CITGO defendants' expert that an award above the paltry rate he has suggested could result in a windfall to Frescati.

Respectfully submitted,

Dated:  February 13, 2015                       /s/ Timothy J. Bergère
                                                Alfred J. Kuffler (AK868) (ID No. 12868)
                                                John J. Levy (JL737) (ID No. 42377)
                                                Eugene J. O'Connor (*Pro Hac Vice*)
                                                Timothy J. Bergère (ID No. 39110)
                                                Tricia J. Sadd (ID No. 90553)
                                                MONTGOMERY, McCRACKEN,
                                                    WALKER & RHOADS, LLP
                                                123 South Broad Street
                                                Philadelphia, PA  19109-1029
                                                (215) 772-1500

                                                Attorneys for Plaintiffs
                                                Frescati Shipping Company and
                                                Tsakos Shipping and Trading, S.A.

-38-

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re Petition of Frescati Shipping Company, Ltd., as owner of the M/T ATHOS I, and Tsakos Shipping and Trading, S.A., as Manager of the ATHOS I, for Exoneration from or Limitation of Liability | ) ) ) ) ) ) | Civil Action No. 05-cv-305 |
| | ) | Civil Action No. 08-cv-2898 |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | CONSOLIDATED |
| | ) | |
| v. | ) | (THE HONORABLE JOEL H. SLOMSKY) |
| | ) | |
| CITGO ASPHALT REFINING COMPANY, *ET AL.*, | ) ) | THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **FRESCATI PLAINTIFFS' PRE-HEARING BRIEF ON THE ISSUE OF DAMAGES**, was filed electronically.  I certify my understanding that the following counsel have consented to service of this filing through the receipt of electronic notification from the Court:

**Frank P. DeGiulio, Esquire**
fpd@pbh.com
**Richard Q. Whelan, Esquire**
rqw@pbh.com
*Attorneys for Citgo Asphalt Refining Company*

**Derek A. Walker, Esquire**
walkerd@chaffe.com
*Attorneys for Citgo Asphalt Refining Company*

**Stephen G. Flynn, Esquire**
Assistant Director Admiralty
Stephen.Flynn@usdoj.gov
**Sharon K. Shutler, Esquire**
Sharon.Shutler@usdoj.gov
*Attorneys for Plaintiff United States*

This Certificate of Service and the said filing are intended to be available for viewing and

downloading from the ECF system of the United States District Court for the Eastern District of

Pennsylvania.

Dated:  February 13, 2015            /s/ Timothy J. Bergère
                                     Alfred J. Kuffler (ID No. 12868)
                                     John J. Levy (ID No. 42377)
                                     Timothy J. Bergère (ID No. 39110)
                                     Eugene J. O'Connor (*Pro Hac Vice*)
                                     Tricia J. Sadd (ID No. 90553)
                                     MONTGOMERY, McCRACKEN,
                                       WALKER & RHOADS, LLP
                                     123 South Broad Street
                                     Philadelphia, PA  19109-1029
                                     (215) 772-1500
                                     Attorneys for Plaintiffs
                                     Frescati Shipping Company, Ltd. and
                                     Tsakos Shipping & Trading, S.A.

3826551v8

ENDNOTES

---

[1]*Trial Tr. Day 19, October 25, 2010, Roussel at 83:22-85:4 ("Q Mr. Roussel, by whom are you employed?  A A company called SOS, Spill On-Site Management.  Q And what is SOS's business?  A We manage finances on large oil spills, even small oil spills.  THE COURT: You provide the money or you just manage other people's money?  THE WITNESS: Provide other people's money.  THE COURT: Thank you.  BY MR. BERGERE:  Q And did you work on the ATHOS I oil spill?  A Yes.  Q And when did you begin work on the ATHOS I oil spill?  A Early December, the first or second week of December.  Q And was SOS one of what Mr. Benson referred to as their network employees on this spill?  Q Now, what is the role of the Finance Section?  A It's part of the Unified Command and we would receive, review, audit and recommend invoices for payment.")*

[2]*Trial Tr. Day 19, October 25, 2010, Roussel at 105:6-107:5 ("MR. BERGERE: Can we have P-1419?  (Pause.)  BY MR. BERGERE: Q Mr. Roussel, do you recognize this document?  A Yes.  Q And what is this document?  MR. BERGERE: Can we call up 78207? I'm sorry.  BY MR. BERGERE:  Q Can you walk us through what we have here?  A This page is a summary of -- MR. BERGERE: This would be the third page in the binder, your Honor.  THE WITNESS: This page is a summary of some of the amounts that were submitted. This is the first submission that we submitted to the NPFC.  BY MR. BERGERE:  Q And the NPFC is the National Pollution Fund Center?  A Yes.  Q And this was a submission to obtain reimbursement for the owners for response costs incurred in connection with the spill?  A Yes.  Q And the amount of the initial submission, is that set forth there?  A Yes, it's 123 million.")*

[3] *Trial Tr. Day 19, October 25, 2010, Roussel at 89:1-90:4 ("Q And how does that program work or assist you in evaluating invoices and daily summaries that you're getting from contractors?  A We receive -- when we arrive on scene, we receive the rate schedules or contracts from the vendors, the bigger OSROs that have the thousands of personnel.  Q When you say OSRO, we're talking about that's an acronym for Oil Spill Response Organization?  A Yes.  Q Okay.  A We input their personnel, equipment and material rates into the database, they're pre-inputted with the rates that match their system. Then when we enter these items into our database, the rate automatically appears for a supervisor or a foreman or a pickup truck or a certain size vessel. So, when we enter it, it's almost fool-proof, the rate automatically appears and, when you hit Tab or Enter, the computer goes to the next line. You have to manually override the system to put in an inaccurate rate from the rate set.  Q So, once the computer program sets the rate based on the approved rate sheets, if there's any invoice that comes in after that and the rates are different, that that would be picked up because the operator would have to manually override the existing rate?  A Yes.  Q And that's done as a check to assure that contractor invoices are paid at the approved rates?  A Yes.").*

[4] *Trial Tr. Day 19, October 25, 2010, Roussel at 91:11-92:1 ("Q How were the negotiations on the ATHOS different than some of the other oil spills you've worked on?  A We were fairly -- we pushed back, we were fairly aggressive on the ATHOS, and kind of pushed pretty hard. The vendors or contractors weren't too happy with us. We -- Q When you say pushed hard, you don't mean physically contacting them, you're talking about something else?  THE COURT: In which* Continued…

----

….Continued

*direction? You haven't specified.  THE WITNESS: We were trying to reduce their rates -- THE COURT: Oh.  THE WITNESS: -- and get negotiated lower rates and discounts from their rates. And we put in several procedures to lower their rates on the ATHOS they weren't too happy with.").*

[5] *Trial Tr. Day 19, October 25, 2010, Roussel at 91:11-92:1; 93:19-96:5Q What are short payments in your business?  A Short payments are when a vendor or contractor supplies us with an invoice, we audit the invoice either through a desk audit or input the detail into the database. We find errors, miscalculations -- Q Double billing?  A -- double billings, incorrect rates. We'll sometimes create a report or call the vendor and notify him we have one issue or multiple issues with your invoice, here's the list of them, here's the amount. Do you agree that these are errors? Most of the time they do agree and they'll say, just short pay this invoice by that amount and we'll call the invoice full and final.  Q And is there any record that's kept when you've short paid an invoice that it's in fact been settled?  A Yes. Sometimes they'll sign a document that has the short payment amount. Q How do you deal with markups?  A Usually all the contractors have a line item at the bottom of their rate schedule that says they can mark up third-party items that they may have purchased at a store.  It kind of comes with the territory, you're going to have them; we try to limit them, but you're pretty stuck with them on their rate schedules.  Q What was done with markups in this case as a cost-control measure, if anything?  A We tried to reduce the percentage. All contractors have a different number, sometimes it's 35 percent down to five percent. We did try to reduce that as much as we can to 15 or ten percent, sometimes zero percent, with these contractors to try to limit it.  Q Was there also an effort to pull some of NRC's subcontractors directly under -- to direct hire them through O'Brien's so that there weren't markups paid?  A Yes.  Q Now, how do you manage hourly rates?  A On this case, the hourly rate is what is listed on the rate sheet, we'll input that into the database so it's properly inputted, we can input the detail. We'll try to negotiate with the more expensive contractors and reduce their rates to a rate that we would rather see.  Q Was there -- were there negotiations or establishment of rates in this case, hourly rates in this case for workers deployed on the spill? A Yes.  Q And how was that done?  A We met with the management team, internal, and the Finance Section on what we thought we could get away with or what they would accept. We knew they wouldn't like it, but we were going to try to have them accept it. We grabbed the top handful of contractors who had the more expensive rates, personnel rates, and we also looked at the contractors who had the lowest rates, and we tried to meet somewhere in the middle, thinking they would accept it. We brought the more expensive contractors down, but we left the lower contractors where they were, we did not bring them up.  Q So, the adjustment of hourly rates was really to lower the cost of the higher-rate contractors working on the job?  A Yes.  Q And were you successful in obtaining lower rates for those higher-priced contractors?  A Yes").*

[6] *Trial Tr. Day 19, October 25, 2010, Roussel* at *118:14-121:18* ("*MR. BERGERE: Can we please have P-1274? If I have the right number.  BY MR. BERGERE: Q Do you recognize this document, Mr. Roussel?  A Yes.  Q And what do you recognize this as?  A We provided a report listing some of the major negotiations we had with the contractors and the results of those negotiations.  Q And is the figure that's there, $37,600,000, is that the amount that you estimated you saved in response costs through these cost-savings measures?  A Yes.  Q And can you walk* Continued…

-2-

….Continued

*us through what the specific categories are where you accounted for these savings? A The top one, which was 3.5 million, was a result of after we met with the contractors and reduced their personnel rates from their rate schedules. After we inputted the data into the database, I can run a report to show how much personnel has cost at any particular day or date range, I picked a date range and it showed a figure. After they invoiced with the reduced rates, I ran that report again and there was a difference, and I extended that out until the event was Federalized, and I reduced it as the number of personnel were reduced towards the end of the job. Q Now -- THE COURT: Was the amount paid actually reduced? THE WITNESS: Yes, sir. In two instances, some of these savings were before they actually invoiced. So, they didn't invoice incorrectly, they adjusted their invoices before submitting them. THE COURT: But at least whatever you claim is a savings amounts to something it was not paid to? THE WITNESS: Correct, yes, sir. THE COURT: Thank you. BY MR. BERGERE: Q And there's a big category down at the bottom that -- why don't we highlight the $12 million claim? Can you tell us how you determined that approximately $12 million would have been saved on the issue of containment boom? A Containment boom was an item we had quite a bit of on the event. We ran a report from the database that showed we were being charged approximately 950,000 per week for containment boom. We negotiated with the contractors and limited the amount of days they can charge for a containment boom to 14 days and we ran the figures if they were to continue to charge that amount for the additional 13 weeks of the response, that amount would have been invoiced. Q In the two or 300 spill responses that you mentioned that you had worked on, had you ever been involved in a case before where you successfully limited the number of days that contractors could bill for boom to a 14-day period? A 14 days, no, have not. Q Have you attempted to implement some of these same controls in the DEEP WATER HORIZON spill? A One measure was taken on the DEEP WATER HORIZON, but many -- some of the others were not. Q Now, is it your view based on your experience as the Finance Chair on the many spills you've mentioned and reviewing the -- THE COURT: Excuse me, before we leave that, are you suggesting that you're the only person that considered the number of days they would need a containment boom? THE WITNESS: No -- THE COURT: Didn't anybody else think about this? THE WITNESS: No, sir, it was a joint effort with the Spill Management Team on a time period that we thought we could convince the contractors to accept, and we tried for 14 days and were successful. THE COURT: Thank you. BY MR. BERGERE: Q And are there other spills where there's no limitation put on the number of days contractors can bill for containment boom? A Yes. THE COURT: Whether they're being used or not? THE WITNESS: Yes. Sometimes, if it's on a spill for a long duration of time, the contractors, according to their rate schedule, can bill for two to three months for this containment boom.")*

[7] *Trial Tr. Day 19, December 7, 2010, Benson at 4:3-9("Q By whom are you employed? A O'Brien's Response Management. Q By whom were you employed in 2004? A O'Brien's Oil Pollution Services, Incorporated. Q Is the name of your current employer a successor name to your employer in 2004? A Yes, it is.")*

[8] *Trial Tr. Day 19, October 25, 2010, Benson at 4:13-16 ("Q Okay. Was there a connection between O'Brien's Oil Pollution Services, your employer in '04, and the O'Brien's Group? A Yes, sir –")*

Continued…

….Continued

[9] *Trial Tr. Day 19, October 25, 2010, Benson at 5:11-13 ("Q Was the O'Brien's Group the parent company of your employer in 2004?  A It was.")*

[10] *Trial Tr. Day 19, October 25, 2010, Benson at 9:1-19 ("Q Okay. Did O'Brien's, meaning O'Brien's Oil Pollution Services, have a contract with Tsakos at the time of the ATHOS spill? A They did.  Q And what services did that contract call for you to provide?  A Qualified Individual services and Response Management services, as per the Vessel Response Plan.  Q Okay. What role does a Qualified Individual play for a shipowner in an oil spill in the United States?  A My role is to liaison with the owners of the vessel in Greece, it's also to liaison with the Coast Guard Federal On-Scene Coordinator and the Unified Command; it's to be knowledgeable of the Oil Pollution Prevention Regulations; again, to authorize the expenditure of resources and assets to the oil spill, and to continue liaison with the Federal On-Scene Coordinator regarding response assets available to the spill, and monitor and supervise and support the Spill- Management Team in accordance with the Vessel Response Plan.")*

[11] *Trial Tr. Day 15, October 18, 2010, Hajimichael at 78:4-20 ("Q Now, how did you get notice of this incident? Explain what happened.  A I was at home, I received a phone call from O'Brien's, who were the qualified individuals under our vessel's response plan.  Q Let me stop you right there. What is a qualified individual?  A When the U.S.A. Government introduced the OPA --  Q The OPA, OPA '90?  A OPA '90, they had introduced a requirement that each vessel should have a vessel's response plans to address emergencies happening in U.S.A. ports. They further requested that the owner should appoint a local company here in the United States who would be their representative. They call that body, that person, that company, qualified individual, and the qualified individual under our vessel's response plan was O'Brien's Group.")*

[12] *Trial Tr. Day 19, October 25, 2010, Benson at 7:20-25 ("Q Can you give us a couple of examples of major oil spills that you've worked on?  A Yes, sir. The tank ship MEGABOARD (ph.) fire off of Galveston, Texas; EXTOC (ph.) oil blowout, Bay of Campeche; EXXON VALDEZ; the Chevron Hawaii explosion in Deer Park; the DBL-152; and, most recently, the BP DEEPWATER HORIZON spill.")*

[13] *Trial Tr. Day 19, October 25, 2010, Benson at 11:9-17 ("Q Now, you mentioned Response Manager; what's the function  of a Response Manager in an oil spill?  A To step up and conform with the Vessel Response Plan,  which outlines response activities under the Incident Command System. We provide qualified personnel for command staff positions, Incident Commander, Safety Officer, Public Affairs. We also man and staff the Section Chief Level positions for operations, tactical operations, logistics, planning, and also for finance.")*

[14] *Trial Tr. Day 19, October 25, 2010, Benson at 9:1-8 ("Q Okay.  Did O'Brien's, meaning O'Brien's Oil Pollution Services, have a contract with Tsakos at the time of the ATHOS spill?  A They did.  Q And what services did that contract call for you to provide?  A Qualified Individual services and Response Management services, as per the Vessel Response Plan.")*

Continued…

….Continued

[15]*Trial Tr. Day 19, October 25, 2010, Benson at 10:6-8 ("Q Do you know how long O'Brien's has been under contract with Tsakos?  A I believe our original contract was dated 1996.")*

[16]*Trial Tr. Day 19, October 25, 2010, Benson at 12:16-19 ("Q Does the regulations implementing the Oil Pollution Act also require that a Vessel Response Plan have a predesignated oil-spill response organization?  A It does.")*

[17]*Trial Tr. Day 19, October 25, 2010, Benson at 15:18-16:3 ("Q How did you go about mobilizing the necessary labor, equipment and supplies needed to respond to the ATHOS spill? A We activated the Vessel Response Plan.  The National Response Corporation is Tsakos' contracted oil-spill cleanup organization or contractor.  From that point, we activated NRC, or National Response Corp., requesting labor, equipment, materials and supplies to respond and mobilize into the Philadelphia area.  We also asked -- requested that the National Response Corp. activate their Incident Command Network, which is pre-event agreements with other subcontractors and cleanup organizations to respond as well.")*

[18]*Trial Tr. Day 19, October 25, 2010, Benson at 16:9-17:1 ("Q Now, at this early stage, did you have an understanding of the situation, that is the status of the ship, the size of the spill, things like that?  A My initial briefing from the Watch Stander and the Duty Incident Commander was very sketchy.  The person on board the ATHOS reported into our Command Center that it had struck something on the bottom, a submerged object of some kind, didn't know what it was, though he did state he had oil in the water, he had an undetermined amount of oil in the water he couldn't quantify.  He also stated that the vessel was starting to take a slight list, which is not a good thing for a vessel in calm water.  We assume -- I assume, as Qualified Individual, the worst, because we don't know.  It's dark, it's late at night; oil is black, it's very difficult to see.  So, essentially I assumed the worst and activated the contractor in their plan and mobilized adequate resources that I thought at the time were reasonable and necessary to prevent further spill.")*

[19]*Trial Tr. Day 33, December 1, 2010, Benson at 114:7-115:15 ("Q What things were the pill management team and its finance section doing to protect the RP's interests in this case?  A Well, you have to understand at the advent of this event is of a very major issue with a ship in distress at night and very, very adverse weather conditions, unknown quantities of oil, at the time, flowing down a fast river system, in a major metropolitan and industrial area.  There's many complexities to this type or response, require immediate activation.  We absolutely follow the vessel response plan, utilizing the resources stated within the vessel response plan for contractors.  We mobilized the incident management team.  We got it in place.  We formed a unified command, according to the incident command system.  We employed the operations logistic planning and finance section, as fast as we possibly could and we employed the tactics and strategies of most spills of this size and category.  Q Do those strategies include active cost control measures?  A Absolutely, absolutely.  Q And what kinds of cost control procedures?  A The procedures basically fall in line with spills of this category, where labor, equipment, materials and supplies, which are listed in contractor's rate sheets and contracts with my client are employed immediately.  We have a lot of extenuating circumstances early in the game on a* Continued…

-5-

---

….Continued

*spill like that. The importance is to get the contractors, get the necessary equipment in the field as fast as we can, to start containing the oil. We very rapidly set up a finance section right in line with the rest of the different section chief levels. We immediately went to the contractors and sourced their rate schedules and their equipment schedules. We started pulling paper and documentation from the field into the finance section for immediate review. That was very rapid. It's all about protecting the client in a casualty such as this.")*

[20] *Trial Tr. Day 19, October 25, 2010, Benson at 15:18-16:8 (Trial Tr. Day 19, October 25, 2010, Benson at 15:18-16:8; ("Q How did you go about mobilizing the necessary labor, equipment and supplies needed to respond to the ATHOS spill? A We activated the Vessel Response Plan. The National Response Corporation is Tsakos' contracted oil-spill cleanup organization or contractor. From that point, we activated NRC, or National Response Corp., requesting labor, equipment, materials and supplies to respond and mobilize into the Philadelphia area. We also asked -- requested that the National Response Corp. activate their Incident Command Network, which is pre-event agreements with other subcontractors and cleanup organizations to respond as well. Q When you say the National Response Corporation has a network of contractors, you're talking about oil-spill cleanup contractors, am I correct? A Professional -- professional oil-spill cleanup contractors, that's correct.").*

[21]*Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10 ("Q Was there a company involved in this case that goes by the acronym SOS? A Yes. Q Okay. What does that stand for? A Spill On-Site Services. Q Is SOS part of the O'Brien's network? A They are, in good standing. Q Okay. What role did SOS play in this case? A They served in the Finance Section within the Incident Command System. Q What does the Finance Section do? A Generally, the Finance Section is responsible for the accumulation of invoices as they pertain to the response and contractors; they review daily support sheets, they compare those daily support sheets to the invoice; they schedule and recommend payment on invoices; and take care of any issues in the invoices that may cause errors, mathematically or fundamentally wrong, something to that effect; that's their primary mission in Finance.").*

[22]*Trial Tr. Day 19, October 25, 2010, Benson at 26:15-18 ("Q Can you estimate in dollar value approximately the amount of invoices that your Finance Section had to process in this case? A I'd say approximately $180 million.").*

[23]*Trial Tr. Day 19, October 25, 2010, Benson at 37:14-22 ("Q How were the contractors paid? If a contractor submits an invoice, can you describe the method, how he's paid? A Well, we start with the daily support sheet, which then goes back to the contractor, who develops an invoice based on a series of day-to-day daily support sheets. An invoice is generated, it's submitted to our Finance Section. Our Finance Section then takes the invoice, compares them to the daily support sheets, then makes a recommendation for payments.").*

[24]*Trial Tr. Day 19, October 25, 2010, Benson at 70:1-17 ("Q All right. Now, would you agree with me that it's not a good idea to telegraph to somebody that you're auditing how much the audit is going to disallow? A I'm asking by contractors, spill-response contractors, from time to* Continued…

---

….Continued

*time when they're going to get paid and I think it's my obligation to let that contractor know what the process is and where we are in that invoice audit through our Finance Section, and I feel compelled to make sure that the contractor knows that we're not withholding their invoice for any other reason other than a fair and reasonable audit. So, it's my simple communications to Mr. Candido saying, yes, we have it, there's some questions that need to be answered; if we can't come to a resolution, we'll forward it over to the correspondent for his review. And the remaining balance on the invoices seem to look pretty good as per our Finance Section and we're within about a two-percent margin, and it will be paid.").*

[25]*Trial Tr. Day 19, October 25, 2010, Benson at 19:21-20:7 ("Q Is it true that the faster you get the spill contained and cleaned up that, in the long run, the more money you're going to save the client?  A Absolutely. In my end of the business, I refer to that as the golden hour. We need to respond as fast as we can with available assets and resources that are closest to the spill site. As information and intelligence flows into the Command Center and we get a better handle on the extent of the spill, we add to those assets and resources in an encompassing fashion, starting locally, regionally, state, East Coast, West Coast, Gulf Coast, and we respond accordingly.").*

[26]*Trial Tr. Day 19, October 25, 2010, Roussel at 108:16-110:10 ("MR. BERGERE: And within this tab can we turn to ATHOS-78208, which is Tab A?  THE COURT: Tab A.  MR. BERGERE: And maybe pull up 208 and 209 side-by-side?  BY MR. BERGERE:  Q Mr. Roussel, can you tell us what this list is?  A This comprises of the 123 million that was listed on the previous page, the summary, this comprised of all of the vendors and their invoice amounts that we submitted to the Fund to make up the $123 million.  Q So, the list of -- THE COURT: Excuse me, but where -- MR. BERGERE: I'm sorry, your Honor.  THE COURT: What page is that on?  MR. BERGERE: This would be ATHOS-78208 and -209, your Honor; it would be Tab A.  THE COURT: Tab A doesn't have that stuff in it.  MR. BERGERE: Perhaps I gave you a bad copy, your Honor.").*

[27]*Kegelman Dep., September 11, 2009 at 155:20-156:5("Q. Okay. And do you agree that cost -- the most cost effective means at the least cost possible, the lowest cost possible?  A. Not necessarily.  Q. Okay. And when is it not?  A. When we have to go into 24-hour operational periods, sometimes we have to pay overtime, double-time in order to get the cleanup done quicker, thus making it cheaper in the long run for the client.").*

[28]*Trial Tr. Day 19, October 25, 2010, Benson at 29:6-15 ("Q Okay. Did O'Brien's pay for hot meals for the workers in the field?  A Yes, we did.  Q Why?  A It was wintertime in Philadelphia and snow and cold and subzero temperatures at some times. Worker safety is our first priority, as I stated earlier. The Coast Guard required us through the Incident Action Plan and through the Site Safety Plan to provide our workers in the field one hot meal a day. So, we were required to do that and we did.").*

[29] *Trial Tr. Day 19, October 25, 2010, Benson at 32:21-33:16 ("Q Did the Unified Command require you to stage boom at shoreside locations?  A Yes, they did.  Q And why was that?  A The dynamics and the physical properties of this oil was such to where it was -- it could barely float on a good day.  Cold water. The Delaware River is laden with sediments and mud suspended in* Continued…

---

….Continued

*the water column, it interacted with the oil, it caused the oil to float and it caused the oil to sink at any given time. Generally, when the sun was behind a cloud, the oil would cool and it would settle down into the water. We had a very real issue with subsurface movement of oil that we couldn't see on the surface, and certainly on the Delaware River the visibility is not that well either. That posed a threat downriver to a number of high-visibility facilities such as marinas, boat harbors, water intakes, industrial berths, sensitive areas, marshes, small rivers and inlets. We were required under the Delaware Bay Area Contingency Plan to protect those areas. And by process of prestaging equipment and boom, in the event that tar balls and oil would show up, we could immediately deploy it.").*

[30]*Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10 ("Q Was there a company involved in this case that goes by the acronym SOS?  A Yes.  Q Okay. What does that stand for?  A Spill On-Site Services.  Q Is SOS part of the O'Brien's network?  A They are, in good standing.  Q Okay. What role did SOS play in this case?  A They served in the Finance Section within the Incident Command System.  Q What does the Finance Section do?  A Generally, the Finance Section is responsible for the accumulation of invoices as they pertain to the response and contractors; they review daily support sheets, they compare those daily support sheets to the invoice; they schedule and recommend payment on invoices; and take care of any issues in the invoices that may cause errors, mathematically or fundamentally wrong, something to that effect; that's their primary mission in Finance.").*

[31]*Trial Tr. Day 19, October 25, 2010, Benson at 50:1-51:7 ("Q In a spill response like this, are you familiar with a concept called Central Supply?  A Yes, I am.  Q And what is that?  A Central Supply is where we pull in all the inventory that's being used, the consumable inventory, the expendable inventory, such as sorbent materials that soak up oil; personnel protective equipment such as suits, boots, gloves; a lot of the expendable inventory that's required to sustain an oil-spill response. In the emergency phase, we would require that each individual contractor support themselves with all the expendable equipment for the oil spill itself, such as rope and pads and Visqueen and bags. Once we started to get a better control, a handle on the spill, we moved towards that proactive phase, we centralized our inventory, and that way we could control its use, limit its use so there's no waste, and document every day how much we were using in the field.  Q Is Central Supply more efficient?  A Very much more efficient.  Q Is it more economical?  A Highly cost effective.  Q Okay. In this case, were you able to set a Central Supply?  A We did.  Was there a particular company that was engaged to handle that?  A We did. We looked through the local Philadelphia area, we -- our Logistics Section identified a company called Aramsco Services, and they're an industrial supply company.  We engaged in dialogue with the Aramsco Services and eventually awarded them Central Supply.")*

[32]*Trial Tr. Day 19, October 25, 2010, Benson at 37:14-22 ("Q How were the contractors paid? If a contractor submits an invoice, can you describe the method, how he's paid?  A Well, we start with the daily support sheet, which then goes back to the contractor, who develops an invoice based on a series of day-to-day daily support sheets. An invoice is generated, it's submitted to our Finance Section. Our Finance Section then takes the invoice, compares them to the daily support sheets, then makes a recommendation for payments.").*

Continued…

-8-

….Continued

[33]*Trial Tr. Day 19, October 25, 2010, Benson at 38:6-15 ("Q Are the oil-spill contractors paid in percentages or all at once? How does that happen exactly?  A They are, they are, they are. And we generally – our Finance Section generally recommends an 80-percent quick payment on an invoice. These contractors need money, they need money to sustain their operation, especially with a large workforce and all the materials and supplies that they're consuming every day. And we withhold 20 percent, Finance withholds 20 percent for further vetting of the invoice to flush out any mistakes or errors.")*

[34]*Trial Tr. Day 18, October 21, 2010, Laferriere at 8:18-9:12 ("Q You mentioned that you were technical advisor to the federal on-scene coordinator and for a time were also the federal on-scene coordinator.  Can you explain what the functions of the federal on-scene coordinator include?  A Yeah, the federal on-scene coordinator is responsible for insuring that the oil spill is cleaned up as quickly as possible, effecting the immediate removal of the oil, and in so doing, he has to insure that all the operations involved in the oil spill, including salvage, oil removal from the water surface, oil removal from the subsurface, wildlife rehabilitation and recapture, all those things, all those different functions have to be performed during a spill.  Q And when you were not the federal on-scene coordinator, who was the federal on-scene coordinator for the ATHOS spill?  A That was Captain Jon Sarubbi.  Q And what was Captain Sarubbi's position at the time?  A Captain Sarubbi was sector commander of Delaware Bay.  Q And you're now sector commander of the Port of Los Angeles; is that correct?  A Yes.")*

[35]*Trial Tr. Day 18, October 21, 2010, Laferriere at 11:18-12:15 ("Q What role does the National Contingency Plan play in preparedness?  A The National Contingency Plan requires the federal on-scene coordinator, and in this case the Coast Guard, to assemble area committees, and these area committees are planning committees that consistent of all the different local agencies, private organizations involved in an oil spill.  Q Do they develop a plan ultimately, a local plan?  A The area committee develops a contingency plan, which is a more specific detailed plan than the national contingency plan.  The area contingency plan deals specifically with the geographic region for which the Coast Guard commander is in charge of. Q And does the plan include information regarding specific contacts or resources available?  A The plan lists all the processes and response actions to be taken by the area committee and the team that's responding to the spill.  It lists a bunch of contact information on the local state -- state and local responders and oil spill cleanup companies.  It also lists all the equipment in the plan.  All that's related to a worse case discharge, which is developed by the area committee.")*

[36]*Trial Tr. Day 18, October 21, 2010, Laferriere at 11:3-10 ("Q Does the National Contingency Plan identify oil spill priorities for cleanup?  A Yes.  What are those priorities?  A The priorities are prevent and mitigate a substantial threat of a discharge, let human life, health and safety. That's No. 1.  The effective and immediate removal of an oil spill and minimize environmental impacts, to my recollection.")*

[37]*Trial Tr. Day 18, October 21, 2010, Laferriere at 11:11-17 ("Q Is incurring the lest possible cost a priority in the NCP for oil spill response?  A No.  Q Why not?  A Because, again, the* Continued…

-9-

----

….Continued

*regulation requires effective and immediate removal.  Costs cannot get in the way of an oil spill cleanup.")*

[38]*Trial Tr. Day 18, October 21, 2010, Laferriere at 13:25-14:9 ("Q What organizational structure does the federal on-scene coordinator use to direct and manage an oil spill?  A That would be the incident command system.  Q What's the incident command system?  A The incident command system is a formalized structure, command and control structure, designed to bring all these different agencies and organizations, responsible party, private organizations, and cleanup companies all in one room to be able to work together, so it's a common system for how to respond to emergencies")*

[39]*Trial Tr. Day 18, October 21, 2010, Laferriere at 14:10-23 ("Q Can you describe the components of the incident command system?  A Yes, the main components of the incident command system are at the top you have a unified command, which consists of the Coast Guard federal on-scene coordinator, a state or a number of state representatives, and a responsible party.  Beneath that unified command are four operational functions; the operations section, planning section, logistic section, and finance.  Operates executes the mission, gets the job done, planning puts the plan together for operations to execute, the finance section funds the operation, and logistics provides all the resources necessary for operations to execute the mission.")*

[40]*Trial Tr. Day 18, October 21, 2010, Laferriere at 16:10-17:6 ("10 Q How does the incident command structure, through the unified command, decide what actions are necessary, where and in what order?  A They create an incident action plan.  Q What is an incident action plan?  A An incident action plan is basically a battle plan for  how the oil spill's going to proceed, and how the operation section is going to carry out the mission of the clean up.  Q And what type of work assignments are included in an incident action plan?  A The incident action plan will address all of the different field functions involved in an oil spill response.  As I mentioned earlier, salvaging the vessel, salvaging the oil, on-water recovery, removing the oil from the water, protective booming operations to protect sensitive areas from getting impacted from the oil, wildlife recovery operations, and also vessel facility decon operations.  That's an example of all the -- a few of the operations.  Q How often are incident action plans prepared particularly at the beginning of an oil spill response?  A During the initial part of the oil spill, the plans were done every 24 hours.")*

[41]*Trial Tr. Day 18, October 21, 2010, Laferriere at 18:19-19:4 ("And then once that's verbally approved by unified command, the incident action plan is assembled, put together, and then it's briefed to the people in the field.  Q And then it's executed the next day?  A Yeah, it's executed, and then the process repeats itself on a daily basis.  The key significance of this is that once you accomplish your incident action plan for an incident, you've from a reactive to a proactive phase.  In other words, you've gotten control of the incident.  So it's very important that you develop your incident action plan very quickly.")*

Continued…

3826551v8

….Continued

[42]*Trial Tr. Day 18, October 21, 2010, Laferriere at 4:17-22 ("Q At the time of the ATHOS spill on November 26th, 2004, what was your position?  A I was the commanding officer of the Coast Guard Atlantic Strike Team.  Q Was the Atlantic Strike Team involved in the ATHOS spill?  A Yes.")*

[43]*Trial Tr. Day 18, October 21, 2010, Laferriere at 5:6-19 ("Q Could you briefly explain what the Atlantic Strike Team is?  A Yes, the Atlantic Strike Team is one of three strike teams in the Coast Guard.  There's one in the Gulf.  There's also one in the Pacific.  They compose the National Strike Force.  These are teams that are specialized oil pollution, chemical, and weapons of mass destruction SWAT Teams, basically.  Q Why does the Coast Guard organize Strike Teams?  A The oil spills, chemical spills, and weapons of mass destruction incidences are very complex, so the Coast Guard put these special teams together to advise and assist other Coast Guard commanders in executing a response to these types of incidents.")*

[44]*Trial Tr. Day 18, October 21, 2010, Laferriere at 8:18-9:12 ("Q And what type of work assignments are included in an incident action plan?  A The incident action plan will address all of the different field functions involved in an oil spill response.  As I mentioned earlier, salvaging the vessel, salvaging the oil, on-water recovery, removing the oil from the water, protective booming operations to protect sensitive areas from getting impacted from the oil, wildlife recovery operations, and also vessel facility decon operations.  That's an example of all the -- a few of the operations.")*

[45]*Trial Tr. Day 18, October 21, 2010, Laferriere at 19:5-20:3 ("Q Who signs an incident action plan?  A The federal on-scene coordinator of the Coast Guard, the responsible party representatives, and the representatives from the states.  Q And were incident action plans used to contain and clean up the ATHOS 1 spill?  A Yes, they were.  Q When you were the federal on-scene coordinator for the ATHOS 1 spill, did you ever sign an incident action plan?  A Yes, I did.  Q Okay.  MS. SHUTLER:  You can take this down.  BY MS. SHUTLER:  Q What was included in the typical incident accident plan for the ATHOS?  A Okay.  You saw the organization chart.  Obviously you've got to have that.  It lets everybody know what the command and control system is for the incident.  You have also seen the list of the response objectives that are developed by the command, and the things that they want to get accomplished.  You have a list of various work assignments that's given to each of the supervisors in the field to execute.  There's a communications plan, and a medical plan, and also a site safety section as well.")*

[46]*Trial Tr. Day 18, October 21, 2010, Laferriere at ("Q What is the federal on-scene coordinator's main consideration when reviewing the incident action plan prior to signing?  A Here's where the Coast Guard differs from the Department of Defense.  The Coast Guard is held by law and required by law to execute the oil spill cleanup in accordance with a National Contingency Plan.  So when I sign one of these incident action plans, I'm basically saying that my operation is consistent with the law and the regulations spelled out by the Oil Pollution Act of 1990.")*

Continued…

….Continued

[47]*Trial Tr. Day 18, October 21, 2010, Laferriere at 37:20-38:2 ("Q And what is the effect of the federal on-scene coordinator's signature on the responsible party? A This is also a document that communicates to the responsible party that this is what the federal on-scene coordinator wants accomplished. Q Is it incumbent on the responsible party to take -- undertake these actions? A Yes.")*

[48]*Trial Tr. Day 18, October 21, 2010, Laferriere at 4:21-25 ("Q Was the Atlantic Strike Team involved in the ATHOS spill? A Yes. Q As commander of the Atlantic Strike Team, were you involved in the ATHOS spill? A Yes, I was.")*

[49]*Trial Tr. Day 18, October 21, 2010, Laferriere at 6:6-19 ("Q Could you briefly explain what the Atlantic Strike Team is? A Yes, the Atlantic Strike Team is one of three strike teams in the Coast Guard. There's one in the Gulf. There's also one in the Pacific. They compose the National Strike Force. These are teams that are specialized oil pollution, chemical, and weapons of mass destruction SWAT Teams, basically. Q Why does the Coast Guard organize Strike Teams? A The oil spills, chemical spills, and weapons of mass destruction incidences are very complex, so the Coast Guard put these special teams together to advise and assist other Coast Guard commanders in executing a response to these types of incidents.")*

[50]*Trial Tr. Day 18, October 21, 2010, Laferriere at 25:17-32:12 ("MS. SHUTLER: Can we have U.S.A. Exhibit 127, Page 06027? Can you call out the top section? The top table? (Pause.) Thank you. BY MS. SHUTLER: Q What is this document, or what is this component of the incident action plan? THE COURT: And how can you tell? THE WITNESS: Right. It's a great question, sir. This is the Incident Command System 42 -- Incident Command System Form 204. It's called an assignment list. That's the title of the form. So right away that tell us that this is an assignment for a field group supervisor that's in charge of this particular mission. The mission as identified here in this particular 204 is waterborne vessel and pier decon. What I mean by pier is facilities, because in addition to vessels getting contaminated with oil, facilities got contaminated as well. So this is the work assignment for this particular group, and the way the groups are designed, you have a group supervisor that's in charge, and he's going to have a number of people, and equipment dedicated for him to accomplish this particular mission of deconing vessels and piers. BY MS. SHUTLER: Q And is that for just this particular day? A This is just for this particular day, so every day that an incident action plan was developed, a new work assignment would be issued. Q And for approximately how many months were incident actions plans developed? A Incident action plans were developed through the entire event, as far as my recollection is. Q And about how many months was the cleanup, did the cleanup last? A I don't recall. I think the end of May. Q I notice there's a signature. What is the significance of the signature on this ICS 204 assignment list? A That's the planning section chief. He, again, he puts the incident action plan together and the work assignments, so his signature means that he's reviewed this and approved this work assignment. THE COURT: But nobody else approves it? THE WITNESS: But there's a missing signature here, sir, and that's an optional signature at the -- at the cover page that we showed you earlier that had a list of all the federal on-scene coordinators, they could either sign this individual worksheet here, or they can sign the incident action plan covering and that suffice for the final approval. THE COURT: Continued…*

-12-

….Continued

*All right.  Or refuse to sign either of them, in which case they don't go into effect, is it?  THE WITNESS: Yes, sir.  If the federal on-scene coordinator doesn't sign that, that means he doesn't approve it, yes, sir.  THE COURT: Thank you.  MS. SHUTLER: All right.  Can we call out the top table, or excuse me, the operations personnel section?  (Pause.)  BY MS. SHUTLER:  Q What is the purpose of this section in the ICS 204 assignment list?  A This is the -- this is basically the chain of command for the work group that we identified earlier, and remembering that work group was vessel decon.  This is the vessel decon work group, and these are the two individuals, a Coast Guard member and it looks like a contractor, who were responsible for executing this work assignment.  What it shows is the -- his basically chain of command, so that he knows when he executes his mission, and who he reports to.  Q At the time, were you the operations section deputy chief?  A Yes, that's my name there, so I was a deputy section chief at that time.  Q All right.  MS. SHUTLER:  Can we call out the operations personnel section -- or excuse me -- the incident resources equipment table section?  (Pause.)  BY MS. SHUTLER:  Q What is -- A Okay.  Oh, I'm sorry.  Q What does this table tell us?  A This table tells us that this is the list of equipment that's available to those two individuals that are in charge of the group.  Q And, again, only for this particular day, correct?  A For this particular day and for this particular mission.  What it shows you here is these are all the different suppliers, and you can see the various different contractors that are involved in an oil spill.  It's not one contractor.  That's why it's important to have this incident command system and this process.  Otherwise, it would be difficult to organize all these folks.  This here is a general list of resource types.  As I mentioned, they use barges and vessels as well.  A little bit more detailed description of what those barges do and what they're for.  This is the hot system here.  This is the pressure system I mentioned earlier.  The quantities that's available to the individual -- for each one of these categories, and then their sizes.  And assign means that logistics was able to provide them that resource, so that resource should be on hand for the response.  MS. SHUTLER:  Can we call out the incident resources manpower section?  (Pause.)  BY MS. SHUTLER:  Q Can you explain what this section provides us, what information it provides us?  A Now that these guys have the equipment, they need to have the people to execute the mission.  So, again, here you see listed the Coast Guard is involved from the National Strike Force, which are the Strike Teams I mentioned earlier, and then these are the other various spill contractors that are all involved.  The key point here is the number of folks that will be involved in each of the incidents, and you can see that Clean Harbors and Miller Environmental Group were repeated down here, because they are -- they are conducting night operations.  In this particular operation, we were able to do night operations, because we were able to stage lights on board the barges or use lights on the vessels for the cleanup.  Q So with respect to Clean Harbor's Coop, the night response component, you would be assured that 30 people, in fact, showed up; is that correct?  A This incident action -- according to the incident action plan, yes, they should have 30 people that show up for the incident.  MS. SHUTLER:  Can we go to Page 2 of this ICS Form 204, 06028, and pull out the assignment section?  (Pause.)  BY MS. SHUTLER:  Q What's the significance of this section?  A Okay.  This is Page 2 of the work order or the work assignment for this vessel decon group again.  What's listed here is the specific missions that's required of the -- this particular group.  This is where the rubber meets the road.  What they're supposed to actually do.  And where it says, "Conduct decontamination activities as directed," back at the command*
Continued…

-13-

....Continued

*post, the operations section chief will have a list of facilities and vessels that need to be decontaminated, and will direct this group to those facilities and vessels. Q I notice that there's a line that states, "That NSF supervisors will actively monitor and critique the operations." Just explain again who is the NSF supervisors are? A Okay. Yes, those are the -- those are the members of the Strike Team, and these are, again, the Coast Guard Special Weapons and Tactics, sort of pollution SWAT Team guys, who were specifically assigned to this mission, and their specific role is to insure that this incident action plan work assignment is carried out and executed. Q Who do they report to? A They reported to me in the operations section. Q And that was because you were in the operations section. Was it also because you were commander of the Atlantic Strike Team? A Yes. Q How often would the report to you? A They would report several times throughout the day. Obviously, when they arrived on scene. Usually what I asked them to do, or I asked them to do, period, was to call me before the tactics meeting for the planning cycle for the next day. What this allowed me to do is get feedback from them on what was needed for tomorrow's operations, so I go into the tactics meeting, develop the tactics for the following day.*

[51]*Trial Tr. Day 18, October 21, 2010, Laferriere at 34:3-17 ("Q How did the Strike Team supervisors use this particular form in the field? A Again, without this -- without this form, we wouldn't be able to have an organized response, and wouldn't be able to execute the Coast Guard's mission at the federal on-scene coordinator's direction. So what this actually becomes is a quality control device for the Coast Guard. The supervisors will take this -- the National Strike Force individuals -- the Coast Guard will take this form out to the field, will make sure that the equipment that's listed on here is actually on scene, they will make sure that the personnel listed there is actually available and operating. And last, but not least, make sure that the mission is executed in accordance with the assignment. That's the key thing.")*

[52]*Trial Tr. Day 19, October 25, 2010, Benson at 53:12-54:3 ("Q Did O'Brien's receive any kind of a commendation at the end of this case for its response to the spill? A Yes, yes, we did. Q What was that, a commendation of Unified Command? A Yes, it was a commendation presented to us by Captain Sarubbi, who was the Coast Guard Federal On-Scene Coordinator. The citation was directed to the Unified Command and the responders for the ATHOS oil-spill event. Very complimentary, very much appreciated, and it was extended to all the Spill Management Team members and I expressed my -- my concerns for -- not concerns per se, but my expression of thank you to all the contractors as well, and this is a -- this is the citation as it reads. Q So, to be clear, the citation was to the Unified Command? A Yes. Q Of which the RPU were one of the elements? A That's correct.")*

[53]*Trial Tr. Day 19, October 25, 2010, Morrison at 161 ("Q And who do you work for? A I work for the National Pollution Funds Center within the United States Coast Guard. Q And what is the mission of the National Pollution Funds Center? THE COURT: I'm sorry, the National something center but you mumbled the word. What is it? MR. FLYNN: My apologies, sir, National Pollution Funds Center. THE COURT: Pollution Fund? MR. FLYNN: Fund, yes. THE COURT: F-u-n-d. MR. FLYNN: Yes, F-u-n-d-s, actually, Funds Center. BY MR. FLYNN: Q And what is the mission of the National Pollution Funds Center? A The National Pollution* Continued...

-14-

....Continued

*Funds Center's -- Center manages the Oil Spill Liability Trust Fund for the United States. Q Is the National Pollution Funds Center also known as the NPFC? A Yes, sir. Q Okay. We'll try not to use that but if somebody slips--THE COURT: Okay. Go ahead. BY MR. FLYNN: Q All right. And what is the Oil Spill Liability Trust Fund? A It's a fund that was established in the Oil Pollution Act of 1990 to make funds available for the removal and response operations to clean up oil and also to pay claimants that are damaged by oil spills. Q And how was it originally funded? A Originally it was funded through transfers from other environmental funds and a per-barrel tax on oil. Q At the time of the ATHOS spill in 2004 was that how the fund was funded? A At the time of the -- in 2004 the tax had expired, the fund received its income from the interest on the principal fund as well as recoveries from responsible parties and penalties. Q And what is your title there? A I'm the chief of the Claims Adjudication Division. Q How long have you held that? A I've been -- I've held that for over six years. Q And so you were chief of the Claims Adjudication Division at the time of the ATHOS spill? A Yes, sir. THE COURT: But hadn't been for very long. BY MR. FLYNN: Q But hadn't been for very long. A No, sir, first year. Q Okay. What was your work prior to the National Pollution Funds Center? A I had a 20-year career in uniform with the Coast Guard driving ships and working finance. Q And did you receive any degrees? A I have a –").*

[54] *Trial Tr. Day 19, October 25, 2010, Morrison at 164:18-166.17 ("A responsible party may submit such claim when they intend to limit their liability and also if they believe they're entitled to full reimbursement through it because of an affirmative defense. Q When you say limit their liability what do you mean? THE COURT: It's under maritime law. MR. FLYNN: Actually, no, your Honor. THE WITNESS: Under OPA the responsible party is fully liable for all costs of the oil spill, strictly liable for it up until the point of that limited liability. So it's like a -- it's a cap in order to limit their liability if they can demonstrate that they're entitled to that limit. BY MR. FLYNN: Q And this is different than the Limitation of Liability Act of 1851? A Yes, sir. Q Okay. And how does the Oil Pollution Act set the limitation amount within that statutory scheme? A Within that statutory scheme depending on the type of vessel and the tonnage of that vessel you would have – they set the cap. THE COURT: Based on the value of the ship? THE WITNESS: No, sir, based on the gross tonnage of the vessel. So in the case of the -- THE COURT: It does relate to the ship. THE WITNESS: Yes, sir. BY MR. FLYNN: Q Unlike the Limitation of Liability Act but is based on the value of the vessel, is that correct? A Correct, yes, sir. Q And what is the formula that the Oil Pollution Act uses for a tank vessel the size of the ATHOS I? A The ATHOS I in 2004 was $1,200 per gross ton which figured out with the certificated gross tonnage resulted in about a 45.4 million, $45.4 million limit of liability. Q Now what is the practical effect if the responsible party demonstrates that it is entitled to this limitation of liability under the Oil Pollution Act? A If the responsible party demonstrates their entitlement they would be eligible to be reimbursed for all OPA costs in excess of their limit. They would have to pay the first in this case $45.4 million. Q Right. So in, for example, in the ATHOS I spill we have heard testimony just today and yesterday that the responsible parties incurred well over $100 million in all the removal cleanup cost and so they would be able to seek that amount back or any amount above $45.4 million? A Yes, sir. THE COURT: From the fund? THE WITNESS: From the fund, yes, sir.").*

Continued…

-15-

….Continued

[55]*Trial Tr. Day 19, October 25, 2010, Morrison at 170:17-171:8 ("Q Did the National Pollution Funds Center adjudicate whether the responsible parties for the ATHOS I incident were entitled to limit their liability?  A Yes, we did adjudicate that and made a decision.  Q And what was that decision?  A We upheld their limit.  Q And who at the National Pollution Funds Center made that decision?  A I made that decision.  Q And what did you base that decision on? And I do not want your analysis but what did you consider in terms of evidence?  A The claimant's submission package which was thousands of pages which included vessel documentation, crew documentation and post incident investigation information and I also did, we did external research and then I had some assistance in reports from a couple of Federal agencies.").*

[56] *Trial Tr. Day 19, October 25, 2010, Morrison at 174:16-175:7 ("A And construction issues. Q Now did you also request from the -- any information from the Federal on-scene commander? A Yes, I did. I requested through the NPFC representatives to the unified command that I have an assessment of the level of cooperation.  Q Why is that important?  A Under OPA in addition to the gross negligence willful misconduct if a -- if a responsible party fails to cooperate with the FOSC, Federal On Scene Coordinator, they could jeopardize their limit of liability specifically by regulation. Additionally, if they failed to comply with the order given, certain orders given they could jeopardize their limit of liability.  Q Okay. And what was your determination, was the claimant entitled to limit its liability?  A The claimant was entitled to limit their liability, yes.").*

[57]*Trial Tr. Day 19, October 25, 2010, Morrison, 176:2-16 ("if they want to? If somebody wanted to claim that it was outrageously gross negligence on the part of the captain of the vessel would they have a chance to present that point of view in your proceeding?  THE WITNESS: I didn't advertise for that information but if that information would come in it could be considered.  BY MR. FLYNN:  Q Who has the burden of proof in this determination?  A The burden of proof is held by the RP, the claimant, the responsible party has to meet their burden.  Q And what is the standard of that burden?  A preponderance of evidence, 51 percent, more likely than not.  Q Now in order to ascertain whether the information").*

[58]*Trial Tr. Day 20, October 26, 2010, Hellberg at 44:16-21 ("Q Now, you offered to compensate only 10.8 million of the supplemental claim for 14.3 million; can you explain why some of these costs were not reimbursable or you determined they weren't reimbursable from the Oil Spill Liability Trust Fund?  A Yes, ma'am, because I determined the costs were either not removal costs or they were unsubstantiated removal costs.").*

[59]*Trial Tr. Day 19, October 25, 2010, Morrison at 178:13-19 ("Q And did you adjudicate those actual removal cost claims yourself?  A No, sir, I did not. I directed Donna Helberg of my staff, one of my claims managers actually, she was the chief of the Removal Branch Section at that time, Removal Cost Claim Branch Section at that time and I assigned the claim to her.").*

[60] *Trial Tr. Day, 20, October 26, 2010, Hellberg at 34:3-16 ("Q What compensation is allowable once the Coast Guard's National Pollution Fund Center has determined that a responsible party may limit its liability?  A By regulation, it's the actions that were taken to prevent, minimize and mitigate the effects of the spill on the environment, those costs must be a result of those actions* Continued…

….Continued

*and the actions must have been determined by the Federal On-Scene Coordinator to be consistent with the National Contingency Plan or were directed by the Federal On-Scene Coordinator.  Q What standard of proof do you employ to determine that the claim for reimbursement meets the standards you just listed?  A A preponderance of the evidence, more likely than not.").*

[61]*Trial Tr. Day 20, October 26, 2010, Hellberg at 32:15-20 ("Q What sources of the law do you rely upon in adjudicating whether removal costs expended by a responsible party can be recovered from the Oil Spill Liability Trust Fund?  A I use the Oil Pollution Act of 1990, the governing claims regulations, which can be found at 33 CFR Part 136, and the National Contingency Plan.").*

[62]*Trial Tr. Day 20, October 26, 2010, Hellberg at 33:1-10 ("Q Were you Supervisor of Claims Managers when the responsible parties for the ATHOS spill submitted their claims to the Oil Spill Liability Trust Fund?  A Yes, ma'am, I was.  Q What was your final determination with respect to the removal cost claims submitted by the ATHOS responsible parties?  A My final determination was that Frescati was entitled to a payment of approximately 88 million beyond their limit of liability of 45.4 million.").*

[63]*Trial Tr. Day 20, October 26, 2010, Hellberg at 33:11-35:19 ("Q Ms. Hellberg, what do you mean by an adjudication of a claim for removal costs?  A An adjudication of a claim for removal costs is when I review all of the documentation submitted by the claimant, as well as governing regulations, and I make a determination of whether the costs are compensable by the Oil Spill Liability Trust Fund.  Q And when you say compensable, do you mean reimbursable?  A Yes, ma'am.  Q And what are removal costs?  A Removal costs are the costs for actions to remove oil. Q When is a responsible party, such as Frescati or Tsakos, entitled to recover their removal costs from the Oil Spill Liability Trust Fund?  A An RP is entitled to recover their costs once the Coast Guard has made a determination of entitlement to their limit of liability.  Q What compensation is allowable once the Coast Guard's National Pollution Fund Center has determined that a responsible party may limit its liability?  A By regulation, it's the actions that were taken to prevent, minimize and mitigate the effects of the spill on the environment, those costs must be a result of those actions and the actions must have been determined by the Federal On-Scene Coordinator to be consistent with the National Contingency Plan or were directed by the Federal On-Scene Coordinator.  Q What standard of proof do you employ to determine that the claim for reimbursement meets the standards you just listed?  A A preponderance of the evidence, more likely than not.  Q How do you determine whether the actions undertaken by the responsible party were consistent with the NCP, the National Contingency Plan, or were directed by the Federal On-Scene Coordinator?  A I review the documents submitted by the claimant, in this case the responsible party, as well as documents generated by the Unified Command.  Q And by -- excuse me.  A I'm sorry. In particular, documents such as the incident-action plans or pollution reports.  Q Is there anything particularly useful to you in an incident-action plan when you're trying to make those determinations?  A Yes, ma'am. Within the incident-action plan are ICS  Forms 204 and 209, and those forms are exclusive to the assignment and summarization of resources on an oil spill.  Q And do those forms identify what* Continued…

-17-

….Continued
*location and on what day those resources and supplies should be at -- on scene?  A Yes, ma'am. Each incident-action plan is for a operational period and for specific locations.  Q And are operational periods, at least for the early phases of a spill, on a 24-hour basis?  A Yes, ma'am, they are done every day.  Q What is the significance of the Federal On-Scene Coordinator's signature on an incident-action plan?  A By the Federal On-Scene Coordinator signing an incident-action plan, it's assuring me that he has directed the response actions that are being undertaken.").*

[64]*Trial Tr. Day 20, October 26, 2010, Hellberg at 35:20-37:10 ("Q Do the regulations implementing the Oil Pollution Act impose any additional requirements that you must evaluate in order to determine whether removal costs are reimbursable?  A Yes, the removal costs must be reasonable.  Q Do you take into account the Federal On-Scene Coordinator response's objectives in determining whether those removal costs are reasonable?  A Yes, ma'am, I do.  Q What environmental factors do you consider when you're determining the reasonableness of removal costs?  A I consider the amount of oil, the type of oil, the geographical area in which the oil was spilled, and all of these factors together affect the amount of personnel, materials and equipment that will be needed for the response.  Q Were these factors important to the spill, the ATHOS spill?  A Yes, ma'am, they were.  Q How did the time of year affect your determination of the reasonableness of removal costs?  A The ATHOS I spill occurred November of '04, which is obviously the winter; therefore, the weather and days were cold, the water was frigid. It required hot meals to all the responders, it required a much more frequent change of personal protective equipment for the responders, and...  Q How did the size of the spill affect your determination of the reasonableness of the cost of the cleanup?  A Because the ATHOS I spill was such a large spill, it spanned three states, at the onset of the spill, it required a massive mobilization of personnel, materials and equipment.  Q Does reasonable cost require the least cost or cheapest clean-up effort?  A No, ma'am.  Q Why not?  A Because it's what's needed, personnel, materials and equipment-wise, to prevent -- mitigating and minimize the effects of the spill on the environment.  Q What additional metric did you use to determine the reasonableness of the rates charged by the clean-up contractors hired by the responsible party for the ATHOS spill?  A I used the prime contractors' rate schedules.").*

[65]*Trial Tr. Day 20, October 26, 2010, Hellberg at 38:9-39:4 ("Q What types of documents do you like to see when you're reviewing a claim for removal costs?  A The type of documents I like to see, first of all, would be a cover letter with an amount requested, or we do have an Oil Spill Liability Trust Form -- Trust Fund Claim Form.  Along with that, I like to see the invoices, the dailies for those invoices; I like to see any contracts or rate schedules that would be applicable; I like to see photographs, disposal manifests, or any other types of documentation available.  Q Did the responsible parties for the ATHOS I spill provide you with those types of documents to support their removal-cost claims?  A Yes, ma'am, they did.  Q What did you do if you felt the documents submitted by the ATHOS I responsible parties were not sufficient to establish a claimed removal cost as reimbursable?  A I would either request additional information or I would call the responsible party and request clarification of whatever issue I needed clarification on, or I would speak to people within the Unified Command, whether it be Coast Guard or the Spill Management Team, or the contractors themselves.")*

Continued…

-18-

….Continued

[66]*Trial Tr. Day 20, October 26, 2010, Hellberg at 39:5-12 ("Q Using the documents provided by the ATHOS responsible parties, how did you satisfy yourself that contractors were on scene and supplies and equipment were delivered on site and the work was executed?  A I reviewed the documentation, such as the contractor invoices, with their dailies, as well as looked at Unified Command documents, such as the incident command -- I mean incident-action plans, I'm sorry.").*

[67]*Trial Tr. Day 20, October 26, 2010, Hellberg at 41:7-46:16 ("Q Did you receive a formal claim from the ATHOS responsible parties?  A Yes, ma'am, I did.  MS. SHUTLER: Could we have U.S.A. Exhibit 1, Athos-16636?  BY MS. SHUTLER:  Q Is this the claim?  A Yes, ma'am. This is a letter submitted by the RP.  Q And how much did the ATHOS responsible parties initially seek the NPFC to adjudicate?  A They initially requested approximately 124 million in their initial submission.  Q And did this amount change?  A Yes, ma'am, it did.  Q And how did that change?  A It changed because throughout my adjudication, as I moved through my adjudication, I had continuing communications with the responsible party and that final requested amount did change and it did go up.  Q And did the ATHOS responsible parties later submit a second or supplemental claim for adjudication?  A Yes, ma'am, they did.  Q For about how much?  A That supplemental claim was for approximately $14 million.  Q How did the ATHOS responsible parties submit the documentation for their claims?  A Their documentation came organized by the ADA vendors that were involved in this claim submission.  Q And did the documentation come in all at once?  A No, ma'am, it didn't, it came in on a rolling basis.  Q And did you review the documentation for those vendors all at once?  A No, ma'am, I reviewed it vendor-by-vendor as it came in.  Q Ms. Hellberg, how long did it take you to adjudicate these claims?  A It took me, formal adjudication, six months, ma'am.  Q Is that for the first claim only? A Yes, ma'am.  MS. SHUTLER: Could we have Exhibit, U.S.A Exhibit 157, NPFC-000085?  BY MS. SHUTLER:  Q What is this document?  A This document is my claims summary determination form for the RP's initial claim submission.  Q And for how much is that initial submission?  A The amount requested is approximately $80 million over and above the limit of liability.  MS. SHUTLER: Could we have U.S.A. Exhibit 157 at 6 00090?  BY MS. SHUTLER:  Q And who drafted this letter here?  A I drafted this letter, ma'am, for Tom Morrison's signature, he was Chief of Claims Adjudication Division, making an offer to the RP of approximately 77.1 million.  Q And did you receive a supplemental claim from the ATHOS responsible parties?  A Yes, ma'am, I did.  Q And did you make a recommendation for payment with respect to the supplemental claim?  A Yes, ma'am, I did.  MS. SHUTLER: Could we have U.S.A. Exhibit 161 at NPFC-00095?  (Pause.)  BY MS. SHUTLER:  Q Is this document your recommendation for how much to reimburse the ATHOS responsible parties for their supplemental claim?  A Yes, ma'am, it is.  Q All right.  THE COURT: Then why does it say, "Amount Requested"? I don't get it.  THE WITNESS: Because the amount requested, sir, is the amount total dollars they came in and said we would like the Fund to adjudicate.  THE COURT: Well, I know, but this doesn't say how much you adjudicated they're entitled to, does it?  MS. SHUTLER: If we could have the next page?  She'll show you that, which is NPFC-161000102.  BY MS. SHUTLER:  Q And was this your recommendation page to Mr. Morrison?  A Yes, ma'am. This Claim Summary Determination Form was for a recommendation of approximately $10.8 million to the RP.  Q Now, you offered to compensate only 10.8 million of the supplemental claim for 14.3 million; can Continued…*

---

….Continued

*you explain why some of these costs were not reimbursable or you determined they weren't reimbursable from the Oil Spill Liability Trust Fund? A Yes, ma'am, because I determined the costs were either not removal costs or they were unsubstantiated removal costs. MS. SHUTLER: Could we have U.S.A. Exhibit 161 at 00101? And could we have several bullets here? BY MS. SHUTLER: Q Now, is this document a page from your recommendation memo that we just looked at to reimburse the RP's approximately 10.8 million for their supplemental claim? A Yes, ma'am, it is. Q Okay. And can you explain what these bullets are within this memo? A Yes, ma'am. This particular page, your Honor, where the bullets are, it's where I identified costs for any one of these vendors for whatever reason they were denied. And in particular, the one that's highlighted is for a vendor called the Pilots Association for the Bay and River Delaware, and the amount that I've denied for this particular vendor was $39,900, and I denied these costs because they were unsubstantiated. MS. SHUTLER: You can take that down. Thank you. BY MS. SHUTLER: Q Did you prepare summaries of your adjudication of the ATHOS responsible party's claims? A Yes, ma'am, I did. MS. SHUTLER: Could we have U.S.A. Exhibit 155 at NPFC-00003? And can we call out -- BY MS. SHUTLER: Q -- do you recognize this document? A Yes, ma'am, I do. Q And what is this document? A This document is the summary of vendors that I created for the RP's initial claim submission. MS. SHUTLER: And can we pull out the -- thank you. BY MS. SHUTLER: Q Can you tell us what's contained in this summary? A Yes, ma'am. This summary is a summarization of -- I have "Contractor" as a heading, but it's a contractor or a vendor, I have them in alphabetical order as they were submitted in this claim. The next column indicates the total invoiced amount requested for a given vendor, the next column indicates how much I determined would be offered by the NPFC, and the last column there is the total paid by the responsible party for those vendors' costs. Q Now, did you prepare more detailed vendors of the 50-some-thousand pages of documents submitted for all 88 vendors? A Yes, ma'am, I did.").*

[68]*Trial Tr. Day 20, October 26, 2010, Hellberg at 48:21-50:9 ("MS. SHUTLER: Can you pull up U.S.A. Exhibit 155 at NPFC-00007? BY MS. SHUTLER: Q Now, is this a more detailed summary of the first claim? A Of the summary sheet? Q Yes. A Yes, ma'am, it is. MS. SHUTLER: And can we pull up underneath the vendors the information for Amquip? (Pause.) BY MS. SHUTLER: Q Can you explain what's contained in this more detailed summary of the responsible party's first claim? A Yes, ma'am. If you look at this sheet, sir, this is the vendor's name, and I organized the details tab in alphabetical order similar to the summary tab, and then this second column are the invoices. So, they're showing you Amquip Corporation, which happened to be a vendor. The second column depicts each of the invoices submitted to me by that vendor and then this column here indicates the amount paid for each of the invoices. This column here was an after-the-fact audit that was done by someone unrelated – I didn't do that. And then this "Comment" column, I put that there, sir, because this claim submission had 54,000 pages. So, in order for me to have a quick recollection of the services provided, I put those notes there for my edification so I would remember. And then I took the details from this sheet and that's what created my summary sheet that you saw first. Q Did you make an offer to settle the ATHOS responsible party's first claim? A Yes, ma'am, I did. MS. SHUTLER: Could we have U.S.A. Exhibit 154 at NPFC-00002? BY MS. SHUTLER: Q Is this your offer letter? A Yes,*
Continued…

….Continued

*ma'am, it is.  Q And did the ATHOS responsible parties accept this offer?  A Yes, ma'am, they did.").*

[69]*Trial Tr. Day 20, October 26, 2010, Hellberg at 51:2-6 ("Q In making the final adjudication of Frescati's supplemental claim, did you likewise prepare a claims summary, a more detailed claims summary, an offer letter, an acceptance letter and a payment authorization form?  A Yes, ma'am, I did.").*

[70]*Trial Tr. Day 20, October 26, 2010, Hellberg at 51:16-52:2 ("MS. SHUTLER: Could we have U.S.A. Exhibit 162 NPFC-17 000103?  BY MS. SHUTLER:  Q Is this a summary of vendors you prepared for Frescati's supplemental claim?  A Yes, ma'am, it is.  MS. SHUTLER: Could we have U.S.A. Exhibit 162 NPFC-23 000104?  BY MS. SHUTLER:  Q And is this a more detailed summary of vendors you prepared for the supplemental claim?  A Yes, ma'am, it is.").*

[71]*Trial Tr. Day 20, October 26, 2010, Hellberg at 81:23-82:11 ("Q In this case, you reviewed over -- or nearly 55,000 documents, correct?  A Yes, sir.  Q Now, did that take you 16 months or six months?  A Actually, the active adjudication took me six months, but I have been involved in the ATHOS.  So, during my deposition I believe I said 16, but I was incorrect.  Q And by active adjudication you mean the process of reviewing the documents took you six months?  A Yes, sir. Q Okay. And I understand that you worked seven days a week, eight hours a day?  A No, I probably work seven days a week, about 18 hours a day during that entire time.").*

[72]*Trial Tr. Day 20, October 26, 2010, Hellberg at 34:3-38:8 ("Q What compensation is allowable once the Coast Guard's National Pollution Fund Center has determined that a responsible party may limit its liability?  A By regulation, it's the actions that were taken to prevent, minimize and mitigate the effects of the spill on the environment, those costs must be a result of those actions and the actions must have been determined by the Federal On-Scene Coordinator to be consistent with the  National Contingency Plan or were directed by the Federal On-Scene Coordinator.  Q What standard of proof do you employ to determine that the claim for reimbursement meets the standards you just listed?  A A preponderance of the evidence, more likely than not.  Q How do you determine whether the actions undertaken by the responsible party were consistent with the NCP, the National Contingency Plan, or were directed by the Federal On-Scene Coordinator?  A I review the documents submitted by the claimant, in this case the responsible party, as well as documents generated by the Unified Command.  Q And by -- excuse me.  A I'm sorry. In particular, documents such as the1 incident-action plans or pollution reports.  Q Is there anything particularly useful to you in an incident-action plan when you're trying to make those determinations?  A Yes, ma'am. Within the incident-action plan are ICS Forms 204 and 209, and those forms are exclusive to the assignment and summarization of resources on an oil spill.  Q And do those forms identify what location and on what day those resources and supplies should be at -- on scene?  A Yes, ma'am. Each incident-action plan is for a operational period and for specific locations.  Q And are operational periods, at least for the early phases of a spill, on a 24-hour basis?  A Yes, ma'am, they are done every day.  Q What is the significance of the Federal On-Scene Coordinator's signature on an incident-action plan?  A By the Federal On-Scene Coordinator signing an* Continued…

-21-

---

….Continued

*incident-action plan, it's assuring me that he has directed the response actions that are being undertaken.  Q Do the regulations implementing the Oil Pollution Act impose any additional requirements that you must evaluate in order to determine whether removal costs are reimbursable?  A Yes, the removal costs must be reasonable.  Q Do you take into account the Federal On-Scene Coordinator response's objectives in determining whether those removal costs are reasonable?  A Yes, ma'am, I do.  Q What environmental factors do you consider when you're determining the reasonableness of removal costs?  A I consider the amount of oil, the type of oil, the geographical area in which the oil was spilled, and all of these factors together affect the amount of personnel, materials and equipment that will be needed for the response.  Q Were these factors important to the spill, the ATHOS spill?  A Yes, ma'am, they were.  Q How did the time of year affect your determination of the reasonableness of removal costs?  A The ATHOS I spill occurred November of '04, which is obviously the winter; therefore, the weather and days were cold, the water was frigid. It required hot meals to all the responders, it required a much more frequent change of personal protective equipment for the responders, and... Q How did the size of the spill affect your determination of the reasonableness of the cost of the cleanup?  A Because the ATHOS I spill was such a large spill, it spanned three states, at the onset of the spill, it required a massive mobilization of personnel, materials and equipment.  Q Does reasonable cost require the least cost or cheapest clean-up effort?  No, ma'am.  Q Why not?  A Because it's what's needed, personnel, materials and equipment-wise, to prevent -- mitigating and minimize the effects of the spill on the environment.  Q What additional metric did you use to determine the reasonableness of the rates charged by the clean-up contractors hired by the responsible party for the ATHOS spill?  A I used the prime contractors' rate schedules.  Q What is a prime contractor?  A A prime contractor is a contractor that has a direct contract relationship in this case with the responsible party.  Q And in the oil spill-response world, is a prime contractor also known as an oil spill-response organization?  A Yes, it is.  Q Why did you determine that the prime contractor's rate schedules were reasonable?  A I determined that the prime contractor's rate schedules were reasonable because they were commercially negotiated prior to the spill.  Q Are the subcontractor rate schedules relevant to your adjudication of a removal cost claim?  A No, ma'am, they are not.  Q Why not?  A They are not because, first of all, I use the prime contractor's rate schedule, because they are the entity that was under contract in this case with the responsible party.  Additionally, the prime contractors take on full responsibility for their workers, i.e. their subcontractors; therefore, that subcontractor's rate schedule is not relevant.").*

[73]*Trial Tr. Day 20, October 26, 2010, Hellberg at 50:10-51:1 ("MS. SHUTLER: Can I have U.S.A. Exhibit 156 at NPFC-00083?  (Pause.)  BY MS. SHUTLER:  Q And is this document the responsible party's acceptance of the NPFC's offer of approximately $77 million?  A Yes, ma'am, it is.  MS. SHUTLER: Can we have U.S.A. Exhibit 153 at NPFC-00001? Please scroll from... actually, I would like it to begin where it says, "From," and down. Thank you.  BY MS. SHUTLER:  Q Can you tell me what this document is?  A Yes, ma'am, this document is what we call an authorization to pay. I crafted this document after the responsible party accepted the offer of 77.1 million.  Q And did you sign this document?  A Yes, ma'am, I did.")*

Continued…

….Continued

[74]*Trial Tr. Day 20, October 26, 2010, Hellberg at 52:3-15 ("MS. SHUTLER: U.S.A. Exhibit 160 at NPFC-00093? BY MS. SHUTLER: Q Is this the signed acceptance letter by the responsible parties of the NPFC's offer to accept $10.8 million? A Yes, ma'am, it is. MS. SHUTLER: And may I have U.S.A. Exhibit 158 NPFC at 00091? BY MS. SHUTLER: Q And, again, is this the authorization-to-pay form that you signed -- A Yes, ma'am, it is. Q -- for the supplemental claim? A I'm sorry, yes, ma'am.").*

[75]*Kegelman Dep., September 11, 2009, 12:9-15 ("Q. Okay. So when the Athos occurred, the Athos incident, you were senior response consultant; and during that time period, you were promoted to manager of the northeast region? A. Manager of response services for northeast region, that is correct.").*

[76] *Kegelman Dep., September 11, 2009, 66:14-24 ("Q. All right. And how is the finance department structured? A. Finance is in two -- generally, two different branches underneath: Claims and compensation. And I'm trying to remember. The other is... Q. So claims and compensation is one? A. Correct. Q. Okay. A. And then there's time unit and then an accounting stream or group.").*

[77]*Kegelman Dep., September 11, 2009, 74:15-75:5 ("Initially. What do you call that? Time and accounting? A. There was -- there was compensation and claims and a time unit. What each was filling, I don't recall. Their initial job when they were there were to review dailies, ensure that they were correct, to ensure that they were signed off by my division group supervisors. Q, Okay. So what do you call this position? Just time and accounting supervisors, something like that? A. We -- essentially, for this incident, we were calling them just the finance section.").*

[78] *Kegelman Dep., September 11, 2009, 93:11-24 ("Q. Did you have any process which you personally instituted on those occasions when you were in the finance department to memorialize any instance of overbilling or overcharging and what you did to rectify it? MR. BERGERE: I object to the scope of the question. It's beyond this witness's 30(b)(6) designation. You can answer if you... THE WITNESS: When l have been in the finance section position, I would note it in a log. 1 would address it with a contractor. And I would have it corrected.").*

[79]*Kegelman Dep., September 11, 2009, 214:9-17 ("Q. How did you control the equipment that contractors brought on site? A. How did we control it. It was controlled, one, by being ordered through our logistics section; two, based upon the incident action plan; and then, three, verified as needed or not needed or extra or not extra by our division, our group supervisors.").*

[80]*Kegelman Dep., September 11, 2009, 130:10-131:8 ("Q. Okay. Did you -- are you aware of any rates that were reduced or discounted during the work? A. Yes. Q. Do you remember any specific entity whose rates were discounted or reduced during the work? A. I believe all of the companies working on were reduced. Q. And why was that done? A. To save the client money. Q. Was there any particular reason or time or circumstance that compelled you to request a reduction in rates? A. We'd got into a phase in the incident where we were longer in a reactionary phase. It was no longer an emergency response. We were transitioning into a* Continued…

---

….Continued

*project. At that time emergency rates did not apply, in my mind. And that's when the financial section was asked to negotiate lower rates.").*

[81]*Kegelman Dep., September 11, 2009, 217:3-24 ("*Q. What's an expendable?  A. An expendable? Item you mean?  Q. Yes.  A. That would be a sorbent material, a rope, tape, Tyvek, suit.  Q. So basically materials that are going to be used, used up --  A. Mm-hmm.  Q. -- and don't -- aren't preserved?  A. Correct.  Q. What kind of inventory process did you have with respect to expendables?  A. Initially, within the first week or two, it was verified by field personnel.  Then we negotiated a contract with a company called Aramsco to be a sole provider of all expendables, which became a centralized warehouse to which the division and group supervisors would place orders for what they thought they needed for the next day's work according to what was asked for in the incident action plan.*").*

[82]*Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10 ("Q Was there a company involved in this case that goes by the acronym SOS?  A Yes.  Q Okay.  What does that stand for?  A Spill On-Site Services.  Q Is SOS part of the O'Brien's network?  A They are, in good standing.  Q Okay.  What role did SOS play in this case?  A They served in the Finance Section within the Incident Command System.  Q What does the Finance Section do?  A Generally, the Finance Section is responsible for the accumulation of invoices as they pertain to the response and contractors; they review daily support sheets, they compare those daily support sheets to the invoice; they schedule and recommend payment on invoices; and take care of any issues in the invoices that may cause errors, mathematically or fundamentally wrong, something to that effect; that's their primary mission in Finance.")*

[83]*Trial Tr. Day 19, October 25, 2010, Roussel at 83:22-84:12 ("Q Mr. Roussel, by whom are you employed?  A A company called SOS, Spill On-Site Management.  Q And what is SOS's business?  A We manage finances on large oil spills, even small oil spills.  THE COURT:  You provide the money or you just manage other people's money?  THE WITNESS:  Provide other people's money.  THE COURT:  Thank you.  BY MR. BERGERE:  Q And did you work on the ATHOS I oil spill?  A Yes.  Q And when did you begin work on the ATHOS I oil spill?  A Early December, the first or second week of December.  Q And was SOS one of what Mr. Benson referred to as their network employees on this spill?")*

[84]*Trial Tr. Day 19, October 25, 2010, Roussel at 85:2-4 ("Q Now, what is the role of the Finance Section?  A It's part of the Unified Command and we would receive, review, audit and recommend invoices for payment.")*

[85]*Kegelman Dep., September 11, 2009, 12:9-15 ("Q. Okay. So when the Athos occurred, the Athos incident, you were senior response consultant; and during that time period, you were promoted to manager of the northeast region?  A. Manager of response services for northeast region, that is correct.").*

[86]*Trial Tr. Day 19, October 25, 2010, Benson at 26:2-10 ("Q What does the Finance Section do?  A Generally, the Finance Section is responsible for the accumulation of invoices as they pertain*
Continued…

———————————

….Continued

*to the response and contractors; they review daily support sheets, they compare those daily support sheets to the invoice; they schedule and recommend payment on invoices; and take care of any issues in the invoices that may cause errors, mathematically or fundamentally wrong, something to that effect; that's their primary mission in Finance.")*

[87]*Trial Tr. Day 19, October 25, 2010, Benson at 26:15-18 ("Q Can you estimate in dollar value approximately the amount of invoices that your Finance Section had to process in this case?  A I'd say approximately $180 million.")*

[88]*Trial Tr. Day 19, October 25, 2010, Benson at 37:14-22 ("Q How were the contractors paid? If a contractor submits an invoice, can you describe the method, how he's paid?  A Well, we start with the daily support sheet, which then goes back to the contractor, who develops an invoice based on a series of day-to-day daily support sheets.  An invoice is generated, it's submitted to our Finance Section.  Our Finance Section then takes the invoice, compares them to the daily support sheets, then makes a recommendation for payments.")*

[89]*Trial Tr. Day 19, October 25, 2010, Benson at 38:6-15 ("Q Are the oil-spill contractors paid in percentages or all at once?  How does that happen exactly?  A They are, they are, they are.  And we generally -- our Finance Section generally recommends an 80-percent quick payment on an invoice.  These contractors need money, they need money to sustain their operation, especially with a large workforce and all the materials and supplies that they're consuming every day.  And we withhold 20 percent, Finance withholds 20 percent for further vetting of the invoice to flush out any mistakes or errors.")*

[90]*Trial Tr. Day 19, October 25, 2010, Roussell at 89:1-90:4 ("Q And how does that program work or assist you in evaluating invoices and daily summaries that you're getting from contractors?  A We receive -- when we arrive on scene, we receive the rate schedules or contracts from the vendors, the bigger  OSROs that have the thousands of personnel.  Q When you say OSRO, we're talking about that's an acronym for Oil Spill Response Organization?  A Yes.  Q Okay.  A We input their personnel, equipment and material rates into the database, they're pre-inputted with the rates that match their system. Then when we enter these items into our database, the rate automatically appears for a supervisor or a foreman or a pickup truck or a certain size vessel. So, when we enter it, it's almost fool-proof, the rate automatically appears and, when you hit Tab or Enter, the computer goes to the next line. You have to manually override the system to put in an inaccurate rate from the rate set.  Q So, once the computer program sets the rate based on the approved rate sheets, if there's any invoice that comes in after that and the rates are different, that that would be picked up because the operator would have to manually override the existing rate?  A Yes.  Q And that's done as a check to assure that contractor invoices are paid at the approved rates?  A Yes.*

[91]*Trial Tr. Day 19, October 25, 2010, Benson at 41:15-23 ("Q Are any of those invoices paid unless your Finance Section, in their judgment, deems that the invoice is correct and proper?  A No, we generally take the word from Finance.  They're the ones that review the invoices and* Continued…

….Continued

recommend payment.  THE COURT:  I don't think that actually answers the question he asked.  He asked whether any of them are paid without this clearance.  THE WITNESS:  No, sir.")

[92]Trial Tr. Day 33, December 1, 2010, Benson at 139:20-140:13 ("Q Is it fair to say then -- is it fair to say that as far as cost matters go and approving of invoices, Mr. Kegelman would be a more appropriate person than you -- A No.  Q -- to adjust those items?  A No, I approved the invoices for payment.  They came to me under my signature.  Q But when you were away from the project, back possibly in Slidell, Louisiana or wherever, you weren't approving the invoices from there, were you?  A There were times when I was, yes, after they went through finance and were vetted and approved and looked through at operations, under signatures and ready for payment, finance submitted to me a letter, with the name of the contractor on it and the amount to be recommended for reimbursement and I signed it, SQR (ph).  Q You didn't review all of the invoices, did you?  A That's what I have a finance section chief for.")

[93]Trial Tr. Day 33, December 1, 2010, Benson at 117:13-119:1 ("Q And do you agree with Mr. McClellan that the rate reductions that the spill management team obtained on December 16th, could have been obtained earlier than that date?  A No, I disagree with that.  THE COURT:  What do you mean December 16th?  It's January 16th.  Q Let me ask you about December 16th.  THE COURT:  Oh, okay.  Q I believe, on direct and we won't repeat your testimony, but on direct, you testified that the first major shift from emergency management phase to project management phase occurred in the middle of December and that was December 16th, is that correct?  A December the 16th, about the middle of December, that's correct.  Q And you read Mr. McClellan's testimony to the effect that he thought that the rate reductions obtained on December 16, 2004, should have been obtained on December 1, 2004?  A That's what he said.  Q And you disagree with that testimony?  A Absolutely.  Q And you were the person actually involved in those negotiations?  A I was.  Q Could you, in fact, have obtained these rate reductions at an earlier date?  A No.  Q And in your -- I'm sorry, Judge.  THE COURT:  Go ahead.  Q And so, your testimony here, on that issue, today is based on your personal experience in these spills and working many other spills that you've worked on?  A Yes, sir.  Thousands of spills of a small nature up to a very major event and it's very common that we initiate the emergency response to get out there right away.  Then you pull the contractors in at a pre-set time, basically and sit down and start talking rates.  And that's exactly what we did here, duplicated many times in the past.")

[94]Trial Tr. Day 19, October 25, 2010, Benson at 25:17-26:10 ("Q Was there a company involved in this case that goes by the acronym SOS?  A Yes.  Q Okay.  What does that stand for?  A Spill On-Site Services.  Q Is SOS part of the O'Brien's network?  A They are, in good standing.  Q Okay.  What role did SOS play in this case?  A They served in the Finance Section within the Incident Command System.  Q What does the Finance Section do?  A Generally, the Finance Section is responsible for the accumulation of invoices as they pertain to the response and contractors; they review daily support sheets, they compare those daily support sheets to the invoice; they schedule and recommend payment on invoices; and take care of any issues in the invoices that may cause errors, mathematically or fundamentally wrong, something to that effect; that's their primary mission in Finance.")

Continued…

-26-

….Continued

[95]*Trial Tr. Day 19, October 25, 2010, Roussel at 83:22-84:12 ("Q Mr. Roussel, by whom are you employed?  A A company called SOS, Spill On-Site Management.  Q And what is SOS's business?  A We manage finances on large oil spills, even small oil spills.  THE COURT:  You provide the money or you just manage other people's money?  THE WITNESS:  Provide other people's money.  THE COURT:  Thank you.  BY MR. BERGERE:  Q And did you work on the ATHOS I oil spill?  A Yes.  Q And when did you begin work on the ATHOS I oil spill?  A Early December, the first or second week of December.  Q And was SOS one of what Mr. Benson referred to as their network employees on this spill?")*

[96]*Trial Tr. Day 19, October 25, 2010, Roussel at 87:10-21 ("for SOS for the past 15 years or so, how many oil spills have you and SOS worked on in a financial-support role as you did in the ATHOS case?  A Several hundred oil spills, I would say, we've handled invoices, 250, 300 different oil spills.  Q And how many millions of dollars in invoices have you vetted and processed?  A We've vetted well over a billion dollars in our history.  Q And do I understand you've also done over a billion in the last six months on the DEEP WATER HORIZON?  A Yes.")*

[97]*Trial Tr. Day 19, October 25, 2010, Roussel at 87:22-90:6 ("Q Now, the computer system that you use, does that have a name, that program?  A Yes, we named CMART, spelled with a C, CMART.  Q And what does that stand for?  A Cost Management and Resource Tracking.  Q And is this a program that you've employed in other oil spills?  A Yes.  Q And is it the same one you're using in the DEEP WATER HORIZON claims that you're reviewing now?  A Yes.  Q And what's an invoice module within the CMART system?  A It's one form of the database where we - - it's kind of  stand-alone where we input the basic information of a particular invoice, the invoice number, the invoice amount, the invoice date, the time period the invoice covered, and maybe a few other fields of information.  THE COURT:  Maybe even the identity of the payee?  THE WITNESS:  Yes, sir, the name of the vendor is definitely in it.  BY MR. BERGERE:  Q And is there another track also within the CMART system besides the invoice module?  A Yes.  We have the invoice module, which has the basic information.  We have a more detailed version where we input the, in this case, thousands of personnel names and equipment and material items, we enter the detail, the quantity, the description, and we do that on a daily basis.  That version is somewhat bigger than just the invoice module.  Q And how does that program work or assist you in evaluating invoices and daily summaries that you're getting from contractors?  A We receive -- when we arrive on scene, we receive the rate schedules or contracts from the vendors, the bigger OSROs that have the thousands of personnel.  Q When you say OSRO, we're talking about that's an acronym for Oil Spill Response Organization?  A Yes.  Q Okay.  A We input their personnel, equipment and material rates into the database, they're pre-inputted with the rates that match their system.  Then when we enter these items into our database, the rate automatically appears for a supervisor or a foreman or a pickup truck or a certain size vessel. So, when we enter it, it's almost fool-proof, the rate automatically appears and, when you hit Tab or Enter, the computer goes to the next line.  You have to manually override the system to put in an inaccurate rate from the rate set.  Q So, once the computer program sets the rate based on the approved rate sheets, if there's any invoice that comes in after that and the rates are different, that that would be picked up because the operator would have to manually override the*
Continued…

-27-

3826551v8

---

….Continued

*existing rate?  A Yes.  Q And that's done as a check to assure that contractor invoices are paid at the approved rates?  A Yes.  THE COURT:  If the computer is working correctly.  THE WITNESS:  That's true, yes, sir.")*

[98]*Trial Tr. Day 19, October 25, 2010, Roussel at 99:6-104:1 ("Q Did you have to order power washers and other things from across the country?  A Yes.  Q And why did you have to do that? A There was a lot of power washing.  Part of the plan to clean boats, to clean shoreline, to clean marinas, rocks, we needed hundreds and hundreds of pressure washers to operate on the spill. Q Now, you've mentioned auditing that was done before; do you use the CMART system that you described to conduct some of those audits?  A Yes.  Q And do you prepare audit reports when you conduct those?  A Yes.  Q Are audit reports always prepared?  A No.  Q Okay.  And when do you or don't you prepare audit reports, how do you decide?  A What's easiest and quickest for us, what's easier for the vendor to understand.  We were located in the Holiday Inn, we saw most of these contractors and vendors on a daily basis.  If I could talk to him and show him a problem, we handshake agreement, we would sell it that way, otherwise we would provide a report showing his finance staff or his accounting office them the errors.  They would usually agree to it and send it back to us.  MR. BERGERE:  Can we have Exhibit -- THE COURT:  Where was the Holiday Inn located?  THE WITNESS:  In downtown Philadelphia on Fourth Street maybe. MR. BERGERE:  About four blocks away, your Honor.  THE COURT:  Away from what? MR. BERGERE:  Away from the courthouse here, right down on Fourth and Market.  THE COURT:  How close to the scene of the disaster?  THE WITNESS:  A few miles.  Although the spill ranged maybe a hundred miles along the river, but I think the Holiday Inn was within five, six miles from where oil was in the river.  THE COURT:  Thank you.  MR. BERGERE:  Can we have P-1275?  BY MR. BERGERE:  Q Mr. Roussel, I think you have a pointer there, can you walk us through what this document is?  A This is an audit report, we called it an adjustment that we created for Clean Harbors Environmental, who was a contractor, an OSRO on the project. Q This is an OSRO for which you would expect to get daily reports?  A Yes.  Q Okay.  And what are we seeing in this report?  Was this generated by the CMART computer system?  A Yes.  Q Okay.  A This is a summary of this particular invoice from Clean Harbors.  We created a summary to show a deduction that we found or an adjustment or error that we found on their invoices and we made a daily amount that we planned to deduct from their invoices, but this was a report to show them the amounts that we were discussing.  MR. BERGERE:  Can we have the next page of this exhibit?  BY MR. BERGERE:  Q And can you walk us through, is this also part of the audit report?  A Yes, this is the detailed version.  The original page was just a summary, this is the more detailed.  There were personnel amounts on the first page, this is the detail of the personnel.  MR. BERGERE:  Can we highlight -- which employee, Ben Aleman?  Can we enlarge the screen there?  Thank you.  BY MR. BERGERE:  Q Can you tell us what this entry would -- the significance of this entry?  A One of the things we did as well as lowering -- this particular contractor's rates were higher than $67, we lowered it to $67, but we also put in place a personnel ratio and only allowed a certain amount of supervisors for the total number of employees that particular contractor had.  Some of the contractors had too many supervisors, so we told them they had to get in line with a ratio.  This particular contractor did not on this day. So, we reduced his supervisor rate to a spill technician rate and noted the difference.  Q Are there any other particular ones?  Can we -- is there one for equipment where you made Continued…*

-28-

_____

….Continued

*adjustments as well?  A Yes.  We also put in place a system to where contractors only had the proper number of operators compared to the number of pieces of equipment that required an operator.  If they had ten boats, they were allowed ten operators.  MR. BERGERE:  Could we call up Chris Blackstone, I believe?  BY MR. BERGERE:  Q Is that one -- would that be an example?  THE COURT:  What period of time does this cover?  THE WITNESS:  This was -- up here it's a little faded, but this was late December, this particular day an invoice -- MR. BERGERE:  December 30, 2004.  THE COURT:  But I mean the employee was paid for how long?  THE WITNESS:  This is for one day, he started the day at 0600, ended the day at 1800, which was eight hours straight time, four hours overtime.  This particular guy they billed as an operator, but we noted after we inputted the detail on the invoice that they only had 19 pieces of equipment that required them to bill operators.  THE COURT:  He was being paid $768 a week?  THE WITNESS:  A day.  THE COURT:  A day, I mean.  BY MR. BERGERE:  Q So, what you is covered in this case was that this gentleman was being billed as a boat operator; however, they only had 19 boats on site and on the overall bill they were billing for 28 different boat operators?  A Yes, but it could be boats or large skimmers.  When we input their rates schedule into our database, we have a checkbox, does this piece of equipment require an operator?  If we check that box, then when we run a specialized report later on it counts the number of pieces of equipment billed on that invoice, and it counts the operators and tells us they're over by five, or in some cases they're under by five, but we usually keep that --")*

[99]*Kegelman Dep., September 11, 2009 at 214:9-17 ("Q. How did you control the equipment that contractors brought on site?  A. How did we control it.  It was controlled, one, by being ordered throughout logistics section; two, based upon the incident action plan; and then three, verified as needed or not needed or extra or not extra by our division, our group supervisors.")*

[100]*Trial Tr. Day 19, October 25, 2010, Benson at 24:5-25:16 ("Q In this case, in the case of the ATHOS, did O'Brien's negotiate rate reductions with the oil spill contractors?  A We did.  Q When?  A That started in -- as soon as the Emergency Response Phase moved in the Project Phase, which was about the middle as well.  Q Why didn't you renegotiate contractor rates at an earlier point in time?  A During the Emergency Phase, the priority is to contain the oil, to get mobilization of contractors on scene, to get equipment in the water, to get personnel assigned to stand up the Command Center, man the positions.  A little bit like a fire department.  We're still in the response mode, we're aggressively trying to attack the oil to try to contain it.  When things settle down, we kind of move more into the Project Phase, a project mode day-by-day, when we're following a dedicated incident action plan, that's generally the time we start approaching the contractors to start looking for concessions.  Q Well, at the time you renegotiated these rates in mid- December, was it understood that the Project Phase, the long- term cleanup, was going to last several months?  A Very evident, yes, sir.  Q Do you think that you would have been able to convince the oil-spill contractors in this case to reduce their rates effective back to Day 1 or Day 5, let's say, of this spill?  A No, sir.  Q In your experience, in all the spills you've dealt with, have you ever been able to persuade contractors to reduce their published rates as early as Day 1 or Day 5, let's say, of a major spill like this?  A No, sir, not of a spill of this size and category; no, sir.  Q Have you heard of anybody else being successful in doing that?  A That is unknown to me, no, sir.")*

Continued…

-29-

….Continued

[101]*Trial Tr. Day 19, October 25, 2010, Roussel at 94:18-24 ("Q What was done with markups in this case as a cost-control measure, if anything? A We tried to reduce the percentage. All contractors have a different number, sometimes it's 35 percent down to five percent. We did try to reduce that as much as we can to 15 or ten percent, sometimes zero percent, with these contractors to try to limit it.)*

[102]*Trial Tr. Day 19, October 25, 2010, Roussel at 95:4-96:5 ("Q Now, how do you manage hourly rates? A On this case, the hourly rate is what is listed on the rate sheet, we'll input that into the database so it's properly inputted, we can input the detail. We'll try to negotiate with the more expensive contractors and reduce their rates to a rate that we would rather see. Q Was there -- were there negotiations or establishment of rates in this case, hourly rates in this case for workers deployed on the spill? A Yes. Q And how was that done? A We met with the management team, internal, and the Finance Section on what we thought we could get away with or what they would accept. We knew they wouldn't like it, but we were going to try to have them accept it. We grabbed the top handful of contractors who had the more expensive rates, personnel rates, and we also looked at the contractors who had the lowest rates, and we tried to meet somewhere in the middle, thinking they would accept it. We brought the more expensive contractors down, but we left the lower contractors where they were, we did not bring them up. Q So, the adjustment of hourly rates was really to lower the cost of the higher-rate contractors working on the job? A Yes. Q And were you successful in obtaining lower rates for those higher-priced contractors? A Yes.")*

[103]*Kegelman Dep., September 11, 2009 at 130:10-131:8 ("Q. Okay. Did you—are you aware of any rates that were reduced or discounted during the work? A. Yes. Q. Do you remember any specific entity whose rates were discounted or reduced during the work? A. I believe all of the companies working on were reduced. Q. And why was that done? A. To save the client money. Q. Was there any particular reason or time or circumstance that compelled you to request a reduction in rates? A. We'd got into a phase in the incident where we were longer in a reactionary phase. It was no longer an emergency response. We were transitioning into a project. At that time emergency rates did not apply, in my mind. And that's when the financial section was asked to negotiate lower rates.")*

[104]*Trial Tr. Day 19, October 25, 2010, Benson at 50:1-51:7 ("Q In a spill response like this, are you familiar with a concept called Central Supply? A Yes, I am. Q And what is that? A Central Supply is where we pull in all the inventory that's being used, the consumable inventory, the expendable inventory, such as sorbent materials that soak up oil; personnel protective equipment such as suits, boots, gloves; a lot of the expendable inventory that's required to sustain an oil-spill response. In the emergency phase, we would require that each individual contractor support themselves with all the expendable equipment for the oil spill itself, such as rope and pads and Visqueen and bags. Once we started to get a better control, a handle on the spill, we moved towards that proactive phase, we centralized our inventory, and that way we could control its use, limit its use so there's no waste, and document every day how much we were using in the field. Q Is Central Supply more efficient? A Very much more efficient. Q Is it more economical? A Highly cost effective. Q Okay. In this case, were you able to set a Central* Continued…

....Continued

*Supply?  A We did.  Was there a particular company that was engaged to handle that?  A We did.  We looked through the local Philadelphia area, we -- our Logistics Section identified a company called Aramsco Services, and they're an industrial supply company.  We engaged in dialogue with the Aramsco Services and eventually awarded them Central Supply.")*

[105]*Trial Tr. Day 18, October 21, 2010, Laferriere at 45:19-46:7 ("Q And how about any lessons learned with respect to logistics?  A One of the logistics lessons learned, the responsible party set up a central supply station, and ordered all their supplies to be managed out of a central supply inventory.  They used representatives from Home Depot and other distributors to maintain the central supply warehouse.  What this enabled us to do is if we had an emergency situation where the oil got remobilized, or escaped our containment systems, rather than having to order it and waiting for it to arrive, they could go to the central supply facility, get it out of the warehouse, and deploy it on scene as quickly as possible.  This particular practice was also implemented during the BP Oil spill as well.")*

[106]*Kegelman Dep., September 11, 2009 at 217:3-24 ("Q. What's an expendable?  A. An expendable?  Item you mean?  Q. Yes.  A. That would be a sorbent material, a rope, tape, Tyvek, suit.  Q. So basically materials that are going to be used, used up—A. Mm-mm.  Q. -- and don't—aren't preserved?  A. Correct.  Q. What kind of inventory process did you have with respect to expendables?  A. Initially, within the first week or two, it was verified by field personnel.  Then we negotiated a contract with a company called Aramsco to be a sole provider of all expendables, which became a centralized warehouse to which the division and group supervisors would place orders for what they thought they needed for the next day's work according to what was asked for in the incident action plan.")*

[107]*Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:17 ("Q And in your experience, were the charges that were on any of these dailies determined by the spill management team to be necessary to the response, verified as having been provided in the field and confirmed to be consistent with the rates agreed upon?  A That's correct.  Q Okay and if there wasn't a signed daily, does that mean you don't pay that contractor?  A No, it does not.  Q Okay, what does it mean when there isn't a signed daily?  A What it means is we don't have a signed daily support sheet, it could be for many, many reasons.  It could have been stuck to the bottom of a piece of paper or it could have been misplaced on that day and then submitted in with the invoice.  If our finance section, in review of these invoices, would pull that daily support sheet out and hold it until we could get the division supervisor, the O'Brien's division supervisor and the contractor manager or supervisor in to discuss it and once it's discussed, it's usually an oversight or an error.  And then it would be signed, approved, submitted back in the invoice and then paid.  Q But if you, ultimately, didn't have a signed one, but you had one of your zone managers advising the spill management team that that work, in fact, had been done.  Would that be sufficient, in your experience, to approve that invoice for payment?  A Absolutely.  I have full confidence in my division supervisors working in the field.")*

[108]*Trial Tr. Day 19, October 25, 2010, Roussel at 97:9-98:2 ("Q And per diems, we've had some discussion about per diems; how did you and the Finance Section deal with per diems?  A We* Continued...

....Continued

*allowed most or just about all contractors to have a per diem. In this particular case where the spill is located, only two OSROs that I was aware of at the time were local and it wasn't a big office for either contractor, they just maybe had a dozen people, if that. So, we knew we were going to, you know, have close to 2,000 people on the job, just about everybody was going to be from outside the area and we were going to have a per diem charge for everybody. Q Now, if you didn't have per diems and you had to review every employee -- every worker's hotel receipt, toll receipt, meal receipts, would that have had an impact on the number of people and the amount of work you would have to do in the Finance Section? A It would have brought the Finance Section probably to a crawl. Reviewing so much documentation for probably very little money would have really slowed us down and probably upset everybody because they weren't getting paid on time.")*

[109]*Trial Tr. Day 19, October 25, 2010, Roussel at 94:25-95:3 ("Q Was there also an effort to pull some of NRC's subcontractors directly under -- to direct hire them through O'Brien's so that there weren't markups paid? A Yes.")*

[110]*Trial Tr. Day 33, December 1, 2010, Benson at 122:24-125:10 ("BY MR. BERGERE: Q Do you understand what Mr. McClellan's criticism was on the lack of direct billing? A Yes and I disagree with his opinion. Q Okay and why do you disagree with that? A Lack of direct billing tells me that the contractor was essentially, marking the costs up and passing it on to the client, according to their rate schedules, which is basically what happens in spill response. He's arbitrarily taken that two-plus million dollars out of there, saying that we did not, that they did not do that and it should have been and it's not the case, no, sir.*

[111]*Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:17 ("Q And in your experience, were the charges that were on any of these dailies determined by the spill management team to be necessary to the response, verified as having been provided in the field and confirmed to be consistent with the rates agreed upon? A That's correct. Q Okay and if there wasn't a signed daily, does that mean you don't pay that contractor? A No, it does not. Q Okay, what does it mean when there isn't a signed daily? A What it means is we don't have a signed daily support sheet, it could be for many, many reasons. It could have been stuck to the bottom of a piece of paper or it could have been misplaced on that day and then submitted in with the invoice. If our finance section, in review of these invoices, would pull that daily support sheet out and hold it until we could get the division supervisor, the O'Brien's division supervisor and the contractor manager or supervisor in to discuss it and once it's discussed, it's usually an oversight or an error. And then it would be signed, approved, submitted back in the invoice and then paid. Q But if you, ultimately, didn't have a signed one, but you had one of your zone managers advising the spill management team that that work, in fact, had been done. Would that be sufficient, in your experience, to approve that invoice for payment? A Absolutely. I have full confidence in my division supervisors working in the field.")*

[112]*Trial Tr. Day 19, October 25, 2010, Benson at 34:3-35:23 ("Okay. Are you familiar with something called dailies? A Daily supports, yes. Q What are they? A What they do is they calculate and account for the labor, numbers of laborers, workers, equipment, materials that are*
Continued...

-32-

….Continued

*used in the oil spill and supplies to support the oil spill, on a day-to-day basis in the geographical area that the workers are working in.  At the end of the day, the contractor fills out his daily support sheet listing, itemizing what was deployed that day, and that is presented to our O'Brien's Division Supervisor.  THE COURT:  Why couldn't O'Brien's do that itself?  THE WITNESS:  Well, it's contractor equipment, it's contractor labor, and they're primarily responsible for that, they fill out the daily support sheets.  Our division supervisor looks at that daily support sheet and concurs that the number of personnel, the number -- the quantity of boom or equipment used for that date is on that daily support sheet, and then they both sign it. BY MR. O'CONNOR:  Q Now, when you say a Section Supervisor, that's your man in the field on-site where the contractor in question has his -- whatever his men, equipment and supplies are?  That is correct, that's our Division Supervisor responsible for that geographical area.  Q And he literally counts heads?  A He does.  Q And does he sign the daily that the contractor has provided?  A That's affirmative, he does.  Q Is that his signification that he agrees that the number of men and equipment set forth in that particular day's daily was in fact on the scene?  A That's the exact reason, yes.  Q Now, in addition to your Section Supervisor, does anybody else check and verify the number of men and materials in a given zone on a given day?  A Absolutely. It's not just the O'Brien's Division Supervisor that's on location, it's also the U.S. Coast Guard. They work in those geographical areas side-by-side with the contractors, along with our Division Supervisors, and they're also monitoring the spill efforts.  I have done this in the past in my career in the Coast Guard, I counted the heads as well as the Coast Guard on the ATHOS spill counted the heads and the equipment and materials in each one of those geographical areas.")*

[113]*Trial Tr. Day 19, October 25, 2010, Benson at 35:8-11 ("Q Is that his signification that he agrees that the number of men and equipment set forth in that particular day's daily was in fact on the scene?  A That's the exact reason, yes.")*

[114]*Trial Tr. Day 33, December 1, 2010, Benson at 128:15-129:17 ("Q And in your experience, were the charges that were on any of these dailies determined by the spill management team to be necessary to the response, verified as having been provided in the field and confirmed to be consistent with the rates agreed upon?  A That's correct.  Q Okay and if there wasn't a signed daily, does that mean you don't pay that contractor?  A No, it does not.  Q Okay, what does it mean when there isn't a signed daily?  A What it means is we don't have a signed daily support sheet, it could be for many, many reasons.  It could have been stuck to the bottom of a piece of paper or it could have been misplaced on that day and then submitted in with the invoice.  If our finance section, in review of these invoices, would pull that daily support sheet out and hold it until we could get the division supervisor, the O'Brien's division supervisor and the contractor manager or supervisor in to discuss it and once it's discussed, it's usually an oversight or an error.  And then it would be signed, approved, submitted back in the invoice and then paid.  Q But if you, ultimately, didn't have a signed one, but you had one of your zone managers advising the spill management team that that work, in fact, had been done.  Would that be sufficient, in your experience, to approve that invoice for payment?  A Absolutely.  I have full confidence in my division supervisors working in the field.")*

Continued…

-33-

_____

….Continued

[115]*Trial Tr. Day 22, November 4, 2010, McLellan at 114:24-116:7 ("Q Can we pull up line 22 d over on to the other, I guess, line 22. You were asked the question, 'I guess in this instance, well, it's inappropriate, I guess in this instance, but what you want and briefly, you would want all the back-up documentation that you could get your hands on,' is the question posed to you. And your response in this instance, can we pull up? 'Yeah, let me give you an example. Contractor, guy comes to me, says, I got this invoice. Where is your back-up? Don't have any back-up or I have this certain situation. I know I've got certain equipment out there. I know the job is done. I'm going to go to my client and say his back-up, his back-up is minimal. We know he was out there. We know the job was done, so, what do you want to do and I said, you know, I think if we know he spent so many days out there and he says he has this equipment, we can -- we've got some manifests or we can try to piece together, as best we can, I'm going to make a recommendation based on that. If I don't have everything, I'm not going to say, oh, you don't have to pay him, because he doesn't have everything. We know the guy worked, he did the job. So, we're going to try to come up with either, if it's the full price, it's the full price. If it's not the full price, if we feel that maybe that he has billed is inconsistent with the facts. But again, what we're talking about, at this point, is what we would call a post mortem. And a post mortem is inherently flawed, because you were not there. And so, at the end of the day, if you disagree and you end up in court and this contractor is going to come in and he's going to come in and say these are the people I had in there and the' -- can we switch to the next segment of the dep -- 'the guy said, okay, who, this guy, this guy, this guy, they can have them all testify and you're going to stand up there and say, well, I don't know if you had them all there.'")*

[116]*Trial Tr. Day 21, November 3, 2010, McLellan 137:10-22 ("Q Briefly take us through your professional experiences since graduating from law school, Mr. McLellan. A I graduated from law school in 1988, joined the law firm of Chaffe McCall, worked as the admiralty and maritime litigation attorney for three years. I left Chaffe in 1991, went with one of our clients on a business venture, Turnabout Services. That was just after the Oil Pollution Act came out and I was tasked with the responsibility of putting together our company's oil pollution response program, both costs and claims. And we put that to use a couple years later in the 1993 Tampa Bay oil spill, which was the first major oil spill after OPA '90. I headed up a claims office that negotiated or adjusted losses for several thousand claimants.")*

[117]*Trial Tr. Day 21, November 3, 2010, McLellan at 195:6-15 ("Q Now, at the outset of your testimony, you stated that your firm does not sit in the finance section of spill management teams under the unified command structure. Did I hear that correctly? A What I stated was that normally, we don't sit in that finance chair under a unified command structure. We do the same function. We just don't sit in that same chair because we don't align ourselves with a spill management team and generally, my clients want me to audit the spill management team. And so, I don't, like I say, we don't align ourselves, we believe that's a conflict of interest.")*

[118]*Trial Tr. Day 21, November 3, 2010, McLellan at 141:22-142:9 ("Q How many documents have you looked at and analyzed, Mr. McLellan? A All together, it's over 200,000 documents. We had a certain amount of documents, well over I would say 70,000 or more from the Plaintiffs and different documentation as far as the claim itself that went to the National Pollution Fund* Continued…

-34-

….Continued

*Center and other documentation that we looked at as part of our analysis. We also -- well, through defense counsel, they issued subpoenas, when we attempted to get additional documentation in support of the charges, and there was approximately 112,000 pages of documents that came in those supplemental -- what we call the supplemental documents that were given to us through the subpoena process.")*

[119]*Trial Tr. Day 21, November 3, 2010, McLellan at 197:19-22 ("Q Referring back to MR & Associates, you mentioned, how many people did you have working on the spill, in your office? Working on the review of the documents in this case? A I believe, at the height of it, it was about 12 to 15.")*

[120]*Trial Tr. Day 22, November 22, 2010, McLellan at 91:25-92:3 ("Q Did you ascertain whether Ms. Holmes or Mr. Tanner obtained any authorization or any confirmation from their zone managers concerning these services here? A That information was not in the documentation provided.")*

[121]*Trial Tr. Day 22, November 22, 2010, McLellan at 97:16-22 ("Q And did you speak to any of the Osrows or the contractors, in this case, to find out whether they would be amenable to any such adjustment? A No, I did not speak to any of the contractors. I just was looking at the evidence in the case and the evidence established that the contractors were amenable to rate reductions early on.")*

[122]*Trial Tr. Day 22, November 22, 2010, McLellan at 118:22-119:10 ("Q Now -- and in this case, neither you nor Ms. Felker (ph) or your children or your wife or Mr. Rasmussen or his wife or any of the 15 people that you hired and paid for, in this case, just so we're clear, none of them sat down and spoke with Mr. Benson, Mr. Kagleman (ph), Captain LaFerrier, Jason Roussel, anybody else that Mr. Walker asked about, Jerry Roussel or anybody else on the finance team, Don Costanza. Nobody attempted to speak to any of them about what they were thinking or what documentation or what information they had to justify their payments, did they? A None of my employees were afforded that opportunity to speak with them. We were basing our analysis on the record that we have and the communications and what-not that might have gone between the two parties.")*

[123]*Trial Tr. Day 22, November 4, 2010, McLellan at 86:6-21 ("Q Mr. Blanchard took it. And Amquip is the top one there, obviously and it looks like you've completely disallowed $267,000? A That's correct. Q Okay and is it your belief that it's more likely than not, that that equipment was not deployed in the field? A It's my opinion that there was no support that satisfied my judgment that these charges had been proven as supported or properly documented. Q And that's -- so, whenever we have insufficient support, this -- it's based on that opinion, which you've just re-expressed here? A Yes, it's based on our review of all the documentation that we had, that we did not find with the documentation presented, that was sufficient to determine whether the charge was valid.")*

Continued…

….Continued

[124]Dep. Trans., November 1, 2010, McLellan at 493:1-11 ("Q. Now, have you prepared any demonstrative exhibits for use at the trial of this matter?  A. No.  Q. Do you know what exhibits you're going to use for your testimony yet?  A. I don't know if that's been decided.  Q. Have the exhibits under consideration been produced to us yet?  A. To my recollection …").

[125]Trial Tr. Day 21, November 3, 2010, McLellan at 197:8-18 ("Q Well, we'll look at the report and see.  And it's your view that the people on the ground, dealing with the spill and the contractors, are in the best position to make these judgment calls about rate rollbacks during the negotiations with the contractors, is that correct?  A As a general statement, I believe that the people on the ground, are in the best position to do that.  But if you're philosophical or your theory of cost control does not begin until the spill is under control, then I could not state that that person would be in the best position to make those kind of adjustments.")

[126]Trial Tr. Day 21, November 3, 2010, McLellan at 164:11-21 ("Q Let's move on to your next category of, "Lack of Direct Billing."  What do you mean by that, Mr. McLellan?  A When you get into a spill response, one of the methods that you can help reduce costs is to eliminate markups.  And so your goal is to try to contract directly with each of the oil-spill response contractors; it's not always obtainable, but that's your goal.  And so this adjustment reflects that in this matter NR -- TOG and the cost-control unit, they made no attempt to avoid the markup and, by not doing that, it resulted in almost $2 million of excess markup charges -- or actually over -- a little over $2 million.")

[127]Trial Tr. Day 21, November 3, 2010, McLellan at 166:6-25 ("Q The third category of your overpayments relates to third-party rental equipment rate adjustment for $1,535,185.40.  Please describe what falls into that category.  A That is very similar to the third-party labor.  Again, when these spill-management teams come on site, they're aware of the resources that the contractors have, they're also aware that they don't have all the resources they're going to need.  As Mr. Benson testified, they knew they were going to need power washers.  At that point, you have to make a business decision.  If you're the RP, responsible party, excuse me, you're going to make a decision, is it cheaper for me to go out and buy those machines and still have them available for salvage after or is it more advantageous for me to have the contractors rent them back to me?  Generally, in a spill of this size, of long duration, you know you're going to need this equipment, it's going to be much, much more advantageous to you financially to buy that equipment yourself.  At the very least, you would not want them to bill it at their own rates, you would want it to be billed at cost plus a markup.")

[128]Trial Tr. Day 21, November 3, 2010, McLellan at 152:18-154:3 ("Q The first item in your chart of categories is, "Third-Party Labor Rate Adjustments."  Can you describe for the Court what you mean by that category, Mr. McLellan?  A When you have a spill of this size, you understand that the contractors that are going to respond to the spill are not going to have the adequate manpower that you're going to need.  So, the spill-management team has to recognize this fact and determine where he's going to get this manpower and how it's going to be billed.  And so in this particular case it involved temporary labor and these bill-management team, instead of either going out and contracting with this laborer directly, they allowed the Continued…

-36-

---

….Continued

*contractors to bill the labor out as their own employees, contrary to some of the contracts, but contrary to good, sound cost-control practices overall.  Q Is it more expensive for these type of vendors to bill out these temporary employees as if they were their own employees as opposed to just applying an invoiced amount plus a markup?  A Very much so, it can be several times the amount that would result if you did it in accordance with their contract or a renegotiated contract, a cost plus a markup.  THE COURT:  Well, what amount was actually paid to these temporary laborers?  THE WITNESS:  The amounts that were -- temporary -- that was paid to the temporary laborers, we have some examples of their charges, your Honor, but we were not provided all of the -- THE COURT:  Well, what adjustment are you making there?  THE WITNESS:  What that adjustment, your Honor, is if -- what we did is we said that they should have billed them according to the cost plus the markup, and so we made an adjustment, because the spill-management team and the cost-control unit there did not do that; they allowed the contractors to bill these -- this third-party labor out as their own employees.")*

[129]*Trial Tr. Day 22, November 4, 2010, McLellan at 77:11-14 ("Q Now, you testified that the lack of a signed daily was sufficient reason for you to reject a particular removal cost, earlier, is that correct?  A That's correct.")*

[130]*McLellan Dep. at 99:1-19 ("A. Yeah, let me give you an example.  Contractor -- guy comes to me, says I got this invoice.  Where is your backup?  Don't have any backup.  Or I have this certain situation, I know I've got certain equipment out there I know the job is done.  I'm going to go to my client and say his backup, his backup is minimal.  We know he was out there, we know the job was done, so what do you want to do?  And I said, you know, I think if we know he spent so many days out there and he's saying he has this equipment, we can -- we've got some manifests or we can try to piece together as best we can, I'm going to make a recommendation based on that.  If I don't have everything, I'm not going to say, oh, you don't have to pay him because he doesn't have everything.  We know the guy worked, he did the job, so we're going to try to come up with either if it's the full price, it's the full price.  If it's not the full price, if we feel that maybe what he's billed is inconsistent with the facts.")*

[131]*Trial Tr. Day 19, October 25, 2010, Roussel at 115:7 ("MR. BERGERE:  Can we get Exhibit P-1420?")*

[132]*Trial Tr. Day 19, October 25, 2010, Roussel at 116:2-18 ("Q Mr. Roussel, do you recognize this package of documents?  A Yes.  Q And is this the documentation relative to the un-reimbursed clean-up response cost claims?  THE COURT:  Among other things, yes.  THE WITNESS:  Yes.  BY MR. BERGERE:  Q And can you just walk us through which claims are documented in this package?  A This was the vendors exhibit category, the name of the vendors, invoice amount, the total of the claim.  Q And is the documentation contained at each tab a list of the actual invoices that were submitted by each of these contractors?  A Yes.  Q As well as the proofs of payment?  A Yes.")*

[133]*Trial Tr. Day 19, October 25, 2010, Benson at 45:7-49:16 ("MR. O'CONNOR:  Can I have P-1280, please?  THE COURT:  Excuse me, he didn't answer your question.  He looks puzzled.  BY* Continued…

….Continued

MR. O'CONNOR:  Q Are you familiar with an outfit called Hudson Marine Management Services?  A Yes, I am.  Q Did they play a role in the ATHOS response?  A They did play a role. Q What was that role?  A Under the Oil Pollution Act of 1990, the Responsible Party, in this case Tsakos Shipping and Trading, is required to bring on a firm to handle third-party claims, Hudson Marine Management was assigned that function.  Q Okay.  And HMMS, that's Hudson? I'm pointing to HMMS, that's Hudson?  A That is correct.  Q Okay.  Could you just briefly explain how this flow chart works -- well, let me strike that.  The third-party claims that you received in this case, can you give me the categories or was there a primary category of the type of claims you were getting?  A Certainly.  In the port we had a large number of recreational vessels and their marinas impacted with oil through the course of the spill.  We also had a number of barges and tugs and vessels that came in contact with the oil as well.  This required cleaning and decontamination of those vessel hulls.  Q Is this a flow chart that comes from the contingency plan?  A No, this -- yes, but this is a flow chart primarily as a plan developed by the Unified Command -- Q To deal with the ATHOS incident?  A -- to deal with the ATHOS incident in particular.  Q Well, can you just briefly describe how this works -- A Sure.  Q -- in connection with the boat-contamination claims that you've just mentioned?  A Absolutely, absolutely. Again, under OPA '90, Hudson Marine Management advertises in the local newspapers … Q Just hit the button.  THE COURT:  Advertises for what?  THE WITNESS:  They advertise -- they sent -- they put an advertisement in the paper that simply states, if you've been affected by the oil spill, if you have a boat or any of your property has been affected by the oil spill, please call this 800 number and file your complaint or your claim.  So, the claim is simply made at this point as a result of that advertising -- or essentially word of mouth, word travels very quickly.  So, we direct those claims, those potential claims, to Hudson Marine Management in the first case. They look at the claim and try to settle the claim first, they try not to have it end up in any type of litigation.  They try to maybe talk to the owners and a cash settlement of some kind.  Or, if they're not interested in a cash settlement and they do not want to litigate the claim itself or the damage, they may elect to have the vessel, in this case a recreational vessel, a yatch or a boat or a barge or even the marina, to be cleaned.  In that case where the decision is to clean the property, it flows down into this area here in what we refer to as our Operations.  O'Brien's manages the Operations Section, within that Operations Section we have a decontamination plan and that decontamination plan would have been employed to clean that vessel hull.  BY MR. O'CONNOR:  Q And was the decontamination conducted arranged sites, at marinas or boat clubs, as indicated on this chart?  A Once, absolutely.  Once it's scheduled by the O'Brien's Operations Section, depending upon where off-site the vessel is, here Island Marine, for example, or the West End Boat Club -- the Lagoon is a another good example in Essington where one of the decon. sites were set up, we would actually clean the hull.  THE COURT:  What are the first two?  Offer of something, I can't read it.  MR. O'CONNOR:  Other potential sites, your Honor.  THE WITNESS:  To be determined, yes, sir.  THE COURT:  Oh, I see.  BY MR. O'CONNOR:  Q At the time this plan was developed, the other sites had been selected or arranged yet?  A That's affirmative.  Q Are you familiar named E.A. Renfrow?  A E.A. Renfrow, yes, I am.  Q Did they play a role in this handling of decontamination of pleasure boats?  A That's exactly right, they played a very instrumental role.  Once the claim was made and it went to cleaning required and it was scheduled by O'Brien's, E.A. Renfrow would manage that Continued…

---

….Continued

*cleaning process for us.  Q Okay.  Are you familiar with a company that participated in this response called Global Remediation Services?  A Yes, Global Remediation Services.  Q What did they do?  A They provided mechanics and special technicians, primarily at the Lagoon decontamination site in Essington.  When we would haul a vessel out of the water and put it into a cradle to clean the hull, Global would come in and perform a winterization of the vessel's lower unit, propulsion unit, drain the internal pipings of water.  Again, because we were in wintertime conditions and subject to freezing temperatures, one of the worst things we could was pull a boat out of the water and suspend it in air, let it freeze and crack pipes and break lower units.  So, Global was contracted to come in to provide the mechanics and the special services to winterize these boats, and also to repair our steam cleaners, repair air compressors, repair pumps.  They served a pretty vital role in our decontamination effort.")*

[134]*Trial Tr. Day 19, October 25, 2010, Benson at 49:17-25 ("Q Are you familiar with a company called Weeks Marine?  A I am.  Q What did they do in this case?  A To the best of my knowledge, Weeks Marine provided crane barges, primarily for the insertion and the fabrication of the box patch, which went onto the bottom of the ATHOS vessel itself for safe transit, and they also were used to search out and pick up debris from the bottom of the river that may be associated with the damage.")*

[135]*Trial Tr. Day 19, October 25, 2010, Benson at 45:7-49:16 ("MR. O'CONNOR:  Can I have P-1280, please?  THE COURT:  Excuse me, he didn't answer your question.  He looks puzzled.  BY MR. O'CONNOR:  Q Are you familiar with an outfit called Hudson Marine Management Services?  A Yes, I am.  Q Did they play a role in the ATHOS response?  A They did play a role. Q What was that role?  A Under the Oil Pollution Act of 1990, the Responsible Party, in this case Tsakos Shipping and Trading, is required to bring on a firm to handle third-party claims, Hudson Marine Management was assigned that function.  Q Okay.  And HMMS, that's Hudson? I'm pointing to HMMS, that's Hudson?  A That is correct.  Q Okay.  Could you just briefly explain how this flow chart works -- well, let me strike that.  The third-party claims that you received in this case, can you give me the categories or was there a primary category of the type of claims you were getting?  A Certainly.  In the port we had a large number of recreational vessels and their marinas impacted with oil through the course of the spill.  We also had a number of barges and tugs and vessels that came in contact with the oil as well.  This required cleaning and decontamination of those vessel hulls.  Q Is this a flow chart that comes from the contingency plan?  A No, this -- yes, but this is a flow chart primarily as a plan developed by the Unified Command -- Q To deal with the ATHOS incident?  A -- to deal with the ATHOS incident in particular.  Q Well, can you just briefly describe how this works -- A Sure.  Q -- in connection with the boat-contamination claims that you've just mentioned?  A Absolutely, absolutely. Again, under OPA '90, Hudson Marine Management advertises in the local newspapers … Q Just hit the button.  THE COURT:  Advertises for what?  THE WITNESS:  They advertise -- they sent -- they put an advertisement in the paper that simply states, if you've been affected by the oil spill, if you have a boat or any of your property has been affected by the oil spill, please call this 800 number and file your complaint or your claim.  So, the claim is simply made at this point as a result of that advertising -- or essentially word of mouth, word travels very quickly.  So, we direct those claims, those potential claims, to Hudson Marine Management in the first case.*
Continued…

….Continued

*They look at the claim and try to settle the claim first, they try not to have it end up in any type of litigation. They try to maybe talk to the owners and a cash settlement of some kind. Or, if they're not interested in a cash settlement and they do not want to litigate the claim itself or the damage, they may elect to have the vessel, in this case a recreational vessel, a yatch or a boat or a barge or even the marina, to be cleaned. In that case where the decision is to clean the property, it flows down into this area here in what we refer to as our Operations. O'Brien's manages the Operations Section, within that Operations Section we have a decontamination plan and that decontamination plan would have been employed to clean that vessel hull. BY MR. O'CONNOR: Q And was the decontamination conducted arranged sites, at marinas or boat clubs, as indicated on this chart? A Once, absolutely. Once it's scheduled by the O'Brien's Operations Section, depending upon where off-site the vessel is, here Island Marine, for example, or the West End Boat Club -- the Lagoon is a another good example in Essington where one of the decon. sites were set up, we would actually clean the hull. THE COURT: What are the first two? Offer of something, I can't read it. MR. O'CONNOR: Other potential sites, your Honor. THE WITNESS: To be determined, yes, sir. THE COURT: Oh, I see. BY MR. O'CONNOR: Q At the time this plan was developed, the other sites had been selected or arranged yet? A That's affirmative. Q Are you familiar named E.A. Renfrow? A E.A. Renfrow, yes, I am. Q Did they play a role in this handling of decontamination of pleasure boats? A That's exactly right, they played a very instrumental role. Once the claim was made and it went to cleaning required and it was scheduled by O'Brien's, E.A. Renfrow would manage that cleaning process for us. Q Okay. Are you familiar with a company that participated in this response called Global Remediation Services? A Yes, Global Remediation Services. Q What did they do? A They provided mechanics and special technicians, primarily at the Lagoon decontamination site in Essington. When we would haul a vessel out of the water and put it into a cradle to clean the hull, Global would come in and perform a winterization of the vessel's lower unit, propulsion unit, drain the internal pipings of water. Again, because we were in wintertime conditions and subject to freezing temperatures, one of the worst things we could was pull a boat out of the water and suspend it in air, let it freeze and crack pipes and break lower units. So, Global was contracted to come in to provide the mechanics and the special services to winterize these boats, and also to repair our steam cleaners, repair air compressors, repair pumps. They served a pretty vital role in our decontamination effort.")*

[136]*Trial Tr. Day 18, October 21, 2010, Laferriere at 9:23-11:10 ("Q What categories of oil spill response does the federal on-scene coordinator direct? A Repeat the question, please? Q What categories of oil spill response does the federal on-scene coordinator direct? A Well, he directs all the functions of the oil spill response, including salvage, the oil removal from the surface of the water, and the subsurface. THE COURT: She wants you to list the various categories. THE WITNESS: I'm not sure I understand that. I'm sorry. BY MS. SHUTLER: Q Perhaps subsurface oil? A Yeah, I said that earlier. Subsurface oil, removal of submerged oil, cleanup of wildlife, cleanup of shoreline, decontamination of vessels, decontamination of facilities, those kinds of operations. Q Does the Government have a standing plan to respond to oil spills? A Yes. Q Can you describe what that plan is? A That plan is the National Contingency Plan. Q And what does the National Contingency Plan provide for? A The National Contingency Plan is a plan that's also actually a regulation as well. It requires the federal on-scene coordinator to Continued…*

-40-

---

….Continued

*take specific actions in relation to an oil spill. It also identifies the different functions that the federal on-scene coordinator performs in the act of doing the clean up of the oil spill. Q Does the National Contingency Plan identify oil spill priorities for cleanup? A Yes. Q What are those priorities? A The priorities are prevent and mitigate a substantial threat of a discharge, let human life, health and safety. That's No. 1. The effective and immediate removal of an oil spill and minimize environmental impacts, to my recollection.")*

[137]*Trial Tr. Day 19, October 25, 2010, Benson at 48:23-49:16 ("Q Okay. Are you familiar with a company that participated in this response called Global Remediation Services? A Yes, Global Remediation Services. Q What did they do? A They provided mechanics and special technicians, primarily at the Lagoon decontamination site in Essington. When we would haul a vessel out of the water and put it into a cradle to clean the hull, Global would come in and perform a winterization of the vessel's lower unit, propulsion unit, drain the internal pipings of water. Again, because we were in wintertime conditions and subject to freezing temperatures, one of the worst things we could was pull a boat out of the water and suspend it in air, let it freeze and crack pipes and break lower units. So, Global was contracted to come in to provide the mechanics and the special services to winterize these boats, and also to repair our steam cleaners, repair air compressors, repair pumps. They served a pretty vital role in our decontamination effort.")*

[138]*Trial Tr. Day 19, October 25, 2010, Benson at 48:23-49:16 ("Q Okay. Are you familiar with a company that participated in this response called Global Remediation Services? A Yes, Global Remediation Services. Q What did they do? A They provided mechanics and special technicians, primarily at the Lagoon decontamination site in Essington. When we would haul a vessel out of the water and put it into a cradle to clean the hull, Global would come in and perform a winterization of the vessel's lower unit, propulsion unit, drain the internal pipings of water. Again, because we were in wintertime conditions and subject to freezing temperatures, one of the worst things we could was pull a boat out of the water and suspend it in air, let it freeze and crack pipes and break lower units. So, Global was contracted to come in to provide the mechanics and the special services to winterize these boats, and also to repair our steam cleaners, repair air compressors, repair pumps. They served a pretty vital role in our decontamination effort.")*

[139]*Trial Tr. Day 19, October 25, 2010, Benson, 48:15-22 ("Q Are you familiar named E.A. Renfrow? A E.A. Renfrow, yes, I am. Q Did they play a role in this handling of decontamination of pleasure boats? A That's exactly right, they played a very instrumental role. Once the claim was made and it went to cleaning required and it was scheduled by O'Brien's, E.A. Renfrow would manage that cleaning process for us.")*

[140]*Trial Tr. Day 19, October 25, 2010, Benson at 49:17-25 ("Q Are you familiar with a company called Weeks Marine? A I am. Q What did they do in this case? A To the best of my knowledge, Weeks Marine provided crane barges, primarily for the insertion and the fabrication of the box patch, which went onto the bottom of the ATHOS vessel itself for safe transit, and they also were*
Continued…

3826551v8

....Continued
*used to search out and pick up debris from the bottom of the river that may be associated with the damage.")*

[141]*Trial Tr. Day 11, October 7, 2010, Bowman at 113:6-115:3 ("Q Did you see it anywhere on the ship?  Did you look at the whole bottom of the ship?  A I did an inspection of the whole bottom walking up, the port side and damaged starboard side.  As you walked forward from this damage along the port side, as the width of the hull widened out towards the amidship section, you could see  what I would call rubbing damage out of the turn of the bilge where the curvature of the hull changed from being flat at the bottom up to the vertical sides of the hull.  MR. LEVY: Ted, would you please Video Clip 3, so we can show the Judge what Mr. Bowman is talking about.  THE WITNESS:  This is the damage I'm talking about in way of Frame 81.  It continued for maybe 50 meters; I'm not sure of that right now, but it was quite a long distance in the widest front of the hull, and I formed the view that this is where the vessel had listed.  MR. LEVY:  Can you play it again, Ted?  THE WITNESS:  I formed the view that when the vessel listed in the anchorage this was likely to have been or very likely to have been the damage or scraping marks that we see now.  THE COURT:  Listed because it had been damaged?  THE WITNESS:  Yes, your Honor, yes.  THE COURT:  Thank you.  BY MR. LEVY:  Q Now, again, just if you would, looking at this damage that we're seeing on Video Clip Number 3, how does that compare to the type of damage you would see if the vessel had run aground?  A How does this -- Q Yes.  A -- damage compare with -- Q Yes.  A -- ground-due damage?  Q Yes.  A Well, if it has grounded -- Q Do ships generally ground sideways?  A No.  Of course, if it ran aground, you would see longitudinal score marks along the hull and you don't see this here.  So, in my opinion, this happened whilst the ship was stationary, because all of the marks were in a transverse direction. THE COURT:  Do you have an opinion as to what the coloration -- explain the colors?  THE WITNESS:  Your Honor, these colors are light rusting marks which have began -- the rust has began to take a hold on the exposed plating where it is rubbed off on the bottom, the bottom of the river.")*

[142]*Trial Tr. Day 21, November 3, 2010, McLellan at 136:20-137:9 ("Q What separates your company from spill on-site management, who we have heard from in this trial, and finance sections of spill-management teams?  A Unlike SOS, spill on-site management, MR & Associates has never worked for a contractor, and we generally do not and have not worked for a spill-management team.  We think that can create a conflict of interest and so we haven't crossed over.  As a result of that, MR & Associates many times is not per se sitting in the finance section chair of a spill-management team, most times we're hired by the insurance companies to observe and to do a separate audit to make sure that the spill-management team and on-site cost-control company is doing what they're doing, because based on their history the insurance companies are not comfortable leaving those companies to do that job themselves.")*

[143]*Trial Tr. Day 21, November 3, 2010, McLellan at 141:22-143:11 ("Q How many documents have you looked at and analyzed, Mr. McLellan?  A All together, it's over 200,000 documents. We had a certain amount of documents, well over I would say 70,000 or more from the Plaintiffs and different documentation as far as the claim itself that went to the National Pollution Fund Center and other documentation that we looked at as part of our analysis.  We also -- well,* Continued…

3826551v8

....Continued

*through defense counsel, they issued subpoenas, when we attempted to get additional documentation in support of the charges, and there was approximately 112,000 pages of documents that came in those supplemental -- what we call the supplemental documents that were given to us through the subpoena process. THE COURT: How many documents a day you peruse? THE WITNESS: I couldn't answer that question, because we don't monitor it, your Honor, by day, because some documents might take you -- a set of five documents and all the related documents, may take you several hours to look at, and other documents you could go through quite quickly. THE COURT: Right, but you're telling this Court that you actually examined over 200,000 documents and you can't tell us how long it took? THE WITNESS: I can't tell you how long it took for each individual document, your Honor, because if you -- if I take for example one of the invoices that NRC put in, it was -- the invoice itself was maybe a couple hundred pages, but in order to analyze that documentation it included 15 subcontractors, and those 15 subcontractors worked in maybe 13 zones and each of the zones was added up separately. So, then you had to go into each zone and you had to add up those charges, and while we were comparing them with the rates and everything else, and then you had to then compare that with what was charged. So that particular invoice would have taken probably several days to look at, although the documentation itself wasn't that much. THE COURT: How many people did you have involved in this process? THE WITNESS: Probably at the height I had approximately 12 to 15.")*

[144] *Trial Tr. Day 21, November 3, 2010, McLellan at 195:6-11 ("Q Now, at the outset of your testimony, you stated that your firm does not sit in the finance section of spill management teams under the unified command structure. Did I hear that correctly? A What I stated was that normally, we don't sit in that finance chair under a unified command structure.")*

[145] *Trial Tr. Day 22, November 4, 2010, McLellan at 118:22-119:10 ("Q Now -- and in this case, neither you nor Ms. Felker (ph) or your children or your wife or Mr. Rasmussen or his wife or any of the 15 people that you hired and paid for, in this case, just so we're clear, none of them sat down and spoke with Mr. Benson, Mr. Kagleman (ph), Captain LaFerrier, Jason Roussel, anybody else that Mr. Walker asked about, Jerry Roussel or anybody else on the finance team, Don Costanza. Nobody attempted to speak to any of them about what they were thinking or what documentation or what information they had to justify their payments, did they? A None of my employees were afforded that opportunity to speak with them. We were basing our analysis on the record that we have and the communications and what-not that might have gone between the two parties.")*

[146] *Trial Tr. Day 32, November 30, 2010, Dunkelberg at 27:21-28:12 ("Q How much money do you think the P & I Club put up? A The particular club? Well, that's a -- that, as I understand it, is a complicated kind of a question. There's 5 million in the first, and then there's 45 million that are shared with the club, et cetera, so it's -- Q So that's correct. So isn't it right that, in fact, the P & I Club in this case only put up $4.5 million, and the balance was put up by the International Group, which is a group of 13 P & I Clubs? A 13 -- well, yes. The 13 -- Q Okay. A -- P & I Clubs together covered this. That's what the P & I Club is all about, it's self-insuring. Continued...*

---

….Continued

*Q So you understand that the P & I Club only put up $4.5 million?  A I'm not sure that that's all they put up, but I understand that they put up the first 5 million.")*

[147]*Trial Tr. Day 22, November 4, 2010, Boudreaux at 130:9-131:3 ("Q All right, now, referring again to the chart on the screen, could you tell us why and explain to the Court, why you use LIBOR plus .5 percent?  A Yes, my appreciation is that for a certain amount of the payment for the spill clean-up, approximately $4 to $5 million, the UK-P&I Club would have been responsible.  Beyond that, for amounts above that, it's essentially the responsibility of the international group of P&I Clubs.  So, that raises the question to me, what is the -- what is a reasonable borrowing rate that, for the initial part and then the subsequent part, the UK-P&I Club and the international group would have had to have paid, if they had borrowed money to pay for this.  I did some investigation of what insurance companies of comparable size, particularly to the international group of the UK-P&I Club would pay to borrow money.  My best efforts to discover that and there are some complications in the pursuit of that issue, is that companies of comparable size would be paying LIBOR plus approximately five of one-half of a percentage point.  Five-tenths of a percentage point in interest.")*

[148]*Trial Tr. Day 15, October 18, 2010, Hajimichael at 146:22-25 ("Q But Tsakos did not pay for any clean-up expenses, correct, on its own account?  A No.  Q All clean-up expenses were paid by the UK/P&I club?  A 99 percent, yes.")*

-44-