## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re Petition of FRESCATI SHIPPING COMPANY, LTD., as Owner of the M/T ATHOS I, and TSAKOS SHIPPING & TRADING, S.A., as Manager of the M/T ATHOS I, for Exoneration from or Limitation of Liability | CIVIL ACTION No. 05-cv-305 (JHS)    CONSOLIDATED |
| UNITED STATES OF AMERICA,<br>                          Plaintiff,<br>        v.<br><br>CITGO ASPHALT REFINING COMPANY, et al.<br>                          Defendants. | CIVIL ACTION No. 08-cv-2898 (JHS) |

## DEFENDANTS' PRE-TRIAL BRIEF ON DAMAGES

CHAFFE McCALL, L.L.P.

> Derek A. Walker
> Douglas L. Grundmeyer
> Chaffe McCall, L.L.P.
> 2300 Energy Centre
> 1100 Poydras Street
> New Orleans, LA 70163-2300
> (504) 585-7000
>
> John G. Bissell
> Strong Pipkin Bissell & Ledyard, L.L.P.
> 4900 Woodway Drive, Suite 1200
> Houston, TX 77056
> (713) 210-4366

PALMER BIEZUP & HENDERSON LLP

> Richard Q. Whelan (ID No. 35688)
> Frank P. DeGiulio (ID No. 41577)
> Palmer Biezup & Henderson, LLP
> 190 N. Independence Mall West
> Suite 401
> Philadelphia, PA 19106-3409
> (215) 625-9900

*Attorneys for Defendants,*
*CITGO Asphalt Refining Company,*
*CITGO Petroleum Corporation, and*
*CITGO East Coast Oil Corporation*

Dated: February 13, 2015

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................................... i

**TABLE OF AUTHORITIES** .......................................................................... iii

I.      **Plaintiffs' Removal Cost Claim Against Defendants Is Limited To $45,474,000 Under The Oil Pollution Act Or Alternatively, Is Grossly Overstated** ................................................................................................4

   A.    **CARCO's Liability for removal costs is limited by OPA-90 to $45,474,000** ....................................................................................4

   B.    **The Plaintiffs cannot recover $44,104,072.32 of overcharges of removal costs that could have been avoided through reasonable efforts or alleged damages that are not proven** ........................................4

          1.   **Retention of the O'Brien's Group** ....................................5

          2.   **Spill response vendors overcharged for non-employee labor obtained through temporary labor services by at least $11,887,284.08** ........................................................8

          3.   **Failure to take timely and reasonable steps to renegotiate rates with spill response vendors resulted in overcharges of $2,769,538.49** ........................................................11

          4.   **The failure to contract directly with spill response vendors resulted in unnecessary mark-ups by NRC of $2,244,086.22** ........13

          5.   **Overpayments of per diems and meal breaks total at least $7,788,384.21** ........................................................14

          6.   **Invoices not supported by proper dailies resulted in $3,919,599.29 of overcharges** ........................................16

          7.   **At least $7,755,146.82 of charges lacked sufficient support to justify payment** ................................................17

2417210-1

8.  Mathematical and clerical errors resulted in $2,370,003.05 of overcharges ........................................................................18

9.  Sales taxes not due and other miscellaneous overcharges total $3,834,844.76 ......................................................................19

C.  Equity defeats the Government's subrogation claim............................19

D.  The NPFC's allowance of much of the Frescati Plaintiffs' reimbursement claim for clean-up expenses is irrelevant and flawed 20

II.  The Frescati Plaintiffs Cannot Recover Damages For Estimated Unrepaired Items ......................................................................26

III. The Frescati Plaintiffs Are Not Entitled To Recover Damages For Amounts Paid In Settlement To The Owners Of The Salem-Hope Creek Nuclear Power Plant.......................................................................28

IV.  The Frescati Plaintiffs are not entitled to $1,541,597 relating to amounts paid to various consultants...........................................................32

V.   Plaintiffs Are Not Entitled To Pre-Judgment Interest............................33

A.  If the Court grants pre-judgment interest on any amounts to the Frescati Plaintiffs, it should apply the statutory rate specified in either 28 U.S.C. § 1961 or 33 U.S.C. § 2705(b)(4)................................35

B.  If the Court does not apply the rates specified in 28 U.S.C. § 1961 or 33 U.S.C. § 2705(b)(4), it should apply the London Interbank Offered Rate (LIBOR) plus 0.5%, not the exorbitant and windfall driven "prime rate" that the Frescati Plaintiffs seek ........................................37

CONCLUSION.............................................................................39

CERTIFICATE OF SERVICE ......................................................41

2417210-1

# TABLE OF AUTHORITIES

## Cases

*Adriatic Ship Supply Co., Inc. v. M/V Shaula*, 632 F. Supp. 1573, 1576 n.4 (E.D. Pa. 1986)............................................................................................................37

*American Training Services, Inc.*, 434 F. Supp. 988, 1003 n.35 (D.N.J. 1977)......21

*APL Co. PTE Ltd. v. Blue Water Shipping U.S., Inc.*, 592 F.3d 108, 111, 2010 A.M.C. 442 (2d Cir. 2010) ................................................................................5

*Bankers Trust*, 658 F.2d 103 (3d Cir. 1981)............................................................34

*Bleakley Trans. Co., Inc. v. Colonial Sand & Stone Co. Inc.*, 245 F.2d 576, 579, 1957 A.M.C. 1746 (2d Cir. 1957) .....................................................................28

*California Navigation & Improvement Co. v. Union Transp. Co.*, 176 F. 533, 535 (9th Cir. 1910) ..................................................................................................26

*City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 196, 115 S. Ct. 2091, 1995 A.M.C. 1882 (1995) ...........................................................................................34

*Coleco Industries, Inc. v. Berman*, 423 F. Supp. 275, 304 (E.D. Pa. 1976).............4

*Delta Supply Co. v. Liberty Mut. Ins. Co.*, 211 F. Supp. 429, 432 (S.D. Tex. 1962) .................................................................................................................. 27, 28

*Frederick v. Hess Oil V.I. Corp.*, 642 F.2d 53, 56 (3d Cir. 1981)...........................32

*Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 593-94, 1999 A.M.C. 324 (2d Cir. 1998)...........................................................................................................34

*Keenan Transp Co. v. United States Coast Guard*, 211 F. App'x 902, 2006 WL 3749570 (11th Cir. 2006) ...............................................................................21

*Koch Refining Co. v. Jennifer Boudreaux M/V*, 85 F.3d 1178, 1183, 1997 A.M.C. 246 (5th Cir. 1996) ...........................................................................................34

*Laconner Assocs. LLC v. Island Tug and Barge Co.,* No. 07-175, 2008 U.S. Dist LEXIS 46914 at *11 (W.D. Wa. June 16, 2008) ...............................................28

*M&O Marine, Inc. v. Marquette Co.*, 730 F.2d 133, 135 (3d Cir. 1984)...............32

*M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1112, 1985 A.M.C. 891 (2d Cir. 1985) ................................................................5, 17

*Mendelson v. Delaware River & Bay Authority*, 112 F. Supp. 2d 386, 388 (D. Del. 2000)................................................................................................32

*Meritt & Chapman Derrick & Wrecking Co. v. Chubb*, 113 F. 173 (2d Cir. 1901)31

*Mon River Towing, Inc. v. Salvage Co.*, No. 06-1499, 2010 WL 1337693, *11 (W.D. Pa. March 31, 2010) ......................................................................5

*Nittetsu Shoji America, Inc. v. M/V CRYSTAL KING*, No. 90-2082, 1992 U.S. Dist. LEXIS 7615 at *44-45 (S.D.N.Y. May 21, 1992) ...............................36

*Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157 (5th Cir. 1990)..........34

*Osprey Ship Mgmt., Inc. v. Foster*, No. 05-3990, 2008 U.S. Dist. LEXIS 71807 at *85 (S.D. Miss. Sept. 18, 2008) .............................................................36

*Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F. Supp. 705, 711, 1962 A.M.C. 2623 (E.D. Pa. 1962)................................................................30

*Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1474, 1994 A.M.C. 1034 (5th Cir. 1991) ....................................................................4

*Pillsbury Co. v. Midland Enter.*, 715 F. Supp. 738, 771, 1989 A.M.C. 2113 (E.D. La. 1989).............................................................................................36

*SEC v. Pattison*, No. 08-4238, 2011 U.S. Dist. LEXIS 23427, at *12-14, 2011 WL 723600 at *4 (N.D. Cal. Feb. 23, 2011) ...............................................36

*Socony Mobil Oil Co., Inc. v. Texas Coastal & Int'l, Inc.*, 559 F.2d 1008 (5th Cir. 1977)........................................................................................................34

*Toledo,* 122 F.2d 255, 257 (2d Cir. 1941) .............................................................32

*Toledo*, 122 F.2d 255, 257, 1941 A.M.C. 1219 (2d Cir. 1941) ...............................31

*Tug Beverly, Inc.*, No. 92-0099, 1994 U.S. Dist. LEXIS 6471, 1994A.M.C. 2437 (E.D. Pa. May 12, 1994).......................................................................37

*U.S. v. Cen. Gulf Lines*, 974 F.2d 621, 630-31, 1993 A.M.C. 2622 (5th Cir. 1992) .................................................................................................................36

iv

*UMBRIA*, 148 F. 283, 289 (S.D.N.Y. 1906) .......................................................... 27

*United States v. Bear Marine Services,* 509 F. Supp. 710, 718 (E.D. La. 1980),
    *appeal dismissed,* 696 F.2d 1117 (5th Cir. 1983) ................................................ 20

*United States v. Georgia Pacific Co.,* 421 F.2d 92, 101 (9th Cir. 1970) ................ 20

*United States v. Inter-Bay Towing Co.*, 2006 A.M.C. 581, 590-91, 2005 U.S. Dist
    LEXIS 41974 (S.D. Tex. 2005), 2006 A.M.C. 581, 590-91 .............................. 20

*United States v. Lazy FC Ranch*, 481 F.2d 985, 989 n.5 (9th Cir. 1973) ............... 21

*United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 91 L. Ed. 2022, 67 S. Ct.
    1599 (1947) ......................................................................................................... 20

*United States v. Rafael*, 349 F. Supp. 2d 84, 97 (D. Mass. 2004) .......................... 35

*Unocal Corp. v. United States*, 222 F.3d 528, 540 (9th Cir. 2000) ........................ 30

*Webb v. Ensco Marine Co.,* 135 F. Supp. 2d 756, 773 (E.D. Tex. 2001) .............. 35

*Western Pacific Fisheries, Inc. v. USS President Grant*, 730 F.2d 1280, 1288-1289
    (9th Cir. 1984) .................................................................................................... 35

*Wilburn v. Maritrans G.P., Inc.*, No. 95-2806, 2000 U.S. Dist. LEXIS 3 at *3 (E.D.
    Pa. Jan. 3, 2000) ................................................................................................. 34

*Wilson v. Ins. Co. of North America*, 36 Pa. D. & C.2d 597, 601 (Pa. Com. Pl.
    1965) .................................................................................................................... 26

*Zeller Marine Corp. v. Nessa Corp*., 1947 A.M.C. 43, 48 (S.D.N.Y. 1946) .......... 26

## **Statutes**

28 U.S.C. § 1961 ...................................................................... 38, 39, 40, 41, 42, 43

28 U.S.C. § 1961(a) .................................................................................................. 38

33 U.S.C. § 2701, *et seq.* (Oil Pollution Act) ................................................... 1, 3, 4

33 U.S.C. § 2704 ................................................................................................... 1, 4

33 U.S.C. § 2704(d)(2)(B) ................................................................................... 3, 4

33 U.S.C. § 2705(b)(3) .............................................................................................. 31

33 U.S.C. § 2705(b)(4)................................................................ 36, 40, 43

**Treatises**

Restatement (Second) of Torts § 918 (1979)............................................5

 **Other Authorities**

*McCormick on Damages* § 33 at 130 (1935)............................................5

Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance* ........39

2417210-1

MAY IT PLEASE THE COURT:

Defendants – Citgo Asphalt Refining Company, Citgo Petroleum Corporation, and Citgo East Coast Oil Corporation (collectively "CARCO" or "defendants") submit that Plaintiffs—Frescati Shipping Company, Ltd., Tsakos Shipping & Trading, S.A. and their subrogee, the United States of America—cannot satisfy their burden of proving any of their causes of action against CARCO. (*See* Defendants' trial brief on liability, filed February 13, 2014). Even if plaintiffs can establish a cause of action against CARCO, their damages are barred, either legally or equitably, and factually most of plaintiffs' alleged damages are either overstated or not recoverable.

There are two sets of plaintiffs in this case: Tsakos and Frescati (the "Frescati Plaintiffs" or "Responsible Parties") and the United States Government ("the Government"), who collectively seek damages in excess of $143 million, plus interest. The Frescati Plaintiffs seek recovery of damages in excess of $55 million, the vast majority of which is for clean-up expenses of $45,317,511.[1] The Government, through the National Pollution Funds Center ("NPFC"), seeks $87,988,157—the amount that it reimbursed the Frescati Plaintiffs from the Oil Spill Liability Trust Fund ("Fund") for removal (clean-up) costs under the Oil Pollution Act ("OPA-90").

Each plaintiff has the burden of proving its damages, and neither is entitled to all of the damages sought. As detailed in this memorandum, the Frescati Plaintiffs ignored numerous cost-

---

[1] As discussed throughout this memorandum, the Coast Guard's National Pollution Fund Center granted the Frescati Plaintiffs a limitation of liability of $45,474,000 under 33 U.S.C. § 2704 based on the tonnage of the ATHOS I, thereby limiting the Frescati Plaintiffs' damages for removal costs to $45,474,000. The total amount sought by the Frescati Plaintiffs for removal is $45,317,511, which represents the limitation amount of $45,474,000 less an allowance for the post-incident recovery of funds through the sale of equipment purchased during the response.

saving opportunities while cleaning up the spill or cannot substantiate their damage claims against CARCO.

The NPFC, for its part, without a truly objective, thorough, and unbiased investigation, unreasonably accepted and adopted the one-sided presentation by the Frescati Plaintiffs in originally granting them the limitation. Then, the NPFC compounded its error by applying its own "subjective" criteria and judgment on an inadequate basis, and it paid over $137,000,000 from the Fund. Now the NPFC attempts to use its flawed review as a club against CARCO to recover the excessive amounts that it unreasonably paid to the Frescati Plaintiffs. The net result of this would be to inequitably impose upon CARCO, a bystander to the clean-up, barred from participation, all costs incurred by the Responsible Parties, without having had an opportunity to test the reasonableness of the clean-up expenditures.

In the aftermath of the Athos spill, no authority directed any blame or criticism toward CARCO.[2] Notably, when CARCO dispatched a representative to the Unified Command headquarters after the spill, the Coast Guard informed CARCO that it had no role to play in the Unified Command (and no right to have a representative in attendance) because CARCO had no responsibility for the incident and therefore no responsibility for pollution cleanup operations.[3] As a result, CARCO had no involvement in the process and participated in no decisions regarding the cleanup operations and expenditures that were incurred. Notably, the $87,989,157 that the Frescati Plaintiffs received in reimbursement came from the very Fund to which CARCO contributed over $103 million up through the end of 2004. The Government should not be allowed to fund the Fund with a tax on imported oil, use that Fund to pay the Frescati Plaintiff's inflated reimbursement claim, and then seek that amount against a contributor to that Fund.

---

[2] [TT Day 30 (Rankine) P. 11:22-12:6].
[3] [TT Day 10 (Drager) P. 79:16-80:20].

Indeed, this Court should apply equitable principles in denying the Government's claims and all damages based on CARCO's recoupment defense. *See* Doc. 713, Defendants' Brief on the Legal Issues Relating to Liability Following Remand.

Even if this Court grants the plaintiffs any recovery, a provision of OPA-90, 33 U.S.C. § 2702(d)(2)(B), limits CARCO's liability to the same limitation amount claimed by the Frescati Plaintiffs based on the tonnage of the ATHOS I, i.e., $45,474,000 (Doc. 749). Alternatively, the Court should reduce the Government's subrogation claim for clean-up expenses, if any, by the sum of $44,104,072.32 in reasonably avoidable expenses incurred during the spill response.

The Frescati Plaintiffs also seek additional sums for repair costs to the ATHOS I ($3,925,585),[4] loss of hire while the ship was out of service ($2,100,000), a National Resources Damage Assessment ("NRDA") ($623,498), amounts paid to various consultants ($1,541,598), an interest payment made to the owners of the Salem-Hope Nuclear Power Plant ($1,500,000), alleged unrepaired items to the ship ($438,512), and alleged miscellaneous port expenses ($50,642). But the Frescati Plaintiffs are not entitled to recovery of the $1,500,000 paid to the owners of the Salem-Hope Nuclear Plant or to the $438,512 sought for alleged unrepaired items to the ATHOS I, which has since been scrapped. Nor are the Frescati Plaintiffs entitled to the vast majority of the alleged $1,541,598 paid to third-party consultants, who duplicated and audited the work of others and did not assist in the clean-up.

---

[4] The Frescati Plaintiffs and CARCO have stipulated to the amounts (but not liability) of the Frescati Plaintiffs' claims for hull damage repair costs, loss of hire and the NRDA cost claim. Thus, CARCO will not discuss those items of damages in this brief.

I. **Plaintiffs' Removal Cost Claim Against Defendants Is Limited To $45,474,000 Under The Oil Pollution Act Or Alternatively, Is Grossly Overstated**

A. **CARCO's Liability for removal costs is limited by OPA-90 to $45,474,000**

CARCO's liability for removal costs, if any, is limited by 33 U.S.C. § 2702(d)(2)(B) of the Oil Pollution Act of 1990 ("OPA-90-90") to $45,474,000. CARCO detailed the reasons why liability is limited under OPA-90-90 in its Memorandum of Law in Support of Motion for Partial Summary Judgment Granting Limitation of Liability under the Oil Pollution Act (Doc. 749-1), filed January 15, 2015. CARCO will not repeat those arguments here but adopts and incorporates them by reference. In sum, regardless of the merits of the Frescati Plaintiffs' and the Government's damage claims, OPA-90 mandates that CARCO's liability for OPA-90 removal costs is limited to $45,474,000—the limitation amount that Frescati and Tsakos obtained under 33 U.S.C. § 2704.[5]

B. **The Plaintiffs cannot recover $44,104,072.32 of overcharges of removal costs that could have been avoided through reasonable efforts or alleged damages that are not proven**

If the Court does not limit CARCO's potential liability for clean-up costs to $45,474,000, as OPA-90 requires, it should deny recovery of $44,104,072 of clean-up costs that the Frescati Plaintiffs could have reasonably avoided during the clean-up of the spill. A plaintiff is not entitled to the recovery of any damages it cannot prove were related to the clean-up of the spill. *See Coleco Industries, Inc. v. Berman*, 423 F. Supp. 275, 304 (E.D. Pa. 1976). Nor can plaintiffs recover any damages that they might have avoided through reasonable efforts. *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1474, 1994 A.M.C. 1034 (5th Cir. 1991); *M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1112, 1985 A.M.C. 891 (2d

---

[5] CARCO does not contest that the removal costs here exceeded the limitation amount of $45,474,000. Thus, the dispute as to clean-up costs apparently relates to the subrogated portion of the removal cost claim sought by the Fund above the limitation amount. The Fund is sustained by a tax on imported oil, including approximately $103,000,000 in taxes paid by CARCO as of the time of the first trial of this matter. [Ex. D-2046]; Doc. 713, at 168.

Cir. 1985); *McCormick on Damages* § 33 at 130 (1935). *See also* Restatement (Second) of Torts § 918 (1979) ("[O]ne injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort."). Thus, the plaintiffs cannot recover damages that they have not proved, or that they could have reasonably avoided. Put another way, only proven reasonable damages are recoverable.

Admiralty plaintiffs have a duty to mitigate their damages. *See Mon River Towing, Inc. v. Salvage Co.*, No. 06-1499, 2010 U.S. Dist. LEXIS 31227, at *34-35, 2010 WL 1337693 at *11 (W.D. Pa. March 31, 2010); *see also APL Co. PTE Ltd. v. Blue Water Shipping U.S., Inc.*, 592 F.3d 108, 111, 2010 A.M.C. 442 (2d Cir. 2010) ("It is elementary that a party injured by a breach is entitled to recover damages that are the natural and probable consequence of the breach . . . The injured party, however, bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery.") (internal citations and quotations omitted).

### 1. Retention of the O'Brien's Group

As the owner and manager of the ATHOS I, Frescati and Tsakos were designated as the Responsible Parties under the OPA-90. The O'Brien's Oil Pollution Service, Inc. ("O'Brien's Group") served as their spill response manager.[6] The O'Brien's Group therefore stood in Plaintiffs' shoes during the response, and O'Brien's Group had the duty to represent the Responsible Parties in cleaning up the spill. As the Spill Manager, O'Brien's Group was responsible for not only accounting for clean-up costs, but for minimizing them as well.

---

[6] References to prior testimony of witnesses who will be recalled is based on their testimony being indicative of that on recall.

Ben Benson served as the "Qualified Individual" and was a Vice-President for O'Brien's Group during the time period of the ATHOS I response. But Mr. Benson did not oversee the on-site day-to-day operations of the response. Rather, Steve Kegelman of O'Brien's Group served as the First Responder and Incident Commander for the ATHOS I clean-up.[7] Kegelman was the first person to arrive for O'Brien's Group and he was on-site for the entire operation during which he oversaw the day-to-day operations of the response.[8] Plaintiffs did not call Mr. Kegelman either in their case-in-chief or on rebuttal. Portions of his prior deposition were admitted by designation.

Although O'Brien's Group was ultimately responsible for managing the response for the Frescati Plaintiffs, it retained other contractors to perform clean-up services. First, it retained a private sister corporation (National Response Corporation or "NRC").[9] O'Brien's Group could also directly contract with other contractors to actually provide the equipment and manpower to do the work. But often it allowed its sister corporation NRC to do so, thereby allowing NRC to add mark-ups to the costs provided by the contractors that actually did the work.

The O'Brien's Group set up a finance section at the site to handle invoicing from response subcontractors[10], but it soon became overwhelmed, and O'Brien's Group contracted with Spill-On-Site Management ("SOS") to take over accounting duties on December 8, 2004. The response had ballooned to around 1,300 persons.[11]

As SOS conceded, oil spill responses by their very nature are ripe for overcharging by spill response contractors responding to a Responsible Parties' efforts to clean up the spill

---

[7] [Kegelman Dep. (Sept. 11, 2009), P. 33:25-34:22].
[8] [Kegelman Dep. (Sept. 11, 2009), P. 26:25-27:7].
[9] [Kegelman Dep. (Sept. 11, 2009), P. 44:19-45:17].
[10] [Kegelman Dep. (Sept. 11, 2009), P. 66:14-24, 67:11-17, 67:21-68:4].
[11] [Kegelman Dep. (Sept. 11, 2009), P. 67:21-69:24; 70:5-10; 202:16-22].

quickly.[12]  The failure to implement a reasonable cost control plan, or to enforce cost control systems, results in massive overcharges by oil spill response contractors, which is precisely what occurred during the ATHOS spill clean-up.  Cost control includes verifying that the work that subcontractors are billing for is necessary, actually performed, and reasonably invoiced.  Double charging for alleged work, overcharging, charging for equipment that was not on-site, and overcharging for rented equipment was occurring during the clean-up, as O'Brien's man-in-charge admitted was reported to him.[13]

CARCO's expert, William McLellan's staff reviewed over two hundred thousand clean-up cost related documents, including documents produced by Frescati and Tsakos, documents submitted to the NPFC, and documents subpoenaed from third party oil spill response contractors.[14]  These included detailed data sheets (nearly 5,000 pages) identifying each specific overcharge, which totaled over $44,000,000 of the $137,000,000 invoiced to the Frescati Plaintiffs for work allegedly incurred in the clean-up of the spill.[15]  The breakdown is:

a.  Third party labor rate adjustment overcharges - $11,887,284.08

b.  Lack of direct billing overcharges - $2,244,086.22

c.  Third party rental equipment rate overcharges - $1,535,185.40

d.  Incorrect charges - $2,370,003.05

e.  Standard rate adjustment overcharges - $2,769,538.49

f.  Per diem overcharges - $7,788,384.21

g.  Missing/Unsigned dailies overcharges - $3,919,599.29

h.  Insufficient support overcharges - $7,755,146.82

---

[12] [TT Day 19 (Roussel) P. 123:20-24]; *see also* [TT Day 21 (McLellan) P. 140:18-141:18].
[13] [Kegelman Dep. (Sept. 11, 2009), P. 87:12-89:7].
[14] [TT Day 21 (McLellan) P. 141:19-143:12].
[15] [Ex. D-1987 (Spill Response Cost Analysis Vendor Summary), Ex. D-1988 (Vendor Excess Payments List by category)].

2417210-1

i.  All other overcharges - $3,834,844.76

## 2. Spill response vendors overcharged for non-employee labor obtained through temporary labor services by at least $11,887,284.08

Typical of their failure to produce damaging documents throughout this litigation, the Frescati Plaintiffs did not produce many of the documents that revealed these overcharges, nor did Frescati/Tsakos produce them to Donna Hellberg at the NPFC while she was reviewing Frescati's reimbursement claim.  Rather, Mr. McLellan, a former tankship officer with over 15 years of experience examining and auditing oil spill clean-up cost claims, knew exactly where to look.  On his suggestion, CARCO subpoenaed documents directly from individual oil response vendors.

The records show that most of the contractors had contracts with the Responsible Parties (through O'Brien's Group) that specified hourly rates for the vendors' employees.  These agreements provided that labor obtained through third party subcontractors must be billed to the Responsible Parties at cost plus a mark-up.  Actual cost, plus mark-up, resulted in rates many times lower than the contractors' standard rates for their own employees and equipment.  What should have provided cost savings to the Responsible Parties was used to multiply the costs.

For example, Miller's Environmental Group's rate sheet contract states in part that: "… materials not listed, and subcontractors will be charged at invoice cost plus 20%."[16]  In the oil spill response industry, this clause applies to vendors that retain temporary subcontract labor from third parties.[17]  Such clauses are common and critical in controlling labor costs because

---

[16] [Ex. D-1991 (Miller Group Rate Schedule)]. There are sound economic reasons why contractors are justified in charging more for their own employees and equipment than for labor and equipment contracted from others.  There are additional costs associated with actual employees that are not paid to temporary laborers obtained through labor services (e.g. payroll taxes, benefits).  Similarly, there are no purchase or storage costs related to rented equipment, which apply to actual owned equipment.

[17] [TT Day 21 (McLellan) P. 205:4-206:6].

O'Brien's Group knew, or should have known, that spill response vendors would need to contract for temporary labor (principally laborers mopping up oil).[18]

O'Brien's Group, made no effort to determine whether the workers provided for the response were actual oil spill response contractors' employees, or temporary laborers retained through another contractor. This neglect causes massive overcharges. For example, Miller's Environmental obtained many laborers from a temporary service – Labor Ready Northeast.[19] Miller paid Labor Ready for one of their typical workers, Raymond Evans, for 12.97 hours at $12.50/hour, plus $5.00 transportation fee for a total of $167.13.[20] Miller's billed the Responsible Parties for Mr. Evans' time on that same day for 8 regular hours at $55/hour, plus 5.5 hours at $82.50/hour for a total of $893.75.[21] Cost plus a 20% mark-up for Mr. Evans would have been approximately $200.00. So the Responsible Parties paid more than four times what they should have because O'Brien's made no effort to identify who was or was not a temporary laborer-.[22]

This was not an isolated incident. There were scores of documented overcharges for the third party labor rate amounting to at least $11,887,284.08.[23] This figure does not capture all of the overcharges, but only those identified through documents produced by third-party contractors/vendors.[24]

---

[18] [TT Day 21 (McLellan) P. 152:18-153:13].
[19] [Ex. D-1990 (Labor Ready Invoice re: Raymond Evans)].
[20] [Ex. D-1990 (Labor Ready Invoice re: Raymond Evans) at MEG0000054].
[21] [Ex. D-1992 (Miller's Bill to NRC re: Raymond Evans); TT Day 21 (McLellan) P. 155:21-158:12].
[22] [TT Day 21 (McLellan) P. 158:14-18]. Additionally, although Miller's did not pay an overtime rate to Labor Ready for Mr. Evans' time, it billed the Responsible Parties for an overtime rate. And despite Mr. Evans working 12.97 hours for Labor Ready, Miller's actually billed the Responsible Parties for 13.5 hours [Ex. D-1990 and Ex. D-1992]. Again, this is an example of the failures that lead to the overcharges that occurred during the spill clean-up.
[23] [Ex. D-1988 (Vendor Excess Payments List by category)]
[24] [TT Day 21 (McLellan) P. 158:19-159:9].

The Frescati Plaintiffs' response, through Ben Benson, is that it is "customary" for response vendors to charge out temporary labor at the vendors' rates for its own employees.[25] Plaintiffs seem to argue that purported "custom" is justified because the vendors allegedly provided "training and medical monitoring" to these temporary laborers.[26] These laborers were largely composed of persons mopping up oil. The very idea that "training" in mopping up oil somehow justifies ignoring the contracts is ludicrous.

Even if some of the contracts did not expressly require that the vendors charge temporary labor and rented equipment at cost plus a mark-up (most did here), O'Brien's Group stood in the Responsible Parties' shoes. It could and should have required that spill response contractors adhere to terms requiring cost plus mark-up pricing for temporary labor.[27] But Steve Kegelman, the Responsible Parties' Incident Coordinator -- and the person on-site each day -- testified that he was unaware that some of the Frescati Plaintiffs' clean-up contractors were subcontracting for labor with temporary agencies and billing those persons as if they were the contractors' employees.[28] This particular abuse would be discovered by the absolute minimum oversight of costs by Kegelman.

These same overcharges occurred for third-party equipment. Response vendors rented equipment from third parties and then billed the Responsible Parties at the rate reserved for the vendors' owned equipment, resulting in overcharges of $1,535,185.40. For example, Miller's Environmental rented light towers for $675/month (approximately $22.75/day), but billed the

---

[25] [TT Day 33, amended (Benson) P. 121:5-13].
[26] [TT Day 33, amended (Benson) P. 121:5-13].
[27] [TT Day 21 (McLellan) P. 152:18-153:6].
[28] [Kegelman Dep. (Sept. 11, 2009), P. 210:13-211:5, 212:19-213:1, and 213:7-9].

NRC at $275 a day.  O'Brien's Group's sister corporation - NRC - in turn added its own 5% mark-up to the $275/day charge and billed that to the Responsible Parties, who paid it.[29]

Moreover, O'Brien's Group <u>knew</u> this was occurring but turned a blind eye to it.  Jason Roussel of SOS who joined O'Brien's Group's finance section in December 2005, informed one of the vendors that "[c]ost + [plus] on the items would be a big reduction, [but] I am not asking for that."[30]  The obvious question is "why not?"  There is no answer to that which supports passing on these inflated costs to anyone.  Clearly, O'Brien's Group had ongoing relationships with the response vendors and apparently wanted to keep them happy, but it should not have allowed contractors to overcharge at the Responsible Parties' expense.  Certainly, the Responsible Parties had the right to choose to pay those inflated expenses, but they cannot recover those overcharges from CARCO as damages in this case.

### 3. Failure to take timely and reasonable steps to renegotiate rates with spill response vendors resulted in overcharges of $2,769,538.49

The "emergency" rates sought by oil spill response contractors at the outset of a spill response are open to renegotiation.  These initial rates are designed for emergency responses of a short duration.  An emergency situation therefore sometimes provides vendors with added leverage because the Responsible Parties need immediate action.  But they do not have that leverage where, as here, the Responsible Parties know that the response will be a long one.[31]  More importantly, even if the Responsible Parties initially pay an "emergency" rate to contractors, it is customary to quickly renegotiate and lower those rates.  That should have occurred within a few days after the spill.  Certainly, those rates could and should have been

---

[29] [Ex. D-1999 (Godwin Pumps Invoice to Miller re: Light Towers); Ex. D-2000 (Miller's Invoice to RP); TT Day 21 (McLellan) P. 166:10-168:21].
[30] [Ex. D-2001].
[31] [TT Day 21 (McLellan) P. 172:3-173:7].

renegotiated and lowered by no later than December 1, 2004.[32] But O'Brien's Group unreasonably delayed until on or about December 16, 2004, resulting in over $2.7 million of avoidable costs.

The Frescati Plaintiffs' (and the Government's) claim that no vendor would have given discounts until mid-December is belied by the fact that NRC (O'Brien's Group's sister corporation) obtained a 10% labor rate discount from one of the spill response contractors effective November 30, 2004.[33] Even more troubling is the fact that not only was NRC able to obtain discounts as of November 30, 2004, but charged the costs to the Responsible Parties at the original undiscounted rates that it did not incur, plus its own mark-up.

On November 29, 2004, three days after the spill, NRC's Jim Godfrey had a conversation with Andrew Shackett of Clean Harbors Environmental Services, Inc. (one of the largest spill response contractors) where Mr. Godfrey requested and Clean Harbors agreed to reduce Clean Harbors' labor rates by 10% effective November 30, 2004.[34] Clean Harbors then created a two-invoice system – one invoice with the original undiscounted amount and another separate "credit" invoice that reflected the rate reduction.[35] For example, Clean Harbors invoiced NRC for labor personnel, equipment and per diems on December 10th through December 12th.[36] Clean Harbors then sent NRC a separate "credit" invoice reducing the personnel charges for each day by 10 percent.[37]

Plaintiffs offered no credible business explanation for this practice. Obviously, the intent was to conceal true net invoice amounts from the Responsible Parties. In fact, NRC passed

---

[32] [TT Day 21 (McLellan) P. 172:3-173:16].
[33] [Ex. D-1993 (Clean Harbors 11/30/04 letter)].
[34] [Ex. D-1993 (Clean Harbors 11/30/04 letter)].
[35] [TT Day 21 (McLellan) P. 161:9-23; Ex. D-1995 (Clean Harbors' 12/11/04 Invoice); Ex. D-1996 (Clean Harbors' 12/12/04 Credit Invoice)].
[36] [TT Day 21 (McLellan) P. 161:9-23; Ex. D-1995 (Clean Harbors' 12/11/04 Invoice)].
[37] [Ex. D-1996 (Clean Harbors' 12/12/04 Credit Invoice)].

along the original undiscounted amount to the Responsible Parties.[38]  The resulting overcharge of $91,220.75 was accomplished by <u>intentional</u> invoice-splitting designed to conceal the discounts from the Responsible Parties and enrich NRC.  This conduct prompted the Court during the trial of this matter to propose the question, "Has anybody been indicted yet?"[39]

Mr. McLellan calculated that if the Responsible Parties had obtained the discounts as of December 1, 2004 --- which they could and should have done --- they would have avoided overcharges of $2,769,538.49.[40]

### 4. The failure to contract directly with spill response vendors resulted in unnecessary mark-ups by NRC of $2,244,086.22

The Frescati Plaintiffs named the NRC – the O'Brien's Group sister corporation – as its oil spill removal organization in the vessel response plan and contracted with it for its services. Tsakos agreed to pay NRC for those services.  But the Responsible Parties (again through O'Brien's Group) should not have allowed NRC to contract with the oil spill response contractors.  This allowed NRC to serve as an unnecessary "middle-man" and pass along the clean-up contractors' costs to the Responsible Parties <u>after</u> NRC had added its own mark-up. This layering procedure was neither required nor reasonable.  Under § 3.2 of the contract, Tsakos was "not required to utilize the provider [NRC] to deploy Response Resources" and could have done so independently, and O'Brien's Group did not need NRC.  O'Brien's Group is a spill response manager.  Response contractors want to build a relationship with O'Brien's Group to further their businesses.  But O'Brien's Group could have easily avoided NRC's mark-ups by dealing with the spill response contractors directly.[41]  The Responsible Parties' Incident Commander Steve Kegelman testified that O'Brien's Group should have contracted directly with

---

[38] [Ex. D-1997 (NRC Invoice to Tsakos, Adam 0034474)].
[39] [TT Day 21 (Judge Fullam) P. 164:5].
[40] [Ex. D-1988 (Vendor Excess Payments List by category)].
[41] [TT Day 21 (McLellan) P. 165:1-166:5].

the clean-up contractors and therefore avoided NRC's mark-ups as soon as possible.[42]  Here, that should have occurred very shortly after the spill.  Yet, O'Brien's Group chose to wait, thereby unreasonably enriching its sister corporation NRC, and inflating the response costs.  The overcharges resulting from O'Brien's Group's failure to contract directly with response contractors, including allowing its sister corporation to add a mark-up, resulted in $2,244,086 of unnecessary expenses that the Frescati Plaintiffs seek to improperly recover from CARCO.[43]

### 5. Overpayments of per diems and meal breaks total at least $7,788,384.21

Per diems for housing and meals are not appropriate unless the labor comes in from outside a designated area, which is generally 50 miles.[44]  But O'Brien's Group's finance section made no attempts to determine where the workers resided.  Rather, the Responsible Parties simply paid per diems for all workers.  Many workers came on site through temporary labor services, including from Labor Ready Northeast, with a billing address in Philadelphia.[45]

There is no evidence establishing that the amount of per diems paid was appropriate, or that the per diems were actually paid to the workers, as opposed to simply pocketed by the response contractors themselves as a profit item.  Moreover, the Responsible Parties provided hot meals to workers on-site, reducing the need for per diems intended to reimburse workers for actual out-of-pocket costs.

O'Brien's Group responds that it simply "didn't care" whether it paid per diems to local workers.[46]  It claims that it was more feasible for workers to reside in hotels and be bused to sites

---

[42] [Kegelman, Dep. (Sept. 11, 2009), P. 204:18-205:2].
[43] [Ex. D-1988].
[44] [TT Day 21 (McLellan) P. 173:17-174:16].
[45] [Ex. D-1990 (Labor Ready Invoice re: Raymond Evans, MEG 0000052-53)].
[46] [TT Day 19 (Benson) P. 32:1-4].

14

by contractors.[47]   But O'Brien's Group had no way of knowing (because it did not try to determine) how many workers actually stayed in hotels, or whether any of the local workers chose to stay in hotels instead of sleeping in their own homes.[48]   The per diem procedures here were simply "giveaways" by O'Brien's Group to the spill response contractors - Undoubtedly those procedures pleased the contractors, who likely pocketed much of the per diems as profits. But clearly the Responsible Parties, through O'Brien's Group, did not reasonably attempt to avoid these unnecessary costs, which plaintiffs nevertheless now seek to recover as damages from CARCO.   That is particularly egregious here because setting up a system whereby O'Brien's Group would get contractors to provide residence information for laborers would have been simple.[49]

Even though none of the amounts of per diems paid is properly supported, CARCO requests that only one-half of the amount of per diems paid be eliminated as an overcharge because it recognizes that some workers were not local residents.[50]   Also included in this category of overcharges were amounts that contractors charged for their workers' meal breaks (*i.e.*, time not working on the clean-up operation).   It is standard in the oil spill response industry that Responsible Parties do not pay for workers' meal breaks.   Even contractors recognize that workers are not entitled to be paid for lunch breaks.[51]   Nonetheless, the Responsible Parties here did pay contractors for their workers' meal breaks.

O'Brien's Group claimed at the initial trial of this matter that it made a conscious decision to provide workers hot meals and pay them for a 30-minute lunch break to keep workers

---

[47] [TT Day 19 (Benson) P. 32:7-15].
[48] [TT Day 19 (Benson) P. 31:18-25].
[49] [TT Day 21 (McLellan) P. 173:20-174:16]. CARCO does not assert that O'Brien's Group should have obtained hotel receipts for non-local workers.  Rather, the reason that per diems were inappropriate here is because O'Brien's Group did not even attempt to determine whether the per diems were justified.
[50] [TT Day 21 (McLellan) P. 173:17-174:16].
[51] [(*See, e.g.* Ex. D-2005 (Moran Environmental Recovery's rate sheet, which recognizes that a 30-minute lunch break is not compensable); TT Day 21 (McLellan) P. 174:17-175:4].

close to the site.[52]  But as the Moran rate sheet recognized, even the contractors themselves did not expect that the Responsible Parties would pay for lunch breaks.  Nor is there any contemporaneous documented evidence that O'Brien's Group made this decision during the response.  Mr. Benson's trial testimony "justification" is obviously based on the benefit of hindsight.  And O'Brien's decision to provide free meals would have kept workers on site in any event, so paying for time not working was yet another type payment that could have been reasonably and easily avoided.  These payments were not reasonable, and Mr. McLellan properly included in this category of overcharges payments for 30-minute lunch breaks.  Overcharges for per diems and lunch breaks total at least $7,788,384.21, and plaintiffs may not recover this amount from CARCO as damages.

### 6. Invoices not supported by proper dailies resulted in $3,919,599.29 of overcharges

A "daily" is a listing of labor, materials, and equipment that a contractor claims that it utilized that day.[53]  O'Brien's Group prudently instituted a requirement that dailies supporting the invoices should be signed by spill response contractors, and any unsigned dailies would be rejected.[54]  O'Brien's Group was responsible for confirming that the information in the dailies was correct, including counting the number of workers and amount of equipment.[55]  Steve Kegelman, O'Brien's Group Incident Commander, agreed that O'Brien's should never have approved payment of invoices that did not include signed dailies.  The reason is simple.  Without signed dailies approving the contractors' invoices, there is no way to confirm that those resources were provided.  This type of confirmation is critical on a response like the ATHOS I's, which involved about 1,300 workers and 80 contractors.

---

[52] [TT Day 33, amended (Benson) P. 127:1-128:4].
[53] [TT Day 19 (Roussel) P. 150:17-23].
[54] [TT Day 19 (Roussel) P. 151:7-12; TT Day 19 (Benson) P. 68:19-69:4].
[55] [Kegelman Dep. (Sept. 11, 2009), P. 74:17-23; 79:24-80:13; 99:20-24].

Despite its own requirement that contractors present signed dailies with an invoice in order to be paid, O'Brien's Group paid invoices without them. It now claims that in such situations contractors' invoices without proper signed dailies were "put on the side" and further investigated. But if a separate investigation had been conducted, there should have been documentation, either on the invoice itself or some other document of that investigation. There are no such documents.[56] There is simply no reason that invoices without dailies, or with unsigned dailies, should have been paid. And, without any supporting documents, plaintiffs cannot assert that such invoices were further investigated before payment. There simply is no proof. Plaintiffs cannot recover $3,919,599.29 of payments that were not supported by signed dailies.

### 7. At least $7,755,146.82 of charges lacked sufficient support to justify payment

On a response as large as the one to the ATHOS I spill, common sense dictates that payments should not be made to spill response contractors without adequate document support. But the practice of paying unsupported invoices occurred continuously throughout the ATHOS I response. For example, United States Environmental Services, LLC billed Tsakos $75,368.00 for containment booms produced on December 20, 2004.[57] But the signed daily provided by United States Environmental for that date did not list any boom.[58] Mr. McLellan reviewed United States Environmental's dailies for other dates as well and found no evidence that the boom was ever delivered.[59] It should not have been paid for.

One of the exhibits that plaintiffs used during the cross-examination of Mr. McLellan served only to highlight CARCO's position. Adam 0061057 is an invoice from Zep

---

[56] [TT Day 21 (McLellan) P. 180:12-24].
[57] [Ex. D-2008 (U.S. Environmental Boom Invoice and Daily)].
[58] [Ex. D-2008 (U.S. Environmental Boom Invoice and Daily) at Adam 0056980-982].
[59] [TT Day 21 (McLellan) P. 183:5-13].

2417210-1

Manufacturing Company to Tsakos. The invoice is signed by Paul Ritchie of O'Brien's Group and initialed "OK to pay" by Linda Holmes of O'Brien's Group. Plaintiffs portray this as a prime example of an invoice that was properly supported. But the invoice itself is signed by Mr. Ritchie on "3-5-05," while the "received" date is 3-6-05.[60]

Although perfect documentation is not needed to support charges, there must be some basic documentation confirming actual delivery of labor and equipment. Mr. McLellan explained he has been involved in numerous responses where materials that were supposedly delivered were not.[61] Payments of $7,755,146.82 were made with insufficient support. The Frescati Plaintiffs' decision to pay those items without support is perplexing, but that was its choice. It cannot now expect to recover those amounts as damages from CARCO without adequate proof.

### 8. Mathematical and clerical errors resulted in $2,370,003.05 of overcharges

Mr. McLellan and his staff's review of over 200,000 pages of documents revealed numerous instances where mathematical or clerical errors led to overcharges that the Responsible Parties paid, and which they now seek from CARCO. For example, Delaware Bay and River Cooperative invoiced Tsakos $290,952.53 on December 20, 2004. Part of that amount was $52,422.45 billed for work on December 16, 2004 "as per attached daily."[62] But the "attached" daily for that date totaled $45,415.85, over $7,000 less.

---

[60] [TT Day 22 (McLellan) P. 119:17-24].
[61] [TT Day 22 (McLellan) P. 105:7-106:3].
[62] [TT Day 21 (McLellan) P. 170:23-171:23].

2417210-1

Frescati has not explained away that error, nor has it offered anything to refute Mr. McLellan's calculations, other than Mr. Benson's self-serving irrelevant testimony that he does not "believe" it.[63]

### 9. Sales taxes not due and other miscellaneous overcharges total $3,834,844.76

O'Brien's Group's sister corporation, NRC, billed the Responsible Parties for New Jersey sales taxes exceeding $800,000, which the Responsible Parties paid to NRC. But no taxes were due to the State of New Jersey on payments to NRC. The New Jersey taxing authority confirmed to Mr. McLellan that no such taxes were due.[64] It is unknown whether NRC actually remitted these sales taxes to the State of New Jersey, and if it did, the State of New Jersey had a procedure for seeking a refund.[65]

This category also included certain payments to Hudson Marine. It became involved to handle third-party claims, and CARCO does not dispute payments to Hudson for that purpose. But Hudson also performed "oversight" and auditing of O'Brien's Group and SOS. That scope of work was redundant of what O'Brien's Group and SOS were doing (and apparently, what they were not), and Hudson's superfluous role had no value to the response and CARCO should not be charged for it.[66]

### C. Equity defeats the Government's subrogation claim

Even if plaintiffs can prove all of their alleged removal-costs damages, equitable principles bar the Government from recovering on its approximately $88 million subrogation claim. CARCO, as an innocent terminal operator, should not be forced to reimburse the Government's clean-up expenses resulting from a hazardous condition in Federal Project Waters

---

[63] [TT Day 33, amended (Benson) P. 125:15-23].
[64] [TT Day 21 (McLellan) P. 184:8-185:16].
[65] [TT Day 21 (McLellan) P. 185:12-16].
[66] [TT Day 21 (McLellan) P. 185:25-186:17].

that the Government maintained, controlled and regulated. CARCO has detailed the equitable principles that defeat the Government's claim in Defendants' Pre-Trial Brief on liability, which CARCO incorporates by reference.

**D.** **The NPFC's allowance of much of the Frescati Plaintiffs' reimbursement claim for clean-up expenses is irrelevant and flawed**

The Frescati Plaintiffs and the Government have continuously asserted throughout this case that Donna Hellberg's review and the ultimate acceptance of most of the Frescati Plaintiffs' claim for reimbursement of removal costs (above the $45,474,000 limitation) establish the reasonableness of the clean-up expenses (including the Fund's $87,989,157 subrogation claim). The Government's position that its own admittedly "subjective" review of the Frescati Plaintiffs' clean-up claims establishes that this court should award it $87,989,151 (and presumably over $45,000,000 to the Frescati Plaintiffs as well) is self-serving and legally and factually flawed.

First, the NPFC's review of the Frescati Plaintiffs' claim for reimbursement does not lessen the plaintiffs' burden of proving damages in this case. The Government, a plaintiff subrogated to the Frescati Plaintiffs rights, has the burden of proving damages against CARCO. The Government stands in the Frescati Plaintiffs' place and has no greater rights than the Frescati Plaintiffs. *See, e.g., United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 91 L. Ed. 2022, 67 S. Ct. 1599 (1947); *United States v. Inter-Bay Towing Co.*, 2005 U.S. Dist LEXIS 41974, at 27 (S.D. Tex. 2005), 2006 A.M.C. 581. The Government is thus subject to any defenses that CARCO has against the Frescati Plaintiffs. *See, e.g., United States v. Bear Marine Services,* 509 F. Supp. 710, 718 (E.D. La. 1980), *appeal dismissed,* 696 F.2d 1117 (5th Cir. 1983) (government suing a non-discharging third-party for pollution damages must meet the burden of proof imposed on any other maritime plaintiff); *United States v. Georgia Pacific Co.,* 421 F.2d 92, 101 (9th Cir. 1970) ("In the instant case, the Government is suing to enforce a

contract between it and a third-party, and thus is acting as a private party would."); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 n.5 (9th Cir. 1973) ("When the government is acting in a proprietary capacity it is much more likely that the public's interest will not be unduly damaged by the imposition of the estoppel defense."); *In re American Training Services, Inc.*, 434 F. Supp. 988, 1003 n.35 (D.N.J. 1977) ("In acting as a private party would, as distinguished from the sovereign, the government may be subject to equitable estoppel by the same standards applicable to private actions. …"); *Kenan Transp Co. v. U.S. Coast Guard*, 211 F. App'x 902, 903-05 (11th Cir. 2006) (plaintiff could not recover response costs from the NPFC where it had settled a claim that it had against a responsible party, and released that party, preventing the NPFC from asserting subrogation rights). In sum, the Government cannot immunize and enrich itself from the Frescati Plaintiffs failure to avoid costs through its own review.

Moreover, the NPFC's findings lack all evidence of reliability, trustworthiness or fairness. CARCO has therefore moved to exclude them (Doc. 750). Even if the NPFC's review of the Frescati Plaintiffs' reimbursement claims was relevant, the Court should give it no weight because it was subjective, incomplete, and ineffectual. It did not rise to the level of reasonable effort to avoid undue expense.

- Third-Party Labor Overcharges ($11,887,284.08) and Equipment Overcharges ($1,535,185.40)

Ms. Hellberg did not analyze whether third-party personnel charges should have been passed on to the Responsible Parties at actual cost plus a mark-up, which would have greatly reduced costs. She could not have made that analysis because she looked only at the prime contractor documents that the Frescati Plaintiffs gave her.[67] She did not review subcontractor

---

[67] In any event, the Frescati Plaintiffs did not provide her all relevant documents. Jason Roussel admitted that he produced some, but not all, of SOS' audit reports to the NPFC. He could not explain the reason for this selective

rate schedules because she felt they were "irrelevant" under the regulations. But the regulations require that the claimant bears the burden of proof of a "sum certain" for compensation.[68] The NPFC recognizes that the regulations provide "some basic guidelines" for required documentation, but that the "claimant must present anything and everything necessary for the NPFC to fully understand the situation . . ."[69] Ms. Hellberg herself claimed that she made her determinations based on the "Guidelines & Regulations."[70] And those guidelines require that the Responsible Party claimants provide "all associated paperwork to validate the invoiced amount (i.e., daily logs … [and] underlying invoices) for products or services the vendor obtained from a secondary source … [including] specialty equipment a vendor may have rented."[71] Ms. Hellberg simply said that her analysis determined that charges were "reasonable" and that was all that was necessary for payment.

Ms. Hellberg and the NPFC therefore disregarded the regulations and their own guidelines by ignoring the fact that the Frescati Plaintiffs allowed clean-up contractors to hire unskilled labor from temporary labor services at a low cost and then pass along those costs -- not at cost plus a reasonable mark-up -- but at greatly elevated rates applicable to the contractors' own employees. The NPFC made the same errors as to third-party equipment that response contractors rented but passed on to the Responsible Parties as if it was owned equipment.

- Lack of Direct Billing by the Responsible Parties to Response Contractors ($2,244,086.22)

Ms. Hellberg did not analyze whether the Responsible Parties could have, and should have, been able to secure direct billing arrangements from the outset of the response and thus

---

production [TT Day 19 (Roussel) P. 142:22-143:12]. The NPFC's review was subjective, flawed and with a blind eye to the overcharges here.

[68] [Ex. D-2139, 33 C.F.R. 136.1, *et seq.*].

[69] [Ex. D-2137 at 5].

[70] [TT Day 20 (Hellberg), 81:6-8].

[71] [Ex. D-2137 at 10; TT Day 20 (Hellberg) P. 37:6-38:8].

2417210-1

avoid unnecessary mark-ups by the O'Brien's Group's sister corporation, NRC. Again, Ms. Hellberg simply looked at the prime clean-up contractors' contracts, not the underlying subcontracts.[72] The regulations and guidelines required more.[73]

- Failure to Timely Obtain Reduction below Standard Rates ($2,769,538.49)

Ms. Hellberg looked at the prime contractor rate schedules only and compared rates on schedules to invoices. She did not analyze whether reductions could have been obtained from any of the spill response contractors earlier than mid-December 2004. The NRC was able to obtain discounts from contractors only a few days after the spill.[74] But in looking only at prime contractor schedules, she could not have determined that reasonable efforts could have resulted in substantial savings.

- Per Diem/Lunch Break Adjustments ($7,788,364.21)

Ms. Hellberg did not analyze whether per diems were paid to local workers. Nor is there evidence that she analyzed whether contractors' personnel should not have been paid for meal breaks. This is contrary to the NPFC's own guidelines, which identify "Per Diem" expenses as a "Frequent Problem Area[ ]" and require extensive documentation.[75]

Overcharges for per diems are evidenced by amounts paid to one of the contractors, Garner, whose rate schedule calls for per diems only for employees "who do not reside in the local commuting area."[76] Yet, there was no analysis by the Responsible Parties or the NPFC of any worker's address. Despite the terms of Garner's contract, the Responsible Parties simply paid everyone's per diems, and the NPFC rubber-stamped it.

- Missing/Unsigned Dailies ($3,919,599.29)

---

[72] [TT Day 20 (Hellberg), P. 37:6-38:8].
[73] [Ex. D-2137, at 9-11].
[74] [Ex. D-1993 (Clean Harbors' 11/30/04 letter)].
[75] [Ex. D-2137, at 11].
[76] [Ex. P-1419, at Adam 0020316, "Travel, Lodging, and Per Diem" section].

23

Ms. Hellberg indicated that not all contractors produced dailies and that missing or unsigned dailies were not a concern because she relied on Incident Action Plans (IAPs) for support if dailies were missing or unsigned.  This is counter to the guidelines, which require "all associated paperwork" including "daily logs."[77]

Moreover, the inherent unreliability of a "plan" in an IAP as support for tracking resources actually used is established by the very IAP that plaintiffs used during Captain Laferriere's testimony at the first trial.[78]  Plaintiffs identified the IAP for December 7, 2004 as an example of how the IAPs worked and how they supported the charges that the NPFC reimbursed to the Frescati Plaintiffs.  Specifically, Captain Laferriere testified that the plan[79] showed Clean Harbors conducting night operations with 30 persons.[80]  But Clean Harbors' actual invoices establish that it did <u>not</u> conduct night operations on December 7.  Clean Harbors' dailies for that day show that almost all personnel worked until around 17:00 or 18:00 (5:00 p.m. or 6:00 p.m.).  None worked overnight.[81]  Quite simply, IAPs are not proof of actual resources utilized, and they are not reliable support for the clean-up cost damages that plaintiffs seek here.

- Insufficient support ($7,755,146.82) and Incorrect Charges ($237,003.05)

Ms. Hellberg claims that there was support for all the charges she approved.  But she could not have engaged in the analysis of claims.  She did not review any subcontracts.  She reviewed what the Frescati Plaintiffs gave her, and even then the Frescati Plaintiffs withheld information.  Specifically, the NPFC can hardly claim that its review of the disputed charges here was "reasonable" in determining a sum certain for the clean-up when it did not follow the

---

[77] [Ex. D-2137, at 10].
[78] [*See* Ex. USA 127 (IAP 11)].
[79] [Ex. USA 127 (IAP 11), at 06027-28]
[80] [TT Day 18, amended (Laferriere) P. 25:17-26:3, 30:1-21].
[81] [*See* Ex. P-1419, at Adam 0033598-628].

procedures specified in its own guidelines. The NPFC guidelines further require that the Responsible Parties' Spill Management Team "provide copies of all documentation of [the Spill Management Team's] review of contractor invoices that explain and outline any and all costs reduced, denied or adjusted." O'Brien's Group here provided only selected audit reports to the NPFC.[82]

The lack of a sufficient review by the NPFC is clear given Ms. Hellberg's admission that it is not her role to determine whether the clean-up expenses were properly incurred.[83] Rather, she relies heavily on what the Responsible Parties provided her and their "subjective criteria" in making her determinations.[84] And, despite her heavy reliance on pre-spill contracts as a basis for determining the reasonableness of the expenses, she admitted that she had the authority to ignore those contracts.[85] Nor did she review any underlying documents from subcontractors, because for purposes of the NPFC's review she considered those documents "irrelevant." It is therefore not surprising that in reviewing over $137,000,000 of invoices produced by the Frescati Plaintiffs, she did not find even one rate that she felt was unreasonable.[86]

In sum, the NPFC's review of the Frescati Plaintiffs' reimbursement claim should be ignored. The Government is free to apply subjective criteria and award the Frescati Plaintiffs what it subjectively determines, based on its definition of reasonableness, but its acts do not, and cannot, in any way influence the Court's independent analysis of the Plaintiffs' damages claim in this case against CARCO.

---

[82] [Ex. D-2136 (Claimant's Guide); Ex. D-2137 (NPFC Claims Process, Responsible Party Claim Submission Guidance), at 10)].
[83] [TT Day 20 (Hellberg) P. 84:2-6].
[84] [TT Day 20 (Hellberg) P. 71:9-72:2].
[85] [TT Day 20 (Hellberg) P. 92:16-20].
[86] [TT Day 20 (Hellberg) P. 77:1-10].

## II.	The Frescati Plaintiffs Cannot Recover Damages For Estimated Unrepaired Items

The Frescati Plaintiffs' claim for $438,542 for unrepaired damage to the ATHOS I allegedly caused by contact with other objects after alliding with the anchor is not proven, and the Court should reject it. The Frescati Plaintiffs' claim is composed of estimated fees for Curacao port agents ($88,000), cost of bunkers during repairs ($105,530); general and dry dock dues ($118,492); stating ($6,000); attendance fees for consultants/others ($7,700); travel costs for "consultants/others" ($1,500); costs to remove sediments ($5,700); extra payment to crew ($25,000); and estimated repair costs ($49,620).

A claimant can only obtain an award for the reasonable cost of repairs. *See Wilson v. Ins. Co. of North America*, 36 Pa. D. & C.2d 597, 601 (Pa. Com. Pl. 1965). In *Zeller Marine Corp. v. Nessa Corp.*, 1947 A.M.C. 43, 68 F. Supp. 795, 797 (S.D.N.Y. 1946), the court noted that, although the general rule in admiralty is that a claimant whose vessel was damaged is entitled to *restitutio in integrum* or to be "made whole," the claimant is only entitled to reasonable damages. The *Zeller* court emphasized that "[a] blind adherence to the doctrine of *restitutio in integrum* may easily lead to an absurd result." *Id.* at 799 (citation and internal quotations omitted). Likewise, in *California Navigation & Improvement Co. v. Union Transp. Co.*, the court explained that:

> [D]amages which are uncertain, contingent or speculative cannot be recovered, and under this rule it has been held that there is uncertainty when the nature of the damage cannot be determined. It follows that, to recover damages over and above repairs for actual cost or permanent depreciation, the nature of such damages must be clearly established . . . .

176 F. 533, 535 (9th Cir. 1910) (citation and internal quotations omitted).

The ATHOS I operated without these repairs until eventually sold in November of 2006. Plaintiffs did not present any evidence of additional bids obtained for this work nor did they

provide any evidence that the estimated costs listed above were necessary. The Frescati Plaintiffs, as proponents of the unrepaired damages claim, bear the burden of proving its reasonableness. *See The UMBRIA*, 148 F. 283, 289 (S.D.N.Y. 1906) ("My conclusion is that libellant has failed to prove that the amount of the bills is the fair and reasonable cost of repairing the damage caused by the collision. . . ."). Because the Frescati Plaintiffs cannot provide any evidence as to the reasonableness of the estimated cost to repair the deferred damages in Curacao, their claim should be dismissed.

Only a small fraction of the amount the Frescati Plaintiffs seek relates to the estimated cost of actual repair. The vast majority of this claim relates to dry docking dues and non-steel renewal charges, such as dry docking, bunkers, agency charges and consultant fees. A reasonable ship owner would never have incurred all of these ancillary charges to make the minor, non-essential steel repairs that the plaintiffs claim. Instead, it would have waited until the next regularly scheduled drydock and maintenance period to make these minor repairs. A reasonable ship owner would never incur these substantial shipyard general expenses simply to do non-emergency (estimated) steel repairs of $61,320 (consisting of actual repair estimates at $49,620, repair staging of $6,000, and sediment removal of $5,700).

Furthermore, because the Frescati Plaintiffs did not repair these alleged damages to the hull, their measure of damages is not estimated cost of repair, but the depreciation of the value of the vessel caused by the alleged unrepaired items. In *Delta Supply Co. v. Liberty Mut. Ins. Co.*, 211 F. Supp. 429, 432 (S.D. Tex. 1962) the court noted that "[i]n a situation where a vessel is not sold but is repaired to make it as good as before, the actual loss would be the cost of repairs. A different situation is presented when a vessel is sold unrepaired, and it requires the application of a different rule as to damages." The *Delta Supply* court held that when a vessel is sold

unrepaired, then claimant is entitled to recover the depreciation value of the vessel (value without damage, less the amount vessel was sold for). *See id.* at 431. Likewise, in *Laconner Assocs. LLC v. Island Tug and Barge Co.,* No. 07-175, 2008 U.S. Dist LEXIS 46914, at *11, 2008 WL 8415154, at *4 (W.D. Wa. June 16, 2008), the court held that damages in admiralty are measured by the diminution in value of the property, that is, the difference between the value of the vessel before and after the collision. Importantly, a court will not automatically assume that a vessel has depreciated in value after a collision:

> Now, in the case of marine damage, the measure of damages is essentially the same, but we don't go ahead and jump to the conclusion that the yacht has been depreciated simply because it has been damaged.

*Wilson v. Ins. Co. of North Am.*, 1965 Pa. Dist. & Cnty. Dec. LEXIS 175, 5, 36 Pa. D. & C.2d 597, 601 (Pa. C.P. 1965) (citation and internal quotations omitted). Evidence of depreciation cannot be speculative. "Without credible evidence to show the amount of depreciation, the appellant failed to discharge its burden to prove a recoverable loss . . . ." *Bleakley Trans. Co., v. Colonial Sand & Stone Co*., 245 F.2d 576, 579, 1957 A.M.C. 1746 (2d Cir. 1957). In this case, plaintiffs have not provided **any** evidence, credible or not, of the depreciation of the ATHOS I resulting from the unrepaired damages. In spite of months of trial testimony, plaintiffs failed to provide the sale price of the ATHOS I or any values for comparative vessels on the market.[87] The Frescati Plaintiffs do not have any basis to seek these damages.

## III. The Frescati Plaintiffs Are Not Entitled To Recover Damages For Amounts Paid In Settlement To The Owners Of The Salem-Hope Creek Nuclear Power Plant

The Frescati Plaintiffs also fail in their attempt to recover $1,500,000.00 that they paid to Exelon Generation Company, L.L.C. ("Exelon") and PSEG Nuclear, L.L.C. ("PSEG"), co-owners of the Salem-Hope Creek Nuclear Power Plant Complex ("the Salem Plant"), in

---

[87] The ship was scrapped not long after the sale.

settlement of the plant owner's claim for interest on an award granted and paid by the National Pollution Fund Center ("NPFC"). The Frescati Plaintiffs had no actual or potential liability to Exelon and PSEG under the provisions of OPA-90 for the accrued interest.

Following the ATHOS I spill, the owners of the Salem Plant temporarily shut it down asserting that they were unable to use water from the river to cool nuclear material. The operators believed that the volume of oil discharged into the water rendered the water unfit for cooling purposes.

On May 31, 2005, Exelon and PSEG submitted claims to the NPFC for a combined $1,456,605 in removal costs and $54,214,604 in lost profits associated with the Salem Plant shutdown. Exelon and PSEG did not present a claim for these losses to the Frescati Plaintiffs, but instead sought recovery directly from Fund. The NPFC later found that only $31,917,366 was recoverable and reimbursed the Salem Plant owners for that amount. The NPFC did not, however, pay any interest on the amount awarded.

On February 12, 2009, the Salem Plant presented the Frescati Plaintiffs with a claim for interest on the amount that the NPFC awarded. The Frescati Plaintiffs paid the operator $1,500,000 (which did not comprise the asserted loss of profits, but rather interest). The Frescati Plaintiffs now seek recovery of that amount from CARCO in contribution. But because the Frescati Plaintiffs had no liability for the interest claim asserted by the Salem Plant, their payment was unreasonable and their claim against CARCO should be denied. The OPA statute provides that a responsible party is not liable for interest on a claim to a third party where the delay during which the interest accrued was beyond the control of the responsible party:

> If in any period a claimant is not paid due to reasons beyond the control of the responsible party or because it would not serve the interests of justice, **no interest shall accrue** under this section during that period.

33 U.S.C. § 2705(b)(3) (emphasis added).

The three-year "delay" in the NPFC's paying the Salem Plant's claims was entirely "beyond the control of the responsible party," and therefore brings the claim within the absolute exclusion for interest during this period. The Salem Plant owners elected to present their claims directly to the Fund, bypassing presentment to the Frescati Plaintiffs. The amount of time it took for the Salem Plant owners to support their claims to the Fund and the length of time that the Fund took to review and pay the claim were beyond Frescati's control.

Moreover, the process utilized by Exelon and PSEG to seek reimbursement was instituted by the Government, not by the Frescati Plaintiffs. The Frescati Plaintiffs were never afforded the opportunity to inspect the nuclear facilities or conduct discovery on the Salem Plant's claim. *See Unocal Corp. v. United States*, 222 F.3d 528, 540 (9th Cir. 2000) ("By its terms, the OPA permits prejudgment interest only when a 'claimant' successfully pursues a claim against a 'responsible party.'").

Much of the delay in paying the Salem Plant's claims would have been beyond Frescati's control even if the claims had been presented to it directly. The Salem Plant owners attempted to recover more than $14 million in lost profits caused by a mechanical failure that had nothing to do with the November 26, 2004, incident. The NPFC rejected that amount. In all, the NPFC rejected over $22 million of the Salem Plant's claims. As such, responding to the claims required investigation and analysis that Frescati would have had to conduct even if the claim had been presented directly to Frescati. This Court denied a claim for interest under similar circumstances in *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F. Supp. 705, 711, 1962 A.M.C. 2623 (E.D. Pa. 1962), where it found that the plaintiff's claim for interest was improper to the extent that the delay in resolving the claim was based on the plaintiff's seeking damages

30

that were not caused by the defendant. *See also Meritt & Chapman Derrick & Wrecking Co. v. Chubb*, 113 F. 173, 175 (2d Cir. 1901) ("In view of the exaggerated claims made by the libelant, no interest should be allowed as against either respondent."). The Frescati Plaintiffs had no liability for interest to Exelon and PSEB and had no rational reason to enter into a settlement agreement with them.

In the March 27, 2009, letter to CARCO, the Frescati Plaintiffs warned that it would dispose of the Salem Plant claim on whatever basis it deemed reasonable and then pursue CARCO for indemnity and contribution (Doc. 597, at Exhibit B). Frescati went on to claim that such an action "once having established [CARCO's] liability, will be simply to establish that the disposition of the above claim was reasonable." Frescati has not provided any rationale for its $1,500,000.00 settlement. In the absence of any explanation as how and why the $1,500,000 figure was reached, Frescati has failed to establish its own reasonableness standard.[88]

The Third Circuit has long held that a party seeking contribution for a settlement must show its *actual* liability to the party with whom it settled. *The Toledo*, 122 F.2d 255, 257, 1941 A.M.C. 1219 (2d Cir. 1941) ("A claim for indemnity … requires that an actual liability be sustained by the indemnitee, and if he settles a claim without a determination of the rights in question, he bears the risk of proving an actual liability in the action over for (sic) indemnity.")[89] Because Frescati has not proved liability for interest to Exelon and PSEG, and it cannot recover contribution for those payments from CARCO.

---

[88] CARCO's counsel repeatedly informed Frescati that settlement was not justified because it had valid defenses to Exelon's and PSEB's claim, to no avail. (*See* Doc. 597, at Exhibits C, D, E, and F).
[89] Although the Third Circuit has considered applying a standard of potential, rather than actual, liability for contribution claims, it has always recognized the importance of protecting the indemnitor from undue prejudice. *See Bainville v. Hess Oil V.I. Corp.*, 837 F.2d 128, 131 (3d Cir. 1988). In any case, the Frescati Plaintiffs have failed to prove even potential liability in light of the 33 U.S.C. § 2705(b)(3) preclusion of prejudgment interest when the delay in paying the claim was not caused by the responsible party.

The Frescati Plaintiffs' prior reliance on *M&O Marine, Inc. v. Marquette Co.*, 730 F.2d 133 (3d Cir. 1984), is misplaced. In *M&O Marine, Inc.*, the court noted the <u>general</u> rule that "in order to secure indemnification an indemnitee must prove that it was actually liable to the injured party, even if, in the original liability suit, it settled with the injured party rather than proceeding to judgment." *Id.* at 135 (citing *Frederick v. Hess Oil V.I. Corp.*, 642 F.2d 53, 56 (3d Cir. 1981)). *See also The Toledo,* 122 F.2d at 257.

Although the Third Circuit in *M&O Marine* recognized that some courts outside of the Third Circuit allow a party to recover on proof of "potential" liability, it did not adopt that standard. Indeed, subsequent courts in the Third Circuit have cited *M&O Marine, Inc.* for the proposition that the party seeking indemnity must prove that it was actually liable to the party with whom it settled, and that the settlement was a reasonable one. *See, e.g., Mendelson v. Delaware River & Bay Authority*, 112 F. Supp. 2d 386, 388 (D. Del. 2000).

The Frescati Plaintiffs have failed to satisfy their burden of proof. They did not offer any evidence that they actually owed anything to the owners of the Salem Power Plant, or that the amount that they ultimately paid to settle was reasonable. They ask the Court to adopt a "trust me" approach that they owed interest to the Salem Plant owners, and that what they paid was reasonable.

## IV. The Frescati Plaintiffs are not entitled to $1,541,597 relating to amounts paid to various consultants

The Frescati Plaintiffs seek $1,541,597 collectively paid to Hudson Marine Management Services ("HMMS"), Global Remediation Services ("Global"), E. A. Renfroe ("Renfroe"), Weeks Marine ("Weeks") and Environmental Protection Engineering, S.A. ("Protection"). The

NPFC rejected those amounts as not reimbursable to the Frescati Plaintiffs from the Fund because they were not related to removal operations.[90]

The majority of these expenses related to redundant services, i.e. other entities reviewing The O'Brien's Group's work.[91]  Specifically, the Frescati Plaintiffs seek $873,783.08 paid to HMMS, out of a total invoiced amount by HMMS of $903,783.08.[92]  Steve Kegelman, The O'Brien's Group's incident commander testified that HMMS was retained by the Frescati Plaintiffs to audit O'Brien's Group's work and to "discredit" it.[93]

The Frescati Plaintiffs also claim $233,091.48 paid to Renfroe and $384,450.43 paid to Global.[94]  The NPFC rejected the Frescati Plaintiffs' attempts to recover these amounts from the Fund concluding that they were not substantiated or were not related to removal operations.[95]  Similarly, CARCO should not be required to pay for alleged costs that are not substantiated.

## V.     Plaintiffs Are Not Entitled To Pre-Judgment Interest

The plaintiffs seek pre-judgment interest on any award in this case.  The Frescati Plaintiffs seek pre-judgment interest based on the United States prime interest rate whereas the Government seeks pre-judgment interest at the rate in the Oil Pollution Act, 33 U.S.C. §

---

[90] [Ex. USA 157 (Claims Determination memo); Ex. USA 161 (Claims Determination supplement)].

[91] [TT Day 21 (McLellan) P. 185:25-186:17].  Mr. McLellan included the overcharges applicable to these vendors in his total overcharges of $44,104,072 [Ex. D-1987 (Spill Response Cost Analysis Vendor Summary), Ex. D-1988 (Vendor Excess Payments List by category)].

[92] [*See* P-1420 (Unreimbursed Cleanup Response Costs Claim)].

[93] [Kegelman Dep. (Sept. 11, 2009), P. 168:1-7, 177:12-178:9].  The NPFC also rejected all of the amounts paid to HMMS, finding them to be "costs for advertisement of claims and associated costs, which are not removal related" [*See* Ex. USA 161 (Claims Determination supplement), at NPFC 000101].  The Frescati Plaintiffs also seek $26,716.20 paid to Weeks and $23,556.00 paid to Protection.  CARCO did not directly address these amounts at trial, and they were not included in Mr. McLellan's analysis.  Nonetheless, CARCO notes that the NPFC rejected these amounts, finding that they were unrelated to the response [Ex. USA 161 (Claims Determination supplement), at NPFC 000101].

[94] [*See* P-1420 (Unreimbursed Cleanup Response Costs Claim)].

[95] [*See* Ex. USA 157 (Claims Determination memo), at NPFC 000090.]

2705(b)(4).  The Court should not award pre-judgment interest here.  But if it does, it should not award interest to the Frescati Plaintiffs based on the exorbitant rate they seek.[96]

An award of pre-judgment interest in a maritime case is not automatic.  *See Koch Refining Co. v. Jennifer Boudreaux M/V*, 85 F.3d 1178, 1183, 1997 A.M.C. 246 (5th Cir. 1996) (citing *City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 196, 115 S. Ct. 2091, 1995 A.M.C. 1882 (1995)).  "[T]he allowance of interest on damages is not an absolute right.  Whether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury."  *Id.* at 1183 (quoting *Nat'l Gypsum Co.*, 515 U.S. at 196).

A court should deny pre-judgment interest when a party has unreasonably delayed the prosecution of its claim, *see Wilburn v. Maritrans G.P., Inc.*, No. 95-2806, 2000 U.S. Dist. LEXIS 3 at *3, 2000 WL 4144, at *2 (E.D. Pa. Jan. 3, 2000), or where the party claiming interest is responsible for delays in resolving the case.  *Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 593-94, 1999 A.M.C. 324 (2d Cir. 1998); *In re Bankers Trust*, 658 F.2d 103, 108-110 (3d Cir. 1981); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157-58 (5th Cir. 1990); *Socony Mobil Oil Co., Inc. v. Texas Coastal & Int'l, Inc.*, 559 F.2d 1008, 1014 (5th Cir. 1977); *see also Nat'l Gypsum Co.*, 515 U.S. at 196 (citation omitted) ("[T]he most obvious example" to justify denying pre-judgment interest is "the plaintiff's responsibility for 'undue delay in prosecuting the lawsuit'").

Here, the delay in bringing this matter to trial was caused by Frescati's request for a stay of litigation against CARCO in 2005 while it pursued limitation and recovery from the Oil

---

[96] As discussed, *infra*, the Government is subrogated to the Frescati Plaintiffs' rights and thus is not entitled to pre-judgment interest for the same reasons that the Court should deny the Frescati Plaintiffs' request.  But if the Court awards the Government pre-judgment interest, it and CARCO have stipulated that the rate is the rate that applies to the Government's claims specified in OPA, 33 U.S.C. § 2705(b)(4).  Only the Frescati Plaintiffs seek the prime rate, which greatly exceeds the OPA rate.

Pollution Fund, a stay that remained in effect until December of 2008. Frescati's decision to request that stay delayed the trial of this matter and is grounds for denying it pre-judgment interest in this case, at least for the three year period of delay caused directly by the Frescati Plaintiffs' claims against the Fund and time it took to resolve that claim. For the same reasons, this Court should not award the Government pre-judgment interest because the Government's claims are based solely on subrogation

A.     **If the Court grants pre-judgment interest on any amounts to the Frescati Plaintiffs, it should apply the statutory rate specified in either 28 U.S.C. § 1961 or 33 U.S.C. § 2705(b)(4)**

Even if this Court were to award the plaintiffs pre-judgment interest, it should reject the inflated "prime" rate that the Frescati Plaintiffs suggest. In setting a pre-judgment interest rate, trial courts may look to reasonable guideposts, including the statutory post-judgment rate contained in 28 U.S.C. § 1961(a) (post-judgment rate, based on the one-year constant-maturity United States Treasury yield rates). *Webb v. Ensco Marine Co.,* 135 F. Supp. 2d 756, 773 (E.D. Tex. 2001).

CARCO agrees that if the Court were to award the pre-judgment interest, then the rate specified in 28 U.S.C. § 1961 is an appropriate guidepost, and would be a reasonable and appropriate rate to be applied in this case. The U.S. Treasury rate is exactly the type of short-term, risk-free obligation that the Frescati Plaintiffs' insurer (who actually paid for the clean-up) could recover as an investment. *See, e.g., Western Pacific Fisheries, Inc. v. USS President Grant*, 730 F.2d 1280, 1288-1289 (9th Cir. 1984) (rejecting the prime rate and other rates as the pre-judgment interest rate and awarding the 28 U.S.C. § 1961 rate instead, noting that the pre-judgment rate should be measured by interest on term risk-free or short obligations (which is specified in 28 U.S.C. § 1961); *United States v. Rafael*, 349 F. Supp. 2d 84, 97 (D. Mass. 2004)

(applying the rate specified in V. which is an objective measure of the value of money over time) (citation omitted); *see also SEC v. Pattison*, No. 08-4238, 2011 U.S. Dist. LEXIS 23427, at *12-14, 2011 WL 723600 at *4 (N.D. Cal. Feb. 23, 2011).

Plaintiffs did not pay any clean-up costs. Their insurers, the P&I Clubs – the UK P&I Club and the International Group of P&I Clubs paid them.[97] And the insurers did not borrow money to pay for the clean-up costs.[98] Where, as here, plaintiffs do not establish they had actually borrowed money and incurred higher interest costs related to their alleged damages, courts have freely and properly applied the statutory rate of 28 U.S.C § 1961 for pre-judgment interest. *See, e.g.*, *Osprey Ship Mgmt., Inc. v. Foster*, No. 05-3990, 2008 U.S. Dist. LEXIS 71807, at *83-86, 2008 WL 4371376, at *29-30 (S.D. Miss. Sept. 18, 2008) (applying 28 U.S.C. § 1961 where plaintiffs failed to introduce any evidence indicating that they had in fact borrowed money and incurred higher interest costs); *U.S. v. Cen. Gulf Lines*, 974 F.2d 621, 630-31, 1993 A.M.C. 2622 (5th Cir. 1992) (finding no abuse of discretion in the district court's application of 28 U.S.C. § 1961 rather than at the average T-bill rate); *Nittetsu Shoji America, Inc. v. M/V CRYSTAL KING*, No. 90-2082, 1992 U.S. Dist. LEXIS 7615, at *44-45, 1992 WL 116430, at *13 (S.D.N.Y. May 21, 1992) (awarding the T-bill based rate where the plaintiff introduced no evidence to support demand for 10% interest rate); *The Pillsbury Co. v. Midland Enter.*, 715 F. Supp. 738, 771, 1989 A.M.C. 2113 (E.D. La. 1989) (applying 28 U.S.C. § 1961 where plaintiff had introduced no evidence that it had actually borrowed money and incurred higher interest costs).

Moreover, this Court has awarded pre-judgment interest based on short-term U.S. Treasury rates in various cases. *See, e.g., Adriatic Ship Supply Co., Inc. v. M/V Shaula*, 632 F.

---

[97] [TT Day 32 (Dunkelberg) P. 27:9 - 28:8].
[98] [TT Day 32 (Dunkelberg) P. 29:23-30:4].

Supp. 1573, 1575 n.4 (E.D. Pa. 1986) (applying the 28 U.S.C. § 1961 rate as the pre-judgment interest rate); *In re Tug Beverly, Inc.*, No. 92-0099, 1994 U.S. Dist. LEXIS 6471, at *1, 1994 WL 194891, at *1, 1994 A.M.C. 2437 (E.D. Pa. May 12, 1994) (applying the three-month United States Treasury Bill rate as the pre-judgment interest rate).

Alternatively, the Court should consider applying the rate set forth in OPA-90, 33 U.S.C. § 2705(b)(4). That section is based on the average of the highest rate for a commercial and finance company payor of 180 days or less. The Government and CARCO have stipulated to the rate in § 2705(b)(4) as the pre-judgment interest rate on the Government's claims (Doc. 492). The Government's stipulation evidences that it considers that rate fair and reasonable from a plaintiff's perspective. Much of the case relates to OPA-90 provisions and related standards, and thus the OPA-90 rate, which Congress deemed appropriate to parties seeking recovery under that act, logically applies to the Frescati Plaintiffs' claims as well. Similarly, CARCO agrees that this Court could appropriately apply the OPA-90 rate to an award to the Frescati Plaintiffs (if it allows pre-judgment interest at all).

**B.**      **If the Court does not apply the rates specified in 28 U.S.C. § 1961 or 33 U.S.C. § 2705(b)(4), it should apply the London Interbank Offered Rate (LIBOR) plus 0.5%, not the exorbitant and windfall driven "prime rate" that the Frescati Plaintiffs seek**

The Frescati Plaintiffs erroneously urge this Court to ignore all statutory guideposts for determining a pre-judgment interest rate and to apply instead a pre-judgment interest rate based on U.S. banks' prime lending rate. But the Frescati Plaintiffs did not borrow any funds to pay the response costs, and the prime lending rate is therefore not a proper measure here. *Cf. The Pillsbury Co.*, 715 F. Supp. at 771 (where plaintiff had no evidence that it had borrowed funds, the court applied the post-judgment rate in 28 U.S.C. § 1961 as the pre-judgment interest rate). Moreover, even if the "cost of borrowed funds" were an appropriate method for determining a

pre-judgment interest rate in this case, the Frescati Plaintiffs did not pay the clean-up costs. The UK P&I Club and the International Group of P&I Insurers actually paid the response costs.

Although conceding that they did not borrow any money to pay for the clean-up or their other alleged damages, the Frescati Plaintiffs have asserted entitlement to pre-judgment interest based on the prime <u>lending</u> rate charged by banks. Thus, CARCO retained Dr. Kenneth Boudreaux to provide expert testimony to the Court on appropriate pre-judgment interest. Dr. Boudreaux has testified that if the Court chooses a "lending" rate as the basis for a pre-judgment interest, then that rate should be based on the creditworthiness of the International Group of P&I Clubs, who actually paid for the clean-up costs here.[99] Despite the expert testimony on the issue, the Frescati Plaintiffs have asserted that the Court should ignore that evidence and apply the "prime" lending rate presumably because it is simple to determine. But it is just as simple to apply the rates in 28 U.S.C. § 1961 and 33 U.S.C. § 2705(b)(4), and neither of these would result in a huge windfall to the Frescati Plaintiffs. *See, e.g.*, *Thorner v. Sony Computer Entm't Am. LLC*, No. CIV.A. 09-1894 MLC, 2014 U.S. Dist. LEXIS 112675, at *13, 2014 WL 4054127, at *4 (D.N.J. Aug. 14, 2014) (deciding to award pre-judgment interest at the 28 U.S.C. § 1961 rate "for ease of calculation and in the interests of justice").

Even if the Court goes beyond these statutory rates, discussed previously, it should adopt the London Interbank Offered Rate (LIBOR) plus 0.5%, which would be the most appropriate rate here. As Dr. Boudreaux explained, the P&I Clubs paid the clean-up costs, and a fair borrowing rate for insurers of the size of the International Group of P&I Clubs is LIBOR plus 0.5%.[100] According to Dr. Boudreaux, the prime rate that the Frescati Plaintiffs seek is neither appropriate nor fair. The "prime" rate is not the rate that banks charge their most creditworthy

---

[99] Interest on clean-up costs constitutes the vast majority of pre-judgment interest that plaintiffs seek here.
[100] [TT Day 22 (Boudreaux) P. 134:10-135:14].

2417210-1

customers. Rather, that prime rate is typically available to individuals or relatively small corporate customers. Banks lend to large creditworthy customers, of similar stature to the International P&I Clubs, at rates substantially below the prime rate.[101]  *See also* Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, which is one of the most widely used textbooks in corporate finance education at the MBA level.[102]  Using the prime rate would unjustly result in an unfair windfall to the Frescati Plaintiffs.

In sum, this Court should not award Frescati pre-judgment interest. Even if it does, however, it should base the rate on the guideposts in 28 U.S.C. § 1961 or 33 U.S.C. § 2705(b)(4). If the Court looks beyond the statutory guideposts and considers the nature of the plaintiffs' borrowing capabilities, it should *not* award pre-judgment interest based on U.S. banks' prime lending rate, as the Frescati Plaintiffs urge, because they did not make the payments (their insurers did); because no evidence shows that the entities that actually made the payments (the UK P&I Club and the International Group of P&I Insurers) borrowed money to pay response costs; and because, even if the borrowing capability of the UK P&I Club and the International Group of P&I Insurers were considered relevant in determining a pre-judgment interest rate, their sizes establish that an equitable rate here is the three-month U.S. commercial paper rates, or at a rate slightly above LIBOR (plus 0.5%).

**CONCLUSION**

The Government's subrogation claim for removal costs of $87,988,137 should be rejected. Alternatively, the total alleged damages should be reduced by at least $44,104,072 because that amount could have been reasonably avoided, or is not proven. The Frescati Plaintiffs alleged damages for unrepaired items and amounts paid to the owners of the Salem-

---

[101] [TT Day 22 (Boudreaux) P. 137:23-139:6].
[102] [TT Day 22 (Boudreaux) P. 138:13-139:6].

Hope Creek Nuclear Plant should be rejected.  If the Court awards any damages, it should not award pre-judgment interest.  And if it awards prejudgment interest to the Frescati Plaintiffs', the rate specified in 28 U.S.C. § 1961, 33 U.S.C. § 2705(b)(4), or the rate of LIBOR plus 0.5%, should apply.

Respectfully submitted,

CHAFFE McCALL, L.L.P.

PALMER BIEZUP & HENDERSON LLP

By: _/s/ Derek A. Walker_
     Derek A. Walker
     Douglas L. Grundmeyer
     Chaffe McCall, L.L.P.
     2300 Energy Centre
     1100 Poydras Street
     New Orleans, LA  70163-02300
     (504) 585-7000

By: _/s/ Richard Q. Whelan_
     Richard Q. Whelan (ID No. 35688)
     Frank P. DeGiulio (ID No. 41577)
     Palmer Biezup & Henderson, LLP
     190 N. Independence Mall West
     Suite 401
     Philadelphia, PA 19106-3409
     (215) 625-9900

By: _/s/ John G. Bissell_
     John G. Bissell
     Strong Pipkin Bissell & Ledyard, L.L.P.
     4900 Woodway Drive
     Suite 1200
     Houston, TX  77056
     (713) 210-4366

*Attorneys for Defendants,*
*CITGO Asphalt Refining Company,*
*CITGO Petroleum Corporation, and*
*CITGO East Coast Oil Corporation*

Dated:  February 13, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that service of a true and correct copy of Defendants' Pre-Trial

Brief on Damages was sent to the following counsel on the below-listed date, via electronic mail:

Alfred J. Kuffler, Esq.
Montgomery, McCracken, Walker,
  & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

John J. Levy, Esq.
Montgomery, McCracken, Walker,
  & Rhoads, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002

Eugene J. O'Connor, Esq.
Montgomery McCracken Walker
  & Rhoads LLP
437 Madison Avenue, 29th Floor
New York, NY 10022

Stephen G. Flynn (SGF-8075)
Department of Justice
Assistant Director Admiralty
Sharon K. Shutler
Trial Attorney
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271


PALMER BIEZUP & HENDERSON LLP

By:    */s/ Richard Q. Whelan*
        Frank P. DeGiulio (ID No. 41577)
        Palmer Biezup & Henderson LLP
        190 N. Independence Mall West Suite 401
        Philadelphia, PA 19106-1572
        Telephone: (215) 625-7809


Dated: <u>February 13, 2015</u>

2417210-1