## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
)
In re Petition of FRESCATI SHIPPING    )     CIVIL ACTION No. 05-cv-305 (JHS)
COMPANY, LTD., as Owner of the M/T   )
ATHOS I, and TSAKOS SHIPPING &   )
TRADING, S.A., as Manager of the M/T   )
ATHOS I, for Exoneration from or   )
Limitation of Liability   )         CONSOLIDATED
_____)

UNITED STATES OF AMERICA,   )     CIVIL ACTION No. 08-cv-2898 (JHS)
                Plaintiff,   )
     v.   )
   )
CITGO ASPHALT REFINING   )
COMPANY, et al.   )
               Defendants.   )
_____)

## DEFENDANTS' PRE-TRIAL BRIEF ON LIABILITY

CHAFFE McCALL, L.L.P.               PALMER BIEZUP & HENDERSON LLP

Derek A. Walker                    Richard Q. Whelan (ID No. 35688)
Douglas L. Grundmeyer            Frank P. DeGiulio (ID No. 41577)
Chaffe McCall, L.L.P.               Palmer Biezup & Henderson, LLP
1100 Poydras Street                 190 N. Independence Mall West
2300 Energy Centre                  Suite 401
New Orleans, LA 70163            Philadelphia, PA 19106-3409
(504) 585-7000                     (215) 625-9900

STRONG PIPKIN BISSELL & LEDYARD, L.L.P.

John G. Bissell
Strong Pipkin Bissell & Ledyard, L.L.P.
4900 Woodway Drive, Suite 1200
Houston, TX 77056
(713) 210-4366

*Attorneys for Claimant,*
*CITGO Asphalt Refining Company,*
*CITGO Petroleum Corporation, and*
*CITGO East Coast Oil Corporation*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................. vi

BACKGROUND ................................................................................................ 1

LAW ................................................................................................................... 6

I.      Plaintiffs Have No Valid Claim Against CARCO In Contract ................................... 6

      A.      The safe-port obligation is limited to a maximum of 37 feet ............................ 7

              1.      CARCO did not owe an added margin of clearance beyond *37 feet above the anchor* ................................. 7

              2.      CARCO did not warrant the safety of the port at all times of the tide, and plaintiffs bore the risk of selecting the tidal stage ............................ 10

      B.      CARCO did not breach the safe-port obligation ............................. 14

              1.      The depth and "flukes-down" orientation of the anchor prove that CARCO afforded at least 37 feet of clearance and that the ATHOS I was drawing more than 37 feet at the time of the incident ............................ 14

              2.      The evidence flatly refutes plaintiffs' "flukes-up" theory ................... 16

              3.      The ATHOS I's own condition demonstrated that its draft exceeded 37 feet when it struck the anchor ......................... 18

              4.      The Court must consider all the characteristics of the vessel and the circumstances of its navigation in determining its draft ....... 22

      C.      The vessel's negligent navigation and unseaworthiness nullify the safe-port warranty ............................ 25

              1.      It was possible for the ATHOS I to avoid the danger through safe navigation and seamanship in view of the stage of the tide ............................ 25

              2.      Plaintiffs own poor navigation and seamanship proximately caused the allision ............................ 31

a.      **Plaintiffs negligently failed to prepare a proper voyage plan** ...................................................................... 33

b.      **Plaintiffs negligently failed to accurately calculate and predict the vessel's underkeel clearance** ........................... 36

c.      **Plaintiffs failed to consider anticipated controlling depths** ..... 38

d.      **Plaintiffs failed to properly consider tidal conditions and wait for a safety margin at higher water** ........................... 40

e.      **Plaintiffs failed to consider the vessel's squat** ........................... 44

f.      **Plaintiffs failed to consider Tsakos's own minimum underkeel requirements** .................................................................. 46

g.      **Plaintiffs negligently failed to conduct a proper master-pilot exchange** .................................................................. 47

      (i)      **No master-pilot exchange with the River Pilot** ............. 48

      (ii)      **No master-pilot exchange with Docking Pilot** .............. 50

h.      **The allision was a direct, proximate, and inevitable consequence of plaintiffs' poor navigation, bad seamanship, and flagrant regulatory violations** ....................... 58

3.      **Plaintiffs breached their non-delegable duty to maintain a seaworthy vessel in good repair and with a competent crew** .............. 58

a.      **Plaintiffs failed to maintain the ballast systems of the ATHOS I in good repair, which rendered the vessel unseaworthy** ..................................................................... 60

b.      **Plaintiffs failed to maintain proper ballasting records and violated their own safety requirements** ..................................... 63

c.      **Plaintiffs failed to maintain a proper safety management system in violation of SOLAS, ISM and U.S. regulations** ....... 65

d.      **Plaintiffs failed to man the ATHOS I with a well-trained and competent crew and monitor their performance, which rendered the vessel unseaworthy** ............................................... 67

**4.** **The hidden nature of the hazard does not excuse negligent navigation and bad seamanship** ............................... 69

**5.** **The ATHOS I's officers and pilots alone were responsible for its safe navigation** ............................... 71

**a.** **Plaintiffs alone decided when to enter the port and approach the berth and chose the wrong time** ........................ 71

**D.** **As third-party beneficiaries, plaintiffs themselves owe warranties to CARCO under the Voyage Charter to furnish a seaworthy vessel, to comply with applicable U.S. Coast Guard regulations, and to limit the vessel's draft** ........................ 72

**E.** **CARCO is not liable in warranty for the sole or superseding fault of others** ............................... 74

**F.** **The Pennsylvania Rule shifts the burden to plaintiffs to prove by clear and convincing evidence that their violations of applicable navigational and operating regulations could not have caused the allision** ............................... 76

**G.** **Tsakos destroyed, lost, or altered critical vessel records, giving rise to adverse evidentiary inferences against plaintiffs** ........................ 82

**H.** **The comparative fault of the vessel can reduce its recovery under the alleged warranty or in negligence** ........................ 82

**I.** **The gross fault of the unknown Government dredging contractor, who abandoned the anchor, proximately caused the allision** ............................... 86

**II.** **CARCO's Equitable Defenses to Liability Defeat the Government's Subrogation Claim** ............................... 89

**A.** **The doctrine of recoupment in equity** ............................... 90

**B.** **The Government assumed responsibility and control for maintaining the Anchorage** ............................... 94

**C.** **Terminal operators such as CARCO have not undertaken maintenance of Federal anchorages** ............................... 97

**D.** **Equitable estoppel bars the Government's claim against**

CARCO for hazards in the Government's anchorage ................................... 100

E.    The Government would be unjustly enriched by recovery
of cleanup expenses caused by a hazard in the Government's
anchorage ...................................................................................... 102

1.    The Oil Spill Liability Trust Fund and the National
Pollution Funds Center ........................................................ 102

2.    Liability of third parties under OPA ................................... 104

3.    Rather than admit the involvement of the Government and its
dredging contractors, the Government collaborated with
Frescati/Tsakos to blame CARCO for the oil spill ............. 105

F.    Responsibility for a loss equitably falls on the party
who was best situated to have avoided the loss .............................. 107

III.    Frescati and Tsakos Have No Valid Wharfinger Negligence Claim ....................... 109

A.    CARCO's tort duty as a wharfinger is one of reasonable care ................... 109

1.    At the time of the ATHOS incident in 2004, no jurisprudence
imposed an existing duty on CARCO to survey Federal
Anchorage No. 9 ................................................................... 111

2.    CARCO reasonably relied on the Government's exclusive
dominion, responsibility, and control over Federal
Anchorage No. 9 ................................................................... 113

3.    No statute or regulation required CARCO to look for
obstructions in federal waters ............................................. 114

4.    No custom put CARCO on notice to survey the Anchorage ............ 115

5.    A prudent wharfinger should not bear the unreasonable <u>burden</u>
to locate and remove an obstruction that nobody knew existed ....... 118

B.    CARCO did not proximately cause the oil spill ........................................... 121

1.    CARCO had no reason to know of the anchor or to assume
that the oil spill was probable ............................................. 123

2.    CARCO could not have reasonably anticipated that a
single hulled tanker would navigate so recklessly at low tide .......... 126

**3.**      **The negligence and fault of the plaintiffs and those in charge of the vessel's navigation were the sole proximate cause of the incident** ............................................................................ 129

CONCLUSION ...................................................................................................... 129

CERTIFICATE OF SERVICE ................................................................................ 131

2418144-1

# TABLE OF AUTHORITIES

**Cases**

*Abruska v. Northland Vessel Leasing Co., LLC*, 258 F. App'x 158 (9th Cir. 2007) .................... 80

*Acciai Speciali Terni USA, Inc. v. M/V Berane,* 181 F. Supp. 2d 458 (D. Md. 2002)................. 73

*Aktienselskabet Eriksen & Andersen's Rederi v. Foy, Morgan & Co.,*
25 Ll.L.Rep. 442 (1946) ........................................................................................ 26

*Allen v. Chance Mfg. Co.*, 873 F.2d 465 (1st Cir. 1989) ........................................................ 75

*Allied Chemical Corp. v. Hess Tankship Co. of Delaware*,
661 F.2d 1044 (5th Cir. Unit A 1981) ........................................................................ 84

*Archawski v. Hanioti*, 350 U.S. 532 (1956)........................................................ 91, 102

*Atlantic Banana Company v. M/V Calanca*, 342 F. Supp. 447,
972 A.M.C. 880, 886 (S.D.N.Y. 1972), *aff'd,* 489 F.2d 752 (2d Cir. 1974) ............................... 59

*Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489,
1994 A.M.C. 1555 (5th Cir. 1994)................................................................ 54

*Bangor & Aroostook R.R. Co. v. The Ship Fernview*,
455 F. Supp. 1043, 1978 A.M.C. 2439 (D. Me. 1978) ............................................... 110

*Bd. of Comm'rs of the Port of New Orleans v. M/V Space King,*
No. 75-1661, 1978 A.M.C. 856 (E.D. La. 1978)........................................................ 85

*Belden v. Chase*, 150 U.S. 674, 14 S. Ct. 264, 37 L. Ed. 1218 (1893) ........................................ 77

*Boyer v. The Merry Queen,* 202 F.2d 575, 1953 A.M.C. 482 (3d Cir. 1953)............................. 78

*Bull v. United States*, 295 U.S. 247, 55 S. Ct. 695, 79 L. Ed. 1421 (1935) ................................ 92

*California ex rel. Dep't of Transp. v. S/T Norfolk,* 435 F. Supp. 1039,
1978 A.M.C. 144 (N.D. Cal. 1977) ................................................................ 10, 110

*California ex rel. Dep't. of Transp. v. S/T Norfolk*, 435 F. Supp. 1039 (N.D. Cal. 1977)........... 54

*Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 2001 A.M.C. 1815 (5th Cir. 2000)...... 109

*Carlton S.S. Co. Ltd. v. Castle Mail Packets Co., Ltd.*, [1898] A.C. 486 (Macnaghten, J.)......... 10

*Charente S.S. Co. v. United States*, 12 F.2d 412, 1926 A.M.C. 1115 (5th Cir. 1926)................. 32

*Citgo Asphalt Refining Co. v. Frescati Shipping Co., Ltd.,*
2014 WL 216155 (Jan. 17, 2014) ........................................................................................ 32

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190 (3d Cir. 1983),
*overruled on other grounds by Lauro Lines v. Chasser,* 490 U.S. 495 (1989)............................ 73

*Commonwealth of Puerto Rico v. S.S. ZOE COLOCOTRONI,*
456 F. Supp. 1327, 1979 A.M.C. 21 (D.P.R. 1978), *aff'd on liability,*
*rev'd on other grounds,* 628 F.2d 652 (1st Cir. 1980) ................................................ 77

*Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.,*
303 F.2d 692 (5th Cir. 1962) ......................................................................................... 92

*Complaint of Nautilus Motor Tanker Co., Ltd.,* 862 F. Supp. 1260
(D.N.J. 1994), *aff'd,* 85 F.3d 105 (3d Cir. 1996) ........................................................ 53

*Consol. Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65,
1988 A.M.C. 2352 (5th Cir. 1987), *cert. denied,* 486 U.S. 1055 (1988)................................... 123

*Constantine & Pickering S.S. Co. v. West India S.S. Co.*, 199 F. 964 (S.D.N.Y. 1912) ............. 83

*Cont'l Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426 (1st Cir. 1992)..... 76, 77

*Cook Inlet Pipe Line Co. v. American Trading and Production Corp.,*
1977 A.M.C. 160 (S.D.N.Y. 1976) ................................................................................... 57

*Cornish v. Renaissance Hotel Operating Co.*, No. 06-1722,
2007 WL 4614776, at *8 (M.D. Fla. Dec. 31, 2007)...................................................... 6

*Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3d Cir. 1994) ................................. 100

*Dalehite v. United States*, 346 U.S. 15 (1953).......................................................................... 123

*Delta Transload, Inc. v. M/V NAVIOS COMMANDER*, 818 F.2d 445,
1988 A.M.C. 1155 (5th Cir. 1987)...................................................................................... 53

*Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 2325 (5th Cir. 1983) ......................................... 80

*E.I. Dupont de Nemours and Co. v. Rhone Poulenc Fiber and*
*Resin Intermediates, S.A.S.,* 269 F.3d 187 (3d Cir. 2001) ......................................... 73

*Evans v. Nantucket City. Sailing, Inc.*, 582 F. Supp. 2d 121,
2009 A.M.C. 360 (D. Mass. 2008) ................................................................................... 109

vii

*Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207,
1993 A.M.C. 2705 (3d Cir. 1993) ................................................................. 53, 54, 75

*Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*, 477 F. Supp. 2d 681 (D.S.C. 2007).............. 88

*Exchange Fire Insurance Co. v. Delaware & Hudson Canal Company*,
10 Bosw. 180 (N.Y. Super. Ct. 1863) ................................................................. 98, 125

*Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 116 S. Ct. 1813,
135 L. Ed. 2d 113, 1996 A.M.C. 1817 (1996) ................................................... 75, 122

*Frederick v. United States,* 386 F.2d 481 (5th Cir. 1967) ........................................... 91

*Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538 (D. Del. 2003) ..................................... 122

*Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207 (4th Cir. 1999) ..................................... 88, 104

*Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1979 A.M.C. 2534 (4th Cir. 1979) ...... 116

*Guinan v. Boston, Cape Cod & New York Canal Co.*, 1 F.2d 239 (2d Cir. 1924) .............. 98, 125

*Guinan v. Boston, Cape Cod & New York Canal Co.,* 1 F.2d 239,
1924 A.M.C. 1161 (2d Cir. 1924) ................................................................. 124, 125

*H. Schuldt v. Standard Fruit & S.S. Co.*, 1979 A.M.C. 2470 (S.D.N.Y. 1978)..................... 25, 31

*Hams v. Luckenbach Terminals, Inc.*, 38 F. Supp. 485,
1941 A.M.C. 1412, 1415-16 (D.N.J. 1941) ................................................................. 123

*Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*,
768 F.2d 1558 (11th Cir. 1985) ................................................................. 32, 58, 59

*Hiernaux v. M/V QUEEN CITY*, 244 F. Supp. 511 (W.D. Pa. 1965) ........................................... 77

*Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*,
182 U.S. 406, 21 S. Ct. 831, 45 L. Ed. 1155 (1901) ................................................................. 53

*Horn v. Cia de Navegacion Fruco,* 404 F.2d 422 (5th Cir. 1968)................................................ 74

*Horsley v. Price,* [1883] 11 Q.B.D. 244 ................................................................. 11

*In re Arb. Between Atlantic Bulker Shipping Corp. and Babun
Bulk Shipping Corp.*, 2006 WL 6171996, at *9-10,
S.M.A. Award No. 3938 (Sept. 8, 2006) ................................................................. 6

*In re Arb. Between Jebsen Carriers, Ltd. and Gravetal Bolivia, S.A,*
1999 WL 34976590, S.M.A. No. 3525 (April 28, 1999)
(Cina, Mordhorst & Jacobson, Arbs.) .................................................... 10

*In re Arb. Between Delphina Tanker Corp. and Axel Johnson Energy*
*Corp. (M/T Delphina),* 1999 WL 34976573, S.M.A. Award No. 3508
(Feb. 5, 1999) (Nelson, Elias & Mordhorst, Arbs.) ........................................ 29, 56, 70

*In re Arb. Between Fondren Corporation and Lagoven, S.A.,* 2001 WL 35459259,
S.M.A. Award No. 3711 (Nov. 28, 2001) (Brown, Berg & Scheinbaum, Arbs.)........................ 29

*In re Arb. Between Hansen Neuerburg Export-Import GMBH*
*(M/V Regal Sword) and I.S. Joseph Shipping Co., Ltd.,* 1982 WL 917235,
S.M.A. No. 1682 (May 28, 1982) (Berg, Simms & James, Arbs.)................................ 25

*In re Arb. Between Navegacion Andina, S.A. and Molinera E. Industrial*
*de Azapa, S.A.,* 1986 WL 1179605, S.M.A. Award No. 2303
(Sept. 12, 1986) (Coutsodontis, Georges & Boulalas, Arbs.)...................................... 74

*In re Arb. Between Pac. Logistics (M/T Halekulani) and Mobil*
*Tankers Ltd.,* 1981 WL 640686, S.M.A. No. 1633 (Dec. 17, 1981)
(Kalaidjian, Brown & Bauer, Arbs.) .................................................... 57

*In re Arb. Between Petroleum Transport, Inc. and Texaco Panama, Inc.,*
1974 WL 335622, S.M.A. No. 896 (Oct. 31, 1974) .................................... 57

*In re Arb. Between PHS Van Ommeren NV and Jno. McCall*
*Coal Export Corp.,* 1989 WL 1646306, S.M.A. No. 2571 (May 26, 1989)
(Berg, Nelson & Mordhorst, Arbs.) .................................................... 56

*In re Arb. Between Slebent Shipping Co., Ltd. and Associated Transport*
*Line, LLC,* 2003 WL 25794986 (Nov. 19, 2003) (Arnold, Fox & Ring Jr., Arbs.)...................... 76

*In re Arb. Between Sunrise Shipping Company S.A. (S.T. Michael C. Lemos*
*and Amerada Hess Shipping Corp.,* 1983 WL 825073, S.M.A. Award No. 1906
(Nov. 7, 1983) (Zubrod, Berg & Nelson, Arbs.).......................................... 56

*In re Arb. Between Trade Sol Shipping Ltd. and Sea-Land Industries*
*Bermuda Ltd.,* 2001 WL 36175165, at *9, S.M.A. Award No. 3677
(March 15, 2001) (Arnold, Berg & Szostak, Arbs.) ........................................ 7, 69

*In re Arb. Between Transportes del Este Navegaceon, S.A.,*
1990 A.M.C. 1058, 1066 (Feb. 13, 1990) (Berg, Healy & Loesberg, Arb.)................................ 54

*In re Arb. Regarding the M/T Anett II Between K/S Anett Kristin and Petrojam Ltd.,* 1998 WL 35281267 at *8-9, S.M.A. Award No. 3433 (March 13, 1998) (Engelbrecht, Berg & Vismans, Arbs.)............................................................. 30

*In re City of Philadelphia Litig.,* 158 F.3d 711 (3d Cir. 1998)..................................................... 71

*In re Complaint of BFT No. Two Corp.*, 433 F. Supp. 854 (E.D. Pa. 1977) ................................ 84

*In re Complaint of Lenzi*, No. 89-4571, 1991 WL 42463, 1991 A.M.C. 1531 (E.D. Pa. Mar. 22, 1991), *aff'd*, 958 F.2d 363 (3d Cir. 1992) (Table).......................................... 32

*In re Complaint of Nautilus Motor Tanker Co. Ltd.*, 862 F. Supp. 1260 (D.N.J. 1994)....... 78, 109

*In re Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 574 F. Supp. 418, 1984 A.M.C. 985 (S.D.N.Y. 1983) ................................................................. 60

*In re Complaint of Waterstand Marine, Ltd.*, No. 87-1516, 1988 WL 78776, 1991 A.M.C. 1784 (E.D. Pa. 1988) ................................................................. 59

*In re Complaint of Waterstand Marine, Ltd.,* No. 87-1516, 1988 WL 78776, 1991 A.M.C. 1784 (E.D. Pa. July 26, 1988)................................................ 58, 59

*In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 2012 A.M.C. 2048 (5th Cir. 2010)....................................................................................................... 1

*In re J.A.R. Barge Lines, L.P.*, No. 03-163, 03-180, 04-753, 04-1611, 2007 WL 6743486 (W.D. Pa. Feb. 28, 2007)................................................................. 76

*In re J.E. Brenneman Co.,* 322 F.2d 846, 1964 A.M.C. 2037 (3d Cir. 1963) ........................... 115

*In re Lloyd's Leasing, Ltd.*, 764 F. Supp. 1114 (S.D. Tex. 1990)..................... 10, 23, 30, 123, 124

*In re Marbulk Shipping, Inc. (M/V Bahama Spirit),* 2004 WL 5658898, S.M.A. Award No. 3849 (June 4, 2004) (Berg, Wiswell & Martowski, Arbs.) ....................... 6, 29

*In re Marbulk Shipping, Inc. (M/V Bahama Spirit),* 2004 WL 5658898, S.M.A. Award No. 3849 (June 4, 2004) (Berg, Wiswell & Martowski, Arbs.) ......................... 56

*In re McDonald,* 205 F.3d 606 (3d Cir. 2000), *cert. denied,* 531 U.S. 822 (2000) ............... 71, 78

*In re Nautilus Motor Tanker Co., Ltd.*, 85 F.3d 105, 1996 A.M.C. 2308 (3d Cir. 1996)........................................................................... 76, 77, 78, 110

*In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 1989 A.M.C. 2447 (5th Cir. 1989) .............. 10, 111

*In re Petition of Frescati Shipping Co., Ltd.,* 718 F.3d 184  (3d Cir. 2012),
*cert. denied,* 134 S. Ct. 1279 (2014) ................................................................ *passim*

*In re Quality Marine Servs., Inc.*, 2005 WL 1155854,
2005 A.M.C. 1438 (E.D. La. May 9, 2005) ............................................... 77

*In re Transportes del Este Navegaceon, S.A. (M/V Cepheus),*
1990 A.M.C. 1058, 1063-66 (Feb. 13, 1990) (Berg, Healy & Loesberg, Arbs.) ........................ 30

*In re Waterstand Marine, Ltd.*, No. 87-15161988 WL 78776,
1991 A.M.C. 1784 (E.D. Pa. 1988) .......................................................... 78

*Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*,
376 U.S. 31584 S. Ct. 748, 11 L. Ed. 2d 732, 1964 A.M.C. 1075 (1964) ................. 108

*Japan Line, Ltd. v. United States*, 1976 A.M.C. 355 (E.D. Pa. 1975), *aff'd,*
1977 A.M.C. 265 (3d Cir. 1976) ................................................. 94, 111, 113

*Johnson v. Goldstein,* 864 F. Supp. 490 (E.D. Pa. 1994), *aff'd,*
 66 F.3d 311 (3d Cir. 1995) .................................................................. 81

*Jones v. Texaco Panama, Inc.*, 428 F. Supp. 1333 (E.D. La. 1977) ............................ 84

*Kure Shipping S.A. v. La. Pac. Corp.*, No. 99-16835, 2000 WL 1154971
(9th Cir. Aug. 15, 2000) ................................................................... 104

*Leeds Shipping v. Societe Francaise Bunge (The Eastern City), [1958]
2 Lloyd's Rep. 127* ................................................................. 26, 27, 31

*Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186 (3d Cir. 1988),
*cert. denied*, 493 U.S. 937 (1989) ......................................................... 91

*Lowe v. Gen. Motors Corp.*, 624 F.2d 1373 (5th Cir. 1980) ................................... 80

*Luckenbach S.S. Co. v. The THEKLA*, 266 U.S. 328, 95 S. Ct. 112, 69 L. Ed. 313 (1924) ........ 90

*LWT, Inc. v. Childers*, 19 F.3d 539 (10th Cir. 1994) ........................................ 81

*Manchester Equip. Co. v. Am. Way Moving & Storage Co., Inc.*,
176 F. Supp. 2d 239 (D. Del. 2001), *aff'd,* 47 F. App'x 189 (3d Cir. 2002) .............. 108

*Maritrans, Inc. v. United States*, 342 F.3d 1344, 2003 A.M.C. 2274 (Fed. Cir. 2003) ........ 78

*Martin Marine Transp. Co., Inc. v. Jakobson & Peterson Inc.,*
135 F.2d 325, 1943 A.M.C. 498 (2d Cir. 1943) ............................................ 116

*McCaldin v. Parke*, 37 N.E. 622, 142 N.Y. 564 (N.Y. 1894)................................................. 70, 124

*Mobil Shipping & Transp. Co v. Wonsild Liquid Carriers, Ltd.,*
190 F.3d 64, 1999 A.M.C. 2705 (2d Cir. 1999) ...................................................... 59, 60

*MP Leasing Corp. v. Colonna's Shipyard*, No. 07-273,
2009 WL 2581575 (E.D. Va. May 8, 2009) ................................................................. 6

*N. Am. Dredging Co. v. Pac. Mail S.S. Co.*, 185 F. 698 (9th Cir. 1911) ..................................... 88

*Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004)................... 13

*Ocean S.S. Co. v. United States,* 38 F.2d 782 (2d Cir. 1930) (Hand, J.) ..................................... 70

*Osprey Ship Mgmt. Inc. v. Foster*, No. 08-61125, 387 F. App'x 425 (5th Cir. 2010)................. 53

*Osprey Ship Mgmt., Inc. v. Foster*, No. 1:05cv390, 2008 WL 4371376
(S.D. Miss. Sept. 18, 2008), *aff'd*, 387 F. App'x 425 (5th Cir. 2010) ................................... 36, 54

*Otal Investments Ltd. v. M.V. Clary*, 494 F.3d 40 (2d Cir. 2007)................................................ 84

*Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169,
1963 A.M.C. 158 (2d Cir. 1962)................................................................................... 83

*Parker v. Winlow,* [1857] 7 E. & B. 942, 119 E.R. 1497 (Coleridge, J.) ..................................... 10

*Pearce v. United States,* 261 F.3d 643 (6th Cir. 2001).............................................................. 111

*Pelican Marine Carriers, Inc. v. City of Tampa*, 1991 WL 325793,
1992 A.M.C. 575 (M.D. Fla. July 30, 1991)................................................................. 88

*Probo II London v. Isla Santay MV*, 92 F.3d 361, 1997 A.M.C. 657 (5th Cir. 1996)................. 53

*Protectus Alpha Navigation Co., Ltd. v. North Pacific Grain Growers, Inc.,* 7
67 F.2d 1379 (9th Cir. 1985) ....................................................................................... 83

*Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 9854 (4th Cir. 1990),
*cert. denied,* 498 U.S. 982 (1990)................................................................................ 102

*Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450 (Del. 1982)....................... 108

*Republic of France v. United States*, 290 F.2d 395, 1961 A.M.C. 1082
(5th Cir. 1961), *partially overruled on other grounds by*
*Rayonier, Inc. v. United States,* 352 U.S. 315 (1957)................................................... 123

*Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296 (1946 ..................................................... 91

*Sikora v. AFD Industries, Inc.*, 18 F. Supp. 2d 841 (N.D. Ill. 1998) ............................................. 92

*Smith v. Burnett,* 173 U.S. 430 (1899) ........................................................................... 109, 112

*Smith v. Condry*, 42 U.S. 28, 11 L. Ed. 35 (1843) ................................................................... 54

*Stevens v. F/V Bonnie Doon*, 655 F.2d 206 (9th Cir. 1981) ....................................................... 84

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684 (1950) ............ 91

*The Calliope* [1891] A.C. 11 (H.L.) 23 .......................................................................... 110, 113

*The China,* 74 U.S. 53, 19 L. Ed. 67, 7 Wall. 53, 2002 A.M.C. 1504 (1868) ............................ 53

*The Moorcock* (1889), L.R. 14 P.D. 64 ........................................................................... 112, 113

*The Oregon,* 158 U.S. 186, 15 S. Ct. 804, 39 L. Ed. 943 (1895) ................................................ 53

*The Pennsylvania,* 86 U.S. 125, 22 L. Ed. 148, 19 Wall. 125 (1873) ................... 5, 76, 77, 78, 80

*Tracy Towing Line, Inc. v. Jersey City*, 105 F. Supp. 910,
1952 A.M.C. 2017 (D.N.J. 1952 ...................................................................................... 123

*Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.,* 571 F.2d 229 (5th Cir. 1975) ................. 110

*Trans-Bay Eng'rs & Builders, Inc., v. Hills,* 551 F.2d 370 (D.C. Cir. 1976) .............................. 73

*U.S. Fidelity & Guar. Co. v. Plovidba,* 683 F.2d 1022, 1983 A.M.C. 2473 (7th Cir. 1982) ...... 116

*United Philippine Lines, Inc. v. USS DANIEL BOONE,*
475 F.2d 478, 1973 A.M.C. 1156 (4th Cir. 1973 ........................................................... 90

*United States v. Am. Color & Chem. Corp.*, 858 F. Supp. 445 (M.D. Pa. 1994) ........................ 91

*United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S. Ct. 1708,
44 L. Ed. 2d 251, 1975 A.M.C. 541 (1975) ............................................................... 83, 84

*United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006),
*aff'd,* 517 F.3d 449 (7th Cir. 2008) ................................................................................ 102

*United States v. Shaw,* 309 U.S. 495, 60 S. Ct. 659, 84 L. Ed. 888(1940) ................................. 90

*United States v. United States Fidelity and Guaranty Co.,*
309 U.S. 506, 60 S. Ct. 653, 84 L. Ed.
894 (1940) ......................................................................................................................... 90

2418144-1

*Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir. 1985) ............................... 122

*Van Buskirk v. W. Bend Co.*, No. CIV. A. 96-6945, 1997 WL 34688
 (E.D. Pa. Jan. 29, 1997) .......................................................................................................... 81

*Vaughan v. Atkinson*, 369 U.S. 527 (1962) ............................................................................... 91

*W. Bulk Carriers, K.S. v. United States,* No. 97-2423, 1999 WL 1427719,
1999 A.M.C. (E.D. Cal. 1999) ........................................................................................ 108, 111

*W. Tankers Corp. v. United States,* 387 F. Supp. 487, 1975 A.M.C. 775 (S.D.N.Y. 1975) ....... 108

*W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306 (3d Cir. 2003) ..................................................... 81

*Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 1969 A.M.C. 1682 (9th Cir. 1969)............ 77

*Weeks Marine, Inc. v. Hanjin Shipping*, No. 04-1703, 2005 WL 1638148,
2005 A.M.C. 1917 (D.N.J. July 12, 2005) ................................................................................ 75

## Regulations

33 C.F.R. § 72.01-1 ..................................................................................................................... 96

33 C.F.R. § 96.220-250 .......................................................................................................... 65, 67

33 C.F.R. § 147.455(b) ................................................................................................................ 38

33 C.F.R. § 151.2041 ................................................................................................................... 60

33 C.F.R. § 157.450 ..................................................................................................................... 49

33 C.F.R. § 157.455 ............................................................................................................... 40, 115

33 C.F.R. § 157.455(a).............................................................................................................. 24, 39

33 C.F.R. § 157.455 (b) ................................................................................................ 24, 44, 67, 79

33 C.F.R. § 160.215 ..................................................................................................................... 60

33 C.F.R. § 164.11 ......................................................................................................... 24, 48, 49, 52

33 C.F.R. § 2045 .......................................................................................................................... 60

33 C.F.R. Part 150........................................................................................................................ 72

2418144-1

33 C.F.R. Part 151.............................................................................................72

33 C.F.R. Part 154.............................................................................................72

33 C.F.R. Part 156.............................................................................................72

33 C.F.R. Part 157.............................................................................................72

33 C.F.R. Part 164.............................................................................................72

61 Fed. Reg. at 39,779 (July 30, 1996)..............................................................79

61 Fed. Reg. at 39,781; 39,783 (July 30, 1996)................................................79

**Statutes**

3 C.F.R. § 164.11..............................................................................................45

33 U.S.C. § 1, *et seq.*......................................................................................94

33 U.S.C. § 2701, *et seq.* (Oil Pollution Act ("OPA")) ...................... *passim*

33 U.S.C. § 2702.............................................................................................102

33 U.S.C. § 2702(d)........................................................................................104

33 U.S.C. § 2703.......................................................................................2, 107

33 U.S.C. § 2704................................................................................................2

33 U.S.C. § 2708(a)(1)....................................................................................104

33 U.S.C. §2712(a)(3) and (4)........................................................................104

33 U.S.C. §2713(b)(1)(B)...............................................................................104

46 U.S.C. § 181, *et seq.* (Shipowner's Limitation of Liability Act).................1

Rivers and Harbors Act of 1910......................................................................94

**Rules**

Fed. R. Evid. 801(d)(2) ...................................................................3, 81, 82, 106

## Treatises

Julian Cooke, *et al.*, *Voyage Charters*, ¶ 5.61 (3d ed. 2007) ....................................................... 54

Julian Cooke, et al., Voyage Charters, ¶ 5.92 ................................................................................. 54

Julian Cooke *et al.*, *Voyage Charters,* ¶ 5.81 (3d ed. 2007) ....................................................... 26

Julian Cooke, et al., *Voyage Charters,* ¶ 5.137 (3d ed. 2007) ..................................................... 31

Terence Coghlin *et al., Time Charters*, ¶ 10.6 (6th ed. 2008) ..................................................... 26

Sir Bernard Eder, *et al., Scrutton on Charter-Parties*, Section IX, art. 85, p. 160 (22nd ed. 2011) ................................................................................................... 11

1 Schoenbaum, *Admiralty and Maritime Law,* §§ 5-2 .................................................................. 111

## Other Authorities

*Guide to Port Entry 2003 / 2004 Edition (Volume 1)* ........................................................... 43, 44

International Maritime Organization ("IMO") ...................................................................... 35, 77

IMO Resolution A.741(18) ............................................................................................................ 65

IMO Resolution A.893 (21) ................................................................................................... 67, 115

International Safety Management Code ("ISM") ............................................ 60, 65, 66, 67, 115

*Restatement (Second) of Contracts* § 309 cmt. b (1981) ............................................................ 73

*Restatement (Second) of Contracts* § 309 cmt. c ....................................................................... 73

*Restatement of Torts* (*Apportionment of Liability*) § 8 (2000) ................................................. 84

*Restatement of Torts (Apportionment of Liability),* § 8, cmt. c ................................................. 85

SOLAS (International Convention for Safety of Life at Sea) ....................................... 35, 77, 115

SOLAS Chapter 3 ........................................................................................................................ 115

SOLAS Chapter 34 ....................................................................................................................... 67

SOLAS, Regulation XIX/3.1 ....................................................................... 65

STCW (Standards of Training Certification and Watchkeeping for Seafarers) ................... 35, 115

STCW Convention, Reg. A-VIII/2, Part 3-1, Para 49 ......................................... 49, 53

UK *East Coast Pilot*.................................................................................... 38

U.S. Coast Guard Report to Congress, Nov. 20, 2013................................................ 89

*U.S. Coast Pilot*............................................................................... 38, 39, 95, 128

Unif. Comparative Fault Act, § 2(b) ............................................................. 85

2418144-1

MAY IT PLEASE THE COURT:

Defendants—CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (collectively "CARCO")—will show that there is no basis under the applicable law or the facts for holding CARCO responsible for the ATHOS I incident.[1] Plaintiffs—Frescati Shipping Company, Ltd., Tsakos Shipping & Trading, S.A., and their subrogee, the United States of America—cannot prove the essential elements of any of their alleged causes of action against CARCO. Furthermore, CARCO has valid legal and equitable defenses that defeat any claims asserted.

## BACKGROUND

On November 26, 2004, the ATHOS I, a 21-year-old single-hull tanker of the type that Congress has since banned from entering U.S. waters, struck an uncharted, abandoned anchor lying on the bottom of the Delaware River. The vessel was negligently navigating at nearly dead low tide within Federal Anchorage No. 9. The unknown anchor, which was lying in a natural position with its flukes down, pierced the vessel's hull, resulting in the release of a portion of the ship's cargo of crude oil.

In January 2005, Frescati (the titled owner of the ATHOS I) and Tsakos (the vessel's manager) filed Civil Action No. 05-305, seeking exoneration or limitation of liability under 46 U.S.C. § 181, *et seq.*, the Shipowner's Limitation of Liability Act. In response, the Government filed its own claim (Doc. 20), alleging that Frescati and Tsakos's negligence, gross negligence, and violations of applicable federal safety and operating regulations had caused the "grounding" of the ATHOS I and the resultant oil spill. *Id.* at ¶ 15. The Government repeatedly alleged that Frescati, Tsakos, and the ATHOS I *in rem* were grossly negligent and negligent *per se* for their

---

[1] References to prior testimony of witnesses who will be recalled is based on their testimony being indicative of that on recall.

statutory and regulatory violations and had failed to operate the vessel in a safe, prudent, and seaworthy manner and condition. *Id.* at ¶¶ 28-33, 37, and 48-49. Neither Frescati, Tsakos, nor the Government asserted that CARCO bore any responsibility for the incident.

As the statutorily responsible parties under 33 U.S.C. § 2701, *et seq.*, the Oil Pollution Act ("OPA"), Frescati and Tsakos paid approximately $124 Million in clean-up costs. In an administrative proceeding before the National Pollution Funds Center ("NPFC"), they then sought to limit their liability under 33 U.S.C. § 2704 of OPA and asked for reimbursement from the Oil Spill Liability Trust Fund ("the OSLTF" or "the Fund").

Tsakos and Frescati withheld key documents and information from the U.S. Coast Guard and the NPFC, including evidence of the vessel's unseaworthiness, malfunctioning ballast system, erroneous underkeel clearance calculations, grossly negligent navigation, fabricated post-accident voyage plan, and violation of multiple U.S. Coast Guard safety and operating regulations that proximately caused the incident. Had Frescati and Tsakos provided all of the relevant documents and truthfully revealed the facts concerning the navigation and operation of the ATHOS I, under 33 U.S.C. § 2704(c) their gross negligence and statutory and regulatory violations would have precluded them from limiting their liability under OPA and being reimbursed for clean-up costs. Unaware of the truth and failing to conduct a proper inquiry, the NPFC limited their liability to approximately $45 Million based on the gross tonnage of the ATHOS I and authorized the Fund to reimburse Frescati and Tsakos approximately $88 Million for costs in excess of that amount.

Throughout the NPFC limitation proceedings, Frescati, Tsakos, and the Government never contended that CARCO was responsible or liable for the ATHOS I incident. In a subsequent NPFC claim seeking total exoneration of liability under 33 U.S.C. § 2703 of OPA,

Frescati and Tsakos asserted that the unknown, third-party anchor dropper was solely at fault in causing the oil spill. But they withdrew that claim and contradicting their own admission now allege in this litigation that CARCO is liable for the incident. However, they reserved (and still have) the right to re-institute that exoneration claim against the OSLTF.

The Government was confronted with embarrassing evidence that the unknown anchor dropper was a federal dredging contractor, who had used the anchor as a dredge weight and then abandoned it in Federal Anchorage No. 9 and that Frescati and Tsakos were not entitled to reimbursement under OPA because of their statutory and regulatory violations, their gross negligence, and the unseaworthiness of their vessel. Seeking a way out of that conundrum and flatly contradicting its own pleading in this lawsuit against Frescati and Tsakos, the Government dismissed that claim but without prejudice against refilling it. Having given and secured "without prejudice" withdrawals of their claims against each other, the Government, Frescati, and Tsakos joined together to make new and different factual assertions and legal claims, all against CARCO.

Plaintiffs' prior allegations before the NPFC and in this litigation are party admissions against their own interests under Fed. R. Evid. 801(d)(2), and their shifting positions, claim shopping, and duplicity underscore why they have no viable claim against CARCO. If the ATHOS I incident is found to have been caused solely by the unknown third party who abandoned the anchor, as previously alleged by Frescati and Tsakos, then *all* costs and damages arising from the oil spill will be borne by the OSLTF, which is separately funded through a dedicated tax on oil importers like CARCO (and not by general government revenues). Congress enacted OPA and intended the Fund to be available to pay costs and damages from a spill in these exact circumstances. Alternatively, all fault must be assigned to Frescati and

Tsakos, because they caused the oil spill by negligently navigating an unseaworthy and ultra-high-risk single-hull tanker in direct violation of mandatory regulations specifically designed to eliminate the risk of striking a submerged object.

Frescati, Tsakos, and the Government have no viable basis for recovery against CARCO in contract or in tort. Plaintiffs cannot prove that Paulsboro was an unsafe port or that CARCO breached the safe-port warranty.[2] CARCO met all the requirements of the safe-port obligation under the Tanker Voyage Charter Party according to the contract terms and the law. The scope of the safe port warranty extends only to seaworthy vessels that are properly operated according to national and international maritime regulations and principles of good seamanship. The ATHOS I was neither. It was indeed possible for the ATHOS I to have reached CARCO's berth safely if plaintiffs had maintained the vessel in a seaworthy condition and navigated it properly by calculating its underkeel clearance and timing its arrival in view of the tidal conditions. By waiting to dock until a higher stage of the tide, plaintiffs could have increased the safety margin beneath the vessel to avoid grounding or alliding with an uncharted object. The ATHOS I could, and should, have avoided the risk of striking the anchor just as hundreds of other similarly situated vessels did by exercising good navigation and seamanship. The ATHOS I's appalling navigational negligence and unseaworthiness proximately caused the oil spill and thereby nullified the safe-port obligation.

Indeed, plaintiffs violated multiple mandatory safety and operating regulations precisely designed to minimize a single-hull tanker's risk of hitting uncharted objects. In particular, the

---

[2] As it has repeatedly stated during the proceedings on remand, CARCO fully reserves its right to contest and seek further review of the Third Circuit's legal determinations that Frescati, Tsakos, and their vessel are third-party beneficiaries of the Voyage Charter, that the safe-port/safe-berth provisions of the Voyage Charter are a warranty of the safety of the port or berth, rather than a duty of due diligence, that the named-port exception is inapplicable, and that CARCO's tort duty as a wharfinger extends to routes to its terminal selected by a vessel's navigator in Federally maintained waters over which CARCO did not exercise dominion or control.

presumption of causation of *The Pennsylvania*, 86 U.S. 125, 22 L. Ed. 148, 19 Wall. 125 (1873), applies to this maritime incident.  Under the Pennsylvania Rule, Frescati and Tsakos have the burden to show that their statutory and regulatory violations in navigating the ATHOS I could not have caused the casualty.  They cannot meet that burden and therefore cannot prevail.

Moreover, CARCO's equitable defenses, including recoupment, bar the Government's subrogation claim against CARCO for the $88 Million it has reimbursed Frescati and Tsakos through the OSLTF.  CARCO relied to its detriment on the Government's own conduct and representations concerning Federal Anchorage No. 9, and the Government is equitably estopped from asserting that CARCO is liable for the oil spill.  The Government would also be unjustly enriched by recovering clean-up expenses from CARCO for a spill that an unknown third party (likely its own contractor) solely caused and that the Fund should rightly bear with oil import tax revenues reserved for that purpose, which CARCO had already paid under OPA to the tune of $103 Million at the time of the ATHOS I incident.  Under the basic principle of equity that imposes loss on a party who had the best opportunity for avoiding the casualty, no responsibility falls on CARCO.  Rather, it equitably rests on the Government, the unknown anchor dropper, Frescati, or Tsakos.

Frescati and Tsakos's negligence claim fares no better.  CARCO breached no duty of reasonable care under the circumstances, but rather did all that was expected of a prudent wharfinger under statute, custom, and general maritime law.  As a dock owner, CARCO was not the guarantor of the vessel's safety and could not have foreseen and discovered an unknown object that it had no reason to suspect even existed in public waters where hundreds of vessels had safely transited without any prior incident and where nothing put CARCO on notice of any problem.  The evidence further shows that submerged objects are often impossible to find, even

when their general location is known and immense efforts and resources are expended to search for them.  The Government admits that it is pointless to speculatively search for unknown and unsuspected objects in the River.  Through this litigation, Frescati and Tsakos cynically attempt to evade their own duties to navigate and maintain their vessel safely and try instead to impose an unreasonable standard of care on CARCO, seeking to cast it liable for an incident it did not proximately cause.

## LAW

### I.    Plaintiffs Have No Valid Claim Against CARCO In Contract

To recover for the alleged breach of a maritime contract, the plaintiff must prove (1) the terms of the contract, (2) breach of the contract, and (3) the reasonable value of the purported damages.  *MP Leasing Corp. v. Colonna's Shipyard*, No. 07-273, 2009 WL 2581575, at *3 (E.D. Va. May 8, 2009); *Cornish v. Renaissance Hotel Operating Co.*, No. 06-1722, 2007 WL 4614776, at *8 (M.D. Fla. Dec. 31, 2007).  Specifically, "[a] shipowner alleging a claim for an unsafe port bears the burden of proving that the port was unsafe and that the unsafe condition was the proximate cause of the damage."  *In re Marbulk Shipping, Inc. (M/V Bahama Spirit)*, 2004 WL 5658898, at *5, S.M.A. Award No. 3849 (June 4, 2004) (Berg, Wiswell & Martowski, Arbs.).[3]  In addition, the burden of proof rests with the vessel owner to show that the danger could not have been avoided by good navigation and seamanship.  *In re Arb. Between Atlantic Bulker Shipping Corp. and Babun Bulk Shipping Corp.*, 2006 WL 6171996, at *9-10, S.M.A. Award No. 3938 (Sept. 8, 2006); *In re Arb. Between Trade Sol Shipping Ltd. and Sea-Land Industries Bermuda Ltd.*, 2001 WL 36175165, at *9, S.M.A. Award No. 3677 (March 15, 2001)

---

[3] CARCO properly cites both arbitral decisions and jurisprudence as authority.  Arbitration decisions often address safe-port and safe-berth clauses of charter parties and are customarily cited in maritime cases.  In its appellate opinion, the Third Circuit itself relied on maritime law treatises, *Time Charters* and *Voyage Charters*, which cite both arbitral decisions and jurisprudence.

(Arnold, Berg & Szostak, Arbs.). Plaintiffs cannot carry these required burdens to prove any basis for liability against CARCO.

## A. The safe-port obligation is limited to a maximum of 37 feet.

The Third Circuit states that the safe-port/safe-berth warranty of the Voyage Charter Party "appears" to have required as much as 37 feet of water depth clearance above the anchor. *In re Petition of Frescati Shipping Co., Ltd.,* 718 F.3d 184, 204 and n.19 (3d Cir. 2012), *cert. denied,* 134 S. Ct. 1279 (2014). Remarking that this question is "ultimately a factual matter for remand," the Court of Appeals stated that "on remand it will need to be determined whether this amount of clearance [37 feet] was actually provided." *Id.* at 215. *See also In re* Frescati, at 204 n.21 ("We note there is record evidence suggesting that the promised 37 feet of clearance was indeed afforded. . . ."); *Id.* at 205. The evidence will show that CARCO did provide indeed at least 37 feet of clearance.

### 1. CARCO did not owe an added margin of clearance beyond 37 feet above the anchor.

Contrary to what plaintiffs would have this Court believe, the safe-port/safe-berth provisions of the Voyage Charter do not mean that CARCO was required to provide a "margin" of additional underkeel clearance beyond 37 feet or give the master an "express assurance" that the ATHOS I's draft was "safe" under all circumstances. The Third Circuit has framed the scope of the warranty as a "promised 37 feet of clearance" for a vessel "drawing 37 feet or less." *In re Frescati*, 718 F.3d at 209 n.21 and 215. Nothing in the Voyage Charter entitles them to a greater margin.

The Third Circuit's opinion dispels any notion that the safe-port/safe-berth obligation is absolute or that the mere fact of the allision imposes liability on CARCO. As the Court of Appeals expressly states, the mere occurrence of a casualty does not render a port dangerous or

unsafe or make CARCO liable.  *Id.* at 203 ("That the *Athos I* was injured by the anchor does not automatically indicate that the warranty was breached.  CARCO's safe berth warranty <u>was</u> <u>not a</u> <u>blank</u> <u>check</u>; it did not warrant that any ship would be safe at its port, but instead assured that the port would be safe for the *Athos I*" if navigated safely and in a seaworthy condition.) (emphasis added).

The limited safe-port clause is not a license for plaintiffs' reckless navigation.  The ATHOS I's navigators, not CARCO as charterer, were solely responsible for providing their own margin of safety by calculating their vessel's underkeel clearance, planning their voyage, and timing their transit at a stage of the tide that allowed them to avoid the risk of grounding or alliding with a submerged object.[4]  The vessel's master was responsible for calculation of underkeel clearance and the ship's navigation, and both the master and the pilot were responsible for knowing tidal conditions.[5]

The master and pilot of the ATHOS I made all decisions concerning the tides, underkeel clearance, berthing window, and timing for the safe transit up the River and through the Anchorage.[6]  They alone were responsible for complying with mandatory U.S. Coast Guard regulations, and the amount of available underkeel clearance as a safety margin for the ATHOS I was in their complete command and control.  Neither of them requested or depended on any information from CARCO to determine the safety of the ship's passage through the Anchorage.[7]  Pilot Bethel evaluated the state of the tide and did not have any contact with the terminal concerning his maneuvers in the Anchorage.

---

[4] [Ex. D-1235 at 33 C.F.R. §157.455 (a) and (b); TT Day 24 (Grenier) P. 84:3-20; 85:25-86:18; 91:15-92:14; 103:6-10; TT Day 24 (Haley) P. 147:2-19; 170:22-171:9; TT Day 27 (Daggett) P. 141:3-6; 141:15-142:7; TT Day 16 (Johnson) P. 207:1-208:6; TT Day 29 (Anderson) P. 116:21-117:6; 117:14-118:18].
[5] [TT Day 30 (Rankine) P. 60:20-61:1].
[6] [TT Day 13 (Brooking) P. 73:4-20; TT Day 24 (Haley) P. 193:13-16].
[7] [T[TT Day 8 (Bethel) P. 48:18-49:6; 50:25-51:6].T Day 13 (Brooking) P. 73:4-74:10].

CARCO did not set the docking window or determine when it was safe for the ATHOS I to dock. Nor did CARCO establish any policies for controlling depth or draft limitations in Federal waterways, including Federal Anchorage No. 9, or dictate the times when the ATHOS I or any other ship could arrive or depart from its berth.[8] The Docking Pilots Association issued suggested guidelines for berthing at terminals based on the tides, monitored them for effectiveness, and could amend them if deemed necessary.[9] According to the Association's suggested "berthing windows," vessels could dock at CARCO at various times during the tidal cycle, depending on their drafts.[10] These guidelines or berthing windows were only suggestions, and a ship's master or a docking pilot could always require a safer time for docking at a higher stage of the tide based on his own assessment and voyage planning.[11]

CARCO could neither modify the Association's directives nor tell a pilot when to sail.[12] The vessel's navigators alone decided when to proceed during the berthing window in consideration of the tides and the ship's underkeel clearance. Those choices belonged solely to Captain Markoutsis and the docking pilot aboard the ATHOS I, not CARCO.[13] The Association expected its member pilots to obtain all necessary updated depth information and soundings from the U.S. Army Corps of Engineers and the National Oceanic and Atmospheric Association ("NOAA").[14]

The safe-port clause does not permit plaintiffs to neglect their duties of good navigation and seamanship and shift them to CARCO. A charterer "who has no control over the vessel,

---

[8] [TT Day 30 (Rankine) P. 54:25-57:8; 61:7-62:19; 67:3-5; 68:2-4; Ex. D-766 (CITGO Marine Operations Guidelines)].

[9] [Quillen Dep. 57:16-58:23].

[10] [TT Day 30 (Rankine) P. 65:13-66:2].

[11] [TT Day 8 (Bethel) P. 77:21-78:12; TT Day 15 (Markoutsis) P. 21:6-10].

[12] [TT Day 30 (Rankine) P. 66:10-11].

[13] [TT Day 8 (Bethel) P. 78:8-12; TT Day 14 amended (Markoutsis) P. 14:7-19; TT Day 30 (Ranking) P. 61:7-62:19; 66:12-18; TT Day 30 (Furlotte) P. 136:25-137:7].

[14] [Quillen Dep. 70:9-18; 72:5-73:10].

2418144-1

assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." *In re Lloyd's Leasing, Ltd.*, 764 F. Supp. 1114, 1136 (S.D. Tex. 1990) (citing *In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 647, 1989 A.M.C. 2447 (5th Cir. 1989)); *see also California ex rel. Dep't of Transp. v. S/T Norfolk,* 435 F. Supp. 1039, 1047-48, 1978 A.M.C. 144 (N.D. Cal. 1977) ("Navigational decisions affecting the safety of the vessel are to be made by the pilot (with the master's supervision) rather than charterers or shoreside personnel. . . .  [A]ny docking at any wharf will present dangers when the vessel is navigated without due regard for existing conditions of tide, current and weather.") (emphasis added); *In re Arb. Between Jebsen Carriers, Ltd. and Gravetal Bolivia, S.A,* 1999 WL 34976590, at *6, S.M.A. No. 3525 (April 28, 1999) (Cina, Mordhorst & Jacobson, Arbs.) (finding that the presence of an abandoned anchor that entangled the ship's own anchor did not amount to a breach of the charterer's safe berth warranty and that the charterer has no responsibility for the ship's operation while in transit).

### 2. CARCO did not warrant the safety of the port at all times of the tide, and plaintiffs bore the risk of selecting the tidal stage.

A safe-port or safe-berth warranty does not guarantee safety at all stages of the tide, unless it expressly includes specific language to that effect.  The phrase "always afloat," without more, simply places the risk of tidal conditions encountered "in the ordinary course of navigation, on the shipowner, not the charterer."  *See Parker v. Winlow,* [1857] 7 E. & B. 942, 948, 119 E.R. 1497 (Coleridge, J.) (by using the words "near thereunto as she may safely get" in reference to a tidal harbor, the contracting parties "know that, in the ordinary course of navigation, the state of the tide may delay the possibility of getting safely to the destination.  The risk of that ordinary delay the ship-owner undertakes to bear."); *Carlton S.S. Co. Ltd. v. Castle Mail Packets Co., Ltd.*, [1898] A.C. 486, 496 (Macnaghten, J.) (where the vessel was going to

ship cargo "always afloat" in a tidal harbor, the shipowner knows that arrival at certain stages of the tide would delay it). Placing the risk of selecting a safe tidal stage on the shipowner makes sense, because such navigational decisions are within the shipowner's complete control.

By contrast, where the charter party includes the further phrase "at all times of the tide" in addition to "always safely afloat," the legal effect of the added phrase is "to relieve the shipowner from a burden which the law would have thrown upon him in the absence of these words, *viz.,* the risk of delay upon arrival from the state of the tides in the river to which the charterer's convenience required the ship to go." *Horsley v. Price,* [1883] 11 Q.B.D. 244, 249. *See also* Sir Bernard Eder, *et al., Scrutton on Charter-Parties*, Section IX, art. 85, p. 160 (22nd ed. 2011) (noting that a clause "always afloat at all times of the tide" relieves "the ship of the duty of waiting in a tidal river or harbor till the tide serve her to proceed to the dock or wharf where she is to discharge," but that a "clause 'always afloat' alone will not justify a vessel in declining to go to a berth where she cannot lie continuously always afloat, if she can do so partly before and partly after neap [lowest] tides.'").

Here, the safe-port language of the Voyage Charter simply provides for "One (1) or two (2) safe port(s) United States Atlantic Coast" without more.[15] The vessel is to proceed to the discharge port "or so near thereunto as she may safely get (always afloat), and deliver said cargo."[16] The safe-berth clause provides in relevant part that "[t]he Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival . . . provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat. . . ."[17] The Voyage Charter does not warrant the safety of the port at any stage of the tide or weather. It uses the phrases "always safely afloat" and "always afloat" only and does not add the phrase "at

[15] [*See* Ex. D-606, ¶ 2 at CARPROD 00538].
[16] [*See* Ex. D-606, Part II, ¶ 1 at CARPROD 00535].
[17] [*See* Ex. D-606, Part II, ¶ 9 at CARPROD 00535].

all times of the tide" or any other remotely similar words that are required to shift liability to the charterer as discussed above.[18] It does not mention wind, tide, or current. The safe-port clause does not relieve plaintiffs of their sole responsibilities and obligations, discussed above, to plan the voyage, calculate their underkeel clearance, and navigate the vessel safely by taking into account the change of available water depth based on tidal conditions.

Plaintiffs proximately caused the allision and the resulting oil spill through their own fault in failing to delay docking until a higher tide. The high tides in Federal Anchorage No. 9 were over 5 feet above the mean lower low water ("MLLW") charted depths on November 26 and 27, 2004.[19] The ATHOS I chose to navigate up the River and into the Anchorage at nearly dead low tide when the margin of safety against contact with unknown obstructions was almost at its absolute minimum. Nothing prevented the ship from planning its voyage and timing its arrival based on the state of the tide to increase that margin of safety by the more than 5 feet of additional depth that was available at high tide. The vessel's navigators alone timed and controlled the ship's transit. Had plaintiffs properly planned their voyage, calculated the vessel's underkeel clearance, and selected a higher tide before docking, they never would have struck the anchor.

During the transit of the ATHOS I, neither the river pilot nor the docking pilot obtained any real time information about the actual height of the tide from NOAA's PORTS System.[20] The master did not discuss underkeel clearance and predicted or actual tide heights and currents with either of them.[21] Despite attempting to dock at nearly low tide and with an insufficient underkeel clearance, the master and second officer of the vessel erroneously believed they were

---

[18] [*See* Ex. D-606, ¶ 9 at CARPROD 0535].
[19] [TT Day 21 (Cole) P. 69:18-70:18; 71:1-11; Ex. D-2015].
[20] [TT Day 2 (Teal) P. 86:12-25; TT Day 8 (Bethel) P. 66:11-24].
[21] [TT Day 2 (Teal) P. 76:9-12; TT Day 8 (Bethel) P. 71:1-18; 73:10-16; TT Day 15 (Markoutsis) P. 24:25-25:5; Markoutsis Dep. P. 410:22-411:23].

navigating at high tide, as they admitted to the Coast Guard after the incident and documented in their fabricated, post-casualty voyage "plan."[22] Had they conducted a proper master-pilot exchange of information and informed the pilot of their erroneous assumptions, they could have avoided striking the anchor by realizing that they had insufficient underkeel clearance in violation of Tsakos's minimum requirements in view of the shallow controlling depth in the Anchorage and that they needed to delay docking until a higher state of the tide.[23]

In fact, in seeking to be found blameless by the Coast Guard and to obtain reimbursement of clean-up costs, after the allision Frescati and Tsakos destroyed documents and fabricated a voyage plan that they then presented to the Coast Guard. Then they compounded that deception by misrepresenting not only that they had a voyage "plan" calling for arrival at CARCO's berth at high tide (as they should have planned), but they also wrongly claimed that they had in fact proceeded at a high level of the tide (as they should have done)! In reality, the ATHOS I chose the wrong time to dock. It proceeded with reckless disregard for safety and the risk of grounding or alliding with an object on the River bottom under circumstances that would have prompted any prudent mariner to simply wait for a higher tide.

As the Third Circuit recognizes, "[m]aritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *In re Frescati,* 718 F.3d at 198 (quoting *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 31, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004)). The plain wording of the Voyage Charter does not make CARCO responsible for the safety of the port at all stages of the tide. Plaintiffs cannot shirk their sole responsibilities of safe navigation and seamanship in view of the tide and foist their duties on CARCO.

---

[22] [TT Day 15 (Markoutsis) P. 7:8-10:24; 12:8-15:25; TT Day 24 (Haley) P. 150:18-152:10; TT Day 25 (Bergin) 104:11-13; TT Day 29 (Anderson) P. 84:2-85:12; Ex. D-87A; Ex. D-1910].
[23] [TT Day 24 (Haley) P. 168:13-170:21; TT Day 25 (Bergin) P. 125:7-127:4; Ex. D-1910].

## B. CARCO did not breach the safe-port obligation.

### 1. The depth and "flukes-down" orientation of the anchor prove that CARCO afforded at least 37 feet of clearance and that the ATHOS I was drawing more than 37 feet at the time of the incident.

CARCO met its obligations under the Voyage Charter by providing a port that was safe for a vessel with a 37-foot draft.

The parties have stipulated that the anchor was submerged in Federal Anchorage No. 9 for at least three years before the ATHOS I hit it.[24] On January 5, 2005, some six weeks after the ATHOS I incident, the anchor was first discovered, and divers and side-scan sonar data confirmed that it was lying in its natural "flukes-down" position flat on the riverbed.[25]

Dr. Peter Traykovski, an expert oceanographer and ocean engineer, gave testimony that Judge Fullam remarked was useful and persuasive and that the Third Circuit noted was probative evidence that CARCO had indeed afforded the promised clearance. He analyzed data obtained from a 2001 Sommerfield & Madsen side-scan sonar data and compared it to the 2005 sonar data collected after the ATHOS I incident.[26] He found that the 2001 sonar data depicted the anchor in the same "flukes-down" position with the anchor's tripping palms extending up to a height of 41 inches above the river bottom, as compared to 37 inches above the riverbed in 2005.[27] He testified that the 2001 height of the anchor off the bottom of 41 inches had an error bound of plus or minus 0.3 feet (3.5 inches).[28] The height of the anchor therefore ranged from 37.5 inches to 44.5 inches above the river bottom.

---

[24] [TT Day 6 (Fish) P. 49:14-16; 62:8-13; Ex. P-1318 (Doc. 525 in Civil Action No. 5-305 (Stipulation)].
[25] [TT Day 6 (Fish) P. 62:21-66:8; TT Day 22 (Traykovski) P. 11:18-12:9; 13:16-21; 16:24-17:14; 20:24-31:3]. It was not identified and removed until January 17, 2005. [TT Day 6 (Fish) P. 89:18-20].
[26] [TT Day 22 (Traykovski) P. 21:11-27:4].
[27] [TT Day 6 (Fish) P. 62:21-63:4; 63:22-64:5; 64:13-67:3; 67:19-69:25; TT Day 22 (Traykovski) P. 11:13-12:9; 15:3-17:14; 20:24-25:13; 29:1-32:10; 36.2-38:23].
[28] [TT Day 22 (Traykovski) P. 29:10-18].

When the ATHOS I struck it, the anchor was lying in its natural "flukes-down" position flat on the riverbed.[29] Based on the shallowest water depth of 41 feet at the anchor recovery location and subtracting the height of the anchor palm, the water clearance above the anchor on November 26, 2004 was therefore between 37.2 and 37.8 feet at MLLW applying the error-bound factor of 0.3 feet.[30] The tide correction of 0.2 feet based on Dr. Cole's testimony would increase the minimum clearance above the anchor to a range between 37.4 feet and 38 feet.[31]

**Thus, to strike the anchor as it did and puncture holes in its hull, the ATHOS I had a draft in excess of 37 feet.** Indeed, the vessel also went directly over a charted 38-foot depth in the Anchorage and touched bottom according to the vessel's own echosounder chart, which showed zero underkeel clearance at that time and location, thereby demonstrating that the ship's draft exceeded 37 feet.[32]

Proper seamanship by planning the transit through the Anchorage by the navigators aboard the ATHOS I to dock at a higher tide could have increased these clearance figures by as much as 5.1 to 5.9 feet.[33] The record therefore shows not only that CARCO satisfied its safe-port obligation, but that plaintiffs caused the allision by negligently navigating their unseaworthy deep-draft vessel without properly calculating their underkeel clearance in view of the tidal conditions and waiting for increased underkeel clearance at a higher stage of the tide..

Furthermore, as Dr. George Langford testified, the evidence of the damage to the ship's hull and the anchor shows that the anchor must have been in its natural flukes-down position when the ATHOS I struck it. His metallurgical analysis revealed that the ship's hull first contacted the tip of the left anchor palm, which caused a semi-circular rupture (a/k/a "semi-

---

[29] [TT Day 22 (Traykovski) P. 16:3-18:5; 21:4-32:10].
[30] [TT Day 22 (Traykovski) P. 49:12-50:24; 51:2-4].
[31] [TT Day 22 (Traykovski) P. 49:12-50:24; Ex. D-2017].
[32] [TT Day 31 (Stoller) P. 82:20-84:16; 85:3-10; 85:16-24; 89:1-17; Ex. D-2063].
[33] [TT Day 21 (Cole) P. 69:18-70:18; 71:1-11; Ex. D-2015].

2418144-1

circular hole") of the ship's hull in Cargo Tank 7C, and that the continuing movement of the vessel's hull caused one of the anchor's flukes to rotate upward and make a second rupture in the hull (a/k/a "the long hole") in Ballast Tank 7C.[34] Before breaking through the hull, the fluke's edge created a crease or score mark on the hull known as the "triangular flap."[35] CARCO's expert naval architect, George Petrie, confirmed Dr. Langford's conclusions through a finite element analysis, which showed that the patterns of stress and deformation on the vessel's hull were consistent with the actual damage, a flukes-down orientation, and Dr. Langford's description of how it had happened.[36]

### 2. The evidence flatly refutes plaintiffs' "flukes-up" theory.

The Sommerfield & Madsen sonar data in 2001 and the post-incident sonar data in 2004-2005 show the nine-ton anchor lying with its flukes horizontal on the River bottom and its shorter tripping palms extending upward with their distinctive "L" shaped acoustic-energy shadows.[37]

In support of plaintiffs' argument that the draft of the ATHOS I was only 36 feet 7 inches when it contacted the anchor, plaintiffs' experts advanced their unfounded, factually unsupported, and physically impossible "flukes-up" theory that the anchor was somehow perched on the riverbed in an unnatural state, with its long flukes pointed up toward the surface and extending 6.48 feet (approximately 6 feet 6 inches) above the River bottom at an inclined angle of 65°.[38] The record evidence belies plaintiffs' scenario.

First, if the anchor was at the height and position that plaintiffs contend, it is incomprehensible how it was not hit by many of the other vessel with at least 37 feet of draft that

---

[34] [TT Day 23 (Langford) P. 29:10-30:17; 31:4-32.22; Ex. D-2022 (Photograph Binder, Anchor Photo #1)].
[35] [TT Day 23 (Langford) P. 37:5-12; Ex. D-2022, Photos 70, 71, and 72].
[36] [TT Day 26 (Petrie) P. 37:3-38:9; 40:2-9].
[37] [TT Day 6 (Fish) P. 62:21-69:1; 72:25-73:25; 80:4-19; TT Day 22 (Traykovski) P. 25:7-29:9].
[38] [TT Day 33 (Bowman) P. 106:9-109:4].

had sailed over the same area in the years that the anchor was lying there. Hundreds of vessels had passed over the spot where it was found, and not a single one touched it or was even aware of any submerged object in the Anchorage.[39] *See also In re Frescati,* 718 F.3d at 206 ("[T]here is no suggestion that anyone—much less the master of the *Athos I*—had any inkling as to the anchor's existence in the River.").

In support of Bowman's "flukes-up" scenario plaintiffs' finite element expert, David Aviram, presented an analysis that defied the facts, common sense, good engineering practice, and the laws of physics. Unbelievably, Aviram manipulated the data to simulate damage that was inconsistent with the sediment of the Delaware River bottom and the actual hull damage.[40] In his simulation, Aviram assumed that the River bottom was hard and virtually impenetrable for Dr. Langford's opinion, but for Bowman's scenario Aviram presumed instead that the riverbed was soft with negligible resistance.[41]

Stephen King, who did the actual computer analysis for him, advised Aviram in an email that Bowman's scenario was impossible given the natural rotation of the anchor.[42] King could not replicate the Bowman "fluke-tip-first" scenario and told Aviram that he would try to "dream up a scheme" to reproduce it, but warned him that it would have to be based on some physical principles.[43] Aviram and plaintiffs' lawyers ordered King to redo the Bowman scheme no fewer than 78 times.[44] The only evidence plaintiffs have offered on the position and orientation of the anchor is their "scheme," which was concocted well after their initial analyses and multiple

---

[39] [TT Day 12 (Bowman) P. 115:14-17; TT Day 13 (Brooking) P. 86:8-88:3; TT Day 10 (Drager) P. 88:4-11].
[40] [TT Day 26 (Petrie) P. 46:6-47:13; 50:2-51:22].
[41] [TT Day 26 (Petrie) P. 43:17-46:17].
[42] [Ex. D-1903 at ATHOS75160-75161; TT Day 8 (Aviram) P. 153:4-155:12].
[43] [TT Day 8 (Aviram) P. 156:14-157:11; Ex. D-1903 at ATHOS75160-75161].
[44] [TT Day 8 (Aviram) P. 148:15-149:13].

2418144-1

expert reports in an effort to comply with the demands of plaintiffs and their lawyers in October-December 2009.[45]

Metallurgical and geological evidence established that the anchor was oriented "flukes down." The physical evidence concerning the depth and orientation of the anchor amply demonstrates that CARCO afforded at least 37 feet of clearance above it and fully satisfied its legal obligations under the Voyage Charter.

### 3. The ATHOS I's own condition demonstrated that its draft exceeded 37 feet when it struck the anchor.

The laws of physics and the record evidence of the vessel's own condition, including its ballast and list, further establish that the vessel's draft exceeded 37 feet when it struck the anchor and holed its hull. The draft of an oil tanker varies based on the quantity and weights of liquids aboard the ship at any given time, including cargo and ballast water. As shown below, as a result of the ATHOS I's defective ballasting system, a very significant quantity of additional unreported ballast water was aboard the vessel before the incident, which increased its draft. With more ballast than reported and with the heel effect created by the tugs as they pushed it, the ATHOS I was obviously deeper than 37 feet when it hit the anchor.

After loading its cargo in Puerto Miranda, the ATHOS I reportedly had a draft of 36 feet 6 inches freshwater based on alleged visual observations at the departure terminal.[46] Importantly, however, no subsequent visual observations or confirmations of the vessel's draft were ever made at any time before the oil-spill incident a week later. Thus, no direct evidence of the vessel's draft exists at the time of the incident. Incredibly, the identical draft of 36 feet 6 inches was continually recorded in the vessel's log books and other records throughout the entire

---

[45] [Ex. D 1903, at Athos 075160, e-mail sent December 7, 2009 at 18:01, 1st unnumbered paragraph; TT Day 12 (Bowman) P. 128:20-23; 130:9-12; TT Day 9 (Crosson) P. 111:8-112:23].
[46] [TT Day 4 (Zotos) P. 42:7-24].

voyage, even though the ship traveled from freshwater to saltwater and to freshwater again, consumed fuel and water, and took on ballast water while sailing 1,900 miles to Paulsboro.[47] Because of the lower density of freshwater, a ship sinks deeper and its draft increases as it enters freshwater from saltwater.[48] A ship drawing 36 feet of saltwater will draw 37 feet in freshwater.[49] Plaintiffs' own expert, Anthony Bowman, testified that the draft of the ATHOS I would have increased about 10 inches as it moved from saltwater at Cape Henlopen to fresh water in Federal Anchorage No. 9.[50] The vessel's recordation of a constant, unchanging draft is inherently suspect and simply wrong. The draft did not remain constant during that time. The vessel's documents reflect that the vessel's crew either fabricated the draft or were incompetent in recording ballasting. Moreover, plaintiffs themselves have since admitted that even they cannot justify the 36-foot 6-inch figure, and they now assert that the actual draft of the ATHOS I was 36 feet 7 inches. *See In re Frescati,* 718 F.3d at 204 n.19.

Taking on ballast increases the vessel's draft.[51] All seagoing ships have means of controlling and documenting ballasting operations, which are critical to safe navigation. The ATHOS I had a broken ballasting system that was documented to be in need of major repairs. The malfunctioning ballast system had leaking ballast lines, hydraulic valves that opened or closed on their own, broken valve-position indicators that prevented the crew from determining whether a valve was open or closed, and broken gauges that prevented the crew from knowing how much ballast was in the ship or in what tank. And plaintiffs have lost, altered, or destroyed vessel logs and records that would have shown every time the ballast pumps were used. The

---

[47] [TT Day 4 (Zotos) P. 54:5-56:10].
[48] [TT Day 2 (Teal) P. 71:25-72:3; TT Day 6 (Zotos) P. 9:22-10:5].
[49] [TT Day 3 (Adams) P. 76:7-9].
[50] [TT Day 12 (Bowman) P. 73:2-14].
[51] [TT Day 5 (Zotos) P. 16:9-18:10; TT Day 8 (Bethel) P. 72:24-73:9].

2418144-1

crew had no way of the ATHOS I's true draft, and the plaintiffs have destroyed the documents that would show it was over 37 feet at the time of the casualty.

The ATHOS I's Pump Room Patrol Log, which would have provided evidence of the time when ballasting was started and stopped aboard the vessel on November 26, 2004 and at all other times, is missing, and no other written record shows what time the ballasting operation of November 26 began or ended.[52]  Computer draft calculations that may have been done before or during the voyage, as well as the record showing liquid quantities aboard the vessel used to perform those calculations, were destroyed, and no records are available.[53]  Plaintiffs have failed to produce the best evidence of the ballast aboard the vessel, and this Court should draw adverse evidentiary inferences against plaintiffs and exclude their secondary evidence concerning the vessel's draft as a result of their blatant spoliation.

The ship's engine log on November 27 shows that the vessel used extra fuel, which indicates that the ATHOS I was using its steam-driven ballast pumps to discharge ballast water.[54]  However, the discharge of ballast was not recorded in the ship's official records.[55]  The evidence also shows that plaintiffs conducted undocumented liquid transfers after the incident, concealed them from their own salvage master and from the Coast Guard, and failed to follow the salvage plan submitted to and approved by the Coast Guard.[56]

Plaintiffs' expert, Anthony Bowman, conceded that just 349.8 tons of unreported additional ballast aboard the ATHOS I would have increased the ship's draft to 37 feet.[57]  He

---

[52] [TT Day 5 (Zotos) P. 20:9-21:7; 34:2-7; 34:12-35:15].
[53] [TT Day 12 (Bowman) P. 76:1-24].
[54] [TT Day 26 (Petrie) P. 95:2-96:6; Ex. P-370 (Engine Log)].
[55] [TT Day 26 (Petrie) P. 95:2-96:14].
[56] [TT Day 9 (Umdenstock) P. 64:9-12; 65:3-11; 65:20; 65:25-66:3; 69:19-21; 71:15-18; 73:17-74:3; 78:24-79:7; Ex. D-179].
[57] [Ex. D-1942; TT Day 12 (Bowman) P. 79:12-80:17].

2418144-1

acknowledged that a difference of just 200 tons of ballast water aboard the ATHOS I at the time of the incident could have increased the draft by 11 inches on one side of the vessel.[58]

CARCO's naval architecture expert, George Petrie, independently determined that there was a minimum of 400 to 600 tons of unreported ballast water aboard the ATHOS I at the time of the incident, even if you accept plaintiffs' unreliable and incompetent ballast records.[59] Based on that determination alone, he testified that the draft of the vessel before the incident would have been a minimum of 36 feet 10 inches.[60] Petrie further testified that when the two tugs pushed the ATHOS I before the allision, they necessarily caused the vessel to heel to the port side with a resulting increase in the vessel's draft on the port side, as compared to the vessel's centerline.[61]

The U.S. Coast Guard took increased draft due to heel into account in analyzing the draft of the ATHOS I at the time it struck the anchor.[62] The Coast Guard determined that the heeling moment caused by the two pushing tugs could have increased the draft of the ATHOS I by as much as 0.17 meters (6½ inches).[63] According to the Coast Guard, this heeling moment resulted in a draft of the ATHOS I at the time of the incident of 37 feet 3 inches (11.35 meters).[64] Using Professor Petrie's minimum draft of 36 feet 10 inches and adding the Coast Guard's 6½ inch increase in draft due to heel resulted in a vessel draft of 37 feet 4½ inches at the time of the allision.

---

[58] [TT Day 12 (Bowman) P. 77:21-78:19].
[59] [TT Day 26 (Petrie) P. 9:3-10:13; 21:6-22:8; 26:4-27:18; 30:6-31:12].
[60] [TT Day 26 (Petrie) P. 27:14-18].
[61] [TT Day 26 (Petrie) P. 52:4-15; Doc. 586 in Civil Action No. 05-305 (Statement of George L. Petrie, BS, MSE, Nav. Arch.), at ¶ 21].
[62] [Ex. D-1969].
[63] [Ex. D-1969 at page 1, ¶ 2 ". . . the heeling moment generated by the mooring tugs, could have increased the depth of the vessel at the location of the damage by as much as .17m (0.56 ft)."].
[64] *Id.* at 3, ¶ 5.

2418144-1

Plaintiffs' expert Bowman admits that he did not take the effect of the tugs' pushing into account.[65] However, Bowman did admit that just one degree of heel or list of the ATHOS I would increase its draft by 11 inches on that side of the vessel.[66] Both Captain Markoutsis and Chief Officer Zotos noticed that the ATHOS I listed one-half degree to port when the tugs first pushed it.[67] That observed list would have resulted in an increased draft of 5½ inches on the port side of the vessel, which is the side where the anchor punctured the hull, bringing it to a draft in excess of 37 feet when it struck the anchor, even assuming plaintiffs' own purported draft of 36 feet 7 inches. The vessel's own condition therefore demonstrated that its draft exceeded 37 feet when it struck the anchor.

### 4. The Court must consider all the characteristics of the vessel and the circumstances of its navigation in determining its draft.

Because of the very nature of the safe-port/safe-berth obligation as the Third Circuit defines it, the Court must consider the amount of the vessel's draft at the time of the casualty" as affected by environmental conditions and dynamic effects and forces. Whether the ATHOS I could safely get to CARCO's berth if properly navigated necessarily means the vessel is moving. Plaintiffs want the Court to only consider "static draft," as if the ship were hypothetically sitting alongside a dock with no external forces being exerted. But the phrase "static draft" cannot be found in the Third Circuit's opinion. It is plaintiffs' misguided effort to limit this Court's scrutiny of the facts, to create a new, self-serving analysis of draft, and to avoid the unpleasant reality of the master's and the docking pilot's ill-timed decision to proceed through the Anchorage without a sufficient underkeel safety margin at low tide.

---

[65] [TT Day 12 (Bowman) P. 105:15-18].
[66] [TT Day 12 (Bowman) P. 78:5-79:3].
[67] [TT Day 4 (Zotos) P. 68:10-69:5; TT Day 15 (Markoutsis) P. 33:3-11].

The ATHOS I incident did not happen while the ship was at rest in a hypothetical "static" condition, but instead while the ship was in motion. Plaintiffs would twist the Third Circuit's opinion and would have this Court ignore the specific "circumstances" surrounding the ATHOS I's use of the port, whether the vessel exercised "bad navigation and seamanship," and "whether the port was safe based on the facts particular to the ATHOS I and its arrival"—the very issues that the Court of Appeals has directed this Court to consider on remand. *In re Frescati,* 718 F.3d at 203-04 (*citing In re Lloyd's Leasing, Ltd.*, 764 F. Supp. 1114, 1135 (S.D. Tex. 1990)).

The Third Circuit expressly states that the focus is on the ATHOS I's "actual" draft and the actual "clearance" for purposes of the alleged warranty claim. *Id.* at 190 ("We cannot be sure, however, that this warranty was <u>actually</u> breached, as the District Court made no finding as to the *Athos I's* <u>actual</u> draft nor the amount of clearance <u>actually</u> provided.") (emphasis added). And this makes sense because the ATHOS I was moving when it struck the anchor. In determining the vessel's draft, whether the port was safe, and whether plaintiffs exercised good navigation and seamanship, the Court cannot fixate on the irrelevant draft of the ship while it is stationary and without regard to its condition and movement as it navigated through the water while affected by tide, wind, current, squat, and other forces, such as those the tugboats exerted on it. The relevant draft is what it was when the ATHOS I struck the anchor under the actual conditions at that time, not at some imaginary point in the abstract.

Indeed, to avoid groundings or allisions with submerged objects, mandatory U.S. Coast Guard regulations for the operation of single-hulled tankers like the ATHOS I require the owner and operator of the vessel, as well as its master and pilots, to consider and calculate the vessel's underkeel clearance based on multiple factors affecting the vessel while it is in motion (not

static), including "the ship's deepest <u>navigational</u> draft," "the anticipated controlling [shallowest] depth" of the water it <u>traverses</u>, and "[c]onsideration of weather or <u>environmental conditions</u>." *See* 33 C.F.R. §§ 157.455(a) and (b) (emphasis added). The reference to weather or environmental conditions necessarily includes the amount of water available to a particular vessel due to the stage of the tide and currents (if any). Weather conditions can vary the tides.[68]

A federal navigation regulation, 33 C.F.R. § 164.11, further requires a pilot directing a vessel underway to know and consider the velocity and direction of the current, the predicted set and drift of the vessel, the state of the tide, the speed of the vessel considering the weather and the channel, and the vessel's characteristics. Tsakos's own vessel operation manual recognizes that underkeel clearance varies with local conditions, such as tidal height, the ship's speed, the width of the waters it navigates, and the effect of squat, a hydrodynamic phenomenon that increases the moving vessel's draft.[69] Tsakos's safety management system required the master to fully analyze squat and anticipated underkeel clearance while paying "strict attention" to, *inter alia*, "b. tidal conditions . . . c. variation in water level due to barometric pressure or tidal surges … d. accuracy of soundings and tidal information . . . f. increase of [draft] due to heel or trim, g. variations in water density . . . h. sea bed conditions, [and] i. the effect of squat."[70] This Court cannot decide issues of the vessel's draft, underkeel clearance, and seamanship by focusing only on its "static" draft while at rest, but rather must consider all these dynamic factors affecting its navigation, just as the vessel's operator <u>must</u> consider them in planning the voyage.

---

[68] [TT Day 21 (Cole) P. 49:7-22].
[69] [TT Day 3 (Esplana) P. 17:8-24].
[70] [Ex. D-20 (Tsakos Vessel Operation Procedures Manual) at pp. Athos 0729-0730, ¶ 24 ("Navigating in Shallow Waters")].

2418144-1

## C. The vessel's negligent navigation and unseaworthiness nullify the safe-port warranty.

### 1. It was possible for the ATHOS I to avoid the danger through safe navigation and seamanship in view of the stage of the tide.

The Third Circuit specified that "[w]hether a port is safe refers to the particular ship at issue" and held that "the District Court correctly framed the ultimate issue as whether it was <u>possible</u> for a ship of the *Athos I*'s purported dimensions to reach CARCO's berth safely." *In re Frescati*, 718 F.3d at 200, 203 (emphasis added). This articulation of the ultimate issue comports with both (1) the fact that the safe-port/safe-berth language of the Voyage Charter does not guarantee safety at all stages of the tide, as discussed above, and (2) the Third Circuit's holding that there can be no breach of a safe-port/safe-berth warranty if the vessel could have avoided an accident by good navigation and seamanship. "To be a safe berth, it is not necessary that every conceivable <u>approach</u> be free of hazards or even that every possible <u>approach</u> be risk-free." *H. Schuldt v. Standard Fruit & S.S. Co.*, 1979 A.M.C. 2470, 2476-77 (S.D.N.Y. 1978) (emphasis added) (finding no breach of a safe-berth clause of a charter where the pier could be approached without running aground on rocky shoals in shallow waters upriver of the pier).

Temporary tidal conditions or abnormally low water as a result of wind and weather do not make a port unsafe. *See In re Arb. Between Hansen Neuerburg Export-Import GMBH (M/V Regal Sword) and I.S. Joseph Shipping Co., Ltd.,* 1982 WL 917235, at *7, S.M.A. No. 1682 (May 28, 1982) (Berg, Simms & James, Arbs.). Indeed, where tides affect the port or berth, tidal conditions that temporarily prevent a vessel from proceeding at a particular time do not render the port or berth unsafe, so long as it is possible for the ship to reach it by exercising good seamanship and navigation, which require the master to determine the stage of the tides and currents and to plan the voyage accordingly. *See* Terence Coghlin *et al., Time Charters*, ¶ 10.6

at p. 198 (6th ed. 2008) ("The fact that for tidal, meteorological or other reasons, the ship may have to wait for a time before entering the port <u>does not, in itself, make that port unsafe</u>.") (emphasis added).

As Coghlin states, the master has the responsibility to time the vessel's arrival and to navigate it in view of the conditions confronting it:

> For example, a ship may have to wait for high water to clear a bar in the approach to the port or for a storm to abate before entering, but as Devil J., said in *The Stork* [1954] 2 Lloyd's Rep. 397, at page 415: "The law does not require the port to be safe at the very time of the vessel's arrival. Just as she may encounter wind and weather conditions which delay her on her voyage to the loading port, so she may encounter similar conditions which delay her entry into the port, and the charterer is no more responsible for the one than for the other."

*Id.; see also* Cooke *et al.*, *Voyage Charters*, ¶ 5.81 at p. 126-27 (3d ed. 2007) ("Thus, where loading in a tidal berth involves movement in the normal way to take account of the tide . . . the costs of the operation will, unless the charter expressly imposes such expenses on the charterer, fall on the [vessel] owner for, by definition, the warranty of safety has not been broken. . . ."); *Aktienselskabet Eriksen & Andersen's Rederi v. Foy, Morgan & Co.,* 25 Ll.L.Rep. 442, 444-45 (1946) (recognizing that a shipowner may not succeed on a claim that a port or berth is unsafe due to insufficient water if the port or berth is accessible by a seaworthy vessel at a different phase of the tide)

In *Leeds Shipping*, 2 Lloyd's Rep. at 131, a decision that the Third Circuit itself cites in defining the scope of the warranty, the English Court of Appeal noted in a safe-port case that an expectation, if not a presumption, exists that dangers created by tidal variations in a river can normally be met and overcome by proper navigation and handling of a vessel in accordance with good seamanship. "Most, if not all, navigable rivers, channels, ports, harbours and berths have some dangers from tides, currents, swells, banks, bars or revetments. Such dangers . . . can

normally be met and overcome by proper navigation and handling of a vessel in accordance with good seamanship." *Id.*

Even though the ATHOS I allided with the anchor in Federal Anchorage No. 9, the Port of Paulsboro was nonetheless safe, because it was possible for this particular vessel, if seaworthy, to have avoided the danger through the exercise of good navigation and seamanship. Dr. George Cole's supplemental opinion and testimony at the recall hearing concerning tidal conditions will provide this Court with evidence demonstrating that 21 other vessels with drafts between 35 and 37.5 feet (and subject to the same docking-pilot window as the ATHOS I) had safely arrived at the CARCO terminal in 2004, the year of the incident. CARCO's port captain, William Rankine, testified that no other ships had hit the anchor, had run aground, or had any problems in transiting Federal Anchorage No. 9 en route to the CARCO berth.[71] He further testified that "just about all of them would go over that spot."[72]

As Dr. Cole observes in his supplemental report, all of the vessels meeting the stated draft criteria arrived at the Anchorage when the tide was well above MLLW so that the actual water depths in the area were significantly deeper than charted depths at those times, and the vast majority of the arrivals occurred when the actual depths were five to seven feet greater than the charted depths. Plaintiffs' witness, Andrew Brooking, acknowledged that other vessels had made safe navigational decisions based on the tide, underkeel clearance, and draft to reach the CARCO terminal safely.[73] The docking pilot aboard the ATHOS I had himself safely berthed 15 vessels at CARCO's terminal without any problem, including the NEREO, a vessel with a draft of 38 feet, 6 inches, two feet deeper than the ATHOS I's reported draft.[74] He admitted that every

---

[71] [TT Day 30 (Rankine) P. 16:11-17:4].
[72] [TT Day 30 (Rankine) P. 20:11-18].
[73] [TT Day 13 (Brooking) P. 84:24-86:19; 87:25-88:3].
[74] [TT Day 8 (Bethel) P. 3:16-20; 4:14-16; 52:23-53:18; 54:17-56:14].

one of those ships had timed its arrival at Paulsboro no earlier than three hours before high tide, a time midway in the six-foot tidal cycle when the water depth was at least three feet more than the charted depths, and none contacted an object or grounded.[75]  This evidence demonstrates that it was indeed possible for a ship with the purported dimensions of the ATHOS I to reach the berth safely over the same path taken by so many vessels before it.

Proper prediction of tidal conditions is a critical factor in calculating predicted underkeel clearance, and Tsakos's own policy instructed the master of the ATHOS I to <u>delay</u> his transit until it was safe, if he had any concern about underkeel clearance and the amount of available water.[76]  The master of the ATHOS I had the responsibility to navigate the vessel and calculate underkeel clearance, and the master and the pilot were responsible for knowing the state of the tides and their fluctuation and the weather conditions to determine whether it was safe to sail to the CARCO berth through the Anchorage when they did.[77]  As discussed above, the navigators of the ATHOS I made wildly incorrect assumptions about the controlling depths and the state of the tide and recklessly proceeded under circumstances that would have prompted any prudent seaman to delay his arrival until higher water.

Although the Court of Appeals stated that the district court's reliance on a finding that the port and berth were "generally safe" based on a "volume of commercial traffic that passed without incident" is not relevant "to whether the warranty was actually breached in this case," the Third Circuit did not hold that evidence of tidal conditions and the arrival times of other vessels with the same or similar dimensions and subject to the same berthing window as the ATHOS I was irrelevant for all purposes.  *In re Frescati,* 718 F.3d at 203-04.  Rather, it recognized that the focus was on the ATHOS I's "purported dimensions" and further observed

---

[75] [TT Day 8 (Bethel) P. 55:21-24; 56:11-14; 59:14-19; 60:8-16].
[76] [TT Day 15 (Markoutsis) P. 21:2-10].
[77] [TT Day 30 (Rankine) P. 60:20-61:6].

that the ATHOS I was following the customary procedure and "the usual path for ships of its size docking at CARCO's terminal" when it struck the anchor.  *Id.* at 192, 203, 204, and 209-10. Thus, evidence that vessels of like size and draft as the ATHOS I had safely used the port without incident under similar circumstances in calling at CARCO's berth is material to show that it was indeed possible for the master and pilots of the ATHOS I also to have avoided the danger by good navigation and seamanship:

- *In re Marbulk Shipping, Inc. (M/V Bahama Spirit)*, 2004 WL 5658898, at *5, S.M.A. Award No. 3849 (June 4, 2004) (Berg, Wiswell & Martowski, Arbs.) (finding the port to be safe, even though plaintiff's vessel struck a submerged pipe, where vessels of the size and draft of the ship that grounded had navigated the western end of a ship channel at Theodore, Alabama without incident for four or five years; "The accident free history of the Theodore Turning Basin is strong evidence of its safety.");

- *In re Arb. Between Fondren Corporation and Lagoven, S.A.*, 2001 WL 35459259, S.M.A. Award No. 3711 (Nov. 28, 2001) (Brown, Berg & Scheinbaum, Arbs.) (the safe port claim against the charterer was rejected and the vessel owner held solely at fault for grounding where the evidence showed that 1,400 vessels a year with the same or greater drafts had used the same channel without grounding);

- *In re Arb. Between Delphina Tanker Corp. (MT Delphina) and Axel Johnson Energy Corp.*, 1999 WL 34976573, at *3, S.M.A. Award No. 3508 (Feb. 5, 1999) (Nelson, Elias & Mordhorst, Arbs.) (finding "that the DELPHINA and many other similar size vessels, through the exercise of good navigation and seamanship were able to safely berth at this facility, is ample evidence that the dangers of the

29

berth approach maneuver could be avoided, if carried out with extreme caution and sound seamanship[,]" even though plaintiff's vessel struck an uncharted rock approximately 100 feet northeast of the berth);

- *In re Arb. Regarding the M/T Anett II Between K/S Anett Kristin and Petrojam Ltd.,* 1998 WL 35281267 at *8-9, S.M.A. Award No. 3433 (March 13, 1998) (Engelbrecht, Berg & Vismans, Arbs.) (finding that a gasoline spill from the vessel's tanks was an unusual occurrence and that the port of Montego Bay, Jamaica was safe, despite the lack of safety and firefighting plans, regulations, personnel, or equipment, where many petroleum tankers had discharged through the same lines to the same tanks without incident);

- *In re Lloyd's Leasing Ltd.*, 764 F. Supp. at 1135-36 (finding the Calcasieu Channel at Lake Charles, Louisiana to be safe, even though the plaintiff's vessel structurally failed and grounded, where vessels substantially identical in size and draft had passed through the channel on a regular basis for over two years before the casualty; "This alone is evidence of the safety of the port for the ALVENUS as loaded.");

- *In re Transportes del Este Navegaceon, S.A. (M/V Cepheus),* 1990 A.M.C. 1058, 1063-66 (Feb. 13, 1990) (Berg, Healy & Loesberg, Arbs.) (finding the port of Anchorage, Alaska to be safe, based on the long-term, accident-free history of the port and the berth, despite the pilot's navigational error in stranding the vessel while attempting to berth it in fog conditions while the harbor was covered with large pans of floating ice); and

- *H. Schuldt v. Standard Fruit & S.S. Co.*, 1979 A.M.C. 2470, 2477 (S.D.N.Y. 1978) (finding that a charterer did not violate the safe-berth provision of the charter where "[a]s evidenced by the large number of ships which safely docked at Pier 42, this pier can be approached by a ship, such as the *Artlenburg*, without running aground on the rocky shoals off Pier 44.").

Safely sailing to CARCO's terminal was not a hopeless, physically impossible feat for the ATHOS I. Hundreds of vessels had done so, and many more had sailed through the Anchorage without incident. It was a routine occurrence for the ATHOS I or any other similar vessel during the same docking-window, as long as it exercised basic navigational safety practices and good seamanship, obeyed the single-hull tanker regulations, planned its voyage, accurately calculated its underkeel clearance in view of the controlling depth, and prudently waited for a higher stage of the tide. But plaintiffs did nothing of the sort.

### 2. Plaintiffs own poor navigation and seamanship proximately caused the allision.

The Court of Appeals further defined the scope of this warranty and the safety of the designated port by stating that "[a] port is deemed safe where 'the particular chartered vessel can proceed to it, use it, and depart from it without, in the absence of abnormal weather or other occurrences, being exposed to dangers <u>which cannot be avoided by good navigation and seamanship</u>.'" *In re Frescati,* 718 F.3d at 200 (emphasis added) (*citing* Julian Cooke, et al., *Voyage Charters,* ¶ 5.137 (3d ed. 2007), and *Leeds Shipping v. Societe Francaise Bunge (The Eastern City),* [1958] 2 Lloyd's Rep. 127, 131). Phrasing the converse of the definition in terms of the "unsafety" of a port, the Third Circuit further declared, "[i]n other words, a port is unsafe—and in violation of the safe berth warranty—where the named ship cannot reach it without harm (absent abnormal conditions or those not avoidable by adequate navigation and

seamanship)." *Id.* at 200. "The test is whether in the exercise of reasonable care in the circumstances, a competent master would be expected to avoid the dangers present at the port or berth." Terence Coghlin, *et al., Time Charters,* ¶ 10.146 at p. 230 (6th ed. 2008). *See also* Julian Cooke *et al., Voyage Charters* ¶ 5.137 at p. 139 (3d ed. 2007) ("Dangers which can be avoided by good seamanship and navigation will not render a port 'unsafe.'").

As the Third Circuit has stated, "negligent seamanship will nullify the safe port warranty. . . ." *In re Frescati*, 718 F.3d at 205. The plaintiff United States itself admitted in its opposition to CARCO's petition for certiorari in the Supreme Court that this Court on remand will "consider petitioner's [CARCO's] claim that the accident was caused by 'bad navigation or seamanship' by *ATHOS I's* operator, which would reduce or eliminate petitioner's liability under the safe berth clause."[78]

In an allision case, four sources provide the standard of care owed by the navigating vessel: (1) statutory rules of navigation; (2) other statutes and regulations having the force of statutes; (3) proved local "customs" not contradicting either of the above; and (4) the requirements of good seamanship and due care. *See In re Complaint of Lenzi*, No. 89-4571, 1991 WL 42463, at *4, 1991 A.M.C. 1531 (E.D. Pa. Mar. 22, 1991), *aff'd*, 958 F.2d 363 (3d Cir. 1992) (Table). "The responsibility for the safety of the ship rests upon the master." *Charente S.S. Co. v. United States*, 12 F.2d 412, 413, 1926 A.M.C. 1115, 1117 (5th Cir. 1926). Careless or improper operation of the ship by its crew is evidence of negligence. *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1565-66 (11th Cir. 1985). The navigators of the ATHOS I miserably failed to meet these standards of care.

---

[78] *See* Brief for the United States in Opposition at 9, *Citgo Asphalt Refining Co. v. Frescati Shipping Co., Ltd.,* 2014 WL 216155, at *9 (Jan. 17, 2014) (No. 13-462).

### a. Plaintiffs negligently failed to prepare a proper voyage plan.

Ricardo Caro, the second officer of the ATHOS I, was responsible for preparing the berth-to-berth voyage plan from Puerto Miranda to Paulsboro.[79] But he did not prepare the required plan with anticipated underkeel clearance calculations before the voyage or before the ship began its upriver transit.[80] In fact, Caro admitted that on the evening of November 26, 2004, immediately after the oil-spill incident, the master instructed him to throw out whatever original voyage plan he had allegedly prepared and to fabricate a new post-accident voyage "plan" before the U.S. Coast Guard boarded the vessel.[81] The officers of the ATHOS I signed this fabricated plan <u>after</u> the incident.[82]

Captain Markoutsis admits that the voyage plan given to the U.S. Coast Guard was created after the oil spill, even though he represented to the Coast Guard that it had been prepared before the vessel had left Puerto Miranda.[83] The plan prepared after the incident violated Tsakos's own procedures, is unheard of in the shipping industry's practice, and defeats the entire purpose of a "plan."[84]

Incredibly, even in the fabricated voyage plan prepared after the ATHOS I incident (when the actual facts of the river transit were known in hindsight), the second officer used incorrect figures for tidal height, controlling water depth, and vessel speed that were wildly

---

[79] [TT Day 2 amended (Esplana) P. 144:11-14; Zotos Dep. Vol. II (5/15/07) P. 146:23-147:5].

[80] [TT Day 27 (Daggett) P. 142:8-13; TT Day 31 (Stoller) P. 52:18-25].

[81] [TT Day 30 amended (Reading of Caro Dep. designations) P. 191:11-195:2; Caro Dep. Vol. III (10/19/06) P. 23:12-24; 37:1-25; 38:6-14].

[82] [TT Day 2 amended (Esplana) P. 177:10-20; TT Day 3 amended (Esplana) P. 17:25-18:13; TT Day 14 amended (Markoutsis) P. 130:8-131:10; Ex. P-463 (Passage Plan Record); Ex. D-87A (TST Original Voyage Plan Pto. Miranda to Paulsboro, NJ)].

[83] [TT Day 14 amended (Markoutsis) P. 124:14-127:4; 130:8-131:23; 134:12-135:25].

[84] [TT Day 29 (Anderson) P. 79:1-81:10; TT Day 16 amended (Johnson) P. 171:3-172:23; Ex. D-20 at pp. Athos 0717-0723].

wrong, underscoring his documented incompetency in voyage planning.[85]   None of his squat calculations was correct.[86]   The fabricated voyage plan erroneously reflected that the vessel undertook a high-tide transit of the River and the Anchorage with a height of 6.2 feet above MLLW, assumed a controlling depth of 46.2 feet, and called for an anticipated underkeel clearance of 5.8 feet (1.77 meters) for the entire transit.[87]   It did not contain any information for course, speed, or time for the portion of the voyage from Billingsport Range to the CARCO berth through the Anchorage.[88]   It erroneously assumed a high-tide passage up the River, when in fact the vessel had transited the entire River at or near dead low tide.   The ATHOS I had almost six feet less of a safety margin of underkeel clearance for the transit than what the vessel's officers apparently assumed.[89]   In reality, plaintiffs attempted to dock at near low tide and did not even follow the requirements of their own error-riddled, post-accident plan.

A mandatory Coast Guard regulation, 33 C.F.R. § 157.455(b), which applied to the ATHOS I as a single-hull tanker, required the master to, *inter alia*, prepare a comprehensive voyage plan with an anticipated minimum underkeel clearance calculation for the vessel before it departed and before it entered any port or place of destination:

### 157.455  Minimum under-keel clearance.

(a)      * * *

(b)      Prior to entering the port or place of destination and prior to getting underway, the master of a tankship that is not fitted with the double bottom that covers the entire cargo tank length shall plan the ship's passage using guidance issued under paragraph (a) of this section and

---

[85] [TT Day 21 (Cole) P. 80:37-81:13; TT Day 27 (Daggett) P. 149:25-153:2; 160:7-25; TT Day 29 (Anderson) P. 84:2-85:5; TT Day 24 amended (Haley) P. 151:19-152:10; 159:10-24; Ex. D-010; TT Day 24 amended (Grenier) P. 97:2-25; 108:12-23; TT Day 31 (Stoller) P. 53:1-14; Ex. D-87A (Voyage Plan)].
[86] [TT Day 25 (Bergin) P. 95:13-97:5; TT Day 27 (Daggett) P. 169:17-170:6].
[87] [TT Day 24 amended (Haley) P. 147:20-149:14; TT Day 29 (Anderson) P. 84:2-87:5; Ex. D-87A (Voyage Plan)].
[88] [Pinat Dep. Vol. II (10/17/06) P. 194:2-195:10].
[89] [TT Day 24 amended (Haley) P. 151:19-152:10; TT Day 25 (Bergin) P. 103:15-104:13; TT Day 29 (Anderson) P. 84:6-85:12; TT Day 31 (Stoller) P. 54:7-11; 54:18-55:19; 55:24-57:3; TT Day 27 (Daggett) P. 169:1-16; Ex. D-1910 (Coast Guard Re-Interview of the Master); Exs. D-2013 and D-2015].

estimate the anticipated under-keel clearance.  The tankship master and the pilot shall discuss the ship's planned transit including the anticipated under-keel clearance.  An entry must be made in the tankship's official log or in other onboard documentation reflecting discussion of the ship's anticipated passage.[90]

The Tsakos Vessel Operation Procedures Manual at VOP-B-11A also required a "berth-to-berth" voyage plan for the entire voyage from departure in Puerto Miranda to arrival at CARCO's berth to ensure that the ATHOS I had a safety margin of underkeel clearance for the passage to avoid groundings and contact with submerged obstructions in coastal and inland waters.[91]

Other international conventions—including the Standards of Training Certification and Watchkeeping for Seafarers ("STCW"), the International Convention for Safety of Life at Sea ("SOLAS"), and International Maritime Organization ("IMO") resolutions—likewise applied to the ATHOS I and required voyage planning.[92]

These regulatory requirements for voyage planning are intended to identify hazards to navigation and to avoid the *risk* of the vessel's grounding or striking an uncharted object.[93]  The ship's master and officers had to consider all water depths that the vessel would encounter on the intended voyage, taking into account predicted tidal heights, vessel squat, and other factors in order to calculate the necessary anticipated underkeel clearance.[94]

The master and navigation officers of the ATHOS I violated 33 C.F.R. § 157.455(a) and (b), the STCW, SOLAS, and Tsakos's own company policy by failing to plan the vessel's

---

[90] [TT Day 24 amended (Grenier) P. 85:25-86:10; TT Day 24 amended (Haley) P. 146:12-147:19; TT Day 31 (Stoller) P. 49:7-50:20; TT Day 16 amended (Johnson) P. 186:4-22; 188:24-189:5].

[91] [TT Day 2 amended (Esplana) P. 143:4-9; 144:3-10; TT Day 3 amended (Esplana) P. 16:23-17:24; TT Day 14 amended (Markoutsis) P. 130:4-7; TT Day 16 (Johnson) P. 188:24-189:19; Pantazatos Dep., Vol. I 02/07/08 P. 264:18-265:3; Ex. D-20 (TST Vessel Operations Procedures Manual); Ex. P-332 (Tsakos Shipping & Trading S.A. Manuals)].

[92] [TT Day 16 (Johnson) P. 192:18-194:5; TT Day 24 amended (Grenier) P. 68:10-77:12; TT Day 31 (Stoller) P. 40:7-12; 41:4-42:17; TT Day 16 amended (Johnson) P. 192:18-194:5; Ex. D-94 (Master's Change of Command Protocols); Ex. D-1296 (STCW as amended); Ex. D-2024A (Grenier Table 1–Applicable Statutes and Regulations)].

[93] [TT Day 24 amended (Grenier) P. 84:3-86:18; 91:15-20; TT Day 24 amended (Haley) P. 147:13-19; TT Day 29 (Anderson) P. 77:3-25; TT Day 27 (Daggett) P. 141:3-6; 141:15-142:7].

[94] [Caro Dep. Vol. III (10/19/06) P. 16:9-17:21; TT Day 16 amended (Johnson) P. 173:3-8].

voyage in advance from berth to berth taking into account all the pertinent information, and by failing to include updated and correct anticipated minimum underkeel clearance under the hull in critical areas, failing to consider estimated times of arrival at critical points for tide heights and flow, failing to set forth the details of the voyage plan, and failing to closely monitor and change the plan.[95] *See Osprey Ship Mgmt., Inc. v. Foster*, No. 1:05cv390, 2008 WL 4371376, at *26 (S.D. Miss. Sept. 18, 2008), *aff'd*, 387 F. App'x 425 (5th Cir. 2010) (finding a master negligent in failing to "properly plan or make and keep himself adequately informed" and allowing the vessel to stray from the channel and strike a submerged launchway). Plaintiffs' egregiously negligent violations of the mandatory voyage planning requirements increased the risk of hitting the uncharted anchor and proximately caused the allision and the oil spill.

> **b. Plaintiffs negligently failed to accurately calculate and predict the vessel's underkeel clearance.**

No document or record contains any anticipated underkeel clearance calculations done by Captain Markoutsis before the November 26, 2004, transit.[96] This failure to timely and correctly calculate underkeel clearance proximately caused the allision with the anchor in Federal Anchorage No. 9, where the pilot considered that a controlling depth of only 37 feet of water was available for the transit of the ATHOS I.[97]

Indeed, the only existing calculations were the widely incorrect underkeel clearance calculation found in the fabricated post-incident voyage plan and the figures exchanged between the master and Tsakos' General Manager Harry Hajimichael after the incident, when the plaintiffs were trying to figure out how they struck the anchor.[98]

---

[95] [TT Day 24 amended (Grenier) P. 95:1-99:18; 103:6-10; 108:6-23].
[96] [TT Day 15 amended (Markoutsis) P. 20:13-22].
[97] [TT Day 24 amended (Haley) P. 169:10-170:21].
[98] [Exs. D-321, D-322, and D-324 (with translation), D-325 (with translation); TT Day 15 amended (Markoutsis) P. 44:21-46:22].

2418144-1

The master and navigators aboard the ATHOS I erred in all respects, and their anticipated underkeel clearance calculations after the allision were either wrong or non-existent.[99] After the incident, the master provided the U.S. Coast Guard with an underkeel clearance calculation of 5 feet 8 inches based upon a predicted height of 6.3 feet of tide, which is the equivalent of high tide.[100]

Second Officer Caro erroneously based the underkeel clearance calculation in his post-incident voyage plan on an incorrect predicted tide of 1.9 meters or 6.2 feet above charted depths in the Baker Range.[101] In fact, the vessel passed through the Baker Range at dead low tide when the predicted height was 0.0 and the actual tide height was six inches below the charted water depth.[102] As a result of this error, the actual underkeel clearance for the vessel in the Baker Range was 6 feet 8 inches less than he calculated.[103] A proper calculation would have revealed negative anticipated underkeel clearance for those areas in violation of the Tsakos 10% safety margin and a significant risk of grounding.[104]

A mandatory Coast Guard regulation applicable to the operation of single-hull tankers, 33 C.F.R. § 157.455(a), requires the vessel owner to provide the master with written underkeel clearance guidance concerning the factors of deepest navigational draft, anticipated controlling depth (the shallowest depth that the vessel will encounter), and weather or environmental conditions:

---

[99] [TT Day 15 amended (Markoutsis) P. 14:14-15:25; TT Day 27 (Daggett) P. 149:25-151:20; 152:5-153:2; TT Day 29 (Anderson) P. 84:2-86:7; TT Day 25 (Bergin) P. 96:18-97:1; 102:5-23; 103:12-104:4; TT Day 24 amended (Grenier) P. 95:17-96:8; 96:13-96:15; 100:25-101:16; 103:5-10; Exs. D-87A and D-1910].
[100] [Ex. D-1910].
[101] [TT Day 21 (Cole) P. 80:16-22].
[102] [TT Day 21 (Cole) P. 80:23-81:9].
[103] [TT Day 21 (Cole) P. 80:23-81:13].
[104] [TT Day 24 amended (Haley) P. 155:6-11; 160:3-162:11; TT Day 25 (Bergin) P. 111:24-112:15; TT Day 31 (Stoller) P. 58:20-59:7].

2418144-1

**157.455  Minimum under-keel clearance.**

(a)      The owner or operator of a tankship, that is not fitted with a double bottom that covers the entire cargo tank length, shall provide the tankship master with written under-keel clearance guidance that includes –

1)      Factors to consider when calculating the ship's deepest navigational draft;

2)      Factors to consider when calculating the anticipated controlling depth;

3)      Consideration of weather or environmental conditions; and

4)      Conditions which mandate when the tankship owner or operator shall be contacted prior to port entry or getting underway; if no such conditions exist, the guidance must contain a statement to that effect.[105]

Its companion provision, 33 C.F.R. § 147.455(b), requires the master to estimate the vessel's anticipated underkeel clearance.[106]

Proper anticipated underkeel clearance provides a margin of safety for a single-hull tanker against the unknown obstructions and deficiencies in charting.[107]   The purpose of the regulation is to eliminate the risk of striking an object or shoal and causing an oil spill.[108] Plaintiffs' unsafe and dangerously inaccurate calculations of anticipated under keel clearance eliminated the required safety margin for the ATHOS I and proximately caused the allision with the abandoned anchor and the resulting oil spill.[109]

### c.      Plaintiffs failed to consider anticipated controlling depths.

Both the *U.S. Coast Pilot* and the UK *East Coast Pilot* of the U.S. specifically distinguish controlling depth from "project depth" and define "controlling depth" as the shallowest depth

---

[105] [TT Day 24 amended (Grenier) P. 84:3-20].
[106] [TT Day 24 amended (Grenier) P. 85:25-86:10; 103:6-10].
[107] [TT Day 24 amended (Grenier) P. 91:15-23; TT Day 24 amended(Haley) P. 147:2-19; 170:22-171:9; TT Day 27 (Daggett) P. 141:3-6; 141:15-142:7].
[108] [TT Day 27 (Daggett P. 141:20-142:2; TT Day 24 amended (Grenier) P. 86:11-18; 91:15-92:14; TT Day 29 (Anderson) P. 116:21-118:18; TT Day 14 amended (Markoutsis) P. 130:3-7].
[109] [TT Day 29 (Anderson) P. 116:21-117:12; 118:6-18; TT Day 21 (Cole) P. 72:4-74:16; Ex. D 2015; TT Day 25 (Bergin) P. 123:23-124:4; 125:7-25; 126:12-21; TT Day 27 (Daggett) P. 194:1-195:2; TT Day 24 amended (Grenier) P. 113:13-22; TT Day 12 amended (Bowman) P. 110:7-111:3; Ex. D-96; Ex. D-2013; Ex. D-2014; Ex. D-2015; Ex. D-2016].

within the confines of the entire channel.[110]  Tsakos failed to provide any guidance to the master

of the ATHOS I concerning the procedure to identify anticipated controlling depths and thereby

violated 33 C.F.R.§ 157.455(a), which specifically requires such guidance.[111]

   The master and navigation officer of the ATHOS I further ignored the published

controlling depth information on the navigation charts before the incident.[112]  Plaintiffs were also

required to be fully aware of NOAA's admonition in its *U.S. Coast Pilot* publication aboard the

ATHOS I, which warned that it cannot be emphasized too strongly that charts based on modern

surveys do not show all sea bed obstructions.[113]

   The post-incident Tsakos voyage plan reveals that the master and second officer of the

ATHOS I based their after-the-fact calculations on an erroneous controlling depth of MLLW of

40 feet, an erroneous height of tide of 6.2 feet (high tide), and the erroneous assumption that

there would be 46.2 feet of available water throughout the Anchorage.[114]  Contrary to their

misconceptions, Pilot Bethel, the docking pilot, was aware of a charted 38 foot shoal in Federal

Anchorage No. 9 and assumed that only 37 feet of available water was available in Federal

Anchorage No. 9 for the transit, since the tidal height was one foot lower than predicted.[115]  Yet,

he never communicated this fact to Captain Markoutsis.[116]  Moreover, an Army Corps of

Engineers Channel Statement issued on January 30, 2004 set forth a controlling depth of 37 feet

---

[110] [TT Day 24 amended (Haley) P. 156:21-157:8; Ex. D-6 at page 2373; TT Day 24 amended (Grenier) P. 84:3-85:20; Ex. D-1108 at page CARPROD 23013].

[111] [TT Day 24 amended (Grenier) P. 84:3-85:20; 101:25-102:16; TT Day 27 (Daggett) P. 138:5-23; 157:14-158:14; Ex. D-234; Ex. D-20 at VOP B-13, pages 0728-0730].

[112] [TT Day 27 (Daggett) P. 176:3-12; TT Day 24 amended (Grenier) P. 101:25-102:16; TT Day 24 amended (Haley) P. 155:12-157:8; 158:5-22; 159:25-160:9; 161:13-162:11; TT Day 15 amended (Markoutsis) P. 8:8-9:8; 9:16-10:25; Ex. D-87A; Ex. D-8 at page 2603].

[113] [Ex. D-1108 at page CARPROD 23014].

[114] [TT Day 24 amended (Haley) P. 169:22-170:21; TT Day 25 (Bergin) P. 125:7-21; Ex. D-1910].

[115] [TT Day 8 amended (Bethel) P. 7:5-9; 10:3-7; 64:22-65:1; TT Day 24 amended (Haley) P. 169:10-170:21; TT Day 31 (Stoller) P. 62:1-24; 67:2-24; 69:13-70:2; 75:5-25; 76:18-24].

[116] [TT Day 8 amended (Bethel) P. 71:1-9; 71:13-18].

and depths as low as 36 feet for Federal Anchorage No. 9.[117]  Nevertheless, Captain Markoutsis and navigators aboard the ATHOS I negligently failed to use 37 feet as the anticipated controlling depth of water for the transit through the Anchorage.[118]

By failing to properly consider anticipated controlling depths and comply with Tsakos' minimum anticipated underkeel clearance guidance, plaintiffs violated 33 C.F.R. § 157.455 (a) and (b) and Tsakos' safety management system procedures.[119]  Their erroneous assumptions, miscalculations, and regulatory violations solely and proximately caused the allision.

### d. Plaintiffs failed to properly consider tidal conditions and wait for a safety margin at higher water.

By failing to consider tide and currents properly, the pilots, the master, and the crew of the ATHOS I negligently violated 33 C.F.R. § 157.455, and Tsakos's own procedures, and transited through the Anchorage with an insufficient underkeel clearance and safety margin to avoid the anchor.  Their violations proximately caused the allision with the anchor at near low tide.

On November 26, 2004, during the ATHOS I's voyage up the Delaware River at low tide with an ebb current flowing out of the River, NOAA's tidal data revealed that the actual tide was, in fact, running 0.8 to 1.1 feet <u>below</u> predicted levels.[120]  Strong winds out of the northwest on November 25 and 26, 2004, as predicted in the *UK Coast Pilot* book aboard the ATHOS I, caused the tidal height also to be lower than predicted.[121]

---

[117] [Ex. D-1174; Ex. D-321].
[118] [TT Day 24 amended (Haley) P. 169:10-170:21; TT Day 31 (Stoller) P. 62:1-24; 67:2-24; 69:13-70:3; 75:5-76:24].
[119] [TT Day 16 (Johnson) P. 187:5-25; TT Day 24 amended (Haley) P. 166:15-168:6; 169:10-170:21; TT Day 27 (Daggett) P. 135:10-136:12; 139:25-140:2].
[120] [TT Day 21 (Cole) P. 60:20-61:4; TT Day 24 amended (Haley) P. 164:3-11].
[121] [TT Day 21 (Cole) P. 49:7-18; TT Day 24 amended (Haley) P. 164:17-20; 165:10-22; Ex. D-46 (East Coast of the United States Pilot Volume 11-9th Ed. 2003) at p. ATHOS 2445].

The high tides at Federal Anchorage No. 9 actually occurred at 12:48 hours on November 26, 2004 and at 01:06 hours on November 27, 2004. At these high tides, the actual tidal heights in the Anchorage were 5.9 feet and 5.1 feet, respectively, above the MLLW charted depths.[122] The tide reached a height of 2.3 feet above charted depths in Federal Anchorage No. 9 at 22:06 hours on November 26, 2004, and water depths in the Anchorage were 5.1 feet above charted depths at maximum high tide, which occurred at 01:06 hours on November 27.[123] The ATHOS I's officers and pilots failed to take these conditions into account and instead proceeded up the river and into the Anchorage at near low tide.

Although he had a cell phone, River Pilot Teal never attempted to obtain information about the actual height of the tide from NOAA's PORTS System either before or during the river transit.[124] Astonishingly, he did not know that the actual tide height was lower than predicted on the date of the incident.[125] Had the master and Pilot Teal properly consulted the PORTS system, they would have readily realized that the tides were lower than predicted and that they were proceeding at low tide, rather than high tide as the master and navigation officer erroneously assumed.[126] The ATHOS I's navigators could not have gotten it any more wrong, and they failed to candidly admit their errors to the Coast Guard, instead representing in Coast Guard interviews and in their fabricated post-incident "voyage plan," that they had planned a high-tide approach and had come in at a higher tide, which if true, would have avoided the anchor.

When Docking Pilot Joseph Bethel boarded the ATHOS I at 20:30-20:31 hours, the vessel was about one and one-half miles south of Federal Anchorage No. 9 and 30-50 minutes away from the CARCO terminal, the tidal current was ebbing (decreasing) at 0.5 knots, and the

---

[122] [TT Day 21 (Cole) P. 69:18-70:18; 71:1-11; Ex. D-2015].
[123] [TT Day 21 (Cole) P. 71:21-74:16; Ex. D-2015].
[124] [TT Day 2 amended (Teal) P. 86:12-25].
[125] [TT Day 2 amended (Teal) P. 87:1-4].
[126] [TT Day 21 (Cole) P. 60:20-61:4].

actual tidal height was 0.5 feet below the charted depths and 1.1 feet below the predicted tidal height.[127] The docking "window" established by the Docking Pilots Association "opened" at the time of the start of the flood current at Billingsport Range. Bethel never consulted NOAA's Ports System to obtain real-time information about the actual height of the tide.[128] Nor did he calculate the predicted tide for the start of the flood current at Billingsport Range, the "trigger" for the start of the docking-pilot window that he was applying. Instead, Bethel erroneously assumed that the flood current would start at about 20:20 or 20:25 hours and that the tide would rise from one to one and one-half feet above low tide by the time he entered the Anchorage.[129] He did not check to confirm, or discuss his assumptions with the ship's officers.

Contrary to Bethel's erroneous assumption, however, the flood current was in fact shown in the official NOAA data to start at Billingsport Range at 20:52 hours, 30 minutes later than Bethel mistakenly believed, which was four minutes <u>after</u> the ATHOS I had already entered Federal Anchorage No. 9, when the actual tide height was one foot lower than predicted and when the water depths were 2.4 inches less than the charted depths.[130] The ATHOS I prematurely arrived in the Anchorage before the Docking Pilots Association's window opened, which should have been "a red flag" to the pilot not to continue onward into potential danger.

In an attempt to camouflage the fact that the ATHOS I entered the Anchorage at dead low tide, plaintiffs have characterized the tide as "rising." But they fail to consider Dr. Cole's actual tidal calculations. Dr. Cole testified that he calculated the tide level for the time the ATHOS I entered the Anchorage to be .2 feet <u>below</u> the MLLW charted depths.[131] He testified that after

---

[127] [TT Day 8 amended (Bethel) P. 4:12-13; 5:19-22; 7:5-13; 8:25-9:3; 13:19-24; Day 21 (Cole) P. 66:16-68:10; Ex. D-2013].
[128] [TT Day 8 amended (Bethel) P. 66:11-24].
[129] [TT Day 8 amended (Bethel) P. 9:21-10:7; 47:21-24; 72:6-14; 74:1-20; TT Day 21 (Cole) P. 69:10-17].
[130] [TT Day 21 (Cole) P. 68:11-69:17; 71:12-73:22; TT Day 31 (Stoller) P. 78:22-79:9; Ex. D-2014; Ex. D-2012; Ex. D-2016; Ex. D-2015].
[131] [TT Day 21 (Cole) P. 71:13-72:23].

42

the ATHOS I had already entered the Anchorage and was reportedly passing over the anchor between 21:00 and 21:04 hours, the tide level was a mere 2.4 to 3.8 inches above MLLW.[132] Tide levels of -.2 feet below and 2.4 to 3.84 inches above MLLW are in stark contrast to the tide levels calculated for the other ships in the same docking window category that safely passed through the Anchorage to get to the CARCO terminal. Had Captain Markoutsis and the navigators properly considered the time and tides, the ATHOS I would have waited before proceeding and would not have struck the anchor.[133] Having no accurate tidal or current calculations of his own, Captain Markoutsis had no means to check Bethel's erroneous assumptions. Instead, Captain Markoutsis blindly relied on what turned out to be dangerously inaccurate information.

The plaintiffs' own expert, Anthony Bowman, admits that the ATHOS I would not have contacted the anchor if the ship had waited until the tide was just 1 foot 6 inches higher, even if the anchor was standing "flukes up" as he hypothesizes.[134] The tide would have risen by more than 1 foot 6 inches in less than an hour after the vessel hit the anchor.[135] By 22:06 hours on November 26, 2004, the tide was 2.3 feet above the charted depths and was 5.1 feet above the charted depths by 01:06 hours on November 27, 2004.[136]

The *Guide to Port Entry 2003 / 2004 Edition (Volume 1)*, a publication referenced by the second officer as having been used in preparing the post-incident Tsakos voyage plan, provided that vessels calling at the CITGO Refinery, Paulsboro, New Jersey should transit the Delaware

---

[132] [TT Day 21 (Cole) P. 74:20-75:11]).
[133] [TT Day 25 (Bergin) P. 125:12-25; 126:12-21; TT Day 27 (Daggett) P. 190:15-191:18; 194:1-195:2; Ex. D-196 at Athos 24524; Ex. D-2013; Ex. D-2014; Ex. D-2015; Ex. D-2016].
[134] [TT Day 12 amended (Bowman) P. 21:13-22:8; 110:8-111:3].
[135] [TT Day 21 (Cole) P. 71:21-74:16; Ex. D-2105].
[136] [TT Day 21 (Cole) P. 69:18-25; 70:18; 71:1-11; 73:23; 74:5; Ex. D-2015].

River on a <u>rising tide</u> so as to arrive off the CITGO dock two hours before high tide.[137]  The Captain of the ATHOS I intentionally ignored the arrival recommendations set forth in that publication.[138]  Had the ATHOS I followed the advice in the *Guide to Port Entry*, the ATHOS I would have had an additional 4½ feet of water as a safety margin during the transit through Federal Anchorage No. 9 and would not have struck the anchor under any orientation scenario.[139]

Plaintiffs contend without support that they were entitled to violate mandatory United States Coast Guard regulation 33 C.F.R. § 157.455 (a) and (b) and rely solely on non-binding Mariners Advisory Committee ("MAC") Transit Advisories to determine whether the vessel had an adequate safety margin for the low tide transit up the Delaware River and through Federal Anchorage No. 9.  But plaintiffs' own expert, retired Coast Guard Captain Gregory Adams, confirmed that the MAC transit advisories did <u>not</u> relieve the master and pilot aboard the ATHOS I of the requirement to fully comply with 33 C.F.R. § 157.455 (a) and (b).[140]  The MAC advisories were non-binding recommendations based on normal tide and weather conditions.[141]  They did not trump or affect the actual conditions of the vessel's transit.  Plaintiffs and their pilots failed to consider actual tidal conditions and to heed the warnings set forth in the very MAC advisories upon which they purportedly relied.

### e.    Plaintiffs failed to consider the vessel's squat.

Plaintiffs' failure to properly calculate and consider the effects of squat proximately caused the allision.  Vessel squat is the increase in draft that a ship experiences as it displaces

---

[137] [TT Day 15 amended (Markoutsis) P. 5:16-6:22; Ex. D-196 at page Athos 24524; Ex. D-87A at page Athos 10082].
[138] [TT Day 15 amended (Markoutsis) P. 6:23-7:7; TT Day 27 (Daggett) P. 194:1-195:2; Ex. D-87A at p. Athos 10082].
[139] [TT Day 27 (Daggett) P. 194:1-195:2; TT Day 12 (Bowman) P. 21:13-22:8; 110:5-111:1; Ex. D-196; Ex. D-2013; Ex. D-2014; Ex. D-2015; Ex. D-2016].
[140] [TT Day 3 amended (Adams) P. 95:16-97:3].
[141] [TT Day 2 amended (Teal) P. 81:10-24; 87:1-4; TT Day 3 amended (Adams) P. 88:2-90:1; TT Day 24 amended (Haley) P. 164:3-16; Ex. D-87A].

water beneath it in proportion to the square of the ship's speed and drops down (squats) deeper in the water. The shallower the depth of water beneath the ship, the greater the squat.[142] Ship's squat is an important factor that must be considered when calculating anticipated underkeel clearance.[143]

Tsakos's safety management system procedures required the master to fully analyze squat and anticipated underkeel clearance.[144] Additionally, regulations and conventions required the navigators aboard the ATHOS I to consider the effects of squat before the start of the subject voyage.[145] There is no evidence that the officers of the ATHOS I, before the casualty, considered squat to determine the depth of the vessel's hull.

Even after the oil-spill incident occurred and "actual data" was available, the second officer still miscalculated the ATHOS I's predicted squat for the transit of the Delaware River by basing it on the wrong vessel speed of 8.4 knots when the vessel's speed was 10 knots during the transit up through Billingsport Range, and he failed to make speed estimates by taking into account the effect of predicted ebb currents, which actually increased the vessel's speed through the water and the amount of squat during the transit.[146] The vessel's failure to properly predict vessel speed and squat made it impossible to accurately calculate anticipated underkeel clearance.[147]

---

[142] [TT Day 27 (Daggett) P. 153:3-20; 155:12-156:13; TT Day 25 (Bergin) P. 98:16-24; TT Day 24 amended (Haley) P. 162:12-23].

[143] [TT Day 15 amended (Markoutsis) P. 46:23-25; 48:3-25; 49:1-18; TT Day 27 (Daggett) P. 156:15-157:9].

[144] [Ex. D-20 (Tsakos Vessel Operation Procedures Manual) at pp. Athos 0729-0730, ¶ 24 ("Navigating in Shallow Waters")].

[145] [3 C.F.R. § 164.11 (p) (3); IMO Res. 893(21), ¶ 3.2.2.2; Ex. D-1201 (Navigation and Inspection Circular No. 2-97 Change No. 1, 11/7/97) at Grenier 052, ¶ H. (2)].

[146] [TT Day 27 (Daggett) P. 139:4-24; 149:25-151:21; 152:5-153:2; 156:6-12; 169:17-170:6; TT Day 25 (Bergin) P. 96:12-97:1; TT Day 15 amended (Markoutsis) P. 11:17-12:7; 14:14-23; TT Day 24 amended (Haley) P. 159:10-24; Ex. D-87A].

[147] [TT Day 27 (Daggett) P. 169:17-170:6; 177:14-178:11].

Squat was also of special significance during the ATHOS I's transit of Federal Anchorage No. 9. Squat increases dramatically when a large ship is being pushed sideways, and the closer the bottom of the hull is to the river bottom, the greater the squat effect.[148] Captain Markoutsis noticed a one-half degree list of his vessel to port when the two tugs were pushing it sideways in the anchorage.[149] The ATHOS I's draft dramatically deepened on its port side as the two tugs pushed it and caused the vessel to "heel" to port relative to the vessel's centerline.[150] This heel effect increased the vessel's draft to a point where its hull was deep enough, regardless of its purported draft, to hit the anchor. *Id.*

f.     **Plaintiffs failed to consider Tsakos's own minimum underkeel requirements.**

Tsakos's own requirements were for 10% anticipated underkeel clearance based on the shallowest controlling depth of each area the vessel transited. Even assuming the vessel's purported draft was 36 feet 6 inches, this would have required a minimum clearance of 3 feet 6 inches.

Once they learned that the pilot was going to dock the vessel port side, rather than starboard side to the berth, the officers of the ATHOS I needed to re-evaluate and re-assess their passage plan with a new course line to the CARCO dock, but they failed to do so.[151] A proper reassessment would have alerted them that the controlling depth of Federal Anchorage No. 9 was 38 feet (based on the navigation chart aboard the vessel) and that the ship lacked a sufficient safety margin of underkeel clearance.[152] Had they done so, the course line would have shown that the vessel was traversing a 38-foot charted spot in Federal Anchorage No. 9, giving the

---

[148] [TT Day 15 amended (Markoutsis) P. 48:3-49:18].
[149] [TT Day 15 amended (Markoutsis) P. 33:3-11; TT Day 4 (Zotos) P. 68:10-69:5].
[150] [TT Day 26 (Petrie) P. 51:23-53:3].
[151] [TT Day 24 amended (Grenier) P. 98:10-16; TT Day 25 (Bergin) P. 122:19-124:1].
[152] [TT Day 24 amended (Haley) P. 166:21-168:6].

vessel only one and one-half feet of underkeel clearance, with its purported draft and without including the effect of squat, tide, and tugboat forces.[153]

The predicted underkeel clearance of the ATHOS I through Federal Anchorage No. 9 at a charted depth of 38 feet was a "no-go area" based on Tsakos's own safety management system procedures.[154] Captain Markoutsis acknowledged that his intention to dock under the circumstances ignored Tsakos's required 10% anticipated underkeel clearance requirement.[155] He should have realized that he was endangering the vessel and was violating his company's own safety requirements unless he waited to proceed to the berth at higher water.[156]

g. **Plaintiffs negligently failed to conduct a proper master-pilot exchange.**

The single-hull tanker regulation, 33 C.F.R. § 157.455(b), further requires the master to conduct a "master-pilot exchange" with each boarding pilot to discuss minimum underkeel clearance requirements, as well as the vessel's voyage plan and its anticipated underkeel clearance calculations.[157] This thorough exchange of information and expectations between the vessel's master and the local pilots is also an entrenched and fundamental principle of good seamanship.[158] Because the voyage plan was admittedly prepared after the oil-spill incident, it was impossible to discuss it with the pilots and complete the mandatory master-pilot exchange.[159] This violation of single hull tanker regulations was a proximate cause of the allision

---

[153] [TT Day 25 (Bergin) P. 122:19-124:1].
[154] [TT Day 24 amended (Haley) P. 166:16-168:6; TT Day 25 (Bergin) P. 123:23-125:11; 125:7-126:21].
[155] [TT Day 15 amended (Markoutsis) P. 21:25-22:9].
[156] [TT Day 25 (Bergin) P. 125:7-21].
[157] [Ex. D-2024A. Ex. D-1201; Ex. D-1235 at Grenier 0542-0543; TT Day 24 amended (Grenier) P. 85:21-86:10; 86:19-87:6; TT Day 24amended (Haley) P. 146:12-147:1; 149:15-150:4; 168:7-12; TT Day 31 (Stoller) P. 49:21-50:20; TT Day 3 amended (Adams) P. 95:16-96:24].
[158] [TT Day 2 amended (Teal) P. 94:1-22].
[159] [TT Day 24 amended (Haley) P. 150:5-17; TT Day 24 amended (Grenier) P. 100:25-101:16; TT Day 27 (Daggett) P. 139:25-140:23; TT Day 25 (Bergin) P. 95:13-96:16].

Additionally, a general navigation regulation, 33 C.F.R. § 164.11, requires the master to inform the pilot of the vessel's draft, maneuvering characteristics, peculiarities, and circumstances that may affect its safe navigation and must ensure that the pilot knows the current velocity and direction and the tidal state for the intended transit.[160]

Captain Markoutsis admitted that it was his job to know all the available depth information before the passage to determine any potential hazards for his vessel.[161] By failing to plan the voyage or calculate the vessel's underkeel clearance before the pilots boarded, however, the master could not carry out his continuing obligation to determine whether the pilots' recommendations and intentions were safe or correct.[162]

### (i)    No master-pilot exchange with the River Pilot.

In direct violation of 33 C.F.R. § 157.455(b), the master had no discussion with River Pilot Teal about the voyage plan that the ship was required to complete.[163] Teal was not given copies of any ship's documents other than the pilot card, and he never saw a voyage plan while aboard the vessel.[164] The master admitted that he had not even seen or checked any voyage plan before the incident.[165]

Pilot Teal testified that the master had no discussion with him about calculations of the minimum anticipated underkeel clearance for the river transit that the ship was required to perform under 33 C.F.R. § 157.455(b).[166] In an interview with the U.S. Coast Guard on December 2, 2004, the master confirmed that he did not discuss underkeel clearance for the transit with either Pilot Teal or Pilot Bethel.

---

[160] [TT Day 24 amended (Grenier) P. 92:19-93:7].
[161] [TT Day 14 amended (Markoutsis) P. 14:7-14:19].
[162] [TT Day 24 amended (Grenier) P. 100:11-101:20].
[163] [TT Day 24 amended (Grenier) P. 96:21-97:1; TT Day 27 (Daggett) P. 142:8-19; TT Day 31 (Stoller) P. 52:18-53:14].
[164] [TT Day 2 amended (Teal) P. 73:1-11].
[165] [TT Day 15 amended (Markoutsis) P. 7:8-25; 9:1-10:24].
[166] [TT Day 2 amended (Teal) P. 76:25-77:19; 101:17-103:1].

48

Nor did the master and Pilot Teal discuss squat or the predicted or actual tidal heights and currents that the ship would encounter during the river transit.[167]  Their failure to do so violated 33 C.F.R. § 157.455(a) and (b) concerning underkeel clearance and 33 C.F.R. § 164.11(l) and (n), which require the master to ensure that persons directing the movement of the vessel know the tidal state and the current velocity and direction for the area to be transited, and Reg. A-VIII/2, Part 3-1, Para 49 of the STCW Convention.[168]  Pilot Teal also was never informed that the ship took on additional ballast water after he boarded.[169]  That failure violated 33 C.F.R. § 164.11(k), which required the master to ensure that the pilot was informed of the vessel's draft and any factors influencing it.[170]

The master also admitted that the ATHOS I was not equipped with the wheelhouse poster required by single-hull tanker regulation 33 C.F.R. § 157.450.[171]  It would have provided Pilot Teal with information on specific squat characteristics, underkeel clearance, maximum bow squat, and increases in draft at various speeds, even though the master failed to provide that information.[172]  The failure to have the required single-hull tanker wheelhouse poster was a violation of 33 C.F.R. § 157.450.[173]

Had a proper master-pilot exchange occurred during the river transit, any reasonably competent pilot would have immediately realized that the ship's assumptions and calculations were completely erroneous for a transit beginning at 1220 hours on November 26th, that his and the master's own assessment of the timing of the transit was in error, and that the transit should

---

[167] [TT Day 2 amended (Teal) P. 76:9-12].
[168] [Exs. D-1236 and D-2024A].
[169] [TT Day 2 amended (Teal) P. 89:6-8.]
[170] [Ex. D-2024C (Grenier Table 3); TT Day 24 amended (Grenier) P. 107:7-22; TT Day 24 amended (Haley) P. 152:11-153:6; TT Day 31 (Stoller) P. 62:1-24].
[171] [TT Day 14 amended (Markoutsis) P. 114:1-25; Ex. D-436 (Email from master to Tsakos dated Nov. 22, 2004 asking for the poster)].
[172] [TT Day 17 amended (Johnson) P. 13:10-15:25; Ex. D-1212 (the required form of the special single-hull tanker wheelhouse poster)].
[173] [TT Day 24 amended (Grenier) P. 82:21-83:21; Ex. D-2024C].

be delayed for approximately five hours to coincide with the next high tide.[174] This simple and brief exchange of information that the regulation requires would have sounded alarms in time to avoid the casualty. Instead, the navigators' fault, negligence, and violations of the mandatory Coast Guard regulations detailed above resulted in the vessel's unnecessarily undertaking the river transit with the least possible underkeel clearance and margin of safety and the maximum possible risk of grounding or contact with an unknown obstruction, the very risk that the applicable regulations were intended to avoid.[175] Plaintiffs attempt to no avail to minimize the effects of their multiple statutory violations during the River transit. Their violations were serious and set in motion the cascade of errors that resulted in the oil spill.

### (ii)     No master-pilot exchange with Docking Pilot.

The master and Pilot Bethel likewise had no discussion about the voyage plan that the ship was required to complete and discuss with him under 33 C.F.R. § 157.455(b).[176] Bethel was not shown copies of any ship's documents other than the pilot card, and he never saw any voyage plan while aboard the vessel.[177] The pilot card contained no information whatsoever concerning a voyage plan, tide or current calculations, or underkeel clearance calculations.[178] These failures made it impossible for the master to satisfy his separate obligation to discuss his plan and his anticipated underkeel clearance calculations with the Pilot Bethel as 33 C.F.R. § 157.455(b) required.

In addition, the master never informed Bethel about the minimum underkeel clearance restriction of 10% of the vessel's draft that the ATHOS I was required to maintain according to

---

[174] [TT 27 (Daggett) P. 180:17-183:6; Exs. D-1415A, D-1424, and D-1425 (Daggett Tables); TT Day 31 (Stoller) P. 59:15-61:25; TT Day 24 amended (Haley) P. 149:15-164:2; TT Day 25 (Bergin) P. 120:14-121:9].
[175] [TT Day 27 (Daggett) P. 141:3-142:2; TT Day 31 (Stoller) P. 59:1-14].
[176] [TT Day 8 amended (Bethel) P. 72:18-20].
[177] [TT Day 8 amended (Bethel) P. 29:15-30:19; 72:15-17; TT Day 15 (Markoutsis) P. 30:8-11; Markoutsis Dep. P. 429:12-430:3].
[178] [Ex. D-015 (pilot card); TT Day 16 amended (Johnson) P. 210:21-25].

2418144-1

the guidance that Tsakos provided to the ship under 33 C.F.R. § 157.455(a) in its official Vessel Operations Procedure Manual.[179]  The master was required to inform him about this restriction under 33 C.F.R. § 157.455(b).  The master admitted that a water depth of 38 feet made it impossible for the ship to maintain a 10% or even a 5% minimum underkeel clearance.[180]  Lacking knowledge of the Tsakos restriction, the docking pilot had no reason to evaluate and advise the master whether the ship could satisfy it based on the depths in Federal Anchorage No. 9 and the state of the tide.[181]

The master and Pilot Bethel had no discussion of the predicted, assumed, or actual tidal heights for the transit through Federal Anchorage No. 9, and Bethel never saw any tide calculations done by the ship's crew.[182]  Despite having a cell phone, Bethel did not obtain any information about the actual height of the tide from the NOAA's PORTS System or any other source.[183]  Although he claims to have assumed that the actual tides were one foot lower than predicted and that the tide would rise from one to one and a half feet above low tide by the time that the ship entered the Anchorage, Bethel never discussed that assumption with the master.[184]  Bethel never told the master that the transit would occur at or near the time of predicted low tide.[185]

Both Bethel and the master had the authority to wait for a higher tide before entering Federal Anchorage No. 9.[186]  Bethel testified that the decision on when to enter Federal Anchorage No. 9 was his alone, subject only to being overruled by the master, and that he had

---

[179] [TT Day 8 amended (Bethel) P. 71:25-72:2].
[180] [TT Day 15 amended (Markoutsis) P. 21:25-22:25].
[181] [TT Day 25 (Bergin) P. 122:19-128:15; TT Day 24 amended (Haley) P. 166:16-169:9; TT Day 31 (Stoller) P. 68:1-71:4].
[182] [TT Day 8 amended (Bethel) P. 71:1-18; 73:10-16].
[183] [TT Day 8 amended (Bethel) P. 66:11-24].
[184] [TT Day 8 amended (Bethel) P. 10:3-7; 72:6-14; 74:1-16].
[185] [TT Day 8 amended (Bethel) 71:13-18].
[186] [TT Day 8 amended (Bethel) P. 79:16-80:6; TT Day 15 amended (Markoutsis) P. 21:6-10].

the authority to depart from the Docking Pilot Guidelines if necessary for safety.[187]  Without a proper master-pilot exchange, however, neither Captain Markoutsis nor Pilot Bethel could make a meaningful decision about safety by considering the tides.

Although he had never piloted a ship through Federal Anchorage No. 9 at dead low tide, but instead at times no earlier than three hours before high tide (when the tide would be at least half way to high tide), Bethel never disclosed that fact to the master of the ATHOS I.[188]  Indeed, Bethel had piloted at least 15 ships to the CARCO terminal before the ATHOS I, and the arrival of every one of those ships was timed to occur no earlier than three hours before high tide.[189]  Had the ATHOS I properly planned its voyage and timed its arrival at the Anchorage to provide for a safe underkeel clearance at a time of the tide consistent with all of the other vessels that Bethel piloted, the ATHOS I would have missed the anchor under either anchor-orientation scenario.[190]

Also in violation of Federal regulations, the master never told Pilot Bethel that the ship had taken on additional ballast water during the upriver transit.[191]  Bethel testified that because more ballast necessarily increased the vessel's draft, he should have been informed.[192]  This failure to communicate violated another mandatory regulation, 33 C.F.R. § 164.11(k), which required the master to ensure that the pilot was informed of the vessel's draft and any factors influencing it.[193]

The master and pilots were all at fault, and the ship and plaintiffs bear the ultimate liability under maritime law.  The mere presence of a pilot on board the ship does not relieve the

---

[187] [TT Day 8 amended (Bethel) P. 77:21-78:12].
[188] [TT Day 8 amended (Bethel) P. 4:14-16; 52:23-25; 53:12-18; 54:17-55:4; 55:13-55:25; 59:14-60:24].
[189] *Id.*
[190] [TT Day 21 (Cole) P. 73:2-74:16; Ex. D-2015; TT Day 25 (Bowman) P. 110:8-111:3].
[191] [TT Day 8 amended (Bethel) P. 72:21-23].
[192] [TT Day 8 amended (Bethel) P. 72:24-73:9].
[193] [Ex. D-2024C (Grenier Table 3); TT Day 31 (Stoller) P. 62:1-24].

vessel's master from his responsibility and obligation for the safety of the vessel. *The Oregon,* 158 U.S. 186, 195, 15 S. Ct. 804, 39 L. Ed. 943 (1895); *Osprey Ship Mgmt. Inc. v. Foster*, No. 08-61125, 387 F. App'x 425, 433 (5th Cir. 2010). Both the docking pilot and the master bear responsibility for bringing a ship safely through a channel to a berth. *See Complaint of Nautilus Motor Tanker Co., Ltd.*, 862 F. Supp. 1260, 1274 (D.N.J. 1994), *aff'd*, 85 F.3d 105 (3d Cir. 1996); *Delta Transload, Inc. v. M/V NAVIOS COMMANDER*, 818 F.2d 445, 451, n.17, 1988 A.M.C. 1155 (5th Cir. 1987).

Under the STCW in effect on November 26, 2004, a pilot's "presence on board <u>does not relieve</u> the master or the officer in charge of the navigational watch from their duties and obligations for the safety of the ship." [STCW, '78 as amended, Reg. A-VIII/2, Part 3-1, paragraph 49] (emphasis added). Before the incident, plaintiffs themselves specifically instructed the captain of the ATHOS I that a pilot's "presence on board <u>does</u> <u>not</u> <u>relieve</u> the Master or Officer in charge of the watch from their duties and obligations for the safety of the ship."[194] Plaintiffs required Captain Markoutsis to "take over for the pilot when he deem[ed] necessary" and to "take any appropriate action to ensure the vessel's safe transit."[195]

The fault of a compulsory pilot like Howard Teal in causing a collision is imputed to the vessel *in rem*, which is liable for the damage caused. *Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 413, 21 S. Ct. 831, 45 L. Ed. 1155 (1901); *The China,* 74 U.S. 53, 64, 19 L. Ed. 67, 7 Wall. 53, 2002 A.M.C. 1504 (1868); *Probo II London v. Isla Santay MV*, 92 F.3d 361, 365, 1997 A.M.C. 657 (5th Cir. 1996); *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 217-18, 1993 A.M.C. 2705 (3d Cir. 1993). If the compulsory pilot's fault alone causes the collision, the shipowner will not be liable *in personam*, but if the

---

[194] [Ex. D-20 (Tsakos Vessel Operation Procedures Manual), P. 0708, ¶ No. 2 "Responsibility" (emphasis added)].
[195] *Id.* at 0708, ¶ No. 2 "Responsibility"; *id.* at 0730, ¶ No. 2.4 "Under keel clearance."

negligence of the master or crew also contributes to the collision, then in addition to the vessel's liability *in rem* the shipowner is also liable *in personam. Id.*; *Smith v. Condry*, 42 U.S. 28, 35-36, 11 L. Ed. 35 (1843); *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 492-93, 1994 A.M.C. 1555 (5th Cir. 1994). "Even in the case of the compulsory pilot . . . the shipowner may still be liable *in personam* if found somehow at fault." *Evans,* 4 F.3d at 218; *see also Osprey Ship Mgmt., Inc. v. Foster*, No. 1:05CV390, 2008 WL 4371376, at *29 (S.D. Miss. Sept. 18, 2008), *aff'd*, No. 08-61125, 387 F. App'x 425 (5th Cir. 2010) (finding a compulsory pilot 50% at fault and the vessel's master 50% at fault in proximately causing damages that the vessel sustained when it allided with a submarine launchway).

A shipowner is also liable for the negligent acts of a voluntary or non-compulsory pilot like Joseph Bethel, the docking pilot who was aboard the ATHOS I. *See Evans*, 4 F.3d at 217-18 ("Where the pilot is taken at the discretion of the shipowner, the case for a master-servant relationship is stronger and the owner may be held to answer for the torts of the pilot."). A voluntary or non-compulsory pilot aboard a vessel is the servant of the vessel owner. *See California ex rel. Dep't. of Transp. v. S/T Norfolk*, 435 F. Supp. 1039, 1046 and n.2 (N.D. Cal. 1977); *In re Arb. Between Transportes del Este Navegaceon, S.A.*, 1990 A.M.C. 1058, 1066 (Feb. 13, 1990) (Berg, Healy & Loesberg, Arb.); Cooke, *et al.*, *Voyage Charters*, ¶ 5.61, at p. 121 (3d ed. 2007) ("Pilots and tugboats are normally regarded as agents of the owner for the purpose of navigating the vessel in restricted waters, whether pilotage is compulsory or not, and errors in navigation by a pilot (or a tug) are thus generally regarded as attributable to the owners."); *id.* at ¶ 5.92, at p. 130 ("The charterer has no liability where the effective cause of the loss is not the unsafety of the port or place but rather the negligence of the master, owner or his

servants or agents, among which are included, in the absence of special provision to the contrary, tugs and pilots.")

As discussed above, the master of the ATHOS I and both pilots failed in their responsibilities to conduct master-pilot exchanges concerning voyage planning, underkeel calculations, and tidal information that were necessary for the safe navigation of the ship and the avoidance of the oil spill, and they violated fundamental principles of good seamanship and mandatory Coast Guard regulations for single-hull tankers.[196] The negligence of River Pilot Teal and Docking Pilot Bethel is imputable to plaintiffs.

The ATHOS I incident is a textbook example of the consequences of a failed master-pilot exchange that put the vessel at high risk. The required master-pilot exchange between the master and the docking pilot represented the last clear chance to prevent the oil spill.[197] Plaintiffs' negligent failure to obey the mandatory Coast Guard regulations resulted in a transit through Federal Anchorage No. 9 when the vessel had the least possible underkeel clearance as a margin of safety and the maximum possible risk of contact with a unknown obstruction—the very risk that the regulations were intended to avoid.[198] No closer or more direct nexus between regulatory violations and the oil spill could exist.

Courts and arbitrators have repeatedly refused to impose liability upon a charterer such as CARCO for alleged breach of a safe-port or safe-berth obligation where the vessel's master or pilot failed to navigate safely under the circumstances in view of the tide or current confronting the vessel. The designated port or berth is safe, and a charterer satisfies a warranty, when it is *possible* for the vessel to avoid the danger through the exercise of good navigation and

---

[196] [TT Day 24 amended(Grenier) P. 107:19-25; 108:1; TT Day 25 (Bergin) P. 120:10-24; TT Day 31 (Stoller) P. 59:15-61:11; Ex. D-2024C (Grenier Table 3)].
[197] [TT Day 31 (Stoller) P. 67:2-24].
[198] [TT Day 24 amended (Grenier) P. 113:13-22; TT Day 31 (Stoller) P. 59:1-14].

seamanship. And a charterer has no liability under a safe-port/safe-berth clause where the vessel's poor seamanship or failure to maintain a proper underkeel clearance or draft solely causes the casualty:

- *In re Arb. Between Delphina Tanker Corp. and Axel Johnson Energy Corp. (M/T Delphina),* 1999 WL 34976573, at *3, S.M.A. Award No. 3508 (Feb. 5, 1999) (Nelson, Elias & Mordhorst, Arbs.) (a vessel that struck an uncharted rock obstruction while attempting to dock took the risk of navigation and could have avoided the dangers of the berthing maneuver if carried out with extreme caution and sound seamanship);

- *In re Marbulk Shipping, Inc. (M/V Bahama Spirit),* 2004 WL 5658898, at *6, S.M.A. Award No. 3849 (June 4, 2004) (Berg, Wiswell & Martowski, Arbs.) (a vessel's striking an uncharted object and grounding resulted solely from imprudent navigation by the pilot and the master);

- *In re Arb. Between Sunrise Shipping Company S.A. (S.T. Michael C. Lemos and Amerada Hess Shipping Corp.,* 1983 WL 825073, at *11, S.M.A. Award No. 1906 (Nov. 7, 1983) (Zubrod, Berg & Nelson, Arbs.) (a vessel grounded due to errors of navigation by the pilot; the charterer furnished a safe port/berth according to its responsibility under the charter party);

- *In re Arb. Between PHS Van Ommeren NV and Jno. McCall Coal Export Corp.,* 1989 WL 1646306, at *7-9, S.M.A. No. 2571 (May 26, 1989) (Berg, Nelson & Mordhorst, Arbs.) (the charterers provided a safe berth with a depth that fluctuated with the tide and prevailing winds; the damage to the vessel's hull that occurred when it stranded "was the end result of the Master's and Pilot's

56

negligence in attempting to berth" with insufficient underkeel clearance at a time when the water level was decreasing with an ebb tide);

- *Cook Inlet Pipe Line Co. v. American Trading and Production Corp.,* 1977 A.M.C. 160, 165-66 (S.D.N.Y. 1976) (no breach of the safe-berth clause occurred where the master and pilot of the vessel were negligent in miscalculating the time, direction, and force of the maximum ebb current and in failing to await a change in tidal conditions before attempting to depart from the terminal);

- *In re Arb. Between Petroleum Transport, Inc. and Texaco Panama, Inc.,* 1974 WL 335622, at *7-9, S.M.A. No. 896 (Oct. 31, 1974) (Ottaway, Berg & Sauer, Arbs.) (the grounding of the vessel resulted from an error in navigation while attempting to unberth from the Texaco facility in Pointe-a-Pierre, Trinidad, where during previous years three longer ships with deeper drafts had "departed the berth at or near high water while the 'PYRGOS' departed about one hour prior to low water," where "the Master could have done more to satisfy himself that the 'PYRGOS' could safely load her cargo and then unberth at near or low tide," and where "[h]e need not have undocked at about the time of low water; this was a matter in which he could exercise his own discretion and for which he had sole authority.");

- *In re Arb. Between Pac. Logistics (M/T Halekulani) and Mobil Tankers Ltd.,* 1981 WL 640686, at *4, S.M.A. No. 1633 (Dec. 17, 1981) (Kalaidjian, Brown & Bauer, Arbs.) (denying a claim for damages associated with a vessel's grounding, noting that the safe-berth provision was not an unconditional warranty, that the master went ashore without obtaining information on tidal conditions or

determining the tidal stage, and that if the vessel had current tidal tables or had obtained tidal information from the Coast Guard, the insufficient depth of the anchorage would have been discovered before the grounding); and

> **h.** **The allision was a direct, proximate, and inevitable consequence of plaintiffs' poor navigation, bad seamanship, and flagrant regulatory violations.**

The master and pilots of the ATHOS I negligently navigated the vessel and attempted to dock at near low tide, instead of waiting for higher water. Frescati, Tsakos, the vessel's officers and crew, and the river and docking pilots aboard the ATHOS I utterly and completely disregarded multiple mandatory domestic and international marine safety regulations that were intended to prevent the very type of casualty that occurred. The ATHOS I incident was no "accident" at all.

> **3.** *Plaintiffs breached their non-delegable duty to maintain a seaworthy vessel in good repair and with a competent crew.*

The ATHOS I was unseaworthy in a multiple of ways, including a malfunctioning ballast system, a deficient maintenance, record-keeping, and safety system required to maintain and repair the vessel's equipment in good order, and an ill-trained and incompetent crew. These unseaworthy conditions directly resulted in the allision.

In addition to negligence, an unseaworthy condition of a vessel can be a contributory and proximate cause of an accident. *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1566 (11th Cir. 1985). "The vessel owner has a nondelegable responsibility to use diligence to make its ship seaworthy which includes proper selection and training of the ship's crew." *In re Complaint of Waterstand Marine, Ltd.,* No. 87-1516, 1988 WL 78776, at *11, 1991 A.M.C. 1784 (E.D. Pa. July 26, 1988). Unseaworthiness may result from an incompetent crew or from improper maintenance of the vessel's equipment. *Hercules*

*Carriers, Inc.*, 768 F.2d at 1566. Here the Voyage Charter, Part II, paragraph 1 contains a seaworthiness warranty that spans the entire voyage of the ATHOS I.[199] *See Mobil Shipping & Transp. Co v. Wonsild Liquid Carriers, Ltd.,* 190 F.3d 64, 66, 1999 A.M.C. 2705 (2d Cir. 1999) (under the charter party contract the ship owner warranted a seaworthy vessel).

As in this case, a vessel may be rendered unseaworthy when the master and crew regularly fail to follow rules and regulations applicable to navigation. *See Hercules,* 566 F. Supp. at 976. The ship must be staunch and strong and well equipped for the intended voyage, with a competent crew and skilled master. *In re Complaint of Waterstand Marine, Ltd.*, No. 87-1516, 1988 WL 78776, at *13, 1991 A.M.C. 1784 (E.D. Pa. 1988).

In *Waterstand Marine*, this Court held that a vessel piloted by Howard Teal (the same River Pilot who was aboard the ATHOS I on November 26, 2004) was unseaworthy when it struck an electric utility tower in the Delaware River. 1988 WL 78776, at *13, 1991 A.M.C. at 1799. As this Court found, the ship was unseaworthy because "both pilot Teal and Captain Siderakis were incompetent regarding the use of ARPA [Automatic Radar Plotting Aid]. This incompetence was due to petitioners' failure to fulfill their duty to man their ships with a fully trained crew." *Id.*, 1991 A.M.C. at 1801. The *Waterstand* court denied the ship owner's request to limit liability, upon concluding that the ship's negligence and/or unseaworthy conditions bore a substantial causal relationship to the collision. *Id.,* 1991 A.M.C. at 1799.

The test of seaworthiness also requires the vessel to be reasonably fit to carry the cargo that she has undertaken to transport. *See Mobil Shipping and Transp. Co. v. Wonsild Liquid Carriers, Ltd.*, 190 F.3d 64, 69, 1999 A.M.C. 2705 (2d Cir. 1999); *Atlantic Banana Company v. M/V Calanca*, 342 F. Supp. 447, 452, 1972 A.M.C. 880, 886 (S.D.N.Y. 1972), *aff'd,* 489 F.2d 752 (2d Cir. 1974). Particularly relevant to the ATHOS I matter—a heightened standard for

---

[199] [Ex. D 606 at ¶ 1, at CARPROD 00535]. *See also* [Ex. D-606, ¶ 19, at CARPROD 00536].

determining seaworthiness applies when the vessel is carrying a hazardous liquid cargo such as oil and when a spill may adversely affect the environment. *See Mobil Shipping,* 190 F.3d at 68-69 ("In this environmentally-sensitive era, consideration of the potential environmental impact of a disaster comports with modern notions of what goes into the 'seaworthiness' calculus."). "Common sense counsels that 'safe' transport encompasses not only the vessel's ability to protect the cargo's integrity, but also its ability to transport the cargo without threatening the environment." *Id.* at 69. The ATHOS I's cargo of crude oil in a single-hulled tanker mandates a heightened standard for determining the vessel's seaworthiness.

Mere certification of the vessel by a classification society or a foreign government does not establish that a ship is seaworthy or that the shipowner is not negligent. *In re Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 574 F. Supp. 418, 428, 1984 A.M.C. 985 (S.D.N.Y. 1983). This is because while "the shipowner, on paper follows the . . . rules and recommendations, the actual practice of the company was" that it does not. *In re Hercules Carriers, Inc.,* 566 F. Supp. 962, 974 (M.D. Fla. 1983), *aff'd,* 768 F.2d 1558 (11th Cir. 1985). Moreover, an ISM audit of a company's safety management system or a vessel audit by Lloyd's Register is not a guarantee that non-conformities or negligent actions by vessel personnel or the company will not occur in the future.[200]

### a. Plaintiffs failed to maintain the ballast systems of the ATHOS I in good repair, which rendered the vessel unseaworthy.

The ATHOS I was unseaworthy because of the seriously deteriorated and unrepaired condition of its ballast system, which caused the ship's personnel to be unable to determine the amount of ballast aboard the vessel during the voyage. Coast Guard regulations, 33 C.F.R. § 160.215 and 33 C.F.R. §§ 151.2041 and 2045, require the vessel to report to the Coast Guard

---

[200] [TT Day 34 amended (Mitchell) P. 34:7-37:2].

2418144-1

anything that affects the seaworthiness of the vessel, such as problems and defects in the ship's ballast system.[201]  Taking on ballast changes the draft of the vessel, which is critical information for the ship's navigation.[202]

The ATHOS I's ballast system was a "U" type with short branch lines leading from the main line to each ballast tank.[203]  To add ballast to any tank, the operator must pressurize the entire ballast line running through all the tanks and use remotely controlled hydraulic valves to direct ballast into specific tanks.[204]  If the ballast line has a hole in it or if a valve to another tank is open, leaking, or not fully closed, ballast water may be unknowingly and unintentionally added to the tank where the hole or open valve is located.[205]

The ballast system of the ATHOS I had been in disrepair since May 5, 2004, when a Tsakos superintendent had inspected it and documented in a Tsakos Assessment Report that the system was broken and in need of repairs.[206]  The ATHOS I had entered the Dalian Shipyard on April 3, 2004, and left the shipyard for sea trials on May 3, 2004.[207]  It left 11 days earlier than scheduled and without completing the following shipyard repair items: (1) broken ballast valve position indicators; (2) leaking ballast lines; (3) inoperable ballast tank and draft gauging system; and (4) hydraulic ballast valves and actuators.[208]  The list placed Tsakos on notice that the ATHOS I had serious deficiencies in its ballast system.[209]

---

[201] [TT Day 31 (Stoller) P. 46:12-47:1].
[202] [TT Day 3 amended (Esplana) P. 15:5-7; TT Day 5 amended (Zotos) P. 16:9-18:10].
[203] [TT Day 5 amended (Zotos) P. 56:12-57:15; Ex. D-145 (Diagram of Cargo & Ballast Pipe – Date Drawn 01/15/82)].
[204] [TT Day 4 amended (Zotos) P. 61:7-63:16].
[205] [TT Day 5 amended (Zotos) P. 65:3-67:8].
[206] [TT Day 5 amended (Zotos) P. 80:20-81:4; Bartzis Dep. Vol. I (10/04/07) P. 66:13-67:24; 71:6-24].
[207] [TT Day 17 amended (Ragousis) P. 39:17-40:17; Ex. D-313 (Athos 34333, ¶¶ 10 and 14)].
[208] [TT Day 17 amended (Ragousis) P. 41:6-54:12; Ex. D-446 with translation; Ex. D-316 at p. Athos 034658, ¶ 073; Ex. D-316 at page Athos 034655, ¶ 16; Ex. D-316 at p. Athos 034657, ¶D050); Ex. D-316 at p. 034657, ¶D0531; Ex. D-151].
[209] [TT Day 31 (Stoller) P. 31:25-35:7].

2418144-1

A series of Greek e-mails in November 2004 documented the ongoing problems with the ATHOS I's ballast system, including valves that were opening and closing, leaks, and a report that the ship was incapable of pumping off some 100 to 200 tons of ballast due to the system's deteriorated condition.[210]   The ballast valve position indicators and ballast tank fixed gauging system were also in disrepair and inoperable before the oil-spill incident.[211]

On November 13, 2004, just 13 days before the oil spill, Captain Markoutsis sent an e-mail to the Assistant Manager of the Tsakos Quality and Safety Department, Vassilis Iliopoulos, documenting the deteriorated condition of the ATHOS I by listing outstanding maintenance and repair items and begging Tsakos to take urgent steps to effect repairs to the ballast system and other critical systems aboard the vessel.   The Captain took 19 photographs documenting the many problems, which he sent to the Tsakos office and saved on the ship's computer, but they are allegedly "missing" and have never been produced in this lawsuit.[212]

Additional e-mails sent to Tsakos on November 22, 2004, just four days before the incident, continued to detail repair items relating to the ballast system.   These deficiencies, which were deteriorating on a daily basis, included:  (1) ballast valves that opened and closed on their own; (2) the inability to conduct normal ballasting operations due to leaking ballast lines; (3) an inoperable ballast tank and draft gauging system; and (4) inoperable ballast valve position indicators.[213]   The ballast valves' opening and closing on their own were not minor problems, but rather, "relate[d] to the return of oil to the hydraulic pump" and the failure of the hydraulic pump crossovers to properly control the pressure.[214]

---

[210] [TT Day 31 (Stoller) P. 35:19-36:11; 40:25-42:1].
[211] [TT Day 5 amended (Zotos) P. 75:19-76:4; Bartzis Dep. Vol. I (10/04/07) P. 71:6-24; 74:9-24].
[212] [TT Day 14 amended (Markoutsis) P. 93:17-95:17; Ex. D-446 (with translation)].
[213] [TT Day 14 amended (Markoutsis) P. 100:23-101:8; 110:21-113:22; 116:11-119:3; TT Day 5 (Zotos) P. 50:6-15; Ex. D-446 (at Athos 040707, Item 5 with translation); Ex. D-425 (with translation); Ex. D-436 (with translation); Ex. D-513 (with translation)].
[214] [TT Day 14 amended (Markoutsis) P. 110:21-113:10; Ex. D-436 with translation, p. 040478, ¶ 3].

These outstanding serious repair items were also repeatedly documented in Tsakos Shipboard Assessments, Weekly Inspection Follow-Up Meeting ("WIFUM") Reports, and spreadsheets completed both before and after the oil spill, on May 5, July 11, September 23, October 21, and December 9 and 16, 2004, and on January 26, 2005.[215] The vessel was using an improvised system of portable tapes to attempt to determine the level of water in the ballast tanks.[216]

Deficiency reports from September-November 2004 confirmed that the problems were unresolved and continuing.[217] The master complained that the entire ballasting system was inoperable and could not be repaired until after the ship arrived in Paulsboro.[218] None of these critical items—most relating to ballast, its effect on the vessel's draft, and the crew's inability to accurately determine the draft—was repaired before the November 26, 2004 oil spill.[219]

> **b.** **Plaintiffs failed to maintain proper ballasting records and violated their own safety requirements.**

The ATHOS I was required to keep records of soundings in a ballast water handling log when taking ballast aboard.[220] The log that plaintiffs have produced as the official record does not show all of the ballasting operations and movements that occurred before the oil-spill incident.[221] There is no written record of any daily soundings of the ballast tanks of the ATHOS I taken either before or after the ballasting operations and thus no evidence of the amount of

---

[215] [TT Day 5 amended (Zotos) P. 58:12-23; 75:19-78:9; 80:20-81:4; TT Day 31 (Stoller) P. 41:14-47:1; Pantazatos Dep. Vol. I (02/07/08) P. 63:1-64:2; 73:2-7; 77:10-18; Papazis Dep. Vol. I (09/25/07) P. 99:5-101:21; 104:6-105:20; Bartzis Dep. Vol. II (10/05/07) P. 149:1-153:23; 159:10-160:25; Figueros Dep. Vol. I (08/01/07) P. 88:15-23; 90:2-91:18; Ex. D-101 (TST Assessment Report dated 12/009/04)].

[216] [Papazis Dep. Vol. I (09/25/07) P. 102:15-23].

[217] [TT Day 31 (Stoller) P. 32:21-34:9].

[218] [TT Day 5 amended (Zotos) P. 70:9-71:11; TT Day 14 amended (Markoutsis) P. 100:23-113:22; Ex. D-436 (11/15/04 E-mail from ATHOS to TST re: ATHOS I CAP & WIFUM ítems (in Greek with formal translation))].

[219] [TT Day 14 amended (Markoutsis) P. 110:21-113:22; TT Day 5 amended (Zotos) P. 50:20-51:11; 75:19-77:20; Papazis Dep. Vol. I (09/25/07) P. 104:6-105:20].

[220] [Zotos Dep. (05/17/07) P. 200:7-20; Papazis Dep. Vol. II (09/26/07) P. 274:5-276:8].

[221] [TT Day 26 (Petrie) P. 9:3-12; Ex. D-9 (Ballast Water Handling Log)].

ballast water in the tanks.[222]   The Pump Room Patrol Log, which would have shown the exact time when ballasting operations were started and stopped, is missing and has never been produced.  The chief officer's record of the November 26 ballasting does not indicate how long the ballasting lasted.[223]

The Tsakos Vessel Operation Procedures Manual required that "all ballast operations be recorded in the Bridge Log Book."[224]   The ballasting done on November 26 was not entered into the Bridge Log Book, and the section of this book for recording the volume of ballast in each tank and the date on which each tank was last filled was not completed during the entire voyage in question.   Third Officer Esplana testified that he could not remember any officer of the ATHOS I who entered ballasting information in the bridge log book.[225]   No Ballast Management Plan was prepared for the ballasting done on November 26, 2004, before the oil spill, even though Tsakos's safety management system required that a plan be prepared for all ballast loading and discharge operations.[226]

Plaintiffs have made much of the various compliance certificates issued to Tsakos and the ATHOS I but fail to explain the missing ballast and maintenance records and photographs.  The mere issuance of a certificate to a shipping company or vessel is not proof that non-conformities or deficiencies did not exist or that outstanding repairs were completed. Nor is a certificate proof that vessel and company personnel did not act negligently.[227]   The entities issuing the certificates relied on by plaintiffs were paid by Tsakos for their services in issuing the certificates.[228]

---

[222] [TT Day 5 amended (Zotos) P. 19:9-19].
[223] [TT Day 5 amended (Zotos) P. 33:20-34:1].
[224] [TT Day 5 amended (Zotos) P. 16:5-11].
[225] [TT Day 3 amended (Esplana) P. 34:1-22].
[226] [TT Day 15 amended (Markoutsis) P. 64:6-66:1; Ex. D-13; Doc. 306 (CA No. 05-305), Admissions of Master, Dep. (Markoutsis) Vol. IV  (02/08/07) P. 646:13-24; 647:1-19)].
[227] [TT Day 34 amended (Mitchell) P. 35:24-36:16; 47:12-24].
[228] [*Id.* at P. 46:19-47:11].

Captain Markoutsis' standing instructions required that the daily soundings of the vessel's ballast tanks be taken and recorded in the ship's record entitled "Monitoring of Cargo Tanks, Water Ballast Tanks, and Void Spaces."[229] Chief Officer Zotos failed to comply with the Captain's standing order, as there is no record of the required soundings in this document.[230] As noted above, the Pump Room Patrol Log, which would have recorded the times and durations of all ballasting operations, is "missing" and has never been produced by plaintiffs, despite confirmation of its being aboard the ATHOS I after the incident in 2005.[231] Plaintiffs' soundings simply do not exist in any ship's record and cannot be used to explain away the inoperable ballast gauging system and the missing Pump Room Patrol Log.

   c. **Plaintiffs failed to maintain a proper safety management system in violation of SOLAS, ISM and U.S. regulations.**

Plaintiffs negligently failed to maintain and monitor a proper safety management system, which further rendered the ATHOS I unseaworthy at the time of the casualty. Regulation XIX/3.1 of SOLAS required Frescati, Tsakos, and the officers of the ATHOS I to comply with the International Safety Management Code as set forth in IMO Resolution A.741(18). Under the ISM Code, shipowners must implement a written safety management system to ensure that the vessel is properly maintained and manned, that the vessel and those in charge comply with all international and national regulatory requirements, and that procedures are in place to detect and correct any non-compliance or maintenance failures. A U.S. regulation, 33 C.F.R. § 96.220-250, also requires compliance with the ISM Code.[232]

---

[229] [Ex. D-220].
[230] [Doc. No. 306 (Civil Action No. 05-305), Admissions of Master, Markoutsis Dep. Vol. I (02/08/07) P. 658:14-662:17; Ex. D-21; Ex. D-220; TT Day 5 amended (Zotos) P. 19:22-20:2].
[231] [TT Day 5 amended (Zotos) P. 20:9-21:7; 34:2-35:15; Ex. D-68 (Blank Tsakos Pump Room Patrol Log form)].
[232] [TT Day 24 amended (Grenier) P. 75:18-79:6; TT Day 29 (Anderson) P. 72:24-75:7].

The ISM Code required Tsakos to include maintenance and repair items in the safety management system with verification through controlled documents and forms within the system.[233] Leaks in ballast lines and maintenance and repair items should be documented and followed in controlled documents as the ISM Code requires.[234] In violation of the ISM Code, Tsakos and Captain Markoutsis used Greek language e-mails to report and discuss serious maintenance and repair items aboard the ATHOS I that were never documented in the official safety management system.[235] Tsakos did not even include many of the critical repair items listed in the Greek language e-mails in their Weekly Inspection Follow Up Meeting ("WIFUM") reports prepared by the company.[236] Tsakos kept the vessel's deficiencies and the WIFUM program apart from and completely outside the official Tsakos safety management system procedures for maintenance and repair.[237]

The failure to verify, track, and document the serious vessel maintenance issues, such as the leaking ballast lines and the ballast valves that opened and closed on their own, resulted in Tsakos's failing to repair the malfunctioning ballast system and other critical systems before the oil spill.[238] The unsafe condition of a critical system of the ATHOS I exposed the vessel to inadvertently taking on unknown additional amounts of ballast water during ballasting operations, a situation that would increase the vessel's draft.[239] The inability to measure the precise quantities of ballast water in each ballast tank prevented the ship's personnel from being able to accurately determine the ship's draft, information that was critical in analyzing anticipated underkeel clearance as required by 33 C.F.R. § 157.455 (a) and (b). The ATHOS I

[233] [TT Day 29 (Anderson) P. 107:22-108:3; 111:21-112:18; 116:1-20].
[234] [TT Day 29 (Anderson) P. 114:11-16].
[235] [TT Day 29 (Anderson) P. 112:19-115:25; TT Day 24 amended (Grenier) P. 112:9-18].
[236] [TT Day 17 amended (Johnson) P. 19:4-24; TT Day 29 (Anderson) P. 112:19-116:5; Ex. D-245; Ex. D-446 with translation].
[237] [TT Day 16 amended (Johnson) P. 219:4-10].
[238] [TT Day 29 (Anderson) P. 113:3-115:25; TT Day 24 amended (Grenier) P. 112:9-18].
[239] [TT Day 24 amended (Haley) P. 171:10-172:22].

should not have sailed with these serious deficiencies in the ballast system, which rendered the ship unseaworthy.[240]

       **d.**      **Plaintiffs failed to man the ATHOS I with a well-trained and competent crew and monitor their performance, which rendered the vessel unseaworthy.**

The ISM Code and 33 C.F.R. § 96.220-250 further required plaintiffs to implement a safety management system to ensure that the ATHOS I was properly manned with officers who could comply with all international and domestic regulatory requirements and that procedures were in effect to detect any failures in compliance.[241]  Tsakos failed to properly train and assess the competency of Captain Markoutsis, Second Officer Ricardo Caro, and the other officers aboard the ATHOS I in proper voyage planning.  Had Tsakos done so, it would have realized that the master and officers did not know how to prepare a voyage plan that complied with Tsakos safety management system voyage planning procedures, SOLAS Chapter 34, IMO Resolution A.893(21), and U.S. Coast Guard regulations, 33 C.F.R. § 157.455 (a) and (b).[242]

Both Captain Markoutsis and Chief Officer Zotos erroneously believed that the Tsakos Voyage Plan VOP B-11/A could be prepared after the completion of each voyage, and they testified that they never prepared, reviewed, or signed voyage plans before the vessels began to sail.[243]  They also were under the mistaken belief that the voyage plan was limited to navigation charts aboard the vessel.[244]  Although this history of improper voyage planning violated its own safety management procedure, Tsakos claims to have been  unaware of these non-conformities

---

[240] [TT Day 31 (Stoller) P. 31:25-33:14; 35:19-36:25; 40:7-41:13].
[241] [TT Day 24 amended (Grenier) P. 74:23-75:6; 77:1; Ex. D-2024A; Ex. D-1211; Ex. D-1213].
[242] [TT Day 29 (Anderson) P. 100:8-101:19; 102:17-104:20; Ex. D-122; TT Day 25 (Bergin) P. 115:14-19; 116:22-117:2; 117:22-118:3; Ex. D-2041].
[243] [TT Day 14 amended (Markoutsis) P. 124:22-25; 125:1-126:12; TT Day 15 amended (Markoutsis) P. 19:7-20:7; Zotos Dep. Vol. II (05/15/07) P. 522:13-525:9].
[244] [TT Day 15 amended (Markoutsis) P. 19:7-20:7; Zotos Dep. Vol. II (05/15/07) P. 524:8-525:9].

2418144-1

by the two highest ranking deck officers aboard the vessel.[245] These egregious failures resulted in the ATHOS I's sailing under the command of an incompetent master and crew, who were incapable of doing a proper risk assessment through a voyage plan with an anticipated underkeel clearance analysis.

In an e-mail dated November 3, 2004, Captain Markoutsis also complained about the competency and performance of the vessel's pumpman, Vincent Figueros, and his inability to respond to critical outstanding repair items. The master requested a replacement for Figueros to repair hydraulic valves, the ballast and cargo system, the pump room, and weakened or leaking ballast lines, but the pumpman was not replaced until _after_ the ATHOS I incident.[246] Chief Officer Zotos relied on Pumpman Figueros for ballast tank soundings, repairs to the ballast system, and assistance in ballasting operations. Before the incident, Chief Officer Zotos had likewise asked Captain Markoutsis for a more experienced pumpman.[247] Tsakos Fleet Superintendent Ragousis was unaware of this request.[248] The ATHOS I had an admittedly incompetent crewmember dealing with a key system of the vessel that affected its ballasting, draft, and underkeel clearance. It is no stretch to conclude that his incompetence and Tsakos's inability to rectify it directly caused the allision.

The ATHOS I should never have begun the voyage with the poor condition of its ballast system and with a master and officers who misunderstood proper voyage planning requirements.[249] The ATHOS I was rendered unseaworthy for at least two reasons: (1) its malfunctioning ballast system and faulty safety management system that failed to monitor and

---

[245] [TT Day 16 amended (Johnson) P. 170:5-172:19].
[246] [TT Day 14 amended (Markoutsis) P. 118:7-119:3; TT Day 5 amended (Zotos) P. 50:6-15; Ex. D-513 (with translation at Ex. D-1899 at Athos 1775)].
[247] [TT Day 5 amended (Zotos) P. 46:19-47:1].
[248] [TT Day 17 amended (Ragousis) P. 63:8-15].
[249] [TT Day 31 (Stoller) P. 40:7-19].

repair it and (2) its incompetent and ill-trained crew, who failed to maintain the vessel's equipment and navigate the vessel properly according to mandatory Coast Guard regulations for the operation of single-hull tankers. In breach of their warranties in the Voyage Charter and their duties under the general maritime law, Frescati and Tsakos negligently violated mandatory federal marine-safety statutes, principles of good seamanship and navigation, and failed to maintain a seaworthy vessel.

Plaintiffs' own gross fault and the unseaworthiness of the ATHOS I proximately caused the vessel to strike the anchor and nullified the safe-port obligation. Plaintiffs therefore cannot satisfy their burdens of proof on the safe-port warranty claim, because it was entirely possible for the ATHOS I to have avoided the incident by exercising good navigation and seamanship.

### 4. The hidden nature of the hazard does not excuse negligent navigation and bad seamanship.

The facts that the anchor was uncharted and that no parties to this lawsuit knew that it existed do not reduce plaintiffs' responsibility for the ATHOS I incident or excuse the breach of their obligations to comply with the applicable navigation regulations and principles of good seamanship. Those mandatory regulations and navigational safety standards were designed to prevent the foreseeable risk known to all mariners of striking unknown and uncharted obstructions. Competent navigators are aware of that risk and take steps to eliminate it by obeying the safety requirements. But plaintiffs did not, and the ATHOS I oil spill is the direct result of their regulatory violations and bad seamanship.

Ports have been found to be safe, even though the navigators were unaware of the hazard and the vessels in question grounded or struck an uncharted, submerged object. *See In re Arb. Between Trade Sol Shipping Ltd. and Sea-Land Industries Bermuda, Ltd.*, 2001 WL 36175165, at *9 (despite a missing navigational buoy that was unknown to the vessel's captain, the port was

safe, and no breach of the safe-port warranty occurred, where the vessel owner could not prove that the grounding could not have been avoided by good navigation and seamanship); *In re Arb. Between Delphina Tanker Corp. (MT Delphina) and Axel Johnson Energy Corp.*, 1999 WL 34976573 at *2-3, S.M.A. Award No. 3508 (Feb. 5, 1999) (Nelson, Elias & Mordhorst, Arbs.) (finding that other vessels, through the exercise of good navigation and seamanship, were able to safely berth at a facility, even though plaintiff's vessel struck an uncharted rock approximately 100 feet northeast of the berth); *McCaldin v. Parke*, 37 N.E. 622, 623-24, 142 N.Y. 564 (N.Y. 1894) (rejecting plaintiffs' contractual claim where hundreds of vessels had gone to the wharf for several years in safety, except for the plaintiffs' vessel, which hit an uncharted rock 70 feet from the dock).

Here, even though it recognized that the anchor was unknown, the Third Circuit nevertheless identified improper navigation and seamanship as an issue to be resolved on remand. *In re Frescati*, 718 F.3d at 204-05 and nn.22 and 23. Moreover, the risk of uncharted objects in navigable waterways is always foreseeable to a mariner. Indeed, precisely to eliminate that risk, the mandatory U.S. Coast Guard regulations for single-hull tankers, as well as the general maritime law, require a vessel's master, crew, and pilots to plan their voyage, calculate and maintain sufficient underkeel clearance, and exchange information to maintain a margin of safety to avoid the risk of an allision with an uncharted object. *See* 33 C.F.R. § 157.455 (a) and (b); s*ee also Ocean S.S. Co. v. United States,* 38 F.2d 782, 784 (2d Cir. 1930) (Hand, J.) ("[I]t must always be remembered that it is the <u>risk</u> of collision, not the collision itself, that the masters must avoid.") (emphasis added).

**5.** ***The ATHOS I's officers and pilots alone were responsible for its safe navigation.***

a**. Plaintiffs alone decided when to enter the port and approach the berth and chose the wrong time.**

In another misreading of the appellate opinion, plaintiffs make much ado about the Third Circuit's passing comment in a footnote that the Panel found "no indication in the record that the *Athos I* was attempting to dock at an inappropriate time." *In re Frescati,* 718 F.3d at 205 n.22. The Court of Appeals did not elaborate or offer any explanation regarding what portions of the "record" it may have reviewed. Importantly, the "record" on appeal consisted only of the limited trial materials selected for inclusion in the joint appendix based on the appellate issues. Its fleeting remark in a footnote to its opinion is not a "finding of fact," has no precedential value, and does not in any way limit this Court's responsibility to hear further evidence and make its own findings of fact on remand. It is a classic example of *dictum*, a "peripheral" statement in a judicial opinion that "could have been deleted without seriously impairing the analytical foundations of the holding." *In re McDonald,* 205 F.3d 606, 612 (3d Cir. 2000), *cert. denied,* 531 U.S. 822 (2000). "The law of the case doctrine . . . acts to preclude review of only those legal issues that the court in a prior appeal actually decided, either expressly or by implication; it does not apply to dicta." *In re City of Philadelphia Litig.,* 158 F.3d 711, 718 (3d Cir. 1998).

Here, the Third Circuit did not and could not make factual conclusions concerning the vessel's navigation, much less the timing of its arrival. Rather, it has remanded the case for this Court to determine all aspects of the vessel's seamanship and navigation. As the evidence discussed above amply demonstrates, the ATHOS I chose the wrong time to attempt to dock. It proceeded with a reckless disregard for safety and the risk of grounding or alliding with an object

71

on the river bottom under circumstances that would have prompted any prudent mariner to simply wait for a higher tide.

> **D.** **As third-party beneficiaries, plaintiffs themselves owe warranties to CARCO under the Voyage Charter to furnish a seaworthy vessel, to comply with applicable U.S. Coast Guard regulations, and to limit the vessel's draft.**

Not only are plaintiffs held to standards of good navigation and seamanship by the force of federal regulations and maritime law, but also by the terms of the Voyage Charter. In this case they <u>warranted</u> that they would meet those requirements. Their failure to comply not only constitutes negligence, but a breach of their warranties.

The Voyage Charter expressly states in Part II, ¶ 1, that the vessel shall be "seaworthy, and having all pipes, pumps and heater coils in good working order." Further, in ¶ 3 of the Citgo Petroleum Corporation clauses of the Voyage Charter, the owner warrants that the vessel "will be in full compliance with all applicable U.S. Coast Guard regulations, including pollution prevention regulations as specifically described as 33 C.F.R. Parts 150, 151, 154, 156, 157, and 164. . . ." In ¶ 25, the owner warrants that it has P&I Club insurance coverage for oil pollution of at least $1 Billion in place for the duration of the charter. In ¶ 36, the owner warrants that the vessel owner or operator has submitted to the U.S. Coast Guard a response plan for the vessel that meets the full requirements of OPA and the governmental regulations issued thereunder and that the owner "shall ensure that the owner or operator of the vessel and the vessel fully meet all other requirements of OPA and any governmental regulations or guidelines issued thereunder."

Because the Third Circuit concluded that plaintiffs have the status of third-party beneficiaries under the Voyage Charter, plaintiffs must likewise be held accountable for the owner's obligations under the contract, not just its benefits. As a matter of law, if they are third-party beneficiaries of the Voyage Charter, plaintiffs necessarily owe CARCO the warranties

discussed above.  As the Third Circuit observes, federal law controls the interpretation of maritime contracts, and "[w]e typically look to the *Restatement of Contracts* for the federal law on third-party beneficiaries."  *In re Frescati,* 718 F.3d at 198.  According to the *Restatement*, "[W]here there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."  *Restatement (Second) of Contracts* § 309 cmt. b (1981).  "The position of a beneficiary is comparable to that of an assignee after knowledge of the assignment by the obligor. . . .  His right, like that of an assignee, is subject to limitations inherent in the contract, and to supervening defenses arising by virtue of its terms."  *Id.* at cmt. c.

The case law echoes the principles of the *Restatement*.  "[A] third-party beneficiary is bound by the terms and conditions of the contract it invokes."  *Acciai Speciali Terni USA, Inc. v. M/V Berane,* 181 F. Supp. 2d 458, 464-65 (D. Md. 2002).  "[T]hird-party beneficiary status does not permit the avoidance of contractual provisions otherwise enforceable."  *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir. 1983), *overruled on other grounds by Lauro Lines v. Chasser,* 490 U.S. 495 (1989).  "[W]hether seeking to avoid or compel arbitration, a third-party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third-party beneficiary."  *E.I. Dupont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.,* 269 F.3d 187, 195 (3d Cir. 2001).  In sum, "[t]he beneficiary 'cannot accept the benefits and avoid the burdens or limitations' of the contract."  *Acciai Speciali Terni USA, Inc.,* 181 F. Supp. 2d at 465 (quoting *Trans-Bay Eng'rs & Builders, Inc., v. Hills,* 551 F.2d 370, 378 (D.C. Cir. 1976)).

Thus, as third-party beneficiaries, plaintiffs must accept the responsibilities and obligations of the contract they invoke.  As alleged third-party beneficiaries of the Voyage Charter, plaintiffs not only had duties under general maritime law to navigate safely in

73

compliance with principles of good seamanship, to follow mandatory U.S. Coast Guard regulations for operating single-hull tankers, and to maintain a seaworthy vessel with a draft of 37 feet or less, but they further expressly warranted in the Voyage Charter to CARCO that they would do so. *See Horn v. Cia de Navegacion Fruco,* 404 F.2d 422, 429 (5th Cir. 1968) (provisions of a charter party making specific reference to certain characteristics, specifications, and capacities of the ship may reasonably be treated as warranties); *In re Arb. Between Navegacion Andina, S.A. and Molinera E. Industrial de Azapa, S.A.,* 1986 WL 1179605 at *5, S.M.A. Award No. 2303 (Sept. 12, 1986) (Coutsodontis, Georges & Boulalas, Arbs.) (the vessel owner breached the charter by arriving with an excessive draft).

As detailed above, plaintiffs nullified the safe-port warranty through their numerous statutory and regulatory violations and the ATHOS I's unseaworthiness. They thereby breached their own warranty obligations owed to CARCO as third-party beneficiaries under the Voyage Charter, and proximately caused the allision through their violations of their duties, both in contract and in tort. CARCO has no liability.

### E. CARCO is not liable in warranty for the sole or superseding fault of others.

Plaintiffs' own extraordinary, superseding negligence in navigating the ATHOS I proximately caused the allision and oil spill and nullifies CARCO's safe-port obligation. The ATHOS I would not have struck the anchor if the master and pilots aboard it had followed mandatory Coast Guard regulations, international conventions, and Tsakos's own guidelines for proper voyage planning, underkeel clearance, vessel maintenance, officer training, safety systems, record-keeping, and principles of good seamanship for operating a single-hull tanker.[250] As voyage charterer, CARCO has no liability whatsoever under the safe-port warranty for the allision, which plaintiffs themselves solely caused.

---

[250] [TT Day 31 (Stoller) P. 106:3-11].

Principles of proximate causation or legal causation determine liability both in contract and in tort. *Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839-40, 116 S. Ct. 1813, 135 L. Ed. 2d 113, 1996 A.M.C. 1817 (1996). "Indeed, the requirement of foreseeability may be more stringent in the context of contract liability than it is in the context of tort liability." 517 U.S. at 840. As the Supreme Court stated, "where the injured party is the sole proximate cause of the damage complained of, that party cannot recover in contract from a party whose breach of warranty is found to be a mere cause in fact of the damage." *Id.* at 839; *see also Allen v. Chance Mfg. Co.*, 873 F.2d 465, 471 (1st Cir. 1989) (where the proximate cause of the injury lies elsewhere a defendant has a complete defense against both negligence and warranty claims).

In *Exxon Co., U.S.A. v. Sofec, Inc.*, a tanker broke away from a mooring system, safely maneuvered out to sea from its position of peril, but ran aground on a reef as the master attempted to navigate the ship back toward the shore. 517 U.S. at 840-42. The vessel owner sued the owner of the mooring equipment for damages arising from the total loss of the ship, based on allegations of negligence, strict products liability, and breach of warranty concerning the mooring. *Id.* The Supreme Court affirmed the judgment holding that the master's extraordinary negligence in failing to plot fixes as he maneuvered his vessel back to shore after the "breakout" was the sole proximate and superseding cause of the grounding. *Id.* The vessel's navigational fault cut off the defendant's liability on both the tort and warranty claims. *See also Weeks Marine, Inc. v. Hanjin Shipping*, No. 04-1703, 2005 WL 1638148 at *5-6, 2005 A.M.C. 1917 (D.N.J. July 12, 2005) (the superseding negligence of a vessel in colliding with a barge while moving from one berth to another was the sole proximate cause that negated any prior alleged independent negligence of the time charterer in sending the vessel to the wrong berth); *In re Arb. Between Slebent Shipping Co., Ltd. and Associated Transport Line, LLC,* 2003 WL

25794986, at *3-5 (Nov. 19, 2003) (Arnold, Fox & Ring Jr., Arbs.) (the master's actions "were so egregiously negligent and unseamanlike that they overcame any safe port deficiencies and led directly to the vessel's grounding," where the master did not prepare a voyage plan, did not chart navigational fixes, did not have the proper chart or notices to mariners on board, and impugned his own credibility by erasing entries in the rough log and rewriting them "so that they would adhere to his version of the events.").

      **F.**     **The Pennsylvania Rule shifts the burden to plaintiffs to prove by clear and convincing evidence that their violations of applicable navigational and operating regulations could not have caused the allision.**

Under the Pennsylvania Rule, a principle of maritime law in effect for 140 years since the U.S. Supreme Court's landmark decision in 1873, when a person violates a statute or regulation imposing a mandatory duty intended to prevent a maritime accident, a presumption arises that the violation caused the resultant injury. *The Pennsylvania*, 86 U.S. at 136; *In re Nautilus Motor Tanker Co., Ltd.*, 85 F.3d 105, 113, 1996 A.M.C. 2308, 2316 (3d Cir. 1996). Three elements must exist for this presumption of causation to apply:

> (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent.

*In re Nautilus Motor Tanker Ltd.*, 85 F.3d at 114, 1996 A.M.C. at 2317-18; *In re J.A.R. Barge Lines, L.P.*, No. 03-163, 03-180, 04-753, 04-1611, 2007 WL 674348, at *13 n.26 (W.D. Pa. Feb. 28, 2007). The Pennsylvania Rule applies not only to statutory violations, but also to violations of federal regulations governing vessel navigation and operation. *See Cont'l Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 436 (1st Cir. 1992) (applying the Pennsylvania Rule to a vessel's failure to comply with numerous federal regulations governing vessel operations); *Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 737 n.28, 1969 A.M.C.

1682 (9th Cir. 1969) (citing *Belden v. Chase*, 150 U.S. 674, 698-99, 14 S. Ct. 264, 37 L. Ed. 1218 (1893)); *In re Quality Marine Servs., Inc.*, 2005 WL 1155854, *3-4, 2005 A.M.C. 1438 (E.D. La. May 9, 2005) (holding that "C.F.R. regulations are treated as statutory violations for the purposes of the *Pennsylvania* rule" and applying the rule to violations of 33 C.F.R. Part 164, the regulations at issue here); *Hiernaux v. M/V QUEEN CITY*, 244 F. Supp. 511, 513 (W.D. Pa. 1965).

The Pennsylvania Rule also applies to violations of international maritime conventions, including the International Convention for Safety of Life at Sea ("SOLAS"), which is at issue in this case. *See Commonwealth of Puerto Rico v. S.S. ZOE COLOCOTRONI*, 456 F. Supp. 1327, 1335, 1979 A.M.C. 21 (D.P.R. 1978), *aff'd on liability, rev'd on other grounds,* 628 F.2d 652 (1st Cir. 1980) (applying the Pennsylvania Rule to a vessel grounding and holding that the ship's violation of SOLAS "is not only indicative of negligence . . . but also brings into play the application of the so called Pennsylvania Rule. . . ."); *see also Continental Grain Co.,* 972 F.2d at 432-436 (applying the Pennsylvania Rule to violations of SOLAS and International Maritime Organization ("IMO") Resolutions incorporated therein).

To rebut the Pennsylvania Rule's presumption of causation, the statutory or regulatory violator must make a "clear and convincing" showing, not merely that the violation was not a proximate cause of the loss based on a preponderance of the evidence, but rather that the violation "could not" have proximately caused it. In effect, in order to escape a finding of fault under this enhanced standard, the violator must prove that the accident would have nevertheless occurred, despite the statutory violation. *In re Nautilus Motor Tanker Co., Ltd.,* 85 F.3d at 114. The Pennsylvania Rule is "necessary to enforce obedience to the mandate of the statute." *The*

*Pennsylvania*, 86 U.S. at 136; *In re Waterstand Marine, Ltd.*, No. 87-1516, 1988 WL 78776, at *8, 1991 A.M.C. 1784 (E.D. Pa. 1988).

In *In re Complaint of Nautilus Motor Tanker Co., Ltd.*, the Third Circuit affirmed the district court's decision and held that when a regulatory violation is established, the burden of proof to overcome the legal presumption shifts to the statutory violator, who must make a clear and convincing showing that the violation could not have been a proximate cause of the incident. 85 F.3d at 114. The district court in the *Nautilus* case held that the "clear and convincing" standard of proof under the Pennsylvania Rule requires "evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Complaint of Nautilus Motor Tanker Co. Ltd.*, 862 F. Supp. 1260, 1272 n.4 (D.N.J. 1994) (citations omitted). *See also Boyer v. The Merry Queen,* 202 F.2d 575, 579, 1953 A.M.C. 482 (3d Cir. 1953) ("'[W]ould not' must go a long way before it becomes 'could not,' in satisfaction of the rule of *The Pennsylvania*.").

In 1990, in the aftermath of the 1989 EXXON VALDEZ oil spill in Alaska, Congress enacted OPA to require that all new tank vessels transporting oil and petroleum products in the United States must be constructed with double hulls and that any single-hull vessel not retrofitted with a double hull would be phased out of service.[251] *See also Maritrans, Inc. v. United States*, 342 F.3d 1344, 1348-49, 2003 A.M.C. 2274 (Fed. Cir. 2003). Congress determined that this double-hull requirement and restrictions on single-hull tankers were necessary to avoid oil spills and to reduce pollution.[252] As Congress recognized in OPA, a single-hull tanker like the ATHOS I presents a far greater risk of oil pollution from contact with uncharted obstructions or

---

[251] [TT Day 24 amended (Grenier) P. 80:14-81:6].
[252] [TT Day 24 amended (Grenier) P. 80:16-25; *Maritrans*, 342 F.3d at 1357].

2418144-1

other hazards to navigation, making it critically important that navigators assure and maintain an adequate underkeel clearance safety margin at all times.[253]

In response to that mandate, the Coast Guard began a rule-making process in 1996 and stressed the need for specific requirements for voyage planning and maintenance of adequate underkeel clearance for single-hull tankers upon finding that "[o]il spills have occurred because tank vessels enter port with drafts too deep for the facility and then 'find' an anchor or rock. . . ." (Emphasis added).[254] More specifically, and quite prophetically apropos to the ATHOS I, the Coast Guard noted that "[o]il spills, such as the *World Prodigy*, indicate that lack of passage planning, specifically lack of under-keel clearance planning, has contributed to accidents" and that its own research of 107 pollution incidents revealed that more than seven thousand barrels of crude oil had been spilled in a five year period "because the pilot or master did not correctly gauge the vessel's draft in relationship to the transit depths. . . ."[255] Thus, what happened to the ATHOS I as a result of its flagrant regulatory violations is not surprising.

The requirements for advance voyage planning, calculation of anticipated minimum underkeel clearance, and exchanges between a master and a pilot in 33 C.F.R. § 157.455(a) and (b) mandate that those in charge of the operation and navigation of a single-hull tanker must conduct a complete and thorough risk assessment before undertaking a voyage in U.S. waters. The purpose of the risk analysis is to plan the anticipated voyage from load to discharge port to eliminate the possibility of contact with unknown and uncharted obstructions or hazards to navigation by taking advantage of the maximum available underkeel margin of safety.[256]

---

[253] [TT Day 24 amended (Grenier) P. 82:6-15; 86:11-18; 91:15-23; TT Day 27 (Daggett) P. 141:20-142:2].
[254] [Ex. D-1221 (61 Fed. Reg. at 39,779 (July 30, 1996)]. ].
[255] [Ex. D-1221 (61 Fed. Reg. at 39,781; 39,783 (July 30, 1996)].
[256] [TT Day 24 amended (Haley) P. 170:22-171:9; TT Day 27 (Daggett) P. 141:3-142:7; TT Day 31 (Stoller) P. 16:24-18:2; TT Day 24 amended (Grenier) P. 86:11-18; 91:15-23].

2418144-1

Frescati and Tsakos cannot possibly meet their burden of proving by clear and convincing evidence under *The Pennsylvania* that their multiple regulatory violations discussed in detail above *could not have* proximately caused the vessel to contact the anchor. Plaintiffs do not even come close to overcoming the Pennsylvania Rule's presumption. Any one of their regulatory and statutory violations alone is fatal to their case, and collectively the violations make the plaintiffs' burden insurmountable. Had the vessel's officers and pilots complied with them, the ATHOS I would not have "found" the anchor in Federal Anchorage No. 9, and this casualty would not have happened. This case is a classic one where the Pennsylvania Rule gives rise to a presumption of proximate causation against plaintiffs, who cannot rebut it.

Furthermore, violation of a Coast Guard regulation amounts to negligence *per se*. When a statute or regulation "creates a minimum standard of care . . . then an unexcused violation, an act done with less than minimum care, would have to be negligence;" in other words, negligence *per se*. *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234-35 (5th Cir. 1983) (quoting *Lowe v. Gen. Motors Corp.*, 624 F.2d 1373, 1381 (5th Cir. 1980)); *see also Abruska v. Northland Vessel Leasing Co., LLC*, 258 F. App'x 158, 160 (9th Cir. 2007) (finding vessel owners negligent per se for failing to follow a Coast Guard regulation in an action by longshoreman).

Notably, after being on the scene and investigating the allision, the Government itself alleged in this lawsuit that Frescati and Tsakos violated federal statutory and regulatory violations and caused the ATHOS I incident. In its claim and answer (Doc. 20) in response to Frescati and Tsakos's limitation complaint, the Government alleged that the "grounding" of the ATHOS I and the resulting oil spill were caused by plaintiffs' "negligence, gross negligence, willful misconduct and/or violation of applicable federal safety, construction, or operating regulation[s]." *Id.* at ¶ 15. The Government further alleged that the vessel was unseaworthy,

that plaintiffs had "operated, manned and equipped the ATHOS I in a negligent or grossly negligent manner," that plaintiffs were guilty of "negligence per se" because of their "violation of federal regulations and/or statutes," and that plaintiffs had "negligently failed to take adequate action and precautions to ensure that the ATHOS I would be operated in a safe, prudent and seaworthy manner and condition." *Id.* at ¶¶ 28-30, 47-48. After joining forces with Frescati and Tsakos and entering into a Joint Interest and Confidentiality Agreement and Cooperation Agreement with them against CARCO,[257] however, the Government changed its stripes and later dismissed its claim and answer in Civil Action No. 05-305 "without prejudice." *See* Doc. 102.

Nonetheless, the Government made these damning allegations against Frescati and Tsakos in its own pleading, and this Court can give them weight as admissions against plaintiffs' interests as parties under Fed. R. Evid. 801(d)(2). *See* Doc. 556 (CARCO's statement of the United States' admissions through the Government's pleading). *See also W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 316 (3d Cir. 2003) (inconsistent earlier allegations may be introduced by the adversary as evidence in a subsequent action); *Van Buskirk v. W. Bend Co.*, No. CIV. A. 96-6945, 1997 WL 34688, at *1 (E.D. Pa. Jan. 29, 1997) ("[A] pleading which is abandoned or superseded through amendment even though it no longer serves any function in the case, may be introduced into evidence as the admission of the party."); *Johnson v. Goldstein,* 864 F. Supp. 490, 493 (E.D. Pa. 1994), *aff'd,* 66 F.3d 311 (3d Cir. 1995) (where ownership of property was admitted in Defendants' First Answer but denied in a Second Answer, the First Answer "was admissible as an admission of Defendants and as an abandoned pleading"). *See also LWT, Inc. v. Childers*, 19 F.3d 539 (10th Cir. 1994) (where a defendant in a state court action became a plaintiff in a separate federal action and abandoned a defense he had asserted in the former action that was directly contrary to his position in the latter, the abandoned defense was admissible

---

[257] [Ex. D-1890].

under Rule 801(d)(2)).  Regardless of their procedural withdrawal, the Government's admissions condemning Frescati and Tsakos for their statutory and regulatory violations are true, and plaintiffs cannot rebut the Pennsylvania Rule's presumption of causation against them.

**G.     Tsakos destroyed, lost, or altered critical vessel records, giving rise to adverse evidentiary inferences against plaintiffs.**

In Doc. 754 and its supporting memorandum, CARCO has moved for adverse evidentiary inferences because of plaintiffs' spoliation of vessel records.  Tsakos and the crew of the ATHOS I hid, manipulated, fabricated, destroyed, altered, or failed to produce critical evidence concerning the vessel's condition and draft.  This spoliation of evidence is not a matter of mere sloppy recordkeeping or innocent mistakes, but rather involves the bad-faith loss, destruction, and alteration of critical vessel records without a proper accounting.  This spoliation warrants adverse inferences findings that plaintiffs negligently navigated an unseaworthy vessel in violation of safety regulations and that the ATHOS I had a draft deeper than 37 feet at the time of the incident.

Furthermore, as CARCO has explained in its motion (Doc. 755) and its supporting memorandum, this Court should enforce the Best Evidence Rule of Fed. R. Evid. 1002, *et seq.,* and exclude plaintiffs' secondary evidence of ballasting aboard the ATHOS I because of plaintiffs' bad-faith loss of the vessel's original ballasting logs.  Even if any of these documents remain in evidence, they should not be given any weight.  Ultimately, plaintiffs have failed to carry their burdens of proof, and this Court should dismiss their claims.

**H.     The comparative fault of the vessel can reduce its recovery under the alleged warranty or in negligence.**

The evidence shows that CARCO  provided a safe port that posed no danger that the ATHOS I could not have avoided through good seamanship and navigation, and that there was

no breach of the safe-berth/safe-port warranty. Rather, the ATHOS I incident resulted from the vessel's own sole and proximate fault. Principles of comparative negligence do not apply when the injury results from such a separate cause. *See Protectus Alpha Navigation Co., Ltd. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1383-84 (9th Cir. 1985).

However, even assuming that CARCO breached the alleged warranty, which is denied, the Third Circuit has recognized that the Court may apportion fault to plaintiffs that would reduce CARCO's liability, if any, under the safe-berth provision. *In re Frescati,* 718 F.3d at 205 n.23 ("If the vessel is found to have been drawing more than 37 feet, this could potentially reduce CARCO's liability even if it were determined that a safe berth was not provided" and further noting that "damages resulting from both a breach of a safe berth warranty and the master's negligence may appropriately be split between the parties."). *See also Paragon Oil Co. v. Republic Tankers, S.A.*, 310 F.2d 169, 173-74, 1963 A.M.C. 158 (2d Cir. 1962) (quoting *Constantine & Pickering S.S. Co. v. West India S.S. Co.*, 199 F. 964, 967-68 (S.D.N.Y. 1912)) ("[O]ne liable for violating a safe berth clause 'may lessen the amount of damages for which he is responsible by showing negligence, or even lack of diligence, on the part of the person wronged, in failing to take steps to lessen certain or even probable damages[.]'").

CARCO has no fault at all and did nothing to proximately cause the ATHOS I incident, but where multiple parties are liable for a maritime accident, the court apportions their liability according to their relative degrees of fault. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251, 1975 A.M.C. 541 (1975) ("We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault . . . ."). Under *Reliable Transfer*, the court now must apportion

liability based on the parties' degrees of responsibility, rather than applying the old admiralty rule of equal division. 421 U.S. at 411 ("[L]iability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.").

In determining comparative fault, courts evaluate the various statutory violations and other contributory faults that might have been factors in the allision or collision. *Lentz v. M/V E. Grace*, 852 F.2d 571 (9th Cir. 1988). The various considerations include, but are not limited to:

- Violations of statutory law by either or both parties. *See Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1052, 1057 (5th Cir. Unit A 1981);

- Failure to observe industry custom. *See Stevens v. F/V Bonnie Doon*, 655 F.2d 206, 208 (9th Cir. 1981);

- Actions of third parties, such as the failure of a pilot station to report incoming traffic to a vessel. *See In re Complaint of BFT No. Two Corp.*, 433 F. Supp. 854, 875-76 (E.D. Pa. 1977);

- Practical navigational abilities of vessels. *See Jones v. Texaco Panama, Inc.*, 428 F. Supp. 1333, 1336-37 (E.D. La. 1977);

- Use of due care and good seamanship by vessels. *Id.* at 1337; and

- Alteration of the ship's logbook. *See Otal Investments Ltd. v. M.V. Clary*, 494 F.3d 40, 58-59 (2d Cir. 2007).

*See also Restatement of Torts* (*Apportionment of Liability*) § 8 (2000) ("Factors for assigning percentages of responsibility to each person whose legal responsibility has been established include (a) the nature of the person's risk-creating conduct, including any awareness or

indifference with respect to the risks created by the conduct and any intent with respect to the harm created by the conduct; and (b) the strength of the causal connection between the person's risk-creating conduct and the harm."); Unif. Comparative Fault Act, § 2(b) ("In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.").

"The nature of each person's risk-creating conduct includes such things as how unreasonable the conduct was under the circumstances, the extent to which the conduct failed to meet the applicable standard, the circumstances surrounding the conduct, each person's abilities and disabilities, and each person's awareness, intent, or indifference with respect to the risks." *Restatement of Torts (Apportionment of Liability),* § 8, cmt. c.  "The comparative strength of the causal connection between the conduct and the harm depends on how attenuated the causal connection is, the timing of each person's conduct in causing the harm, and the comparison of the risks created by the conduct and the actual harm suffered by the plaintiff." *Id.; see also Bd. of Comm'rs of the Port of New Orleans v. M/V Space King,* No. 75-1661, 1978 A.M.C. 856 (E.D. La. 1978) (assigning the charterer 30% fault for breach of the safe-berth warranty and assigning the vessel 70% fault for its breach of its warranty of proper loading and seaworthiness, where the vessel grounded after failing to observe the loading process and the tidal stage of the river).

All of these factors warrant assessment of the overwhelming percentage of fault, if not total liability, to the plaintiffs for the ATHOS I incident.  As discussed above, the ATHOS I's navigators violated multiple compulsory Coast Guard regulations for single-hull tankers that were specifically designed to prevent allisions with submerged obstructions, whereas no statute, regulation, or custom put CARCO on notice to search for objects in Federal Anchorage No. 9.

The unseaworthy ATHOS I recklessly transited the River and the Anchorage without a voyage plan and adequate underkeel clearance, contrary to the mandatory regulations and Tsakos's own minimum safety requirements. Plaintiffs destroyed, lost, or altered critical vessel records. Plaintiffs created the risk of the allision and directly caused the oil spill, which they could have entirely avoided by following the regulations and their own safety policy and exercising the requisite due care and good seamanship. On the other hand, CARCO had no active or constructive knowledge of the hazard and acted as any prudent charterer and wharfinger would have at the relevant time and under the circumstances.

## I. The gross fault of the unknown Government dredging contractor, who abandoned the anchor, proximately caused the allision.

Besides plaintiffs, the only other person liable for the ATHOS I incident is the unknown anchor-dropper. CARCO had nothing to do with the anchor or the other objects found within Federal Anchorage No. 9 and neither knew nor had any reason to know that they even existed before the allision. Rather, all the evidence on this point implicates an unidentified Government contractor working for the Corps of Engineers as the entity who intentionally or negligently dropped and abandoned the anchor (and likely the concrete block and pump casing found at the allision scene too), failed to report it to the Government or warn the public, and thus proximately caused the ATHOS I incident and the resulting oil spill.

Plaintiffs' metallurgist, Joseph Crosson, testified that the abandoned anchor found in Federal Anchorage No. 9 was of a type used by the U.S. Navy.[258] Plaintiffs' expert Bolton called it an "ex-anchor" because its shank or rectangular portion, which would ordinarily have been attached to a chain, was cut off.[259] Dredging companies hired by the Corps of Engineers commonly use large, heavy objects, such as pump casings and anchors with cut shanks, during

---

[258] [TT Day 9 (Crosson) P. 130:1-22].
[259] *Id.*; [TT Day 17 amended (Bolton) P. 133:23-134:5].

their hydraulic pipeline dredging operations.[260]  Most of the Corps of Engineers' dredging in the Delaware River is hydraulic pipeline dredging.[261]  Robert Ross, the diver who discovered the pump casing and the anchor after the ATHOS I incident, testified that his company has been involved in searches for anchors lost by dredging contractors.[262]  Third-party contractors conduct ninety-five percent of the dredging that the Corps of Engineers undertakes in the Delaware River.[263]

The Corps of Engineers conducts all the dredging within Federal Anchorage No. 9. David Olson testified that during his 36 years of employment with the Corps of Engineers it has never received a request from, nor granted a permit to, a private terminal to dredge within Federal Anchorage No. 9.[264]  The only entities that dredged within Federal Anchorage No. 9 were the Corps of Engineers and Weeks Marine, its dredging contractor.[265]

Although the Corps of Engineers states that it has been unable to definitively determine who owned and left the pump casing found in the Anchorage, it did determine that casing was cast in a pattern owned by American Dredging, who may have bought it.[266]  Weeks Marine later purchased American Dredging.[267]  Both companies performed dredging in the Delaware River for the Corps of Engineers.[268]  The NPFC and the Corps of Engineers did not conduct an investigation to determine who owned the anchor and did not contact Weeks Marine to try to find out if it had any knowledge about it.[269]  From this overwhelming circumstantial evidence, it

---

[260] [TT Day 10 (De Pasquale) P. 114:22-115:22; TT Day 28 (Long) P. 107:24-108:20; TT Day 29 (Denmark) P. 34:3-7; 58:10-14].
[261] [TT Day 10 (DePasquale) P. 108:2-10].
[262] [TT Day 33 amended (Ross) P. 31:15-32:3; Ex. D 2086 (Randive Newsletter July-August 2009)].
[263] [TT Day 29 (Denmark) P. 44:11-14].
[264] [TT Day 10 (Olson) P. 147:4-12].
[265] [TT Day 29 (Denmark) P. 58:7-14].
[266] [TT Day 29 (Denmark) P. 31:9-32:3; 32:18-33:8].
[267] [TT Day 29 (Denmark) P. 33:9-16].
[268] [TT Day 29 (Denmark) P. 33:18-34:2; 51:5-9].
[269] [TT Day 19 (Morrison) P. 205:22-206:6; TT Day 29 (Denmark) P. 34:8-15].

is reasonable and proper for the Court to infer that the unidentified entity who abandoned the anchor was most certainly a dredging contractor for the U.S. Government.

Admiralty law imposes tort liability on a defendant who negligently creates or leaves a hidden obstruction in a navigable waterway resulting in damage to a vessel that allides with it. *See Pelican Marine Carriers, Inc. v. City of Tampa*, 1991 WL 325793, at *4-5, 1992 A.M.C. 575 (M.D. Fla. July 30, 1991).  *See also Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*, 477 F. Supp. 2d 681, 686, 689 (D.S.C. 2007) (finding a valid cause of action for fault against the Corps of Engineers' dredging contractors for damage to a container vessel that struck a submerged dredge pipeline in a federal channel and further finding that the Pennsylvania Rule would apply upon proof that the dredging contractors had violated requirements of the Corps of Engineers dredging contract, which were "intended to prevent the very sort of allision that occurred"); *N. Am. Dredging Co. v. Pac. Mail S.S. Co.*, 185 F. 698, 701-02 (9th Cir. 1911) (finding a dredger liable for leaving a submerged wire cable and buoy anchor chain used in its dredging work in Honolulu Harbor where it fouled a vessel's propeller).  As the *North American Dredging* court recognized, "To leave a wire cable attached to the anchor chain of a buoy in a harbor when not in use was obviously negligence and a menace to deep draft vessels, and therefore a legal wrong subjecting the wrongdoer to legal liability for the direct consequences."  185 F. at 702.

The fault of an unidentified third person can proximately cause damage.  In *Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207, 209-10 (4th Cir. 1999), the act of an unknown vandal, who jammed open seven above-ground fuel storage tanks, was the sole cause of the resultant fuel spill and entitled the tank owner to a complete defense to any responsibility or strict liability under OPA, 33 U.S.C. § 2701, *et seq.*

No act or omission of CARCO proximately caused the incident.  It occurred in Federal Anchorage No. 9 after the unidentified third party abandoned the anchor and after plaintiffs failed to comply with the mandatory single-hull tanker regulations and principals of good seamanship and navigation.  CARCO is not the responsible party under OPA, should not unjustly bear the fault of the anchor dropper in any degree, and has no liability for the superseding negligent acts of others who solely and proximately caused the oil spill.

## II.    CARCO's Equitable Defenses to Liability Defeat the Government's Subrogation Claim

Equitable principles bar the Government's subrogation claim against CARCO, which is based on Frescati's allegation that CARCO breached the alleged safe-port warranty of the Voyage Charter.  Necessarily, if Frescati fails to carry its burden of proving that a safe-port warranty was breached, the Government cannot recover.  Even assuming, however, that Frescati were able to prove a breach, equity precludes the Government from recovering the $88 Million it has reimbursed Frescati through the OSLTF.  CARCO, as an innocent terminal operator, should not be forced to reimburse the Government's clean-up expenses resulting from a hazardous condition in Federal Project waters that the Government maintained, controlled, and regulated.

CARCO and the Government have settled all tort claims between them.  In order to eliminate CARCO's negligence claims, the Government waived its claims against CARCO for additional damages that reportedly exceeded $120 Million.[270]  In Section 4.2 of the Settlement Agreement with CARCO (Exhibit A to Doc. 29 in Civil Action No. 08-cv-2989), the Government stipulated that CARCO reserved and could assert every possible legal and equitable defense to the Government's remaining claims, ". . . including but not limited to the right to raise affirmative defenses under any theory or doctrine of law or equity, the right to assert setoff or

---

[270] *See* U.S. Coast Guard Report to Congress, Nov. 20, 2013, "Oil Pollution Act Liability Limits."

2418144-1

recoupment and the right to assert compulsory or non-compulsory counterclaims other than a Claim for Contribution or Indemnity. . . ."

As a result of that voluntary agreement and the explicit waivers contained therein, the Government is absolutely barred in this litigation from attempting to assert that CARCO owed or breached any duty to ensure the safe navigation of vessels through Federal Anchorage No. 9 based on tort or equitable principles. And the Third Circuit expressly rejected the Government's attempt "to preclude CARCO on remand from raising any equitable defense premised on the Government's regulation of the Anchorage." *In re Frescati,* 718 F.3d at 214. The Government has waived the issue, and CARCO has the right to pursue "any previously raised equitable defense to the Government's subrogation claims." *Id.*

**A.     The doctrine of recoupment in equity.**

In answer to the Government's complaint, CARCO has denied any responsibility for the submerged object that the ATHOS I contacted in Federal Project waters created, monitored, controlled, surveyed, and charted by the Government's agencies and has pleaded the equitable doctrine of recoupment. *See* Doc. 11 in Civil Action No. 08-cv-2898 at Fourth Separate Defense and Fourteenth Separate Defense. By filing suit against CARCO, the Government consented to CARCO's right to assert legal and equitable defenses, including recoupment, up to the amount of the Government's own claim, and sovereign immunity does not apply. *See generally United States v. Shaw,* 309 U.S. 495, 502, 60 S. Ct. 659, 84 L. Ed. 888(1940); *United States v. United States Fidelity and Guaranty Co.*, 309 U.S. 506, 512-13, 60 S. Ct. 653, 84 L. Ed. 894 (1940); *Luckenbach S.S. Co. v. The THEKLA*, 266 U.S. 328, 95 S. Ct. 112, 69 L. Ed. 313 (1924) (suit to recover damages to a vessel constitutes waiver of sovereign immunity to counterclaim); *United Philippine Lines, Inc. v. USS DANIEL BOONE*, 475 F.2d 478, 1973 A.M.C. 1156 (4th Cir. 1973)

(Government waived sovereign immunity by filing counterclaim against vessel that collided with a U.S. submarine); *Frederick v. United States,* 386 F.2d 481 (5th Cir. 1967) (waiver of sovereign immunity can be by statutory consent or by the institution of the particular action).

A district court sitting in admiralty may grant any equitable relief appropriate to the transaction before the court, even on subsidiary or derivative issues. *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 691-92 (1950); *see also Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief."). The Court can balance the equities of the parties to a maritime contract in order to prevent unjust enrichment and avoid an unjust result. *See Archawski v. Hanioti*, 350 U.S. 532, 535-36 (1956). The purpose of recoupment is to "permit a transaction which is made subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole." *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 299 (1946).

The remedy of recoupment is available when (1) a defendant's claim or defense arises from the same transaction or occurrence as the plaintiff's claim; (2) the defendant seeks relief of the same kind and nature; and (3) if a claim is being made by defendant, that claim is defensive in nature and does not seek affirmative relief. *United States v. Am. Color & Chem. Corp.*, 858 F. Supp. 445, 451 (M.D. Pa. 1994); *see also Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186, 1195-96 (3d Cir. 1988), *cert. denied*, 493 U.S. 937 (1989). Here, CARCO's defenses meet the criteria for application of recoupment.

First, the Government's subrogation claim and CARCO's defenses arise from the same occurrence—the November 2004 oil spill in Federal Anchorage No. 9. The Government contends that CARCO breached a contract warranty that the Anchorage was safe for vessel

traffic, and CARCO's defenses are premised on the Government's responsibility and control over Federal Anchorage No. 9 under federal law.

Second, the Government and CARCO seek relief of the same kind and nature, specifically equitable relief. It is well recognized that subrogation claims, including those asserted in a maritime setting, are rooted in equity:

> This takes us to the very fundamentals of subrogation. It is now a mechanism so universally applied in new and unknown circumstances that it is easy to overlook that it originates in equity. Every facet, whether substantive or procedural, is controlled by the equitable origin and aim of subrogation.

*Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir. 1962).

Third, CARCO does not request affirmative relief, and has asserted its equitable rights and defenses solely for the purpose of offsetting or reducing the Government's subrogation claim. "[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded." *Bull v. United States*, 295 U.S. 247, 262, 55 S. Ct. 695, 79 L. Ed. 1421 (1935).

A claim in subrogation does not preclude an equitable defense. "It is permissible for a defendant to make a claim for recoupment against a plaintiff's subrogee, since it is generally true that any defenses that are valid against plaintiff are also valid against its subrogee." *Sikora v. AFD Industries, Inc.*, 18 F. Supp. 2d 841, 847 (N.D. Ill. 1998). Because the Government seeks reimbursement of clean-up expenses as the subrogee of Frescati, CARCO is entitled to raise any legal or equitable defense that applies to either the Government or to Frescati. The Government's right of subrogation under OPA does not strip CARCO of its equitable defenses under general and maritime law, as the Government is entitled to no special or preferential treatment. Like any other private litigant, the Government must contend with the defenses

available to CARCO, who properly invokes the Court's traditional power to examine all aspects of the dispute and apply those equitable principles necessary to achieve a fair result.

Even if OPA endowed the Government with a "super-subrogation" claim, the partial settlement agreement stipulates that the Government's rights against CARCO are strictly limited. In Section 3.4 of the Settlement, the Government expressly waived all rights against CARCO that might exist apart from the voyage charter and the bill of lading, and agreed that it would not "assert, file, commence, prosecute, or pursue any other claims, demands, causes of action or legal theories of recovery against CITGO based in tort, equity, strict liability, nuisance, trespass or any other common law or statute against CITGO. . . ." The agreement bars the Government from asserting any statutory right of subrogation that somehow diminishes or extinguishes CARCO's available defenses. As a result, even if the Government could have asserted some supreme claim of subrogation under OPA that guaranteed a recovery, the Government released that claim. The Third Circuit eliminated any issue in this regard and ruled that the Government has waived any right to preclude CARCO from raising its equitable defenses. *In re Frescati,* 718 F.3d at 214-15.

Accordingly, CARCO is entitled to the remedy of recoupment and its equitable defenses in order to offset the Government's claim for restitution of clean-up expenses. CARCO should not have to pay any amount to the Government. As discussed below, the Government's recovery against CARCO for clean-up expenses caused by a hazard to navigation in the Government's Anchorage would contravene the equity and fairness incorporated in such doctrines as equitable estoppel, unjust enrichment, and the unjust imposition of losses and penalties on an innocent party.

### B. The Government assumed responsibility and control for maintaining the Anchorage.

Almost forty years ago, Judge Troutman of this Court stated "Congress has charged the Secretary of the Army and the Chief of Engineers with the responsibility of seeing that navigable waterways remain unobstructed and safe for navigation," and the "Army Corps of Engineers in the Delaware River undertook the responsibility of surveying, dredging and depth maintenance of the river. . . ." *Japan Line, Ltd. v. United States*, 1976 A.M.C. 355, 364 (E.D. Pa. 1975), *aff'd*, 1977 A.M.C. 265 (3d Cir. 1976). Judge Troutman ruled that the "United States has the duty of periodically surveying the channel of the Delaware River and reporting the results of these surveys promptly to mariners," and held that the "United States by (1) statute, (2) regulations and (3) course of conduct of the United States Army Corps of Engineers has assumed the obligation to survey, maintain and advertise depths of the navigable waters of the Delaware River. . . ." *Id.* at 366, 371.

Congress established Federal Anchorage No. 9 in 1930 as part of the country's regulated system for water-borne commerce. The Corps of Engineers, NOAA, and the Coast Guard maintain and control the Anchorage. For decades, as authorized by a 1930 amendment to 33 U.S.C. § 1, *et seq.*, the "Rivers and Harbors Act" of 1910, the Army Corps of Engineers has been charged with maintaining Federal Anchorage No. 9 at its "project depth" of 40 feet to accommodate deep draft vessels on the Delaware River.[271] For the thirty years that preceded the incident, the Corps of Engineers and its third-party contractors performed all dredging for depth maintenance in Anchorage No. 9.[272] The only other dredging that has occurred in the Anchorage took place in 1977, when the Corps of Engineers issued a permit for mining of gravel and fill to be used in the Philadelphia Airport expansion project. Even then, the Corps of Engineers

---

[271] [TT Day 10 (De Pasquale) P. 101:2-10].
[272] [TT Day 10 (Olson) P. 147:4-18.]

supervised the dredging and also confirmed afterwards that project water depths had been maintained.[273]

In accordance with a plan to perform surveys on an annual basis, the Corps of Engineers has regularly surveyed Federal Project waters for depth and for dredging of Federal Anchorage No. 9, using single-beam sonar.[274]  In fact, the Corps of Engineers surveyed the _entire_ Anchorage in June 2004, less than six months before the Athos oil spill.[275]  The Corps reports the results of these hydrographic surveys to the maritime community, including mariners and terminal users, and publishes the survey results in "Channel Statements" that summarize the controlling or shallowest depths of the channels and anchorages.[276]  The Corps did not report the presence of the anchor in any of its multiple surveys since 2001.

The Corps of Engineers has routinely provided copies of their hydrographic survey drawings to the Coast Guard, NOAA, the Pilots' Association, and anyone else who asked.[277]  As of November 2004, federal law mandated that the Corps of Engineers post its hydrographic surveys on a website accessible to the public.[278]

Congress has assigned the responsibility of preparing and publishing official nautical charts to NOAA.[279]  NOAA maintains its "AWOIS" database of known or suspected submerged objects.[280]  NOAA publishes the _Coast Pilot_, which sets forth important information for mariners as a supplement to its charts, including information about hazards to navigation in a particular

---

[273] [TT Day 10 (Olson) P. 148:5-14].
[274] [TT Day 10 (DePasquale) P. 92:16-22; 96:15-25].
[275] [TT Day 10 (De Pasquale) P. 92:23-93:5; Ex. P-666].
[276] [TT Day 10 (De Pasquale) P. 91:12-22; 92:3-15; 108:2-109:9; TT Day 30 amended (Rankine) P. 54:25-55:16; Ex. D-1174 (Depth Chart)].
[277] [TT Day 10 (De Pasquale) P. 119:23-120:22; 121:11-17].
[278] [TT Day 35 (Barnes) Video Dep. P. 65:21-25; 66:1-24].
[279] [TT Day 24 amended (Barnum) P. 5:4-11].
[280] [TT Day 24 (Barnum) amended P. 27:11-22; 33:25-34:11].

area.[281] NOAA likewise published nautical charts showing the depths taken from hydrographic surveys performed by NOAA and by the Corps of Engineers, as well as the locations of reported obstructions and hazards to navigation discovered by surveys or otherwise.[282]

NOAA is also responsible for providing the public with tide and tidal current predictions.[283] It publishes predicted tide and tidal current tables and provides real-time information concerning the actual tides and current on the Delaware River via its PORTS system, which is available to mariners by telephone and NOAA's internet website.[284] Its objective is to promote safe navigation to deep-draft ships and give mariners information and a clearer picture of potential dangers as they make their decisions.[285]

The U.S. Coast Guard is charged by statute with the obligation to implement and enforce laws and regulations designed to facilitate the safe navigation of vessels. *See* 14 U.S.C. § 2. The Coast Guard also maintains a warning communication system, known as "Notices to Mariners," which are issued weekly to notify mariners of any changes in navigable waterways, including the location of newly discovered hazards and obstructions to navigation.[286] *See* 33 C.F.R. § 72.01-1. The Coast Guard is further tasked with the responsibility for marking structures, sunken vessels, and other obstructions that constitute hazards to navigation. The applicable regulations require it to take corrective action as to any "obstruction, usually sunken, that presents sufficient danger to navigation so as to require expeditious, affirmative action such as marking, removal, or redefinition of a designated waterway to provide for navigational safety." 33 C.F.R. § 64.06.

---

[281] [TT Day 24 (Barnum) amended P. 34:19-35:3; TT Day 25 (Danley) Video Dep. P. 27:6-13; 105:2-21; 107:13-108:19].
[282] [TT Day 24 amended (Barnum) P. 5:17-24; 6:13-21; TT Day 25 (Danley) Video Dep. P. 21:4-14; 22:4-6; Ex. D-1535 (Letter from U.S. Coast Guard to Rep. Booth)].
[283] [TT Day 23 (Szabados) Video Dep. P. 88:7-23].
[284] [TT Day 23 (Szabados) Video Dep. P. 89:4-90:3; 92:4-93:19; 115:5-116:11].
[285] [TT Day 23 (Szabados) Video Dep. P. 92:4-8; Ex. D-1338 (Website printout for NOAA PORTS Description dated 08/11/09)].
[286] [TT Day 8 amended (Bethel) P. 37:16-38:12; 39:4-40:8; Ex. D-1810; Ex. D-1535 (Letter from U.S. Coast Guard to Rep. Booth)].

Both the Corps of Engineers and NOAA actively searched for hazards to navigation within Federal Anchorage No. 9 before and after the ATHOS I incident. In 1974, the Corps of Engineers searched the bottom of Federal Anchorage No. 9 for hazards when a tanker exploded across the Delaware River, blowing debris into the Anchorage.[287] In 1981, NOAA surveyed the Delaware River, including Federal Anchorage No. 9, searching for hazards to navigation.[288] When NOAA surveyed the Delaware River again in 2002, NOAA searched for hazards to navigation and in fact found a hazard within Federal Anchorage No. 9, the position of which was to be marked on NOAA's chart, but the hazard was mistakenly omitted.[289]

Furthermore, representatives of the Coast Guard, NOAA, and the Corps of Engineers regularly attend the quarterly meetings of the Mariners Advisory Committee ("MAC") for the Delaware River, which is comprised of the terminal operators and other representatives from the maritime community. At the MAC meetings, the federal agencies report on conditions and activities within Federal Project waters, including ongoing and planned surveying, charting, and dredging.[290]

## C. Terminal operators such as CARCO have not undertaken maintenance of Federal anchorages.

Until this litigation against CARCO, there was never any suggestion that the Government, or anyone else, expected terminal operators like CARCO to survey, dredge or search for objects in Federal Project waters. When the ATHOS I spill occurred, the Coast Guard requested that both NOAA and the Corps of Engineers provide survey vessels to search Federal

---

[287] [TT Day 10 (Olson) P. 153:12-23].
[288] [TT Day 24 amended (Barnum) P. 17:3-8; Ex. D-1517 at p. 5-7 (NOAA Descriptive Survey Report 1981)].
[289] [TT Day 24 amended (Barnum) P. 10:17-21; 30:20-25; 31:1-16; Ex. D. 1520 at p. 5 (NOAA Descriptive Survey Report 2002); Ex. D-1522; Ex. D-1354 (Nautical Chart 12313 (50th ed.)].
[290] [TT Day 10 (De Pasquale) P. 106:24-108:23; TT Day 3 amended (Adams) P. 69:10-22; 98:2-22].

2418144-1

Anchorage No. 9 for the hazard(s) that had damaged the ship.[291]  **No one looked to CARCO for survey information or assistance.**

As the Government has conceded, "no maritime statute or regulation creates a duty to keep anchorage grounds free of hidden obstructions."  *See* Brief of United States, Appeal No. 11-2577, at p. 44.  Similarly, it has long been recognized that navigation channels and anchorages are not, and cannot be, maintained in perfect condition for the <u>convenience</u> of mariners.  *See Guinan v. Boston, Cape Cod & New York Canal Co.*, 1 F.2d 239, 243 (2d Cir. 1924) (quoting *Exchange Fire Insurance Co. v. Delaware & Hudson Canal Company*, 10 Bosw. 180 (N.Y. Super. Ct. 1863), which recognizes that it is unreasonable to require a canal owner "to sound and drag" or guard the canal "perpetually" for an unknown obstruction not previously contacted).

After the ATHOS I went aground and spilled her cargo, no one demanded survey data from CARCO or asked CARCO to search Federal Anchorage No. 9 for the object that had apparently caused the damage and pay the costs of its removal.  CARCO was not cited, fined, or reprimanded, nor even questioned about the incident or any specific obligation or expectation that it should have surveyed, dredged, or searched in Federal Anchorage No. 9, outside its permitted area.  When the pump casing and cement block, and later the anchor, were ultimately found and identified as the possible culprits, the Government removed the objects from the Anchorage.  The only culprits were the entity who dropped the anchor, or in the eyes of the Government, the grossly negligent plaintiffs who had violated statutes and regulations in navigating an unseaworthy vessel.

Likewise, in the aftermath of the ATHOS I spill, no authority directed any blame or criticism toward CARCO.[292]  Notably, when CARCO dispatched a representative to the Unified

---

[291] [TT Day 10 (De Pasquale) P. 133:10-21; TT Day 24 amended (Barnum) P. 36:20-24; 37:20-24; TT Day 25 (Danley) Video Dep. P. 125:3-126:16; 129:7-15; 129:21-130:8].

Command headquarters after the spill to determine what involvement CARCO might have, the Coast Guard informed CARCO that it had no role to play in the Unified Command (and no right to have a representative in attendance) because CARCO had no responsibility for the incident or for pollution cleanup operations.[293]  As a result, CARCO had no involvement in the process and participated in no decisions.

The Government gave essentially the same response to Delaware State Representative Joseph Booth, who wrote to the Coast Guard and pointedly asked "which agency is responsible for ensuring that the waterways by which these tankers travel is clear of debris and safe for passage."  The Coast Guard Captain of the Port simply replied that the Corps of Engineers, NOAA and the Coast Guard "all have a role in this mission."[294]  The Government made no mention of CARCO and never suggested that any non-governmental entity had some role in safeguarding vessels within the Federal Anchorage.

Not even the Government contends that CARCO had a duty to conduct dredging or water-depth surveys for shoals in the Anchorage.  Congress assigned to the Corps of Engineers the responsibility of dredging the Anchorage and maintaining the project depth of 40 feet.[295]  Richard Long of Hudson Engineers has performed hydrographic surveys for 31 of the 32 marine terminals on the Delaware River, and testified that prior to the ATHOS I incident, all terminal owners surveyed only the permitted area adjacent to their berths, and did not survey any area within designated boundaries of the Federal Project limits.[296]  Like uncharted objects, shoals can

---

[292] [TT Day 30 amended (Rankine) P. 11:22-12:6].
[293] [TT Day 10 (Drager) P. 79:16-80:20].
[294] [Ex. D-1535].
[295] [TT Day 10 (De Pasquale) P. 100:25-101:10; TT Day 35 (Barnes) Video Dep. P. 60:11-24; 96:7-15; Ex. D-1535 (Letter from U.S. Coast Guard to Rep. Booth].
[296] [TT Day 28 (Long) P. 79:15-80:25; 132:12-15; 136:15-17; *see also* Klein Dep. P. 23:1-14; 25:17-26:17; 35:16-38:11; 40:6-15; 115:24-116:11; Long Dep. P. 46:1-12].

2418144-1

pose a hazard to navigation. But neither the Government nor anyone else expected CARCO to survey Federal Anchorage No. 9 for shoals or objects.

The Government was the only entity that (i) conducted hydrographic surveys, (ii) performed dredging, (iii) prepared and issued nautical charts, (iv) searched for hazards, and (v) warned the maritime public about the existence of hazards to navigation within the designated confines of Federal Anchorage No. 9. It was the Government, and only the Government, who undertook those responsibilities and furnished the results of those activities directly to the public and mariners for their use in planning and conducting the navigation of their vessels. The evidence is overwhelming that the responsibilities undertaken by the Government in Federal Anchorage No. 9 are substantial, exclusive, and all-encompassing. It is no wonder that the many entities who comprise the maritime industry on the Delaware River, including marine terminals and charterers like CARCO, have justifiably relied on the Government to maintain the navigational safety of Federal Project waters.[297]

### D. Equitable estoppel bars the Government's claim against CARCO for hazards in the Government's anchorage.

Under federal common law, equitable estoppel will bar a claim upon a showing of (1) a material misrepresentation, (2) defendant's reasonable reliance to its detriment, and (3) extraordinary circumstances that warrant barring the plaintiff from asserting an otherwise lawful claim. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994). The defense of equitable estoppel applies to breach-of-contract claims by the Government acting in the proprietary capacity of a private party. *See In re Am. Training Services, Inc.*, 434 F. Supp. 988, 1003 n.35 (D.N.J. 1977) ("In acting as a private party would, as distinguished from the sovereign, the government may be subject to equitable estoppel by the same standards applicable

---

[297] [TT Day 3 amended (Adams) P. 98:5-22; TT Day 28 (Taylor) P. 178:12-23; Ex. D 766 at p. 5 (CARCO Marine Operations Guidelines)].

to private actions, *i.e.*, with no additional 'affirmative misconduct' requirement. . . .") (citations omitted).

The Government cannot evade examination of its own conduct and responsibilities simply because the Government asserts subrogated rights under Frescati's voyage charter. By virtue of its lawsuit against CARCO for a hazardous condition in Anchorage No. 9, the Government has put at issue its own regulation and control of the anchorage, and the activities that have continuously been conducted by the Government within the Anchorage. Thus, under equitable principles, the Government's responsibilities, actions, and omissions are subject to scrutiny, including the Government's creation of the Anchorage as federal waters for navigation by deep-draft vessels; the Government's undertaking to dredge, maintain, survey, and chart this federal waterway; the Government's announcements that the Anchorage remained open to general vessel traffic; and in particular, the Government's representations to the maritime community that the Anchorage was safe for navigation. Through its unquestionable power to achieve equity and fairness, the Court can and should find that equitable estoppel prevents the Government from asserting that CARCO is somehow liable for relying to its detriment on the Government's own actions and reports.

Regardless of whether the Government's conduct is deemed to fall into some defined category of equitable estoppel, the principles of equity inherent in the doctrine apply here. The loss cannot fairly be imposed on CARCO, who was not the "responsible party" under OPA. CARCO no control over Federal Anchorage No. 9 and relied to its detriment on the safety of a federal waterway that the Government created, controlled, and maintained for decades. CARCO never could have anticipated being held responsible to the Government for the condition of the Government's own anchorage.

**E.** **The Government would be unjustly enriched by recovery of cleanup expenses caused by a hazard in the Government's anchorage.**

A district court has the power "to prevent unjust enrichment from a maritime contract" and to prevent "a maritime contract from being exploited. . . ." *Archawski v. Hanioti*, 350 U.S. 532, 535, 76 S. Ct. 617, 100 L. Ed. 676, 1956 A.M.C. 742 (1956). To withstand scrutiny of its subrogated contract claim under the doctrine of unjust enrichment, the Government would have to show that the Government had a reasonable expectation of receiving payment from CARCO for oil spills in the Federal Anchorage, and further, that CARCO should reasonably have expected to pay the Government's expenses, or society's reasonable expectations would be defeated by nonpayment. *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990), *cert. denied,* 498 U.S. 982 (1990); *United States v. Rogan*, 459 F. Supp. 2d 692, 728 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008). To the contrary, the legislative scheme reflected in OPA demonstrates that the Government, CARCO, and society generally had the reasonable expectation that cleanup expenses incurred in the present circumstances would be paid by the OSLTF, which was established for this very purpose.

*1.* *The Oil Spill Liability Trust Fund and the National Pollution Funds Center.*

Congress enacted OPA as comprehensive legislation intended to prevent oil pollution and to ensure that mechanisms are in place to fund cleanup operations and pay claims resulting from a pollution incident. *See* 33 U.S.C. § 2701, *et seq.*[298] A "Responsible Party" designated under the Act is liable to pay the removal costs and damages resulting from an oil spill in navigable waters. 33 U.S.C. § 2702. According to Thomas S. Morrison, the NPFC's Chief of the Claims Adjudication Division, the NPFC can determine that an oil spill was caused solely by an unknown third party. In that event, the unknown polluter is deemed to be the "Responsible

---

[298] . [TT Day 24 amended (Grenier) P. 80:14-21.]

Party" under the statute,[299] and the OSLTF absorbs the pollution cleanup costs and damages arising from the spill.[300]  The primary source of revenue for the self-sustaining Fund is the tax paid by companies like CARCO into the Fund for every barrel of crude oil that they import.[301]  As of the time of trial, CARCO had already paid into the Fund approximately $103 Million.[302]

After the ATHOS I incident, the U.S. Coast Guard designated Frescati and Tsakos as the "Responsible Parties" who were therefore liable in the first instance to pay all pollution cleanup costs and damage claims.[303]  As Mr. Morrison acknowledged, however, if the Court determines that the sole cause of the oil spill was the unknown anchor dropper, then Frescati and Tsakos would be entitled to present their claim to the Fund for exoneration.  That was precisely the result of Judge Fullam's trial and is still available as a statutory remedy, as the Third Circuit noted.  Frescati and Tsakos would recover all of their uncompensated damages and costs from the Fund.[304]

Here, CARCO is not a "Responsible Party" under the provisions of OPA, and no act or omission on their part renders CARCO liable for cleanup costs.  Indeed, putting aside the fault of Frescati and Tsakos, the only party who bears responsibility for the oil spill is the person who left the anchor on the river bottom.  Under these circumstances, OPA places the financial burden on the Fund that was established for the specific purpose of paying cleanup expenses and claims arising from oil spills in U.S. waters, and that has been endowed through taxes paid by companies like CARCO.[305]  Having already paid $103 Million into the Fund, CARCO reasonably could expect OPA and the Fund to work as Congress intended, such that the true

---

[299] [TT Day 19 (Morrison) at 190:6-191:2; 192:14-193:18].
[300] [TT Day 19 (Morrison) at 194:5-9].
[301] [TT Day 19 (Morrison) P. 189:1-19].
[302] [TT Day 28 (Taylor) P. 189:23-192:23; Ex. D-2046 (Spreadsheet of tax payments)].
[303] [TT Day 19 (Morrison) P. 189:24-191:12].
[304] [TT Day 19 (Morrison) at 195:18-196:1].
[305] [TT Day 19 (Morrison) P. 162:10-15; 166:3-20; 189:10-19].

Responsible Parties and the Fund would pay the necessary cleanup expenses and not that CARCO would essentially have to pay twice. Neither CARCO nor anyone else could have anticipated the joint attempt by Frescati and the Government to force a terminal operator to pay twice for oil spilled from Frescati's vessel because someone abandoned an anchor in the Government's Anchorage. Equity does not allow, and this Court should not permit, such a result.

## 2. Liability of third parties under OPA.

Under OPA, where a third party's act or omission is the sole cause of the oil spill, that third party must be treated as the responsible party for purposes of determining liability for removal costs and damages. 33 U.S.C. § 2702(d); *see Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207, 209-10 (4th Cir. 1999); *Kure Shipping S.A. v. La. Pac. Corp.*, No. 99-16835, 2000 WL 1154971, at *4 (9th Cir. Aug. 15, 2000) ("Under this provision, the third party is treated as the responsible party for purposes of determining liability, and an original responsible party . . . may seek total indemnification."). Congress created the OSLTF to reimburse uncompensated removal costs, and a statutory responsible party who is exonerated may claim full reimbursement from the Fund. *Gatlin*, 169 F.3d at 209; 33 U.S.C. §§ 2708(a)(1), 2712(a)(3) and (4), and 2713(b)(1)(B).

When Frescati and Tsakos submitted their claim for limitation of liability, they never suggested that CARCO had caused or contributed to the oil spill.[306] Likewise, when the NPFC evaluated the Frescati/Tsakos request for limitation of their liability, the NPFC never suggested that CARCO was somehow implicated.[307] In fact, when Frescati and Tsakos submitted their separate application for complete exoneration from liability, they stated without qualification that

---

[306] [TT Day 20 (Morrison) P. 6:14-23].
[307] *Id.*

the oil spill was caused solely by the unidentified person "who lost, impermissibly abandoned (and/or neglected to discover) a nine (9) ton anchor in the Delaware River without reporting or marking the hazard."[308]   Again, Frescati and Tsakos never mentioned CARCO nor alleged that CARCO had contributed to the occurrence of the oil spill in any way.[309]   In such circumstances, if the NPFC concludes a spill was caused solely by an unknown third party, the Fund is solely responsible to pay all cleanup expenses and damages arising from the spill, including reimbursement of all amounts that have been paid by the statutory Responsible Party.[310]

> **3.** ***Rather than admit the involvement of the Government and its dredging contractors, the Government collaborated with Frescati/Tsakos to blame CARCO for the oil spill.***

The Government's actions after the oil spill further reflect their transparent and cynical strategy to pin blame on CARCO.  When the pump casing was discovered in the anchorage after the ATHOS I incident, the Government was well aware of evidence linking it to a Government contractor who performed dredging for the Corps of Engineers.  Nevertheless, the Corps of Engineers neglected to consult the dredger about its knowledge regarding the pump casing or the anchor.[311]   Despite knowing that a dredging contractor working for the Government had likely abandoned the anchor and the other objects in the Anchorage, the Corps of Engineers admittedly did nothing to determine the identity of the anchor's owner.[312]

Frescati and Tsakos's administrative claim presented to the NPFC states unequivocally that the unknown person who abandoned the anchor was solely responsible for the ATHOS I oil spill.[313]   Nevertheless, just as the Corps of Engineers made no effort to consult its dredging

---

[308] [Ex. D-2142 (claim submission for complete exoneration)].
[309] [TT Day 20 (Morrison) P. 8:23-9:2].
[310] [TT Day 19 (Morrison) P. 192:9-193:18; 193:21-194:9].
[311] [TT Day 29 (Denmark) P. 30:3-34:15].
[312] [TT Day 10 (De Pasquale) P. 134:11-14; TT Day 29 (Denmark) P. 33:1-34:11].
[313] [TT Day 20 (Morrison) P. 6:14-7:19].

contractors, the NPFC admittedly made no attempt to identify the unknown anchor dropper.[314] Furthermore, despite the Government's assertion in this litigation that the ATHOS I was unseaworthy and that the master and crew had negligently navigated the vessel in violation of Coast Guard regulations (Doc. 20 in Civil Action No. 05-305), the NPFC has nonetheless determined that Frescati was without fault and entitled to limitation of its liability under Section 2704 of OPA. Plaintiffs' contradictory claims are admissible and deserve weight as judicial admissions against their interests under Fed. R. Evid. 801(d)(2).

The Government crafted a cooperation agreement with Frescati and Tsakos in December 2008, which allowed them to withdraw their exoneration claim against the Fund, while fully reserving the right to re-assert their claim in the future.[315] In this way, the Government suspended the issue of third-party liability and exoneration of Frescati and Tsakos, and postponed the Fund's potential obligation to pay them an additional $45 Million, so that the plaintiffs could re-direct the Frescati/Tsakos claim for $45 Million, and the Government's claim for $88 Million against CARCO. Frescati and Tsakos risk nothing, since even if their claim against CARCO fails, they will still have recourse against the Fund. The Government likewise risks nothing. If the Government's subrogated contract claim against CARCO fails, the plaintiffs will simply resolve the Fund's postponed obligations and determine whether the Fund should pay $45 Million to Frescati/Tsakos.[316]

Ultimately, neither OPA nor equity allows plaintiffs to foist liability on CARCO for any pollution-related liability resulting from the ATHOS I incident. The facts and procedural history of this case speak for themselves. Even the Third Circuit was puzzled by plaintiffs' inexplicable withdrawal of their exoneration claim. *See In re Frescati,* 718 F.3d at 193 and n.6 ("In February

---

[314] [TT Day 19 (Morrison) P. 205:22-206:24].
[315] [TT Day 20 (Morrison) P. 9:13-10:11].
[316] [TT Day 19 (Morrison) P. 194:5-14; 194:22-196:2].

2418144-1

2007, Frescati applied to have its liability exonerated pursuant to 33 U.S.C. § 2703(a)(3). That subsection directs that a responsible party is not liable for the acts or omissions of a third party. In this case, that third party would have been the unknown anchor-dropper. It is unclear why Frescati withdrew this claim in 2008.").

Furthermore, not only the statute but the Voyage Charter itself imposes all risks of pollution and responsibilities under OPA on the vessel owner, not CARCO. In Paragraph 3 of the CITGO Petroleum Corporation clauses, the vessel owner warranted that the vessel "will be in full compliance with all applicable U.S. Coast Guard regulations, including pollution prevention regulations. . . ." In Paragraph 25, the owner warranted having P&I Club insurance coverage for oil pollution of at least $1 Billion during the period of the charter. In Paragraph 36, the owner warranted that a pollution response plan meeting the full requirements of OPA had been submitted to the Coast Guard, and "that the owner shall ensure that the owner or operator of the vessel and the vessel fully meet all other requirements of OPA and any governmental regulations or guidelines issued thereunder." As the charterer, CARCO is the beneficiary of these warranties. It is not the warrantor or the obligor who owes them. Despite these warranties, Frescati, Tsakos and the Government have joined forces to attempt to shift OPA liability entirely to CARCO, contrary to the statute and the Voyage Charter.

## F. Responsibility for a loss equitably falls on the party who was best situated to have avoided the loss.

A fundamental principle of equity provides that when a loss must be borne by one of two innocent parties, the loss should fall on the party who enabled the loss to occur or who had the best opportunity for avoiding the loss. This long-established equitable doctrine has been applied in a variety of settings under many differing circumstances. *See Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 324, 84 S. Ct. 748, 11 L. Ed. 2d 732,

1964 A.M.C. 1075 (1964). For example, in *Manchester Equip. Co. v. Am. Way Moving & Storage Co., Inc.*, 176 F. Supp. 2d 239, 247 (D. Del. 2001), *aff'd,* 47 F. App'x 189 (3d Cir. 2002), both the plaintiff and the defendant were defrauded when a third party induced the plaintiff to deliver computer equipment to the defendant. The district court stated that "where both litigants are innocent, the burden must fall on the party that was the most active in creating the situation that lead [sic] to the loss." *Id.* (citing *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 457 (Del. 1982)).

In *W. Bulk Carriers, K.S. v. United States,* No. 97-2423, 1999 WL 1427719, 1999 A.M.C. at 2827 (E.D. Cal. 1999), the court found no authority for a contractual claim of breach of implied warranty "where a wharfinger has failed to discover, remove and/or warn about the existence of a shoal located within a federally-maintained waterway." As the *Western Bulk* court stated, "to find that the implied warranty stretches so far would run counter to the Supreme Court's reasoning that 'liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury.'" *Id.* (quoting *Italia Societa per Azioni di Navigazione*, 376 U.S. at 324); *see also W. Tankers Corp. v. United States,* 387 F. Supp. 487, 491, 1975 A.M.C. 775 (S.D.N.Y. 1975) (holding that the vessel was best situated to have taken preventive measures to avoid injury to a seaman in an unsafe berth and was sufficiently negligent to preclude it from recovering indemnity from the charterer for breach of its duty to furnish a safe berth).

Here, if the unknown third party who left the anchor in the River solely caused the spill, the cost of the clean-up falls on the Oil Spill Liability Trust Fund, not CARCO. Alternatively, plaintiffs were in control of their vessel's navigation and could have avoided striking the anchor through good seamanship. And in any event, at all times the Government retained sole

responsibility and control of Federal Anchorage No. 9. The unknown anchor-dropper, Frescati,

Tsakos, and the Government itself were all in better positions than CARCO to have prevented

the incident. Under equitable principles, no responsibility falls on CARCO.

In the end, this litigation reflects a massive effort by plaintiffs to avoid their own

embarrassment and responsibilities. Plaintiffs seek to impose liability on CARCO by subverting

the OPA statute and perverting the provisions of CARCO's Voyage Subchapter with Star

Tankers. Admiralty law, OPA, and equity do not permit such an injustice.

## III.    Frescati and Tsakos Have No Valid Wharfinger Negligence Claim

To establish negligence or fault under the general maritime law, the plaintiff must prove

that the defendant owed it a duty, that the defendant breached the duty, and that a causal

connection exists between the defendant's conduct and the plaintiff's injury. *See Canal Barge

Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376, 2001 A.M.C. 1815 (5th Cir. 2000); *Evans v.

Nantucket City. Sailing, Inc.*, 582 F. Supp. 2d 121, 137, 2009 A.M.C. 360 (D. Mass. 2008). The

plaintiff must carry this burden of proof by a preponderance of the evidence. *In re Nautilus

Motor Tanker Co., Ltd.*, 862 F. Supp. 1260, 1271 (D.N.J. 1994), *aff'd*, 85 F.3d 105 (3d Cir.

1996). Frescati and Tsakos cannot meet their burden. CARCO acted as any reasonable private

terminal would and bears no responsibility for an allision and oil spill that it could not have

foreseen and in no way caused.

### A.    CARCO's tort duty as a wharfinger is one of reasonable care.

The Third Circuit states that a wharfinger is ''bound to use reasonable diligence in

ascertaining whether the berths themselves and the approaches to them are in an ordinary

condition of safety for vessels coming to and lying at the wharf.'' *In re Frescati,* 718 F.3d at 207

(quoting *Smith v. Burnett,* 173 U.S. 430, 436 (1899) (quoting, with approval, *The Calliope*

[1891] A.C. 11 (H.L.) 23 (appeal taken from Eng.)).  Although the Court of Appeals has determined that the ATHOS I was within the "approach" to the CARCO berth, it left to this Court on remand the task of delineating "the exact standard of care required by CARCO, let alone whether there was a breach of that standard (a.k.a. duty)." *Id.* at 211-12.  The Third Circuit emphasized that CARCO's tort duty of reasonable diligence does not make it "a guarantor of a visiting ship's safety" and that it does not have "an unconstrained mandate to 'ensure safe surroundings or warn of hazards merely in the vicinity.'" *In re Frescati,* 718 F.3d at 207 (quoting *In re Nautilus,* 85 F.3d at 116 (citing *Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.,* 571 F.2d 229, 230 (5th Cir. 1975)).

Plaintiffs cannot shift their own duties of good seamanship and navigation onto CARCO as a dock owner.  The master and pilot must make navigational decisions with due regard to "existing conditions of tide, current, and weather." *See California ex rel. Dep't of Transp. v. S/T Norfolk,* 435 F. Supp. 1039, 1047, 1978 A.M.C. 144 (N.D. Cal. 1977).  "A wharfinger is under no duty to advise an approaching vessel of weather reports at the pier or of other conditions arising during the ordinary course of navigation or docking and which are readily apparent to the ship." *Bangor & Aroostook R.R. Co. v. The Ship Fernview*, 455 F. Supp. 1043, 1062, 1978 A.M.C. 2439 (D. Me. 1978).  Indeed, in discussing CARCO's tort duty, the Third Circuit itself recognizes that the vessel bears the responsibility for its own navigation by stating that "'a vessel should be able to enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship.'" *In re Frescati,* 718 F.3d at 207 (quoting *Trade Banner Line, Inc.,* 521 F.2d at 230).  CARCO fully met all these legal standards and did not breach its duty of reasonable care as a prudent wharfinger.

**1.** **At the time of the ATHOS incident in 2004, no jurisprudence imposed an existing duty on CARCO to survey Federal Anchorage No. 9.**

In its opinion, the Third Circuit states that negligence in admiralty law requires "[t]he existence of a duty required by law which obliges the person to conform to a certain standard of conduct. . . ." *In re Frescati,* 718 F.3d at 207 (citing 1 Schoenbaum, *Admiralty and Maritime Law,* §§ 5-2 at 252; *Pearce v. United States,* 261 F.3d 643, 647 (6th Cir. 2001)). The Court of Appeals emphasizes that the standard of reasonable diligence required of a wharfinger "varies greatly" and depends upon "the circumstances" of the particular case. *In re Frescati,* 718 F.3d at 211 ("Negligence exists where there was a 'fail[ure] to exercise that caution and diligence which the circumstances demanded, and which prudent men ordinarily exercise.' . . . In admiralty, the particular duty required under any given circumstance can be gleaned from statute, custom, or 'the demands of reasonableness and prudence.'" (citations omitted)).

Importantly, at the time of the ATHOS allision in 2004, no existing case law or statutory regulation imposed any duty on a private wharfinger to survey Federal project waters for hazards. Indeed, published jurisprudence held that a private wharfinger had no such duty. *See W. Bulk Carriers, K.S. v. United States,* No. 97-2423, 1999 WL 1427719, 1999 A.M.C. 2818, 2827 (E.D. Cal. 1999) (holding that a wharfinger had no duty in tort or contract to discover and warn of a shoal located within a federally maintained waterway); *Japan Line, Ltd. v. United States,* 1976 A.M.C. 355, 366 (E.D. Pa. 1975), *aff'd,* 547 F.2d 1161, 1977 A.M.C. 265 (3d Cir. 1976) (recognizing that the Federal Government "has assumed the duties of surveying the navigable channels of the Delaware River in advising mariners *promptly* of its findings.") (emphasis in original). The Third Circuit itself recognized that its ruling imposing a duty on CARCO concerning the "approach" in this case was novel. *See In re Frescati,* 718 F.3d at 207 ("The geographic scope of a safe approach has been largely unaddressed by the courts."). Prior

to the Third Circuit's decision in this case, no court had held that a private wharfinger owed any duty concerning Federal Project waters. "Under the circumstances" prevailing at the time of the ATHOS allision, therefore, CARCO acted reasonably in maintaining its own permitted area and in not conducting speculative searches for unsuspected and unknown objects in Federal Anchorage No. 9, an area that the Government agencies controlled.

The fact that the anchor was unknown to CARCO or anyone else limits the degree of prudence expected of a reasonable wharfinger such as CARCO. In *Smith v. Burnett,* a vessel grounded on a rock within a berth while actually secured to the pier and loading crushed stone. Moreover, the wharf owners in *Smith* knew that another vessel with a similar draft had previously grounded on a rock in the same berth. The *Smith* case did not involve an <u>unknown</u> obstruction in an "approach" in a Federal waterway outside the berth, nor did it involve a vessel that was underway and approaching the berth area. *Smith's* mere reference to the vague "approach" language in decisions applying English law does not support plaintiffs' claim that CARCO breached its duty of reasonable care under the law that existed at the time of the allision.

In *The Moorcock* (1889), L.R. 14 P.D. 64, one of the English decisions cited in *Smith* and relied upon by plaintiffs, a vessel sustained damage when she settled on a ridge on the bottom of the River Thames while actually secured to the pier waiting to discharge at the defendant's facility. Unlike CARCO in the case at bar, the wharfinger in *Moorcock* had prior actual knowledge that ships would touch bottom at low tide while docked at the berth, and the case did not involve an unknown hazard in the approach.

In *The Calliope* [1891], A.C. 11, L.R. 14 Prob. Div. 138, another English case relied upon by plaintiffs, a vessel damaged its hull when she came to rest on a mud ridge in the River

Usk. Like *The Moorcock,* the case involved a condition of the river bottom that was well known to the wharfinger and that had resulted from the use of the wharfinger's facility. The wharf in *The Calliope* had two berths, one alongside the pier and the other just outside of it, where vessels would lie when stranded by the receding tide, causing mud ridges to form. The vessel in question had been heading to the inner berth when she stranded on a ridge. Indeed, the *Calliope* court ultimately found that the wharfinger did not breach any duty, because the captain and pilot of the vessel had caused the injury by attempting to berth the vessel at an unsafe time of the tide.

**2.     *CARCO reasonably relied on the Government's exclusive dominion, responsibility, and control over Federal Anchorage No. 9.***

Through a "comprehensive system" and "elaborate plan" the Government "has assumed the duties of surveying the navigable channels of the Delaware River and advising mariners *promptly* of its findings." *Japan Line*, 1976 A.M.C. at 366 (emphasis in original). As discussed above, the Corps of Engineers, NOAA, and the Coast Guard investigated and reported the condition of Federal Project waters.

The general public, terminal operators, and the Mariners Advisory Committee ("MAC"), (an organization of professional mariners concerned with safe navigation of deep-draft vessels on the Delaware River) naturally and properly looked to and relied on the Corps of Engineers, NOAA, and the Coast Guard as the responsible federal agencies with the mandate for the navigational safety of the River, including federal anchorages.[317] One of the primary functions of these three Government agencies is to ensure safe navigation.[318] The MAC was made up of professional mariners, ship operators, terminal operators, the U.S. Coast Guard, NOAA, and the Corps of Engineers.[319] The expectation of the MAC that the Corps of Engineers, NOAA, and the

---

[317] [TT Day 3 amended (Adams) P. 67:16-20; 69:10-23; 98:5-99:5; Ex. D-1535].
[318] [TT Day 35 (Barnes) Video Dep. P. 60:17-24; Ex. D-1535].
[319] [TT Day 3 amended (Adams) P. 69:10-23; 101:13-20].

2418144-1

Coast Guard were responsible for navigational safety of the Delaware River anchorages constitutes evidence of the custom and practice on November 26, 2004. The MAC never looked to private terminals when it came to the safety of federal channels or anchorages.

This complex scheme of federal statutes and regulations charging the Corps of Engineers, NOAA, and the Coast Guard with responsibilities for Federal Anchorage No. 9 and informing the public necessarily affects the standard of care expected of CARCO as a prudent wharfinger at the time the ATHOS I incident in 2004. The evidence readily shows that CARCO as a private wharfinger reasonably relied on the Government to safeguard federal waterways, including Federal Anchorage No. 9.

### 3. *No statute or regulation required CARCO to look for obstructions in federal waters.*

In its Opinion in this case concerning the specific nature of CARCO's duty of reasonable care as a wharfinger, the Third Circuit openly acknowledges that no statute required CARCO to survey Federal Anchorage No. 9 for obstructions. *See In re Frescati,* 718 F.3d at 211 n.31 ("In evaluating the specific nature of this duty, the parties point to no statute on point and our research reveals none."). The Government itself has judicially admitted in this case that "no maritime statute or regulation creates a duty to keep anchorage grounds free of hidden obstructions." *See* USA Appellate Brief at p. 45. This point is especially significant as this Court considers and delineates the exact standard of care required of CARCO on remand. As discussed in detail above, the OPA statute and the Coast Guard regulations promulgated under it impose an extensive network of requirements on the owners and operators of single-hull tankers, but do not charge private terminal operators to search for objects in Federal Anchorage No. 9.

Plaintiffs own expert, Andrew Brooking, admitted that no law or regulation required CARCO to survey or look for obstructions in federal waters.[320]  He agreed that the Corps of Engineers, NOAA, the Coast Guard, the pilots, the Maritime Exchange, and the Mariners Advisory Committee (all with a greater responsibility over Federal Anchorage No. 9 than CARCO) did not identify and manage the risk of the unknown anchor.[321]  Yet plaintiffs would now seek impose that responsibility on CARCO as a prudent wharfinger.

The International Ship Safety Management System ("ISM"), though required for ships, is not required of shoreside terminals.[322]  This is because ships are much more heavily regulated than shoreside terminals.  Although the SOLAS convention and 33 C.F.R. § 157.455 legally mandate that the master of a single hulled tanker such as the ATHOS I pre-plan the ship's voyage to calculate anticipated underkeel clearance (and thereby assess the risk of striking uncharted, submerged objects), no federal or state statutes or regulations require CARCO to adopt the policies that plaintiffs propose.  *See* 33 C.F.R. § 157.455 (a) and (b); SOLAS Chapter 34 and IMO Resolution A.893 (21); STCW.  Even Andy Brooking, plaintiffs' expert, concedes this.[323]  Plaintiffs, not CARCO, failed to properly monitor and enforce a safety management system, and thereby proximately caused the ATHOS I incident.

### 4.    *No custom put CARCO on notice to survey the Anchorage.*

The absence of custom and statutory duty is relevant to establish the required standard of care.  *See In re J.E. Brenneman Co.,* 322 F.2d 846, 855, 1964 A.M.C. 2037 (3d Cir. 1963); *Pennsylvania R.R. Co. v. S.S. Marie Leonhardt,* 202 F. Supp. 368, 375, 1962 A.M.C. 370 (E.D. Pa. 1962).  It is a "material consideration."  *See U.S. Fidelity & Guar. Co. v. Plovidba,* 683 F.2d

---

[320] [TT Day 13 amended (Brooking) P. 71:3-5; TT Day 30 amended (Rankine) P. 57:16-19; TT Day 30 amended (Furlotte) P. 132:1-4; TT Day 35 (Barnes) Video Dep. P. 96:2-97:1].
[321] [TT Day 13 amended (Brooking) P. 92:2-17].
[322] [TT Day 13 amended (Brooking) P. 71:10-17; TT Day 30 amended (Rankine) P. 11:9-25].
[323] [TT Day 13 amended (Brooking) P. 71:10-17].

1022, 1028, 1983 A.M.C. 2473 (7th Cir. 1982). Custom is a finding of fact, subject to review under the clearly erroneous standard. *See Goodman v. Fireman's Fund Ins. Co.,* 600 F.2d 1040, 1043, 1979 A.M.C. 2534 (4th Cir. 1979); *Martin Marine Transp. Co., Inc. v. Jakobson & Peterson Inc.,* 135 F.2d 325, 327, 1943 A.M.C. 498 (2d Cir. 1943).

No policy or custom imposed any obligation on CARCO or any other private terminal on the Delaware River to survey the federal anchorage for uncharted objects before the ATHOS I incident.[324] Annually since 1991, an independent contractor, S.T. Hudson Engineering ("Hudson"), performed hydrographic surveys of CARCO's permitted area of responsibility. Hudson performed surveys and obtained permits for thirty out of the thirty-two terminals on the Delaware River and always used the same single beam sonar technology—which makes perfect sense since the surveys are to determine depths and for no other purpose.[325] The Corps of Engineers also used only single-beam sonar to survey Federal Anchorage No. 9.[326]

Hudson only surveyed CARCO's and the other terminals' permitted areas of responsibility, and CARCO had no responsibility, authority, interest, or reason to conduct soundings or surveys beyond its permitted area.[327] CARCO has never asked Hudson to survey Federal Anchorage No. 9, and Hudson has never been asked to survey federal waters by any terminal.[328] Before 2004, Hudson had not conducted any side-scan sonar surveys for any terminals to look for obstructions, other than looking for debris immediately adjacent to

---

[324] [TT Day 6 amended (Capone) P. 183:2-20; TT Day 13 amended (Brooking) P. 70:24-71:25; 92:10-17; 106:1-4; TT Day 28 (Long) P. 79:15-81:13; 112:8-117:11].

[325] [TT Day 10 (Drager) P. 67:21-24; 70:16-71:11; TT Day 28 (Long) P. 80:11-81:13; Rankine Dep. (10/16/07) P. 146:6-13; Klein Dep. (11/20/07) P. 25:17-22; 35:1-12; 115:24-116:11; Ex. D-603 (Survey dated 10/18/04)].

[326] [TT Day 6 amended (Capone) P. 182:6-184:6; TT Day 10 (De Pasquale) P. 92:20-93:10; TT Day 28 (Long) P. 91:14-92:4].

[327] [TT Day 30 amended (Rankine) P. 54:7-24; Rankine Dep. 10/16/07, P. 172:5-174:5; TT Day 28 (Long) P. 79:15-81:13; 82:4-18; 88:23-89:21; 112:8-117:11].

[328] [TT Day 30 amended (Rankine) P. 57:6-58:3; TT Day 28 (Long) P. 79:15-81:13; 82:4-18; 88:23-89:12; 112:8-117:11].

116

collapsed piers or pilings.[329] CARCO's Marine Operations Guidelines specifically state that CARCO has a policy of not surveying or dealing in any way with federal waters.[330]

Indeed, plaintiffs' own witnesses acknowledged that no private terminal on the Delaware River surveys federal project waters outside of their own berths and permitted areas of maintenance.[331] Brooking has never recommended that his private clients should survey federal waterways, and he was unaware of any terminal on the Delaware River that has undertaken a responsibility to survey Federal Anchorage No. 9.[332] Thus, plaintiffs' own experts established that there was no custom and practice by wharfingers on the Delaware River to survey federal waters. Whether CARCO could have voluntarily surveyed the Anchorage or could have requested a permit to do so is beside the point. Like every other terminal on the river, CARCO had no reason to do so and never did. According to the custom and practice in the industry prior to the November 26, 2004 incident, terminal operators on the Delaware River did not survey Federal anchorages.

As discussed above, CARCO and all the other users of the Delaware River relied upon the Corps of Engineers and other federal agencies to maintain Federal Project waters, including Federal Anchorage No. 9. Suggesting that CARCO and the other terminals' duties as prudent wharfingers included surveying for and discovering unknown and unsuspected objects in publicly navigated waterways is unworkable, unrealistic, unreasonable, and unenforceable.

Finally, the events after the ATHOS I incident are the best evidence of who had the responsibility to survey Federal Anchorage No. 9. NOAA and the Corps of Engineers immediately took responsibility by conducting surveys of Federal Anchorage No. 9 to look for

---

[329] [Klein Dep. (11/20/07) P. 25:23-26:17; 115:24-116:11].
[330] [R. Williams Dep. (01/16/08) P. 144 (Errata); TT Day 30 amended (Rankine) P. 52:12-53:4; Ex. D-766 (Marine Operations Guidelines (revised (5/30/2000)].
[331] [TT Day 6 amended (Capone) P. 183:2-20; TT Day 13 amended (Brooking) P. 71:3-25; 92:10-17; 106:1-4].
[332] [TT Day 13 amended (Brooking) P. 92:10-17; 105:22-106:4].

the object struck by the ATHOS I. The Corps of Engineers conducted multi-beam sonar surveys on November 28 and 29, 2004, and NOAA conducted side-scan sonar surveys searching for objects within the Anchorage.[333] Their actions are the best evidence of custom and practice concerning who was responsible for surveying the Federal Anchorage No. 9. No one ever looked to CARCO for survey information either before or after the incident. As a prudent wharfinger, CARCO had no reason to believe that surveys of the Federal Anchorage were necessary or expected of it as a private terminal.

5. *A prudent wharfinger should not bear the unreasonable <u>burden</u> to locate and remove an obstruction that nobody knew existed.*

Absent notice of a potential hazard, the Corps of Engineers does not routinely search for hazards because it is too expensive.[334] Indeed, the U.S. Government in its Third Circuit appellate brief admitted: *"Unrebutted expert testimony in district court established that unless a known or suspected hazard justifies the expense, federal agencies do not search for objects on the river bed because speculative searches would be a pointless waste of resources."* *See* USA Brief, Appeal No. 11-2577, at pp. 50-51 (emphasis added). The Government stated that "searching indiscriminately for underwater hazards [would not] be a prudent use of resources for the agencies charged with promoting the overall interests of safe navigation. . . ." *Id.* at pp. 23-24. The Government also acknowledged that no dredging was performed after the Corps performed its 2004 depth survey, "'because of the limited use of the anchorage' and the lack of any complaints or other evidence that 'this was causing anybody any problems. . . ." *Id.* at p. 48. Ironically, the search for the anchor in this case confirms the accuracy of the Government's concessions. Following the oil spill, the Government committed immense resources and spent

---

[333] [TT Day 10 (DePasquale) P. 133:10-21; TT Day 24 amended (Barnum) P. 36:20-24; 37:20-24; TT Day 25 (Danley) Video Dep. P. 125:3-24; 126:1-16; 129:7-15; 129:21-24; 130:1-8; Ex. D-1514 (NOAA Graphic); TT Day 22 (Traykovski) P. 11:4-17].
[334] [TT Day 35 (Barnes) Video Dep. (08/12/09) P. 68:2-11].

118

several weeks searching a part of the anchorage for the object, but the anchor was not located and removed until some 40 days after the incident. The Government's stated position constitutes evidence of custom and practice concerning surveying. Neither the Government nor private terminal operators conducted speculative searches for unknown objects. The long and expensive post-incident search for the anchor in this case further proves the Government's point.

Any suggestion that the anchor would have necessarily or easily been discovered through the use of side-scan or multi-beam sonar surveys or a wire drag is flatly contradicted by the evidence demonstrating the extraordinary difficulty encountered by the Government in locating the anchor after the incident. It took plaintiffs, NOAA, the Coast Guard, and the Corps of Engineers 40 days of active searching to locate the anchor after the November 26, 2004 oil spill, even though: (1) they knew that the object struck by the ATHOS I existed; (2) they knew the precise GPS track of the ATHOS I; (3) they knew the approximate GPS location of the anchor; and (4) they were assisted by divers, government survey vessels, more than 200 side scan sonar surveys, multiple multibeam sonar surveys, and magnetometer technology.[335] Despite this detailed actual knowledge and these technological advantages, plaintiffs spent over $100,000 in post-incident search charges paid to John Fish's company AUSS, which does not include the additional labor and equipment dedicated to the search by NOAA, the Coast Guard, and the Corp of Engineers.[336] Plaintiffs' own expert, John Fish, testified at trial that he believed that a side scan survey would cost between $8,000 and $10,000, but his own firm charged more than $100,000 for the post-incident search that took 40 days, even though they knew the ship's GPS track and the GPS coordinates of the location where the ship contacted the anchor.[337]

---

[335] [TT Day 33 amended (Ross) P. 21:2-13; 22:17-23:8; TT Day 6 amended (Fish) P. 56:13-57:1; 84:16-24; 85:21-86:17; 87:1-8; 88:19-89:21; 91:2-24; Ex. D-1914].
[336] [TT Day 6 amended (Fish) P. 88:19-25; 91:25-92:5].
[337] [TT Day 6 amended (Fish) P. 56:13-19; 84:13-24; 89:1-21; 91:2-92:5].

Furthermore, very early on in the 40-day search, the Government held a press conference on December 7, 2004 and erroneously advised the public that a pump casing was the object struck by the ATHOS I.[338]  It was Captain Sarrubi of the Coast Guard who identified the pump casing as the culprit at the press conference.[339]  Ironically, the wrongly blamed pump casing was not identified by the many sonar surveys, but rather by happenstance when diver Robert Ross "bumped into it" at the end of one of his dives.[340]  Plaintiffs' first phase of their extensive search for a known object ended on December 10, 2004 and cost more than $38,000 with the result being the inadvertent discovery of the wrong object and the inability to find the anchor.[341]

Despite performing and analyzing numerous side scan surveys that would have included the location of the anchor, plaintiffs blamed the pump casing for the incident and did not discover the anchor until weeks later.[342]  After more than 200 side-scan runs, plaintiffs did not locate, identify, and remove the anchor until January 17, 2005.[343]  Plaintiffs own difficulty and confusion in their post-incident search of Federal Anchorage No. 9 refutes their speculation that CARCO would have somehow found the anchor with minimal effort and expense.

Side-scan sonar does not indicate the depth of an object and therefore does not provide information about whether or not it poses a danger to navigation.[344]  In light of these facts, plaintiffs have no basis for their unsupported suggestion that CARCO could have easily found the anchor through an "inexpensive" search for an object it did not know existed.  Indeed, as the Third Circuit noted, Judge Fullam stated that he "was not convinced that had the area been scanned the anchor would perforce have been detected. . . ."  *In re Frescati,* 718 F.3d at 212 and

---

[338] [TT Day 6 amended (Fish) P. 87:9-88:22].
[339] [TT Day 33 amended (Ross) P. 21:2-13; 21:22-22:1; TT Day 6 amended (Fish) P. 84:16-24; 85:21-24; 87:1-25; 88:1-3; Ex. D-1549A; Danley Dep. P. 142:22-144:12].
[340] [TT Day 33 amended (Ross) P. 21:2-13; Ex. D-1549A].
[341] [TT Day 6 amended (Fish) P. 87:9-88:25; TT Day 33 amended (Ross) P. 21:2-13].
[342] [TT Day 33 amended (Ross) P. 22:25-23:8; TT Day 6 amended (Fish) P. 87:9-89:21].
[343] [TT Day 6 amended (Fish) P. 84:13-24; 89:1-21].
[344] [TT Day 22 (Traykovski) P. 57:3-58:21; TT Day 6 amended (Fish) P. 98:19-21].

n.32.  The anchor was only discovered post-accident after herculean and costly efforts, even with the benefit of the vessel's GPS track and the exact location of the vessel's contact with the object.

The Corps of Engineers' ultimately fruitless search for a missing propeller from the Dredge MCFARLAND in 2004 further exemplifies the difficulty of detecting the existence of objects in the Delaware River.  The search for that propeller included side-scan surveys inside the confines of Federal Anchorage No. 9.[345]  Although it knew the dredge's location when it lost its propeller, as well as the vessel's track, the Corps of Engineers was never able to find the propeller, despite searching for it for months using multi-beam and side-scan sonar, as well as divers.[346]  Plaintiffs' assertion that inexpensive measures somehow would have led to CARCO to discover an unknown anchor ignores reality and their own time-consuming, expensive, and massive effort to find a known object armed with precise GPS coordinates.

Even if the subject area within Federal Anchorage No. 9 had been surveyed with side scan sonar technology as proposed by plaintiffs, the evidence shows that more likely than not that the anchor would **not** have been discovered.  This is the very reason why plaintiff USA admitted in its appellate brief that speculative searches for unknown objects are a waste of resources.  [USA Appellate Brief at p. 50-51].  CARCO's standard of reasonable care as a private wharfinger likewise does not require such perpetual speculative searches for unknown and unsuspected objects.

### B.    CARCO did not proximately cause the oil spill.

The law also requires plaintiffs to prove that CARCO proximately caused the oil spill. *See In re Frescati,* 718 F.3d at 212 ("On remand, the District Court will also need to determine

---

[345] [TT Day 10 (DePasquale) P. 130:13-20].
[346] [TT Day 10 (DePasquale) P. 127:1-24; 130:13-20; TT Day 6 amended (Capone) P. 138:10-139:3].

2418144-1

whether the failure, if any, to meet the standard of care proximately caused the accident."). A party alleging negligence under maritime law must demonstrate both factual and proximate causation. *In re J.A.R. Barge Lines, L.P.*, No. 03-180, 2007 WL 674348 at *29 (W.D. Pa. Feb. 28, 2007); *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 548 (D. Del. 2003). Factual causation involves an inquiry into whether the event would have occurred in the absence of an act or omission, whereas proximate cause involves an inquiry into whether the damage was a reasonably foreseeable consequence. *Id.* All factual ("but for") causes are not necessarily proximate causes. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 492 (3d Cir. 1985); *see In re Frescati,* 718 F.3d at 212 ("More crucially, the issue is whether the accident would have been prevented had CARCO exercised its duty to act as a prudent wharfinger within the approach. . . . Here, the causation inquiry turns on whether prudent behavior—had it been exercised, a factual inquiry—would have prevented the injury.").

Plaintiffs cannot prove that CARCO breached a duty that proximately caused the oil spill. Proximate cause involves an inquiry into whether the damage was a reasonably foreseeable consequence of the defendant's act or omission, not simply a factual, temporal, or "but-for" occurrence in a chain of factual events leading up to the alleged damage. *See In re J.A.R. Barge Lines, L.P.,* 2007 WL 674348 at *29. Proximate cause "hinges on principles of responsibility, not physics." *Van Buskirk,* 760 F.2d at 492. As noted earlier, a defendant has a complete defense against both negligence and warranty claims when the sole proximate cause lies elsewhere with other persons. *See Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 842, 116 S. Ct. 1813, 135 L. Ed. 2d 113, 1996 A.M.C. 1817 (1996); *Allen v. Chance Mfg. Co.,* 873 F.2d 465, 471 (1st Cir. 1989).

### 1. CARCO had no reason to know of the anchor or to assume that the oil spill was probable.

In order to carry its burden of proving that the defendant's negligent act proximately caused the damage, the plaintiff must show that the wharfinger knew or should have known about the condition at issue. *Tracy Towing Line, Inc. v. Jersey City*, 105 F. Supp. 910, 912, 1952 A.M.C. 2017 (D.N.J. 1952). "Lack of care is never presumed; it must be shown by a fair preponderance of the evidence. . . . " *Hams v. Luckenbach Terminals, Inc.*, 38 F. Supp. 485, 487, 1941 A.M.C. 1412, 1415-16 (D.N.J. 1941) (citation omitted).

Foreseeability is relevant to both the duty and proximate cause determinations. *Republic of France v. United States*, 290 F.2d 395, 399, 1961 A.M.C. 1082 (5th Cir. 1961), *partially overruled on other grounds by Rayonier, Inc. v. United States,* 352 U.S. 315 (1957). To prove a duty and its breach, plaintiffs must show that the defendant had knowledge of a danger and failed to warn of it, which requires a finding that the defendant knew or had reason to know that a specific danger is "not merely possible, but probable." *Dalehite v. United States*, 346 U.S. 15, 42 (1953); *In re Lloyd's Leasing, Ltd.*, 764 F. Supp. 1114, 1136, 1991 A.M.C. 906 (S.D. Tex. 1990). The harm alleged must be "within the scope of the risk" that the defendant's conduct creates. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 212, 2012 A.M.C. 2048 (5th Cir. 2010); *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67, 1988 A.M.C. 2352 (5th Cir. 1987), *cert. denied,* 486 U.S. 1055 (1988).

In *Lloyd's Leasing*, where vessels with similar drafts had safely used the port without complaints or problems, the court held that Conoco, a charterer and terminal owner, was not negligent in chartering a vessel with a 40-foot draft to carry a cargo of crude oil to its terminal near Lake Charles, Louisiana, where "there was no way for Conoco to have known it was possible for a properly navigated, seaworthy vessel of the size and draft of the ALVENUS to

contact the bottom, much less suffer any hull damage under normal weather and tide conditions in the Calcasieu Channel." 764 F. Supp. at 1123, 1136. "Conoco was not negligent because it was not probable that there would be any damage to a seaworthy vessel with a 40-foot draft." *Id.* at 1136. The court likewise found no tort liability or duty on Conoco to change its policy on draft where "Conoco could not have foreseen that a 40-foot draft on a seaworthy vessel could result in damage to that seaworthy vessel that would result in an oil spill. . . ." *Id.* at 1136.

In *McCaldin v. Parke*, the court held that a wharfinger was not negligent and had not failed to use ordinary care to make its wharf reasonably safe where a vessel struck an uncharted rock in the East River about 70 feet from the wharf. 37 N.E. 622, 623-24, 142 N.Y. 564 (N.Y. 1894). In so holding, the court noted that the wharfingers had owned and used their wharf for 12 years, that neither they nor their employees had ever heard of the rocks, that 500 to 1,000 vessels (many of them as large and some larger than the plaintiff's vessel) had gone to the wharf in safety, that the plaintiff's vessel had used the wharf twice before, and that the defendants had dredged the place in front of their wharf. *Id.* As the *McCaldin* court stated, under those circumstances the wharfingers had no reason to suppose that the approach to their wharf was not safe:

> What greater assurance of their safety could they have than that they had always been found adequate for all the vessels that came there during a series of years? They had employed a dredging company to dredge out the basin in front of their wharf. What more should they have done, having no notice whatever of the presence of the rocks there?

*Id.* at 624.

In *Guinan v. Boston, Cape Cod & New York Canal Co.,* 1 F.2d 239, 245, 1924 A.M.C. 1161 (2d Cir. 1924), a private canal company had no liability for damage to a barge that struck an unknown obstruction while navigating the defendant's tidewater ship canal, where numerous

vessels had passed through the canal and over the identical spot without damage and where no one knew of the existence of any obstruction at that point until this accident. The *Guinan* court cited with approval the following passage from *Exchange Fire Ins. Co. v. Delaware & Hudson Canal Co.,* 10 Bosw. 180, 188 (N.Y. Super. Ct. 1863), which held that a canal owner had employed reasonable diligence and likewise was not liable for an unknown obstruction:

> One thing is very clear, that, the stone being covered by water, there was no notice of its presence until something came in contact with it. It would be unreasonable to require the defendants to sound and drag the whole length of their canal perpetually, to ascertain what obstructions might lie at the bottom, or to keep guards along the banks to prevent the commission of injuries by designing persons. *Id.* at 243.

The *Exchange Fire* court found no evidence to attribute the presence of the stone to the defendant's negligence rather than to an unforeseen accident. *Id.* The *Guinan* court similarly held that the plaintiff had failed to carry its burden of showing negligence or want of due care under the circumstances concerning an unknown obstruction. 1 F.2d at 245.

The foregoing decisions cannot be more determinative and on point. Like the charterers/terminal operators/canal owners in those cases, CARCO neither knew nor had any reason to believe that an anchor or other object was present in Federal Anchorage No. 9.

Not only was the actual presence of the anchor in Federal Anchorage No. 9 unknown to CARCO, but CARCO knew that hundreds of vessels, many with drafts deeper than the ATHOS I's reported draft of 36 feet 6 inches, in fact had safely used the Anchorage and its dock for years. Not one of those vessels had problems transiting the river, Federal Anchorage No. 9, or at the berth.[347] A total of 250 ships had arrived at or departed from the CARCO berth over the course of seven years without any reported problems in the Anchorage or at the berth.[348]

---

[347] [TT Day 30 amended (Rankine) P. 14:3-17:15; Ex. 586; Ex. 586 A].
[348] *Id.*; [TT Day 30 amended (Rankine) P. 22:25-23:6; 23:13-23].

Plaintiffs' own witness, Stephen Carroll (a local steamship agent for the ATHOS I, who coordinated the ship's arrival and docking), had no knowledge that any ship had ever struck a submerged object in Federal Anchorage No. 9 before the ATHOS I.[349] Carroll had previously handled the berthing of vessels with 39-foot drafts at the CARCO dock without any problem.[350] Pilot Bethel had previously docked 15 tankers at the terminal and was not aware of any obstructions or hazards to navigation in Federal Anchorage No. 9 before the ATHOS I incident.[351]

Under these circumstances, as a reasonable dock owner, CARCO could not possibly have foreseen that as a result of choosing its berth at Paulsboro as the point of cargo discharge, the ATHOS I would allide with the uncharted anchor abandoned in Federal Anchorage No. 9. The oil spill was not "probable" and was therefore not foreseeable to CARCO as a terminal operator in view of the extensive and continuous history of safe passage by hundreds of similar vessels and the frequent use of the Anchorage and CARCO's berth by ships with drafts as deep or deeper than the ATHOS I. As the Third Circuit states in its Opinion, "the particular hazard—the submerged anchor—was unknown to the parties." *In re Frescati*, 718 F.3d at 206. CARCO had no actual or constructive knowledge of the uncharted anchor hundreds of yards from its berth. The presence of this anchor was not reasonably foreseeable, except in plaintiffs' "perfect hindsight," which they wrongly seek to impose on CARCO and no one else.

> **2.** **CARCO could not have reasonably anticipated that a single hulled tanker would navigate so recklessly at low tide.**

Plaintiffs—who certainly owed a duty to maintain a seaworthy vessel and to adhere to statutes and regulations governing safe navigation—could have prevented the oil spill with

---

[349] [TT Day 11 amended (Carroll) P. 72:15-24].
[350] *Id.* [TT Day 11 amended (Carroll) P. 73:6-21].
[351] [TT Day 8 amended (Bethel) P. 4:14-20; 41:18-42:2; 54:17-55:9; 56:11-14].

2418144-1

virtually no "burden" at all. As the Third Circuit noted, no claim is available against a wharfinger where a danger can be avoided by the vessel "by reasonably prudent navigation and seamanship." *In re Frescati,* 718 F.3d at 207. The ATHOS I would have avoided hitting the anchor had plaintiffs undertaken a proper underkeel clearance analysis and transited through the Anchorage at a higher state of the tide. If the ship had performed the underkeel clearance analysis required by both Federal regulations and Tsakos' own Safety Management System, the crew would have realized that the ship did not have the necessary safety margin and would have waited for a higher stage of the tide.

Frescati and Tsakos cannot prove that the oil spill was a highly "probable" and "foreseeable" result of any act of CARCO, though it was certainly the probable (if not certain) result of plaintiffs' own actions in negligently navigating an unseaworthy vessel without accurate knowledge of its draft and underkeel clearance in view of the tide. In light of the unblemished safety record of the port and berth, CARCO had no inkling that an oil spill was probable or even possible, or that a seaworthy vessel properly maintained and navigated would encounter any problem.

Notwithstanding the anchor's being indisputably unknown to the United States, the pilots, and to all river users, and unforeseeable in a practical sense based on the extensive history of vessel traffic using the Anchorage and the berth without incident, plaintiffs nevertheless go still further and seek to impose "constructive knowledge" of the anchor against CARCO (but no one else), on the basis that the anchor had been there a long time. The fact that it had been there for years without prior incident or complaint shows that there had been no reason, over <u>many</u> years of ship traffic, to suspect it was there. In other words, this fact rebuts plaintiffs' reasoning rather than supporting it.

Plaintiffs attempt to evade responsibility for their own faulty navigation, failure to maintain a seaworthy vessel, and disregard and violation of applicable safety regulations by arguing that CARCO "did nothing." Based on information available to CARCO (as opposed to the universe of navigational information possessed by plaintiffs), there was a negligible chance from CARCO's standpoint that a vessel, with a draft similar to or even greater than ATHOS I's reported draft, would strike an abandoned, uncharted submerged anchor in the Federal Anchorage and cause an oil spill.

On the other hand, there is ample evidence warning single hull tankers such as the ATHOS I of the critical importance of maintaining an adequate underkeel safety margin precisely because of the danger they might encounter an uncharted hazard or shoal. The following oft-cited statement from the *Coast Pilot* concerning underkeel clearance is just one example: "It cannot be too strongly emphasized that even charts based on modern surveys may not show all seabed obstructions or the shoalest depths, and actual tide levels may be appreciably lower than those predicted."[352] Plaintiffs, who failed to even consider underkeel clearance before the transit, did so with full awareness that uncharted objects pose a threat to ships (particularly single-hulled ships) and that proper voyage planning is the best and only line of defense against this risk.

Plaintiffs' own conduct in navigating their unseaworthy single-hulled tanker at low tide *without* planning their voyage and calculating underkeel clearance in view of the tide and the controlling depths of the waters they traversed greatly increased the risk of an oil spill from grounding or striking an object that it could easily have been able to avoid by exercising good seamanship and complying with the mandatory Coast Guard regulations. Thus, to the extent the

---

[352] [TT Day 24 amended (Barnum) P. 35:8-25; Ex. D-1108 at CARPROD 23014 (2004 United States Coast Pilot: Atlantic Coast)].

foreseeability of a major oil spill is used to evaluate CARCO's and plaintiffs' respective actions, plaintiffs proximately caused the allision and should be held liable, not CARCO.

### 3. *The negligence and fault of the plaintiffs and those in charge of the vessel's navigation were the sole proximate cause of the incident.*

As discussed in detail above, the unseaworthiness of the ATHOS I and the fault and negligence of those in charge of the vessel's navigation proximately caused the incident. Those facts and the applicable law are equally relevant to both the contract and tort claims. Therefore, even if the plaintiffs could establish a *prima facia* case on its wharfinger negligence claim, which they cannot, this Court should conclude that the plaintiffs' fault, negligence, and the unseaworthiness of the ATHOS I solely caused the allision and the resultant oil spill.

### CONCLUSION

Under the applicable law and the evidence, plaintiffs have no basis for recovery against CARCO either in contract or in negligence. This Court should find in favor of CARCO on all claims asserted against it.

Respectfully submitted,

CHAFFE McCALL, L.L.P.                    PALMER BIEZUP & HENDERSON LLP

By: */s/ Derek A. Walker*                By: */s/ Richard Q. Whelan*
    Derek A. Walker                   Richard Q. Whelan (ID No. 35688)
    Douglas L. Grundmeyer             Frank P. DeGiulio (ID No. 41577)
    Chaffe McCall, L.L.P.             Palmer Biezup & Henderson, LLP
    1100 Poydras Street               190 N. Independence Mall West
    2300 Energy Centre                Suite 401
    New Orleans, LA 70163             Philadelphia, PA 19106-3409
    (504) 585-7000                    (215) 625-9900


STRONG PIPKIN BISSELL & LEDYARD, L.L.P.

By: */s/ John G. Bissell*
    John G. Bissell
    Strong Pipkin Bissell & Ledyard, L.L.P.
    4900 Woodway Drive, Suite 1200
    Houston, TX  77056
    (713) 210-4366

*Attorneys for Claimant,*
*CITGO Asphalt Refining Company,*
*CITGO Petroleum Corporation, and*
*CITGO East Coast Oil Corporation*


Dated:  February 13, 2015

2418144-1

**CERTIFICATE OF SERVICE**

The undersigned certifies that service of a true and correct copy of Defendants' Pre-Trial Brief on Liability was sent to the following counsel on the below-listed date, via electronic mail:

Alfred J. Kuffler, Esq.
Montgomery, McCracken, Walker
  & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

John J. Levy, Esq.
Montgomery, McCracken, Walker
  & Rhoads, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002

Eugene J. O'Connor, Esq.
Montgomery, McCracken, Walker
  & Rhoads, LLP
437 Madison Avenue, 29th Floor
New York, NY 10022

Stephen G. Flynn (SGF-8075)
Department of Justice
Assistant Director Admiralty
Sharon K. Shutler
Trial Attorney
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271


PALMER BIEZUP & HENDERSON LLP

By:     */s/ Richard Q. Whelan*
        Frank P. DeGiulio (ID No. 41577)
        Palmer Biezup & Henderson LLP
        190 N. Independence Mall West Suite 401
        Philadelphia, PA 19106-1572
        Telephone: (215) 625-7809


Dated:  February 13, 2015