# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re Petition of FRESCATI SHIPPING CO., LTD. as Owner of the M/T ATHOS I, for Exoneration from or Limitation of Liability, | ) ) ) ) ) | Civil Action No. 05-cv-305 |
|  | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Plaintiff, | ) | Civil Action No. 08-cv-2898 |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| CITGO ASPHALT REFINING COMPANY, CITGO PETROLEUM CORPORATION, and  CITGO EAST COAST OIL CORPORATION, | ) ) ) ) | |
|  | ) |  |
| Defendants. | ) |  |

## PLAINTIFF UNITED STATES OF AMERICA'S PRE-HEARING BRIEF

STEPHEN G. FLYNN
Assistant Director Admiralty
SHARON K. SHUTLER
Trial Attorney
SARAH S. KEAST
Trial Attorney
Torts Branch, Civil Division
Department of Justice
Post Office Box 14271
Washington, D.C. 20044-4271
Telephone: (202) 616-4070
Facsimile: (202) 616-4002
Stephen.Flynn@usdoj.gov
Sharon.Shutler@usdoj.gov
Sarah.Keast@usdoj.gov

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ........................................................................ iv

I.     INTRODUCTION ............................................................................... 1

     A.  Challenges to Recovery of Cleanup Costs Fail ................................. 1

     B.  Non-Statutory Defense to Liability Fail ............................................ 3

II.    OPA IS A COMPREHENSIVE OIL SPILL RESPONSE AND LIABILITY
     SCHEME THAT GOVERNS THE RESPONSIBILITIES OF THE COAST
     GUARD AND THE RESPONSIBLE PARTY ........................................ 4

     A.  Summary of the Liability Scheme of the Oil Pollution Act of 1990 ................... 4

     B.  Response is Carried Out by the Responsible Party and Directed by the
         Coast Guard ..................................................................................... 6

     C.  OPA'S Liability Scheme Governs the Responsible Party's Recovery of
         Removal Costs from the Fund ........................................................... 9

     D.  Pursuant to OPA, the United States is Subrogated to Frescati's Rights ............. 11

     E.  Preservation of Maritime Remedies ................................................. 12

III.   OIL SPILL RESPONSE, LIMITATION DETERMINATION AND
     DAMAGES DETERMINATION .......................................................... 12

     A.  The ATHOS Oil Spill Response Complied with the Federal Oil Spill
         Statutory Scheme Including the National Contingency Plan ............ 12

     B.  The Coast Guard Determined that Frescati was Entitled to Limit its
         Liability ........................................................................................... 17

     C.  Coast Guard's Adjudication of the Responsible Party's Removal Costs
         Claims ............................................................................................. 18

IV.   CLEANUP COSTS WERE REASONABLE AS DETERMINED BY
     COAST GUARD'S ADJUDICATION ................................................. 23

     A.  Reasonableness of Mitigation Based on Facts and Circumstances Unique
         to Case ............................................................................................. 23

i

   B.  Frescati's Costs were Reasonable Based on the Magnitude of the Spill and the OPA Scheme ............................................................................... 24

   C.  Reasonableness of Cleanup Costs in an Analogous Oil Spill Case .................. 28

V.   CITGO CANNOT MEET ITS BURDEN TO DEMONSTRATE THAT FRESCTI'S CLEANUP COSTS, REIMBURSED BY THE NPFC, WERE UNREASONABLE ................................................................................................ 30

VI.   CITGO CANNOT AVAIL ITSELF OF THE THIRD-PARTY LIMITATIONS OF LIABILITY PARTIAL DEFENSE ......................................... 35

VII.   CITGO HAS NO VALID CLAIM FOR RECOUPMENT OR OTHER EQUITABLE DEFENSES AGAINST THE UNITED STATES ........................... 36

   A.  CITGO has No Valid Claim for Recoupment .................................................. 38

   B.  Equitable Estoppel ......................................................................................... 40

      Unjust Enrichment ........................................................................................ 41

   C.  CITGO's Assertion that the United States was in a Better Position to Prevent the ATHOS Oil Spill is Incorrect and Irrelevant ................................... 42

   D.  United States Statutory Right to Subrogation May Not be Preempted by Equitable Theories ........................................................................................ 43

VIII.   THE UNITED STATES HAS NO GENERAL OBLIGATION TO GUARANTEE SAFETY OF VESSELS IN THE NAVIGATION PROJECT ................................................................................................................ 44

   A.  No General Obligation to Guarantee Safety of Vessels that Traverse Designated Anchorages ..................................................................................... 44

   B.  The United States Has No Statutory or Regulatory Duty to Search for Hidden Underwater Obstructions .................................................................... 45

IX.   THE UNITED STATES' COURSE OF CONDUCT, PUBLICATIONS, SURVEYS AND DREDGING PRACTICES DO NOT CREATE INCHOATE DUTIES FOR WHICH CITGO CAN ASSERT EQUITABLE DEFENSES ........................................................................................ 47

   A.  The Role of the Army Corps of Engineers with Respect to the Delaware River Navigation Project .................................................................................. 48

   B.  NOAA's Role with Respect to the Delaware River ......................................... 50

ii

C.  The Coast Guard's Role with Respect to the Delaware River ........................... 52

D.  Japan Lines is Irrelevant ................................................................................. 54

X.  THE MARITIME INDUSTRY DID NOT – AND HAD NO BASIS - TO RELY ON GOVERNMENT TO GUARANTEE THE SAFETY OF VESSELS IN THE DELAWARE RIVER NAVIGATION PROJECT .................. 55

XI.  THERE IS NO EVIDENCE THAT THE ANCHOR WAS LEFT BY A GOVERNMENT CONTRACTOR ........................................................................ 56

XII.  NOTHING PREVENTS A PRIVATE PARTY FROM SURVEYING, REMOVING OBSTRUCTIONS, OR DREDGING WITHIN THE DELAWARE RIVER NAVIGATION PROJECT .................................................... 57

XIII.  CONCLUSION ............................................................................................. 58

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apex Oil Co. v. United States*, 208 F. Supp. 2d 642,
    651-52 (E.D. La. 2002) .................................................................................... 5, 9

*APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*,
    592 F.3d 108, 111 (2nd Cir. 2010) ................................................................ 23, 24

*Barber v. Hawai'i*, 42 F.3d 1185, 1193 (9th Cir. 1994) .................................... 47

*Bull v. United States*, 295 U.S. 247, 258-62 (1935) ......................................... 38

*Citizens Fed. Bank .v United States*, 66 Fed Cl. 179, 186 (2005) ..................... 32

*Crescent Ship Serv. v. M/V Mitera Vassiliki*, No. 94-2391, 1995
    U.S. Dist. LEXIS 9130 (E.D. La. June 28, 1995) ........................................... 28

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    805 F.2d 1074, 1081 (1st Cir. 1986) ................................................................ 6

*Deltona Corp. v. Alexander*, 682 F.2d 888, 891-92 (11th Cir. 1982) ............... 40

*Ellerman Lines Ltd. v. President Harding*, 288 F.2d. 288, 290
    (2d Cir. 1961) .................................................................................................. 24

*Fortis Corporate Ins., S.A. v. M/V Cielo Del Canada*,
    320 F. Supp. 2d 95, 106 (S.D.N.Y 2004) ....................................................... 24

*Gatlin Oil Co. v. United States*, 169 F.3d 207, 211 (4th Cir. 1999) ................. 11

*Gercey v. United States*, 540 F. 2d 536, 538-539 (1st Cir. 1976),
    *cert denied*, 430 U.S. 954 (1977) .................................................................. 53

*In re Frescati Shipping Co.*, 718 F.3d 184, 214 (E.D. Pa. 2013) .................... 4, 36, 45

*In re Hokkaido Fisheries Co.*, 506 F. Supp. 631, 634 (D. Alaska 1981) .................. 43

*In re Jahre Spray II K/S*24 , No. 95-3495, 1996 U.S. Dist.
    LEXIS 11594 (D.N.J. Aug. 5, 1996) ................................................................ 6

*In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950) ................. 23, 24, 25, 32

*In re Oswego Barge Corp.*, 664 F.2d 327, 340 (2d Cir. 1981) ......................... 43
*Japan Line, Ltd. v. United States,* 1976 A.M.C. 355, 364 (E.D. Pa. 1975),
    *aff'd*, 1977 A.M.C. (3d Cir. 1976) ................................................................. 55

iv

*Johnson v. Guhl*, 357 F.3d 403, 409-10 (3d Cir. 2004) .............................................................. 40

*Jones v. Horton & Horton, Inc.*, 100 F.2d 345, 346 (5th Cir. 1938) ......................................... 28

*Kamara v. Columbia Home Loans, LLC*, **C**ase No. 08-5998, 2009
U.S. Dist. LEXIS 66003, at \*8 (E.D. Pa. July 24, 2009) ...................................................... 39

*Koppers Co., Inc v, Aetna Cas. & Sur. Co*. 98 F.3d 1440,
1448 (3d Cir. 1996) ............................................................................................................ 24, 30

*Livera v. First Nat'l State Bank*, 879 F.3d 1186,
1195 (3d Cir. 1989) .................................................................................................... 38, 39, 40

*Metlife Capital Corp. v. M/V EMILY S.*, 132 F.3d 818,
822 (1st Cir. 1997) ..................................................................................................................... 6

*Murphy Oil USA v. United States* 2014 WL 794134 at \*2
(E.D. La. February 27, 2014) ................................................................................................... 35

*Nereus Shipping v. United States,* 2014 WL 1096131 at \*5
(E.D. Pa. March 20, 2014) ....................................................................................................... 35

*Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 461 (5th Cir. 1984),
*cert. denied*, 469 U.S. 832 (1984) ......................................................................................... 46

*Office of Pers. Management v. Richmond*, 496 U.S. 414, 419 (1990) ...................................... 40

*Pension Benefit Guar. Corp. v. White Consol. Indus*.,
72 F. Supp. 2d 547, 550 (W.D. Pa. 1999) ............................................................................. 38

*Portmann v. United States,* 674 F.2d 1155, 1167 (7th Cir. 1982) ............................................. 41

*Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 259 (3d Cir. 2008) .................................. 24, 30

*Redwing Carriers, Inc. v. United States*, No. 295-76, 1978 U.S. Ct. Cl.
LEXIS 764 (Ct. Cl. June 29, 1978) ....................................................................... 28, 29, 30, 32

*Rice v. Harken Exploration Co*., 250 F.3d 264, 266 (5th Cir. 2001) .......................................... 6

*Sunpride (Cape) (pty) Ltd., v. Mediterranean Shipping Co., Ltd*., No. 01 Civ.
3493(CSH), 2003 WL 22682268 at \*37 (S.D.N.Y Nov. 12, 2003) ...................................... 24

*Sweet Pea Marine, Ltd. v. APJ Marine, Inc.* 411 F.3d 1242, 1249 (11th Cir. 2005) ................ 28

*Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 934 (5th Cir. 1979),
    *reh'g denied* and op. amended by 604 F.2d 13 (5th Cir. 1979).......................................25, 26

*Tew v. United States*, 86 F.3d 1003, 1006 (10th Cir. 1996) .................................................46, 53

*The Aller*, 73 F. 875, 877 (2d Cir. 8916) ................................................................................45

*The Isaac T Mann*, 63 F. Supp. 339, 341 (S.D.N.Y. 1945) ....................................................45

*The Southern Cross*, 93 F.2d 297, 299 (2d Cir. 1937)............................................................44

*United States v. Am. Color & Chem. Corp.*, 858 F. Supp. 445, 451
    (M.D. Pa. 1994) ................................................................................................................38, 39

*United States v. American Commercial Lines, L.L.C.* 2014 U.S. App
    LEXIS 13592, at *5-6 (E.D. La. Mar. 21, 2013) ............................................................11, 12

*United States v. Boccanfuso*, 882 F.2d 666, 670 (2d Cir. 1989) .................................................40

*United States v. Conoco, Inc.*, 916 F. Supp. 581, 584 (E.D. La. 1996).....................................10

*United States v. Great Lakes Dredge & Dock, Co.*, No. 97-2510-CIV-DAVIS/BROWN,
    1999 U.S. Dist. LEXIS 17612, at *20 (S.D. Fla. Sept. 27, 1999) ,
    aff'd in part, vacated in part by 259 F.3d 1300 (11th Cir. 2001)..............................................6

*United States v. Inter-Bay Towing Co.*, No. H-03-5727, 2005 U.S. Dist
    LEXIS 41974, at *22 (S.D. Tex. Aug. 8, 2005) ....................................................................12

*United States v. LeBeouf Bros. Towing Co.*, 621 F.2d 787, 789
    (5th Cir. 1980) ..........................................................................................................................5

*United States v. Riley Tar & Chem. Corp.*, 546 F. Supp. 1100,
    1112 (D. Minn. 1982) ...............................................................................................................6

*United States v. Slaey*, Case No. 06-4930, 2008 U.S. Dist.
    LEXIS 55699, at *9 (E.D. Pa. July 23, 2008) .......................................................................38

*United States v. St. Louis & Mississippi Valley Transp. Co.*,
    184 U.S. 247, 255 (1902)........................................................................................................45

*United States v. U.S. Fidelity & Guar. Co.*, 309 U.S. 506 (1940).............................................38

*Unocal Corp. v. United States*, 222 F.3d 528, 535 (9th Cir. 2000).............................................6

*Water Quality Ins. Syndicate v. United States,* 632 F. Supp. 2d 108, 114 (D. Mass. 2009) ........5

*Wyandotte Transportation v. United States,* 389 U.S. 191, 207 (1967) ..................................... 45

**Treatises**

25 Op. Att'y Gen. 37, 38 (1903) ................................................................................ 44

Dan B. Dobbs, Law of Remedies, Damages, Equity, Restitution, § 3.9 (2nd ed. 1993) ............ 23

Restatement (Second) of Contracts § 347 (1981) ...................................................... 23

Vol. 1 Restatement (Second) of Contracts § 350(2) .................................................. 24

## I.      INTRODUCTION

Plaintiff United States, as a statutory subrogee to the rights of Frescati Shipping Company Limited and Tsakos Shipping & Trading S.A. (collectively "Frescati"), seeks to recover oil spill removal costs from CITGO.[i]  The United States, therefore, joins in Frescati's pre-hearing brief regarding issues of CITGO's liability to Frescati.  The United States writes separately to discuss issues related to the proper measure of damages to which it is entitled and to address CITGO's argument that the United States' significant role in regulating navigation to the Delaware River creates a defense for CITGO to the government's claim.

### A.  Challenges to Recovery of Cleanup Costs Fail

On November, 26, 2004, at approximately 9 p.m., the *Athos I* struck an uncharted, abandoned anchor lying on the riverbed of the Delaware River near the CITGO Asphalt Refinery Facility, Paulsboro, NJ.  The anchor pierced the vessel's hull, causing a spill of approximately 264,000 gallons of heavy crude into the Delaware River.  Ex. USA-1 at Athos 016637; Ex. USA-157 at NPFC 000085*; Trial Day 10, October 6, 2010, Hall at 193:6-21;[1]* Ex. P- 1203*.*  The *Athos I* was owned by Frescati and managed by Tsakos and, pursuant to the Oil Pollution Act ("OPA"), both were deemed Responsible Parties without regard to fault and required to clean up the spill under the direction and oversight of the U.S. Coast Guard.[2]  33 U.S.C. §§ 2701(32), 2702(a), 1321(c)(1) and (d); 40 C.F.R. § 300 App. E § 3.3.1.

Frescati incurred cleanup costs of approximately $140 million.[ii]  OPA, however, provides Responsible Parties, such as Frescati, with the right to seek a liability limitation

---

[i] The United States refers to CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Oil Corporation collectively as either "CITGO" or Defendant.

[ii] The initial claim for cleanup (or removal) costs was $124,226,443.  There was a net adjustment upward by $1,454,246.  From this amount, the limitation of $45,474,000 reduced the total claim.  Frescati submitted a supplemental claim of $14,353,979 for cleanup costs.

1

provided they meet statutory and regulatory requirements.  33 U.S.C. §§ 2708(a), 2712(a)(4); 33 C.F.R. § 136.205.  The Coast Guard, which determines whether Responsible Parties are entitled to limit their OPA liability for an oil spill response, granted Frescati its OPA limitation, $45,474,000, and authorized reimbursement of approximately $88 million in cleanup costs in excess of the limitation amount.  *Trial Day 19, Oct. 25, 2010, Morrison at 170:17-22,*[3] *175:5-7;*[4] Ex. USA - 367.  Reimbursement came from the United States' Oil Spill Liability Trust Fund ("Fund") which is administered by the Coast Guard's National Pollution Funds Center ("NPFC") in Arlington, Virginia.  33 U.S.C. §§ 2712(a)(4) and (e).

Upon reimbursement of Frescati for such costs, OPA explicitly provides that the United States is subrogated to Frescati's causes of action up to the amount reimbursed from the Fund. 33 U.S.C. § 2715(a) and (c).  Accordingly, the United States seeks to recover $87,789,147.31 plus interest from CITGO.  *Trial Day 20, Oct. 26, 2010, Hellberg at 41:15-42:6,*[5] *42:21-43:25,*[6] *49:9-15;*[7] *51:19-52:7;*[8] Exs. USA - 161 at 000095-102; 157 at 000085, 000090.

CITGO challenges the United States' right to recover these cleanup costs.  With respect to challenges on the quantum, CITGO argues that the expenditures for cleanup costs were too high or were insufficiently supported by documentation and that Frescati (and thus the United States, to the extent it reimbursed Frescati) overpaid for clean-up activities.  CITGO similarly asserts that the United States' reimbursement of Frescati was excessive and that the evidence relating to the United States' evaluation of reasonableness of Frescati's expenditures should be excluded.  See Doc. 750-1, Memorandum in Support of Defendant's Motion in Limine to Exclude the Reports and Findings of the National Pollution Funds Center.

The cleanup costs were generated from actions taken by Frescati, though its contractors, at the direction of the Coast Guard, to ensure "immediate removal of a discharge" and to

mitigate the effects of the oil as required by OPA and the Federal Water Pollution Control Act ("FWPCA"). 33 U.S.C. §§ 1321(c)(1) and (d). The Coast Guard's National Pollution Funds Center, charged with adjudicating whether cleanup costs are compensable under OPA, painstakingly reviewed the costs and support documentation, determined that the costs were incurred in accord with the statutory and regulatory scheme, and were reasonable in light of the exigency of a major spill and standard industry charges for cleanup actions.

On August 15, 2014, CITGO raised a new defense, asserting for the first time a right to limit its liability as a third party under OPA for $45,474,000, the same amount accorded to Frescati as vessel owner/operator.[iii] By failing to raise this defense until three and a half years after completion of trial and 15 months after the appellate decision and remand, CITGO has waived this defense. Irrespective, the new defense cannot succeed. CITGO does not qualify as a third-party Responsible Party because it does not meet OPA's statutory prerequisites. Lastly, if CITGO was allowed the limitation, it would not affect CITGO's obligation to indemnify Frescati (and the United States) under the safe berth warranty because OPA specifically preserves such indemnification agreements.

### B. Non-Statutory Defenses to Liability Fail

With respect to liability, CITGO asserts various equitable defenses only as to the United States' claim. These defenses are not only legally deficient but are based on the notion that the United States' prominent regulatory role in the Delaware River would somehow make it unfair to allow the government to recover, even as to the contractual warranty CITGO provided the shipowner. These defenses suffer from a fundamental misunderstanding of the government's

---

[iii] See U.S. Memorandum in Support of its Motion to Strike CITGO's OPA Defense or in the Alternative Motion for Partial Summary Judgment, Doc. 741-1; Defendant's Memorandum in Opposition, Doc. 771; CITGO's Memorandum in Support of its Motion for Partial Summary Judgment Granting Limitation of Liability under OPA, Doc. 749; .U.S. Memorandum in Opposition, Doc. 773; Frescati's Memorandum in Opposition, Doc. 772.

role in navigable waters.  The United States does not, as CITGO asserts, ensure the navigability of federal waterways or the safety of vessels navigating the Delaware River Navigation Project. The Third Circuit properly recognized that the United States has no general obligation to keep federally-regulated waters free of hazards to navigation.  "No Government entity… is responsible for preemptively searching all federal waters for obstructions, and the District Court found that the Government does not actually survey the Anchorage for hazards."  *In re Frescati Shipping Co*., 718 F.3d 184, 214 (E.D. Pa. 2013).  It is beyond dispute that the United States had no notice of the anchor and, absent notice, had no obligation to mark, remove, or provide notice to the public.  Hence, CITGO's equitable defense theories are not permissible in light of the Third Circuit's opinion and, as will be shown, in any event, have no legal merit.

## II.    OPA IS A COMPREHENSIVE OIL SPILL RESPONSE AND LIABILITY SCHEME THAT GOVERNS THE RESPONSIBILITIES OF THE COAST GUARD AND THE RESPONSIBLE PARTY

### A.  Summary of the Liability Scheme of the Oil Pollution Act of 1990

OPA is a comprehensive oil spill response and liability scheme designed by Congress to ensure "those who produce, handle, and transport oil" are held strictly liable.  *See* H.R. Rep. No. 101-242, pt. 2, at 36 (1989).

> Congress explicitly recognized that the existing federal and state laws provided inadequate cleanup and damages remedies, required large taxpayer subsidies for costly cleanup activities, and presented substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills.  *See* S. Rep. No. 94, 101st Cong., 1st Sess. (1989); 1990 U.S.C.C.A.N. 772.  Congress also recognized that, pre-OPA, the costs of cleanup and damage from spills were not high enough to encourage greater industry efforts to prevents spills, and develop effective techniques to contain spills that did in fact occur.  *Id.*  Congressional intention is manifestly that the new law would effect compensation to victims, quick and efficient cleanup with minimization of

4

> damages to natural resources, and the internalization of the costs
> of oil spills within the oil industry.

*Water Quality Ins. Syndicate v. United States,* 632 F. Supp. 2d 108, 114 (D. Mass. 2009)

("*WQIS*") (*citing Apex Oil Co. v. United States*, 208 F. Supp. 2d 642, 651-52 (E.D. La. 2002)).

A hallmark of OPA's scheme is that the liability of those that discharge oil is strict,

joint, and several[iv] for removal costs and related damages.[v]  33 U.S.C. §§ 2702 and 2703.  OPA

increased the liability limit for vessels[vi] from limits previously established under the FWPCA,

33 U.S.C. § 2704; expanded the scope of damages recoverable from Responsible Parties, 33

U.S.C. § 2702(b); and disallowed the liability limitation altogether when the Responsible

Parties' gross negligence, willful misconduct, or violation of a federal safety, construction, or

operating regulation proximately caused the oil spill.  33 U.S.C. § 2704.  The statute restricts

complete defenses to liability to acts of God, acts of war, or the acts or omissions of a third

party, provided however, that the third party was not in contractual relationship with the

Responsible Party.[vii]  33 U.S.C. § 2703.  It specifically allows the Responsible Party to obtain

indemnification of its OPA obligations through contract.  33 U.S.C. § 2710.

---

[iv] OPA adopted the FWPCA's standard of liability, which has been "determined repeatedly to be strict, joint, and several liability."  S. Rep. No. 101-94, at 11 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 722, 732-33; *see also* H.R. Rep. No. 101-653, at 102 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 779, 779-80.

[v] Congress amended OPA to expand the definition of Responsible Party to include an entity such as CITGO that owns oil that is transported on a single hull vessel.  Pub. L. No. 111-281, § 713 (2010).

[vi] OPA provides that "except as otherwise provided in this section, the total liability of a responsible party under section 2702 of this title . . . with respect to each incident shall not exceed – (1) for a tank vessel, the greater of – (A) $1,200 per gross ton; or (B)(1) in the case of a vessel greater than 3,000 gross tons or less, $10,000,000 . . ." 33 U.S.C. § 2704(a)(1).  Since the incident, Congress has amended the limitation amounts.

[vii]  OPA shares a liability scheme similar to the FWPCA, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), and the National Marine Sanctuaries Act.  33 U.S.C. §§ 1241 *et seq.*; 42 U.S.C. §§ 9601 *et seq.*; 16 U.S.C. §§ 1431 *et seq.*  Courts have concluded these statutes are remedial in purpose and have construed their provisions liberally to avoid frustration of the beneficial legislative purposes. *See, e.g., United States v. LeBeouf Bros. Towing Co.,* 621 F.2d 787, 789 (5th Cir. 1980) (in a pre-OPA, FWPCA case the Fifth Circuit narrowly interpreted application of third-party defense provisions noting that the "statute's comprehensive scheme for preventing and cleaning up oil spills would be undermined if barge owners like LeBeouf could escape strict liability merely by hiring out their operations to tugs and independent contractors.");

**B. Response is Carried Out by the Responsible Party and Directed by the Coast Guard**

Congress also sought to spur quick and efficient oil spill cleanups.  *See Rice v. Harken Exploration Co*., 250 F.3d 264, 266 (5th Cir. 2001) ("OPA was . . . intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." (*citing* S. Rep. No. 104-94, reprinted in 1990 U.S.C.C.A.N. 722, 723); *Unocal Corp. v. United States*, 222 F.3d 528, 535 (9th Cir. 2000) ("The purpose of OPA, as well as other remedial legislation passed by Congress and the states to address environmental disasters such as oil spills, was to encourage rapid private party responses."  C*iting Metlife Capital Corp. v. M/V EMILY S.*, 132 F.3d 818, 822 (1st Cir. 1997) *quoting In re Jahre Spray II K/S*24 , No. 95-3495, 1996 U.S. Dist. LEXIS 11594 (D.N.J. Aug. 5, 1996)).  Thus, OPA imposes the primary duty of oil cleanup on the Responsible Party and *requires* an owner or operator of a tank vessel to develop a Vessel Response Plan and secure *in advance* the personnel and equipment to cleanup a worst-case scenario spill.  33 U.S.C. § 1321(c)(3); 33 C.F.R. § 155.1510 *et seq.*  A Vessel Response Plan must identify a Qualified Individual to implement removal actions and a contractor, referred to as an Oil Spill Response Organization ("OSRO"), with the capacity to address a worst case

---

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986) ("CERCLA is essentially a remedial statute designed by Congress to protect public health and the environment.  We are therefore obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purpose."); *United States v. Riley Tar & Chem. Corp*., 546 F. Supp. 1100, 1112 (D. Minn. 1982) ("Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.  To give effect to these congressional concerns, CERCLA should be given a broad and liberal construction.  The statute should not be narrowly interpreted to frustrate the government's ability to respond promptly and effectively, or to limit the liability of those responsible for cleanup costs beyond the limits expressly provided."); *United States v. Great Lakes Dredge & Dock, Co.*, No. 97-2510-CIV-DAVIS/BROWN, 1999 U.S. Dist. LEXIS 17612, at *20 (S.D. Fla. Sept. 27, 1999) ("[T]he NMSA, like the FWPCA, is a remedial statute that should be interpreted in a way that will effectuate its remedial purposes.  The FWPCA and NMSA have very similar provisions for remedial action and limited categories of defenses that were intended to provide a straight forward means to impose liability for environmental damage."), *aff'd in part, vacated in part by* 259 F.3d 1300 (11th Cir. 2001).

spill.[viii]  The Coast Guard must approve this plan.  33 C.F.R. § 155.1065; *Trial Day 18, October 21, 2010, Laferriere at 13:16-24;[9] Trial Day 19, October 25, 2010, Benson at 9:22-10:5,[10] 12:16-19.[11]*  Thus, to ensure that critical resources can be immediately deployed at the outset of a spill, the Responsible Party and its prime OSRO(s) enter into a pre-spill contract for the services to be supplied and the rates to be charged in such event.

While the principal responsibility for oil spill cleanup and damages lies with the Responsible Party, the Coast Guard directs the cleanup effort.  Specifically, section 4201 of OPA amended the FWPCA to make clear that the Coast Guard must "*ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge of oil.*"  33 U.S.C. § 1321(c)(1)(A) (emphasis added).

The Coast Guard carries out this authority through the Federal On Scene Coordinator ("FOSC"), the federal official pre-designated by the Coast Guard, who is authorized to "direct or monitor all federal, state, and private actions to remove a discharge."  33 U.S.C. § 1321(c)(1)(B); 40 C.F.R. §§ 300.120(a), 300.135(a), 300.305(c) and (d).  Further, where a discharge poses:

> a substantial threat to the public health or welfare of the United States (including but not limited to fish, shellfish, wildlife and other natural resources . . . of the United States), the President *shall* direct all Federal, State, and private actions to remove, mitigate or prevent the threat of the discharge.

---

[viii] Specifically, the Vessel Response Plan must: "(ii) identify the qualified individual having full authority to implement removal actions and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);  (iii) *identify, and ensure by contract or other means approved by the President, the availability of private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge . . . and to mitigate or prevent a substantial threat of such a discharge;*  (iv) describe the training, equipment, testing, periodic unannounced drills, and response actions of persons on the vessel . . . to be carried out under the plan to ensure the safety of the vessel . . . and to mitigate or prevent the discharge, or the substantial threat of a discharge. . ."  33 U.S.C.§ 4202(b), 33 U.S.C. § 1321(j)(5)(D) (emphasis added).

33 U.S.C. §1321(c)(2) (emphasis added).  This authority includes issuing administrative orders to the Responsible Party to take removal actions.  33 U.S.C. § 1321(e)(1)(B).  Failure by the Responsible Party to comply with an order from the FOSC can have significant adverse consequences, including denial by the Coast Guard of a Responsible Party's request to limit its liability and assessment of *civil penalties for up to three times the costs incurred by the Fund.* 33 U.S.C. § 1321(b)(7)(A) and (B).

The FOSC is also required to ensure compliance with the National Contingency Plan, the federal government's blueprint for responding to spills and other releases of oil or hazardous substances.  33 U.S.C. § 1321(d)(4).  *See generally*, 40 C.F.R. 300 *et seq*.  The National Contingency Plan provides the organizational structure and procedures for preparing for, and responding to, discharges of oil.  40 C.F.R. § 300.1.  It reflects the Congressional concern for "efficient, coordinated, and effective action to minimize damage" from discharges of oil.  40 C.F.R. § 300.3(b).  The National Contingency Plan establishes the oil spill response priorities in the following order:

(a)  safety of human life including the insurance of safety of response personnel;

(b)  stabilizing the situation to prevent additional oil spillage, and "reduc[ing] the need for follow-up response action, and to minimize adverse impact to the environment;" and

(c)  ensuring that the response "must" use "all necessary containment and removal tactics in a coordinated manner to ensure a timely, effective response that minimizes adverse impact to the environment."

40 C.F.R. § 300.317(a)-(c).

The National Contingency Plan also directs the FOSC to "not delay containment and removal decisions unnecessarily" and to "*take actions to minimize adverse impact to the environment that begins as soon as a discharge occurs . . . .*"  40 C.F.R. § 300.317(d)

(emphasis added).[ix] These response priorities make sense given the potential for serious impacts to the environment, higher clean-up expenses due to delay, and significant costs to commercial shipping and private property from a spill not quickly addressed. Hence, these statutory and regulatory mandates make clear that cost of the cleanup is not the immediate concern of the FOSC. Rather, the FOSC focuses on rapid containment. *Trial Day 18, October 21, 2010, Laferriere at 8:18-9:4,*[12] *11:11-17;*[13] *Trial Day 33, December 1, 2010, Benson at 138:10-55;*[14] *Trial Day 20, October 26, 2010, Hellberg at 36:24 -37:5.*[15]

For large or complex spills, the FOSC receives technical support from the Coast Guard's National Strike Force, comprised of the Atlantic, Gulf, and Pacific Strike Teams. Each Team is staffed with skilled Coast Guard personnel who specialize in oil spills, chemical spills, and emergency response. 33 U.S.C. § 1321(d)(2)(C); 33 C.F.R. § 300.145. *Trial Day 18, October 21, 2010, Laferriere at 5:6-19.*[16]

### C. OPA'S Liability Scheme Governs the Responsible Party's Recovery of Removal Costs from the Fund

OPA also provides a framework to compensate individuals, businesses, and even governmental entities for cleanup costs as well as for specifically enumerated categories of damages. This framework also addresses payment of OPA compensable damages where the Responsible Party is unknown, refuses to pay, or is entitled to a liability limitation. 33 U.S.C. §§ 2712 and 2713. Under these latter circumstances, claimants are compensated by the Fund. The Fund is administered by the Coast Guard's National Pollution Funds Center ("NPFC"), and intended to ensure prompt and complete recovery for damages arising from an oil spill. *Apex Oil Co. v. United States*, 208 F. Supp. 2d 642, 651-52 (E.D. La. 2002). The Fund is financed by several sources of revenue including taxes on the petroleum industry, interest earned on

---

[ix] The National Contingency Plan further enumerates the FOSC's specific functions. 40 C.F.R. § 300.120.

fund principal from United States Treasury investments and cost recoveries, fines, and civil penalties collected from Responsible Parties.[x]  26 U.S.C. § 9509(b).  *United States v. Conoco, Inc.*, 916 F. Supp. 581, 584 (E.D. La. 1996).

OPA explicitly provides for circumstances where the Responsible Party may be a claimant to the Fund for removal costs.  33 U.S.C. §§ 2708(a) and 2712(a)(4); 33 C.F.R. § 136.205.  This is a two-step process.  A Responsible Party must first prove it is entitled to a complete defense or, as in this case, to a right to limit its liability.  33 U.S.C. §§ 2708(a) and 2712(a)(4); 33 C.F.R. § 136.205.  To be eligible for limitation, the Responsible Party must demonstrate that the incident was not "proximately caused by (A) gross negligence or willful misconduct or, (B) violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship . . . ."  33 U.S.C. § 2704(c).  It must also show that it provided "all reasonable cooperation and assistance requested by a responsible official in connection with removal activities . . . ."  *Id*.  By failing to cooperate with the FOSC, the Responsible Party risks losing the right to limitation.  *Id*.  *Trial Day 19, October 25, 2010, Morrison at 174:23-175:4*.[17]  OPA establishes limitation amounts based on vessel gross tonnage.  The limitation amount for tank vessels such as the *Athos I*, at the time of the spill, was $1,200 per gross ton.  33 U.S.C. § 2704(a)(1)(A).

If the NPFC grants limitation, then the Responsible Party can seek recovery of removal costs expended beyond the limitation amount.  *See* 33 U.S.C. §§ 2708, 2712 and 2713.  The process by which the Responsible Party, as well as other claimants, seek reimbursement from the Fund was established by Congress when it passed OPA.  The President delegated authority

---

[x] At the time of the *Athos I* spill, November 2004, the tax had expired and the Fund received its income from interest on principle as well as from recoveries from Responsible Parties and civil penalties.

for administration of the Fund to the Coast Guard,[xi] which in turn, created the NPFC to execute those responsibilities.  Congress, in OPA, also authorized the passage of regulations, promulgated at 33 C.F.R. Part 136, for the processing of claims.  33 U.S.C. § 2713(e).

Under the regulations, costs are compensable provided the Responsible Party can demonstrate to the NPFC that: (1) the actions taken were necessary to prevent, minimize, or mitigate the effects of the incident; (2) removal costs were incurred as a result of these actions; (3) actions taken were determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC; and, (4) costs were reasonable as determined by the NPFC. 33 C.F.R. §§ 136.105, 136.203 and 136.205.  Hence, the Fund is directed to reimburse oil spill removal costs that are necessary, reasonable, and adhere to the relevant statutory and regulatory criteria for Fund payments.  33 U.S.C. §§ 2712(a)(4), 2713; 33 C.F.R. § 136.1(a)(1); *United States v. American Commercial Lines, L.L.C*. 2014 U.S. App LEXIS 13592, at *5-6 (E.D. La. Mar. 21, 2013); *Gatlin Oil Co. v. United States*, 169 F.3d 207, 211 (4th Cir. 1999).

### D.  Pursuant to OPA, the United States is Subrogated to Frescati's Rights

Once the Fund has paid compensation to a claimant, including the Responsible Party, it is subrogated to all rights the claimant has under any other law.[xii]  33 U.S.C. § 2715(a); 33 C.F.R. §136.115.  Upon payment of the Frescati's cleanup costs of $87,789,147.31 from the Fund, the United States became subrogated to all rights, claims, and causes of action Frescati had under any other law for recovery of those amounts.  *American Commercial Lines*, U.S.

---

[xi] Executive Order No. 12,777, 56 Fed. Reg. 54,757 (October 18, 1991) delegates responsibility from the President of the United States to the Coast Guard.

[xii] Specially, "Any person, including the Fund, who pays compensation pursuant to this act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).  Further, the NPFC's regulations provide that "[A]cceptance of any compensation also constitutes an agreement by the claimant to assign to the Fund any rights, claims, and causes of action the claimant has against any person for the costs and that damages are the subject of the compensated claims . . . ." 33 C.F.R. §136.115.

App LEXIS 13592, at *5.  *See also United States v. Inter-Bay Towing Co.*, No. H-03-5727,

2005 U.S. Dist LEXIS 41974, at *22 (S.D. Tex. Aug. 8, 2005) ("[T]he law is clear, that under

[33 U.S.C. § 2715(a)], USA is indeed subrogated to any cause of action that TGLO, the

'claimant' had.").

### E.  Preservation of Maritime Remedies

For other damages incurred by the Responsible Party, including hull damage and

cleanup expenses not recovered from the Fund, OPA preserves the Responsible Party's right of

contribution against any person who is liable under OPA *or any other law* as well as rights and

remedies under maritime law, except as otherwise provided by OPA.  33 U.S.C. §§ 2709, 2751.

"Except as otherwise provided in this Act, this Act does not affect – (1) admiralty and maritime

law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions

under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to

which they are otherwise entitled."  33 U.S.C. § 2717(e).  Here, Frescati availed itself of its

right to assert admiralty contract and tort claims against CITGO, and the United States

exercised its right of subrogation based on Frescati's contract claims against CITGO.[xiii]

### III.   OIL SPILL RESPONSE, LIMITATION DETERMINATION AND DAMAGES DETERMINATION

### A.  The *Athos I* Oil Spill Response Complied with the Federal Oil Spill Statutory Scheme Including the National Contingency Plan

After the *Athos I* struck the anchor, Frescati and Tsakos were deemed Responsible

Parties without regard to fault and required to clean up the spill under the direction and

oversight of the Coast Guard's FOSC.  33 U.S.C. §§ 2701(32), 2702, 1321(c)(1)-(d); 40

C.F.R.§ 300.305(c)-(d).  *Trial Day 18, October 21, 2010, Laferriere at 9:13-22.*[18]

---

[xiii] The United States' claim lies in OPA's subrogation provision and thus is contingent on successful prosecution by Frescati of its contractual third-party beneficiary claim.  33 U.S.C. § 2715.

The Responsible Parties (also referred to as Frescati) had designated the National Response Corporation ("NRC") as their OSRO and Mr. Courtney Benson of the O'Brien's Group as the Qualified Individual in their pre-spill Vessel Response Plan.[xiv] *Trial Day 19, October 25, 2010, Benson at 8:11-9:8,[19] 11:18-12:5;[20] Trial Day 18, October 21, 2010,* Ex. P-1500 at ATHOS 001046 - 001047; Ex. P-1501; Ex. P-1502.  The Responsible Parties activated their Plan and, within an hour after the incident, notified the Coast Guard's National Response Center.  33 U.S.C. § 1321(j)(5); 40 C.F.R. § 300.125(a).  *Trial Day 19, October 25, 2010, Benson at 15:18-16:3;[21]* Ex. USA-157 at NPFC 00085.  Coast Guard personnel from the Philadelphia Marine Safety Office were deployed on scene and, Capt. John Sarubbi,[xv] the Coast Guard's FOSC, activated the Incident Command System ("ICS") that evening.  *Trial Day 19, October 25, 2010, Benson at 11:18-12:5;[22]* Ex. USA-157 at NPFC 000085.

The ICS is a command and control structure for responding to oil spills and other disasters that brings together hosts of resources including those of the Responsible Party and provides a common scheme for emergency response.  The *Athos I* ICS was managed by the Unified Command, comprised of the FOSC, Frescati's representative, and a designated official from each the three affected states.  The Unified Command determined spill response priorities on a day by day basis.  *Trial Day 18, October 21, 2010, Laferriere at 13:25-14:23.[23]*  While the spill response decisions were generally reached by consensus of the Unified Command, ultimate authority for the *Athos I* spill response rested with the FOSC.  33 U.S.C. §§ 1321(c)(1)(B)(ii) and (d)(2)(K); 40 C.F.R. §§ 300.120(a), 300.135(a), 300.305(c) and (d).

---

[xiv] NRC is the largest OSRO in the United States and is called out on virtually every major spill, drawing on its extensive network of response subcontractors to provide manpower, equipment and expertise to respond to a major incident like this.  The O'Brien's Group managed the Responsible Parties' spill response.

[xv] The FOSC is generally a Coast Guard Sector Commander who is also the Captain of the Port.  Capt. Sarubbi was the Captain of the Port and Sector Commander for Delaware Bay.

In light of the seriousness of the spill, the Coast Guard deployed its Atlantic Strike Team.  33 U.S.C. §§ 1321(d)(2)(c) and (j)(2).  The Atlantic Strike Team was under the command of then-Commander Roger Laferriere,[xvi] who at the time of the *Athos I* spill, held a Type 1 Qualification for Incident Commander, the highest level qualification for emergency response.  *Trial Day 18, October 21, 2010, Laferriere at 4:17-22,*[24] *15:15-16:8.*[25]  Capt. Laferriere served as technical advisor to the FOSC and as the FOSC in Capt. Sarubbi's absence.  *Trial Day 18, October 21, 2010, Laferriere at 6:1-10.*[26]

The spill response was driven by its sheer magnitude.  The spill covered over 140 miles of shoreline in three states and, for effective management, the response was divided into 29 different geographic zones.  At the height of the response, the cleanup involved over 1800 responders—1300 of which were contractors hired by the Responsible Parties and the remainder of which were personnel from the Coast Guard and other federal and state agencies. *Trial Day 18, October 21, 2010, Laferriere at, 8:2-17;*[27] *Trial Day 19, October 25, 2010 Benson at 20:14-18.*[28]

Response efforts were further complicated by conditions unique to the *Athos I* spill.  Tides and currents transported the oil up and down a fast moving river system near a major metropolitan area, continually remobilizing oil that had been deposited on shore.  Cold weather conditions, along with the physical characteristics of the oil, caused it to sink, confounding recovery.  All of this created challenges forecasting where oil would be transported each day. *Trial Day 18, October 21, 2010,  Laferriere at 7:5-8:1,*[29] *23:20-24:5;*[30] *Trial Day 33, December*

---

[xvi] At the time of his testimony, Commander Laferriere had been promoted to Captain and was serving as Sector Commander of the Port of Los Angeles.  Prior to the *Athos I* spill, Mr. Laferriere, a two-time veteran of the Atlantic Strike Team, had been involved in a number of high profile,  large oil spill responses including an 8.3 million gallon spill released during Hurricane Katrina.  Post *Athos 1*, he was detailed from his job as Sector Commander to help direct the 2010 response to the BP Gulf oil spill serving as the Coast Guard's Incident Commander for two months.  *Trial Day 18, October 21, 2010, Laferriere at  4:17-22, 6:11-7:4.*

1, 2010, Bowman at 114:9-15.[31]  Hence, the FOSC directed Frescati to "stage" or place equipment[xvii] such as boom at multiple onshore locations along the river, even before the arrival of the oil, to prevent contamination of shoreline, critical fish and wildlife habitats, and private property.  *Trial Day 18, October 21, 2010, Laferriere at 23:20-24:5.*[32]  Additionally, the severe cold posed a safety issue for spill responders.  To ensure their protection, and comply with regulations, the Coast Guard's site safety plan required Frescati to provide workers hot meals on site and proper cold weather gear.  40 C.F.R. § 300.150; *Trial Day 18, October 21, 2010, Laferriere at 41:1-42:2;*[33] *Trial Day 19, October 25, 2010, Benson at 29:6-15.*[34]

Spill response priorities were embodied in, and executed through, Incident Action Plans ("IAPs").  The IAPs included standard forms on which to identify the daily cleanup objectives and assignments of personnel, equipment, and supplies by location.  *Trial Day 18, October 21, 2010, Laferriere at 16:10-17:6,*[35] *19:18-20:3.*[36]  *See* Attachment 1, the IAP from December 7, 2010 as a representative plan.  Before an IAP could go into effect, it had to be approved and signed by the FOSC thereby certifying that the actions in the plans were in accordance with the requirements of OPA, FWPCA, and the National Contingency Plan, and comported with their priorities:

- protection of human health and safety,

- effective and immediate removal of the oil, and

- minimization of environmental and economic impacts.

33 U.S.C. § 1321(c)(3); 33 C.F.R. § 300.317.  *Trial Day 18, October 21, 2010, Laferriere at 11:3-10,*[37] *19:5-14,*[38] *37:10-38:2.*[39]  *See, e.g.,* Ex. USA-117-147.

---

[xvii] Staging boom required hauling it by tractor-trailer to different locations in anticipation of oil trajectories.  *Trial Day 18, October 21, 2010, Laferriere at 23:20-24:5.*

Capt. Laferriere testified that each IAP would be carefully developed to lay out the objectives and included assignments of contractor personnel and equipment in each of the 29 zones across the three states for the next day.  This information was included in standard ICS forms which covered organizational charts, response objectives, work assignments by location, communications plans, medical plans, and site safety plans.  *Trial Day 18, October 21, 2010, Laferriere at 17:12-19:4.*[40]  Attachment 2 includes, at CG IS 000437, an exemplar ICS Standard Form 204 Assignment List from December 7, 2004.  This particular form provides the field assignments, by contractor, to the Waterborne Vessel and Pier Decontamination Team, including the type and amount of equipment it was to provide on that date.  *Trial Day 18, October 21, 2010, Laferriere at 20:8-24:10;*[41] *26:2-31:11,*[42] *35:3-36:10.*[43]  Signed IAPs were then provided to the Responsible Parties to carry out.  *Trial Day 18, October 21, 2010, Laferriere at 37:3-24.*[44]

Capt. Laferriere also explained that members of his Strike Team were deployed in the field to verify that specific work assignments were executed by the Responsible Parties and that personnel and equipment were dispatched in accordance with the IAP for that day.  The Strike Team members reported several times daily to Capt. Laferriere, functioning as a "quality control device" for both the Coast Guard and the Responsible Parties.  *Trial Day 18, October 21, 2010, Laferriere at 31:12 -32:12;*[45] *34:3- 17;*[46] Ex. USA-127 at 06027-28.

Failure by the Responsible Parties to implement actions in the IAPs could have had consequences.  Had the Coast Guard assumed spill cleanup and financial responsibility, it could have charged Frescati not only for cleanup costs, but also for all Coast Guard costs including salaries and vessel and helicopter operational costs, thereby increasing the Responsible Parties' liability dramatically.  *Trial Day 18, October 21, 2010, Laferriere at 37:25-39:15.*[47]  Even more

16

significantly, as explained, under OPA, failure to cooperate with the FOSC could bar Frescati from limiting its liability.  Capt. Laferierre, however, testified that the Responsible Parties cooperated with the FOSC and properly implemented the IAPs.  *Trial Day 18, October 21, 2010, Laferriere at 39:16-18;[48] Trial Day 19, October 25, 2010, Benson at 53:12-54:3.[49]*

### B.  The Coast Guard Determined that Frescati was Entitled to Limit its Liability

Frescati petitioned the NPFC to limit its liability under OPA, to $45,474,000 – an amount calculated from the weight of the *Athos I* of 37,895 tons and the statutory limitation amount of $1,200 per gross ton (at the time of the incident). 33 U.S.C. § 2704(a)(1)(A).  *Trial Day 19, October 25, 2010, Morrison at 165:9-166:2.[50]*  By March, 2005, Frescati's oil spill response expenditures had exceeded the limitation amount by approximately $90 million.

On May 22, 2005, Frescati petitioned the NPFC to limit its liability and to recover removal costs in excess of the limitation amount.  33 U.S.C. §§ 2704, 2712 and 2713; 33 C.F.R. § 136.105(b).  Ex. USA-1 at ATHOS  016636.  The Responsible Parties submitted a claim and supporting documentation for $124,226,518.59 in removal costs, of which $45,474,000 comprised the limitation amount and $78,752,518 represented the amount for which they sought reimbursement.  Over time, the total claim was amended to $125,680,764.  *Trial Day 20, October 26, 2010, Hellberg at 41:15-41:25;[51]* Ex. USA-1 at ATHOS 016636; Ex. USA-157 at NPFC 000086.  Thomas Morrison, chief of the Claims Adjudication Division of the NPFC, was responsible for adjudicating the limitation request.[xviii]  *Trial Day 19, October 25, 2010, Morrison at 162:25-163:6,[52] 167:19-22.[53]*  In arriving at his decision Mr. Morrison explained that he:

---

[xviii] Mr. Morrison was well qualified to make this determination.  Prior to becoming chief of the Claims Adjudication Division, he had a 20-year career as a Coast Guard officer culminating as the Commanding Officer of a cutter.  He is a graduate of the Coast Guard Academy and received a Masters in Business from the College of William and Mary.  *Trial Day 19,  October 25, 2010, Morrison at 163:-164:12.*

(1) Reviewed thousands of pages produced by the Responsible Parties including, but not limited to, vessel, navigational, and operational documents and records. *Trial Day 19, October 25, 2010, Morrison at 171:1-8;*[54] Ex. USA-368 at ATHOS 021127-021136;

(2) Requested an objective analysis of the *Athos I's* draft from a naval architect in the Coast Guard's Marine Safety Office. *Trial Day 19, October 25, 2010, Morrison at 173:9-24;*[55] Ex. D-1969 at MSC_DOCS 000001- 000011*;*

(3) Requested additional information including nautical charts and tide tables from the National Oceanic and Atmospheric Administration. *Trial Day 19, October 25, 2010, Morrison at 172:16-173:7;*[56]

(4) Contacted the Coast Guard Captain of the Port in Mobile, where the *Athos I* was dry-docked post incident, to verify her compliance with hull thickness regulations. *Trial Day 19, October 25, 2010, Morrison at 173:25-174:16;*[57]

(5) Reviewed other relevant safety, construction, or operation regulations. *Trial Day 19, October 25, 2010, Morrison at 174:9-16;*[58] and,

(6) Confirmed that the Responsible Parties had executed the directives of the FOSC. *Trial Day 19, October 25, 2010, Morrison at 174:17-175:4.*[59]

Mr. Morrison determined on August 15, 2005 that Frescati had met its burden for entitlement to a limitation on liability of $45,474,000 finding that it:  (a) committed no gross negligence that proximately caused the release of oil; (b) committed no willful misconduct that proximately caused the release of oil; (c) violated no Federal safety, construction, or operating regulation that proximately caused the release of oil; and, (d) cooperated with the FOSC and complied with his orders.  33 U.S.C. § 2704(c).  *Trial Day 19, October 25, 2010, Morrison at 167:19-168:10,*[60] *170:17-22,*[61]*175:5-7;*[62] Ex. USA-367.

### C.  Coast Guard's Adjudication of the Responsible Party's Removal Costs Claims

The NPFC next determined whether the Responsible Parties' removal costs were compensable in order to determine the amount that should be reimbursed above the limitation amount.  26 U.S.C. § 9509; 33 U.S.C. § 2712.  The task of adjudicating the initial and

supplemental claims, $80,206,764[xix] and $14,351,679.94, respectively, was assigned to Ms. Donna Hellberg, Chief of the Removal Claims Branch within the NPFC and an experienced claims adjudicator. *Trial Day 20, October 26, 2010, Hellberg at 32:2-14,[63] 32:23-33:4;[64] 41:15-41:25,[65] 42:1-6;[66] Trial Day 19, October 25, 2010, Morrison at 178:13-19.[67]* Ms. Hellberg testified that she reviewed over 60,000 pages of invoices, dailies, proofs of payments, and rate sheets submitted by Frescati for 88 different OSROs and vendors to assure herself that payment of each invoice was proper; that is, that the removal costs (1) arose from actions that were necessary to prevent, minimize, or mitigate the effects of the incident; (2) were incurred as a result of these actions; (3) arose from actions determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC; and, (4) were reasonable as determined by the NPFC.  33 C.F.R. §§ 136.203, 136.205; *Trial Day 20, October 26, 2010, Hellberg at 38:9-39:4,[68] 46:13-16.[69] See e.g.* Ex. P-1419 at ADAM 0000001, Ex. P-1419 at ADAM 0020469.  As will be explained, Ms. Hellberg determined that the Responsible Parties were entitled to reimbursement of $87,989,157 beyond their $45,474,000 million OPA limitation.

First, with respect to the initial claim, Ms. Hellberg examined the cleanup costs charged by the primary OSROs and supply vendors and reimbursed by Frescati.  For charges by the OSROs for manpower and equipment, she explained how she used "dailies" to corroborate invoices.  Dailies were forms prepared in the field and signed by a member of the Unified Command which itemized personnel and equipment provided by an OSRO in a given cleanup zone and the rates charged.  Ms. Hellberg explained that dailies served as a contemporaneous verification that the labor, equipment, and materials itemized on the form were at a given

---

[xix] Initial total claim of $124,226,443 plus adjustment upward of $1,454,246 minus limitation amount of $45,474,000 = $80,206,764.

cleanup zone on a specific day. *Trial Day 19, October 25, 2010, Benson at 34:3-35:11;[70] Trial Day 20, October 26, 2010, Hellberg at 39:5-12;[71]* Ex. P- 1419 at ADAM 0020463. Ms. Hellberg then reviewed rate schedules for the prime OSROs to confirm that rates charged, as represented on invoices and where appropriate on dailies, were proper. *Trial Day 20, October 26, 2010, Hellberg at 37:6-14;[72] 53:18-55:21;[73] 56:9-57:12;[74]* Ex. P-1419 at ADAM 0020318. When there were no dailies, or she had additional questions regarding the sufficiency of documentation, Ms. Hellberg reviewed the IAPs and other documents generated by the Unified Command and/or requested additional information from the Responsible Parties or the vendors. *Trial Day 20, October 26, 2010, Hellberg at 38:22-39:4;[75] 85:8-25.[76]*

To determine whether actions taken by Frescati were necessary to minimize or mitigate the effects of the spill and were directed by the FOSC or consistent with the NCP,[xx] Ms. Hellberg compared the Responsible Parties' documentation, described above, with Unified Command documentation which laid out the FOSC's daily spill objectives by geographical location. 33 U.S.C. § 2712(a)(4); 33 C.F.R. § 136.203. *Trial Day 20, October 26, 2010, Hellberg at 34:17-35:14.[77]*

Ms. Hellberg then evaluated whether the costs of the oil removal actions were reasonable. Reasonableness, she explained, is not predicated on whatever is the least-cost cleanup but rather takes into account a number of factors. *Trial Day 20, October 26, 2010, Hellberg at 36:24-37:5.[78]* These factors include, but are not limited to:

**Amount and type of oil.** In this case, 264,000 gallons of Bachaquero crude was spilled. A heavy and viscous crude, the Bachaquero increased the cost of response. Ex. P-375.

---

[xx] As discussed elsewhere, the regulations require (a) "that the actions taken were necessary to prevent, minimize or mitigate the effects of the incident; (b) that the removal costs were incurred as a result of these actions; (c) that the actions taken were determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC. 33 C.F.R. § 136.203.

**Geographical scope of the spill.**  For a large spill such as the *Athos I*, which impacted three states and a busy commercial port, cleanup required massive mobilization of personnel, materials, and equipment, including importing contractors from outside the region.  *Trial Day 20, October 26, 2010, Hellberg at 36:19-23,[79] 59:14-17.[80]*

**Weather and time of year.**  Winter weather and frigid water temperatures required additional expenditures for hot meals and cold weather gear to ensure the safety of spill responders.  *Trial Day 20, October 26, 2010, Hellberg at 36:14-18;[81] Trial Day 18, October 21, 2010, Laferriere at 41:1-24.[82]*

**FOSC's response objectives for the day.**  These objectives were found in the daily IAP, particularly ICS standard form 202 – Response Objectives.  *Trial Day 20, October 26, 2010, Hellberg at 34:17-35:14.[83]*

**Contractual rate schedules for Frescati's prime OSROs**.  Ms. Hellberg explained that she relied on the contracts between the Responsible Party and its "prime" OSROs and the rates established in those contracts to help determine reasonableness because those contracts were negotiated pre-spill, were competitive with rates charged in other large spills (see below), and because the prime OSROs were responsible for the work performed by their subcontractors and the subcontractor's personnel.  *Trial Day 20, October 26, 2010, Hellberg at 37:11-38:8,[84] 73:23-74:1;[85] 78:8-22.[86]*

**Rates charged by NRC and O'Brien's at other spill locations.**  At trial, Ms. Hellberg demonstrated that the rates charged by NRC and O'Brien's at several large spills including DBL152 spill in Texas (2005), Cosco Busan spill in California (2008), Dubai Star in California (2009), and Capeco in Puerto Rico (2009) were remarkably consistent with those charge for the *Athos I*.  *Trial Day 20, October 26, 2010, Hellberg at 60:17-61:23;[87] 62:11-64:19;[88] 66:2-9.[89]*

21

| | | | NRC | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Athos 1 PA 2004 | | DBL152 (Phase 1) TX 2005 | DBL152 (Phase 2) TX 2005 | Cosco Busan CA 2008 | Dubai Star CA 2009 | Capeco PR 2009 | DM932 LA 2008 |
| **Labor Catagories** | | | | | | | | |
| Project Manager | $95.00 | | $95.00 | $95.00 | $95.00 | $100.00 | $100.00 | |
| Supervisor | $60.00 | | $60.00 | $60.00 | $60.00 | $70.00 | $70.00 | |
| Foreman | $55.00 | | $55.00 | $55.00 | $55.00 | $55.00 | $55.00 | |
| Hazmat Technician | $50.00 | | $50.00 | $50.00 | $50.00 | $45.00 | $45.00 | |
| Equipment Technician | $45.00 | | $45.00 | $45.00 | $45.00 | $45.00 | $45.00 | |
| | | | | | | | | |
| **Equipment** | | | | | | | | |
| OSRVessel (day) | $7,750.00 | | $7,750.00 | $7,750.00 | $9,750.00 | $9,750.00 | $9,750.00 | |
| Skimmer Model 12 (day) | $600.00 | | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | |
| ORD Magna Skimmer (day) | $1,600.00 | | $1,600.00 | $1,600.00 | $1,600.00 | $700.00 | $700.00 | |
| 18 in Oil Boom (Ft per Day) | $1.25 | | $1.25 | $1.25 | $1.25 | $1.25 | $1.25 | |
| Hand Held Radio VHS (day) | $30.00 | | $30.00 | $30.00 | $30.00 | $25.00 | $25.00 | |
| FRT - 26ft (day) | $1,500.00 | | * | * | $1,500.00 | $2,000.00 | $2,000.00 | |
| ATV (day) | $250.00 | | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | |
| | | | | | | | | |
| Truck Ut. Vehicle (day plus Miliage) | 150.00 + .65m | | 150.00 + .65m | 150.00 + .65m | 150.00 + .75m | $150.00 | 150.00 + .75m | |

NPFC 000221

TABLE 1:  Comparison of Key Labor and Equipment Rates Charged by NRC for Several Large Spills.  Ex. USA - 366.

After a painstaking review, which with respect to the first claim, took Ms. Hellberg 6 months, full time, she determined that Frescati had met its burden of proof, and that, except for a small portion that were not OPA-compensable, the costs were reasonable in light of the magnitude of the spill and customary industry rates.  Ms. Hellberg testified that the burden of proof used by the NPFC is preponderance of the evidence or "more likely than not."  *Trial Day 20, October 26, 2010, Hellberg at 33:5-34:12;* [90] *34:13-16.* [91]

In August, 2006, the NPFC issued payment from the Fund to Frescati for $77,181,859.54[xxi] above the limitation amount.  *Trial Day 20, October 26, 2010, Hellberg at 43:8-11;* [92] Ex. USA-157 at NPFC 000085-000090.  In June, 2008, Ms. Hellberg adjudicated

---

[xxi] The Responsible Parties amended their initial claim $125,680,764.40 of which $80,206,764.40 was potentially eligible for reimbursement. The NPFC denied approximately $3 million of this claim.

Frescati's supplemental claim in the same manner as the initial claim and determined that $10,807,297.77 out of the $14,351,679.94[xxii] was reimbursable and issued payment from the Fund in that amount. *Trial Day 20, October 26, 2010, Hellberg at 42:1-6;[93] 43:15-25.*[94] Reimbursement for the claim and supplemental claim totaled $87,989,147.31.[xxiii]   This is the principle amount sought by the United States from CITGO.

## IV.   CLEANUP COSTS WERE REASONABLE AS DETERMINED BY COAST GUARD'S ADJUDICATION

### A.  Reasonableness of Mitigation Based on Facts and Circumstances Unique to Case

In a breach of contract case, the injured party is entitled to recover damages that are a natural and probable consequence of the breach. *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.,* 592 F.3d 108, 111 (2nd Cir. 2010); *see also*, Restatement (Second) of Contracts § 347 (1981).  The injured party is generally required to make reasonable efforts to mitigate damages.[xxiv]  Dan B. Dobbs, Law of Remedies, Damages, Equity, Restitution, § 3.9, at 380 (2nd ed. 1993) ("The defendant is entitled to a credit against liability for any consequential damages the plaintiff could have avoided or minimized by reasonable effort and expense, whether or not the plaintiff actually avoided or minimized such damages."); Restatement (Second) of Contracts § 350(2) (1981).  Whether the injured party has discharged this obligation depends on the reasonableness of its conduct.  *Id.* at 259; *In re Kellet Aircraft Corp*., 186 F.2d 197, 198 (3d Cir. 1950).  Reasonableness of its conduct "is determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the

---

[xxii] $3,544,382 was not compensable because they were not for cleanup or were unsubstantiated.

[xxiii] The U.S. and CITGO stipulated that interest is calculated pursuant to 33 U.S.C. § 2705.  Doc. 492.

[xxiv] The concept of minimizing damages is common to contract, tort, and statutory rules.  Dan B. Dobbs, Law of Remedies § 3.9, at 360 (2nd ed.).  Courts often cite to tort cases on minimizing damages when analyzing contract claims and vice versa.

situation at the time the problem was presented. *Id.*; *APL Co.*, 592 F.3d at 111; *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 259 (3d Cir. 2008). Furthermore, when the injured party has adopted a reasonable course of action, "it is not fatal to recovery that one course of action, reasonably open but not followed would have avoided further injury whereas another, also reasonable and taken, produced it." *Ellerman Lines Ltd. v. President Harding*, 288 F.2d. 288, 290 (2d Cir. 1961). Courts do not permit the rule of mitigation of damages to be "invoked by a contract breaker as a basis for a hypercritical examination of the conduct of the injured party." *In re Kellet,* 186 F.2d at 1981. *See also, Fortis Corporate Ins., S.A. v. M/V Cielo Del Canada*, 320 F. Supp. 2d 95, 106 (S.D.N.Y 2004)*; Sunpride (Cape) (pty) Ltd., v. Mediterranean Shipping Co., Ltd.*, No. 01 Civ. 3493(CSH), 2003 WL 22682268 at \*37 (S.D.N.Y Nov. 12, 2003). Whether the injured party sufficiently mitigated the damages is an affirmative defense for which the breaching party bears the burden of proof. *Prusky*, 532 F3d at 258, *citing Koppers Co., Inc v, Aetna Cas. & Sur. Co.* 98 F.3d 1440, 1448 (3d Cir. 1996).

### B. Frescati's Costs were Reasonable Based on the Magnitude of the Spill and the OPA Scheme

Facts and circumstances critical to any reasonableness calculus regarding cleanup costs must include the spill's magnitude, location, and time of year. The piercing of the *Athos I* resulted in a spill of approximately 264,000 gallons of heavy crude into the Delaware River. Ex. USA-1 at ATHOS 016637, Ex. USA-157 at NPFC 000085*; Trial Day 10, Oct. 6, 2010, Hall at 193:6-21.*[95] The spill covered over 140 miles of shoreline in three states, shut down the port of Philadelphia for multiple days, required a massive mobilization of 1800 responders, occurred in a tidal system which constantly remobilized oil, and required staging and deployment of miles of boom to protect critical fish and wildlife habitat, and commercial and private property. Some of the heavy, viscous crude sank, confounding recovery actions.

24

Winter weather and frigid temperatures added difficulty to the response and created safety issues for responders.  All these factors influenced the size of the response and, predictably, the cost.  *In re Kellet*, 186 at 198; *APL Co.*, 582 F.3d at 111.

The reasonableness of costs will also be heavily influenced by any overarching statutory and regulatory scheme which prescribes responsibilities and liabilities on parties.  Here, OPA is unambiguous – it imposes the primary duty of oil cleanup and corresponding financial liability on the Responsible Party, irrespective of fault.[xxv]  33 U.S.C. § 2702.

The Fifth Circuit has addressed the reasonableness of damages, where another statutory scheme, the Rivers and Harbors Act ("RHA"), prescribed responsibilities on the owner of a barge that sunk in a navigable channel.  *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 934 (5th Cir. 1979), *reh'g denied* and op. amended by 604 F.2d 13 (5th Cir. 1979).  Tennessee Valley's barge sank where it had been tied off after being towed to that location by a towing company.   Tennessee Valley salvaged the barge and sued the tower for the damages resulting from the sinking including the costs expended to raise the barge.  The towing company argued that the barge sank as a result of the barge's unseaworthiness.  Tennessee Valley countered that the sinking resulted entirely from the towing company's lack of care.  The district court held in favor of Tennessee Valley but denied recovery for the expense of raising the barge, finding the plaintiff had failed to mitigate damages.  *Id*. at 932.  The Fifth Circuit reversed on the issue of damages.

> In considering the reasonableness of Tennessee Valley's decision to raise the barge, we must analyze its duties under section 15 of the Rivers and Harbors Act, 33 U.S.C. § 409.  The statute imposes on the owner of the

---

[xxv] § 2702.  Elements of Liability. (a) In general.  Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or facility from which oil is discharged,  or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident. 33 U.S.C. § 2702.

> vessel sunk in a navigable channel the obligation 'to commence the
> immediate removal of the same and prosecute such removal diligently . . .
> .' If he fails to act to remove the obstruction, the government may
> undertake the task in the interest of navigational safety, and the owner will
> be held liable not only for this cost, . . .but for any damage caused by the
> wreck in the meantime. . . .The owner of a vessel sunk without any
> negligence on his part is still subject to the statutory obligation to remove
> the wreck. . . ..

*Id.*

The Fifth Circuit concluded that while Tennessee Valley had always contended it was free of fault, "its vindication, if it came, would be several years away at the end of a court battle. If it were ultimately held responsible for the accident, it would be liable for expenses incurred and mishaps occurring in the meantime. Even if it then claimed that the barge was not an obstruction to navigation, the Corps of Engineers might disagree and subject Tennessee Valley to more lengthy litigation." *Id.* Thus, given its obligations under the RHA, the court allowed Tennessee Valley recovery and further noted that its decision to "raise the barge immediately by private undertaking may have saved [the towing company] considerable expense in that a government salvage operation might have proved more expensive due to changing conditions caused by delay, . . . or due to the nature of governmental undertakings." *Id.* at 935. (internal citations omitted).

Like the RHA, OPA requires the vessel owner to take action or face consequences. Thus, from the inception of the *Athos I* spill, Frescati was required to follow the orders, directives, IAPs, and other plans approved by the FOSC. And as discussed elsewhere, the FOSC was required to prosecute the oil spill response so as to ensure safety of human life, prevention of further oil spillage, reduction in the need for additional response actions, and minimization of the adverse impact to the environment through the coordination of the

containment and removal tactics.  These priorities, which conspicuously do not include cost, make clear the importance of deploying personnel and equipment as quickly as possible.

Importantly, had Frescati failed to rapidly respond with sufficient personnel or equipment, the Coast Guard could have assumed control of the spill at potentially far higher cost.  Similarly, had Frescati failed to "properly carry out removal" of the oil - that is failed to implement the spill response requirements as dictated by the FOSC -  it could have been subject to civil penalties for as much as treble damages.  33 U.S.C. § 1321(b)(7)(A) & (B).  As pointed out by Captain Laferriere, the statutory scheme is designed to be a disincentive to the Responsible Party to shirk its responsibilities and force the federal government to undertake the cleanup.  *Trial Day 18, Oct. 21, 2010, Laferriere at 38:20-39:15.*[96]

Rapid mobilization is also cost effective.  Delay in responding forcefully to a spill only enlarges the area of impact, increasing impacts to shore-side personal and commercial property, tankers, freight ships, tugs, and private boats as well as natural resources and dramatically adding to the cost of cleanup.  *Trial Day 19, Oct. 25, 2010, Benson 19:21-20:13.*[97]  This underscores the critical importance of a strong Vessel Response Plan which engages capable and experienced oil spill response contractors such as NRC to "hit the spill hard" early, thereby reducing the zone of impact and mitigating damages.

Finally, any reasonableness determination must take into account OPA's statutory and regulatory scheme for adjudication of claims for cleanup costs and other damages and which entrusts this responsibility to the Coast Guard.  Pursuant to this scheme, the NPFC has adjudicated over $500 million in claims for removal costs.  At the time of the *Athos I* claims adjudication, Ms. Hellberg had adjudicated the largest oil spill removal cost claims submitted to the NPFC, including the Julie N, Kiroshima, Sergo Zakariadze, Buffalo 292, and Buffalo

296 for hundreds of millions of dollars.  Because of Ms. Hellberg's deep experience in

adjudicating oil spill cleanup cost recovery claims for large spills nationwide, she was aware of

the customary charges by prime OSRO's for resources and personnel as well as typical

methods of billing by primes for equipment or personnel provided by their subcontractors.  *See,*

*e.g., Sweet Pea Marine, Ltd. v. APJ Marine, Inc.* 411 F.3d 1242, 1249 (11th Cir. 2005) (in the

context of a contract case, " . . . [r]easonableness of charges, in the maritime context, is

measured by whether they are "customary"); *Jones v. Horton & Horton, Inc.*, 100 F.2d 345,

346 (5th Cir. 1938) (plaintiff's burden may be satisfied by testimony that charges were

reasonably in accord with industry standards); *Crescent Ship Serv. v. M/V Mitera Vassiliki*, No.

94-2391, 1995 U.S. Dist. LEXIS 9130 (E.D. La. June 28, 1995) (plaintiff must present some

modicum of evidence regarding what competitors would have charged for similar work or

material).

### C.  Reasonableness of Cleanup Costs in an Analogous Oil Spill Case

Although no reported OPA cases have done so, a pre-OPA case, decided under the

FWPCA, has addressed how to measure the reasonableness of oil spill removal costs incurred

by a Responsible Party.  *Redwing Carriers, Inc. v. United States*, No. 295-76, 1978 U.S. Ct. Cl.

LEXIS 764 (Ct. Cl. June 29, 1978).  In *Redwing*, the Responsible Party hired a reputable

contractor who had been recommended by the EPA.  The contractor cleaned up the spill to the

satisfaction of the On-Scene-Coordinator and, because the spill was the sole fault of a third

party, the Responsible Party sought recovery of costs paid to the contractor from the EPA.  The

EPA refused, arguing that the contractor's costs were "padded" to the extent that "more

sophisticated equipment and techniques were used than were required for the job" and therefore

were not "reasonable" as required by the FWPCA.  *Id.* at *15.  The court reviewed the rate

sheets of several other oil spill contractors for categories such as labor, per diem, vessels, containment boom, and vehicles and found they were not sufficiently lower than those of the Responsible Party's contractor to establish either that the "rates of others are maximums or that plaintiff's rates were unreasonable." *Id.* at \*16-17.

The *Redwing* court pragmatically recognized that numerous factors play into the rates set for oil cleanup work, including the amount of experience and equipment that a contractor could bring to bear:

> It is not possible to compute with mathematical accuracy, what a reasonable rate is for any of the 20 to 30 items listed on the rate sheets of any of the oil spill cleanup contractors.  Regional wage scales, nature, condition, and value of the equipment used and reputation or skill of the contractors are so lacking in uniformity that it is left to each contractor to set rates which are adequate to compensate him for his work, investment of capital, and business risks. While Clean River's rates, in general, are on the high side, they are not unreasonable as compared with rates of others in the same business, *most of whom were less experienced and owned less equipment than Clean River*.

*Id.* (emphasis added).

Likewise the court rejected after-the-fact arguments regarding the level of effort and amount of equipment, finding that the defendant failed to establish that equipment listed on the contractor's bill was not brought to the site or that contractor personnel were not present at the site during the hours for which their time was charged.  *Id*. at \*19.  The Court found unpersuasive the defendant's use of expert witnesses who had made estimates of "reasonable" costs "about a year and a half after the fact based on hindsight as to the methods and equipment to be used and the type of labor to be employed."  *Id.* at \*28.  Rejecting this later second guessing, the court explained: to "find that [the claimed sum] was the reasonable cost

29

legitimately 'incurred' by Redwing, the court need only look to the invoice and the cancelled check in payment thereof." *Id*.

The court explained:

> In the absence of a showing of fraud or collusion, and in the absence of a showing that the rates, per se, are unreasonable, it is virtually impossible, after the fact, to determine . . . whether the work actually done could have been done cheaper, or in a shorter period of time, or with less expensive equipment. When there is an oil spill, time is usually of the essence and shopping for the lowest estimate is impractical. If a reputable, experienced contractor is available, there should be no burden on the party responsible for removal of the discharge to go beyond the first available, qualified contractor in obtaining the necessary services to remove the discharged oil.

*Id.* at *26-27.

## V.   CITGO CANNOT MEET ITS BURDEN TO DEMONSTRATE THAT FRESCTI'S CLEANUP COSTS, REIMBURSED BY THE NPFC, WERE UNREASONABLE

It is CITGO's burden to demonstrate that cleanup costs incurred by Frescati, and reimbursed by the NPFC, were unreasonable, or that in the totality of the circumstances, Frescati failed to effectively mitigate damages. *Prusky*, 532 F.3d at 258; *Koppers* 98 F.3d at 1448. CITGO's ten or so arguments that the cleanup costs were unreasonable can be lumped into several categories. First, CITGO urges that Frescati, and thus the United States, should have only reimbursed cleanup costs which CITGO's expert deemed least cost in light of 5 years[xxvi] of hindsight. Second, CITGO argues that Frescati and the NPFC lacked sufficient documentation to support reimbursement of cleanup costs. Third, CITGO argues that the NPFC failed to follow either OPA's regulations or "mandatory guidelines" in adjudicating Frescati's claims. *See* Doc. 716 at 23-33. CITGO proffers these arguments through its expert, William McLellan, who has never served as an incident commander or qualified individual and

---

[xxvi] Mr. McLellan issued his first expert report nearly 5 years after the spill.

never served in the finance section of a major spill.  *Trial Day 21, Nov. 3, 2010, McLellan at136:20-137:9,[98] 195:6-21.[99]*   As will be briefly discussed, none of these arguments are persuasive, and CITGO fails to meet its burden.

**Category 1:  CITGO's Assertions that Cleanup Costs Were Too High**.

Mr. McLellan puts forth several types of charges he believes to be too high.  He criticizes Frescati, for example, for failing to renegotiate for lower rates with its prime OSROs earlier than it did.  He arbitrarily set day 6 rather than day 22 of the spill as the date Frescati should have renegotiated new rates and concludes that Frescati should not have paid costs "in excess" of those hypothetical new rates.  *Trial Day 21, Nov. 3, 2010, McLellan at 172:3-173:7.[100]*   As a corollary, he argues that the United States should not have reimbursed Frescati for the presumed excess and thus is not entitled to reimbursement.  Mr. McLellan's position is wholly speculative and fails to recognize that contract renegotiations on the sixth day of a massive spill could have disrupted work, worsened spill conditions, and actually increased the cost of cleanup.  Delay in prosecuting the response could have also precipitated a Coast Guard takeover at higher costs and civil penalties.  Notably, Mr. McLellan could not point to one contractor who confirmed that he would have agreed to accept unspecified reduced contract rates at any date earlier.  *Trial Day 22, Nov. 4, 2010, McLellan at 97:4-98:7.[101]*

In another example, Mr. McLellan believes that a prime OSRO should not charge for resources supplied by its subcontractors (referred to as third-party labor or equipment) at the prime's rates.  Again, he urges that Frescati should not have paid for, nor should the U.S. have reimbursed, these costs.  *Trial Day 21, Nov. 3, 2010, McLellan at 152:18-153:13,[102] 166:6-167:6.[103]*   However, as explained by Ms. Hellberg, she reimbursed Frescati where (1) the contract between Frescati and a prime allowed the prime to charge for the resources of its

subcontractors at the rate of the prime; and (2) the rates charged were commensurate with prevailing industry rates. [xxvii]

McLellan's arguments that the costs paid for labor, per diem, vessels, and containment were too high are virtually identical to those the *Redwing* court rejected. *Redwing Carriers*, No. 295-76, 1978 U.S. Ct Cl. LEXIS 764 at *16-17. Where, as here, the rates were not "per se unreasonable, whether the work could have been done cheaper or in a shorter period of time, or with less expensive equipment," is irrelevant when time is of the essence. *Id.* at *26-27. The Third Circuit took a dim view of hypercritical second guessing, finding the argument that a plaintiff failed to mitigate damages

> . . . may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment.

*In re Kellet*, 186 F.2d at 198-199. Mr. McLellan's opinions fail to reflect the exigency of an oil spill crisis, are arbitrary, and could have resulted in considerably greater costs. The injured plaintiff is "not required to undertake measures that would entail a risk of further economic damage." *Citizens Fed. Bank .v United States*, 66 Fed Cl. 179, 186 (2005).

More importantly, nowhere does the OPA statutory or regulatory scheme mandate use of the least cost oil spill removal services in order to be reasonable or compensable. To interpret the scheme in this fashion would eviscerate a paramount purpose of the statute – to implement an emergency response scheme immediately after a discharge of oil to minimize the impacts on the environment and the damages incurred by businesses and individuals. This

---

[xxvii] As discussed earlier, Ms. Hellberg also evaluated whether (1) the costs were incurred for cleanup tasks directed by the FOSC or consistent with the National Contingency Plan; (2) there was sufficient documentation to assure her that services were rendered and paid for Frescati; and (3) the costs were otherwise reasonable.

simply cannot happen without a vigorous and effective response scheme, which inevitably entails hiring skilled contractors and deploying sufficient equipment.  In light of all the facts and circumstances, Mr. McLellan's opinions should be given little weight.

**Category 2:  CITGO's Assertions that Documentation was Insufficient.**

Mr. McLellan contends, for example, that Frescati should have withheld payment of, and the NPFC should have denied costs for, invoices without signed dailies.  *Trial Day 21, Nov. 3, 2010, McLellan at 176:25-179:14.*[104]  As explained by Ms. Hellberg, a daily is not the only method to verify that resources were deployed and payment was proper.  Assignment lists found in the IAPs or other Unified Command documents can confirm this information. [xxviii] Furthermore, Ms. Hellberg pointed out that vendors who supply certain types of equipment and materials, such as Amquip and Aramsco, never produce dailies and, like Home Depot or Lowes, provide receipts only.  *Trial Day 20, October 26, 2010, Hellberg at 39:23-40:6.*[105] Irrespective, neither OPA nor the regulations require signed dailies as a requisite for reimbursement of oil spill cleanup costs and, in any event, McLellan's arguments miss the point.  The purpose of the scheme is not to deny payment when, more likely than not, services were provided as part of a massive effort to stem the impact of the oil spill.  *Trial Day 20, October 26, 2010, Hellberg at 32:15-20;*[106] *90:3-20.*[107]

Mr. McLellan's opinion is undermined by his testimony on behalf of plaintiffs in a prior oil spill case, *Targa Midstream Services v. K-Sea Transportation Partners ("K-Sea"),* who, like Frescati, had hired the O'Brien's Group to manage the spill response for the Responsible Party.  In *K-Sea*, Mr. McLellan testified that insufficient documentation was *not* grounds to deny payment for a job done.

---

[xxviii] As discussed earlier, ICS form 204 listed each contractor who provided personnel and equipment in a cleanup zone on a given day as well as the numbers of individuals and amount of equipment.

33

> [L]et me give you an example.  Contractor, guy comes to me, says, I got this
> invoice.  Where is your back-up?  Don't have any back-up . . . . I know I've got
> certain equipment out there.  I know the job is done.  I'm going to go to my
> client and say his back-up is minimal.  We know he was out there.  We know the
> job was done, so, what do you want to do and I said, you know, I think if we
> know he spent so many days out there and he says he has this equipment, we can
> - - we've got some manifests or we can try to piece together, as best we can, I'm
> going to make a recommendation based on that.  If I don't have everything, I'm
> not going to say, oh, you don't have to pay him because he doesn't have
> everything.

Ex. P-1581 at 99:1-19.  Mr. McLellan new position regarding signed dailies is inconsistent and

should be disregarded.

> ### Category 3:  CITGO's Contention that the NPFC Failed to Follow OPA, the
> Regulations or "Guidance Documents" in Adjudicating Frescati's Claims.

As testified by Ms. Hellberg and Mr. Morrison, the criteria the NPFC relies on to

adjudicate claims are those established in OPA and its implementing regulations.  CITGO,

however, urges that the NPFC adjudications must adhere to a document entitled "Claimant's

Guide" located on the NPFC's website and asserts that the United States should not recover

costs which CITGO deems were paid contrary to this and other guidance documents.[xxix]  *Trial*

*Day 21, Nov. 3, 2010, McLellan at 189:2-191:12.*[108]  Both Ms. Hellberg and Mr. Morrison

explained that the guidance documents on the website were intended to assist a claimant make

a well supported claim.  They are an aid to the adjudication process but are not binding on the

claimants or the NPFC.  *Trial Day 19, October 25, 2010, Morrison at 179:15-180:7;*[109] *Trial*

*Day 20, October 26, 2010, Hellberg at 90:25-91:19,*[110] *94:17-95:3.*[111]  Pointedly, the

introduction to the Claimant's Guide states:

> This guide is intended to help claimants submit a claim against the OSLTF.  **IT
> IS NOT A LEGAL REFERENCE**. . . . Claimants should consult the claims
> regulations in 33 CFR Part 136 to address legal and regulatory issues.  If there is
> a conflict between this guide and OPA or the regulations at 33 CFR Part 136 the

---

[xxix] The NPFC's website includes a guidance document for Responsible Parties and for Oil Spill Response
Organizations.  These as well as the Claimant's Guide are guidance only.

> statute and regulations prevail." [The NPFC ] "created this guide to assist you in determining whether you have damages that may be covered, and if so, how to properly submit a claim.

Ex. D-2136 at p.1 (emphasis in the original).

Thus, only OPA and its regulations establish mandatory adjudication requirements. *Trial Day 20, October 26, 2010, Hellberg at 32:15-20.*[112]  *See e.g.*, *Nereus Shipping v. United States,* 2014 WL 1096131 at *5 (E.D. Pa. March 20, 2014) (regulations state the evidence to support a claim); *Murphy Oil USA v. United States* 2014 WL 794134 at *2 (E.D. La. February 27, 2014) (NPFC has promulgated regulations that prescribe the type of evidence required to make a claim).  Mr. McLellan's reliance on the Claimant's Guide is myopic and exalts form over substance.

## VI.   CITGO CANNOT AVAIL ITSELF OF THE THIRD-PARTY LIMITATION OF LIABILITY PARTIAL DEFENSE

CITGO belatedly argues that it is entitled under OPA to limit its liability as a third-party Responsible Party.  Generally, only a Responsible Party is entitled to limit its liability under OPA.  The only circumstance where OPA allows a third party to limit its liability is when the third party is treated as the Responsible Party under 33 U.S.C. § 2702(d).  And the only time a third party can be treated as the Responsible Party under § 2702(d) is when the statutory Responsible Party can establish that the spill was caused solely by "an act or omission of a third party, *other than . . . a third party whose act or omission occurs in connection with any contractual relationship with the responsible party . . . .*" under the OPA defense at 33 U.S.C. § 2703(a)(3).  That cannot be the case here because CITGO's alleged acts and omissions are in connection with its contractual relationship with Frescati.  Its duties with respect to the approach to its berth are inextricably related to this contractual relationship.  Further, the Third Circuit held that Frescati was a third-party beneficiary to the safe berth warranty and hence in a

35

contractual relationship with CITGO. CITGO, therefore, has no right to an OPA-based limitation on liability.

Moreover, even should CITGO be deemed a responsible party under § 2702(d), its limitation amount would be that of a facility owner/operator ($350,000,000), not the owner of the *ATHOS I*, because the acts or omissions at issue occurred in connection with CITGO's operation of its own Paulsboro facility. Lastly, if CITGO was allowed the limitation, it would not affect CITGO's obligation to indemnify Frescati (and the United States) under the safe berth warranty because OPA specifically preserves such indemnification agreements. As these arguments have been fully briefed in cross motions for partial summary judgment, the United States directs the Court to parties' pleadings at Docs. 741-1,749, 771, 772, and 773.

## VII.   CITGO HAS NO VALID CLAIM FOR RECOUPMENT OR OTHER EQUITABLE DEFENSES AGAINST THE UNITED STATES

The original trial of this matter included a significant amount of evidence as to the role of the federal agencies in regulating the Delaware River and providing information about it to the public. The evidence was offered to address two issues. One was the geographical extent of CITGO's duty to use reasonable care to make its berth, and the approaches to it, safe. CITGO has long pointed to the fact that the approach passed through a federally designated anchorage, with attendant monitoring of the anchorage depth by the Army Corps of Engineers, as evidence that its duty only extended to the waters immediately around its dock.

This argument was rejected by the Third Circuit.   The Court, after examining the government's role, held that the area for which CITGO must exercise care includes "the berths themselves and the approaches to them." *In re Frescati Shipping Co*., 718 F.3d at 207.  While this holding should obviate the need to look at the conduct of federal agencies with regard to the Delaware River, CITGO also maintains that it still possesses certain equitable defenses to

36

the United States' claim based on these same activities.   These defenses include the following

from Defendants' Brief on Legal Issues Relating to Liability Following Remand:

- The doctrine of equitable recoupment bars the United States from recovery.  Doc. 713 at 136.
- "The Government assumed responsibility and control for maintaining the Anchorage." [xxx] *Id.* at 141.
- "Equitable estoppel bars the Government's claims against CARCO for hazards in the Government's anchorage."  *Id*. at 143.
- "The Government would be unjustly enriched by recovery of cleanup expenses caused by a hazard in the Government's anchorage."  *Id*. at 148.
- "The responsibility for a loss equitably falls on the party who was best situated to have avoided the loss."  *Id.* at 154.

It is noteworthy that the only equitable defense CITGO asserted in its answer to the

United States' complaint was "the equitable doctrine of recoupment."  Doc. 11 (08-cv-2928

docket).  It never pled any of the other equitable defenses nor sought leave to amend its

complaint to include those defenses.  At various times, CITGO included its equitable defenses

under the rubric of recoupment and at other times argued them separately.  As the United States

has explained in prior briefing, recoupment is a means to bring separate claims only, not to

raise unpled defenses.  Nevertheless, no matter how framed, at the heart of the various

equitable defenses is CITGO's allegation that the United States is an insurer of the safety of the

Delaware River Navigation Project, including the designated anchorages, and required to keep

them free from obstructions to navigation.  According to CITGO, because the United States has

such an obligation it would be inequitable to allow the United States to recover for any breach

---

[xxx] CITGO asserts in its post-trial briefings and its Issues Brief on Liability, July 15, 2014, that the United States' statutes and regulations, representations to the public, and "the maritime industry's purported reliance on the Government's jurisdiction responsibilities, dominion, control, course of conduct, practices, publications, representations, and assumed responsibilities concerning the status, condition, and safety of navigation" in the Delaware River Navigation Project including the anchorages" makes inequitable a finding of liability by CITGO for damages to the United States.. Docs. 713 at 141-154 and 697 at 10-11.

of the safe berth warranty owed to Frescati.  As will be shown, these defenses are neither

legally valid nor do they reflect an accurate description of the United States' regulatory role.

### A.  CITGO has No Valid Claim for Recoupment

As noted, the only equitable defense actually pleaded was recoupment.  Recoupment

allows a defendant to defensively assert a claim that arises out of the same transaction as the

plaintiff's claim as an offset to the plaintiff's recovery.  *United States v. U.S. Fidelity & Guar.*

*Co.*, 309 U.S. 506 (1940).  *See also Livera v. First Nat'l State Bank*, 879 F.3d 1186, 1195 (3d

Cir. 1989) ("A recoupment claim against the United States government arises out of the same

transaction or occurrence as the main suit. . . ."); *Pension Benefit Guar. Corp. v. White Consol.*

*Indus.*, 72 F. Supp. 2d 547, 550 (W.D. Pa. 1999) ("Recoupment is a common law, equitable

doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of

damages recoverable by a plaintiff.").

Recoupment is equitable in nature and thus allows a defendant to bring claims that

would be barred if they were brought in a separate action.  For example, a defendant may bring

a claim by way of recoupment even if the statute of limitation has expired on that claim.  *See,*

*e.g., Bull v. United States*, 295 U.S. 247, 258-62 (1935).  Similarly, some claims against the

United States that would otherwise be barred by sovereign immunity or administrative

exhaustion requirements can be asserted by way of recoupment even though those claims could

not be asserted affirmatively.  *See, e.g., United States v. Slaey*, Case No. 06-4930, 2008 U.S.

Dist. LEXIS 55699, at *9 (E.D. Pa. July 23, 2008) ("Recoupment claims are equitable in

nature, and to some extent, circumvent Government immunity."); *United States v. Am. Color &*

*Chem. Corp.*, 858 F. Supp. 445, 451 (M.D. Pa. 1994).

38

To recover on a claim of recoupment, a defendant must show that: 1) the *claim* arises from the same transaction or occurrence as the plaintiff's claim; 2) the *claim* seeks relief of the same kind and nature as that sought by the plaintiff; and 3) the *claim* is defensive in nature and does not seek affirmative relief. *Livera*, 879 F.3d at 1195; *Am. Color & Chem. Corp.*, 858 F. Supp. at 451. CITGO has no claim for its own loss here. It nonetheless maintains it can assert recoupment as a defense.[113] Recoupment may certainly be pled as a defense.[xxxi] But this in no way alters the fundamental fact that recoupment is based on a quantifiable claim distinct from a mere contention that less is owed than the plaintiff seeks. *Kamara v. Columbia Home Loans, LLC,* Case No. 08-5998, 2009 U.S. Dist. LEXIS 66003, at *8 (E.D. Pa. July 24, 2009) (stating "recoupment is a defensive claim which can only be asserted in response to an independent action instituted by another party").

Whether CITGO's arguments are based on general maritime law, equitable estoppel, or unjust enrichment, none are quantifiable "claims" that can be raised against the United States to offset the United States' recovery. Rather, they are mere arguments that the United States should not be permitted to recover fully in the first instance. None of the arguments involve setting one monetary claim amount against another, and thus, all the legal theories that CITGO

---

[xxxi] The better practice under the modern Federal Rules of Civil Procedure is to plead recoupment as a Rule 13(a) counterclaim. *See* 3 James Wm. Moore *et al.,* Moore's Federal Practice – Civil § 13.11, at 13-24 (3d ed. 2009); *Ace Hardware Corp. v. Marn, Inc*., Case No. 06-5335, 2008 U.S. Dist. LEXIS 84709, at *30 (N.D. Ill. Sept. 16, 2008) (claim for recoupment is not technically a defense). CITGO argues recoupment need not be predicated on a claim. Yet, the very cases cited by CITGO, such as *Bull v. United States,* involve monetary claims. In *Bull*, a taxpayer argued that it had overpaid its taxes and filed a *claim* for a refund from the Commissioner of Revenue, which was denied. The Court of Claims held for the Commissioner. Subsequently, the United States sued the taxpayer for additional taxes arising from the same transaction as the previous litigation. The taxpayer sought recoupment of the overpayment of taxes which was otherwise barred by the statute of limitations. The Supreme Court held that where the government's new proceeding arose from the same transaction, the statute of limitations could not bar defendant's defensive *monetary claim* for recoupment. *Bull*, 295 U.S. 247, 262 (1935). Likewise, CITGO relies on *United States v. Shaw*, 309 U.S. 495 (1940) and *U.S. Fidelity*, cases which involve specific monetary claims to be set off against a claim otherwise barred. In *Shaw*, the Supreme Court held that an administrator was entitled to assert a cross claim to "set-off" a monetary amount only up to the amount sought by the United States. *Shaw*, 309 U.S. at 502; *U.S. Fidelity*, 309 U.S. at 512 ("Defendant may, without statutory authority, recoup on a *counter claim* an amount equal the principal claim.") (emphasis added).

39

asserts by way of recoupment are merely defenses to liability.   And a claim is required for there to be a recoupment.   *See, e.g., Livera*, 879 F.3d at 1195-96 ("a defendant may assert by way of recoupment *any claim* arising out of the same transaction or occurrence . . . .") (emphasis in original).   As CITGO has no claims, it has no basis for recoupment.   Further, as will be discussed below, apart from recoupment, none of the other unpled equitable defenses have merit.

### B.  Equitable Estoppel

At the outset, "[e]quitable estoppel will not lie against the Government as it lies against private litigants."   *Office of Pers. Management v. Richmond*, 496 U.S. 414, 419 (1990).   The Supreme Court and the Third Circuit have left open the possibility that the government may be estopped in cases of "affirmative misconduct," but have never found such an estoppel.   *Id*. at 421; *Johnson v. Guhl*, 357 F.3d 403, 409-10 (3d Cir. 2004).

To succeed, CITGO must not only show the traditional elements of equitable estoppel—that the government made a misrepresentation upon which it intended for CITGO to rely and upon which CITGO reasonably relied to its detriment—but also that the government engaged in affirmative misconduct.   *Johnson*, 357 F.3d at 409-10; *United States v. Boccanfuso*, 882 F.2d 666, 670 (2d Cir. 1989); *Deltona Corp. v. Alexander*, 682 F.2d 888, 891-92 (11th Cir. 1982).

No evidence was presented at trial that the United States represented to the public or to CITGO that anchorages within the Delaware River Navigation Project are free of debris or even that they are maintained to the depth authorized by Congress.   At no time did the federal agencies represent to the public that they undertook regular surveys to search for obstructions to navigation.   (*See* Section VII).

Absent a misrepresentation, there can be no equitable estoppel.  Nor is there credible evidence that anyone at CITGO actually relied on a misrepresentation.  To the contrary, there was ample evidence of the government's extensive efforts to keep the maritime community informed of its actual, more limited activities.[114]  There was also testimony of CITGO's own port captain, William Rankine, that neither he, nor anyone else at CITGO, made any effort to determine the government's role with respect to searching for obstructions to navigation.  *Trial Day 30, Nov. 22, 2010 Rankine at 9:2-6*,[115] *9:21-24*,[116] *88:1-14*.[117]

Further, CITGO has not introduced evidence of affirmative misconduct by the government's representations of the scope of its activities in the Delaware River.  CITGO argues that it need not show "affirmative misconduct" where the government acts in a proprietary, rather than a sovereign, capacity.  Some courts, but not the Third Circuit, have made such a distinction.  *See, e.g.*, *Portmann v. United States,* 674 F.2d 1155, 1167 (7th Cir. 1982).  This Court need not decide whether to join the courts that recognize such a distinction, because it is not raised by this case.  CITGO's attempt to estop the government is based on alleged misrepresentation about the scope of the government's activities in creating and maintaining federal projects in the waterways of the United States.  Such projects are manifestly an exercise of the United States' sovereign powers, not a proprietary undertaking.

### C.  Unjust Enrichment

The remedy for a claim of unjust enrichment is restitution.  Comments to the Restatement of Restitution and Unjust Enrichment explain that "[l]iability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant."  Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a. (2011).  CITGO argues that the United States would be unjustly enriched if it were allowed to recover oil spill cleanup costs it reimbursed

Frescati out of the Fund.  CITGO reasons that because it paid to the Fund $103,000,000 over

the years in taxes on oil, the United States' recovery of the *Athos I* cleanup costs constitutes

unjust enrichment.  But there can be no unjust enrichment where the United States is carrying

out its congressionally authorized mandate to recover money on behalf of the Fund.

Congress provided income for the Fund in several ways.  One way is through a portion

of the per-barrel tax on oil.  26 U.S.C. § 9509(b)(1).  Another way is through the amount

recovered by the Fund pursuant to 33 U.S.C. § 2715 which authorizes the United States to

pursue removal costs as subrogee of a claimant to the Fund.  *See* 26 U.S.C. § 9509(b)(3).  Here,

CITGO has been previously taxed based upon its *business activity*. The United States now

seeks to recover, as a statutory subrogee, for CITGO's role in causing the ATHOS spill.  Both

are explicitly authorized by Congress.  CITGO has no claim for restitution based on theories of

unjust enrichment or otherwise.   Under CITGO's theory, any oil company that paid the tax on

barrels of oil it produced would be immunized from suits by the United States arising out of

pollution incidents.  This is obviously not the law.

### D.  CITGO's Assertion that the United States was in a Better Position to Prevent the ATHOS Oil Spill is Incorrect and Irrelevant

It seems obvious that a facility owner is in the best position to be aware of hazards to

navigation within the approach to its berth.  After all, it is the facility owner that invites deep

draft oil tankers to its berth and has the ability to limit their size, draft, and times of approach.

CITGO'S port captain, William Rankine was aware that debris was likely present in the

Mantua Creek Anchorage, and that ships lose anchors in anchorages.  *Rankine Dep. Oct. 16,*

*2007, at 248:23-249:12;*[118] *Trial Day 6. Sept. 29, 2010, Capone at 135:12-136:1.*[119]

**E.  United States Statutory Right to Subrogation May Not be Preempted by Equitable Theories**

CITGO's assertion that it can challenge the United States' statutory right to subrogation based on some equitable grounds misconstrues the nature of statutory subrogation which, conferred by the legislature, displaces equitable subrogation principles.[120] OPA states:

> Any person, *including the Fund*, who pays compensation pursuant to this act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law.

33 U.S.C. § 2715(a).

OPA provides no exception to the Fund's right to subrogation, and CITGO's reliance on OPA's savings provision to preempt the government's right to subrogation is in error.  The savings provision states that "[e]xcept as otherwise provided in this Act, this Act does not affect - (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction . . . ."  33 U.S.C. § 2751(e).  The key here is the clause "except as otherwise provided in the Act."  OPA has "otherwise provided" for subrogation.

Courts have readily understood the "except as otherwise provided in the Act" clause preempts[121] certain traditional maritime rights and defenses.  Where, for example, petitioners sought to use the savings clause to limit the government's OPA and Clean Water Act claims to the value of their vessel under the Limitation of Liability Act of 1851, 46 U.S.C. §§ 181 *et seq.*, courts have held that the savings clause may not be used to limit rights established by OPA or the Clean Water Act.  *In re Oswego Barge Corp.*, 664 F.2d 327, 340 (2d Cir. 1981) ("notwithstanding" clause means that remedies established by the Clean Water Act are not to be modified by preexisting law).  *Accord*, *In re Hokkaido Fisheries Co.*, 506 F. Supp. 631, 634

43

(D. Alaska 1981).   Put squarely, there can be no equitable defense to congressionally mandated subrogation.

### VIII.   THE UNITED STATES HAS NO GENERAL OBLIGATION TO GUARANTEE SAFETY OF VESSELS IN THE NAVIGATION PROJECT

#### A.  No General Obligation to Guarantee Safety of Vessels that Traverse Designated Anchorages

Not only are the various equitable defenses raised by CITGO legally untenable, they rely on facts which are simply incorrect, or for which there is no evidence.   A federal anchorage ground is in no sense federal property.   Rather, anchorages are areas designated to assist navigation.[xxxii]   See 25 Op. Att'y Gen. 37, 38 (1903) ("Anchorage and anchorage grounds are matters relating to the movement of vessels [and] navigation.").   The United States designates anchorage grounds because although it is not "lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft," 33 U.S.C. § 409, a ship may nonetheless need to anchor if bad weather, congestion in the shipping lanes, or some other difficulty prevents her from proceeding safely with her voyage.   *See e.g., The Southern Cross*, 93 F.2d 297, 299 (2d Cir. 1937) (in dense fog, "good navigation required [the vessel] to anchor, but not in the channel, for she could have proceeded to an anchorage ground but a few hundred yards away").

In anchorage grounds, anchored vessels, contrary to the usual navigational rules, have priority over other shipping.   *See generally*, *The Isaac T Mann*, 63 F. Supp. 339, 341 (S.D.N.Y. 1945) ("Anchorage grounds many not be used with the same freedom as unrestricted waters, and vessels should not embarrass a vessel properly using the grounds for purposes of navigation in connection with anchoring.").   Thus, in determining negligence when vessels collide, a relevant consideration may be whether one vessel was anchored inside or outside an

---

[xxxii] The river bed is owned by the adjacent state, here New Jersey.

anchorage ground.  See, *e.g., United States v. St. Louis & Mississippi Valley Transp. Co.*, 184

U.S. 247, 255 (1902) ("There was also culpable negligence in anchoring in an unusual and

improper position."); *The Aller*, 73 F. 875, 877 (2d Cir. 1896) ("A vessel which undertakes to

navigate over anchorage ground takes the risk of determining whether other vessels which she

finds there are navigating or at anchor (*Steamship Co. v. Calderwood*, 19 How. 241); and, when

such other vessels are in no fault, she alone is responsible for the results of her mistakes in that

particular.").  Simply by designating federal anchorage grounds, therefore, the United States

does *not* guarantee the safety of vessels that might anchor in them, let alone the safety of

vessels, like the *Athos I*, which had to cross through the anchorage to arrive at CITGO's

terminal, without ever anchoring within it.

### B. The United States Has No Statutory or Regulatory Duty to Search for Hidden Underwater Obstructions

None of the maritime agencies - the Army Corps of Engineers ("Corps"), the National

Oceanic and Atmospheric Administration ("NOAA"), or the Coast Guard - have a statutory or

regulatory duty to search for hidden underwater obstructions in the Delaware River.  As

recognized by the Third Circuit, "No Government entity, however is responsible for

preemptively searching all federal waters for obstructions . . . ."  *In re Frescati,* 718 F.3d at

184.  Further, the "primary responsibility for removal of wrecks or other obstructions lies with

the owner, lessee, or operator …."  33 C.F.R. § 145.10(b).  *See also* 33 U.S.C. § 409 ("it shall

be the duty of the owner, lessee, or operator of [a] sunken craft to commence the immediate

removal of the same.").  While the Corps has authority to remove *known* obstructions, such as

sunken vessels, no law or regulation requires the Corps to search for or remove a wreck or

obstruction it knows nothing about.  33 U.S.C. §§ 414 and 415; 33 C.F.R. §§ 245.10(c), 245.15,

245.25(b) and 245.50(a); *In re Frescati*., 718 F.3d at 194;  *See also, Wyandotte Transportation*

*v. United States,* 389 U.S. 191, 207 (1967) (noting that these sections "are intended to protect the United States against liability for removing a sunken vessel *if it chooses* to do so.") (emphasis added); *Tew v. United States*, 86 F.3d 1003, 1006 (10th Cir. 1996)*; Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 461 (5th Cir. 1984), *cert. denied*, 469 U.S. 832 (1984) (statute authorizes the U.S. to either mark or remove sunken vessels when owner fails to do so but it imposes no mandatory duty). Likewise, no statute or regulation requires either the Coast Guard or NOAA to search for unknown objects in the river.

Indeed, CITGO's own expert, John Barnes, formerly a Branch Chief in the Corps' Engineering and Construction Division, Vicksburg, Tennessee who testified at trial by videotaped deposition, explained that neither the Army Corps, NOAA, or the Coast Guard have a mission to routinely search for obstructions to navigation. With respect to the Corps, "…we don't routinely just go looking for [obstructions]. None of our districts do. It's too expensive. We wait until we have a report that there is one, whether it be a report from us, the public, or whoever." Further, "[n]one of the agencies routinely look for hazards to navigation in the federally-regulated waters because it would be senseless to scour the river bed in an area as vast as the Delaware River Project."[122] *Barnes Dep. Aug. 12, 2009, at 25:8-15*,[123] *26:4-17*,[124] *63:8-21*;[125] *Trial Day 10, Oct. 6, 2010, DePasquale at 98:12-14*.[126]

Though there is no mandate to preemptively search for obstructions, the Corps does initiate a series of response actions once it is notified of a suspected obstruction. Mr. DePasquale, Chief of Operations for the Corps' Philadelphia District, testified that when the public or a government agency notifies the Corps of a suspected obstruction, the Corps mobilizes its survey crews and attempts to locate the obstruction using multi-beam or side-scan sonar.[127] If it finds an object, the Corps determines, in conjunction with the Coast Guard,

whether the obstruction is a hazard to navigation using several factors.  These include but are not limited to: (1) whether the object is within the boundaries of the Delaware River Navigation Project; (2) whether the object is projecting above the authorized depth;[128] (3) the location of that object; and, (4) the frequency of use of the area where the object was found.  If the agencies conclude that the obstruction poses a hazard, either the Coast Guard marks it with an aid to navigation[129] and issues a Notice to Mariners,[130] or the Corps will remove the obstruction if the obstruction's owner cannot be found or cannot remove it.  *Trial Day 10, Oct. 6, 2010, DePasquale at 90:17-24*,[131] *98:15-100:5*,[132] *130:21-131:3*;[133] 33 C.F.R. § 245.25(b).

Thus, although the Corps and the Coast Guard have an obligation to act, as resources allow, once they learn of a potentially hazardous obstruction, they have no freestanding duty to undertake precautionary searches of any of the sixteen anchorages and the shipping channel in the Delaware River.  See e.g. 33 C.F.R. § 245.20(a), 33 C.F.R. § 64.01.  The uncontested evidence from trial shows that prior to the *Athos I* incident, the government had no notice of the anchor in the Mantua Creek Anchorage.[134]  *Trial Day 29, Nov. 18, 2010, Denmark at 49:25-50:4*;[135] *Trial Day 24, Nov. 9, 2010, Barnum at 10:17-21*;[136] *Danley Dep. Aug. 4, 2009, at 94:19-24*,[137] Ex. D 1354 (nautical chart 12313 July 1 2004).

## IX.   THE UNITED STATES' COURSE OF CONDUCT, PUBLICATIONS, SURVEYS AND DREDGING PRACTICES DO NOT CREATE INCHOATE DUTIES FROM WHICH CITGO CAN ASSERT EQUITABLE DEFENSES

CITGO would have the Court believe that the United States "exercises exclusive dominion" over the Delaware River Project and *ergo* the United States is somehow responsible for the *Athos I* incident.  As discussed in the previous section, however, no statute or regulation requires the federal agencies to guarantee safe navigation or preemptively search for objects in the Delaware River Navigation Project.  As will now be discussed, no statute or regulation

requires these agencies to dredge continuously to maintain the entire Project at its authorized depth, much less to mark and chart obstructions to navigation for which it has no knowledge. Hence, "federal legislation in the field of navigation is far from extensive."[138] *Barber v. Hawai'i*, 42 F.3d 1185, 1193 (9th Cir. 1994). Further, the government's course of conduct, whether through its dredging practices, its navigation related publications, or hydrographic surveys, creates no mandatory duties that shift the liability for the *Athos I* incident to the United States.

**A. The Role of the Army Corps of Engineers with Respect to the Delaware River Navigation Project**

The Corps may undertake improvements to navigation as specifically authorized by Congress. Congress authorized improvements to the Delaware River, referred to as the "Delaware River Navigation Project,"[139] of which the Mantua Creek Anchorage (also known as Federal Anchorage No. 9) is a part and, in 1958, authorized the Project depth to 40 feet. The Corps' responsibilities for the Delaware River Navigation Project principally relate to determining channel depth conditions and periodic dredging to maintain the Delaware River Navigation Project depth.

No statute or regulation requires the Corps to continuously maintain all parts of the Delaware River Navigation Project to the authorized depth. How the Corps determines whether to dredge a given stretch of river requires balancing specific considerations including shoaling[140] patterns, complaints from users, amount and type of vessel traffic, and, above all, available appropriations. Without Congressional appropriations, the Corps cannot dredge to the authorized depth. As explained by Mr. DePasquale, "once [a project is] authorized, we can't begin dredging until we are appropriated the funds to do the dredging. So, we can't begin any kind of dredging until we have funds in hand, to be able to advertise the contract." Mr.

DePasquale further amplified, "we never get enough to dredge the whole River and keep it at 40 feet at all times."  Appropriately, the Corps targets its limited dredging resources towards problem areas in channel and anchorages.  *Trial Day 10, Oct. 6, 2010, DePasquale at 101:11-102:3.*[141]

The Corps undertakes hydrographic surveys to determine the depth of the Delaware River Navigation Project including its anchorages in order to (1) assess future dredging needs and (2) to inform the maritime community regarding changes in depth conditions.  The Corps regularly provides the depth survey results in the form of channel statements[142] and survey charts to the Coast Guard, NOAA, the pilots, terminals, tug companies, and any other maritime users.  *Trial Day 10, Oct. 6, 2010, DePasquale 91:12-92:14;*[143] *Barnes Dep. Aug. 12, 2009, at 65:2-18.*[144]

The Corps aims to survey the navigation channel and anchorages in the Delaware River annually.  "But depending on funding, resources, conditions, shoaling patterns in the river and usage of that particular part of the channel, some areas get surveyed two, three, four times a year and other areas, because of the nature and location, might not get surveyed at all."  *Trial Day 10, Oct. 6, 2010, DePasquale at 96:15-25.*[145]

Through approximately 2006, the standard tool used by the Corps to determine depth in the Delaware Navigation Project was single beam sonar.  Single beam sonar obtains depth readings at discrete points along parallel survey lines and uses a grid of point measurements to produce a chart.[146]  In an effort to evaluate dredging needs in as many stretches of the river as possible, survey lines are widely spaced, at 400 feet apart with depth measurements every ten to fifteen feet along the survey lines.  Not surprisingly, depth surveys with single beam sonar do not provide comprehensive coverage of the river bottom nor are they intended to or capable

of locating submerged objects.  Barnes Rep. at 4;[147] *Barnes Dep. Aug. 12, 2009, at 68:18-69:15*;[148] *Trial Day 10, Oct. 6, 2010, DePasquale at 93:2-94:4*,[149] *96:11-14*.[150]

Mr. Barnes reviewed the Mantua Creek surveys conducted prior to the 2004 accident by the Philadelphia District of the Corps and found "they were performed …exactly the same way we performed ours in the Vicksburg District and - - in accordance with the regulations" and the Corps' Engineering Manual.  Survey results from 1995 to 2004, show that the Mantua Creek Anchorage shoaling[151] is minimal through time.  The Corps' most recent survey preceding the *Athos I* incident, conducted in June 2004, demonstrated that the Anchorage was mostly at its project depth of 40 feet, with some minor shoaling to the north, at the end of the Anchorage furthest from the CITGO refinery.  The Corps received no complaints from other users of the Anchorage regarding depths either before or after the June 2004 survey.  Accordingly, the Corps saw no need to dredge the shallow area of the Mantua Creek Anchorage identified in the survey.  As explained by Mr. DePasquale, "because of the limited use of the anchorage" and the lack of any complaints or other evidence that "this was causing anybody any problems," the Corps determined that "it wasn't really effective or efficient for us to come up to this particular section of the river and dredge…1,000 foot of material."  The last time either the Corps, or contractors working on behalf of the Corps, dredged the Anchorage was in 1984.  *Barnes Dep. Aug. 12, 2009, at 68:18-69:15*;[152] *Trial Day 10, Oct. 6, 2010, DePasquale at 102:9-104:11*,[153] *111:25-112:2*,[154] *117:23-118:4*;[155] Exs. D-1733-1738, D-1740, D-1174-1178.

### B.  NOAA's Role with Respect to the Delaware River

NOAA is charged with providing nautical charts and related navigational publications.  Charts include, among other things, depths, locations of aids to navigation, and locations of navigational obstructions, for which NOAA has notice.  NOAA also publishes the United

States' Coast Pilot, a regional supplement to the nautical charts, which provides information not easily displayed on charts such as regulations and navigational services including pilotage, towing, and vessel traffic separation schemes.  33 U.S.C. §§ 883(a) and (b) and 892(a); *Trial Day 24, Nov. 9, 2010 Barnum at 34:22-35:3*.[156]  *See generally* Ex. D-1108 at CARPROD 23032-23039.

NOAA is authorized to undertake hydrographic surveys in support of its charting mission.  As explained by Captain Steven Barnum, former Director of NOAA's Office of Coast Survey, NOAA's charting mission encompasses 3.4 million square nautical miles.  However, Congressional appropriations limit NOAA's hydrographic surveys to approximately 3,000 square nautical miles per year.[157]  33 U.S.C. §§ 883(a) and (b) and 892(a); *Trial Day 24, Nov. 9, 2010 Barnum at 42:1-13*,[158] *47:10-16*.[159]

Due to budget constraints, NOAA does not typically survey the federally designated navigation channels or anchorages.[160]  Instead, NOAA uses annual depth data collected by the Corps in federal navigation projects including the Delaware River to support its charting mission.  NOAA's nautical charts also include data from other available sources such as port authorities and terminal managers.  *Trial Day 24, Nov. 9, 2010 Barnum at 42:19-43:5*,[161] *44:3-8*.[162]

Far from claiming its charts contain up-to-date depth data or identify all obstructions to navigation, NOAA provides the public warning:

> "The chart reflects general conditions at the time of the surveys or reports and does not necessarily portray present conditions.  Significant changes may have taken place since the last survey or report . . . Depth information on nautical charts is based on soundings from the latest available hydrographic surveys, which in many cases may be quite old.  The age of the hydrographic surveys supporting nautical charts varies.  *Approximately 60 percent of inshore hydrography was acquired by lead-line (pre-1940) sounding technology.*"

Ex. D-1108 at CARPROD 23034 (emphasis added); *Trial Day 24, Nov. 9, 2010 Barnum at 43:10-17*.[163]

NOAA conducted its last hydrographic survey of the Mantua Creek Anchorage in 1981 using single beam sonar.  In 2002, NOAA was directed by the Navy to conduct a sidescan survey of the Delaware River Navigation Project but specifically *excluding* all Delaware River Anchorages including the Mantua Creek Anchorage.  As explained by Captain Barnum, the impetus for the survey was the terrorist attacks of 9/11.  The survey was intended to provide a baseline of the river bottom from which the Navy could use in the future to determine whether any mines might be deployed by terrorists.  *Trial Day 24, Nov. 9, 2010 Barnum at 15:10-17*,[164] *24:13-25:14*;[165] Ex. D-1520.

### C.  The Coast Guard's Role with Respect to the Delaware River

The Coast Guard has authority to establish aids to navigation, such as buoys and lights, pursuant to 14 U.S.C. § 81 which states:

> In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard *may* establish, maintain, and operate:
>
> (1) aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States;

(emphasis added).  This system is not expected to be all encompassing or infallible.  As the regulations warn: "[t]he aids to navigation system *is not intended to identify every shoal or obstruction to navigation* which exists in navigable waters of the United States, but rather provides for reasonable marking of marine features as resources permit."  33 C.F.R. § 62.1(c) (emphasis added).  As with the Coast Guard's authority to establish aids to navigation, its authority to mark obstructions does not create an obligation:

> The Secretary *may* mark for the protection of navigation any sunken vessel or other obstruction existing on the navigable waters of the United States in such

manner and for so long as, in his *judgment*, the needs of maritime navigation require.

14 U.S.C. § 86 (emphasis added).  *See generally Tew v. United States*, 86 F.3d 1003, 1005 and 1006 (10th Cir. 1996).

The Coast Guard regulations further provide that the owner of an obstruction or hazard to navigation is responsible for marking its location.  33 C.F.R. § 64.11.  If, however, the owner fails to properly mark the hazard, the Coast Guard may mark it after taking into account a variety of regulatory factors including, but not limited to, navigational traffic patterns, navigational difficulty in the vicinity of the obstruction, depth of water over the obstruction, physical characteristics of the obstruction, and the draft, type, and density of vessel traffic in the vicinity of the obstruction.  33 C.F.R. §§ 64.3, 64.33.  The Coast Guard publishes Local Notices to Mariners and Broadcast Notices to Mariners to inform the public of changes to aids to navigation, report dangers to navigation, of which it is aware, as well as to correct nautical charts.  33 U.S.C. § 62.21(c)(3) and (5).  As the Coast Guard has no hydrographic survey mission, it depends on the public, the Corps, and NOAA for information related to possible underwater obstructions to navigation to include in the Notices to Mariners.

The Coast Guard has authority to inspect various types of vessels and regulate certain activities.  *See, e*.g. 46 U.S.C. §§ 3301 and 3302.  However, this power, singularly or in concert with its other statutory authorities which include for example, marking channels with aids to navigation, hardly constitutes complete control over the safety of vessels navigating in the Delaware River Navigation Project.  Where, for example, the Coast Guard was sued for failing to adopt steps to protect the public from vessels whose certifications were revoked by the Coast Guard, the First Circuit refused to impose liability.  *Gercey v. United States*, 540 F. 2d 536, 538-539 (1st Cir. 1976), *cert denied*, 430 U.S. 954 (1977).

> "Congress has mandated only that the Coast Guard periodically conduct certain types of inspections of passenger carrying vessels . . . [and] revoke the certificates of vessels which fail to meet federal requirements. . . . [I]t neither expressly nor by necessary implication imposed a duty upon the Coast Guard to devise, fund, staff and implement the kind of follow-up system which plaintiffs believe is required by ordinary prudence."

*Id.* at 538.

### D.  Japan Lines is Irrelevant

CITGO cites *Japan Line Ltd v. United States*, as its only authority for the proposition that the United States is responsible for ensuring the navigability of the Delaware River.  *Japan Line, Ltd. v. United States,* 1976 A.M.C. 355, 364 (E.D. Pa. 1975), *aff'd*, 1977 A.M.C. (3d Cir. 1976).  *See e.g.*, Doc. 749-1 at 16-17.  In *Japan Line,* the Court found the Corps negligent for failing to publicly report a shoal *after discovering* its presence.

> The United States has established a comprehensive system providing for the *distribution of channel information* by its agencies, *i.e.*, the Corps of Engineers, the Coast Guard, and the Hydrographic Office at Washington. This elaborate plan for the *distribution* of this vital information establishes conclusively the importance which the United States attaches to the channel depth data obtained by the Corps of Engineers.  The United States has assumed the duties of surveying the navigable channels of the Delaware River and advising mariners *promptly* of its findings.

*Japan Line*, 1976 A.M.C. at 366 (emphasis in the original for the word "promptly," emphasis added for other terms).  See e.g. Docs 749-1 at 16 and 599 at 11.  It is undisputed that the United States operates just such a comprehensive system to *distribute known channel information* and advise mariners promptly of shoaling *when discovered*.  Testimony from Messrs. DePasquale, and Denmark of the Corps, and Captain Barnum, on behalf of NOAA, explained this distribution and notification system.  However, the facts in *Japan Line* materially differ from those in the case before this Court.  It is undisputed that no government agency had notice of the abandoned anchor found in the approach to berth at CITGO's Paulsboro facility, and thus obviously no duty to notify.  *Japan Line* is simply inapposite.

X.   **CITGO DID NOT – AND HAD NO BASIS - TO RELY ON GOVERNMENT TO GUARANTEE THE SAFETY OF VESSELS IN THE DELAWARE RIVER NAVIGATION PROJECT[166]**

As discussed in previous sections, there is no justification for either the maritime industry or CITGO to rely on the United States to keep the Delaware River Navigation Project free from hazards to navigation.  Furthermore, interactions between the federal agencies and the local Marine Advisory Committee ("MAC"), made up of waterway users including CITGO, make clear that neither the agencies nor the members of the MAC rely on agencies to ensure that the Delaware River Navigation Project is free from hazards to navigation.

As explained by Mr. DePasquale, "…personnel from the pilots, the tug companies, ship owners, ship agents, facilities, different fuel terminals and refineries ….[T]he whole maritime industry shows up…" at the MAC's quarterly meetings.  The Corps, Coast Guard, and NOAA attend these meetings, and the Corps makes a presentation at each regarding the status of dredging and results of their hydrographic surveys with time for questions and answers. Captain Gregory Adams, former Coast Guard Captain of the Port, Philadelphia (1998 – 2002), was a member of the MAC from 1998 through the time of trial and testified that the MAC, among other things, makes recommendations to the (1) Corps regarding the extent and frequency of hydrographic surveys in the navigable channels, and (2) Coast Guard regarding the number, location, and type of navigational aids.  At each meeting, the Corps and NOAA brief the MAC on the status of depth surveys and dredging activities.  At no time have these agencies represented to the MAC or the general public that they routinely survey for obstructions without report of a hazard.  Captain Adams explained that the MAC never relied on the Corps to conduct continuous hydrographic surveys to search for objects.[167]  *Trial Day 10, Oct. 6, 2010, DePasquale 98:12-14;*[168] *106:24-107:25,*[169] *108:14-23;*[170] *Trial Day 3, Sept.*

*23, 2010, Adams at 64:4-20,*[171] *65:1-8;*[172] *67:16-68:14,*[173] *69:10-70:8,*[174] *101:21-102:7,*[175]*102:19-103:3;*[176]  Ex. D-1271 at p.1.

## XI.   THERE IS NO EVIDENCE THAT THE ANCHOR WAS LEFT BY A GOVERNMENT CONTRACTOR[177]

CITGO claims that the anchor was abandoned by a government dredging contractor and this alone makes the United States responsible for the oil cleanup costs under one of its equitable defenses.[178]  CITGO further argues that the United States failed to search for the anchor's owner.  This, too, is not only irrelevant but also incorrect.  The Coast Guard contacted an anchor manufacturer for assistance in identifying the anchor's owner.[179]  It also issued subpoenas to Norfolk Dredging and Weeks Marine, the only two dredging companies who dredge in the Delaware River.  These dredging companies contract with both the Corps and private facilities.  In response to the subpoenas, both companies averred no knowledge of a lost anchor fitting the description of the one that brought the ATHOS to grief.  *Trial Day 29, Nov. 18, 2010, Denmark at 44:15-45:19;*[180] *Trial Day 10, Oct., 6 2010, DePasquale at 108:2-10,*[181] *115:9-22.*[182]  Prior to the incident, the last dredging in the vicinity of the Mantua Creek Anchorage near CITGO's Paulsboro Marine Terminal was undertaken in 1991 by CITGO's predecessor.  Given that the Corps last dredged Mantua Creek Anchorage in 1984, it is more probable that the anchor was abandoned or lost by CITGO's contractor.  All this, including whether the anchor was even dropped by a dredger, is conjecture.  Assuming CITGO's bald assertion even met the basic requirements of an affirmative defense, there is simply no evidence to support it.  Doc. 594 at 44-50.[183]  *Trial Day 10, Oct. 6, 2010, DePasquale 111:25-112:2;*[184] Ex. D-757 at CARPROD 048865-04873.

XII.   **NOTHING PREVENTS A PRIVATE PARTY FROM SURVEYING, REMOVING OBSTRUCTIONS, OR DREDGING WITHIN THE DELAWARE RIVER NAVIGATION PROJECT**[185]

Private citizens are free to take actions within federal projects to enhance navigational safety.  A facility owner, such as CITGO, concerned about safe access to its berth, may conduct hydrographic surveys of any conceivable nature in the Delaware River Navigation Project, including anchorages, *without* a permit (or permission) from the United States.  Mr. DePasquale noted that Conoco Phillips annually surveys the depths of its berthing area, including portions of the federal channel adjacent to its berth, and provides results to the Corps. A facility owner may also remove an obstruction from the Delaware River Navigation Project, including designated anchorages, or ask the Corps to do it.  While a facility owner needs a permit to remove an obstruction, Mr. DePasquale explained that removal actions are covered by a "blanket permit" and are typically approved within a couple of days.  Similarly, if a facility owner wishes to dredge within the Delaware River Navigation Project, it may do so as well upon application and receipt of a permit from the Corps.[186]  *Trial Day 10, Oct. 6, 2010, DePasquale at 104:20-106:23;*[187] *Trial Day 10, Oct. 6, 2010, Olson at 148:5-14;*[188]

CITGO seeks refuge in an unsubstantiated assertion that its ability to dredge is limited to the area designated on a Corps' issued permit for its wharf.[189]  This is misleading.  As explained by David Olson, Deputy Chief of Operations of the Corps' Philadelphia District from 1991 through 2008, it is the facility owner, not the Corps, which identifies on its permit application the area it seeks to dredge.

In 1991, Seaview Petroleum, the predecessor owner of CITGO's Paulsboro facility, requested a permit from the Corps to dredge a specific area depicted in a drawing submitted with its permit application.  CITGO's predecessor could have included, but chose not to, the area of the river bottom extending from its wharf into the approach to the facility's berth that

lay within the boundary of the Mantua Creek Anchorage.  The Corps granted the permit to

dredge the area, which CITGO now refers to as its sole "area of responsibility."[190]  Nothing

prevented Seaview or CITGO from requesting a permit to dredge the approach to its berth in

addition to the more limited area next to its wharf.  Seaview or CITGO needed only to submit

the drawings and a plan showing actual depths and a template describing the proposed dredging

area.  *Trial Day 10, Oct. 6, 2010, Olson at 143:19-144:12;*[191] *Trial Day 10, Oct. 6, 2010,*

*DePasquale at 106:10-19;*[192] *139:3-25.*[193]  CITGO's Port Captain for the Paulsboro facility and

CITGO's representative to the MAC in 2004, William Rankine, was responsible for providing

guidance to the terminal on marine safety at the berth.  Mr. Rankine claimed*:* (1) his duties did

not extend to anything outside of Seaview's more narrowly crafted "area of responsibility;" (2)

that he was not allowed to survey or dredge within the federal anchorage; and, (3) that the

United States "guarantees safe access through federal waters" to CITGO's berth.  Mr. Rankine

is incorrect and, frankly incredible.  In any event, his mistaken beliefs are irrelevant and

contradicted by all other evidence on these issues.  *Trial Day 10, Oct. 6, 2010, DePasquale at*

*104:16-105:13;*[194] *Trial Day 24, Nov. 9, 2010 Barnum at 51:9-15.*[195] *Trial Day 30, Nov. 22,*

*2010, Rankin at 9:21-24;*[196] *10:17-23,*[197] *52:20-53:4,*[198] *96:18-20;*[199] *Rankine Dep. Oct. 16*

*2007, at 172:12-177:8.*[200]

### XIII.   CONCLUSION

The United States reimbursed the Responsible Parties $87,789,147.31 for actions they

took to minimize or mitigate the impact of the oil.  These actions were done at the direction of

the FOSC, or consistent with the National Contingency Plan, and were reasonable in light of

the unique circumstances associated with the spill and in the context of the OPA statutory

scheme.  Should this Court find that CITGO breached its safe berth warranty, the United States,

as the statutory subrogee to Frescati's contract cause of action, is entitled to reimbursement of $87,789,147.31 plus interest.

CITGO's equitable defenses are pure distraction from the issues before this Court. The Third Circuit properly recognized that the United States has no general obligation to keep federally-regulated waters free of hazards to navigation, and CITGO does not dispute that the U.S. had no knowledge of the anchor. No matter how CITGO constructs its innumerable arguments, all are predicated on the mistaken allegation of an affirmative duty by the United States to maintain the Delaware River Navigation Project, including designated anchorages, free from obstructions to navigation. Further, as CITGO has no quantifiable claim to recoup, it has no valid recoupment defense or any of the other equitable defenses it asserts under the umbrella of recoupment.

Dated:  February 13, 2015

<div style="margin-left:40%">

Respectfully submitted,
JOYCE BRANDA
Acting Assistant Attorney General

ZANE DAVID MEMGER
United States Attorney
MARGARET L. HUTCHENSON
Chief, Civil Division

 /s/ Sharon K. Shutler
SHARON K. SHUTLER
Trial Attorney
STEPHEN G. FLYNN
Assistant Director Admiralty
SARAH S. KEAST
Trial Attorney
Torts Branch, Civil Division
Department of Justice
Post Office Box 14271
Washington, D.C.  20044-4271
Telephone:  (202) 616-4070
Facsimile:  (202) 616-4002

</div>

Stephen.Flynn@usdoj.gov
Sharon.Shutler@usdoj.gov
Sarah.Keast@usdoj.gov
Attorneys for Plaintiff United States

## ENDNOTES

---

[1] **Hall – Direct 193:6-21 (Trial Day 10, October 6, 2010)**
Hall – Direct 193
6 Q And is this a letter that you wrote to the captain of the
7 port in Philadelphia?
8 A Yes.
9 Q And this letter was directed to the captain at his
10 request?
11 A Yes.
12 Q And does this letter reflect the penultimate number that
13 you determined was the loss cargo to the river?
14 A Yes, it was the best estimate that I could make.
15 MR. BERGERE: Could we bring up the final sentence
16 of the second paragraph, the final two sentences there?
17 (Pause.)
18 BY MR. BERGERE:
19 Q And can you point out for the Court what the final tally
20 was, the total estimate of the amount of oil was?
21 A The best estimate that I could make was 264,335 gallons.

[2] OPA adopted the Federal Water Pollution Control Act's standard of liability, which has been "determined
repeatedly to be strict, joint, and several liability." S. Rep. No. 101-94, at 11 (1991) as reprinted in 1990
U.S.C.C.A.N. 772, 732-33; see also H.R. Rep. No. 101-653, at 102 (1990) as reprinted in 1990 U.S.C.C.A.N. 779,
779-80.

[3] **Morrison – Direct 170:17-22 (Trial Day 19, Oct. 25, 2010)**
Morrison-Direct 170
17 Q Did the National Pollution Funds Center adjudicate
18 whether the responsible parties for the ATHOS I incident were
19 entitled to limit their liability?
20 A Yes, we did adjudicate that and made a decision.
21 Q And what was that decision?
22 A We upheld their limit.

[4] **Morrison – Direct 175:5-7 (Trial Day 19, Oct. 25, 2010)**
Morrison – Direct 175
5 Q Okay. And what was your determination, was the claimant
6 entitled to limit its liability?
7 A The claimant was entitled to limit their liability, yes.

[5] **Hellberg – Direct 41:15-42:6 (Trial Day 20, Oct. 26, 2010)**
Hellberg – Direct 41
15 Q And how much did the ATHOS responsible parties initially
16 seek the NPFC to adjudicate?
17 A They initially requested approximately 124 million in
18 their initial submission.
19 Q And did this amount change?
20 A Yes, ma'am, it did.
21 Q And how did that change?
22 A It changed because throughout my adjudication, as I moved
23 through my adjudication, I had continuing communications with

24 the responsible party and that final requested amount did
25 change and it did go up.
Hellberg – Direct 42
1 Q And did the ATHOS responsible parties later submit a
2 second or supplemental claim for adjudication?
3 A Yes, ma'am, they did.
4 Q For about how much?
5 A That supplemental claim was for approximately $14
6 million.

[6] **Hellberg – Direct** 42:21-43:25 **(Trial Day 20, Oct. 26, 2010)**
Hellberg – Direct 42
21 MS. SHUTLER: Could we have Exhibit, U.S.A Exhibit
22 157, NPFC-000085?
23 BY MS. SHUTLER:
24 Q What is this document?
25 A This document is my claims summary determination form for
Hellberg – Direct 43
1 the RP's initial claim submission.
2 Q And for how much is that initial submission?
3 A The amount requested is approximately $80 million over
4 and above the limit of liability.
5 MS. SHUTLER: Could we have U.S.A. Exhibit 157 at
6 00090?
7 BY MS. SHUTLER:
8 Q And who drafted this letter here?
9 A I drafted this letter, ma'am, for Tom Morrison's
10 signature, he was Chief of Claims Adjudication Division,
11 making an offer to the RP of approximately 77.1 million.
12 Q And did you receive a supplemental claim from the ATHOS
13 responsible parties?
14 A Yes, ma'am, I did.
15 Q And did you make a recommendation for payment with
16 respect to the supplemental claim?
17 A Yes, ma'am, I did.
18 MS. SHUTLER: Could we have U.S.A. Exhibit 161 at
19 NPFC-00095?
20 (Pause.)
21 BY MS. SHUTLER:
22 Q Is this document your recommendation for how much to
23 reimburse the ATHOS responsible parties for their
24 supplemental claim?
25 A Yes, ma'am, it is.

[7] **Hellberg – Direct 49:25-50:16 (Trial Day 20, Oct. 26, 2010)**
Hellberg – Direct 49
25 Q Did you make an offer to settle the ATHOS responsible
Hellberg – Direct 50
1 party's first claim?
2 A Yes, ma'am, I did.
3 MS. SHUTLER: Could we have U.S.A. Exhibit 154 at
4 NPFC-00002?
5 BY MS. SHUTLER:
6 Q Is this your offer letter?
7 A Yes, ma'am, it is.

62

8 Q And did the ATHOS responsible parties accept this offer?
9 A Yes, ma'am, they did.
10 MS. SHUTLER: Can I have U.S.A. Exhibit 156 at
11 NPFC-00083?
12 (Pause.)
13 BY MS. SHUTLER:
14 Q And is this document the responsible party's acceptance
15 of the NPFC's offer of approximately $77 million?
16 A Yes, ma'am, it is.

[8] **Hellberg – Direct 51:19-52:7 (Trial Day 20, Oct. 26, 2010)**
Hellberg – Direct 51
19 Q Is this a summary of vendors you prepared for Frescati's
20 supplemental claim?
21 A Yes, ma'am, it is.
22 MS. SHUTLER: Could we have U.S.A. Exhibit 162 NPFC-
23 000104?
24 BY MS. SHUTLER:
25 Q And is this a more detailed summary of vendors you
Hellberg – Direct 52
1 prepared for the supplemental claim?
2 A Yes, ma'am, it is.
3 MS. SHUTLER: U.S.A. Exhibit 160 at NPFC-00093?
4 BY MS. SHUTLER:
5 Q Is this the signed acceptance letter by the responsible
6 parties of the NPFC's offer to accept $10.8 million?
7 A Yes, ma'am, it is.

[9] **Laferriere – Direct 13:16-24 (Trial Day 18, October 21, 2010)**
Laferriere – Direct 13
16 A Yes, vessel owners are required to have their own plan.
17 Q And what does that vessel -- what requirements are
18 included in that vessel response plan?
19 A In a vessel response plan, basically the vessel owner and
20 operator has to identify a worse case discharge for that
21 vessel. In addition to that, the vessel owner and operator
22 has to identify the equipment, containment equipment,
23 recovery equipment, and a number of resources to respond to
24 that spill.

[10] **Benson – Direct 9:22-10:5 (Trial Day 19, October 25, 2010)**
**Benson – Direct 9**
22 THE WITNESS: Yes, sir. The Vessel Response Plan is
23 also born out of the Oil Pollution Act of 1990 requiring
24 every tank vessel to have an Emergency Response Plan in the
25 event of an oil spill, yes, sir.
**Benson – Direct 10**
1 THE COURT: Thank you.
2 BY MR. O'CONNOR:
3 Q Does that plan have to be approved by the Coast Guard?
4 A It is, it's vetted and inspected and approved by the
5 Coast Guard.

[11] **Benson - Direct 12:16-19 (Trial Day 19, October 25, 2010)**
**Benson – Direct 12**

63

16 Q Does the regulations implementing the Oil Pollution Act
17 also require that a Vessel Response Plan have a predesignated
18 oil-spill response organization?
19 A It does.

[12] **Laferriere – Direct 8:18-9:4 (Trial Day 17, October 21, 2010)**
**Laferriere – Direct 8**
18 Q You mentioned that you were technical advisor to the
19 federal on-scene coordinator and for a time were also the
20 federal on-scene coordinator. Can you explain what the
21 functions of the federal on-scene coordinator include?
22 A Yeah, the federal on-scene coordinator is responsible for
23 insuring that the oil spill is cleaned up as quickly as
24 possible, effecting the immediate removal of the oil, and in
25 so doing, he has to insure that all the operations involved
**Laferriere – Direct 9**
1 in the oil spill, including salvage, oil removal from the
2 water surface, oil removal from the subsurface, wildlife
3 rehabilitation and recapture, all those things, all those
4 different functions have to be performed during a spill.

[13] **Laferriere - Direct 11:11-17 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 11**
11 Q Is incurring the least possible cost a priority in the NCP
12 for oil spill response?
13 A No.
14 Q Why not?
15 A Because, again, the regulation requires effective and
16 immediate removal. Costs cannot get in the way of an oil
17 spill cleanup.

[14] **Benson – Cross 138:10-25 (Trial Day 33, December 1, 2010)**
**Benson – Cross 138**
10 Q And your priorities, your priorities, as the qualified
11 individual on the project, was to get the spill cleaned up,
12 correct?
13 A Under Federal Law, it tells me that I must react very
14 quickly, I must activate resources, be knowledgeable of the
15 vessel response plan and make sure it's cleaned up.

[15] **Hellberg – Direct 36:24-37:5 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 36**
24 Q Does reasonable cost require the least cost or cheapest
25 clean-up effort?
**Hellberg – Direct 37**
1 A No, ma'am.
2 Q Why not?
3 A Because it's what's needed, personnel, materials and
4 equipment-wise, to prevent -- mitigating and minimize the
5 effects of the spill on the environment.

[16] **Laferriere - Direct 5:6-19 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 5**
6 Q Could you briefly explain what the Atlantic Strike Team
7 is?

8 A Yes, the Atlantic Strike Team is one of three strike
9 teams in the Coast Guard. There's one in the Gulf. There's
10 also one in the Pacific. They compose the National Strike
11 Force. These are teams that are specialized oil pollution,
12 chemical, and weapons of mass destruction SWAT Teams,
13 basically .
14 Q Why does the Coast Guard organize Strike Teams?
15 A The oil spills, chemical spills, and weapons of mass
16 destruction incidences are very complex, so the Coast Guard
17 put these special teams together to advise and assist other
18 Coast Guard commanders in executing a response to these types
19 of incidents.

[17] **Morrison – Direct 174:23-175:4 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 174**
23 A Under OPA in addition to the gross negligence willful
24 misconduct if a – if a responsible party fails to cooperate
25 with the FOSC, Federal On scene Coordinator, they could
**Morrison – Direct 175**
1 jeopardize their limit of liability specifically by
2 regulation.  Additionally, if they failed to comply with the
3 order given, certain orders given they could jeopardize their
4 limit of liability.

[18] **Laferriere – Direct 9:13-22 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 9**
13 Q Who is designated as the responsible party for the ATHOS
14 spill?
15 A It was the owner of the vessel.
16 Q And is the operator also designated?
17 A The owner and operator of the vessel.
18 Q What is the responsible under the Oil Pollution Act?
19 A The responsible party is the owner and operator of the
20 vessel or facility from which the oil spilled.
21 Q Is that designation without regard to fault?
22 A Yes.

[19] **Benson – Direct 8:11-9:8 (Trial Day 19, October 25, 2010)**
**Benson – Direct 8**
11 Q Okay. What's your connection with the ATHOS, this case
12 that we're here in court on today?
13 A I am the designated Qualified Individual for the vessel
14 and for Tsakos Shipping and Trading.
15 Q What's a Qualified Individual?
16 A Qualified Individual is a person that is basically born
17 out of the Oil Pollution Act of 1990. I am the designated
18 person for Tsakos Shipping and Trading, representing the
19 ATHOS at the time of the spill. I'm based in the United
20 States, I'm on call 24 hours a day. I liaison with the
21 owners back in Greece, and I'm also authorized to activate
22 resources and spend money on behalf of the owner.
23 Q Were you designated as the Qualified Individual in the
24 Vessel Response Plan for the ATHOS?
25 A I was.
**Benson – Direct 9**

1 Q Okay. Did O'Brien's, meaning O'Brien's Oil Pollution
2 Services, have a contract with Tsakos at the time of the
3 ATHOS spill?
4 A They did.
5 Q And what services did that contract call for you to
6 provide?
7 A Qualified Individual services and Response Management
8 services, as per the Vessel Response Plan.

[20] **Benson - Direct 11:18-12:5 (Trial Day 19, October 25, 2010)**
**Benson – Direct 11**
18 Q How did you come to learn about the ATHOS incident?
19 A Actually, I was on vacation and I received a call from
20 our 24-hour Command Center in Slidell, Louisiana.
21 Q When you got the call, what did you do?
22 A I immediately notified the Duty Incident Commander and
23 advised him to make Federal, state and local notifications,
24 which consisted of the National Response Center, the Marine
25 Inspection Office -- or the Marine Safety Office in
**Benson – Direct 12**
1 Philadelphia, the U.S. Coast Guard, the Tri-State
2 notifications for Pennsylvania, Delaware and New Jersey, and
3 available Local Emergency Preparedness Commission personnel,
4 fire departments and police departments in this local area.
5 Also, we activated the Duty Incident Commander as well.

[21] **Benson - Direct 15:18- 16:3 (Trial Day 19, October 25, 2010)**
**Benson – Direct 15**
18 Q How did you go about mobilizing the necessary labor,
19 equipment and supplies needed to respond to the ATHOS spill?
20 A We activated the Vessel Response Plan. The National
21 Response Corporation is Tsakos' contracted oil-spill cleanup
22 organization or contractor. From that point, we activated
23 NRC, or National Response Corp., requesting labor, equipment,
24 materials and supplies to respond and mobilize into the
25 Philadelphia area. We also asked -- requested that the
**Benson – Direct16**
1 National Response Corp. activate their Incident Command
2 Network, which is pre-event agreements with other
3 subcontractors and cleanup organizations to respond as well.

[22] **Benson – Direct 11:18-12:5 (Trial Day 19, October 25, 2010)**
**Benson – Direct 11**
18 Q How did you come to learn about the ATHOS incident?
19 A Actually, I was on vacation and I received a call from
20 our 24-hour Command Center in Slidell, Louisiana.
21 Q When you got the call, what did you do?
22 A I immediately notified the Duty Incident Commander and
23 advised him to make Federal, state and local notifications,
24 which consisted of the National Response Center, the Marine
25 Inspection Office -- or the Marine Safety Office in
**Benson – Direct 12**
1 Philadelphia, the U.S. Coast Guard, the Tri-State
2 notifications for Pennsylvania, Delaware and New Jersey, and
3 available Local Emergency Preparedness Commission personnel,

4 fire departments and police departments in this local area.
5 Also, we activated the Duty Incident Commander as well.

**[23] Laferriere – Direct 13:25-14:23 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 13**
25 Q What organizational structure does the federal on-scene
**Laferriere – Direct 14**
1 coordinator use to direct and manage an oil spill?
2 A That would be the incident command system.
3 Q What's the incident command system?
4 A The incident command system is a formalized structure,
5 command and control structure, designed to bring all these
6 different agencies and organizations, responsible party,
7 private organizations, and cleanup companies all in one room
8 to be able to work together, so it's a common system for how
9 to respond to emergencies.
10 Q Can you describe the components of the incident command
11 system?
12 A Yes, the main components of the incident command system
13 are at the top you have a unified command, which consists of
14 the Coast Guard federal on-scene coordinator, a state or a
15 number of state representatives, and a responsible party.
16 Beneath that unified command are four operational functions;
17 the operations section, planning section, logistic section,
18 and finance.
19 Operates executes the mission, gets the job done,
20 planning puts the plan together for operations to execute,
21 the finance section funds the operation, and logistics
22 provides all the resources necessary for operations to
23 execute the mission.

**[24] Laferriere - Direct 4:17-22 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 4**
17 Q At the time of the ATHOS spill on November 26th, 2004,
18 what was your position?
19 A I was the commanding officer of the Coast Guard Atlantic
20 Strike Team.
21 Q Was the Atlantic Strike Team involved in the ATHOS spill?
22 A Yes.

**[25] Laferriere - Direct 15:15-16:8 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 15**
15 Q What are your qualifications with respect to incident
16 command systems?
17 A Currently I hold a Type I Incident Commander
18 qualification and a Type I Operation Section Chief
19 qualification.
20 Q What is a Type I qualification?
21 A A Type I qualification is the highest level qualification
22 you can get for ICS. In this particular case, incident
23 commander.
24 Q And who issues these certifications?
25 THE COURT: That doesn't tell us very much to me. I
**Laferriere – Direct 16**
1 can only read one or two levels. How many --

67

2 THE WITNESS: Okay, sir. Sorry about that, your
3 Honor.
4 There are five different levels of types actually,
5 and the Type I incident is the highest level, and that
6 consists of, for example, a Katrina-type incident, and a 9/11
7 attack. Those would be Type I incidences, so Type I is the
8 highest qualification.

[26] **Laferriere - Direct 6:1-10 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 6**
1 Q In what other capacities were you involved in the ATHOS 1
2 spill?
3 A I served as the technical advisor to the Coast Guard
4 federal on-scene coordinator who was in charge. I also
5 provided salvage assistance, review of the salvage plans,
6 review of incident and action plans, technical advice on
7 cleanup methods and methodologies, how to remove the oil from
8 the water -- the surface of the water, subsurface.
9 Q Were you ever the federal on-scene coordinator?
10 A I was for a little over a few weeks.

[27] **Laferriere - Direct 8:2-17 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 8**
2 Q How much area did the spill affect?
3 A During my period of service, it was about 70 miles of
4 shoreline on both sides of New Jersey, and also Pennsylvania,
5 and three states were involved, and over 29 -- I recollect
6 over 29 political subdivisions, geographic subdivisions.
7 Q And how many spill responders were involved?
8 A During my period, approximately 1800 folks.
9 Q What was the composition of the spill responders?
10 A The spill responders, it's -- they're made up of a whole
11 different amount of folks. It's like building a Fortune 500
12 company overnight literally. You bring in the Coast Guard,
13 you bring in a response party, a team, you also have several
14 oil spill contractors, you have state, local, and other
15 federal agencies such as the Environmental Protection Agency,
16 U.S. Fish & Wildlife, the National Oceanographic Atmosphere
17 Administration, so a lot of folks were involved.

[28] **Benson – Direct 20:14-18 (Trial Day 19, October 25, 2010)**
**Benson – Direct 20**
14 Q Can you estimate at its peak how many people were in the
15 field dealing with containment and cleanup on this oil spill?
16 A I think our -- we peaked at about 1200, 1300 workers in
17 the field.
18 Q And that's excluding the people in the Command Center –

[29] **Laferriere – Direct 7:5-8:1 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 7**
5 Q How did the ATHOS spill response compare to the spill
6 responses for these others?
7 A The ATHOS oil spill was unique in that we were dealing
8 with a submerged oil issue. Because of the oil mixing with
9 the stand on both Pennsylvania and New Jersey sides, also on

68

10 Tinnicum Island and some other areas, the oil was remobilized
11 by tides and currents, and actually sank below the surface of
12 the water. It also was on the bottom.
13 This is truly unique. We haven't had too many cases
14 where we've had to recover oil below the water surface.
15 Q How did the time of year affect the complexity of the oil
16 spill response?
17 A It was in the winter months. We had cold weather issues
18 to deal with, as far as protecting the workers, and making
19 sure they were safe. We had issues of the currents they have
20 to deal with in the river, which is not typical of, again,
21 large oil spills. We had current -- the tide influences,
22 which caused some of the oil to actually go north of the
23 source point itself.
24 So it became a real challenge in trying to fight
25 this spill, because every day was different where the oil was
**Laferriere – Direct 8**
1 migrating.

[30] **Laferriere – Direct 23:20-24:5 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 23**
20 But the other thing that's important here, too, to
21 realize is that it's very difficult to predict, especially
22 during the ATHOS incident, the way the oil was going to go
23 the next day, and primarily that was due to different
24 currents, river currents, wind, and the affects of the tide.
25 So we ended staging a lot of equipment down river of the
Laferriere – Direct 24
1 spill in anticipation of migration of the oil in that area.
2 And it's a good thing we did that, because we were
3 able to protect a lot of sensitive areas that were impacted
4 that otherwise, if we hadn't staged that boom, we wouldn't be
5 able to get there in time.

[31] **Bowman – Redirect 114:9-15 (Trial Day 33, December 1, 2010)**
**Bowman – Redirect 114**
9 A Well, you have to understand at the advent of this event
10 is of a very major issue with a ship in distress at night and
11 very, very adverse weather conditions, unknown quantities of
12 oil, at the time, flowing down a fast river system, in a
13 major metropolitan and industrial area. There's many
14 complexities to this type or response, require immediate
15 activation. We absolutely follow the vessel response plan,

[32] **Laferriere - Direct 23:20-24:5 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 23**
20 But the other thing that's important here, too, to
21 realize is that it's very difficult to predict, especially
22 during the ATHOS incident, the way the oil was going to go
23 the next day, and primarily that was due to different
24 currents, river currents, wind, and the affects of the tide.
25 So we ended staging a lot of equipment down river of the
**Laferriere – Direct 24**
1 spill in anticipation of migration of the oil in that area.
2 And it's a good thing we did that, because we were

69

3 able to protect a lot of sensitive areas that were impacted
4 that otherwise, if we hadn't staged that boom, we wouldn't be
5 able to get there in time.

**[33] Laferriere - Direct 41:1-42:2 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 41**
1 Q Did the unified command ever require the development of
2 specific plans that would supplement the incident action
3 plans, the daily incident action plans?
4 A Yes.
5 Q Why?
6 A One example is the site safety plan. The site safety
7 plan, especially in this spill, is very critical because of
8 the water temperature and the frigid air temperatures. So we
9 developed a specific site safety plan again. It's developed
10 on a 24-hour basis for protecting the workers. That's an
11 example of one plan.
12 Q And what kind of requirements did you include in that
13 site safety plan to protect worker's safety?
14 A That would include things like protective equipment
15 against the oil itself. The oil posed a dermal hazard, so
16 they had to make sure that the workers were protected from
17 skin contact with the oil.
18 Additionally, warm weather gear was important. The
19 issuance of hot meals, and warm meals, and those kinds of
20 things were all critical to insuring the health and safety of
21 the workers.
22 THE COURT: Did you mean warm weather gear?
23 THE WITNESS: Yes, sir. Warm weather gear, right.
24 Winter gear primarily.
25 THE COURT: Well, that's not warm weather.
**Laferriere – Direct 42**
1 THE WITNESS: Oh, cold weather gear. I'm sorry. My
2 apologies, sir.

**[34] Benson – Direct 29:6-15 (Trial Day 19, October 25, 2010)**
**Benson – Direct 29**
6 Q Okay. Did O'Brien's pay for hot meals for the workers in
7 the field?
8 A Yes, we did.
9 Q Why?
10 A It was wintertime in Philadelphia and snow and cold and
11 subzero temperatures at some times. Worker safety is our
12 first priority, as I stated earlier. The Coast Guard
13 required us through the Incident Action Plan and through the
14 Site Safety Plan to provide our workers in the field one hot
15 meal a day. So, we were required to do that and we did.

**[35] Laferriere - Direct 16:10-17:6 (Trial Day 18, October 21, 2010)**
**Laferriere - Direct 16**
10 Q How does the incident command structure, through the
11 unified command, decide what actions are necessary, where and
12 in what order?
13 A They create an incident action plan.
14 Q What is an incident action plan?

70

15 A An incident action plan is basically a battle plan for
16 how the oil spill's going to proceed, and how the operation
17 section is going to carry out the mission of the cleanup.
18 Q And what type of work assignments are included in an
19 incident action plan?
20 A The incident action plan will address all of the
21 different field functions involved in an oil spill response.
22 As I mentioned earlier, salvaging the vessel, salvaging the
23 oil, on-water recovery, removing the oil from the water,
24 protective booming operations to protect sensitive areas from
25 getting impacted from the oil, wildlife recovery operations,

**Laferriere - Direct 17**

1 and also vessel facility decon operations. That's an example
2 of all the -- a few of the operations.
3 Q How often are incident action plans prepared particularly
4 at the beginning of an oil spill response?
5 A During the initial part of the oil spill, the plans were
6 done every 24 hours.

[36] **Laferriere - Direct 19:18-20:3**

**Laferriere - Direct 19**

18 Q What was included in the typical incident accident plan
19 for the ATHOS?
20 A Okay. You saw the organization chart. Obviously you've
21 got to have that. It lets everybody know what the command
22 and control system is for the incident. You have also seen
23 the list of the response objectives that are developed by the
24 command, and the things that they want to get accomplished.
25 You have a list of various work assignments that's given to

**Laferriere - Direct 20**

1 each of the supervisors in the field to execute. There's a
2 communications plan, and a medical plan, and also a site
3 safety section as well.

[37] **Laferriere - Direct 11:3-10 (Trial Day 18, October 21, 2010)**

**Laferriere - Direct 11**

3 Q Does the National Contingency Plan identify oil spill
4 priorities for cleanup?
5 A Yes.
6 Q What are those priorities?
7 A The priorities are prevent and mitigate a substantial
8 threat of a discharge, let human life, health and safety.
9 That's No. 1. The effective and immediate removal of an oil
10 spill and minimize environmental impacts, to my recollection.

[38] **Laferriere - Direct19:5-20:3 (Trial Day 18, October 21, 2010)**

**Laferriere – Direct 19**

5 Q Who signs an incident action plan?
6 A The federal on-scene coordinator of the Coast Guard, the
7 responsible party representatives, and the representatives
8 from the states.
9 Q And were incident action plans used to contain and clean
10 up the ATHOS 1 spill?
11 A Yes, they were.
12 Q When you were the federal on-scene coordinator for the

71

13 ATHOS 1 spill, did you ever sign an incident action plan?
14 A Yes, I did.

[39] **Laferriere – Direct 37:10-38:2 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 37**
10 Q What is the federal on-scene coordinator's main
11 consideration when reviewing the incident action plan prior
12 to signing?
13 A Here's where the Coast Guard differs from the Department
14 of Defense. The Coast Guard is held by law and required by
15 law to execute the oil spill cleanup in accordance with a
16 National Contingency Plan. So when I sign one of these
17 incident action plans, I'm basically saying that my operation
18 is consistent with the law and the regulations spelled out by
19 the Oil Pollution Act of 1990.
20 Q And what is the effect of the federal on-scene
21 coordinator's signature on the responsible party?
22 A This is also a document that communicates to the
23 responsible party that this is what the federal on-scene
24 coordinator wants accomplished.
25 Q Is it incumbent on the responsible party to take –
**Laferriere – Direct 38**
1 undertake these actions?
2 A Yes.

[40] **Laferriere – Direct 17:12-19:4 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 17**
12 Q What is this document?
13 A This is the operation planning P cycle that we call.
14 Q And what information is contained in the stem?
15 MS. SHUTLER: If we could just hold off for a
16 second?
17 THE WITNESS: Okay. During the initial part of the
18 incident here, because this is the incident event, and you go
19 through the notifications, and the key part of this is the
20 initial getting the unified command together. This only
21 happens one time. Once you assemble the initial unified
22 command, then we go through a planning cycle for executing
23 the battle plan, which we refer to as the incident action
24 plan.
25 BY MS. SHUTLER:
**Laferriere – Direct 18**
1 Q Can you please explain what occurs in this daily
2 operational planning cycle?
3 A Yes. First and foremost, the unified command gets
4 together and they develop their objectives. These are very
5 broad and general directives on what needs to be
6 accomplished. Once they do that, they communicate those
7 objective to those four sections I mentioned earlier;
8 operations, planning, finance, and logistics.
9 From those general directives, the operation section
10 and the planning section get together and put -- have what's
11 called a tactics meeting. This tactics meeting is designed
12 to develop, you know, how are we going to actually execute
13 the directives provided by the unified command.

14 Once those tactics are all assembled, they have a
15 planning meeting, they get back with the unified command,
16 they brief the unified command on what their tactics will be.
17 Again, this is for the following day, not for the actual day
18 of the incident.
19 And then once that's verbally approved by unified
20 command, the incident action plan is assembled, put together,
21 and then it's briefed to the people in the field.
22 Q And then it's executed the next day?
23 A Yeah, it's executed, and then the process repeats itself
24 on a daily basis. The key significance of this is that once
25 you accomplish your incident action plan for an incident,
**Laferriere – Direct 19**
1 you've from a reactive to a proactive phase. In other words,
2 you've gotten control of the incident. So it's very
3 important that you develop your incident action plan very
4 quickly.

[41] **Laferriere – Direct 20:8-24:10 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 20**
8 BY MS. SHUTLER:
9 Q Do you recognize this document?
10 A Yes.
11 Q What is it?
12 A This is an incident action plan. This is the cover sheet
13 for an incident accident plan. Now, in this particular plan
14 you'll notice it covers the period from the 7th of December,
15 6:00 in the morning, till 6:00 in the morning on the 8th, the
16 next day, so that's a 24-hour period.
17 Q Thank you.
18 MS. SHUTLER: Can we have U.S.A. Exhibit 127, 06006,
19 the first top five lines?
20 (Pause.)
21 BY MS. SHUTLER:
22 Q What is this component of the incident action plan?
23 A This is, again, this is a standardize ICS form. We call
24 it ICS, Incident Command System Form 202, which is the
25 response objectives I mentioned earlier. This is the
**Laferriere – Direct 21**
1 objectives that the unified command wants to get accomplished
2 for the cleanup operation.
3 THE COURT: This is quite a while after the incident
4 itself, wasn't it?
5 THE WITNESS: Well, this particular incident action
6 plan is, sir, but early on we had incident action plans the
7 second and third day, right from the beginning.
8 BY MS. SHUTLER:
9 Q Okay. And what do these objectives provide?
10 A Again, these objectives provide direction to the
11 operations section chief -- operations section and planning
12 as far as what the unified command wants accomplished.
13 MS. SHUTLER: Can we take this down and call out the
14 top third of the objectives?
15 (Pause.)
16 BY MS. SHUTLER:

17 Q Can you walk us through a few of the objectives for
18 December 7th, 2004?
19 A All right. The particular objective you see that's
20 highlighted is called expedite decon of vessels. That
21 particular objective is, as you can see, is very broad. What
22 we're referring to here is the commercial vessels that were
23 in the port. These are the freight ships, the tank vessels,
24 the cruise ships, other vessels that were oiled by the spill.
25 The unified command is telling the staff here that,

**Laferriere – Direct 22**

1 I want these cleaned and cleaned up quickly. The importance
2 of this objective is that this objective allows for the port
3 to restore -- be restored as quickly as possible. Once you
4 clean the vessels, you get the port back in operation.
5 Q Was the port ever shut down as a result of the spill?
6 A Yes, it was.
7 MS. SHUTLER: Can we scroll a little further?
8 (Pause.)
9 THE WITNESS: This next highlighted objective is a
10 -- is a more common objective you see for an oil spill. This
11 is a continued aggressive shoreline cleanup and disposal
12 operations. In every major oil spill you will have shoreline
13 contamination, and in this case we had -- with the ATHOS we
14 had it.
15 As you can see, this is very broad, but the key word
16 in the statement is the word "aggressive." That tells --
17 that's the unified command telling the operations section, I
18 want you to move out and step out on this and make sure this
19 jobs gets done quickly.
20 MS. SHUTLER: All right. Can we scroll down a
21 little farther?
22 (Pause.)
23 THE WITNESS: Okay. This particular example, again,
24 is another common objective. It's basically booming
25 operations, and a boom is floating protector barrier that we

**Laferriere – Direct 23**

1 use to contain the oil that spills on the water, and we also
2 use it to protect areas that may be impacted from the oil.
3 So this particular objective actually has two
4 components; one is monitor existing boom operation, existing
5 sensitive site booming strategies, and implement additional
6 strategies as appropriate. So it's telling planning to
7 identify additional sensitive areas that might be threatened
8 by the oil spill, and additionally telling operations to make
9 sure that we protect those areas.
10 BY MS. SHUTLER:
11 Q If you're planning for boom for areas that may need to be
12 protected, what do you do with that boom at the time?
13 A Well, what you do is, the first thing you do is you
14 obviously -- you identify your sensitive areas. Those are
15 pre-identified in the area contingency plan, okay? These are
16 a list of, like, for example, a best nesting area, okay? So
17 that will be pre-identified. And what we want to do with the
18 boom is make sure we put the boom in advance of that to
19 prevent the oil from impacting it.

74

20 But the other thing that's important here, too, to
21 realize is that it's very difficult to predict, especially
22 during the ATHOS incident, the way the oil was going to go
23 the next day, and primarily that was due to different
24 currents, river currents, wind, and the affects of the tide.
25 So we ended staging a lot of equipment down river of the

**Laferriere – Direct 24**

1 spill in anticipation of migration of the oil in that area.
2 And it's a good thing we did that, because we were
3 able to protect a lot of sensitive areas that were impacted
4 that otherwise, if we hadn't staged that boom, we wouldn't be
5 able to get there in time.
6 Q What do you mean by "staging boom"?
7 A Well, this is a -- what you do basically is you take the
8 boom and you put them in specific land sites usually on a
9 tractor-trailer or something, so that you can mobilize it
10 when need to into a different area for protection.

[42] **Laferriere – Direct 26:2-31:11 (Trial Day 18, October 21, 2010)**

**Laferriere – Direct 26**

2 This is the Incident Command System 42 -- Incident
3 Command System Form 204. It's called an assignment list.
4 That's the title of the form. So right away that tell us
5 that this is an assignment for a field group supervisor
6 that's in charge of this particular mission.
7 The mission as identified here in this particular
8 204 is waterborne vessel and pier decon. What I mean by pier
9 is facilities, because in addition to vessels getting
10 contaminated with oil, facilities got contaminated as well.
11 So this is the work assignment for this particular
12 group, and the way the groups are designed, you have a group
13 supervisor that's in charge, and he's going to have a number
14 of people, and equipment dedicated for him to accomplish this
15 particular mission of deconing vessels and piers.
16 BY MS. SHUTLER:
17 Q And is that for just this particular day?
18 A This is just for this particular day, so every day that
19 an incident action plan was developed, a new work assignment
20 would be issued.
21 Q And for approximately how many months were incident
22 actions plans developed?
23 A Incident action plans were developed through the entire
24 event, as far as my recollection is.
25 Q And about how many months was the cleanup, did the

**Laferriere – Direct 27**

1 cleanup last?
2 A I don't recall. I think the end of May.
3 Q I notice there's a signature. What is the significance
4 of the signature on this ICS 204 assignment list?
5 A That's the planning section chief. He, again, he puts
6 the incident action plan together and the work assignments,
7 so his signature means that he's reviewed this and approved
8 this work assignment.
9 THE COURT: But nobody else approves it?
10 THE WITNESS: But there's a missing signature here,

75

11 sir, and that's an optional signature at the -- at the cover
12 page that we showed you earlier that had a list of all the
13 federal on-scene coordinators, they could either sign this
14 individual worksheet here, or they can sign the incident
15 action plan covering and that suffice for the final approval.
16 THE COURT: All right. Or refuse to sign either of
17 them, in which case they don't go into effect, is it?
18 THE WITNESS: Yes, sir. If the federal on-scene
19 coordinator doesn't sign that, that means he doesn't approve
20 it, yes, sir.
21 THE COURT: Thank you.
22 MS. SHUTLER: All right. Can we call out the top
23 table, or excuse me, the operations personnel section?
24 (Pause.)
25 BY MS. SHUTLER:
**Laferriere – Direct 28**
1 Q What is the purpose of this section in the ICS 204
2 assignment list?
3 A This is the -- this is basically the chain of command for
4 the work group that we identified earlier, and remembering
5 that work group was vessel decon. This is the vessel decon
6 work group, and these are the two individuals, a Coast Guard
7 member and it looks like a contractor, who were responsible
8 for executing this work assignment.
9 What it shows is the -- his basically chain of
10 command, so that he knows when he executes his mission, and
11 who he reports to.
12 Q At the time, were you the operations section deputy
13 chief?
14 A Yes, that's my name there, so I was a deputy section
15 chief at that time.
16 Q All right.
17 MS. SHUTLER: Can we call out the operations
18 personnel section -- or excuse me -- the incident resources
19 equipment table section?
20 (Pause.)
21 BY MS. SHUTLER:
22 Q What is --
23 A Okay. Oh, I'm sorry.
24 Q What does this table tell us?
25 A This table tells us that this is the list of equipment
**Laferriere – Direct 29**
1 that's available to those two individuals that are in charge
2 of the group.
3 Q And, again, only for this particular day, correct?
4 A For this particular day and for this particular mission.
5 What it shows you here on the left is these are all
6 the different suppliers, and you can see the various
7 different contractors that are involved in an oil spill.
8 It's not one contractor. That's why it's important to have
9 this incident command system and this process. Otherwise, it
10 would be difficult to organize all these folks.
11 This here is a general list of resource types. As I
12 mentioned, they use barges and vessels as well. A little bit
13 more detailed description of what those barges do and what

14 they're for. This is the hot system here. This is the
15 pressure system I mentioned earlier. The quantities that's
16 available to the individual -- for each one of these
17 categories, and then their sizes. And assign means that
18 logistics was able to provide them that resource, so that
19 resource should be on hand for the response.
20 MS. SHUTLER: Can we call out the incident resources
21 manpower section?
22 (Pause.)
23 BY MS. SHUTLER:
24 Q Can you explain what this section provides us, what
25 information it provides us?

**Laferriere – Direct 30**

1 A Now that these guys have the equipment, they need to have
2 the people to execute the mission. So, again, here you see
3 listed the Coast Guard is involved from the National Strike
4 Force, which are the Strike Teams I mentioned earlier, and
5 then these are the other various spill contractors that are
6 all involved.
7 The key point here is the number of folks that will
8 be involved in each of the incidents, and you can see that
9 Clean Harbors and Miller Environmental Group were repeated
10 down here, because they are -- they are conducting night
11 operations.
12 In this particular operation, we were able to do
13 night operations, because we were able to stage lights on
14 board the barges or use lights on the vessels for the
15 cleanup.
16 Q So with respect to Clean Harbor's Coop, the night
17 response component, you would be assured that 30 people, in
18 fact, showed up; is that correct?
19 A This incident action -- according to the incident action
20 plan, yes, they should have 30 people that show up for the
21 incident.
22 MS. SHUTLER: Can we go to Page 2 of this ICS Form
23 204, 06028, and pull out the assignment section?
24 (Pause.)
25 BY MS. SHUTLER:

**Laferriere – Direct 31**

1 Q What's the significance of this section?
2 A Okay. This is Page 2 of the work order or the work
3 assignment for this vessel decon group again. What's listed
4 here is the specific missions that's required of the -- this
5 particular group. This is where the rubber meets the road.
6 What they're supposed to actually do.
7 And where it says, "Conduct decontamination
8 activities as directed," back at the command post, the
9 operations section chief will have a list of facilities and
10 vessels that need to be decontaminated, and will direct this
11 group to those facilities and vessels.

[43] **Laferriere – Direct 35:3-36:10 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 35**
3 Q Is the location where they are deployed generally
4 included in this ICS 204 assignment sheet?

5 A Yes, and that's another important thing is that you --
6 you have to have this -- again, these get briefed to the
7 people that morning, and said, All right. This is what
8 you're going to do, this is what your mission is, here's
9 where you're going to report to, and it's important that they
10 have a reporting location, so they show up for work in the
11 right place.
12 MS. SHUTLER: Can we pull up the map, please?
13 (Pause.)
14 And can we pull up the -- thank you.
15 BY MS. SHUTLER:
16 Q Now, what is this particular map?
17 A Okay. This map shows -- this is actually an overflight
18 map that was taken, but it shows how we divided the different
19 areas for fighting the oil spill. As you can see, we have
20 Pennsylvania 6, that's a division, Pennsylvania 8, and
21 various Delaware divisions, and then on the New Jersey side,
22 various divisions as well.
23 You need to do this so you can have a battlefield
24 that you can manage appropriately with the right resources.
25 In each one of the divisions, we have a commander that's in
**Laferriere – Direct 36**
1 charge of that division specifically, and make sure that the
2 mission gets executed for that.
3 These highlighted areas that you see, and these
4 colored areas, are all different areas responding to
5 different shoreline types. For example, the red is marsh.
6 Marsh is the most sensitive -- one of the most sensitive
7 areas to oil.
8 So what this map shows us is that these are the
9 areas that we need to protect and boom off to make sure that
10 none of the oil got into the marsh.

[44] **Laferriere – Direct 37:3-24 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 37**
3 Q Now, you mentioned signatures earlier. What are the
4 signatures on this particular first page -- on this first
5 page of this particular ICS?
6 A Okay. Again, this is the Coast Guard signature here,
7 that's the federal on-scene coordinator, and then all three
8 states who were involved signed this plan, and, of course,
9 the responsible party representative.
10 Q What is the federal on-scene coordinator's main
11 consideration when reviewing the incident action plan prior
12 to signing?
13 A Here's where the Coast Guard differs from the Department
14 of Defense. The Coast Guard is held by law and required by
15 law to execute the oil spill cleanup in accordance with a
16 National Contingency Plan. So when I sign one of these
17 incident action plans, I'm basically saying that my operation
18 is consistent with the law and the regulations spelled out by
19 the Oil Pollution Act of 1990.
20 Q And what is the effect of the federal on-scene
21 coordinator's signature on the responsible party?
22 A This is also a document that communicates to the

23 responsible party that this is what the federal on-scene
24 coordinator wants accomplished.

[45] **Laferriere – Direct 31:12-32:12 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 31**
12 Q I notice that there's a line that states, "That NSF
13 supervisors will actively monitor and critique the
14 operations."
15 Just explain again who is the NSF supervisors are?
16 A Okay. Yes, those are the -- those are the members of the
17 Strike Team, and these are, again, the Coast Guard Special
18 Weapons and Tactics, sort of pollution SWAT Team guys, who
19 were specifically assigned to this mission, and their
20 specific role is to insure that this incident action plan
21 work assignment is carried out and executed.
22 Q Who do they report to?
23 A They reported to me in the operations section.
24 Q And that was because you were in the operations section.
25 Was it also because you were commander of the Atlantic Strike
**Laferriere – Direct 32**
1 Team?
2 A Yes.
3 Q How often would the report to you?
4 A They would report several times throughout the day.
5 Obviously, when they arrived on scene. Usually what I asked
6 them to do, or I asked them to do, period, was to call me
7 before the tactics meeting for the planning cycle for the
8 next day.
9 What this allowed me to do is get feedback from them
10 on what was needed for tomorrow's operations, so I go into
11 the tactics meeting, develop the tactics for the following
12 day.

[46] **Laferriere – Direct 34:3- 17 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 34**
3 Q How did the Strike Team supervisors use this particular
4 form in the field?
5 A Again, without this -- without this form, we wouldn't be
6 able to have an organized response, and wouldn't be able to
7 execute the Coast Guard's mission at the federal on-scene
8 coordinator's direction.
9 So what this actually becomes is a quality control
10 device for the Coast Guard. The supervisors will take this
11 -- the National Strike Force individuals -- the Coast Guard
12 will take this form out to the field, will make sure that the
13 equipment that's listed on here is actually on scene, they
14 will make sure that the personnel listed there is actually
15 available and operating. And last, but not least, make sure
16 that the mission is executed in accordance with the
17 assignment. That's the key thing.

[47] **Laferriere – Direct 37:25- 39:15 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 37**
25 Q Is it incumbent on the responsible party to take --
**Laferriere – Direct 38**

1 undertake these actions?
2 A Yes.
3 Q In the ATHOS spill, did the ship owner or operator pay
4 contractors to undertake actions directed by the federal
5 on-scene coordinator in these instant action plans?
6 A Yes.
7 Q What would happen if the ship owner did not cooperate
8 with the federal on-scene coordinator and refuse to implement
9 the actions identified in the incident action plans?
10 MR. O'DONOVAN: Objection, your Honor. This calls
11 for a legal conclusion.
12 THE COURT: Yes, but he might know it.
13 Objection overruled.
14 THE WITNESS: The answer to the question is this:
15 If the responsible -- let's assume that the responsible party
16 was not willing to execute their work assignment for vessel
17 decon, the Coast Guard federal on-scene coordinator can step
18 in and take action on his own.
19 BY MS. SHUTLER:
20 Q And what happens when the federal on-scene coordinator
21 takes action on his own?
22 A Basically what he's doing is he's now assuming financial
23 responsibility for the cleanup for that particular act, and
24 in some cases, he can do -- take over the entire incident.
25 THE COURT: But then does he then hold the

**Laferriere – Direct 39**

1 responsible party liable somehow?
2 THE WITNESS: The responsible party would be
3 responsible now for recovering -- for paying for all the
4 Coast Guard costs, which before he didn't have to, so this
5 would include salaries, the cost of our helicopters, the cost
6 of our boats, the cost of our parts, so it would be much more
7 expensive for him to do that.
8 BY MS. SHUTLER:
9 Q And how much more expensive would it be for a -- for a
10 typical -- in a typical spill response?
11 A On average between two and three times more expensive.
12 So it's designed to be a disincentive to have the Federal
13 Government do all the cleanup. The way the Oil Pollution Act
14 and National Contingency Plan is designed is that the spiller
15 cleans up the oil.

[48] **Laferriere – Direct 39:16-18 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 39**
16 Q And did the owners and operators in the ATHOS 1 incident
17 comply with the directives in the incident action plans?
18 A Yes.
[49] **Benson – Direct 53:12-54:3 (Trial Day 19, October 25, 2010)**
**Benson – Direct 53**
12 Q Did O'Brien's receive any kind of a commendation at the
13 end of this case for its response to the spill?
14 A Yes, yes, we did.
15 Q What was that, a commendation of Unified Command?
16 A Yes, it was a commendation presented to us by Captain
17 Sarubbi, who was the Coast Guard Federal On-Scene

18 Coordinator. The citation was directed to the Unified
19 Command and the responders for the ATHOS oil-spill event.
20 Very complimentary, very much appreciated, and it was
21 extended to all the Spill Management Team members and I
22 expressed my -- my concerns for -- not concerns per se, but
23 my expression of thank you to all the contractors as well,
24 and this is a -- this is the citation as it reads.
25 Q So, to be clear, the citation was to the Unified Command?
**Benson – Direct 54**
1 A Yes.
2 Q Of which the RPU were one of the elements?
3 A That's correct.

[50] **Morrison – Direct 165:9-166:2 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 165**
9 Q Okay. And how does the Oil Pollution Act set the
10 limitation amount within that statutory scheme?
11 A Within that statutory scheme depending on the type of
12 vessel and the tonnage of that vessel you would have -- they
13 set the cap.
14 THE COURT: Based on the value of the ship?
15 THE WITNESS: No, sir, based on the gross tonnage of
16 the vessel. So in the case of the --
17 THE COURT: It does relate to the ship.
18 THE WITNESS: Yes, sir.
19 BY MR. FLYNN:
20 Q Unlike the Limitation of Liability Act but is based on
21 the value of the vessel, is that correct?
22 A Correct, yes, sir.
23 Q And what is the formula that the Oil Pollution Act uses
24 for a tank vessel the size of the ATHOS I?
25 A The ATHOS I in 2004 was $1,200 per gross ton which when
**Morrison – Direct 166**
1 figured out with the certificated gross tonnage resulted in
2 about a 45.4 million, $45.4 million limit of liability.

[51] **Hellberg - Direct 41:15-41:25 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 41**
15 Q And how much did the ATHOS responsible parties initially
16 seek the NPFC to adjudicate?
17 A They initially requested approximately 124 million in
18 their initial submission.
19 Q And did this amount change?
20 A Yes, ma'am, it did.
21 Q And how did that change?
22 A It changed because throughout my adjudication, as I moved
23 through my adjudication, I had continuing communications with
24 the responsible party and that final requested amount did
25 change and it did go up.

[52] **Morrison – Direct 162:25-163:6 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 162**
25 Q And what is your title there?
**Morrison – Direct 163**
1 A I'm the chief of the Claims Adjudication Division.

2 Q How long have you held that?
3 A I've been -- I've held that for over six years.
4 Q And so you were chief of the Claims Adjudication Division
5 at the time of the ATHOS spill?
6 A Yes, sir.

[53] **Morrison – Direct 167:19-22 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 167**
19 Q Okay. Who determines whether a responsible party is
20 entitled to this limitation of liability at the National
21 Pollution Funds Center?
22 A I make that determination.

[54] **Morrison - Direct 171:1-8 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 171**
1 Q And what did you base that decision on? And I do not
2 want your analysis but what did you consider in terms of
3 evidence?
4 A The claimant's submission package which was thousands of
5 pages which included vessel documentation, crew documentation
6 and post incident investigation information and I also did,
7 we did external research and then I had some assistance in
8 reports from a couple of Federal agencies.

[55] **Morrison – Direct 173:9-24 (Trial Day 19,  October 25, 2010)**
**Morrison – Direct 173**
9 Q They give us the weather reports, that's right. And then
10 you said you also went to was it another part of the Coast
11 Guard to ask for assistance?
12 A Yes.
13 Q And who was that?
14 A Well, first was the Marine Safety Center which is in the
15 Washington, DC.
16 Q And what do they do?
17 A They're responsible, they are the Coast Guard command
18 that's responsible for the technical review of ship
19 standards, ship standards foreign and domestic U.S. for
20 evaluating regulations requirements.
21 Q And what did you -- what help did you seek from them?
22 A I wanted them to do an objective analysis of the data
23 that was provided by the responsible party regarding the
24 draft of the vessel.

[56] **Morrison - Direct 172:16-173:7 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 172**
16 Q Now in order to ascertain whether the information
17 submitted to you by the claimant was correct what sources did
18 you look at outside of those materials in this case?
19 A I looked at the existing publications, existing charts on
20 navigation, Delaware Bay and River. I also contacted NOAA
21 and got additional information from them and I contacted a
22 couple of elements within the Coast Guard, the captain at
23 port down in Mobile, Alabama.
24 Q Well, let's slow down a little.
25 A Sorry.

Morrison – Direct 173
1 Q Okay. Let's, first, you mentioned NOAA, what did you ask
2 NOAA for?
3 A I asked them for tidal, their tide tables basically
4 predicted and actual for the period leading up to the
5 incident and after the incident.
6 Q And NOAA is the National Oceanic and Atmospheric
7 Administration?

[57] **Morrison - Direct 173:25-175:4 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 173**
25 Q And did you ask any other component of the Coast Guard?
**Morrison – Direct 174**
1 I think mentioned somebody in Mobile for information.
2 A Yes, sir. The ship was drydocked in Mobile and I wanted
3 to ensure that the hull was in compliance with the thickness,
4 the engineering requirements.
5 Q In other words, the minimum thickness for the hull
6 plating?
7 A Minimum thickness of hull plating on a single hull
8 tanker, single bottom tanker.
9 Q And were there any particular regulations that you
10 examined to ascertain whether the claimant had complied with?
11 A Yes, sir, there were several that related to depth of
12 vessel, draft of vessel, depth of water, specifically the
13 under keel clearance regulations which I think is 33 CFR 157.
14 And the 46 CFR on the engineering.
15 Q Okay.
16 A And construction issues.

[58] **Morrison - Direct 174:9-16 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 174**
9 Q And were there any particular regulations that you
10 examined to ascertain whether the claimant had complied with?
11 A Yes, sir, there were several that related to depth of
12 vessel, draft of vessel, depth of water, specifically the
13 under keel clearance regulations which I think is 33 CFR 157.
14 And the 46 CFR on the engineering.
15 Q Okay.
16 A And construction issues.

[59] **Morrison - Direct 174:17-175:4 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 174**
17 Q Now did you also request from the -- any information from
18 the Federal on-scene commander?
19 A Yes, I did. I requested through the NPFC representatives
20 to the unified command that I have an assessment of the level
21 of cooperation.
22 Q Why is that important?
23 A Under OPA in addition to the gross negligence willful
24 misconduct if a -- if a responsible party fails to cooperate
25 with the FOSC, Federal On Scene Coordinator, they could
**Morrison – Direct 175**
1 jeopardize their limit of liability specifically by
2 regulation. Additionally, if they failed to comply with the

3 order given, certain orders given they could jeopardize their
4 limit of liability.

[60] **Morrison - Direct 167:19-168:10 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 167**
19 Q Okay. Who determines whether a responsible party is
20 entitled to this limitation of liability at the National
21 Pollution Funds Center?
22 A I make that determination.
23 THE COURT: Is there a procedure that's followed?
24 THE WITNESS: Yes, sir.
25 BY MR. FLYNN:
**Morrison – Direct 168**
1 Q Can you tell us about that procedure?
2 A Under OPA there's clear requirements and really there's
3 three determinations or three steps, three elements that are
4 done. The responsible party will have to come in and
5 demonstrate that they're -- that they by gross -- their gross
6 negligence did not proximately cause the release, that no
7 willful misconduct proximately caused the release and that no
8 violation of Federal safety construction or operating
9 regulation was violated, was violated to proximately cause
10 the release.

[61] **Morrison - Direct 170:17-22 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 170**
17 Q Did the National Pollution Funds Center adjudicate
18 whether the responsible parties for the ATHOS I incident were
19 entitled to limit their liability?
20 A Yes, we did adjudicate that and made a decision.
21 Q And what was that decision?
22 A We upheld their limit.

[62] **Morrison - Direct 175:5-7 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 175**
5 Q Okay. And what was your determination, was the claimant
6 entitled to limit its liability?
7 A The claimant was entitled to limit their liability, yes.

[63] **Hellberg – Direct 32:2-14 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 32**
2 Q And what division or branch within the U.S. Coast Guard's
3 National Pollution Fund Center do you work within?
4 A I work within the Claims Adjudication Division.
5 Q What is your current position in the Claims Adjudication
6 Division?
7 A I'm currently the Lead Claims Manager.
8 Q Have you held any other positions at the National
9 Pollution Fund Center prior to this?
10 A Yes, ma'am. I have held the position of Claims Manager
11 and Removal Claims Branch Chief.
12 Q As Supervisor of Claims Managers, do you personally
13 adjudicate claims?
14 A Yes, ma'am, I do.

84

[64] **Hellberg – Direct 32:23-33:4 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 32**
23 Q Did you adjudicate the claims from the responsible
24 parties for the ATHOS spill?
25 A Yes, ma'am, I did.
**Hellberg – Direct 33**
1 Q Were you Supervisor of Claims Managers when the
2 responsible parties for the ATHOS spill submitted their
3 claims to the Oil Spill Liability Trust Fund?
4 A Yes, ma'am, I was.

[65] **Hellberg – Direct 41:15-41:25 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 41**
15 Q And how much did the ATHOS responsible parties initially
16 seek the NPFC to adjudicate?
17 A They initially requested approximately 124 million in
18 their initial submission.
19 Q And did this amount change?
20 A Yes, ma'am, it did.
21 Q And how did that change?
22 A It changed because throughout my adjudication, as I moved
23 through my adjudication, I had continuing communications with
24 the responsible party and that final requested amount did
25 change and it did go up.

[66] **Hellberg – Direct 42:1-6 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 42**
1 Q And did the ATHOS responsible parties later submit a
2 second or supplemental claim for adjudication?
3 A Yes, ma'am, they did.
4 Q For about how much?
5 A That supplemental claim was for approximately $14
6 million.

[67] **Morrison – Direct 178:13-19 (Trial Day 19, October 25, 2010)**
Morrison – Direct 178
13 Q And did you adjudicate those actual removal cost claims
14 yourself?
15 A No, sir, I did not. I directed Donna Helberg of my
16 staff, one of my claims managers actually, she was the chief
17 of the Removal Branch Section at that time, Removal Cost
18 Claim Branch Section at that time and I assigned the claim to
19 her.

[68] **Hellberg – Direct 38:9-39:4 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 38**
9 Q What types of documents do you like to see when you're
10 reviewing a claim for removal costs?
11 A The type of documents I like to see, first of all, would
12 be a cover letter with an amount requested, or we do have an
13 Oil Spill Liability Trust Form -- Trust Fund Claim Form.
14 Along with that, I like to see the invoices, the dailies for
15 those invoices; I like to see any contracts or rate schedules
16 that would be applicable; I like to see photographs, disposal
17 manifests, or any other types of documentation available.

18 Q Did the responsible parties for the ATHOS I spill provide
19 you with those types of documents to support their removal-
20 cost claims?
21 A Yes, ma'am, they did.
22 Q What did you do if you felt the documents submitted by
23 the ATHOS I responsible parties were not sufficient to
24 establish a claimed removal cost as reimbursable?
25 A I would either request additional information or I would
**Hellberg – Direct 39**
1 call the responsible party and request clarification of
2 whatever issue I needed clarification on, or I would speak to
3 people within the Unified Command, whether it be Coast Guard
4 or the Spill Management Team, or the contractors themselves.

[69] **Hellberg – Direct 46:13-16 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 46**
13 Q Now, did you prepare more detailed vendors of the 50-
14 some-thousand pages of documents submitted for all 88
15 vendors?
16 A Yes, ma'am, I did.

[70] **Benson – Direct 34:3-35:11 (Trial Day 19, October 25, 2010)**
**Benson – Direct 34**
3 Q Okay. Are you familiar with something called dailies?
4 A Daily supports, yes.
5 Q What are they?
6 A What they do is they calculate and account for the labor,
7 numbers of laborers, workers, equipment, materials that are
8 used in the oil spill and supplies to support the oil spill,
9 on a day-to-day basis in the geographical area that the
10 workers are working in. At the end of the day, the
11 contractor fills out his daily support sheet listing,
12 itemizing what was deployed that day, and that is presented
13 to our O'Brien's Division Supervisor.
14 THE COURT: Why couldn't O'Brien's do that itself?
15 THE WITNESS: Well, it's contractor equipment, it's
16 contractor labor, and they're primarily responsible for
17 that, they fill out the daily support sheets. Our division
18 supervisor looks at that daily support sheet and concurs that
19 the number of personnel, the number -- the quantity of boom
20 or equipment used for that date is on that daily support
21 sheet, and then they both sign it.
22 BY MR. O'CONNOR:
23 Q Now, when you say a Section Supervisor, that's your man
24 in the field on-site where the contractor in question has his
25 -- whatever his men, equipment and supplies are?
**Benson – Direct 35**
1 A That is correct, that's our Division Supervisor
2 responsible for that geographical area.
3 Q And he literally counts heads?
4 A He does.
5 Q And does he sign the daily that the contractor has
6 provided?
7 A That's affirmative, he does.
8 Q Is that his signification that he agrees that the number

9 of men and equipment set forth in that particular day's daily
10 was in fact on the scene?
11 A That's the exact reason, yes.

[71] **Hellberg – Direct 39:5-12 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 39**
5 Q Using the documents provided by the ATHOS responsible
6 parties, how did you satisfy yourself that contractors were
7 on scene and supplies and equipment were delivered on site
8 and the work was executed?
9 A I reviewed the documentation, such as the contractor
10 invoices, with their dailies, as well as looked at Unified
11 Command documents, such as the incident command -- I mean
12 incident-action plans, I'm sorry.

[72] **Hellberg – Direct 37:6-14 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 37**
6 Q What additional metric did you use to determine the
7 reasonableness of the rates charged by the clean-up
8 contractors hired by the responsible party for the ATHOS
9 spill?
10 A I used the prime contractors' rate schedules.
11 Q What is a prime contractor?
12 A A prime contractor is a contractor that has a direct
13 contract relationship in this case with the responsible
14 party.

[73] **Hellberg – Direct 53:18-55:21 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 53**
18 MS. SHUTLER: Could we have P Exhibit 1419 at ADAM-
19 0020462?
20 (Pause.)
21 BY MS. SHUTLER:
22 Q Ms. Hellberg, what is this document?
23 A This document is a summary sheet that was preceding the
24 invoices associated with Garner Environmental. This
25 particular summary is for Garner's Invoice 403791, the total
**Hellberg – Direct 54**
1 amount of that invoice was $307,350.
2 THE COURT: And 79 cents?
3 THE WITNESS: And 79 cents, yes, sir.
4 BY MS. SHUTLER:
5 Q Ms. Hellberg, how did you determine that the $307,350.79
6 should be paid?
7 A I would take the Garner Environmental invoice and compare
8 it to Garner Environmental's daily.
9 MS. SHUTLER: Could we have Plaintiffs' Exhibit 1419
10 at ADAM-0020463? Can you call out from December -- or --
11 right, yes, December 6th down through December 7th.
12 BY MS. SHUTLER:
13 Q Is this the invoice that corresponds with the $307,350
14 and some cents?
15 A Yes, ma'am, it is.
16 Q Okay. Can you tell me a little bit about this invoice?
17 A Yes, ma'am. At the top it indicates the number that I

18 referenced from the summary sheet; it shows that the first
19 day of response for this particular invoice is Monday,
20 December 6th, 2004.
21 MS. SHUTLER: May I have Plaintiffs' Exhibit 1419 at
22 ADAM-0020469? And can you call out the first two tables?
23 BY MS. SHUTLER:
24 Q What document is this?
25 A This is the contemporaneous daily field log that the

**Hellberg – Direct 55**

1 invoice was generated from.
2 MS. SHUTLER: Now, can I have a side-by-side between
3 the -- for Plaintiffs' 1419?
4 BY MS. SHUTLER:
5 Q Can you explain -- can you compare these two documents
6 together?
7 A Yes, ma'am. Your Honor, the bottom is an excerpt from
8 that daily they just had up. In the first section here that
9 they are showing us is the labor section and it shows that we
10 have one supervisor who began work in the evening at 8:00
11 p.m., worked until midnight, which constitutes four hours of
12 overtime; it shows he worked at a rate of $75. Likewise, a
13 foreman came on that same night, same start time, same stop
14 time, for four hours at a rate of $60 an hour. So, then I
15 took that information and compared it to the invoice on the
16 top, which does demonstrate four hours supervisor overtime
17 with a corresponding same hourly rate, and the same four
18 hours overtime for a foreman at $60 an hour.
19 Q So that in this case you were able to use the dailies to
20 corroborate the invoices for the manpower?
21 A Yes, ma'am.

**[74] Hellberg – Direct 56:9-57:12 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 56**

9 Q How did you verify that the rates were proper for
10 manpower and equipment?
11 A Because I compared the information from the daily and the
12 invoice to the Garner Environmental rate schedule that was
13 submitted with the claim for the responsible party.
14 MS. SHUTLER: Can I have P-1419 at ADAM-0020311?
15 BY MS. SHUTLER:
16 Q Is this the Garner's rate schedule that was submitted by
17 the ATHOS responsible parties?
18 A Yes, ma'am, it is.
19 MS. SHUTLER: Can I have P-1419 at ADAM-0020317?
20 And can we pull out the personnel section?
21 BY MS. SHUTLER:
22 Q Can you explain what this is?
23 A Yes. This is the second page of the Garner rate schedule
24 that begins with the personnel and the first highlighted item
25 shows that a supervisor's overtime rate is 75, it has the

**Hellberg – Direct 57**

1 foreman listed with an overtime rate of 60, which does
2 correlate to the daily as well as the Garner invoice.
3 MS. SHUTLER: Can I have P-1419 at ADAM-0020318?
4 (Pause.)

5 BY MS. SHUTLER:
6 Q What's contained in this component of the Garner's rate
7 sheet?
8 A This shows the rates for automotive equipment and the
9 first highlighted line does demonstrate that the pickup truck
10 was billed out at $115 a day, and at the second-to-the-bottom
11 line here does show a utility trailer at $75 a day, which
12 does match with the daily and the invoice.

[75] **Hellberg – Direct 38:22-39:4 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 38**
22 Q What did you do if you felt the documents submitted by
23 the ATHOS I responsible parties were not sufficient to
24 establish a claimed removal cost as reimbursable?
25 A I would either request additional information or I would
**Hellberg – Direct 39**
1 call the responsible party and request clarification of
2 whatever issue I needed clarification on, or I would speak to
3 people within the Unified Command, whether it be Coast Guard
4 or the Spill Management Team, or the contractors themselves.

[76] **Hellberg – Cross 85:8-25 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 85**
8 Q That was my next question. There was absolutely no issue
9 during the six months of your review with respect to any item
10 that the on-scene command ordered, isn't that correct?
11 A No, that's actually not true.
12 Q Okay. Then what inquiries did you make and to whom and
13 on what basis?
14 A Well, I can't tell you exactly. What I can assure you is
15 that any time I had a question on level of effort or whether
16 something went on because maybe a daily wasn't signed, if I
17 couldn't get clarification through Unified Command documents,
18 then I might call the vendor themselves.
19 Q So, the first level would be the documents that you had
20 yourself to see if there was an explanation?
21 A Right. Or then I would ask the responsible party, I
22 would contact Mr. Chalos, or sometimes he would refer me to
23 Roussel. And then other times, if I needed an answer or felt
24 like they weren't working quick enough, I would call the
25 contractor.

[77] **Hellberg – Direct 34:17-35:19 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 34**
17 Q How do you determine whether the actions undertaken by
18 the responsible party were consistent with the NCP, the
19 National Contingency Plan, or were directed by the Federal
20 On-Scene Coordinator?
21 A I review the documents submitted by the claimant, in this
22 case the responsible party, as well as documents generated by
23 the Unified Command.
24 Q And by -- excuse me.
25 A I'm sorry. In particular, documents such as the
**Hellberg – Direct 35**
1 incident-action plans or pollution reports.

89

2 Q Is there anything particularly useful to you in an
3 incident-action plan when you're trying to make those
4 determinations?
5 A Yes, ma'am. Within the incident-action plan are ICS
6 Forms 204 and 209, and those forms are exclusive to the
7 assignment and summarization of resources on an oil spill.
8 Q And do those forms identify what location and on what day
9 those resources and supplies should be at -- on scene?
10 A Yes, ma'am. Each incident-action plan is for a
11 operational period and for specific locations.
12 Q And are operational periods, at least for the early
13 phases of a spill, on a 24-hour basis?
14 A Yes, ma'am, they are done every day.

[78] **Hellberg - Direct 36:24-37:5 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 36**
24 Q Does reasonable cost require the least cost or cheapest
25 clean-up effort?
**Hellberg – Direct 37**
1 A No, ma'am.
2 Q Why not?
3 A Because it's what's needed, personnel, materials and
4 equipment-wise, to prevent -- mitigating and minimize the
5 effects of the spill on the environment.

[79] **Hellberg – Direct 36:19-23 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 36**
19 Q How did the size of the spill affect your determination
20 of the reasonableness of the cost of the cleanup?
21 A Because the ATHOS I spill was such a large spill, it
22 spanned three states, at the onset of the spill, it required
23 a massive mobilization of personnel, materials and equipment.

[80] **Hellberg – Direct 59:14-17 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 59**
14 Q For a large spill such as the ATHOS, did the Unified
15 Command need oil spill responders from outside the Northeast
16 region?
17 A Yes, ma'am, they did.

[81] **Hellberg – Direct 36:14-18 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 36**
14 A The ATHOS I spill occurred November of '04, which is
15 obviously the winter; therefore, the weather and days were
16 cold, the water was frigid. It required hot meals to all the
17 responders, it required a much more frequent change of
18 personal protective equipment for the responders, and...

[82] **Laferriere – Direct 41:1-24 (Trial Day 18, October 21, 2010)**
**Laferriere – Direct 41**
1 Q Did the unified command ever require the development of
2 specific plans that would supplement the incident action
3 plans, the daily incident action plans?
4 A Yes.
5 Q Why?

6 A One example is the site safety plan. The site safety
7 plan, especially in this spill, is very critical because of
8 the water temperature and the frigid air temperatures. So we
9 developed a specific site safety plan again. It's developed
10 on a 24-hour basis for protecting the workers. That's an
11 example of one plan.
12 Q And what kind of requirements did you include in that
13 site safety plan to protect worker's safety?
14 A That would include things like protective equipment
15 against the oil itself. The oil posed a dermal hazard, so
16 they had to make sure that the workers were protected from
17 skin contact with the oil.
18 Additionally, warm weather gear was important. The
19 issuance of hot meals, and warm meals, and those kinds of
20 things were all critical to insuring the health and safety of
21 the workers.
22 THE COURT: Did you mean warm weather gear?
23 THE WITNESS: Yes, sir. Warm weather gear, right.
24 Winter gear primarily.

[83] **Hellberg – Direct 34:17-35:14 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 34**
17 Q How do you determine whether the actions undertaken by
18 the responsible party were consistent with the NCP, the
19 National Contingency Plan, or were directed by the Federal
20 On-Scene Coordinator?
21 A I review the documents submitted by the claimant, in this
22 case the responsible party, as well as documents generated by
23 the Unified Command.
24 Q And by -- excuse me.
25 A I'm sorry. In particular, documents such as the
**Hellberg – Direct 35**
1 incident-action plans or pollution reports.
2 Q Is there anything particularly useful to you in an
3 incident-action plan when you're trying to make those
4 determinations?
5 A Yes, ma'am. Within the incident-action plan are ICS
6 Forms 204 and 209, and those forms are exclusive to the
7 assignment and summarization of resources on an oil spill.
8 Q And do those forms identify what location and on what day
9 those resources and supplies should be at -- on scene?
10 A Yes, ma'am. Each incident-action plan is for a
11 operational period and for specific locations.
12 Q And are operational periods, at least for the early
13 phases of a spill, on a 24-hour basis?
14 A Yes, ma'am, they are done every day.

[84] **Hellberg – Direct 37:11-38:8 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 37**
11 Q What is a prime contractor?
12 A A prime contractor is a contractor that has a direct
13 contract relationship in this case with the responsible
14 party.
15 Q And in the oil spill-response world, is a prime
16 contractor also known as an oil spill-response organization?

17 A Yes, it is.
18 Q Why did you determine that the prime contractor's rate
19 schedules were reasonable?
20 A I determined that the prime contractor's rate schedules
21 were reasonable because they were commercially negotiated
22 prior to the spill.
23 Q Are the subcontractor rate schedules relevant to your
24 adjudication of a removal cost claim?
25 A No, ma'am, they are not.

**Hellberg – Direct 38**

1 Q Why not?
2 A They are not because, first of all, I use the prime
3 contractor's rate schedule, because they are the entity that
4 was under contract in this case with the responsible party.
5 Additionally, the prime contractors take on full
6 responsibility for their workers, i.e. their subcontractors;
7 therefore, that subcontractor's rate schedule is not
8 relevant.

[85] **Hellberg – Cross 73:23-74:10 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 73**
23 THE WITNESS: It depends on the contractor we're
24 talking about. This was a very big spill with a varied
25 amount of contractors. I stated in my direct that I used the

**Hellberg – Cross 74**
1 prime contractor's rate schedule and in doing so, while I
2 made a reasonableness determination of rates, I used the
3 prime contractor's rate schedule because it was commercially
4 negotiated prior to the spill. Therefore, I looked at those
5 rates in comparison to all of the rates that I had in-house
6 prior to the ATHOS spill, ongoing during the ATHOS spill, as
7 well as demonstrated by my comparison chart after the
8 fact, and looked at those to look at the overall pricing
9 mechanism and consistency of prices, and took all of that
10 information and made a monetary determination.

[86] **Hellberg –Cross 78:8-22 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 78**
8 Q To be clear with the Judge's question, if it was 200 on
9 the invoice and 200 on the rate sheets, you would have
10 assumed it was per se reasonable because that was the
11 negotiated contracted rate on the rate sheet, correct?
12 A No, you're misstating. I told you that I looked at the
13 prime contractors' rate schedules because they are the
14 contracts that were with the RP, but I looked at it on two --
15 four -- two-fold; I looked at it because the rates were
16 commercially negotiated in advance, well before the spill,
17 but I also looked at the rates and compared them to what I
18 know at that time were going prices in the oil spill response
19 industry and, if I felt comfortable those rates were
20 reasonable, which for a given case, if I didn't deny for
21 unreasonable, then I determined the rates to be reasonable
22 not just because a contract existed.

[87] **Hellberg – Direct 60:17-61:23 (Trial Day 20, October 26, 2010)**

**Hellberg – Direct 60**

17 Q And where did you get the rates charged by NRC that are
18 contained in this particular chart?
19 A I received them from claimants at the time claims came in
20 that I adjudicated for each of these incidents.
21 Q Okay. Can you discuss what you see on this page in more
22 detail now?
23 A Yes, ma'am. If we did take the project manager, for
24 instance, the first line item, sir, the highlighted column
25 indicates that NRC for ATHOS charged an hourly rate for a

**Hellberg – Direct 61**

1 project manager of $95. If you look at the next two columns,
2 that's the DBL-152 and NRC likewise charged the same hourly
3 rate for a project manager. Then if we go to the COSCO BUSON
4 spill that occurred in California in '08, we'll see that NRC
5 charged the same rate for a project manager at that spill.
6 And then the DUBAI STAR in California in 2009, they charged
7 $100 an hour, as did they in the KOPEKA (ph.) spill in Puerto
8 Rico in 2009.
9 Q What does this show you about the rates charged by NRC
10 for the ATHOS I?
11 A It shows me that the NRC rates for the Athos I are
12 consistent with what NRC charged in following years on
13 following spills, they are pretty much consistent. And it
14 does indicate that over many years prices do go up, but they
15 varied very minimally.
16 MS. SHUTLER: Could we have Exhibit 168 NPFC-000148?
17 BY MS. SHUTLER:
18 Q And is this the NRC rate contract submitted to the NPFC
19 as part of a request for adjudication of removal costs for
20 the DBL spill you were just referring to?
21 A Yes, ma'am, it is.
22 MS. SHUTLER: Could I have U.S.A. Exhibit 168 NPFC-
23 000153? And can we call out the first part of the document?

[88] **Hellberg – Direct 62:11-64:19 (Trial Day 20, October 26, 2010)**

**Hellberg – Direct 62**

10 BY MS. SHUTLER:
11 Q Ms. Hellberg, is this where you got the rate information
12 for your comparison chart?
13 A Yes, ma'am. This is the second page of the NRC rate
14 schedule for the DBL spill. And if you look at the second
15 line item, sir, you can't see the gray area, but what that
16 demonstrates is that the project manager rate of $95 that I
17 put on my chart, I did receive it from this rate schedule.
18 Q All right. Please turn to Tab 14 of your binder.
19 MS. SHUTLER: Tab 14 contains U.S. Exhibits 167,
20 168, 171 and part of P-1419.
21 THE COURT: And therefore what?
22 BY MS. SHUTLER:
23 Q Are these the rate sheets you used to create this chart?
24 A Yes, ma'am, they are.
25 Q And were these rate sheets submitted to the NPFC as

**Hellberg – Direct 63**

1 documentation in support of adjudication for removal cost

2 claims for the ATHOS, the COSCO BUSON, the DUBAI and the
3 KOPEKA spills?
4 A Yes, ma'am, they are.
5 Q And do you review these rate sheets as part of your
6 adjudication of these claims?
7 A Yes, ma'am.
8 Q Are these rate sheets maintained in NPFC's records?
9 A Yes, ma'am, they are.
10 Q Did you likewise compare -- create a comparison of rates
11 charged by the O'Brien's Group?
12 A Yes, ma'am, I did.
13 MS. SHUTLER: Could we have U.S.A. Exhibit 366,
14 Comparison Table Page 2?
15 BY MS. SHUTLER:
16 Q Why did you select the O'Brien's Group?
17 A I selected the O'Brien's Group because they are one of
18 the most -- the most frequently used spill management teams
19 on large spills.
20 Q Are the rates charged for labor or equipment in either
21 the ATHOS or the DBL spill one year later any different?
22 A No, ma'am, they're exactly the same with the exception of
23 the charge for mileage.
24 MS. SHUTLER: May I have U.S.A. Exhibit 169 at NPFC-
25 000159? And can you call out the first third?
**Hellberg – Direct 64**
1 BY MS. SHUTLER:
2 Q What is this document?
3 A This document is the O'Brien's Group contract with the
4 responsible party for the DBL-152 spill and its associated
5 rate schedule.
6 Q Okay. And if you turn to Tab 15 --
7 MS. SHUTLER: -- we can take this down --
8 BY MS. SHUTLER:
9 Q -- this contains the exhibits that include rate sheets
10 for TOG -- or the O'Brien's Group that were submitted for
11 both the ATHOS and the DBL spills?
12 A Yes, ma'am, that's correct.
13 Q And did you use the rate sheets that are contained in
14 this tab in putting together your comparison table for the
15 O'Brien's Group?
16 A Yes, ma'am, I did.
17 Q Did you get the O'Brien's Group information from claim
18 submissions to the NPFC for the ATHOS and DBL spills?
19 A Yes, ma'am, I did.

[89] **Hellberg – Direct 66:2-9 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 66**
2 Q Why did you look at these rate sheets as well as those
3 for the O'Brien's Group and NRC?
4 A I'm sorry?
5 Q Why did you look at those rate sheets at Tab 16 as well
6 as those from the O'Brien's Group and the NRC?
7 A Because it gave me the opportunity to do a comparison of
8 reasonable rates and what is similar at any given point in
9 time.

[90] **Hellberg – Direct 33:5-34:12 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 33**
5 Q What was your final determination with respect to the
6 removal cost claims submitted by the ATHOS responsible
7 parties?
8 A My final determination was that Frescati was entitled to
9 a payment of approximately 88 million beyond their limit of
10 liability of 45.4 million.
11 Q Ms. Hellberg, what do you mean by an adjudication of a
12 claim for removal costs?
13 A An adjudication of a claim for removal costs is when I
14 review all of the documentation submitted by the claimant, as
15 well as governing regulations, and I make a determination of
16 whether the costs are compensable by the Oil Spill Liability
17 Trust Fund.
18 Q And when you say compensable, do you mean reimbursable?
19 A Yes, ma'am.
20 Q And what are removal costs?
21 A Removal costs are the costs for actions to remove oil.
22 Q When is a responsible party, such as Frescati or Tsakos,
23 entitled to recover their removal costs from the Oil Spill
24 Liability Trust Fund?
25 A An RP is entitled to recover their costs once the Coast
**Hellberg – Direct 34**
1 Guard has made a determination of entitlement to their limit
2 of liability.
3 Q What compensation is allowable once the Coast Guard's
4 National Pollution Fund Center has determined that a
5 responsible party may limit its liability?
6 A By regulation, it's the actions that were taken to
7 prevent, minimize and mitigate the effects of the spill on
8 the environment, those costs must be a result of those
9 actions and the actions must have been determined by the
10 Federal On-Scene Coordinator to be consistent with the
11 National Contingency Plan or were directed by the Federal On-
12 Scene Coordinator.

[91] **Hellberg - Direct 34:13-16 (Trial Day 20, October 26, 2010)**
**Hellberg Direct 34**
13 Q What standard of proof do you employ to determine that
14 the claim for reimbursement meets the standards you just
15 listed?
16 A A preponderance of the evidence, more likely than not.

[92] **Hellberg - Direct 43:8-11 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 43**
8 Q And who drafted this letter here?
9 A I drafted this letter, ma'am, for Tom Morrison's
10 signature, he was Chief of Claims Adjudication Division,
11 making an offer to the RP of approximately 77.1 million.

[93] **Hellberg – Direct 42:1-6 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 42**
1 Q And did the ATHOS responsible parties later submit a

2 second or supplemental claim for adjudication?
3 A Yes, ma'am, they did.
4 Q For about how much?
5 A That supplemental claim was for approximately $14
6 million.

[94] **Hellberg – Direct 43:15-25 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 43**
15 Q And did you make a recommendation for payment with
16 respect to the supplemental claim?
17 A Yes, ma'am, I did.
18 MS. SHUTLER: Could we have U.S.A. Exhibit 161 at
19 NPFC-00095?
20 (Pause.)
21 BY MS. SHUTLER:
22 Q Is this document your recommendation for how much to
23 reimburse the ATHOS responsible parties for their
24 supplemental claim?
25 A Yes, ma'am, it is.

[95] **Hall – Direct 193:6-21 (Trial Day 10, October 6, 2010)**
Hall – Direct 193
6 Q And is this a letter that you wrote to the captain of the
7 port in Philadelphia?
8 A Yes.
9 Q And this letter was directed to the captain at his
10 request?
11 A Yes.
12 Q And does this letter reflect the penultimate number that
13 you determined was the loss cargo to the river?
14 A Yes, it was the best estimate that I could make.
15 MR. BERGERE: Could we bring up the final sentence
16 of the second paragraph, the final two sentences there?
17 (Pause.)
18 BY MR. BERGERE:
19 Q And can you point out for the Court what the final tally
20 was, the total estimate of the amount of oil was?
21 A The best estimate that I could make was 264,335 gallons.

[96] **Laferriere – Direct38:20-39:15 (Trial Day 18, Oct. 21, 2010)**
Laferriere – Direct 38
20 Q And what happens when the federal on-scene coordinator
21 takes action on his own?
22 A Basically what he's doing is he's now assuming financial
23 responsibility for the cleanup for that particular act, and
24 in some cases, he can do -- take over the entire incident.
25 THE COURT: But then does he then hold the
Laferriere – Direct 39
1 responsible party liable somehow?
2 THE WITNESS: The responsible party would be
3 responsible now for recovering -- for paying for all the
4 Coast Guard costs, which before he didn't have to, so this
5 would include salaries, the cost of our helicopters, the cost
6 of our boats, the cost of our parts, so it would be much more
7 expensive for him to do that.

96

8 BY MS. SHUTLER:
9 Q And how much more expensive would it be for a -- for a
10 typical -- in a typical spill response?
11 A On average between two and three times more expensive.
12 So it's designed to be a disincentive to have the Federal
13 Government do all the cleanup. The way the Oil Pollution Act
14 and National Contingency Plan is designed is that the spiller
15 cleans up the oil.

[97] **Benson - Direct 19:21-20:13 (Trial Day 19, Oct. 25, 2010)**
Benson – Direct 19
21 Q Is it true that the faster you get the spill contained
22 and cleaned up that, in the long run, the more money you're
23 going to save the client?
24 A Absolutely. In my end of the business, I refer to that
25 as the golden hour. We need to respond as fast as we can
Benson – Direct 20
1 with available assets and resources that are closest to the
2 spill site. As information and intelligence flows into the
3 Command Center and we get a better handle on the extent of
4 the spill, we add to those assets and resources in an
5 encompassing fashion, starting locally, regionally, state,
6 East Coast, West Coast, Gulf Coast, and we respond
7 accordingly.
8 Q Is it easier to bring additional resources to a spill or
9 to send extra resources home?
10 A The way I calculate that is I would prefer to over
11 respond to a spill, that way I know I have the necessary
12 labor, the equipment and materials to combat the spill. I
13 can always send it home.

[98] **McLellan – Direct 136:20-137:9 (Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 136
20 Q What separates your company from spill on-site
21 management, who we have heard from in this trial, and finance
22 sections of spill-management teams?
23 A Unlike SOS, spill on-site management, MR & Associates has
24 never worked for a contractor, and we generally do not and
25 have not worked for a spill-management team. We think that
McLellan – Direct 137
1 can create a conflict of interest and so we haven't crossed
2 over. As a result of that, MR & Associates many times is not
3 per se sitting in the finance section chair of a spill-
4 management team, most times we're hired by the insurance
5 companies to observe and to do a separate audit to make sure
6 that the spill-management team and on-site cost-control
7 company is doing what they're doing, because based on their
8 history the insurance companies are not comfortable leaving
9 those companies to do that job themselves.

[99] **McLellan – Cross 195:6-21(Trial Day 21, Nov. 3, 2010)**
McLellan – Cross 195
6 Q Now, at the outset of your testimony, you stated that
7 your firm does not sit in the finance section of spill
8 management teams under the unified command structure. Did I

9 hear that correctly?
10 A What I stated was that normally, we don't sit in that
11 finance chair under a unified command structure. We do the
12 same function. We just don't sit in that same chair because
13 we don't align ourselves with a spill management team and
14 generally, my clients want me to audit the spill management
15 team. And so, I don't, like I say, we don't align ourselves,
16 we believe that's a conflict of interest.
17 THE COURT: Your role is to criticize what they do,
18 right?
19 THE WITNESS: That's correct, your Honor and if
20 we're not in that position or if we're aligned with the spill
21 management team, that makes it difficult.

[100] **McLellan – Direct 172:3-173:16 (Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 172
3 Q Your next category of adjustments, Mr. McLellan, relate
4 to standard rate adjustments. Explain what you mean by
5 overpayments relating to standard rate adjustments.
6 A In a spill response, a proactive cost-control unit, as
7 soon as they get on site, want to engage in negotiations with
8 the spill contractors. You have to understand that the
9 contracts that are in place generally are really for
10 emergency, short-duration contracts. And so the contractors
11 understand anything of a longer duration, they're going to be
12 subject to renegotiation. This particular case, as the cost-
13 control, SOS and the spill-management team testified, they do
14 not believe that you should attempt these types of
15 negotiations early on an event, they did not attempt them
16 until towards the middle of December; that's contrary to our
17 philosophy. Our philosophy is that and our experience has
18 been that the best time to get a rate adjustment is at the
19 outset of an event, that way both parties have an expectation
20 of what's going to happen and you meet with them and you try
21 to get those rate negotiations. And in this particular case
22 we believed that, based on everything that we saw, that --
23 that the spill-management team should have been able to
24 negotiate reduced rates off of the contracted rates as early
25 as day one, but we didn't do it at day one. We gave them a
McLellan – Direct 173
five-day window and we didn't make these adjustments until
2 day six. So, this adjustment reflects the difference from
3 day six until the spill-management team made their
4 adjustments, but it goes onward because what we found was,
5 even though they had made adjustments, there were errors in
6 applying those adjustments, and so they were put into this
7 category.

[101] **McLellan – Cross 97:4-98:7 (Trial Day 22, Nov. 4, 2010)**
McLellan – Cross 97
4 Q Well, there were approximately, how many contractors and
5 Osrows, who were on the site as of December 17th or December
6 5th, when you would have had them out there reducing their
7 rates?
8 A I think it would be easier just to state that what we did

9 with the rate adjustments for the contractors that SOS had
10 achieved the rate adjustments. In our opinion, those rate
11 adjustments could have been achieved earlier had they
12 initiated negotiations at the outset of the event, just like
13 we saw yesterday with NRC. And so, we took the same
14 contractors that they had negotiated and we just started
15 those rate adjustments on Day 6.
16 Q And did you speak to any of the Osrows or the
17 contractors, in this case, to find out whether they would be
18 amenable to any such adjustment?
19 A No, I did not speak to any of the contractors. I just
20 was looking at the evidence in the case and the evidence
21 established that the contractors were amenable to rate
22 reductions early on.
23 THE COURT: You've answered the question. Don't
24 make speeches.
25 Q What evidence did you have that they were amenable to
McLelland – Cross 98
1 taking rate reductions?
2 A The evidence that we showed yesterday.
3 Q That was the NRC and Clean Harbors negotiation in which
4 Clean Harbors agreed to take a ten percent discount on its
5 bills in exchange for NRC's agreement to make prompt payment
6 of 70 percent of its bills within 14 days and full payment
7 within 30?

[102] **McLellan – Direct 152:18-153:13 (Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 152
18 Q The first item in your chart of categories is, "Third-
19 Party Labor Rate Adjustments." Can you describe for the
20 Court what you mean by that category, Mr. McLellan?
21 A When you have a spill of this size, you understand that
22 the contractors that are going to respond to the spill are
23 not going to have the adequate manpower that you're going to
24 need. So, the spill-management team has to recognize this
25 fact and determine where he's going to get this manpower and
McLellan – Direct 153
1 how it's going to be billed. And so in this particular case
2 it involved temporary labor and these bill-management team,
3 instead of either going out and contracting with this laborer
4 directly, they allowed the contractors to bill the labor out
5 as their own employees, contrary to some of the contracts,
6 but contrary to good, sound cost-control practices overall.
7 Q Is it more expensive for these type of vendors to bill
8 out these temporary employees as if they were their own
9 employees as opposed to just applying an invoiced amount plus
10 a markup?
11 A Very much so, it can be several times the amount that
12 would result if you did it in accordance with their contract
13 or a renegotiated contract, a cost plus a markup.

[103] **McLellan – Direct 166:6-167:6(Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 166
6 Q The third category of your overpayments relates to third-
7 party rental equipment rate adjustment for $1,535,185.40.

8 Please describe what falls into that category.
9 A That is very similar to the third-party labor. Again,
10 when these spill-management teams come on site, they're aware
11 of the resources that the contractors have, they're also
12 aware that they don't have all the resources they're going to
13 need. As Mr. Benson testified, they knew they were going to
14 need power washers. At that point, you have to make a
15 business decision. If you're the RP, responsible party,
16 excuse me, you're going to make a decision, is it cheaper for
17 me to go out and buy those machines and still have them
18 available for salvage after or is it more advantageous for me
19 to have the contractors rent them back to me? Generally, in
20 a spill of this size, of long duration, you know you're going
21 to need this equipment, it's going to be much, much more
22 advantageous to you financially to buy that equipment
23 yourself. At the very least, you would not want them to bill
24 it at their own rates, you would want it to be billed at cost
25 plus a markup.
McLellan – Direct 167
1 Q Do you have examples here where one of the oil-spill
2 response contractors actually rented equipment and then
3 billed that out to the responsible party at its own standard
4 rates, as if it was his own equipment, when in fact it had
5 leased that equipment from someone else?
6 A Yes, sir.

[104] **McLellan – Direct 176:25-179:14 (Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 176
25 Q The next item, Mr. McLellan, is "Missing and Unsigned
McLellan – Direct 177
1 Dailies."
2 First, dailies have been talked about a lot at this
3 trial; what are dailies?
4 A Dailies are a listing of the daily resources that a
5 contractor states he uses on a particular day, but to fully
6 understand a daily I'd like to just give you a brief history
7 on it, is that what was happening is that contractors would
8 give a daily several days after the fact to the responsible
9 party, and the responsible party had a complaint that how do
10 I know the resources are here. And so they said, well,
11 you've got to get them assigned. So, the problem was they
12 were still giving them several days after the facts, and
13 people were signing them and then the contractors were taking
14 that signed daily and using it as proof and going to court on
15 it to say you approved everything. Well, we -- back in 1997,
16 we began telling anyone on a spill response you have to put,
17 "Subject to Audit."
18 You have to understand also that, contrary to what
19 Mr. Benson testified to, he gave the vision of a contractor
20 that --
21 MR. BERGERE: Your Honor, can I object? This is --
22 there's not even a question, he's just going on ad hominem.
23 THE COURT: Your objection is overruled. It's
24 interesting.
25 THE WITNESS: Contrary to what Mr. Benson testified

McLellan – Direct 178
1 to, he said that and he gave you the vision that you've got
2 the contractor standing there and you've got the RP -- or the
3 zone manager there and they're counting out each one. And
4 your Honor stated, well, why then doesn't the zone manager
5 make the daily? The truth of the matter is that daily
6 doesn't get made by that zone manager or by that contractor
7 in the field. Generally, that daily is produced in an office
8 someplace and that's why you don't get it that day, you get
9 it later on and, if you look at it, the dailies aren't signed
10 -- they're not dated and many times they are several days
11 after the fact. So, you still have the problem is that with
12 several hundred items on a daily, several hundred
13 individuals, how anyone without keeping independent notes --
14 and that's what we do on a spill, that's the only way that
15 you can capture those quantities is that zone manager -- he
16 has two functions: One, he has got to capture all of the
17 resources, because if you think about it, if the zone manager
18 was doing his job and there came in a daily that was
19 unsigned, there wouldn't be any question, he would just go
20 back to the zone manager and say, produce your notes. And I
21 would look at them and you could reconcile it, but that
22 didn't happen. I have worked with O'Brien's on several
23 spills, they don't do that. And so that's the issue with the
24 dailies is that you have dailies that don't get signed until
25 after the fact, and so it's not really a representative of
McLellan – Direct 179
1 what's actually out there -- or may not be.
2 BY MR. BLANCHARD:
3 Q Is there any way to confirm the work was done or
4 equipment supplied if you don't have a signed daily, Mr.
5 McLellan?
6 A Yes, if the zone manager would have kept independent
7 notes and he was able to do that. But in this case, you've
8 heard both Mr. Benson and Steve Calgiman, they both testified
9 during their depositions, they said, if you don't have a
10 signed daily, then the resources haven't been approved and
11 they both should be rejected. And so in this instance, if I
12 have two people working on the response and they both
13 testified that an unsigned daily or missing -- they should be
14 rejected, that's what I did, I rejected it.

[105] **Hellberg – Direct 39:23-40:6 (Trial Day 20, October 26, 2010)**
Hellberg – Direct 39
23 Q Do all contractors or vendors even submit dailies?
24 A No, ma'am. There are -- off the top of my head, there
25 are a couple contractors in this particular incident, Amquip
Hellberg – Direct 40
1 and Aramsco, they are vendors that do not have daily field
2 logs, so to speak. They are what I would consider equivalent
3 to your local Home Depot or Lowes, where you obtain supplies;
4 therefore, dailies aren't generated.
5 Q So, they would simply have a receipt submitted?
6 A Yes, ma'am.

[106] **Hellberg – Direct 32:15-20 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 32**
15 Q What sources of the law do you rely upon in adjudicating
16 whether removal costs expended by a responsible party can be
17 recovered from the Oil Spill Liability Trust Fund?
18 A I use the Oil Pollution Act of 1990, the governing claims
19 regulations, which can be found at 33 CFR Part 136, and the
20 National Contingency Plan.

[107] **Hellberg – Cross 90:3-20 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 90**
3 Q Whose signature did you expect on the dailies?
4 A I don't expect a signature on the daily; if there is one,
5 it's ideal and it's great, but it's a preponderance of the
6 evidence, sir. It's what was going on as ordered by the
7 Federal On-Scene Coordinator that the daily coincides with.
8 So, for instance, if Miller was out there and Miller didn't
9 sign it, but I go back to the FOSC documents and I can get
10 Coast Guard field notes that show Miller was in a given zone
11 on that day, and the response objective was being met and
12 that was articulated in the daily, I don't need a signature
13 on a daily, that's not a reason not to pay.
14 Q And you're aware of no criteria or guideline or
15 recommendation in the NPFC's requirements that in fact
16 require signed dailies?
17 A No. Actually, our only requirements for adjudication of
18 removal cost claims, sir, are found at 33 CFR 136-203 and
19 205, and neither of those citations say there has to be a
20 signed daily.

[108] **McLellan – Direct 189:2-191:12 (Trial Day 21, Nov. 3, 2010)**
McLellan – Direct 189
2 Another important point about the NPFC is that when
3 the spill-management team, they have it in their guidebooks
4 that state that, you know, to determine this reasonableness
5 is that they wanted the spill-management team to submit any
6 audits that they had for costs that were denied, adjusted or
7 paid. We know in this case that SOS performed an audit, it
8 was a line-by-line-item audit. We also know that there was
9 communications going back and forth between the SOS and the
10 OSROs to say -- to say, hey, this is what we disagree with.
11 None of those audits, outside of the few that showed some
12 disallowances, were presented to the Fund Center and the Fund
13 Center did not ask for them. If we could just go to the
14 O'Brien's Group, it was over a $600,000 difference, the
15 responsible party hired an independent contractor to come in
16 and review O'Brien's invoices, and those invoices showed
17 there was over -- it was about 700,000 -- it was only on
18 about a few of the invoices, it wasn't even on all of them --
19 the NPFC did not request or ask to see what this independent
20 company found unreasonable. Now, we weren't provided with
21 that, so we can't comment on what it was, but it would seem
22 to beg the question that if somebody found something
23 unreasonable the NPFC, who is supposed to be guarding the
24 trust, the Fund, would have wanted those answers. Throughout

25 the whole thing, there's -- this is a very voluminous case,

McLellan – Direct 190

1 it would entail -- I can just tell you from what we had to do
2 in our office to do all the calculations, there's absolutely
3 no way the NPFC did those calculations. I know they looked
4 at some rates; we didn't challenge the rates. Most of the
5 rates we used we accepted with what SOS had. So, it's not
6 the rates, it's making sure that you put in place a cost-
7 management structure that gives a cost-efficient response
8 from day one, not day 15. You are supposed to be
9 representing the RP. I have a -- I have a real big issue
10 right now, because based on --
11 MR. BERGERE: Your Honor, can I interpose an
12 objection? In the past the Court admonished --
13 THE COURT: Oh, go right ahead. Your objection is
14 sustained.
15 MR. BERGERE: Thank you.
16 THE COURT: He's not responding to any particular
17 question that I am aware of.
18 BY MR. BLANCHARD:
19 Q Mr. McLellan, just a few more questions.
20 You mentioned in your report that the NPFC should
21 have done a quantitative analysis. Can you briefly describe
22 what you mean by quantitative analysis?
23 A A quantitative analysis is simply looking and ensuring
24 that whatever was charged is accurate, you know, looking at
25 the rates.

McLellan – Direct 191

1 THE COURT: It means how much, in other words?
2 THE WITNESS: That's correct, your Honor.
3 BY MR. BLANCHARD:
4 Q And you also mentioned qualitative analysis; what do you
5 mean by that?
6 A A Qualitative analysis is presented in the publications
7 that the NPFC that produces that tells the claimants that
8 they will do a qualitative analysis. A qualitative analysis,
9 as explained by the NPFC in their guidebooks, if you had a
10 five-gallon spill, it should have cost 50,000 to clean up.
11 And we did not see any evidence that they did a qualitative
12 analysis.

**[109] Morrison – Direct 179:15-180:7 (Trial Day 19, October 25, 2010)**
**Morrison – Direct 179**

15 Q Okay. Can you tell us what this document was?
16 A Yes, sir. That was April 2003 is the date at the bottom
17 and that was a claimant's guide that was developed to assist
18 claimants in understanding what they need to submit to the
19 National Pollution Funds Center to help speed the process in
20 the evaluation of their claims.
21 Q Thank you.
22 MR. FLYNN: And can we pull up Morrison-57?
23 BY MR. FLYNN:
24 Q And what is this document?
25 A This is a 2005 version of the frequently asked questions

**Morrison – Direct 180**

1 for oil spill response organizations. Specifically this type
2 of claimant only dealing with removal costs has more specific
3 issues that this document was intended to supplement the
4 document you previously showed in order to help the oil spill
5 response organizations streamline their claims process and
6 make sure they have the information we need so we can move
7 faster and this is guidance.

**110 Hellberg – Cross 90:25-91:19 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 90**
25 MR. WALKER: Hellberg Exhibit 8?
**Hellberg – Cross 91**
1 BY MR. WALKER:
2 Q You're familiar with this?
3 A I have seen it, yes, sir.
4 Q You saw it for the first time in your deposition?
5 A I don't know if that's the first time I've seen it, no,
6 but I have seen it.
7 Q And is it your testimony that nothing in this document
8 applies to the Claims Managers and their adjudication
9 process?
10 A No. This document was created as a helpful hint, it was
11 put on the Coast Guard's Web site for potential claim OSROs
12 if they had questions of what might be helpful for them to
13 submit to the Fund in support of their claim; that is by no
14 means a regulation of what I need to do to adjudicate a
15 claim.
16 Q Right. So, there's nothing in this document that you
17 consider to be guidelines or recommendations for Claims
18 Managers adjudicating claims, correct?
19 A Correct.

**111 Hellberg – Cross 94:17-95:3 (Trial Day 20, October 26, 2010)**
**Hellberg – Cross 94**
17 Q So, what you're saying is that the NPFC disseminates to
18 the general public on its Web site what we have seen on the
19 front page, which is the NPFC claims process, and expects the
20 claimants to abide by it, but that you do not?
21 A No, sir --
22 THE COURT: It's a recommendation to the claimant?
23 THE WITNESS: Right. It's not a requirement, sir,
24 this is guidance, helpful hints for somebody submitting a
25 claim. This does not mean a claim has to come in any
**Hellberg – Cross 95**
1 particular way. A claimant can submit a claim and submit
2 whatever they want, the burden is on them. This is just to
3 help them.

**112 Hellberg – Direct 32:15-20 (Trial Day 20, October 26, 2010)**
**Hellberg – Direct 32**
15 Q What sources of the law do you rely upon in adjudicating
16 whether removal costs expended by a responsible party can be
17 recovered from the Oil Spill Liability Trust Fund?
18 A I use the Oil Pollution Act of 1990, the governing claims
19 regulations, which can be found at 33 CFR Part 136, and the

20 National Contingency Plan.

[113] The better practice under the modern Federal Rules of Civil Procedure is to plead recoupment as a Rule 13(a) counterclaim. *See* 3 James Wm. Moore *et al.*, Moore's Federal Practice – Civil § 13.11, at 13-24 (3d ed. 2009); *Ace Hardware Corp. v. Marn, Inc*., Case No. 06-5335, 2008 U.S. Dist. LEXIS 84709, at *30 (N.D. Ill. Sept. 16, 2008) (claim for recoupment is not technically a defense). CARCO argues recoupment need not be predicated on a claim. However, the very cases cited in its post trial briefs involve monetary claims. CARCO cited *Bull v. United States* for the proposition that "recoupment is in the nature of a defense arising out of the same feature of the transaction upon which the plaintiff's action is grounded." CARCO, however, takes this quote out of context. In *Bull*, a taxpayer argued that it had overpaid its taxes and filed a *claim* for a refund from the Commissioner of Revenue, which was denied. The taxpayer litigated his claim in the Court of Claims which held for the Commissioner. Subsequently, the United States filed suit against the taxpayer for additional taxes arising from the same transaction as the previous litigation. Defendant taxpayer "made a counter demand for recoupment of the previous overpayment of taxes" by way of a defense, which was otherwise barred by the statute of limitations. The Supreme Court held that where the government's new proceeding arose from the same transaction, the statute of limitations could not bar defendant's defensive monetary *claim* for recoupment. *Bull*, 295 U.S. 247, 262 (1935). Likewise, CARCO cites *United States v. Shaw*, 309 U.S. 495 (1940) and *U.S. Fidelity*, 309 U.S. 506 for the proposition that a defendant may assert a recoupment defense against the United States to the extent of the amount of the government's claim. CITGO Post Tr. Br., Doc. 594 at 191. But in *Shaw*, the administrator of an estate asserted a *cross claim* for a specific amount against the United States in excess of the amount that the United States sought against the administrator. The Supreme Court held that the administrator was entitled to assert a cross claim to "set-off" a monetary amount only up to the amount sought by the United States. *Shaw*, 309 U.S. at 502;[9] *U.S. Fidelity*, 309 U.S. at 512 ("Defendant may, without statutory authority, recoup on a *counter claim* an amount equal the principal claim.") (emphasis added).

[114] Notwithstanding CITGO's assertions to the contrary, Captain Gregory Adams, former Coast Guard Captain of the Port, Philadelphia (1998 - 2002), and member of the Mariner's Advisory Committee from 1998 through the present, testified that the Mariner's Advisory Committee never relied on the Corps to conduct continuous hydrographic surveys to search for objects

[115] **Rankine – Direct 9:2-6 (Trial Day 30, Nov. 22, 2010)**
Rankine – Direct 9
2 Q All right. Since 2002, you have been employed by CITGO?
3 A I have, yes.
4 Q And when you joined CITGO, did you join as a Port
5 Captain?
6 A I joined as a Senior Port Captain, yes.

[116] **Rankine – Direct 9:21-24 (Trial Day 30, Nov. 22, 2010)**
Rankine – Direct 21
21 Q And who would be responsible for providing guidance to
22 the terminal on issues relating to marine safety at the
23 berth?
24 A That was my job, marine safety, marine guidance.

[117] **Rankine – Cross 88:1-14 (Trial Day 30, Nov. 22, 2010)**
Rankine – Cross 88
Q Did you gain any such experience in hydrographic surveys
2 that would look for obstructions at any time between the time
3 you started in January of 2002 and before the date of the
4 accident, November 26th, 2004?
5 MR. WALKER: Objection, beyond the scope.
6 THE COURT: It is indeed.
7 THE WITNESS: No.
8 THE COURT: Objection overruled.

9 BY MR. LEVY:
10 Q In November of 2004, did you have any knowledge or
11 experience as to what the Army Corps of Engineers was doing
12 to check the Federal anchorage for obstructions and debris?
13 A Not my area of responsibility, so I didn't pay any
14 attention to what they were doing.

[118] **Rankine Dep. 248:23-249:12 (Oct. 16, 2007)**
Rankine 248
23 Q Before that time, actually, before
24 the ATHOS 1 incident on November 26, 2004, did you
25 assume that there was no obstruction to navigation
Rankine 249
1 in the federal anchorage, Anchorage No. 99?
2 MR LEBLANC:
3 Object to the form of the
4 question.
5 THE WITNESS:
6 No.
7 BY MR. LEVY:
8 Q Do you believe there were
9 obstructions out there?
10 A It wouldn't have surprised me.
11 Q Why wouldn't that surprise you?
12 A Because ships lose anchors.

[119] **Capone – Direct 135:12-136:1 (Trial Day 6. Sept. 29, 2010)**
Capone – Direct 135
12 Did you also form an opinion as to whether it was
13 common, in November of 2004, to find debris on the Delaware
14 Riverbed including in anchorages?
15 A Yes.
16 Q And what's your opinion?
17 A My opinion is that debris was very common.
18 Q And how did you form that opinion?
19 A Well, there were actually three facets of forming that
20 opinion. The first was personal experience and --
21 Q What was your personal experience?
22 A I have conducted over 75 side scan surveys on the various
23 parts of the river and anchorages, the second was examining
24 other people's data from some other reports, and the third
25 was just a very general internet search in looking for news
Capone – Direct 136
1 articles.

[120] Where the statutory or regulatory language is clear, courts must give effect to that language.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (*citing Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990)).  Courts have applied this maxim where statutes, such as OPA, have explicitly provided subrogation. *Thompson v. Workers Comp. Appeal Bd.*, 781 A.2d 1146 (Pa. 2001); *U.S. Fid. & Guar. Co. v. McAuliffe*, No. 94-4431, 1996 U.S. Dist. LEXIS 433, at *10 (E.D. Pa. 1996) ("[T]he courts are cautious about denying subrogation rights on [equitable] grounds, insisting that any allegation of wrongdoing by the employer must be weighed against the plain wording of the statute which gives the employer an unqualified right to subrogation."); *Winfree v. Phila. Elec. Co.*, 554 A.2d 485, 487 (Pa. 1989) ("as a general principle of law, the employer's subrogation rights are *statutorily absolute* and can be abrogated only by choice") (emphasis added).

106

[121] In fact, "OPA explicitly supercedes the Limitations Act's liability limits with respect to cleanup costs and damages from oil." *Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1347 (11th Cir. 1998); *In re Lloyd's Leasing, Ltd.,* 764 F. Supp. 1114, 1137 (S.D. Tex. 1990).  Likewise, OPA's subrogation provision supercedes CARCO's equitable subrogation theory.

[122] While briefly considered post ATHOS, Congress never provided the Corps with appropriations to prophylactically search for obstructions to navigation in the Delaware River Project. See, e.g., Hearing before the Subcomm. on Coast Guard and Maritime Transportation of the Comm. on Transportation and Infrastructure, 109th Cong. 5 (1st Sess. Jan. 18, 2005) (statement of Rep. Andrews); Trial Day 10, Oct. 6, 2010, DePasquale at 98:12-14.

[123] **Barnes Dep. 25:8-15 (Aug. 12, 2009)**
Barnes 25
8 And - - and I didn't see any criticisms of
9 NOAA or of the U.S. Coast Guard in your report, is
10 that correct?
11 A That is correct.

[124] **Barnes Dep. 26:4-17 (Aug. 12, 2009)**
Barnes 26
4 Q What - - what exactly was your assignment in
5 that case?
6 A I was to look at, based on my expertise in
7 hydrographic survey and - - how the Corps and Coast
8 Guard and NOAA functioned interactively amongst the
9 different agencies, to look at all of the data that
10 was available and determine how they function in
11 this area, and did they function according to the
12 rules and regulations that - - that governed the
13 agencies.
14 Q And you found that they did function in
15 accordance with the rules and regulations that govern
16 those agencies?
17 A I did.

[125] **Barnes Dep. 63:8-21 (Aug. 12, 2009)**
Barnes 63
8 Absent notice from any source of a hazard
9 to navigation in a federal project area, what's your
10 understanding of what the Army Corps does on the
11 Delaware River prior to November 26, 2004 with respect
12 to looking for potential obstructions to navigation?
13 A None of the agencies routinely look for
14 hazards to navigation. It's kind of like chasing a
15 needle in a haystack that may not even be in the
16 haystack. What it requires to normally find those
17 hazards is very expensive and fruitless if there's no
18 thought that there may be a hazard in that area
19 So they don't.
20 Q They don't routinely look?
21 No.

[126] **DePasquale – Direct 98:12-14 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 98
12 Q Does the Philadelphia District of the Corp have a mission

107

13 to search for debris in the Delaware River project?
14 A No.

[127] According to the Corps' Engineering Manual, applicable to all districts, the Corps may use multibeam or sidescan sonar as well as divers to try to locate the object.   However, as discussed, the Corps does not, nor is it required to, routinely look for objects without notice.  Trial Day 10, Oct. 6, 2010, DePasquale at 92:16-22, 1 1 6 : 9 - 1 2 ,  122:19-24; Barnes Dep. 67:13-69:11, Aug.12, 2009; see, e.g., Ex. D-1733.

[128] Authorized depth refers the depth at which Congress has authorized the Corps to conduct dredging.  To dredge, however, the Corps also must have Congressionally appropriated funds.

[129] The Coast Guard's aids to navigation "are designed to assist the prudent mariner in the process of navigation. The aids to navigation system is not intended to identify every shoal or obstruction to navigation which exists in the navigable waters of the United States, but rather provides for reasonable marking of marine features as resources permit." 33 C.F.R. § 62.1 (c).

[130] Notice to Mariners warn mariners of any changes to aids to navigation, reported dangers, scheduled construction or other disruptions, chart corrections and similar useful marine information.  33 C.F.R § 62.21(c)(3).

[131] **DePasquale – Direct 90:17-21 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 90
17 BY MS. SHUTLER:
18 Q Mr. DePasquale, who do you work for?
19 A I work for the U.S. Army Corp of Engineers in
20 Philadelphia.
21 Q And what's your position with the Army Corp?
22 A I'm the Chief of Operations Division.
23 Q Are hydrographic surveys part of your division?
24 A Yes.

[132] **DePasquale – Direct 98:15-100:5 Trial Day 10, Oct. 6, 2010)**
DePasquale –Direct 98
15 Q What is your mission with respect to obstructions in the
16 Delaware River project?
17 A When the corp is notified of an object or an obstruction,
18 by an outside party, at that point, we mobilize our survey
19 crews and attempt to travel to the location and report it to
20 us and determine if the object or obstruction is a hazard to
21 navigation.
22 THE COURT: And if it is, do you remove it?
23 THE WITNESS: If it is a hazard to navigation and we
24 aren't able to determine who the owner of that object or the
25 cause of that is, we get together with the Coast Guard and
DePasquale – Direct 99
1 determine a joint -- in a joint decision, that it is a hazard
2 and we'll move to contract that work and remove the object.
3 Q You mentioned that you get together with the Coast Guard
4 to determine whether or not it is, in fact, a hazard to
5 navigation. What factors do you use to make that decision?
6 A The first thing we do is to determine whether it's within
7 the federal project boundaries. If it is within the federal
8 project boundaries, we then make a determination whether or
9 not the object is sticking up above the authorized project
10 depth of the particular project. If that is the case and the

11 area is being used frequently by the maritime industry, we
12 will then, with the Coast Guard, jointly determine that it is
13 a hazard to navigation.
14 And if that's the case, the first thing we'll do is
15 mark the object with a buoy and send a diver down to try and
16 determine who the owner of that object is, if possible. At
17 that point, if we haven't ascertained who the owner is, we
18 will do a contracting action and we'll get somebody out there
19 to remove the object.
20 Q Do you notify anyone that there's an obstruction to
21 navigation, once you've made that determination?
22 A We'll notify the Coast Guard, but they're normally in on
23 the whole action. But we will notify the Coast Guard and we
24 will tend to give the pilots a call, also.
25 Q Why do you notify the Coast Guard?
DePasquale – Direct 100
1 A They're responsible for broadcasting the notice to
2 mariners, that would warn the maritime community of the
3 hazard.
4 Q And was this your practice in 2004?
5 A Yes.


[133] **DePasquale – Cross 130:21-131:3 (Trial Day 10, Oct. 6, 2010)**
DePasquale - Cross 130
21 Q Now, there are other instances where the Army Corp has
22 searched for a particular object in the river, made a
23 determination as to whether it's a hazard to navigation and
24 then decided whether or not to remove the object, right?
25 A Well, we didn't actually search for the object. It would
DePasquale – Cross 131
1 be reported to us and then we would go out and locate it. We
2 didn't perform a random search. It was only if we're
3 notified.


[134] None of the Army Corps of Engineers' hydrographic surveys of the Mantua Creek Anchorage prior to the incident showed any hazards to navigation.


[135] **Denmark – Cross 49:25-50:4 (Trial Day 29, Nov. 18, 2010)**
Denmark – Cross 49
25 Q Okay. Did the Corps of Engineers have any prior notice
Denmark – Cross 50
1 that there was an anchor, a concrete block, or a pump casing
2 in the Mantua Creek Anchorage prior to the ATHOS incident in
3 2004?
4 A No, we did not.


[136] **Barnum – Direct 10:17-21 (Trial Day 24, Nov. 9, 2010)**
Barnum – Direct 10
17 Q You had talked a little bit, earlier you had mentioned
18 that NOAA charts would include sometimes obstructions to
19 navigation. Do you see any obstructions to navigation marked
20 within Anchorage No. 9?
21 A No.

[137] **Danley Dep. 94:19-24 (Aug. 4, 2009)**
Danley 94
19 There are no obstructions or
20 hazards to navigation shown within
21 federal anchorage number 9 in chart
22 12313, are there?
23 A There are none marked with
24 the dotted circle and the blue tint.

[138] The United States Army Corps of Engineers regulates public and private activity affecting the Delaware River. See generally 33 C.F.R. § 320.1(b). The Corps' "regulatory jurisdiction * * * extend[s] laterally to the entire water surface and bed" of the river, and includes "all the land and waters below the ordinary high water mark." 33 C.F.R. § 329.11(a). The Coast Guard has concurrent responsibility for matters affecting navigation safety. See *id.* § 1.01-1 (Coast Guard's responsibilities include "safeguarding navigation on the high seas and navigable waters of the United States")

[139] See Pub. L. No. 61-425, 36 State. 933, 936 (1911) and H. Doc. 61-733 (1910). Subsequent amendments authorized the creation of Federal Anchorage No. 9 (Pub. L. No. 71- 520, 46 Stat. 918, 921 (1930) and H. Doc. No. 71-304 (1930)) and in 1958 deepening of channels and anchorages to 40 feet (Pub. L. No. 85-500, 72 Stat. 297 (1958) and H. Doc. 85-185(1957)).

[140] Shoaling refers to the deposition of mud or sand on the river bottom making the bottom more shallow.  See, Trial Day 10, Oct. 6, 2010, DePasquale at 109:5-9; 102:4-8

[141] **DePasquale – Direct 101:11-102:3 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 101
11 Q Once Congress has identified or authorized a project
12 depth, when do you dredge to that depth?
13 A Well, once it's authorized, we can't begin dredging until
14 we are appropriated the funds to do the dredging. So, we
15 can't begin any kind of dredging until we have funds in hand,
16 to be able to advertise the contract.
17 Q What other considerations does the corp take into account
18 when it makes decisions as to whether to dredge in the
19 project area?
20 A We take into account, as I said previously, the shoaling
21 patterns, how much material has actually deposited, on the
22 bottom of the river, in a particular area. We look at the
23 usage of that particular area and whether or not we are
24 getting inquiries or complaints about navigation. And then
25 we take, you know, the existing funding that we're provided
DePasquale – Direct 102
1 and prioritize the different areas that we have to dredge.
2 But we never get enough to dredge the whole river and keep it
3 at 40 feet, at all times.

[142] Channel statements identify the shallowest depth in a particular portion of the river or anchorage.   Trial Day 10, Oct. 6, 2010, DePasquale at 109:5-9; 110:5-12.

[143] **DePasquale – Direct 91:12-92:15 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 91
12 Q What is the principal mission of a hydrographic surveys
13 group within the Philadelphia District of the Corp?
14 THE COURT: Conduct hydrographic surveys.

15 A That's correct, conduct hydrographic surveys within the
16 district, projects within the district boundaries and report
17 the results of those surveys to the maritime community. In
18 addition, we use the results of those surveys to make
19 decisions on dredging and dredging practices.
20 Q And when you say results of the surveys, what are you
21 referring to?
22 A The depths in those surveys.
23 Q You also mentioned the Delaware River or federal
24 waterways. Are you referring to the navigational channels or
25 designated anchorages that were established pursuant to
DePasquale – Direct 92
1 congressional authorization?
2 A Yes.
3 Q For what purposes does the corp report the depths?
4 A We report the depths for the maritime community, for
5 their use and we also use them in dredging practices.
6 Q And who receives this information about depths? Who in
7 the community?
8 A Basically, whoever asks for it. We typically provide the
9 information to the Coast Guard, NOAA, the pilots, terminal
10 users, tug companies, any maritime people along the river
11 that it would be of interest to.
12 Q In 2004, in what form did you provide depth information
13 to those who requested it?
14 A We would provide survey drawings, hydrographic exams and
15 we would also provide channel statements.

[144] **Barnes Dep. 65:2-18 (Aug. 12, 2009)**
Barnes 65
2 Q Okay. The very last sentence of that
3 paragraph, "Survey frequency is based on project
4 conditions and survey information is provided to the
5 shipping industry."
6 What survey information, to your knowledge,
7 is provided to the shipping industry with respect to
8 the Delaware River?
9 A Anytime any Corps district or, for that
10 matter, any other federal agency does any kind of
11 survey works, it's available to the public, period.
12 It's available to anyone that wants the information,
13 free of charge, except for production costs.
14 So any time we do reconnaissance surveys on
15 a federally authorized project so we can determine
16 when and if dredging is needed to maintain that
17 channel, that information is there and made available
18 to anyone that wants it.

[145] **DePasquale – Direct 96:15-25 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 96
15 Q We can take the exhibit down. How often does the corp
16 survey depths of the various segments within the Delaware
17 River project?
18 A Our goal is to survey each part of the project area once
19 per year. But depending on funding, resources, conditions,

20 shoaling patterns in the river and the usage of that
21 particular part of the channel, some areas get surveyed two,
22 three, four times a year and other areas, because of the
23 nature of the history of that location, might not get
24 surveyed at all. The goal is to get everything surveyed once
25 per year.

[146] The single beam echo sounder records the bottom of the water body by recording a single echo return from the bottom of the river.  Barns Rep. at 4.

[147] The single beam echo sounder is designed for determining depth and "is not intended to find submerged objects since it would be virtually impossible for one of those beams to hit a relatively small object."  Barns Rep. at 4.

[148] **Barnes Dep. 68:18-69:15 (Aug. 12, 2009)**
Barnes 68
18 Q What were the types of surveys that the Army
19 Corps of Engineers was doing along the Delaware River
20 on a routine basis before November 26th, 2004
21 A The Copies of all of the survey data that was
22 given to me to review indicates that they do it th
23 same way we did it in Vicksburg, using a single beam
24 echo sounder to run cross-sectional data or
Barnes 69
1longitudinal data in the channel as was specified in
2 the engineering manual.
3 Q Okay.
4 A They - - they performed it exactly the same way
5 we performed ours in Vicksburg and - - and in
6 accordance with the regulation
7 Q And was that true, also, with respect to the
8 Mantua Creek Anchorage before November 26, 2004?
9 A Yes
10 Q And the single beam hydrographic surveys that
11 were being done by the Army Corps of Engineers in - -
12 Engineers in the Mantua Creek Anchorage were not
13 designed to search for obstructions to navigation; is
14 that correct?
15 A That is correct.

[149] **DePasquale – Direct 93:2-94:4 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 93
2 A It's the Mantua Creek anchorage exam.
3 Q Could we please highlight the date? When was the depth
4 survey conducted?
5 A June 23, 2004.
6 Q And why was it conducted?
7 A As part of our regular operations for surveying in our
8 project areas.
9 Q And was this to also report depth conditions?
10 A Yes.
11 Q You can remove the date panel. Mr. DePasquale, there are
12 a number -- there are tiny numbers which we're going to zoom
13 into in just a moment. And if we could, zoom into the berth
14 area, I'd appreciate it. Can you point with your laser,

112

15 there, to those numbers and can you tell me what those
16 numbers represent?
17 A Each line of numbers here represents the path of the
18 survey vessel and it would travel back and forth across the
19 anchorage and those numbers represent the depth at that exact
20 location, represented by the decimal point and the numbers,
21 the actual exact location of the depth.
22 Q And how far apart are these lines?
23 A The lines are approximately 400 feet apart.
24 Q And how often is the sonar taking a depth reading, as it
25 travels back and forth across these lines?
DePasquale – Direct 94
1 A Typically, about one per second, which amounts to about
2 every ten to fifteen feet with the speed of the boat. So,
3 about every ten to fifteen feet, we're getting a shot on the
4 bottom.

[150] **DePasquale – Direct 96:11-14 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 96
11 Q So, in undertaking the depth surveys in 2004, the Corp
12 did not survey the entire bottom of the Delaware anchorage at
13 Mantua Creek?
14 A That's right.

[151] Shallow areas are only to be expected in a river like the Delaware, which is prone to shoaling. They are marked on government-issued nautical charts to give notice of any potential hazard to navigation.. In practice, tankers navigating the Delaware River calculate under-keel clearance using the "controlling depth" – the "least depth that a vessel is going to encounter from port of departure to port of arrival," – rather than the "project depth" authorized by Congress. "When the Corps of Engineers dredges a channel, it's to a certain project depth, but over the years, due to silting, or other deposits, there may be shoaling, and that then will become the controlling depth." Trial Day 10, Oct. 6, 2010, DePasquale at 109-110; Trial Day 24, Nov. 9,2010 Grenier at 84:17-20,85:1-4.

[152] **Barnes Dep. 68:18-69:15 (Aug. 12, 2009)**
Barnes 68
18 Q What were the types of surveys that the Army
19 Corps of Engineers was doing along the Delaware River
20 on a routine basis before November 26th, 2004
21 A The Copies of all of the survey data that was
22 given to me to review indicates that they do it the
23 same way we did it in Vicksburg, using a single beam
24 echo sounder to run cross-sectional data or
Barnes 69
1longitudinal data in the channel as was specified in
2 the engineering manual.
3 Q Okay.
4 A They - - they performed it exactly the same way
5 we performed ours in Vicksburg and - - and in
6 accordance with the regulation
7 Q And was that true, also, with respect to the
8 Mantua Creek Anchorage before November 26, 2004?
9 A Yes
10 Q And the single beam hydrographic surveys that
11 were being done by the Army Corps of Engineers in - -
12 Engineers in the Mantua Creek Anchorage were not
13 designed to search for obstructions to navigation; is

14 that correct?

15 A That is correct.

[153] **DePasquale – Direct 102:9 – 104:11 (Trial Day 10, Oct. 6, 2010)**

DePasquale – Direct 102

9 Q I'd like to bring back, on the screen, the June 23, 2004

10 survey, with the highlighting? Okay, Mr. DePasquale, can you

11 use your pointer just to identify where the Citgo facility is

12 on this?

13 A It's down here in this corner.

14 Q Okay. And are there depths that are less than 40 feet in

15 this survey of the Mantua Creek anchorage?

16 A Yes.

17 Q And generally, where are they in the anchorage?

18 A Principally, up in this norther part, there a -- that's

19 the 40-foot contour and everything within that is shallower

20 than 40 feet.

21 Q All right, can we back back out of this?

22 A There are a couple other spots up here, one there and one

23 there, they're just one -- I think they might be just one

24 reading or two readings that are less than 40 feet.

25 Q And how close -- is this area anywhere near the Citgo

DePasquale – Direct 103

1 terminal?

2 A No.

3 Q Was this survey provided to maritime users?

4 A Yes.

5 Q Did any waterway users come to you and ask to have the

6 anchorage dredged after the survey came out?

7 A No.

8 Q Do users usually make requests to the corp when they feel

9 deepening in their given area and the given areas necessary

10 for their use?

11 A Yes.

12 Q Do any users of the river notify the corp of any concerns

13 with the Mantua Creek anchorage in 2004?

14 A No, no, we didn't get any inquiries about it.

15 Q And how do you know that?

16 A Well, I was Chief of Technical Support Branch and

17 normally, any kind of outside inquiries that require us to

18 dredge, would then require -- the first step would be to go

19 out with the survey vessels and they were under my direction,

20 under my supervision, so, during that time period, we did not

21 get any calls about Mantua Creek.

22 Q Was Mantua Creek anchorage dredged as a result of this

23 survey?

24 A No.

25 Q Why not?

DePasquale – Direct 104

1 A Well, there was only this small area that would actually

2 require dredging and because of the limited use of the

3 anchorage, in the northern area and the fact that we did not

4 get any inquiries as to, you know, that this was causing

5 anybody any problems. It wasn't really effective or

6 efficient for us to come up to this particular section of the

7 river and dredge this, you know, 1,000 foot of material. So,
8 we had higher priorities in the river and that's kind of what
9 I was explaining before. This would be an area where no one
10 was asking or came to us and said that that was a problem,
11 even though it wasn't at the project depth.

[154] **DePasquale – Direct 111:25-112:2 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 111
25 Q When did the corp last dredge the Mantua Creek anchorage?
DePasquale – Direct 112
1 A The last time we dredged it, well, we did a portion of it
2 in 2009, but before that, the last time was 1984.

[155] **DePasquale – Cross 117:23-118:4 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Cross 117
23 Q And so, it's correct to conclude that the Army Corp did
24 not receive any complaints about the depth in Mantua Creek
25 anchorage during that same time frame, correct?
DePasquale – Cross 118
1 A I don't recall there being any complaints, although,
2 sometimes, users will complain and we don't actually act on
3 their complaints and dredge. But we, during that time frame,
4 no.

[156] **Barnum – Direct 34:22-35:3 (Trial Day 24, Nov. 9, 2010)**
Barnum – Direct 34
22 Q And what is the purpose of the Coast Pilot?
23 A The purpose of the Coast Pilot is a compendium to the
24 nautical chart. It's a book that portrays information that's
25 not easily graphically displayed on the nautical chart. So
Barnum – Direct 35
1 that could be the Code of Federal Regulations, it could be
2 tides, currents, it could be weather conditions that a
3 mariner should be aware of when he's making port.

[157] Given NOAA's budgetary constraints, it would take 160 years to survey 500,000 of the 3.4 million square
nautical miles deemed the most navigationally significant.  Trial Day 24, Nov. 9, 2010 Barnum at 47:10-16.

[158] **Barnum – Cross 42:1-13 (Trial Day 24, Nov. 9, 2010)**
Barnum – Cross 42
1 Q Mr. Barnum, how large of an area does the Office of Coast
2 Survey's charting mission encompass?
3 A About 3.4 million square nautical miles.
4 Q And approximately how much area can NOAA survey each
5 year?
6 A About 3,000 square nautical miles.
7 Q Does that include both the surveys NOAA conducts with its
8 own vessels and the contract surveys that NOAA contracts to
9 private parties?
10 A Yes.
11 Q Why doesn't NOAA survey more area?
12 A We'd like to survey more area, but we -- that's all the
13 resources that are provided by Congress.

[159] **Barnum – Cross 47:10-16 (Trial Day 24, Nov. 9, 2010)**
Barnum – Cross 47
10 Q Is NOAA able to address all of its survey priorities in
11 any given year?
12 A No. Again, we only survey about 3,000 square nautical
13 miles a year, and I've mentioned we have 3.4 million square
14 nautical miles of which 500,000 is significant,
15 navigationally significant, so at that rate it's about 160
16 years before we can even get to that.

[160] NOAA determines which areas to survey each year based on priorities identified in its National Survey Plan,
developed from constituent input from the Mariner's Advisory Committee and local Harbor Safety Committees,
which bring together the concerns of the pilots, port authorities, terminal managers, the Coast Guard, the Corp and
others interested in making the waterway safer for navigation.  Trial Day 24, Nov. 9, 2010 Barnum at 44:16-45:19,
46:25-47:15.

[161] **Barnum – Cross 42:19-43:5 (Trial Day 24, Nov. 9, 2010)**
Barnum – Cross 42
19 Q And where does NOAA typically get the water depth
20 information it publishes for the federally-designated
21 channels and anchorages?
22 A From the U.S. Army Corps of Engineers, because they much
23 more, and have the ability to much more frequently survey
24 these waters than NOAA does.
25 Q And roughly what percentage of the updates to NOAA charts
Barnum – Cross 43
1 each year come from the Corps of Engineers?
2 A A large portion. NOAA gets about 10,000 documents that
3 they apply to their nautical charts every year, and a
4 significant portion of those is Army Corps of Engineers'
5 surveys.

[162] **Barnum – Cross 44:3-8 (Trial Day 24, Nov. 9, 2010)**
Barnum – Cross 44
3 Q Okay. And where does NOAA get the information for the
4 obstructions it notes on its charts?
5 A From a large array of -- of maritime users, from our own
6 units, from port authorities, from terminal managers, from
7 the Coast Guard, from maritime shipping. It can be just
8 about anybody.

[163] **Barnum – Cross 43:10-17 (Trial Day 24, Nov. 9, 2010)**
Barnum – Cross 43
10 Q And are the areas that have been surveyed, surveyed with
11 modern sonar techniques?
12 A No. About half of them -- half of the soundings on our
13 nautical charts predate 1940, which mean they're lead line
14 soundings.
15 Q And does NOAA publicize how many of the charted soundings
16 are still lead line soundings?
17 A Yes.

[164] **Barnum – Direct 15:10-17 (Trial Day 24, Nov. 9, 2010)**
Barnum – Direct 15

116

10 Q Do you know whether any of NOAA's hydrographic surveys on
11 the Delaware River included sections of Mantua Creek
12 Anchorage?
13 A Yes.
14 Q Okay.
15 THE COURT: You do know, did they?
16 THE WITNESS: There were surveys performed in the
17 early '80s of that region, sir, by NOAA.

[165] **Barnum – Direct 24:13-25:14 (Trial Day 24, Nov. 9, 2010)**
Barnum – Direct 24
13 Q Okay. Did NOAA also undertake a survey in the Delaware
14 River in 2002, using its hydrographic survey vessel, the
15 RUDE?
16 A Yes.
17 Q And that's R-U-D-E, correct?
18 A Correct.
19 Q All right. Now, you were not on board the RUDE during
20 that survey?
21 A I was not.
22 Q Do you know the purpose of the RUDE's hydrographic survey
23 of the Delaware River?
24 A Yes, it was a corridor survey that was done at the
25 request of the United States Navy. This was a request post
Barnum – Direct 25
1 9/11, September 11th, 2001. The Navy was concerned. They
2 wanted imagery of the ship channel bottom, so that if
3 somebody put something in the water, or said they put
4 something in the water, the Navy mine hunters could come and
5 take another picture, and they would compare the picture the
6 RUDE took to the picture that the mine hunters took, and look
7 for differences. So that allowed the Navy to greatly
8 increase or decrease the amount of time a port or shipping
9 channel would be closed.
10 Q As part of the RUDE survey, were they looking to find
11 objects on the bottom of the river?
12 A That was not their primary purpose. The purpose was to
13 image the bottom. However, if they found an object, those
14 objects were identified and charted.

[166] CARCO Issues C.1.d and C.1.e.  The maritime industry and CARCO rely on "the government's jurisdiction, responsibilities, dominion, control course of conduct, publications, representations and assumed responsibilities concerning the status, condition and safety of navigation" in Delaware River and the Mantua Creek anchorage" thereby shifting liability for the ATHOS incident to the United States.  Doc. 697 at 11.

[167] CITGO insinuates that because the Corps had multibeam sonar, the Philadelphia District should have used it to search for objects irrespective of whether it had notice of a potential obstruction.  As explained, however, the Corps' hydrographic survey mission is to determine depth in order to inform its dredging decisions and to notify the public of changes in Project depth.  The Philadelphia District had no manpower or fiscal resources to undertake prophylactic searches for obstructions.  (US F/F 18, 23)

[168] **DePasquale – Direct 98:12-14 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 98
12 Q Does the Philadelphia District of the Corp have a mission

117

13 to search for debris in the Delaware River project?
14 A No.

[169] **DePasquale – Direct 106:24-107:25 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 106
24 Q Are you familiar with the Mariners Advisory Committee,
25 also known as the MAC?
DePasquale – Direct 107
1 A Yes.
2 Q Does the corp attend the quarterly MAC meetings?
3 A Yes, we do.
4 Q Have you personally attended quarterly MAC meetings on
5 behalf of the corp?
6 A Yes, I have.
7 Q Who else typically attends those MAC meetings?
8 A Well, they're attended by the Corp of Engineers, the
9 Coast Guard and NOAA. And then there's a lot of -- a lot of
10 other personnel from the pilots, the tug companies, ship
11 owners, ship agents, facilities, different fuel terminals and
12 refineries. Sometimes, the Navy is there, but rarely. But
13 there's, you know, the whole maritime industry shows up,
14 pretty much, at these meetings.
15 Q What does the corp present at the MAC meetings?
16 A We present our dredging that we've completed and our
17 dredging schedule for the immediate future and we'll report
18 on how much material we're removing and how long the dredge
19 is going to be out in the river. That poses, you know, when
20 the dredge is out there, it actually poses a problem for
21 ships, because we get in the way a lot, so, we want to let
22 the industry know that we're going to be out there and that
23 we're going to be out there, let's say, from October to
24 December, what area of the river we're going to be in and any
25 other details of the dredging contract.

[170] **DePasquale – Direct 108:14-23 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 108
14 Q Is there an opportunity for dialogue between the corp and
15 users of the river at the MAC, regarding dredging and any
16 other need, for that matter?
17 A Yes, after our presentation, typically, there's a
18 question and answer period. And then we're at the meeting
19 for two to three hours, so, during that period, there is the
20 opportunity for us to discuss dredging and issues on the
21 Delaware River, with whoever wants to talk to us.
22 Q Was this true in 2004?
23 A Yes.

[171] **Adams – Direct  64:4-20, (Trial Day 3, Sept. 23, 2010)**
Adams – Direct 64
4 Q All right. And, Captain, in that -- in your capacity as
5 Captain of the Port, were you a member of the Mariners
6 Advisory Committee?
7 A Yes, I was.
8 Q All right. And when did you assume that membership?
9 A When I assumed command of the Port of Philadelphia in

118

10 July -- June or July of 1998.
11 Q All right. Do you remain a member today?
12 A I do, sir.
13 THE COURT: Excuse me a moment. How do you occupy
14 your time now that you're retired?
15 THE WITNESS: I'm a maritime consultant, your Honor.
16 BY MR. KUFFLER:
17 Q Captain, before we go on with a discussion about the MAC,
18 would --
19 MR. KUFFLER: -- Pam, would you put up Exhibit
20 P-763, please?

[172] **Adams – Direct  65:1-8 (Trial Day 3, Sept. 23, 2010)**
Adams – Direct 65
1 BY MR. KUFFLER:
2 Q Captain, is this your current CV?
3 A This is the CV I provided you with.
4 THE COURT: So, yes.
5 BY MR. KUFFLER:
6 Q Now, a couple of questions about Page 2. As you see
7 there it says, 1998 to 2002 where you're Captain of the Port?
8 A Yes, I see that.

[173] **Adams – Direct 67:16-68:14 (Trial Day 3, Sept. 23, 2010)**
Adams – Direct 67
16 Is the purpose of the MAC -- is the MAC concerned
17 with the safety of navigation?
18 A Primarily, yes.
19 Q Safe navigation of large vessels?
20 A Yes.
21 Q And is it explicitly charged with making recommendations
22 for safe drafts?
23 A Yes, it is.
24 Q All right. Now, does it make those recommendations to
25 the Corps of Engineers?
Adams – Direct 68
1 A It does.
2 Q The Coast Guard?
3 A Yes.
4 Q The National Oceanographic and Atmospheric
5 Administration?
6 A Yes.
7 Q Local bridge authorities?
8 A Yes.
9 Q Channel users?
10 A Yes.
11 Q What in the MAC parlance are channel users?
12 A Channel users would be the deep-draft traffic, as well as
13 other tug and towing operations, in commercial traffic
14 predominantly.

[174] **Adams – Direct 69:10-70:8 (Trial Day 3, Sept. 23, 2010)**
Adams – Direct 69
10 Q All right. Now, would you tell us by category what the
11 membership of the MAC consists of?

12 A Yes. The MAC was convened and initially started by the
13 (inaudible) Association in 1964 and its charter was twofold,
14 two interests was to direct its efforts at the navigation
15 safety of large oceangoing ships upon the Delaware River and,
16 secondly, to have its membership comprised of professional
17 mariners within the region, as well as Coast Guard Port
18 Engineers.
19 Q And does membership in the shipping community you
20 mentioned include the local shipping operators?
21 A It does.
22 Q And terminal operators?
23 A Yes, it does.
24 Q Now, during your tenure as Captain of the Port, did the
25 Coast Guard initiate a program to encourage the nationwide
Adams – Direct 70
1 formation of harbor safety committees?
2 A Yes, they did.
3 Q And was the MAC utilized in that effort in any way?
4 A Yes. As I assumed command in 1998, the Coast Guard, in
5 response to the Oil Pollution Act of 1990, was working to
6 develop national -- national harbor safety committees in all
7 the U.S. ports and the MAC that had been in existence since
8 1964 was used as a model to follow in that process.

[175] **Adams – Cross 101:21-102:7 (Trial Day 3, Sept. 23, 2010)**
Adams – Cross 101
21 Q And did the MAC rely on the Corps of Engineers and NOAA
22 and the United States Coast Guard to identify and remove
23 obstructions to navigation -- identify or remove obstructions
24 to navigation?
25 A I wouldn't say identify as I would say that the MAC
Adams – Cross 102
1 looked to those entities as obstructions were identified, as
2 you put up with the Marcus Hook situation with the pinnacles
3 of rock and the rock cut there, then the MAC would look to
4 the Corps of Engineers and NOAA and the Coast Guard to
5 address those obstructions. The MAC did not look to the
6 Corps to conduct continuous surveys or -- other than their
7 normal dredging and annual dredging program.

[176] **Adams- Redirect 102:19-103:3 (Trial Day 3, Sept. 23, 2010)**
Adams – Redirect 102
19 BY MR. KUFFLER:
20 Q Captain, in your time as a member of the Mariners
21 Advisory Committee, was it your understanding that the Army
22 Corps of Engineers as a matter of course was not looking at
23 the Federal waterways, channels, anchorages for obstructions?
24 MR. WHELAN: Objection, leading.
25 THE COURT: Objection overruled.
Adams – Redirect 103
1 THE WITNESS: Yes. The major involvement of the
2 Corps was involved in dredging operations, not -- it was not
3 dealing with surveys and soundings and foreign objects.

120

[177] CARCO Issue C.1.h.  "The Government's conduct and admissions after the oil spill and in the administrative proceedings before the National Pollution Funds Center concerning the sole fault of the anchor dropper and the absence of any inquiry or claim against CARCO."  Doc. 697 at 11.

[178] CARCO alleges that the government erred in failing to search for the anchor owner.  While this is irrelevant, CARCO fails to acknowledge the government's subpoena to Weeks Marine in attempt to determine..

[179] D Ex. 2142 at NPFC Corr. 014644.

[180] **Denmark – Cross 44:15-45:19 (Trial Day 29, Nov. 18, 2010)**
Denmark – Cross 44
15 Q And does the Army Corps contract with the same private
16 dredging companies as facility owners in the Delaware River?
17 A Yes, we do. There's about three dredging contractors
18 that do almost all the work on the East Coast; Weeks Norfolk
19 Dredging, and Great Lakes Dredging, and everybody uses the
20 same dredging companies.
21 Q And these dredging companies often use clamshell bucket
22 dredges when dredging adjacent to private facilities; is that
23 correct?
24 A That is correct.
25 Q Are there any instances where bucket dredge operations
Denmark – Cross 45
1 need to use heavy weights?
2 A Yes, yes, it is.
3 Q Could you explain when?
4 A Yes, when the -- a bucket dredge is actually working on a
5 project site, they will have -- it is on a barge, it's on a
6 platform, and next to it is a barge the dredged material is
7 placed in. They want to have a continuous operation going
8 on, so they will have a number of other empty barges nearby.
9 So those barges have to be held in place so they use heavy
10 weights, attach those to buoys, and attach the barges to that
11 so that they will remain stationary in position. And the
12 whole idea is when that barge next to the dredge is full and
13 it leaves, they immediately move the barge back in -- a new
14 barge then is empty and then begin filling that one up again,
15 so they have to have the heavy weights to keep the anchors --
16 keep the buoys in place to hold the empty barges.
17 Q And these heavy weights could also be anchors; is that
18 correct?
19 A They could be anchors, correct.

[181] **DePasquale – Direct 108:2-10 (Trial Day 10, Oct., 6 2010)**
DePasquale – Direct 108
2 THE COURT: Excuse me, you mentioned bucket
3 dredging, is there any other kind of dredging that's used?
4 THE WITNESS: Primarily, on the Delaware River, in
5 the federal channel, we normally do hydraulic dredging,
6 hydraulic pipeline dredging, which is a little bit different
7 than bucket. We have a larger dredge that is sucking mud off
8 the bottom and pumping it out through a pipe to a land-based
9 facility, as opposed to digging it off the bottom and
10 dropping it into barges and shipping it somewhere.

121

[182] **DePasquale – Direct 115:9-22 (Trial Day 10, Oct., 6 2010)**
DePasquale – Direct 115
9 THE COURT: They use them as anchors, is that what
10 you're saying?
11 THE WITNESS: They're actually using old anchors as
12 anchors, but not in the same way. They take pieces of it,
13 depending on the operation that they're doing. Sometimes,
14 they'll have full anchors, regular anchors, but other times,
15 they'll use pieces of anchors and cut off anchors.
16 THE COURT: And what are they using, what are they
17 anchoring with those pieces?
18 THE WITNESS: They may be anchoring a barge
19 associated with the dredging process or a lot of times,
20 they'll use them to anchor their pull lines, which actually
21 pull the dredge back and forth in a hydraulic dredging
22 operation.

[183] Frescati issued its first subpoena on Mar. 6, 2006.  Arguing that the subpoena was overbroad, Weeks filed a Motion to Quash on Mar. 20, 2006 which was granted by this Court on Apr. 6, 2006.  Docs. 91 and 101.  On Apr. 7, 2007, Frescati filed its second subpoena to Weeks.  Even though the time period was reduced from 35 to 14 years, Weeks filed another Motion to Quash on the basis that the subpoena was overbroad.  Doc. 103.  This too was granted on June 14, 2006.  Doc. 110.

[184] **DePasquale – Direct 111:25-112:2 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 111
25 Q When did the corp last dredge the Mantua Creek anchorage?
DePasquale – Direct 112
1 A The last time we dredged it, well, we did a portion of it
2 in 2009, but before that, the last time was 1984.

[185] CARCO issue C.1.f.:  "The Practical and Legal Limitations Restricting Private Parties from Taking Actions with Respect to the Federal Project Waters Including Federal Anchorage No. 9.  Doc. 697 at 11..

[186] This was the case in 1997 when the Philadelphia Airport Authority was granted permission by the Corps to dredge the northern portion of the Mantua Creek Anchorage in order to use dredge materials as fill for the airport's expansion.  Trial 10, Oct. 6, 2010, Olson at 148:5-14;

[187] **DePasquale – Direct 104:20-106:23 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 104
20 Q Can you give me an example of any organizations or
21 facilities that have done hydrographic surveying within the
22 bounds of the Delaware River project?
23 MR. O'DONOVAN: Objection, your Honor, it calls for
24 hearsay.
25 THE COURT: No, it doesn't.
DePasquale – Direct 105
1 BY MS. SHUTLER:
2 Q You can answer.
3 A Well, first, I know that NOAA always overlaps our surveys
4 in the channel. Second of all, facilities often do their own
5 surveying. Conoco Phillips, at this time, on an annual
6 basis, is surveying their berthing area and they are
7 requesting to use Corp of Engineers disposal areas for dredge
8 material disposal. So, they're providing us with their

122

9 survey, along with the survey of the federal channel in front
10 of their berthing areas. It's not the whole channel that
11 they're surveying, but they're surveying their berthing areas
12 and then they're overlapping and surveying the federal
13 channel and kind of indicating that both areas need dredging.
14 Q May a riverfront facility owner remove an object from the
15 river bottom?
16 A Yes.
17 Q Does it make any difference as to whether the object is
18 inside or outside the federal project area?
19 A No.
20 Q In either circumstance, would the facility owner need a
21 permit from the corp?
22 A Yeah, they need a permit, but it's covered under a
23 blanket permit that exists so a facility only has to write a
24 letter and request permission under the blanket permit to
25 remove an object.
DePasquale – Direct 106
1 Q And how long does that take?
2 A That usually should -- the approval of the kind of,
3 probably, takes a couple days.
4 Q Does a private company need a permit to dredge in the
5 Delaware River project?
6 A Yes.
7 Q Does it matter whether the dredging is inside or outside
8 the project area?
9 A No.
10 Q Can a private party obtain a permit to dredge within the
11 boundaries of a project?
12 A Yes.
13 Q How does a facility owner apply for such a permit?
14 A He would have to go through the normal permit process.
15 In an application, he's provide where he wanted to dredge,
16 the depth he wanted to dredge, what he was going to do with
17 the material, he'd have to provide test results and he's have
18 to just indicate the general process that he would be taking
19 to do the dredging.
20 Q Would he have to include some kind of plan?
21 A Yeah, there would have to be drawings and plan indicating
22 the depths that existed, at that time and indicating a
23 template as to what he wanted to dredge to.

[188] **Olson – Cross 148:5-14 (Trial Day 10, Oct. 6, 2010)**
Olson – Cross 148
5 Q Okay. The last time any portion of Mantua Creek
6 Anchorage was actually dredged was prior to November of 2004,
7 was in April and August of 1990 -- sorry -- 1997, correct?
8 A I believe so, yes.
9 Q And that was part of the Runway Extension Project for the
10 Philadelphia Airport, right?
11 A Yes.
12 Q Okay. And at that time only the northern-most section of
13 the anchorage was dredged, right?
14 A Yes.

[189] Dredging in federal anchorage grounds is no different from dredging in other areas of the river. While private dredging may often as a practical matter be coordinated with government dredging within federal projects, see generally 33 C.F.R. § 322.5(c), a private party may dredge in an anchorage ground under the same conditions as the government.  Dredging must be authorized in advance, by permit.  See 33 U.S.C. § 403; 33 C.F.R. § 322.3(a) (permit required for "work in or affecting  navigable waters of the United States"); *id.* § 322.2(c) ("work" includes dredging); *id.* § 322.3(c) (federal agencies must obtain the necessary permits). The Corps will  evaluate a private party's request under its general permitting policies, see *id.* § 322.5(c), which consider "the full public interest by balancing the favorable impacts  against the detrimental impacts" of the dredging, *id.* § 320.1(a).  In 1997,  the Philadelphia Airport Authority obtained a permit and dredged in the Mantua Creek Anchorage. Trial Day 10, Oct 6, 2010, Olson at 148:5-14.

[190] Mr. Olson testified he never heard of the phrase "area of responsibility" talismanically invoked by CARCO for the proposition that private parties are prevented from surveying, removing obstructions, or dredging in a federal anchorage.  Trial Day 10, Oct 6, 2010 Olson at 144:13-19.

[191] **Olson – Direct 143:19-144:12 (Trial Day 10, Oct. 6, 2010)**
Olson – Direct 143
19 Q Now, is this drawing something the Corps of Engineers
20 prepares?
21 A No, it is not. This is something that the applicant
22 submits.
23 Q Okay. So what does the cross-hatch area in this drawing
24 represent?
25 A This is the area that the –
Olson – Direct 144
1 THE COURT: It's not cross-hatched. It's only
2 hatched in one direction.
3 BY MS. SHUTLER:
4 Q The single hatched, the lines, in this drawing represent?
5 A This represents the area that they're requesting to
6 dredge.
7 Q And when you say "they're requesting to dredge," in this
8 case this was Seaview Petroleum?
9 A Yes, the applicant.
10 Q So Seaview, not the Corps of Engineers, chose this
11 particular area to dredge?
12 A Correct.

[192] **DePasquale – Direct 106:10-19 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Direct 106
10 Q Can a private party obtain a permit to dredge within the
11 boundaries of a project?
12 A Yes.
13 Q How does a facility owner apply for such a permit?
14 A He would have to go through the normal permit process.
15 In an application, he's provide where he wanted to dredge,
16 the depth he wanted to dredge, what he was going to do with
17 the material, he'd have to provide test results and he's have
18 to just indicate the general process that he would be taking
19 to do the dredging.

[193] **DePasquale – Cross 139:3-25 (Trial Day 10, Oct. 6, 2010)**
DePasquale – Cross 139
3 Q In order for a terminal, such as Citgo, to perform

4 maintenance dredging in the vicinity of its berth, Citgo
5 would have to obtain a permit from the Army Corp, correct?
6 A Yes.
7 Q And permits issued by the Army Corp, include conditions
8 such as the depth to which an area can be dredged, right?
9 A Yeah, whatever the applicant requests is what's in the
10 permit.
11 Q Well, the Army --
12 THE COURT: Assuming that's a reasonable request.
13 THE WITNESS: Assuming it's reasonable, right. We
14 don't set the depth, the applicant does.
15 Q But it's not granted whatever depth they request, the
16 Army Corp is authorized to limit the depth to which something
17 can be dredged, correct?
18 A No, not in a private berth. They can, if they wanted to,
19 they could put a permit to dig it to 100.
20 Q And the Army Corp would grant that?
21 A I can't say that we would grant it or not, they have to
22 consider all the conditions. But there's no, there's no
23 limit to what --
24 THE COURT: What they can request.
25 THE WITNESS: -- request.

[194] **DePasquale – Direct 104:16-105:13 (Trial Day 10, Oct. 6, 2010)**
DePasquale  - Direct 104
16 Q Would a private company need any kind of permit from the
17 Corp of Engineers to do a hydrographic survey in the federal
18 area?
19 A No.
20 Q Can you give me an example of any organizations or
21 facilities that have done hydrographic surveying within the
22 bounds of the Delaware River project?
23 MR. O'DONOVAN: Objection, your Honor, it calls for
24 hearsay.
25 THE COURT: No, it doesn't.
DePasquale – Direct 105
1 BY MS. SHUTLER:
2 Q You can answer.
3 A Well, first, I know that NOAA always overlaps our surveys
4 in the channel. Second of all, facilities often do their own
5 surveying. Conoco Phillips, at this time, on an annual
6 basis, is surveying their berthing area and they are
7 requesting to use Corp of Engineers disposal areas for dredge
8 material disposal. So, they're providing us with their
9 survey, along with the survey of the federal channel in front
10 of their berthing areas. It's not the whole channel that
11 they're surveying, but they're surveying their berthing areas
12 and then they're overlapping and surveying the federal
13 channel and kind of indicating that both areas need dredging.

[195] **Barnum - Cross 51:9-15 (Trial Day 24, Nov. 9, 2010)**
Barnum- Cross 51
9 Q Did a private entity need to get a permit in order to
10 conduct a hydrographic survey in the Delaware River?
11 A No.

125

12 Q Is that answer the same, that they did not have to get a
13 permit, even if the survey was going to include the federal
14 channel or a designated anchorage?
15 A Yes.

[196] **Rankin – Direct 9:21-24 (Trial Day 30, Nov. 22, 2010)**
Rankine - Direct 9
21 Q And who would be responsible for providing guidance to
22 the terminal on issues relating to marine safety at the
23 berth?
24 A That was my job, marine safety, marine guidance.

[197] **Rankin - Direct 10:17-23 (Trial Day 30, Nov. 22, 2010)**
Rankine – Direct 10
17 Q Did any of your duties extend to any area outside the
18 berth?
19 A No, not at all.
20 Q Specifically, did your duties extend out into the Federal
21 anchorage?
22 A No, not at all; that was the responsibility of the Corps
23 of Engineers.

[198] **Rankin – Direct 52:20-53:4 (Trial Day 30, Nov. 22, 2010)**
Rankine – Direct 52
20 Q Where were the depth surveys to be obtained that this
21 refers to?
22 A What we call the permitted dredge area for our dock or
23 the area of responsibility.
24 Q Okay. Did the draft standards say anything about
25 searching for obstructions?
Rankine – Direct 53
1 A No.
2 Q Did they say anything about surveying the anchorage?
3 A Absolutely not. The anchorage is the responsibility of
4 the Corps of Engineers, not us.

[199] **Rankin – Cross 96:18-23 (Trial Day 30, Nov. 22, 2010)**
Rankine- Cross 96
18 Q Now, you sat on the Mariners Advisory Committee on behalf
19 of CITGO in 2004, didn't you?
20 A I attended the meetings, yes.

[200] **Rankine Dep. 172:12-177:8 (Oct. 16, 2007)**
Rankine 172
12 Q I—I'm looking at it from a little
13 bit of a different way. Is it – was it the policy
14 in 2004, and I'm not looking away anything from what
15 you've said, was it the policy in 2004 not
16 survey federal waterways?
17 A We have no responsibility for the
18 federal waterways, so we—we—out policy, to
19 use your word, is to obtain hydrographic surveys
20 only for our area of responsibility for dredging
21 because we have no responsibility for anything

22 outside that area.
23 Q Okay. I'm not asking you what you
24 think your responsibility is or what you think the
25 company's responsibility is, I'm asking you if the
Rankine 173
1 policy in 2004 was not to survey federal waters for
2 depth?
3 A We did not survey federal waters
4 because we had no responsibility for federal
5 waters.
6 Q And that was the policy in 2004?
7 A That is correct
8 Q And 2003 and 2002?
9 A As long as this document's been in
10 place.
11 Q And I assume that if you are not
12 surveying federal waterways for depth, you're
13 certainly not surveying them for anything else; is
14 that correct?
15 A That is correct.
16 Q And that was the policy in 2004?
17 A We—we are not permitted to survey
18 federal waterways, those are federal waterways,
19 we're not allowed to survey federal waterways, the
20 Army Corps of Engineers surveys federal waterways.
21 We cannot willingly go out and survey federal
22 waterways.
23 Q What makes you think that you cant
24 survey federal waterways?
25 A We were told not to survey federal
Rankine 174
1 waterways. We were told during the ATHOS not to
2 survey federal waterways. We've been told in other
3 ports that's not our responsibility and we are not
4 to survey federal waterways, the federal government
5 surveys federal waterways.
6 Q All right. Let's just focus on the
7 Delaware River, Paulsboro facility.
8 A Okay.
9 Q Were you personally told by anyone,
10 at the U.S. Coast Guard or the Army Corps of
11 Engineers that prior to November 26, 2004, that you
12 could not survey the federal anchorage.
13 A I was not personally told because
14 it's an established fact that we're not allowed to
15 survey federal waterways, to I didn't ask the
16 question.
17 Q And did you think it's established
18 fact because you've – you've read that somewhere?
19 A I know its an established fact
20 because that's what I've been told by other people
21 within CITGO
22 Q What other people within CITGO told
23 you that before November 26, 2004?
24 A At one point in time, I believe it

127

25 came up in a discussion on the Lake Charles
Rankine 175
1 Calcasieu River
2 Q And who told you what?
3 A I believe it was the legal department
4 told us that we were not to survey federal waters
5 because we had a concern over depth of the
6 water.
7 Q And where was that?
8 A On the Calcasieu River.
9 MR. LEBANC:
10 Lake Charles.
11 THE WITNESS:
12 Lake Charles.
13 BY MR. LEVY:
14 Q And who in the legal department told
15 you what?
16 A I don't know. The subject came up
17 and I don't know who said it. It may have come at
18 one of our staff meetings, but I can't recall
19 exactly.
20 Q When you were port captain for the
21 Paulsboro facility of CITGO Petroleum or CIT – or
22 CARCO, did you believe at that time that you had no
23 right to conduct any type of survey in federal
24 waterways?
25 A That is correct.
Rankine 176
1 Q Was your belief at that time based
2 upon anything other than what somebody in the law
3 department may have told you?
4 MR. LEBANC:
5 Object to the form of the
6 question. It's not properly stating
7 what he previously testified to.
8 BY MR. LEVY:
9 Q You may answer.
10 A Okay. Based on a conversation, as I
11 recall, there was a discussion as to whether we
12 could legally, without the permission of the Army
13 Corps of Engineers or the Coast Guard, survey a
14 federal channel. I don't know who said it, I don't
15 know when it took place, but that was my
16 understanding at the time.
17 Q Well, now you—you said in your
18 answer there, doing it without permission, didn't
19 you?
20 A Yes.
21 Q Now, my question was: Did you think
22 you could not do it, so let me rephrase my
23 question.
24 In November—in 2004, before the
25 ATHOS 1 incident, did you believe that you needed
Rankine 177
1 permission to do any type of surveying in federal

128

2 waterways off the Paulsboro facility?
3 A If we had any responsibility for
4 surveying the federal waterways, then that subject
5 might have come up, but for Paulsboro, it never
6 came up here because I believed we could not do it
7 without any permission, but we wouldn't have asked
8 because it's not our responsibility.